No. 3:22-cv-02170-S

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

---

In the Matter of: Highland Capital Management, L.P.,

      Debtor.

---

NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P.,

      Appellants,

v.

Highland Capital Management, L.P.,

      Appellee.

---

### APPENDIX OF APPELLANTS NEXPOINT ADVISORS, L.P. AND HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.

---

*Appeal from the United States Bankruptcy Court for the*
*Northern District of Texas, Hon. Stacey G.C. Jernigan*

Davor Rukavina, Esq.
Tex. Bar No. 24030781
Julian P. Vasek, Esq.
Tex. Bar No. 24070790
**MUNSCH HARDT KOPF & HARR P.C.**
500 N. Akard St., Ste. 3800
Dallas, TX 75201
214-855-7500
drukavina@munsch.com
jvasek@munsch.com

**COUNSEL FOR APPELLANTS NEXPOINT
ADVISORS, L.P. AND HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.**

Appellants NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P. hereby submit their appendix under Fed. R. Bankr. P. 8018.

## CONTENTS

| Tab | Description | Record No. |
|-----|-------------|------------|
| 1 | Bankruptcy Docket | 000010 – 000027 |
| 2 | Debtor's Complaint | 000028 – 000115 |
| 3 | Advisors' Answer | 000116 – 000122 |
| 4 | Advisors' Administrative Expense Application | 000324 – 000335 |
| 5 | Debtor's Response to Admin. Expense Application | 000336 – 000354 |
| 6 | Judgment | 000004 – 000006 |
| 7 | Findings of Fact & Conclusions of Law | 000264 – 000323 |
| 8 | Notice of Appeal | 000001 – 000003 |
| 9 | Transcript Day 1, Part 1 (April 12, 2022) | 002905 – 003059 |
| 10 | Transcript Day 1, Part 2 (April 12, 2022) | 002482 – 002642 |
| 11 | Transcript Day 2, Part 1 (April 13, 2022) | 003060 – 003143 |
| 12 | Transcript Day 2, Part 2 (April 12, 2022) | 002643 – 002823 |
| 13 | Transcript Day 3 (April 27, 2022) | 002824 – 002904 |

RESPECTFULLY SUBMITTED this 12th day of January, 2023.

**MUNSCH HARDT KOPF & HARR P.C.**

/s/  By:  Davor Rukavina

Davor Rukavina, Esq.
Tex. Bar No. 24030781
Julian P. Vasek, Esq.
Tex. Bar No. 24070790
500 N. Akard St., Ste. 3800
Dallas, TX 75201
214-855-7500
drukavina@munsch.com
jvasek@munsch.com

**COUNSEL FOR APPELLANTS**


## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on January 12, 2023, a true and correct copy of the foregoing document (and all attachments) was served on the following recipients via the Court's CM/ECF system:

Case Admin Sup    txnb_appeals@txnb.uscourts.gov

Melissa S. Hayward    mhayward@haywardfirm.com, mholmes@haywardfirm.com

Stacey G.C. Jernigan    sgj_settings@txnb.uscourts.gov, anna_saucier@txnb.uscourts.gov

Zachery Z. Annable    zannable@haywardfirm.com, zannable@franklinhayward.com

/s/  Davor Rukavina

Davor Rukavina

# Tab 1

**U.S. Bankruptcy Court**
**Northern District of Texas (Dallas)**
**Adversary Proceeding #: 21−03010−sgj**

*Assigned to:* Chief Bankruptcy Jud Stacey G Jernigan          *Date Filed:* 02/17/21
*Lead BK Case:* 19−34054
*Lead BK Title:* Highland Capital Management, L.P.
*Lead BK Chapter:* 11
*Demand:*
  *Nature[s] of Suit:*  91 Declaratory judgment
                        02 Other (e.g. other actions that would have been brought in state court if unrelated to
                           bankruptcy)
                        72 Injunctive relief − other

*Plaintiff*
−−−−−−−−−−−−−−−−−−−−−−−
**Highland Capital Management, L.P.**          represented by **Zachery Z. Annable**
                                                Hayward PLLC
                                                10501 N. Central Expressway
                                                Suite 106
                                                Dallas, TX 75231
                                                (972) 755−7108
                                                Fax : (972) 755−7108
                                                Email: zannable@haywardfirm.com
                                                *LEAD ATTORNEY*

V.

*Defendant*
−−−−−−−−−−−−−−−−−−−−−−−
**Highland Capital Management Fund**          represented by **Thomas Daniel Berghman**
**Advisors, L.P.**                              Munsch Hardt Kopf & Harr PC
K&LGates LLP                                    500 N Akard Street, Suite 3800
c/o Stephen G. Topetzes                         Dallas, TX 75201−6659
1600 K Street, NW                               (214) 855−7554
Washington, DC 20006                            Fax : (214) 978−4346
                                                Email: tberghman@munsch.com

                                                **A. Lee Hogewood, III**
                                                K&L Gates LLP
                                                4350 Lassiter at North Hills Avenue
                                                Suite 300
                                                Raleigh, NC 27609
                                                (919) 743−7306
                                                Fax : (919) 516−2006
                                                Email: lee.hogewood@klgates.com

                                                **Davor Rukavina**
                                                Munsch, Hardt, Kopf & Harr
                                                500 N. Akard Street, Ste 3800
                                                Dallas, TX 75201−6659

(214)855−7587
Fax : 214−978−5359
Email: drukavina@munsch.com

**Julian Preston Vasek**
Munsch Hardt Kopf & Harr P.C.
500 N. Akard Street
Suite 3800
Dallas, TX 75201
214−855−7500
Fax : 214−855−7584
Email: jvasek@munsch.com

*Defendant*
—————————————————

**NexPoint Advisors, L.P.**
K&L Gates LLP
c/o Stephen G. Topetzes
1600 K Street, NW
Washington, DC 20006

represented by **Thomas Daniel Berghman**
(See above for address)

**A. Lee Hogewood, III**
(See above for address)

**Davor Rukavina**
(See above for address)

**Julian Preston Vasek**
(See above for address)

| Filing Date | Docket Text |
|---|---|
| 02/17/2021 | 1 Adversary case 21−03010. Complaint by Highland Capital Management, L.P. against Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P.. Fee Amount $350 (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I # 10 Exhibit J # 11 Adversary Cover Sheet). Nature(s) of suit: 91 (Declaratory judgment). 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). 72 (Injunctive relief − other). (Annable, Zachery) |
| 02/17/2021 | Receipt of filing fee for Complaint(21−03010−sgj) [cmp,cmp] ( 350.00). Receipt number 28496915, amount $ 350.00 (re: Doc# 1). (U.S. Treasury) |
| 02/17/2021 | 2 Motion to compel Adoption and Implementation of a Plan for the Transition of Services by February 28, 2021. *(Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021)* filed by Plaintiff Highland Capital Management, L.P. (Annable, Zachery) |
| 02/17/2021 | 3 Brief in support filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)2 Motion to compel Adoption and Implementation of a Plan for the Transition of Services by February 28, 2021. *(Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Service).* (Annable, Zachery) |
| 02/17/2021 | 4 Declaration re: *(Declaration of Mr. James P. Seery, Jr. in Support of Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021)* filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)2 Motion to compel Adoption and Implementation of a Plan for the Transition of Services by February 28, 2021. *(Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Service).* (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit |

| | |
|---|---|
| | *H # 9 Exhibit I # 10 Exhibit J)* (Annable, Zachery) |
| 02/17/2021 | 5 Motion for expedited hearing(related documents 2 Motion to compel) filed by Plaintiff Highland Capital Management, L.P. (Annable, Zachery) |
| 02/17/2021 | 6 Notice of hearing filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)2 Motion to compel filed by Plaintiff Highland Capital Management, L.P.). Hearing to be held on 2/23/2021 at 09:30 AM Dallas Judge Jernigan Ctrm for 2, (Annable, Zachery) |
| 02/18/2021 | 7 Summons issued on Highland Capital Management Fund Advisors, L.P. Answer Due 3/22/2021; NexPoint Advisors, L.P. Answer Due 3/22/2021 (Edmond, Michael) |
| 02/18/2021 | 8 Scheduling order setting deadlines. Discovery and all exhibits except impeachment documents: 45 days prior to Docket Call, pre−trial order: 7 calendar days prior to Docket Call, proposed findings of fact and conclusions of law: 7 days prior to first scheduled docket call (RE: related document(s)1 Complaint filed by Plaintiff Highland Capital Management, L.P.). Trial Docket Call date set for 7/12/2021 at 01:30 PM at Dallas Judge Jernigan Ctrm. Trial will be held during the week of 7/19/2021., Entered on 2/18/2021 (Edmond, Michael) |
| 02/18/2021 | 9 Notice of Appearance and Request for Notice by A. Lee Hogewood III filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P.. (Hogewood, A.) |
| 02/18/2021 | 10 Witness and Exhibit List filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)2 Motion to compel Adoption and Implementation of a Plan for the Transition of Services by February 28, 2021. *(Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Service). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16)* (Annable, Zachery) |
| 02/18/2021 | 11 Order granting motion for expedited hearing (Related Doc# 5)(document set for hearing: 2 Motion to compel) Hearing to be held on 2/23/2021 at 09:30 AM Dallas Judge Jernigan Ctrm for 2, Entered on 2/18/2021. (Okafor, M.) |
| 02/19/2021 | 12 Certificate of service re: *Documents Served on February 17, 2021* Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)1 Adversary case 21−03010. Complaint by Highland Capital Management, L.P. against Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P.. Fee Amount $350 (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I # 10 Exhibit J # 11 Adversary Cover Sheet). Nature(s) of suit: 91 (Declaratory judgment). 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). 72 (Injunctive relief − other). filed by Plaintiff Highland Capital Management, L.P., 2 Motion to compel Adoption and Implementation of a Plan for the Transition of Services by February 28, 2021. *(Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021)* filed by Plaintiff Highland Capital Management, L.P. filed by Plaintiff Highland Capital Management, L.P., 3 Brief in support filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)2 Motion to compel Adoption and Implementation of a Plan for the Transition of Services by February 28, 2021. *(Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Service). filed by Plaintiff Highland Capital Management, L.P., 4 Declaration re: (Declaration of Mr. James P. Seery, Jr. in Support of Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021) filed by Plaintiff Highland Capital* |

| | |
|---|---|
| | *Management, L.P. (RE: related document(s)* <u>2</u> *Motion to compel Adoption and Implementation of a Plan for the Transition of Services by February 28, 2021. (Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Service). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I # 10 Exhibit J) filed by Plaintiff Highland Capital Management, L.P.,* <u>5</u> *Motion for expedited hearing(related documents* <u>2</u> *Motion to compel) filed by Plaintiff Highland Capital Management, L.P. filed by Plaintiff Highland Capital Management, L.P.,* <u>6</u> *Notice of hearing filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)*<u>2</u> *Motion to compel filed by Plaintiff Highland Capital Management, L.P.). Hearing to be held on 2/23/2021 at 09:30 AM Dallas Judge Jernigan Ctrm for* <u>2</u>, *filed by Plaintiff Highland Capital Management, L.P.). (Kass, Albert)* |
| 02/20/2021 | <u>13</u> Amended Notice of hearing filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)<u>2</u> Motion to compel filed by Plaintiff Highland Capital Management, L.P.). Hearing to be held on 2/23/2021 at 09:00 AM Dallas Judge Jernigan Ctrm for <u>2</u>, (Annable, Zachery) |
| 02/20/2021 | <u>14</u> BNC certificate of mailing − PDF document. (RE: related document(s)<u>11</u> Order granting motion for expedited hearing (Related Doc<u>5</u>)(document set for hearing: <u>2</u> Motion to compel) Hearing to be held on 2/23/2021 at 09:30 AM Dallas Judge Jernigan Ctrm for <u>2</u>, Entered on 2/18/2021. (Okafor, M.)) No. of Notices: 1. Notice Date 02/20/2021. (Admin.) |
| 02/21/2021 | <u>15</u> Notice to take deposition of James P. Seery Jr. filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P.. (Vasek, Julian) |
| 02/21/2021 | <u>16</u> Notice to take deposition of Dustin Norris filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 02/21/2021 | <u>17</u> Notice to take deposition of James Dondero filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 02/21/2021 | <u>18</u> Witness and Exhibit List filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. (RE: related document(s)<u>2</u> Motion to compel Adoption and Implementation of a Plan for the Transition of Services by February 28, 2021. *(Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Service). (Attachments: #* <u>1</u> *Exhibit A #* <u>2</u> *Exhibit B #* <u>3</u> *Exhibit C #* <u>4</u> *Exhibit D #* <u>5</u> *Exhibit E #* <u>6</u> *Exhibit F #* <u>7</u> *Exhibit G #* <u>8</u> *Exhibit H #* <u>9</u> *Exhibit I #* <u>10</u> *Exhibit J #* <u>11</u> *Exhibit K #* <u>12</u> *Exhibit L #* <u>13</u> *Exhibit M #* <u>14</u> *Exhibit N)* (Vasek, Julian) |
| 02/22/2021 | <u>19</u> Amended Witness and Exhibit List filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)<u>10</u> List (witness/exhibit/generic)). (Attachments: # <u>1</u> Exhibit 17 # <u>2</u> Exhibit 18 # <u>3</u> Exhibit 19 # <u>4</u> Exhibit 20 # <u>5</u> Exhibit 21) (Annable, Zachery) |
| 02/22/2021 | <u>20</u> Objection to (related document(s): <u>2</u> Motion to compel Adoption and Implementation of a Plan for the Transition of Services by February 28, 2021. *(Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Service filed by Plaintiff Highland Capital Management, L.P.) filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P.. (Rukavina, Davor)* |
| 02/23/2021 | <u>21</u> Request for transcript regarding a hearing held on 2/23/2021. The requested turn−around time is hourly. (Edmond, Michael) |
| 02/23/2021 | <u>22</u> Certificate of service re: *1) Debtor's Witness and Exhibit List with Respect to Evidentiary Hearing to be Held on February 23, 2021; and 2) Order Granting Debtor's Motion for Expedited Hearing on it's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Implement a Plan for the Transition of Services by February 28,* |

000013

|  |  |
|---|---|
|  | *2021* Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)10 Witness and Exhibit List filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)2 Motion to compel Adoption and Implementation of a Plan for the Transition of Services by February 28, 2021. *(Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Service). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16) filed by Plaintiff Highland Capital Management, L.P.,* 11 Order granting motion for expedited hearing (Related Doc5)(document set for hearing: 2 Motion to compel) Hearing to be held on 2/23/2021 at 09:30 AM Dallas Judge Jernigan Ctrm for 2, Entered on 2/18/2021. (Okafor, M.)). (Kass, Albert) |
| 02/23/2021 | 23 Hearing held on 2/23/2021. (RE: related document(s)2 Motion to compel Adoption and Implementation of a Plan for the Transition of Services by February 28, 2021, (Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021) filed by Plaintiff Highland Capital Management, L.P. filed by Plaintiff Highland Capital Management, L.P.) (Appearances: J. Morris and J. Pomeranz for Debtor; L. Hogewood and D. Rukavina for Advisors; J. Wilson and B. Assink for J. Dondero; M. Clemente for UCC. Evidentiary hearing. Motion moot, as a result of evidence and findings that court made on the record. Mr. Morris to upload an order consistent with the courts ruling.) (Edmond, Michael) (Entered: 02/24/2021) |
| 02/23/2021 | 27 Court admitted exhibits date of hearing February 23, 2021 (RE: related document(s)2 Motion to compel Adoption and Implementation of a Plan for the Transition of Services by February 28, 2021. (Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021) filed by Plaintiff Highland Capital Management, L.P.) (COURT ADMITTED PLAINTIFF'S EXHIBIT'S #1 THROUGH #21 ADMITTED BY JOHN MORRIS THAT APPEAR AT DOC. #10 & #19 AND DEFENDANT EXHIBIT'S #A THROUGH #N THAT APPEAR AT DOC. #18 & EXHIBIT #0 (TO BE SUPPLEMENTED IN) BY DAVOR RUKAVINA) (Edmond, Michael) (Entered: 02/25/2021) |
| 02/24/2021 | 24 Support/supplemental document*Letter to Court Regarding Proposed Order* filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. (RE: related document(s) 23 Hearing held). (Rukavina, Davor) |
| 02/24/2021 | 25 Order dismissing motion to compel as moot. (related document # 2) Entered on 2/24/2021. (Bradden, T.) |
| 02/25/2021 | 26 Transcript regarding Hearing Held 02/23/2021 (239 pgs.) RE: Motion for Mandatory Injunction. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 05/26/2021. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972−786−3063. (RE: related document(s) 23 Hearing held on 2/23/2021. (RE: related document(s)2 Motion to compel Adoption and Implementation of a Plan for the Transition of Services by February 28, 2021, (Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021) filed by Plaintiff Highland Capital Management, L.P. filed by Plaintiff Highland Capital Management, L.P.) (Appearances: J. Morris and J. Pomeranz for Debtor; L. Hogewood and D. Rukavina for Advisors; J. Wilson and B. Assink for J. Dondero; M. Clemente for UCC. Evidentiary hearing. Motion moot, as a result of evidence and findings that court made on the record. Mr. Morris to upload an order consistent with the courts ruling.)). Transcript to be made available to the public on 05/26/2021. (Rehling, Kathy) |
| 02/25/2021 |  |

| | |
|---|---|
| | 28 Certificate of service re: *Documents Served on or Before February 23, 2021* Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)13 Amended Notice of hearing filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)2 Motion to compel filed by Plaintiff Highland Capital Management, L.P.). Hearing to be held on 2/23/2021 at 09:00 AM Dallas Judge Jernigan Ctrm for 2, filed by Plaintiff Highland Capital Management, L.P., 16 Notice to take deposition of Dustin Norris filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P., 17 Notice to take deposition of James Dondero filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P., 19 Amended Witness and Exhibit List filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)10 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 17 # 2 Exhibit 18 # 3 Exhibit 19 # 4 Exhibit 20 # 5 Exhibit 21) filed by Plaintiff Highland Capital Management, L.P.). (Kass, Albert) |
| 02/27/2021 | 29 BNC certificate of mailing − PDF document. (RE: related document(s)25 Order dismissing motion to compel as moot. (related document 2) Entered on 2/24/2021. (Bradden, T.)) No. of Notices: 1. Notice Date 02/27/2021. (Admin.) |
| 03/01/2021 | 30 Certificate of service re: *Order* Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)25 Order dismissing motion to compel as moot. (related document 2) Entered on 2/24/2021. (Bradden, T.)). (Kass, Albert) |
| 03/10/2021 | 31 Notice of Appearance and Request for Notice by Paige Holden Montgomery filed by Interested Party Committee of Unsecured Creditors. (Montgomery, Paige) |
| 03/10/2021 | 32 Notice of Appearance and Request for Notice by Juliana Hoffman filed by Interested Party Committee of Unsecured Creditors. (Hoffman, Juliana) |
| 03/22/2021 | 33 Answer to complaint filed by Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P.. (Rukavina, Davor) |
| 07/12/2021 | 34 Hearing held on 7/12/2021. (RE: related document(s)1 Adversary case 21−03010. Complaint by Highland Capital Management, L.P. against Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Nature(s) of suit: 91 (Declaratory judgment). 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). 72 (Injunctive relief − other). filed by Plaintiff Highland Capital Management, L.P.) (Appearances: D. Rukavina. Nonevidentiary TDC. Matter is being consolidated with Defendants trial in September on its asserted administrative claims. Counsel should submit an agreed order to this effect.) (Edmond, Michael) (Entered: 07/13/2021) |
| 07/14/2021 | 35 PDF with attached Audio File. Court Date & Time [07/12/2021 01:37:35 PM]. File Size [ 1287 KB ]. Run Time [ 00:05:29 ]. (admin). |
| 08/04/2021 | 36 Stipulation by Highland Capital Management, L.P. and Highland Capital Management Fund Advisors, L.P., and NexPoint Advisors, L.P.. filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)8 Standing scheduling order in an adversary proceeding). (Annable, Zachery) |
| 08/06/2021 | 37 Order approving stipulation (A) amending schedule and (B) consolidating and resolving certain matters (RE: related document(s)2607 Stipulation filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 36 Stipulation and 1 Complaint filed by Plaintiff Highland Capital Management, L.P.). Trial date set for 12/7/2021 at 09:30 AM at Dallas Judge Jernigan Ctrm. Entered on 8/6/2021 (Okafor, M.) |
| 08/06/2021 | 38 Certificate of service re: *Stipulation (A) Amending Scheduling Order and (B) Consolidating and Resolving Certain Matters* Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)36 Stipulation by Highland Capital Management, |

| | |
|---|---|
| | L.P. and Highland Capital Management Fund Advisors, L.P., and NexPoint Advisors, L.P.. filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)8 Standing scheduling order in an adversary proceeding). filed by Plaintiff Highland Capital Management, L.P.). (Kass, Albert) |
| 08/08/2021 | 39 BNC certificate of mailing − PDF document. (RE: related document(s)37 Order approving stipulation (A) amending schedule and (B) consolidating and resolving certain matters (RE: related document(s)2607 Stipulation filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 36 Stipulation and 1 Complaint filed by Plaintiff Highland Capital Management, L.P.). Trial date set for 12/7/2021 at 09:30 AM at Dallas Judge Jernigan Ctrm. Entered on 8/6/2021 (Okafor, M.)) No. of Notices: 1. Notice Date 08/08/2021. (Admin.) |
| 08/11/2021 | 40 Certificate of service re: *Order Approving Stipulation (A) Amending Scheduling Order and (B) Consolidating and Resolving Certain Matters* Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)37 Order approving stipulation (A) amending schedule and (B) consolidating and resolving certain matters (RE: related document(s)2607 Stipulation filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 36 Stipulation and 1 Complaint filed by Plaintiff Highland Capital Management, L.P.). Trial date set for 12/7/2021 at 09:30 AM at Dallas Judge Jernigan Ctrm. Entered on 8/6/2021 (Okafor, M.)). (Kass, Albert) |
| 10/05/2021 | 41 Notice to take deposition of Highland Capital Management Fund Advisors, L.P. filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 10/11/2021 | 42 Certificate of service re: Highlands Notice of Rule 30(b)(6) Deposition to Highland Capital Management Fund Advisors, L.P. Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)41 Notice to take deposition of Highland Capital Management Fund Advisors, L.P. filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P.). (Kass, Albert) |
| 11/01/2021 | 43 Notice *of Reservation of Rights Regarding Application for Allowance of Administrative Expense Claim* filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P.. (Vasek, Julian) |
| 12/09/2021 | 44 Notice of Trial hearing filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P.. Trial date set for 2/8/2022 at 09:30 AM at at https://us−courts.webex.com/meet/jerniga. (Vasek, Julian) |
| 12/15/2021 | 45 Stipulation by Highland Capital Management, L.P. and Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P.. filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)37 Order to set hearing). (Annable, Zachery) |
| 12/17/2021 | 46 Order approving stipulation regarding second amended scheduling order (RE: related document(s)1 Complaint filed by Plaintiff Highland Capital Management, L.P., 45 Stipulation filed by Plaintiff Highland Capital Management, L.P.). Trial Docket Call date set for 2/8−9/2022 at 09:30 AM Dallas Judge Jernigan Ctrm. Entered on 12/17/2021 (Okafor, Marcey) |
| 12/19/2021 | 47 BNC certificate of mailing − PDF document. (RE: related document(s)46 Order approving stipulation regarding second amended scheduling order (RE: related document(s)1 Complaint filed by Plaintiff Highland Capital Management, L.P., 45 Stipulation filed by Plaintiff Highland Capital Management, L.P.). Trial Docket Call date set for 2/8−9/2022 at 09:30 AM Dallas Judge Jernigan Ctrm. Entered on 12/17/2021) No. of Notices: 2. Notice Date 12/19/2021. (Admin.) |
| 12/20/2021 | 48 Certificate of service re: Stipulation Regarding Second Amended Scheduling Order Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)45 Stipulation by Highland Capital Management, L.P. and Highland Capital Management |

| | |
|---|---|
| | Fund Advisors, L.P. and NexPoint Advisors, L.P.. filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)37 Order to set hearing). filed by Plaintiff Highland Capital Management, L.P.). (Kass, Albert) |
| 12/22/2021 | 49 Reply to Debtors Objection to Application for Administrative Claim of Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P.. (Vasek, Julian) Modified text on 12/23/2021 (Okafor, Marcey). |
| 12/22/2021 | 50 Certificate of service re: Order Approving Stipulation Regarding Second Amended Scheduling Order Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)46 Order approving stipulation regarding second amended scheduling order (RE: related document(s)1 Complaint filed by Plaintiff Highland Capital Management, L.P., 45 Stipulation filed by Plaintiff Highland Capital Management, L.P.). Trial Docket Call date set for 2/8−9/2022 at 09:30 AM Dallas Judge Jernigan Ctrm. Entered on 12/17/2021). (Kass, Albert) |
| 12/27/2021 | 51 Subpoena on Frank Waterhouse filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 12/28/2021 | 52 Certificate of service re: Plaintiff's Notice of Service of a Subpoena to Frank Waterhouse Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)51 Subpoena on Frank Waterhouse filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P.). (Kass, Albert) |
| 01/04/2022 | 53 Notice to take deposition of Highland Capital Management Fund Advisors, L.P. filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 01/04/2022 | 54 Notice to take deposition of NexPoint Advisors, L.P. filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 01/04/2022 | 55 Notice to take deposition of Dustin Norris filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 01/05/2022 | 56 Response opposed to (related document(s): 49 Notice (generic) filed by Defendant Highland Capital Management Fund Advisors, L.P., Defendant NexPoint Advisors, L.P.) filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 01/06/2022 | 57 Certificate of service re: 1) Highland's Amended Notice of Rule 30(b)(6) Deposition to (A) Highland Capital Management Fund Advisors, L.P. and (B) NexPoint Advisors, L.P.; 2) Highland's Amended Notice of Rule 30(b)(6) Deposition to (A) Highland Capital Management Fund Advisors, L.P. and (B) NexPoint Advisors, L.P.; and 3) Highland's Notice of Deposition to Dustin Norris Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)53 Notice to take deposition of Highland Capital Management Fund Advisors, L.P. filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P., 54 Notice to take deposition of NexPoint Advisors, L.P. filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P., 55 Notice to take deposition of Dustin Norris filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P.). (Kass, Albert) |
| 01/07/2022 | 58 Certificate of service re: Highland Capital Management, L.P.'s Reply in Further Support of Debtor's Objection to Application for Administrative Claims of Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)56 Response opposed to (related document(s): 49 Notice (generic) filed by Defendant Highland Capital Management Fund Advisors, L.P., Defendant NexPoint Advisors, L.P.) filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P.). (Kass, Albert) |

| | |
|---|---|
| 01/31/2022 | <u>59</u> Joint Motion to continue hearing on (related documents <u>1</u> Complaint, <u>45</u> Stipulation) filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Plaintiff Highland Capital Management, L.P. (Attachments: # <u>1</u> Proposed Order) (Rukavina, Davor) |
| 02/01/2022 | <u>60</u> Agreed Amended Scheduling Order granting motion to continue trial (related document # <u>59</u>) (related documents Complaint, Stipulation) Trial date set for 4/12/2022 at 09:30 AM at Dallas Judge Jernigan Ctrm. Entered on 2/1/2022. (Okafor, Marcey) |
| 02/03/2022 | <u>61</u> BNC certificate of mailing − PDF document. (RE: related document(s)<u>60</u> Agreed Amended Scheduling Order granting motion to continue trial (related document <u>59</u>) (related documents Complaint, Stipulation) Trial date set for 4/12/2022 at 09:30 AM at Dallas Judge Jernigan Ctrm. Entered on 2/1/2022.) No. of Notices: 2. Notice Date 02/03/2022. (Admin.) |
| 02/04/2022 | <u>62</u> Certificate of service re: Agreed Amended Scheduling Order Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)<u>60</u> Agreed Amended Scheduling Order granting motion to continue trial (related document <u>59</u>) (related documents Complaint, Stipulation) Trial date set for 4/12/2022 at 09:30 AM at Dallas Judge Jernigan Ctrm. Entered on 2/1/2022.). (Kass, Albert) |
| 02/26/2022 | <u>63</u> Notice to take deposition of Dustin Norris filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 02/26/2022 | <u>64</u> Notice to take deposition of Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 02/26/2022 | <u>65</u> Notice to take deposition of Dennis J. Sauter, Jr. filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 03/02/2022 | <u>66</u> Subpoena on Frank Waterhouse filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 03/03/2022 | <u>67</u> Certificate of service re: 1) Highland's Amended Notice of Deposition to Dustin Norris; 2) Highland's Second Amended Notice of Rule 30(b)(6) Deposition to (A) Highland Capital Management Fund Advisors, L.P. and (B) NexPoint Advisors, L.P.; and 3) Highland's Amended Notice of Deposition to Dennis J. Sauter, Jr. Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)<u>63</u> Notice to take deposition of Dustin Norris filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P., <u>64</u> Notice to take deposition of Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P., <u>65</u> Notice to take deposition of Dennis J. Sauter, Jr. filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P.). (Kass, Albert) |
| 03/07/2022 | <u>68</u> Certificate of service re: Plaintiff's Amended Notice of Service of a Subpoena to Frank Waterhouse Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)<u>66</u> Subpoena on Frank Waterhouse filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P.). (Kass, Albert) |
| 03/15/2022 | <u>69</u> Subpoena on Frank Waterhouse filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 03/15/2022 | <u>70</u> Subpoena on Highland Capital Management Fund Advisors, L.P. filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 03/15/2022 | |

| | |
|---|---|
| | <u>71</u> Subpoena on NexPoint Advisors, L.P. filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 03/16/2022 | <u>72</u> Certificate of service re: 1) Plaintiffs Second Amended Notice of Service of a Subpoena to Frank Waterhouse; 2) Plaintiff's Notice of Service of Trial Subpoena to Highland Capital Management Fund Advisors, L.P.; and 3) Plaintiff's Notice of Service of Trial Subpoena to NexPoint Advisors, L.P. Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)<u>69</u> Subpoena on Frank Waterhouse filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P., <u>70</u> Subpoena on Highland Capital Management Fund Advisors, L.P. filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P., <u>71</u> Subpoena on NexPoint Advisors, L.P. filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P.). (Kass, Albert) |
| 03/22/2022 | <u>73</u> Subpoena on Frank Waterhouse filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 03/24/2022 | <u>74</u> Certificate of service re: Plaintiffs Third Amended Notice of Service of a Subpoena to Frank Waterhouse Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)<u>73</u> Subpoena on Frank Waterhouse filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P.). (Kass, Albert) |
| 04/01/2022 | <u>75</u> Subpoena on NexPoint Advisors, L.P. filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/01/2022 | <u>76</u> Subpoena on Highland Capital Management Fund Advisors, L.P. filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/01/2022 | <u>77</u> Subpoena on James Dondero filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/01/2022 | <u>78</u> Subpoena on Dustin Norris filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/01/2022 | <u>79</u> Subpoena on The Retail Board filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/01/2022 | <u>80</u> (REDACTED EXHIBITS ADDED 04/18/2022); Witness and Exhibit List *(Reorganized Debtor's Witness and Exhibit List with Respect to Trial to Be Held on April 12−13, 2022)* filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)<u>1</u> Complaint). (Attachments: # <u>1</u> Exhibit 1 # <u>2</u> Exhibit 2 # <u>3</u> Exhibit 3 # <u>4</u> Exhibit 4 # <u>5</u> Exhibit 5 # <u>6</u> Exhibit 6 # <u>7</u> Exhibit 7 # <u>8</u> Exhibit 8 # <u>9</u> Exhibit 9 # <u>10</u> Exhibit 10 # <u>11</u> Exhibit 11 # <u>12</u> Exhibit 12 # <u>13</u> Exhibit 13 # <u>14</u> Exhibit 14 # <u>15</u> Exhibit 15 # <u>16</u> Exhibit 16 # <u>17</u> Exhibit 17 # <u>18</u> Exhibit 18 # <u>19</u> Exhibit 19 # <u>20</u> Exhibit 20 # <u>21</u> Exhibit 21 # <u>22</u> Exhibit 22 # <u>23</u> Exhibit 23 # <u>24</u> Exhibit 24 # <u>25</u> Exhibit 25 # <u>26</u> Exhibit 26 # <u>27</u> Exhibit 27 # <u>28</u> Exhibit 28 # <u>29</u> Exhibit 29 # <u>30</u> Exhibit 30 # <u>31</u> Exhibit 31 # <u>32</u> Exhibit 32 # <u>33</u> Exhibit 33 # <u>34</u> Exhibit 34 # <u>35</u> Exhibit 35 # <u>36</u> Exhibit 36 # <u>37</u> Exhibit 37 # <u>38</u> Exhibit 38 # <u>39</u> Exhibit 39 # <u>40</u> Exhibit 40 # <u>41</u> Exhibit 41 # <u>42</u> Exhibit 42 # <u>43</u> Exhibit 43 # <u>44</u> Exhibit 44 # <u>45</u> Exhibit 45 # <u>46</u> Exhibit 46 # <u>47</u> Exhibit 47 # <u>48</u> Exhibit 48 # <u>49</u> Exhibit 49 # <u>50</u> Exhibit 50 # <u>51</u> Exhibit 51 # <u>52</u> Exhibit 52 # <u>53</u> Exhibit 53 # <u>54</u> Exhibit 54 # <u>55</u> Exhibit 55 # <u>56</u> Exhibit 56 # <u>57</u> Exhibit 57 # <u>58</u> Exhibit 58 # <u>59</u> Exhibit 59 # <u>60</u> Exhibit 60 # <u>61</u> Exhibit 61 # <u>62</u> Exhibit 62 # <u>63</u> Exhibit 63 # <u>64</u> Exhibit 64 # <u>65</u> Exhibit 65 # <u>66</u> Exhibit 66 # <u>67</u> Exhibit 67 # <u>68</u> Exhibit 68 # <u>69</u> Exhibit 69 # <u>70</u> Exhibit 70 # <u>71</u> Exhibit 71 # <u>72</u> Exhibit 72 # <u>73</u> Exhibit 73 # <u>74</u> Exhibit 74 # <u>75</u> Exhibit 75 # <u>76</u> Exhibit 76 # <u>77</u> Exhibit 77 # <u>78</u> Exhibit 78 # <u>79</u> Exhibit 79 # <u>80</u> Exhibit 80 # <u>81</u> Exhibit 81 # <u>82</u> Exhibit 82 # <u>83</u> Exhibit 83 # <u>84</u> Exhibit 84 # <u>85</u> Exhibit 85 # <u>86</u> Exhibit 86 # <u>87</u> Exhibit 87 # <u>88</u> Exhibit 88 # <u>89</u> Exhibit 89 # <u>90</u> Exhibit 90 # <u>91</u> Exhibit 91 # <u>92</u> Exhibit 92 # <u>93</u> Exhibit 93 # <u>94</u> Exhibit 94 # <u>95</u> Exhibit 95 # <u>96</u> Exhibit 96 # <u>97</u> Exhibit 97 # <u>98</u> Exhibit 98 # <u>99</u> Exhibit 99 # <u>100</u> Exhibit 100 # <u>101</u> Exhibit 101 # <u>102</u> Exhibit 102 # <u>103</u> Exhibit 103 # |

| | |
|---|---|
| | 104 Exhibit 104 # 105 Exhibit 105 # 106 Exhibit 106 # 107 Exhibit 107 # 108 Exhibit 108 # 109 Exhibit 109 # 110 Exhibit 110 # 111 Exhibit 111 # 112 Exhibit 112 # 113 Exhibit 113 # 114 Exhibit 114 # 115 Exhibit 115 # 116 Exhibit 116 # 117 Exhibit 117 # 118 Exhibit 118 # 119 Exhibit 119 # 120 Exhibit 120 # 121 Exhibit 121 # 122 Exhibit 122 # 123 Exhibit 123 # 124 Exhibit 124 # 125 Exhibit 125 # 126 Exhibit 126 # 127 Exhibit 127 # 128 Exhibit 128 # 129 Exhibit 129 # 130 Exhibit 130 # 131 Exhibit 131 # 132 Exhibit 132 # 133 Exhibit 133 # 134 Exhibit 134 # 135 Exhibit 135 # 136 Exhibit 136 # 137 Exhibit 137 # 138 Exhibit 138 # 139 Exhibit 139 # 140 Exhibit 140 # 141 Exhibit 141 # 142 Exhibit 142 # 143 Exhibit 143 # 144 Exhibit 144 # 145 Exhibit 145 # 146 Exhibit 146 # 147 Exhibit 147 # 148 Exhibit 148 # 149 Exhibit 149 # 150 Exhibit 150 # 151 Exhibit 151 # 152 Exhibit 152 # 153 Exhibit 153 # 154 Exhibit 154 # 155 Exhibit 155 # 156 Exhibit 156 # 157 Exhibit 157 # 158 Exhibit 158 # 159 Exhibit 159) (Annable, Zachery) Additional attachment(s) added on 4/18/2022 (Okafor, Marcey). |
| 04/01/2022 | 81 Witness and Exhibit List / *Advisors' Trial Witness and Exhibit List* filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. (RE: related document(s)1 Complaint). (Berghman, Thomas) |
| 04/05/2022 | 82 Objection to (related document(s): 80 List (witness/exhibit/generic) filed by Plaintiff Highland Capital Management, L.P.) filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P.. (Berghman, Thomas) |
| 04/05/2022 | 83 Objection to (related document(s): 81 List (witness/exhibit/generic) filed by Defendant Highland Capital Management Fund Advisors, L.P., Defendant NexPoint Advisors, L.P.)*(Reorganized Debtor's Objections to Advisors' Trial Witness and Exhibit List)* filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/06/2022 | 84 Certificate of service re: Subpoena to Appear and Testify at a Hearing or Trial in a Bankruptcy Case (or Adversary Proceeding) *(Affidavit of Service)* filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)78 Subpoena). (Annable, Zachery) |
| 04/06/2022 | 85 Certificate of service re: Subpoena to Appear and Testify at a Hearing or Trial in a Bankruptcy Case (or Adversary Proceeding) *(Affidavit of Service)* filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)77 Subpoena). (Annable, Zachery) |
| 04/06/2022 | 86 Certificate of service re: Subpoena to Appear and Testify at a Hearing or Trial in a Bankruptcy Case (or Adversary Proceeding) *(Affidavit of Service)* filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)76 Subpoena). (Annable, Zachery) |
| 04/06/2022 | 87 Certificate of service re: Subpoena to Appear and Testify at a Hearing or Trial in a Bankruptcy Case (or Adversary Proceeding) *(Affidavit of Service)* filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)76 Subpoena). (Annable, Zachery) |
| 04/06/2022 | 88 Certificate of service re: Subpoena to Appear and Testify at a Hearing or Trial in a Bankruptcy Case (or Adversary Proceeding) *(Affidavit of Service)* filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)75 Subpoena). (Annable, Zachery) |
| 04/06/2022 | 89 Certificate of service re: Subpoena to Appear and Testify at a Hearing or Trial in a Bankruptcy Case (or Adversary Proceeding) *(Affidavit of Service)* filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)75 Subpoena). (Annable, Zachery) |
| 04/06/2022 | 90 Brief in opposition filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. (RE: related document(s)1 Complaint). (Rukavina, Davor) |

| | |
|---|---|
| 04/06/2022 | <u>91</u> Proposed findings of fact and conclusions of law filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)<u>1</u> Complaint). (Annable, Zachery) |
| 04/06/2022 | <u>92</u> Proposed pre−trial order filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/07/2022 | <u>93</u> Certificate of service re: Documents Served on April 1, 2022 Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)<u>75</u> Subpoena on NexPoint Advisors, L.P. filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P., <u>76</u> Subpoena on Highland Capital Management Fund Advisors, L.P. filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P., <u>77</u> Subpoena on James Dondero filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P., <u>78</u> Subpoena on Dustin Norris filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P., <u>79</u> Subpoena on The Retail Board filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P., <u>80</u> Witness and Exhibit List *(Reorganized Debtor's Witness and Exhibit List with Respect to Trial to Be Held on April 12−13, 2022)* filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)<u>1</u> Complaint). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34 # 35 Exhibit 35 # 36 Exhibit 36 # 37 Exhibit 37 # 38 Exhibit 38 # 39 Exhibit 39 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42 # 43 Exhibit 43 # 44 Exhibit 44 # 45 Exhibit 45 # 46 Exhibit 46 # 47 Exhibit 47 # 48 Exhibit 48 # 49 Exhibit 49 # 50 Exhibit 50 # 51 Exhibit 51 # 52 Exhibit 52 # 53 Exhibit 53 # 54 Exhibit 54 # 55 Exhibit 55 # 56 Exhibit 56 # 57 Exhibit 57 # 58 Exhibit 58 # 59 Exhibit 59 # 60 Exhibit 60 # 61 Exhibit 61 # 62 Exhibit 62 # 63 Exhibit 63 # 64 Exhibit 64 # 65 Exhibit 65 # 66 Exhibit 66 # 67 Exhibit 67 # 68 Exhibit 68 # 69 Exhibit 69 # 70 Exhibit 70 # 71 Exhibit 71 # 72 Exhibit 72 # 73 Exhibit 73 # 74 Exhibit 74 # 75 Exhibit 75 # 76 Exhibit 76 # 77 Exhibit 77 # 78 Exhibit 78 # 79 Exhibit 79 # 80 Exhibit 80 # 81 Exhibit 81 # 82 Exhibit 82 # 83 Exhibit 83 # 84 Exhibit 84 # 85 Exhibit 85 # 86 Exhibit 86 # 87 Exhibit 87 # 88 Exhibit 88 # 89 Exhibit 89 # 90 Exhibit 90 # 91 Exhibit 91 # 92 Exhibit 92 # 93 Exhibit 93 # 94 Exhibit 94 # 95 Exhibit 95 # 96 Exhibit 96 # 97 Exhibit 97 # 98 Exhibit 98 # 99 Exhibit 99 # 100 Exhibit 100 # 101 Exhibit 101 # 102 Exhibit 102 # 103 Exhibit 103 # 104 Exhibit 104 # 105 Exhibit 105 # 106 Exhibit 106 # 107 Exhibit 107 # 108 Exhibit 108 # 109 Exhibit 109 # 110 Exhibit 110 # 111 Exhibit 111 # 112 Exhibit 112 # 113 Exhibit 113 # 114 Exhibit 114 # 115 Exhibit 115 # 116 Exhibit 116 # 117 Exhibit 117 # 118 Exhibit 118 # 119 Exhibit 119 # 120 Exhibit 120 # 121 Exhibit 121 # 122 Exhibit 122 # 123 Exhibit 123 # 124 Exhibit 124 # 125 Exhibit 125 # 126 Exhibit 126 # 127 Exhibit 127 # 128 Exhibit 128 # 129 Exhibit 129 # 130 Exhibit 130 # 131 Exhibit 131 # 132 Exhibit 132 # 133 Exhibit 133 # 134 Exhibit 134 # 135 Exhibit 135 # 136 Exhibit 136 # 137 Exhibit 137 # 138 Exhibit 138 # 139 Exhibit 139 # 140 Exhibit 140 # 141 Exhibit 141 # 142 Exhibit 142 # 143 Exhibit 143 # 144 Exhibit 144 # 145 Exhibit 145 # 146 Exhibit 146 # 147 Exhibit 147 # 148 Exhibit 148 # 149 Exhibit 149 # 150 Exhibit 150 # 151 Exhibit 151 # 152 Exhibit 152 # 153 Exhibit 153 # 154 Exhibit 154 # 155 Exhibit 155 # 156 Exhibit 156 # 157 Exhibit 157 # 158 Exhibit 158 # 159 Exhibit 159) filed by Plaintiff Highland Capital Management, L.P.). (Kass, Albert) |
| 04/07/2022 | <u>94</u> Certificate of service re: Reorganized Debtor's Objections to Advisors' Trial Witness and Exhibit List Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)<u>83</u> Objection to (related document(s): <u>81</u> List (witness/exhibit/generic) filed by Defendant Highland Capital Management Fund Advisors, L.P., Defendant NexPoint Advisors, L.P.)*(Reorganized Debtor's Objections to Advisors' Trial Witness and Exhibit List)* filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P.). (Kass, Albert) |

| | |
|---|---|
| 04/08/2022 | <u>95</u> Subpoena on Frank Waterhouse filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/08/2022 | <u>96</u> Joint Pre−Trial order (RE: related document(s)<u>1</u> Complaint filed by Plaintiff Highland Capital Management, L.P.). Entered on 4/8/2022 (Okafor, Marcey) |
| 04/08/2022 | <u>97</u> Motion to redact/restrict Emergency Redact (related document(s):<u>80</u>) (Fee Amount $26) filed by Plaintiff Highland Capital Management, L.P. (Attachments: # <u>1</u> Exhibit 31 (Redacted) # <u>2</u> Exhibit 32 (Redacted) # <u>3</u> Exhibit 34 (Redacted) # <u>4</u> Exhibit 36 (Redacted) # <u>5</u> Exhibit 37 (Redacted) # <u>6</u> Exhibit 38 (Redacted) # <u>7</u> Exhibit 39 (Redacted) # <u>8</u> Exhibit 40 (Redacted) # <u>9</u> Exhibit 49 (Redacted) # <u>10</u> Exhibit 76 (Redacted) # <u>11</u> Exhibit 86 (Redacted) # <u>12</u> Exhibit 142 (Redacted)) (Annable, Zachery) |
| 04/08/2022 | Receipt of filing fee for Motion to Redact/Restrict From Public View( 21−03010−sgj) [motion,mredact] ( 26.00). Receipt number A29454882, amount $ 26.00 (re: Doc# <u>97</u>). (U.S. Treasury) |
| 04/08/2022 | <u>98</u> Support/supplemental document − *OBJECTIONS TO TRIAL SUBPOENAS DUCES TECUM* filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. (RE: related document(s)<u>75</u> Subpoena, <u>76</u> Subpoena). (Berghman, Thomas) |
| 04/08/2022 | <u>99</u> Certificate of service re: re 1) Highland's Proposed Findings of Fact and Conclusions of Law; and 2) Joint Pretrial Order Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)<u>91</u> Proposed findings of fact and conclusions of law filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)<u>1</u> Complaint). filed by Plaintiff Highland Capital Management, L.P., <u>92</u> Proposed pre−trial order filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P.). (Kass, Albert) |
| 04/10/2022 | <u>100</u> BNC certificate of mailing − PDF document. (RE: related document(s)<u>96</u> Joint Pre−Trial order (RE: related document(s)<u>1</u> Complaint filed by Plaintiff Highland Capital Management, L.P.). Entered on 4/8/2022) No. of Notices: 2. Notice Date 04/10/2022. (Admin.) |
| 04/11/2022 | <u>101</u> Objection to (related document(s): <u>98</u> Support/supplemental document filed by Defendant Highland Capital Management Fund Advisors, L.P., Defendant NexPoint Advisors, L.P.)*(Highland's Response to Objections to Trial Subpoenas Duces Tecum)* filed by Plaintiff Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/11/2022 | <u>102</u> Declaration re: *(Declaration of John A. Morris in Support of Highland's Response to Objections to Trial Subpoenas Duces Tecum)* filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)<u>101</u> Objection). (Attachments: # <u>1</u> Exhibit 1 # <u>2</u> Exhibit 2 # <u>3</u> Exhibit 3 # <u>4</u> Exhibit 4 # <u>5</u> Exhibit 5) (Annable, Zachery) |
| 04/12/2022 | <u>103</u> Certificate of service re: 1) Plaintiff's Notice of Service of a Trial Subpoena to Frank Waterhouse ; 2) Joint Pretrial Order; and 3) Reorganized Debtor's Emergency Motion to Redact Certain Exhibits Attached to Reorganized Debtor's Witness and Exhibit List with Respect to Trial to be Held on April 12 − 13, 2022 Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)<u>95</u> Subpoena on Frank Waterhouse filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P., <u>96</u> Joint Pre−Trial order (RE: related document(s)<u>1</u> Complaint filed by Plaintiff Highland Capital Management, L.P.). Entered on 4/8/2022, <u>97</u> Motion to redact/restrict Emergency Redact (related document(s):<u>80</u>) (Fee Amount $26) filed by Plaintiff Highland Capital Management, L.P. (Attachments: # 1 Exhibit 31 (Redacted) # 2 Exhibit 32 (Redacted) # 3 Exhibit 34 (Redacted) # 4 Exhibit 36 (Redacted) # 5 Exhibit 37 (Redacted) # 6 Exhibit 38 (Redacted) # 7 Exhibit 39 (Redacted) # 8 Exhibit 40 (Redacted) # 9 Exhibit 49 (Redacted) # 10 Exhibit 76 (Redacted) # 11 Exhibit 86 (Redacted) # 12 Exhibit 142 (Redacted)) filed by Plaintiff Highland Capital Management, L.P.). (Kass, Albert) |

| | |
|---|---|
| 04/12/2022 | <u>104</u> Certificate of service re: 1) Highland's Response to Objections to Trial Subpoenas Duces Tecum; and 2) Declaration of John A. Morris in Support of Highland's Response to Objections to Trial Subpoenas Duces Tecum Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)<u>101</u> Objection to (related document(s): <u>98</u> Support/supplemental document filed by Defendant Highland Capital Management Fund Advisors, L.P., Defendant NexPoint Advisors, L.P.)*(Highland's Response to Objections to Trial Subpoenas Duces Tecum)* filed by Plaintiff Highland Capital Management, L.P.. filed by Plaintiff Highland Capital Management, L.P., <u>102</u> Declaration re: *(Declaration of John A. Morris in Support of Highland's Response to Objections to Trial Subpoenas Duces Tecum)* filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)<u>101</u> Objection). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5) filed by Plaintiff Highland Capital Management, L.P.). (Kass, Albert) |
| 04/12/2022 | 105 Hearing continued (RE: related document(s)<u>1</u> Adversary case 21−03010. Complaint by Highland Capital Management, L.P. against Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Nature(s) of suit: 91 (Declaratory judgment). 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). 72 (Injunctive relief − other), filed by Plaintiff Highland Capital Management, L.P.) Continued Hearing to be held on 4/13/2022 at 09:30 AM Dallas Judge Jernigan Ctrm for <u>1</u>, (Edmond, Michael) (Entered: 04/13/2022) |
| 04/12/2022 | <u>106</u> Request for transcript regarding a hearing held on 4/12/2022. The requested turn−around time is hourly. (Edmond, Michael) (Entered: 04/13/2022) |
| 04/12/2022 | <u>115</u> Court admitted exhibits date of hearing April 12, 2022 (RE: related document(s)<u>1</u> Adversary case 21−03010. Complaint by Highland Capital Management, L.P. against Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Nature(s) of suit: 91 (Declaratory judgment). 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). 72 (Injunctive relief − other). filed by Plaintiff Highland Capital Management, L.P.) (COURT ADMITTED ALL OF PLAINTIFF'S/DEBTOR EXHIBITS #1 THROUGH #161 BY JOHN MORRIS & COURT ADMITTED DEFENDANT'S/HCM FUND ADVISORS, L.P. AND NEXPOINT ADVISORS, L.P., EXHIBITS #A, #B, #C, #D, #E, #F, #G, #H, #I, #J, #K, #M, #N, #O, #P, #Q, #R, #S, #T, #U, #V, #W, #X, #Y, #AA, #BB, #CC & #EE BY DAVOR RUKAVINA) (Edmond, Michael) (Entered: 04/15/2022) |
| 04/13/2022 | <u>107</u> Request for transcript regarding a hearing held on 4/12/2022. The requested turn−around time is hourly (Bergreen, J.) |
| 04/13/2022 | <u>108</u> Request for transcript regarding a hearing held on 4/13/2022. The requested turn−around time is hourly. (Edmond, Michael) |
| 04/13/2022 | 109 Hearing held on 4/13/2022. (RE: related document(s)<u>1</u> Adversary case 21−03010. Complaint by Highland Capital Management, L.P. against Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Adversary Cover Sheet). Nature(s) of suit: 91 (Declaratory judgment). 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). 72 (Injunctive relief − other). filed by Plaintiff Highland Capital Management, L.P.) (Appearances: J. Morris, H. Winograd, and G. Demo for Reorganized Debtor; D. Rukavina and T. Berghman for HCMFA and NPA. Evidentiary hearing. Evidence closed. Court will schedule closing arguments (WebEx only) in one−two week time frame. Court room deputy will reach out to parties regarding same.) (Edmond, Michael) (Entered: 04/14/2022) |
| 04/14/2022 | <u>110</u> Transcript regarding Hearing Held 04/12/2022 (155 pages) RE: Trial Day 1 (9:38 am to 2:19 pm segment). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 07/13/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972−783−3063. (RE: related document(s) 105 Hearing continued (RE: related |

| | |
|---|---|
| | document(s)1 Adversary case 21−03010. Complaint by Highland Capital Management, L.P. against Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Nature(s) of suit: 91 (Declaratory judgment). 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). 72 (Injunctive relief − other), filed by Plaintiff Highland Capital Management, L.P.) Continued Hearing to be held on 4/13/2022 at 09:30 AM Dallas Judge Jernigan Ctrm for 1,). Transcript to be made available to the public on 07/13/2022. (Rehling, Kathy) |
| 04/14/2022 | 111 PDF with attached Audio File. Court Date & Time [04/12/2022 08:44:21 AM]. File Size [ 124265 KB ]. Run Time [ 08:52:34 ]. (admin). |
| 04/14/2022 | 112 PDF with attached Audio File. Court Date & Time [04/13/2022 08:49:27 AM]. File Size [ 25764 KB ]. Run Time [ 01:50:11 ]. (admin). |
| 04/15/2022 | 113 Transcript regarding Hearing Held 04/12/2022 RE: hearing. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 07/14/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Acorn Transcripts, LLC, Telephone number 1−800−750−5747. (RE: related document(s) 105 Hearing continued (RE: related document(s)1 Adversary case 21−03010. Complaint by Highland Capital Management, L.P. against Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Nature(s) of suit: 91 (Declaratory judgment). 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). 72 (Injunctive relief − other), filed by Plaintiff Highland Capital Management, L.P.) Continued Hearing to be held on 4/13/2022 at 09:30 AM Dallas Judge Jernigan Ctrm for 1,). Transcript to be made available to the public on 07/14/2022. (Gardelli, Nancy) |
| 04/15/2022 | 114 Transcript regarding Hearing Held 04/13/2022 RE: Hearing. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 07/14/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Acorn Transcripts, LLC, Telephone number 1−800−750−5747. (RE: related document(s) 109 Hearing held on 4/13/2022. (RE: related document(s)1 Adversary case 21−03010. Complaint by Highland Capital Management, L.P. against Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Adversary Cover Sheet). Nature(s) of suit: 91 (Declaratory judgment). 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). 72 (Injunctive relief − other). filed by Plaintiff Highland Capital Management, L.P.) (Appearances: J. Morris, H. Winograd, and G. Demo for Reorganized Debtor; D. Rukavina and T. Berghman for HCMFA and NPA. Evidentiary hearing. Evidence closed. Court will schedule closing arguments (WebEx only) in one−two week time frame. Court room deputy will reach out to parties regarding same.)). Transcript to be made available to the public on 07/14/2022. (Gardelli, Nancy) |
| 04/18/2022 | 116 Transcript regarding Hearing Held 04/13/22 RE: Trial PM Session. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 07/18/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Liberty Transcripts/Dipti Patel, Telephone number 847−848−4907. (RE: related document(s) 109 Hearing held on 4/13/2022. (RE: related document(s)1 Adversary case 21−03010. Complaint by Highland Capital Management, L.P. against Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Adversary Cover Sheet). Nature(s) of suit: 91 (Declaratory judgment). 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). 72 (Injunctive relief − other). filed by Plaintiff Highland Capital Management, L.P.) (Appearances: J. Morris, H. Winograd, and G. Demo for Reorganized Debtor; D. Rukavina and T. Berghman for HCMFA and NPA. Evidentiary hearing. Evidence closed. Court will schedule closing arguments (WebEx only) in one−two week time frame. Court room deputy will reach out to |

| | parties regarding same.)). Transcript to be made available to the public on 07/18/2022. (Patel, Dipti) |
|---|---|
| 04/18/2022 | 117 Amended Witness and Exhibit List *(Reorganized Debtor's Amended Witness and Exhibit List with Respect to Trial to Be Held on April 12−13, 2022)* filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)80 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 160 # 2 Exhibit 161) (Annable, Zachery) |
| 04/18/2022 | 118 Order Granting Emergency Motion to Redact Certain Exhibits (Related Doc # 97) Entered on 4/18/2022. (Okafor, Marcey) |
| 04/19/2022 | 119 Trial/Closing arguments set (RE: related document(s)1 Adversary case 21−03010. Complaint by Highland Capital Management, L.P. against Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P.. Fee Amount $350 (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I # 10 Exhibit J # 11 Adversary Cover Sheet). Nature(s) of suit: 91 (Declaratory judgment). 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). 72 (Injunctive relief − other). filed by Plaintiff Highland Capital Management, L.P.) Trial date set for 4/27/2022 at 01:30 PM at at https://us−courts.webex.com/meet/jerniga. Parties should appear via Webex. (Ellison, T.) |
| 04/20/2022 | 120 Certificate of service re: 1) Reorganized Debtor's Amended Witness and Exhibit List with Respect to Trial to be Held on April 12 − 13, 2022; and 2) Order Granting Emergency Motion to Redact Certain Exhibits Attached to Reorganized Debtor's Witness and Exhibit List with Respect to Trial to be Held on April 12 − 13, 2022 Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)117 Amended Witness and Exhibit List *(Reorganized Debtor's Amended Witness and Exhibit List with Respect to Trial to Be Held on April 12−13, 2022)* filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)80 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 160 # 2 Exhibit 161) filed by Plaintiff Highland Capital Management, L.P., 118 Order Granting Emergency Motion to Redact Certain Exhibits (Related Doc 97) Entered on 4/18/2022.). (Kass, Albert) |
| 04/27/2022 | 121 Hearing held on 4/27/2022. (RE: related document(s)1 Adversary case 21−03010. Complaint by Highland Capital Management, L.P. against Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Adversary Cover Sheet). Nature(s) of suit: 91 (Declaratory judgment). 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). 72 (Injunctive relief − other), filed by Plaintiff Highland Capital Management, L.P.) (Appearances: J. Morris for Reorganized Debtor; D. Rukavina for HCMFA and NexPoint Advisors. Nonevidentiary hearing (closing arguments). Court took matter under advisement.) (Edmond, Michael) (Entered: 04/28/2022) |
| 05/04/2022 | 123 Request for transcript regarding a hearing held on 4/27/2022. The requested turn−around time is hourly (Smith, Caitlynne) (Entered: 05/25/2022) |
| 05/09/2022 | 122 Transcript regarding Hearing Held 4/27/2022 RE: Closing Arguments. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 08/8/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Dipti Patel/Liberty Transcripts, Telephone number 847−848−4907. (RE: related document(s) 121 Hearing held on 4/27/2022. (RE: related document(s)1 Adversary case 21−03010. Complaint by Highland Capital Management, L.P. against Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Adversary Cover Sheet). Nature(s) of suit: 91 (Declaratory judgment). 02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)). 72 (Injunctive relief − other), filed by Plaintiff Highland Capital Management, L.P.) (Appearances: J. Morris for Reorganized Debtor; D. Rukavina for HCMFA and NexPoint Advisors. Nonevidentiary |

| | |
|---|---|
| | hearing (closing arguments). Court took matter under advisement.)). Transcript to be made available to the public on 08/8/2022. (Patel, Dipti) |
| 08/30/2022 | 124 Findings of fact and conclusions of law in support of judgment: (A) granting breach of contract claims asserted by the Reorganized Debtor; and (B) denying Defendants' requests for allowance of administrative expense claims (RE: related document(s)1 Complaint filed by Plaintiff Highland Capital Management, L.P.). Entered on 8/30/2022 (Okafor, Marcey) |
| 09/01/2022 | 125 BNC certificate of mailing − PDF document. (RE: related document(s)124 Findings of fact and conclusions of law in support of judgment: (A) granting breach of contract claims asserted by the Reorganized Debtor; and (B) denying Defendants' requests for allowance of administrative expense claims (RE: related document(s)1 Complaint filed by Plaintiff Highland Capital Management, L.P.). Entered on 8/30/2022) No. of Notices: 2. Notice Date 09/01/2022. (Admin.) |
| 09/14/2022 | 126 Judgment (final). Entered on 9/14/2022 (Okafor, Marcey) |
| 09/16/2022 | 127 BNC certificate of mailing − PDF document. (RE: related document(s)126 Judgment (final). Entered on 9/14/2022) No. of Notices: 2. Notice Date 09/16/2022. (Admin.) |
| 09/20/2022 | 128 Notice of appeal . Fee Amount $298 filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. (RE: related document(s)126 Judgment). Appellant Designation due by 10/4/2022. (Rukavina, Davor) |
| 09/20/2022 | Receipt of filing fee for Notice of appeal( 21−03010−sgj) [appeal,ntcapl] ( 298.00). Receipt number A29832129, amount $ 298.00 (re: Doc# 128). (U.S. Treasury) |
| 09/30/2022 | 130 Notice of docketing notice of appeal. Civil Action Number: 3:22−cv−02170−S. (RE: related document(s)128 Notice of appeal . Fee Amount $298 filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. (RE: related document(s)126 Judgment). Appellant Designation due by 10/4/2022.) (Whitaker, Sheniqua) |
| 09/30/2022 | 131 Certificate of mailing regarding appeal (RE: related document(s)128 Notice of appeal . filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. (RE: related document(s)126 Judgment). Appellant Designation due by 10/4/2022.) (Attachments: # 1 Service List) (Whitaker, Sheniqua) |
| 09/30/2022 | 132 Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)128 Notice of appeal . filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. (RE: related document(s)126 Judgment). (Whitaker, Sheniqua) |
| 10/02/2022 | 133 Statement of issues on appeal, filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. (RE: related document(s)128 Notice of appeal). (Rukavina, Davor) |
| 10/02/2022 | 134 Appellant designation of contents for inclusion in record on appeal filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. (RE: related document(s)128 Notice of appeal). Appellee designation due by 10/17/2022. (Rukavina, Davor) |
| 10/02/2022 | 135 BNC certificate of mailing. (RE: related document(s)132 Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)128 Notice of appeal . filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. (RE: related document(s)126 Judgment).) No. of Notices: 0. Notice Date 10/02/2022. (Admin.) |

| | |
|---|---|
| 10/04/2022 | 136 Clerk's correspondence requesting amended designation from attorney for debtor. (RE: related document(s)134 Appellant designation of contents for inclusion in record on appeal filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. (RE: related document(s)128 Notice of appeal). Appellee designation due by 10/17/2022.) Responses due by 10/7/2022. (Blanco, J.) |
| 10/04/2022 | 137 Amended appellant designation of contents for inclusion in record on appeal filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. (RE: related document(s)134 Appellant designation). (Rukavina, Davor) |
| 10/07/2022 | 138 Motion to stay pending appeal *(Agreed Motion)* (related documents 126 Judgment) filed by Defendants Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. (Attachments: # 1 Proposed Order) (Rukavina, Davor) |
| 10/07/2022 | 139 Support/supplemental document *Supersedeas Bond* filed by Defendant NexPoint Advisors, L.P. (RE: related document(s)126 Judgment). (Rukavina, Davor) |
| 10/07/2022 | 140 Support/supplemental document *Supersedeas Bond* filed by Defendant Highland Capital Management Fund Advisors, L.P. (RE: related document(s)126 Judgment). (Rukavina, Davor) |
| 10/11/2022 | 141 Agreed Order conditionally staying judgment pending appeal (related document # 138) Entered on 10/11/2022. (Okafor, Marcey) |
| 10/13/2022 | 142 Receipt of court papers − supersedeas bond Nexpoint Advisors receipt #D307 (RE: related document(s)141 Agreed Order conditionally staying judgment pending appeal (related document 138) Entered on 10/11/2022.) (Ecker, C.) |
| 10/13/2022 | 143 Receipt of court papers − supersedeas Bond Highland Capital Management Fund Advisors, L.P. receipt #D308 (RE: related document(s)141 Agreed Order conditionally staying judgment pending appeal (related document 138) Entered on 10/11/2022.) (Ecker, C.) |
| 10/13/2022 | 144 BNC certificate of mailing − PDF document. (RE: related document(s)141 Agreed Order conditionally staying judgment pending appeal (related document 138) Entered on 10/11/2022.) No. of Notices: 2. Notice Date 10/13/2022. (Admin.) |

# Tab 2

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | _____ |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., AND NEXPOINT ADVISORS, L.P., | § | |
| | § | |
| Defendants. | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

## PLAINTIFF HIGHLAND CAPITAL MANAGEMENT, L.P.'S
## VERIFIED ORIGINAL COMPLAINT FOR DAMAGES
## AND FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession ("Plaintiff" or the "Debtor"), by its undersigned counsel, files this *Verified Original Complaint for Damages and for Declaratory and Injunctive Relief* (the "Complaint") against defendants Highland Capital Management Fund Advisors, L.P. ("HCMFA") and NexPoint Advisors, L.P. ("NPA," and together with HCMFA, the "Defendants" or the "Advisors"), seeking damages and declaratory and injunctive relief pursuant to sections 105(a), 362, 542, and 1107 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In support of its Complaint, the Debtor alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

### PRELIMINARY STATEMENT[2]

1.     The Advisors serve as the investment manager, either directly or indirectly, to a number of investment vehicles (collectively, the "Funds") regulated pursuant to the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Company Act of 1940. Certain of the Funds are publicly traded and have thousands of retail investors who are at risk due to the Advisors' deleterious conduct.

2.     The Advisors are owned and controlled by James Dondero. Pursuant to certain Shared Services Agreements, the Debtor has historically provided back-office and middle-office services that enable the Advisors to manage the Funds. Although the Debtor is paid for these

---

[2] Capitalized terms not specifically defined in this Preliminary Statement shall have the meanings ascribed to them below.

000029

services, providing the services requires the Debtor to maintain a full staff, the cost of which has historically caused substantial net losses to the Debtor.

3.      Each of the Shared Services Agreements gives either party the unilateral right to terminate the respective Shared Services Agreement by providing prior written notice.  On November 30, 2020, the Debtor provided written notice of its intent to terminate the Shared Services Agreements effective as of January 31, 2021.

4.      The Termination Notices could not have come as a surprise to the Advisors because the Debtor was in bankruptcy and had been pursuing an "asset monetization" plan of reorganization that would leave it with a substantially scaled-down work force since at least August 2020.  With that in mind, the Debtor began developing a plan pursuant to which the shared services would be transitioned to an entity that would be created, owned, and operated by certain of the Debtor's employees who were expected to be terminated as part of the implementation of the Debtor's Plan.

5.      At the same time, the Debtor continued to provide the services required under the Shared Services Agreements – despite the Advisors being in substantial arrears with an outstanding amount due to the Debtor in excess of $3 million – and otherwise continued in its attempts to transition those services in a smooth and orderly manner.  Indeed, in order to give the Advisors more time to engage and complete the transition, the Debtor has extended the termination date on two occasions, with the current termination deadline being February 19, 2021.[3]

---

[3] Although the Shared Services Agreement will terminate on February 19, 2021, the Debtor is willing to further extend the termination dates of the Shared Services Agreements through February 28, 2021, solely to prevent catastrophic harm to the retail investors in the Funds, but the Debtor will be unable to extend the termination date any further as the Debtor is expected to reduce its workforce at the end of February and will have insufficient personnel thereafter to perform under the Shared Services Agreements.

DOCS_NY:42310.8 36027/002

000030

6.      Regrettably, as described in more detail below, and notwithstanding the Debtor's best efforts to aid in the transition of services, the Advisors have willfully failed and refused to adopt and effectuate a transition plan, choosing instead to spend the last months threatening the Debtor and certain of its employees and seeking to deflect responsibility for their own wrongful conduct.

7.      The status quo is untenable.  The Debtor has the contractual right to terminate the Shared Services Agreements and has exercised that right.  Pursuant to the Debtor's Plan, there will shortly be a substantial reduction in the Debtor's work force and the Debtor will be unable to provide services to the Advisors.  The Advisors' failure to work with the Debtor or to otherwise develop a transition plan of their own has put thousands of retail investors at risk.

8.      The Debtor is faced with an awful choice.  It can either (a) exercise its rights to terminate the Shared Services Agreements to the detriment of the Funds and their investors, and be sucked into more litigation because of Mr. Dondero's conduct, or (b) attempt to provide services to the Advisors under the Shared Services Agreements at substantial losses and risk material delays in the implementation of the Debtor's Plan.

9.      Therefore, in addition to seeking damages and declaratory relief, the Debtor is filing a separate emergency motion for a mandatory injunction compelling the Advisors to adopt and implement a transition plan by February 28, 2021, when the Debtor is expected to substantially reduce its workforce.  In the absence of such a mandate, the Funds (together with their thousands of investors) and the Debtor will be irreparably harmed.

000031

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§§ 157 and § 1334(b).  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §

157(b)(2)(A) and (O).

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

12.     This adversary proceeding is commenced pursuant to Bankruptcy Rules 7001 and

7065, Bankruptcy Code sections 105(a) and 362, 28 U.S.C. §§ 2201 and 2202, and applicable

Delaware law.

## THE PARTIES

13.     The Debtor is a limited liability partnership formed under the laws of Delaware

with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

14.     Upon information and belief, HCMFA is a limited partnership with offices

located in Dallas, Texas.

15.     Upon information and belief, NPA is a limited partnership with offices located in

Dallas, Texas.

## CASE BACKGROUND

16.     On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition

for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the

District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland

Bankruptcy Case").

17.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an

Official Committee of Unsecured Creditors with the following members:   (a) Redeemer

Committee of Highland Crusader Fund, (b) Meta-e Discovery, (c) UBS Securities LLC and UBS

000032

AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP LLC.

18.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[4]

19.     The Debtor has continued to operate and manage its business as a debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee or examiner has been appointed in this chapter 11 case.

20.     On November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (the "Plan").

21.     On February 2 and 3, 2021, the Court conducted a confirmation hearing with respect to the Plan.  [Docket No. 1808].

22.     On February 8, 2021, the Court rendered an opinion in which it approved the Plan.  [Docket No. 1924].

## STATEMENT OF FACTS

**A.      The Debtor Has the Contractual Right to Terminate the Shared Services Agreements, and It Timely Exercised that Right**

23.     The Debtor is party to the Shared Services Agreements pursuant to which it has a contractual right of termination upon written notice.

***The Debtor's Shared Services Agreement with HCMFA***

24.     The Debtor and HCMFA are parties to that certain *Second Amended and Restated Shared Services Agreement*, effective as of February 8, 2013 (the "HCMFA Shared Services Agreement"), a copy of which is attached hereto as **Exhibit A**.

---

[4] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

25.     Pursuant to section 2.01 of the HCMFA Shared Services Agreement and Annex A affixed thereto, the Debtor provides certain services to HCMFA that enable HCMFA to manage the Funds.

26.     The HCMFA Shared Services Agreement was for a one-year term, subject to automatic one-year renewals "unless sooner terminated under Section 7.02."

27.     Section 7.02 of the Shared Services Agreement provides that "[e]ither Party may terminate this Agreement, with or without cause, upon at least 60 days advance written notice at any time prior to the expiration of the Term."

28.     On November 30, 2020, the Debtor provided written notice to HCMFA that it intended to terminate the HCMFA Shared Services Agreement as of January 31, 2021 (the "HCMFA Termination Notice").  A copy of the HCMFA Termination Notice is attached hereto as **Exhibit B**.

### *The Debtor's Shared Services Agreement with NPA*

29.     The Debtor and NPA are parties to that certain *Amended and Restated Shared Services Agreement*, effective as of January 1, 2018 (the "NPA Shared Services Agreement" and together with the HCMFA Shared Services Agreement, the "Shared Services Agreements"), a copy of which is attached hereto as **Exhibit C**.

30.     Pursuant to Article II of the NPA Shared Services Agreement, the Debtor provides certain services to NPA that enable NPA to manage the Funds.

31.     The NPA Shared Services Agreement did not have a fixed term.  Instead, section 7.01 provided that "[e]ither Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other."

32.     On November 30, 2020, the Debtor provided written notice to NPA that it intended to terminate the NPA Shared Services Agreement as of January 31, 2021 (the "NPA

Termination Notice" and together with the HCMFA Termination Notice, the "Termination Notices").  A copy of the NPA Termination Notice is attached hereto as **Exhibit D**.

**B.      Prior to Providing the Termination Notices, the Debtor Worked on a Transition Plan, but the Advisors Failed to Engage or Pay for Services Rendered**

33.      On August 12, 2020, after considering its strategic options, the Debtor filed an "asset monetization" plan of reorganization pursuant to which, in general, the Debtor proposed to reduce staff, reject certain contracts, and monetize its assets consistent with maximizing value for all stakeholders.  [Docket No. 944].

34.      Thus, at least as of that time, all stakeholders – including the Advisors – were on notice that the Debtor intended to continue operations on a scaled-down basis with the goal being an orderly monetization of assets.[5]

35.      Consistent with that intent, the Debtor began formulating a plan for the transition of services provided under the Shared Services Agreements.

36.      Specifically, beginning in the summer of 2020, the Debtor attempted to negotiate for the orderly transition of services with James Dondero, the individual who owns and controls each of the Advisors.

37.      The Debtor's proposal contemplated the transition of services to the Advisors from the Debtor to an entity that would be created, owned, and operated by certain of the Debtor's employees ("NewCo") who were expected to be terminated as part of the Debtor's asset monetization plan.

---

[5] Furthermore, on November 13, 2020, the Debtor filed its *Third Amended Plan of Reorganization of Highland Capital Management* [Docket No. 1383] (the "Third Amended Plan").  In its Third Amended Plan (and subsequent plans), the Debtor explicitly stated that it did not intend to continue providing services under the Shared Service Agreements precisely because they are money losers.  Third Amended Plan, Art. IV.A ("[I]t is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities.  The Debtor believes that the continued provision of the services under such contracts will not be cost effective.")

38.     With Mr. Dondero in control, the Advisors never provided any constructive response to the Debtor's proposal.  Indeed, Mr. Dondero specifically informed the Debtor that he intended to make the transition difficult for the apparent purpose of creating leverage in plan negotiations.

39.     In addition to failing to engage in any process designed to provide for the orderly transition of services, the Advisors also failed to pay the Debtor for the services provided under the Shared Services Agreement.

40.     Since the Petition Date, each of the Advisors has failed to meet certain of its payment obligations under the Shared Services Agreements.  For the period between the Petition Date and January 31, 2021, (a) HCMFA owes the Debtor $2,121,276 for services rendered under the HCMFA Shared Services Agreement, and (b) NPA owes the Debtor $932,977 for services rendered under the NPA Shared Services Agreement.  These amounts exclude amounts owed for services provided prior to the Petition Date.

41.     The Debtor loses significant money providing services under the Shared Services Agreements, which is why it publicly stated its intention in the Third Amended Plan (and each subsequent amendment and modification to the Plan) not to assume or assume and assign them. While that is bad enough, the Advisors failure to pay for services previously rendered is a blatant breach of the Agreements.

**C.     The Debtor Offers to Extend the Termination Date to Avoid a Catastrophe and Attempts to Engage the Funds' Board to Aid in the Adoption of a Transition Plan**

42.     Instead of engaging in the process, the Advisors and certain of their employees were more focused on threatening the Debtor and its employees, all in a transparent effort to deflect responsibility for their own obstinate and wrongful conduct.

000036

43.     With the January 31, 2021 termination date fast approaching, and with the Advisors continuing to fail to work cooperatively on a transition plan, the Debtor took the initiative and offered to extend the termination date by two weeks (i) in order to avoid catastrophic consequences for the Funds and their investors that would result from an abrupt termination, and (ii) in the hope that the Advisors would use the extended time to finally and constructively engage.

44.     Thus, on January 29, 2021, the parties executed an agreement extending the termination date to February 14, 2021 in exchange for the Advisors paying in advance for services to be rendered by the Debtor during that two-week period.  A copy of the January 29, 2021, agreement is attached hereto as **Exhibit E**.

45.     During the two-week period, the Debtor and its employees and professionals made every effort to bring the issue of the transition of services to a resolution.  Among other things, the Debtor continued to refine the proposal for the transition of services to NewCo.

46.     The Debtor also attempted to get the attention of the Funds' Boards because it was concerned that the Boards were either uninformed, not engaged, or were under the influence and control of Mr. Dondero.

47.     Among other communications, James P. Seery, Jr., the Debtor's Chief Executive Officer, sent formal written communications to the Board of Directors for the Funds on January 27, 2021, February 8, 2021, and February 12, 2021.[6]  Copies of Mr. Seery's letters are attached hereto as **Exhibits F, G and H,** respectively.

48.     Despite the efforts of certain of the Advisors' professionals, and despite the Debtor's willingness to make all reasonable concessions on a transition agreement, Mr. Dondero

---

[6] Mr. Seery's formal correspondence was in addition to his informal correspondence and communications with the Funds' Board and the substantial communications between counsel to the Debtor, the Advisors, and the Funds.

and the Advisors have refused to "say yes" or to otherwise take steps to formulate a transition plan for the protection of the Funds and their investors.

49.     Faced with an untenable situation, the Debtor again agreed to extend the termination date, this time to February 19, 2021.  *See* **Exhibit I**.

50.     Finally, on February 16, 2021, the Debtor made its last attempt to reach an agreement before being forced to take alternative actions to protect itself, the Funds, and investors, by sending the Advisors a proposed term sheet (the "Term Sheet") that provided a reasonable transition plan. A copy of the Term Sheet is attached as **Exhibit J**.  The Advisors refused to agree to the terms thereunder.

51.     Given that the Court will soon enter an order confirming the Debtor's Plan, and the reduction in the Debtor's work force will follow soon thereafter, the Debtor will be unable to provide services to the Advisors much longer.  The Advisors' failure to agree on or formulate a transition plan is creating catastrophic risk for the Funds and their investors.  The Advisors' failure to plan for a transition is also creating material risk to the Debtor.

## FIRST CLAIM FOR RELIEF

### (For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)

52.     The Debtor repeats and realleges each of the allegations in each of the foregoing paragraphs as though fully set forth herein.

53.     A bona fide, actual, present dispute exists between the Debtor and the Advisors concerning their respective rights and obligations under the Shared Services Agreements.

54.     A judgment declaring the parties' respective rights and obligations will resolve their disputes.

55.     Pursuant to Bankruptcy Rule 7001, the Debtor specifically seeks declarations that:

- Each of the Advisors is owned and controlled by Mr. Dondero;

- The Debtor has the contractual right to terminate the HCMFA Shared Services Agreement on 60 days' written notice;

- The Debtor properly exercised its right to terminate the HCMFA Shared Services Agreement by providing at least 60 days' written notice;

- The Debtor's obligation to provide services to HCMFA under the HCMFA Shared Services Agreement (or otherwise) will terminate on February 19, 2021;

- The Debtor has the contractual right to terminate the NPA Shared Services Agreement on 30 days' written notice;

- The Debtor properly exercised its right to terminate the NPA Shared Services Agreement by providing at least 30 days' written notice; and

- The Debtor's obligation to provide services to NPA under the NPA Shared Services Agreement (or otherwise) will terminate on February 19, 2021.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract)

56.    The Debtor repeats and realleges each of the allegations in each of the foregoing paragraphs as though fully set forth herein.

57.    The Shared Services Agreements are valid and binding contracts.

58.    The Debtor has fully performed all obligations under the Shared Services Agreements.

59.    The Advisors have breached the Shared Services Agreements by failing to pay for certain services rendered by the Debtor to the Advisors under the Shared Services Agreements.

60.    The Advisors have failed to pay the Debtor all amounts due and owing under the Shared Services Agreements despite the Debtor's demands.

61.    The Advisors' breach of the Shared Services Agreements has damaged the Debtor in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF

### (For Injunctive Relief -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7065)

62.     The Debtor repeats and realleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

63.     Pursuant to Bankruptcy Code section 105(a) and Bankruptcy Rule 7065, the Debtor seeks a mandatory injunction directing the Advisors to adopt and implement a plan for the orderly transition of services currently provided under the Shared Services Agreements from the Debtor to NewCo or any other entity of the Advisors' choosing.

64.     Bankruptcy Code section 105(a) authorizes the Court to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a).

65.     Bankruptcy Rule 7065 incorporates by reference Rule 65 of the Federal Rules of Civil Procedure and authorizes the Court to issue injunctive relief in adversary proceedings.

66.     The Debtor will succeed on the merits of its claims for (a) a declaratory judgment that it has the contractual right to terminate each of the Shared Services Agreements, that it properly exercised those rights, and that, effective February 19, 2021, it has no further legal or equitable obligation to provide any services to the Advisors; (b) damages for breach of contract; and (c) for a mandatory injunction requiring the Advisors to adopt and implement a plan for the orderly transition of shared services.

67.     The Advisors' failure to adopt and implement a transition plan is untenable because – as the Advisors have known for months – the Debtor will soon be unable to provide services under the Shared Services Agreements, and such willful misconduct and gross

negligence will cause irreparable harm to the Funds and their investors and to the Debtor and its estate.

68.     Given that (a) the Advisors were on notice since at least August 2020, that the Debtor was unlikely to provide services under the Shared Services Agreement for an extended period of time; (b) the Debtor has been pursuing a transition plan since the summer of 2020; (c) the Third Amended Plan filed on November 13, 2020 (and each subsequent version of the Plan), expressly stated that the Debtor would not assume or assume and assign the Shared Services Agreements; (d) the Debtor timely provided notice of termination of the Shared Services Agreements on November 30, 2020; (e) upon information and belief, the Advisors (and not the Debtor) owe contractual and other duties to the Funds, the entities most at risk; and (f) the Debtor has acted in good faith by, among other things, twice extending the anticipated termination date, the balance of the equities strongly favors the Debtor.

69.     Finally, the public interest virtually requires that the Advisors be directed to adopt and implement a transition plan.  In the absence of a mandatory injunction, thousands of retail investors are likely to suffer catastrophic losses, and there will likely be substantial market disruptions with unforeseeable consequences.

70.     Based on the foregoing, the Debtor requests that the Court direct the Advisors to adopt and implement a plan for the orderly transition of services currently provided under the Shared Services Agreements from the Debtor to NewCo, or any other entity of the Advisors' choosing, by February 28, 2021.

DOCS_NY:42310.8 36027/002

## **PRAYER**

WHEREFORE, the Debtor prays for judgment as follows:

- On the First Cause of Action, a judgment declaring that: (i) each of the Advisors is owned and controlled by Mr. Dondero; (ii) the Debtor has the contractual right to terminate the HCMFA Shared Services Agreement on 60 days' written notice; (iii) the Debtor properly exercised its right to terminate the HCMFA Shared Services Agreement by providing at least 60 days' written notice; (iv) the Debtor's obligation to provide services to HCMFA under the HCMFA Shared Services Agreement (or otherwise) will terminate on February 19, 2021; (v) the Debtor has the contractual right to terminate the NPA Shared Services Agreement on 30 days' written notice; (vi) the Debtor properly exercised its right to terminate the NPA Shared Services Agreement by providing at least 30 days' written notice; and (vii) the Debtor's obligation to provide services to NPA under the NPA Shared Services Agreement (or otherwise) will terminate on February 19, 2021.

- On the Second Cause of Action, damages in an amount to be determined at trial arising from the Advisors' breach of the Shared Services Agreements;

- On the Third Cause of Action, a mandatory injunction directing the Advisors to adopt and implement a plan for the orderly transition of services currently provided under the Shared Services Agreements from the Debtor to NewCo, or any other entity of the Advisors' choosing, by February 28, 2021; and

- For such other and further relief as this Court deems just and proper.

Dated:  February 17, 2021.          **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
             ikharasch@pszjlaw.com
             jmorris@pszjlaw.com
             gdemo@pszjlaw.com
             hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Plaintiff Highland Capital Management, L.P.*

000043

## <u>VERIFICATION</u>

I have read the foregoing <u>VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF</u> and know its contents.

  ··    I am a party to this action.  The matters stated in it are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

  ☒    I am the Chief Executive Officer and Chief Restructuring Officer of Highland Capital Management, L.P., the Plaintiff in this action, and am authorized to make this verification for and on behalf of the Plaintiff, and I make this verification for that reason.  I have read the foregoing document(s).  I am informed and believe and on that ground allege that the matters stated in it are true.

  ··    I am one of the attorneys of record for _____, a party to this action.  Such party is absent from the county in which I have my office, and I make this verification for and on behalf of that party for that reason.  I have read the foregoing document(s).  I am informed and believe and on that ground allege that the matters stated in it are true.

I certify and declare under penalty of perjury under the laws of the United States that the foregoing is true and correct as of this 17th day of February 2021.


         */s/ James P. Seery, Jr.*
         James P. Seery, Jr.

# EXHIBIT A

000045

# SECOND AMENDED AND RESTATED
# SHARED SERVICES AGREEMENT

THIS SECOND AMENDED AND RESTATED SHARED SERVICES AGREEMENT (this "***Agreement***") is entered into to be effective as of 8th day of February, 2013 (the "***Effective Date***") by and among Highland Capital Management, L.P., a Delaware limited partnership ("***HCMLP***"), and Highland Capital Management Fund Advisors, L.P., formerly known as Pyxis Capital, L.P., a Delaware limited partnership ("***HCMFA***"), and any affiliate of HCMFA that becomes a party hereto.  Each of the signatories hereto is individually a "***Party***" and collectively the "***Parties***".

## RECITALS

A.    During the Term, HCMLP will provide to HCMFA certain services as more fully described herein and the Parties desire to allocate the costs incurred for such services and assets among them in accordance with the terms and conditions in this Agreement.

## AGREEMENT

In consideration of the foregoing recitals and the mutual covenants and conditions contained herein, the Parties agree, intending to be legally bound, as follows:

## ARTICLE I
## DEFINITIONS

"***Actual Cost***" means, with respect to any period hereunder, one hundred percent (100%) of the actual costs and expenses caused by, incurred or otherwise arising from or relating to (i) the Shared Services and (ii) the Shared Assets, in each case during such period.

"***Affiliate***" means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, a specified Person.  The term "***control***" (including, with correlative meanings, the terms "***controlled by***" and "***under common control with***") means the possession of the power to direct the management and policies of the referenced Person, whether through ownership interests, by contract or otherwise.

"***Agreement***" has the meaning set forth in the preamble.

"***Allocation Percentage***" has the meaning set forth in Section 4.01.

"***Applicable Margin***" shall mean an additional amount equal to 5% of all costs allocated by Service Provider to the other parties hereto under Article IV; provided that the parties may agree on a different margin percentage as to any item or items to the extent the above margin percentage, together with the allocated cost of such item or service, would not reflect an arm's length value of the particular service or item allocated.

"***Change***" has the meaning set forth in Section 2.02(a).

"***Change Request***" has the meaning set forth in Section 2.02(b).

"***Code***" means the Internal Revenue Code of 1986, as amended, and the related regulations and published interpretations.

"**_Effective Date_**" has the meaning set forth in the preamble.

"**_Governmental Entity_**" means any government or any regulatory agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"**_Liabilities_**" means any cost, liability, indebtedness, obligation, co-obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any nature (whether direct or indirect, known or unknown, absolute or contingent, liquidated or unliquidated, due or to become due, accrued or unaccrued, matured or unmatured).

"**_Loss_**" means any cost, damage, disbursement, expense, liability, loss, obligation, penalty or settlement, including interest or other carrying costs, legal, accounting and other professional fees and expenses incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement, that may be imposed on or otherwise incurred or suffered by the referenced Person; provided, however, that the term "**_Loss_**" will not be deemed to include any special, exemplary or punitive damages, except to the extent such damages are incurred as a result of third party claims.

"**_New Shared Service_**" has the meaning set forth in Section 2.03.

"**_Party_**" or "**_Parties_**" has the meaning set forth in the preamble.

"**_Person_**" means an association, a corporation, an individual, a partnership, a limited liability company, a trust or any other entity or organization, including a Governmental Entity.

"**_Quarterly Report_**" has the meaning set forth in Section 5.01.

"**_Recipient_**" means HCMFA and any of HCMFA's direct or indirect Subsidiaries or managed funds or accounts in their capacity as a recipient of the Shared Services and/or Shared Assets.

"**_Service Provider_**" means any of HCMLP and its direct or indirect Subsidiaries in its capacity as a provider of Shared Services or Shared Assets.

"**_Service Standards_**" has the meaning set forth in Section 6.01.

"**_Shared Assets_**" shall have the meaning set forth in Section 3.02.

"**_Shared Services_**" shall have the meaning set forth in Section 2.01.

"**_Subsidiary_**" means, with respect to any Person, any Person in which such Person has a direct or indirect equity ownership interest in excess of 50%.

"**_Tax_**" or "**_Taxes_**" means: (i) all state and local sales, use, value-added, gross receipts, foreign, privilege, utility, infrastructure maintenance, property, federal excise and similar levies, duties and other similar tax-like charges lawfully levied by a duly constituted taxing authority against or upon the Shared Services and the Shared Assets; and (ii) tax-related surcharges or fees that are related to the Shared Services and the Shared Assets identified and authorized by applicable tariffs.

"**_Term_**" has the meaning set forth in Section 7.01.

000047

ARTICLE II
SHARED SERVICES

Section 2.01    <u>Services</u>.  During the Term, Service Provider will provide Recipient with Shared Services, including without limitation, all of the (i) finance and accounting services, (ii) human resources services, (iii) marketing services, (iv) legal services, (v) corporate services, (vi) information technology services, and (vii) operations services; each as requested by HCMFA and as described more fully on **Annex A** attached hereto, the "***Shared Services***")), it being understood that personnel providing Shared Services may be deemed to be employees of HCMFA to the extent necessary for purposes of the Investment Advisers Act of 1940, as amended.

Section 2.02    <u>Changes to the Shared Services</u>.

(a)    During the Term, the Parties may agree to modify the terms and conditions of a Service Provider's performance of any Shared Service in order to reflect new procedures, processes or other methods of providing such Shared Service, including modifying the applicable fees for such Shared Service to reflect the then current fair market value of such service (a "***Change***").  The Parties will negotiate in good faith the terms upon which a Service Provider would be willing to provide such New Shared Service to Recipient.

(b)    The Party requesting a Change will deliver a description of the Change requested (a "***Change Request***") and no Party receiving a Change Request may unreasonably withhold, condition or delay its consent to the proposed Change.

(c)    Notwithstanding any provision of this Agreement to the contrary, a Service Provider may make: (i) Changes to the process of performing a particular Shared Service that do not adversely affect the benefits to Recipient of Service Provider's provision of such Shared Service in any material respect or increase Recipient's cost for such Shared Service; (ii) emergency Changes on a temporary and short-term basis; and/or (iii) Changes to a particular Shared Service in order to comply with applicable law or regulatory requirements, in each case without obtaining the prior consent of Recipient.  A Service Provider will notify Recipient in writing of any such Change as follows: in the case of clauses (i) and (iii) above, prior to the implementation of such Change, and, in the case of clause (ii) above, as soon as reasonably practicable thereafter.

Section 2.03    <u>New Shared Services</u>.  The Parties may, from time to time during the Term of this Agreement, negotiate in good faith for Shared Services not otherwise specifically listed in Section 2.01 (a "***New Shared Service***").  Any agreement between the Parties on the terms for a New Shared Service must be in accordance with the provisions of Article IV and Article V hereof, will be deemed to be an amendment to this Agreement and such New Shared Service will then be a "***Shared Service***" for all purposes of this Agreement.

Section 2.04    <u>Subcontractors</u>.  Nothing in this Agreement will prevent Service Provider from, with the consent of Recipient, using subcontractors, hired with due care, to perform all or any part of a Shared Service hereunder.  A Service Provider will remain fully responsible for the performance of its obligations under this Agreement in accordance with its terms, including any obligations it performs through subcontractors, and a Service Provider will be solely responsible for payments due to its subcontractors.

3

Case 21-03010-sgj   Doc 1-1   Filed 02/17/21   Entered 02/17/21 08:05:38   Desc
Case 3:22-cv-02170-S Document 12-4 Filed 05/27/22   Page 45 of 888   PageID 8949
Exhibit A   Page 5 of 142   Page 486 of 882

## ARTICLE III
## SHARED ASSETS

Section 3.01   <u>Shared IP Rights</u>.   Each Service Provider hereby grants to Recipient a non-exclusive right and license to use the intellectual property and other rights granted or licensed, directly or indirectly, to such Service Provider (the "***Shared IP Rights***") pursuant to third party intellectual property Agreements ("***Third Party IP Agreements***"), provided that the rights granted to Recipient hereunder are subject to the terms and conditions of the applicable Third Party IP Agreement, and that such rights shall terminate, as applicable, upon the expiration or termination of the applicable Third Party IP Agreement. Recipient shall be licensed to use the Shared IP Rights only for so long as it remains an Affiliate of HCMLP.   In consideration of the foregoing licenses, Recipient agrees to take such further reasonable actions as a Service Provider deems to be necessary or desirable to comply with its obligations under the Third Party IP Agreements.

Section 3.02   <u>Other Shared Assets</u>.   Subject to Section 3.01, each Service Provider hereby grants Recipient the right, license or permission, as applicable, to use and access the benefits under the agreements, contracts and licenses that such Service Provider will purchase, acquire, become a party or beneficiary to or license on behalf of Recipient (the "***Future Shared Assets***" and collectively with the Shared IP Rights, the "***Shared Assets***").

## ARTICLE IV
## COST ALLOCATION

Section 4.01   <u>Actual Cost Allocation Formula</u>.   The Actual Cost of any item relating to any Shared Services or Shared Assets shall be allocated based on the Allocation Percentage.   For purposes of this Agreement, "***Allocation Percentage***" means:

(a)   To the extent 100% of such item is demonstrably attributable to HCMFA, 100% of the Actual Cost of such item shall be allocated to HCMFA as agreed by HCMFA;

(b)   To the extent a specific percentage of use of such item can be determined (e.g., 70% for HCMLP and 30% for HCMFA), that specific percentage of the Actual Cost of such item will be allocated to HCMLP or HCMFA, as applicable and as agreed by HCMFA; and

(c)   All other portions of the Actual Cost of any item that cannot be allocated pursuant to clause (a) or (b) above shall be allocated between HCMLP and HCMFA in such proportion as is agreed in good faith between the parties.

Section 4.02   <u>Non-Cash Cost Allocation</u>.   The actual, fully burdened cost of any item relating to any Shared Services or Shared Assets that does not result in a direct, out of pocket cash expense may be allocated to HCMLP and HCMFA for financial statement purposes only, as agreed by HCMFA, without any corresponding cash reimbursement required, in accordance with generally accepted accounting principles, based on the Allocation Percentage principles described in Section 4.01 hereof.

## ARTICLE V
## PAYMENT OF COST AND REVENUE SHARE; TAXES

Section 5.01   <u>Quarterly Statements</u>.   Within thirty (30) days following the end of each calendar qaurter during the Term (or at such time as may be otherwise agreed by the parties), each Service Provider shall furnish the other Parties hereto with a written statement with respect to the Actual Cost paid by it in respect of Shared Services and Shared Assets provided by it, in each case, during such

Case 21-03010-sgj   Doc 1-1   Filed 02/17/21   Entered 02/17/21 08:05:38   Desc
Case 3:22-cv-02170-S   Document 2-1   Filed 10/04/22   Page 47 of 888   PageID 50
Exhibit A - Page 6 of 242   Page 46 of 882   PageID 950

period, setting forth (i) the cost allocation in accordance with Article IV hereof together with the Applicable Margin on such allocated amounts, and (ii) any amounts paid pursuant to Section 5.02 hereof, together with such other data and information necessary to complete the items described in Section 5.03 hereof (hereinafter referred to as the "***Quarterly Report***").

Section 5.02    Settlement Payments.    At any time during the Term, any Party may make payment of the amounts that are allocable to such Party together with the Applicable Margin related thereto, regardless of whether an invoice pursuant to Section 5.03 hereof has been issued with respect to such amounts.

Section 5.03    Determination and Payment of Cost and Revenue Share.

(a)    Within ten (10) days of the submission of the Quarterly Report described in Section 5.02 hereof (or at such other time as may be agreed by the parties), the Parties shall (i) agree on the cost share of each of the Parties and Applicable Margin as calculated pursuant to the provisions of this Agreement; and (ii) prepare and issue invoices for the cost share and Applicable Margin payments that are payable by any of the Parties.

(b)    Within ten (10) days of preparation of the agreement and the issuance of the invoice described in Section 5.03(a) (or at such other time as may be agreed by the parties), the Parties shall promptly make payment of the amounts that are set forth on such cost allocation invoice. Notwithstanding anything in this Agreement to the contrary, provision of the Shared Services shall commence from the Effective Date, but no fees shall be payable from Recipient or otherwise accrue with respect to such services provided during the month of December 2011.

Section 5.04    Taxes.

(a)    Recipient is responsible for and will pay all Taxes applicable to the Shared Services and the Shared Assets provided to Recipient, provided, that such payments by Recipient to Service Provider will be made in the most tax-efficient manner and provided further, that Service Provider will not be subject to any liability for Taxes applicable to the Shared Services and the Shared Assets as a result of such payment by Recipient. Service Provider will collect such Tax from Recipient in the same manner it collects such Taxes from other customers in the ordinary course of Service Provider's business, but in no event prior to the time it invoices Recipient for the Shared Services and Shared Assets, costs for which such Taxes are levied. Recipient may provide Service Provider with a certificate evidencing its exemption from payment of or liability for such Taxes.

(b)    Service Provider will reimburse Recipient for any Taxes collected from Recipient and refunded to Service Provider. In the event a Tax is assessed against Service Provider that is solely the responsibility of Recipient and Recipient desires to protest such assessment, Recipient will submit to Service Provider a statement of the issues and arguments requesting that Service Provider grant Recipient the authority to prosecute the protest in Service Provider's name. Service Provider's authorization will not be unreasonably withheld. Recipient will finance, manage, control and determine the strategy for such protest while keeping Service Provider reasonably informed of the proceedings. However, the authorization will be periodically reviewed by Service Provider to determine any adverse impact on Service Provider, and Service Provider will have the right to reasonably withdraw such authority at any time. Upon notice by Service Provider that it is so withdrawing such authority, Recipient will expeditiously terminate all proceedings. Any adverse consequences suffered by Recipient as a result of the withdrawal will be submitted to arbitration pursuant to Section 9.14. Any contest for Taxes brought by Recipient may not result in any lien attaching to any property or rights of Service Provider or otherwise jeopardize Service Provider's interests or rights in any of its property. Recipient agrees to

5

indemnify Service Provider for all Losses that Service Provider incurs as a result of any such contest by Recipient.

(c)    The provisions of this Section 5.04 will govern the treatment of all Taxes arising as a result of or in connection with this Agreement notwithstanding any other Article of this Agreement to the contrary.

## ARTICLE VI
## SERVICE PROVIDER RESPONSIBILITIES

Section 6.01    Service Provider General Obligations.  Service Provider will provide the Shared Services and the Shared Assets to Recipient on a non-discriminatory basis and will provide the Shared Services and the Shared Assets in the same manner as if it were providing such services and assets on its own account (the "*Service Standards*").  Service Provider will conduct its duties hereunder in a lawful manner in compliance with applicable laws, statutes, rules and regulations and in accordance with the Service Standards, including, for avoidance of doubt, laws and regulations relating to privacy of customer information.

Section 6.02    Books and Records; Access to Information.  Service Provider will keep and maintain books and records on behalf of Recipient in accordance with past practices and internal control procedures.  Recipient will have the right, at any time and from time to time upon reasonable prior notice to Service Provider, to inspect and copy (at its expense) during normal business hours at the offices of Service Provider the books and records relating to the Shared Services and Shared Assets, with respect to Service Provider's performance of its obligations hereunder.  This inspection right will include the ability of Recipient's financial auditors to review such books and records in the ordinary course of performing standard financial auditing services for Recipient (but subject to Service Provider imposing reasonable access restrictions to Service Provider's and its Affiliates' proprietary information and such financial auditors executing appropriate confidentiality agreements reasonably acceptable to Service Provider).  Service Provider will promptly respond to any reasonable requests for information or access.  For the avoidance of doubt, all books and records kept and maintained by Service Provider on behalf of Recipient shall be the property of Recipient, and Service Provider will surrender promptly to Recipient any of such books or records upon Recipient's request (provided that Service Provider may retain a copy of such books or records) and shall make all such books and records available for inspection and use by the Securities and Exchange Commission or any person retained by Recipient at all reasonable times.  Such records shall be maintained by Service Provider for the periods and in the places required by laws and regulations applicable to Recipient.

Section 6.03    Return of Property and Equipment.  Upon expiration or termination of this Agreement, Service Provider will be obligated to return to Recipient, as soon as is reasonably practicable, any equipment or other property or materials of Recipient that is in Service Provider's control or possession.

## ARTICLE VII
## TERM AND TERMINATION

Section 7.01    Term.  The term of this Agreement will commence as of the Effective Date and will continue in full force and effect until the first anniversary of the Effective Date (the "*Term*"), unless terminated earlier in accordance with Section 9.02.  The Term shall automatically renew for successive one year periods unless sooner terminated under Section 7.02.

Section 7.02    Termination.  Either Party may terminate this Agreement, with or without cause, upon at least 60 days advance written notice at any time prior to the expiration of the Term.

ARTICLE VIII
LIMITED WARRANTY

Section 8.01    Limited Warranty.  Service Provider will perform the Shared Services hereunder in accordance with the Service Standards.  Except as specifically provided in this Agreement, Service Provider makes no express or implied representations, warranties or guarantees relating to its performance of the Shared Services and the granting of the Shared Assets under this Agreement, including any warranty of merchantability, fitness, quality, non-infringement of third party rights, suitability or adequacy of the Shared Services and the Shared Assets for any purpose or use or purpose.  Service Provider will (to the extent possible and subject to Service Provider's contractual obligations) pass through the benefits of any express warranties received from third parties relating to any Shared Service and Shared Asset, and will (at Recipient's expense) assist Recipient with any warranty claims related thereto.

ARTICLE IX
MISCELLANEOUS

Section 9.01    No Partnership or Joint Venture; Independent Contractor.  Nothing contained in this Agreement will constitute or be construed to be or create a partnership or joint venture between or among HCMLP or HCMFA or their respective successors or assigns.  The Parties understand and agree that, with the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, this Agreement does not make any of them an agent or legal representative of the other for any purpose whatsoever.  With the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, no Party is granted, by this Agreement or otherwise, any right or authority to assume or create any obligation or responsibilities, express or implied, on behalf of or in the name of any other Party, or to bind any other Party in any manner whatsoever.  The Parties expressly acknowledge that Service Provider is an independent contractor with respect to Recipient in all respects, including with respect to the provision of the Shared Services.

Section 9.02    Amendments; Waivers.  Except as expressly provided herein, this Agreement may be amended only by agreement in writing of all Parties.  No waiver of any provision nor consent to any exception to the terms of this Agreement or any agreement contemplated hereby will be effective unless in writing and signed by all of the Parties affected and then only to the specific purpose, extent and instance so provided.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.03    Schedules and Exhibits; Integration.  Each Schedule and Exhibit delivered pursuant to the terms of this Agreement must be in writing and will constitute a part of this Agreement, although schedules need not be attached to each copy of this Agreement.  This Agreement, together with such Schedules and Exhibits constitutes the entire agreement among the Parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the Parties in connection therewith.

Section 9.04    Further Assurances.  Each Party will take such actions as any other Party may reasonably request or as may be necessary or appropriate to consummate or implement the transactions contemplated by this Agreement or to evidence such events or matters.

7

Section 9.05     <u>Governing Law</u>.  This Agreement and the legal relations between the Parties will be governed by and construed in accordance with the laws of the State of Texas applicable to contracts made and performed in such State and without regard to conflicts of law doctrines unless certain matters are preempted by federal law.

Section 9.06     <u>Assignment</u>.  Except as otherwise provided hereunder, neither this Agreement nor any rights or obligations hereunder are assignable by one Party without the express prior written consent of the other Parties.

Section 9.07     <u>Headings</u>.  The descriptive headings of the Articles, Sections and subsections of this Agreement are for convenience only and do not constitute a part of this Agreement.

Section 9.08     <u>Counterparts</u>.   This Agreement and any amendment hereto or any other agreement delivered pursuant hereto may be executed in one or more counterparts and by different Parties in separate counterparts.  All counterparts will constitute one and the same agreement and will become effective when one or more counterparts have been signed by each Party and delivered to the other Parties.

Section 9.09     <u>Successors and Assigns; No Third Party Beneficiaries</u>.  This Agreement is binding upon and will inure to the benefit of each Party and its successors or assigns, and nothing in this Agreement, express or implied, is intended to confer upon any other Person or Governmental Entity any rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 9.10     <u>Notices</u>.  All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given: (i)immediately when personally delivered; (ii) when received by first class mail, return receipt requested; (iii) one day after being sent for overnight delivery by Federal Express or other overnight delivery service; or (iv) when receipt is acknowledged, either electronically or otherwise, if sent by facsimile, telecopy or other electronic transmission device.  Notices, demands and communications to the other Parties will, unless another address is specified by such Parties in writing, be sent to the addresses indicated below:

>           If to HCMLP, addressed to:
>
>           Highland Capital Management, L.P.
>           300 Crescent Court, Suite 700
>           Dallas, Texas 75201
>           Attention:  General Counsel
>           Fax:  (972) 628-4147
>
>           If to HCMFA, addressed to:
>
>           Highland Capital Management Fund Advisors, L.P.
>           300 Crescent Court, Suite 700
>           Dallas, Texas 75201
>           Attention:  General Counsel
>           Fax:  (972) 628-4147

Section 9.11     <u>Expenses</u>.  Except as otherwise provided herein, the Parties will each pay their own expenses incident to the negotiation, preparation and performance of this Agreement, including the fees, expenses and disbursements of their respective investment bankers, accountants and counsel.

000053

Section 9.12     <u>Waiver</u>.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.13     <u>Severability</u>.  If any provision of this Agreement is held to be unenforceable for any reason, it will be adjusted rather than voided, if possible, to achieve the intent of the Parties.  All other provisions of this Agreement will be deemed valid and enforceable to the extent possible.

Section 9.14     <u>Arbitration; Jurisdiction</u>.  Notwithstanding anything contained in this Agreement or the Annexes hereto to the contrary, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; <u>provided, however</u>, that either party or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief.  The Arbitration will be conducted by the American Arbitration Association, or another, mutually agreeable arbitration service.  The arbitrator(s) shall be duly licensed to practice law in the State of Texas.  The discovery process shall be limited to the following:  Each side shall be permitted no more than (i) two party depositions of six hours each.  Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production.  In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents.  The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered.  No arbitrator will have authority to render a decision that contains an outcome determinative error of state or federal law, or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable, arbitration service rules.  The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees.  All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site.  Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees.  The duty to arbitrate described above shall survive the termination of this Agreement.  Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.  All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

Section 9.15     <u>General Rules of Construction</u>.  For all purposes of this Agreement and the Exhibits and Schedules delivered pursuant to this Agreement: (i) the terms defined in Article I have the meanings assigned to them in Article I and include the plural as well as the singular; (ii) all accounting terms not otherwise defined herein have the meanings assigned under GAAP; (iii) all references in this Agreement to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of the body of this Agreement; (iv) pronouns of either gender or neuter will include, as appropriate, the other pronoun forms; (v) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (vi) "or" is not exclusive; (vii) "including" and "includes" will be deemed to be followed by "but not limited to" and "but is not limited to, "respectively; (viii) any definition of or

9

reference to any law, agreement, instrument or other document herein will be construed as referring to such law, agreement, instrument or other document as from time to time amended, supplemented or otherwise modified; and (ix) any definition of or reference to any statute will be construed as referring also to any rules and regulations promulgated thereunder.

10

000055

IN WITNESS HEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers as of the day and year first above written.

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:   Strand Advisors, Inc., its general partner

By:_____
Name:  James Dondero
Title:   President

**HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

By:    Strand Advisors XVI, Inc., its general partner

By:_____
Name:  Brian Mitts
Title:   Assistant Secretary

000056

**<u>Annex A</u>**

**Shared Services**

<u>Compliance</u>
         General compliance
         Compliance systems

<u>Facilities</u>
         Equipment
         General Overhead
         Office Supplies
         Rent & Parking

<u>Finance & Accounting</u>
         Book keeping
         Cash management
         Cash forecasting
         Credit facility reporting
         Financial reporting
         Accounts payable
         Accounts receivable
         Expense reimbursement
         Vendor management

<u>HR</u>
         Drinks/snacks
         Lunches
         Recruiting

<u>IT</u>
         General support & maintenance (OMS, development, support)
         Telecom (cell, phones, broadband)
         WSO

<u>Legal</u>
         Corporate secretarial services
         Document review and preparation
         Litigation support
         Management of outside counsel

<u>Marketing and PR</u>
         Public relations

<u>Tax</u>
         Tax audit support
         Tax planning
         Tax prep and filing

<u>Investments</u>
         Investment research on an ad hoc basis as requested by HCMFA

Valuation Committee

<u>Trading</u>

Trading desk services

<u>Operations</u>

Trade settlement

000058

# EXHIBIT B

November 30, 2020

Highland Capital Management Fund Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: General Counsel

**RE:** **Termination of Second Amended and Restated Shared Services Agreement, effective as of February 8, 2013, by and among Highland Capital Management, L.P. ("HCMLP"), and Highland Capital Management Fund Advisors, L.P. (the "Agreement").**

To Whom It May Concern:

As set forth in Section 7.02 of the Agreement, the Agreement is terminable at will upon at least 60 days advance written notice.

By this letter, HCMLP is notifying you that it is terminating the Agreement.  Such termination will be effective January 31, 2021.  HCMLP reserves the right to rescind this notice of termination.

Please feel free to contact me with any questions.

Sincerely,

HIGHLAND CAPITAL MANAGEMENT, L.P.

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Chief Executive Officer
Chief Restructuring Officer

000060

# EXHIBIT C

000061

## AMENDED AND RESTATED SHARED SERVICES AGREEMENT

This Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated effective as of January 1, 2018, is entered into by and between NexPoint Advisors, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Parties entered into that certain Shared Services Agreement, dated effective as of January 1, 2013 (the "Original Agreement");

WHEREAS, the Parties desire to amend and restated the Original Agreement and the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company, in each case, on the terms and conditions hereof;

WHEREAS, the Management Company may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company; and

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee"), if any, is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree, and the Original Agreement is hereby amended, restated and replaced in its entirety as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01    Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person. The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"Client or Account" shall mean any fund, client or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission, corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) all capital lease obligations; (e) all indebtedness guaranteed by such Person or any of its subsidiaries; and (f) all indebtedness guaranteed by such Person or any of its subsidiaries.

000063

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a Client or Account.

"Portfolio" means the portfolio of securities and other assets, including without limitation, financial instruments, equity investments, collateral loan obligations, debt securities, preferred return notes and other similar obligations held directly or indirectly by, or on behalf of, Clients and Accounts from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

Section 1.02    Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

# ARTICLE II

## SERVICES

Section 2.01    General Authority.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and if applicable, to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02    Provision of Services.  Without limiting the generality of Section 2.01 and subject to Section 2.04 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)    *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, investment research, trade desk services,

000064

including trade execution and settlement, finance and accounting, payments, operations, book keeping, cash management, cash forecasting, accounts payable, accounts receivable, expense reimbursement, vendor management, and information technology (including, without limitation, general support and maintenance (OMS, development, support), telecom (cellphones, telephones and broadband) and WSO);

(b)    *Legal/Compliance/Risk Analysis*.  Assistance and advice with respect to legal issues, litigation support, management of outside counsel, compliance support and implementation and general risk analysis;

(c)    *Tax*.  Assistance and advice with respect to tax audit support, tax planning and tax preparation and filing.

(d)    *Management of Clients and Accounts*.  Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any Client or Account from time to time.

(e)    *Valuation*.  Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(f)    *Execution and Documentation*.  Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a Client or Account managed by the Management Company, transactions involving the Management Company or a Client or Account managed by the Management Company, and any other rights and obligations of the Management Company or a Client or Account managed by the Management Company;

(g)    *Marketing*.  Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified Clients or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(h)    *Reporting*.  Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any Client or Account, including reports relating to (i) credit facility reporting and purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

000065

        (i)    *Administrative Services.* The provision of office space, information technology services and equipment, infrastructure, rent and parking and other related services requested or utilized by the Management Company from time to time;

        (j)    *Shared Employees.* To the extent applicable, the provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of <u>Section 2.03</u> hereof;

        (k)    *Ancillary Services.* Assistance and advice on all things ancillary or incidental to the foregoing; and

        (l)    *Other.* Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any Client or Account or similar securitization, (c) the substantive investment management decisions with respect to any Client or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Section 2.03 <u>Shared Employees.</u>

        (a)    The Staff and Services Provider hereby agrees and consents that each Shared Employee, if any, shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider. Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company. To the extent applicable, the Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder. The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

000066

(b)     Notwithstanding that the Shared Employees, if any, shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)     To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)     Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)     Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)     The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)     The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any Client or Account, and regulators, as applicable.  To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)     The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

000067

(i)    The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)    The Staff and Services Provider shall require that each Shared Employee:

(i)    certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)    be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)    provide services hereunder and take actions hereunder only as approved by the Management Company;

(iv)    provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)    to the extent authorized to transact on behalf of the Management Company or a Client or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)    act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a Client or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)    Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04    Applicable Asset Criteria and Concentrations.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.02 above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05    Compliance with Management Company Policies and Procedures.  The Management Company will from time to time provide the Staff and Services Provider and the

7

000068

Shared Employees, if any, with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06    Authority.  The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement.  The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party.  Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time.  The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Section 2.07    Third Parties.

(a)    The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)    In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a Client or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08    Management Company to Cooperate with the Staff and Services Provider. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09    Power of Attorney.  If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company

8

000069

and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments). Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01    Consideration. As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive a flat fee of $168,000 per month (the "Staff and Services Fee"), payable monthly in advance on the first business day of each month.

Section 3.02    Costs and Expenses. Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.03    Deferral. Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01    Representations. Each of the Parties hereto represents and warrants that:

(a)    It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)    no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms

000070

of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01   Compliance; Advisory Restrictions.

(a)      The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider. Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)      This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof. It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02   Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its

10

rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Client or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such information as is routinely disclosed to the trustee, custodian or collateral administrator of any Client or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such Client or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the Clients or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Clients or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01  Standard of Care. Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder. No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account. Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

000072

Section 6.02    Exculpation.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless it is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.  The exculpations set forth in this Section 6.02 shall exculpate any Covered Person regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03    Indemnification by the Management Company.   The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, causes of action (including, but not limited to, strict liability, negligence, statutory violation, regulatory violation, breach of contract, and all other torts and claims arising under common law), demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or

12

000073

arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons. Any Covered Person shall be indemnified under the terms of this Section 6.03 regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder shall be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04    Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the Clients or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; provided that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

000074

Section 6.05   <u>Rights of Heirs, Successors and Assigns</u>. The indemnification rights provided by <u>Section 6.03</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06   <u>Reliance</u>. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01   <u>Termination</u>. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01   <u>Amendments</u>. This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02   <u>Assignment and Delegation</u>.

(a)      Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)      Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)      The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has

14

substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    <u>Non-Recourse; Non-Petition</u>.

(a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive.  The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)    Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)    The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)    The provisions of this <u>Section 8.03</u> shall survive termination of this Agreement for any reason whatsoever.

15

000076

Section 8.04    <u>Governing Law</u>.

(a)    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)    The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "<u>Proceedings</u>") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05    <u>WAIVER OF JURY TRIAL</u>.    EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06    <u>Severability</u>.    The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07    <u>No Waiver</u>.    The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08    <u>Counterparts</u>.    This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

000077

Section 8.09    Third Party Beneficiaries.    This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, Client or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10    No Partnership or Joint Venture.    Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.  Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11    Independent Contractor.    Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12    Written Disclosure Statement.    The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13    Headings.    The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14    Entire Agreement.    This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15    Notices.    Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

      (a)    If to the Management Company:

          NexPoint Advisors, L.P.
          200 Crescent Court
          Suite 700
          Dallas, TX 75201

000078

    (b)      If to the Staff and Services Provider:

            Highland Capital Management, L.P.
            300 Crescent Court
            Suite 700
            Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

000079

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed as of the date hereof by its duly authorized representative.

NEXPOINT ADVISORS, L.P.

By:  NexPoint Advisors GP, LLC, its General Partner

By: _____

Name: Frank Waterhouse
Title: Treasurer

HIGHLAND CAPITAL
MANAGEMENT, L.P.

By:  Strand Advisors, Inc., its General Partner

By: _____

Name: Frank Waterhouse
Title: Treasurer

# EXHIBIT D

November 30, 2020

NexPoint Advisors, L.P.
200 Crescent Court, Suite 700
Dallas, Texas 75201

> RE: **Termination of Amended and Restated Shared Services Agreement, dated January 1, 2018, and among Highland Capital Management, L.P. ("<u>HCMLP</u>"), and NexPoint Advisors, L.P. (the "<u>Agreement</u>").**

To Whom It May Concern:

As set forth in Section 7.01 of the Agreement, the Agreement is terminable at will upon at least 30 days advance written notice.

By this letter, HCMLP is notifying you that it is terminating the Agreement.  Such termination will be effective January 31, 2021.  HCMLP reserves the right to rescind this notice of termination.

Please feel free to contact me with any questions.

Sincerely,

HIGHLAND CAPITAL MANAGEMENT, L.P.


/s/ James P. Seery, Jr.

James P. Seery, Jr.
Chief Executive Officer
Chief Restructuring Officer

# EXHIBIT E

000083

*Execution Version*

Highland Capital Management LP
300 Crescent Court, Suite 700
Dallas, Texas 75201

NexPoint Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

Highland Capital Management Fund Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

January 30, 2021

Ladies and Gentlemen:

This letter agreement (the "Letter Agreement") is entered into by and among Highland Capital Management LP ("HCMLP"), NexPoint Advisors, L.P. ("NPA"), and Highland Capital Management Fund Advisors, L.P. ("HCMFA").

Reference is made to the following agreements (as amended to date, the "NPA Services Agreements"):

1. Amended and Restated Shared Services Agreement dated effective as of January 1, 2018 by and between NPA and HCMLP

2. Payroll Expense Reimbursement Agreement dated as of May 1, 2018 by and between NPA and HCMLP (as amended by Amendment Number One December 14, 2018)

Reference is made to the following agreements (as amended to date, the "HCMFA Services Agreements" and together with the NPA Services Agreements, the "Services Agreements"):

1. Second Amended and Restated Shared Services Agreement dated effective as of February 8, 2013 by and between HCMFA and HCMLP

2. Payroll Expense Reimbursement Agreement dated as of May 1, 2018 by and between HCMFA and HCMLP (as amended by Amendment Number One December 14, 2018)

Pursuant to termination notices delivered by HCMLP to each of NPA and HCMFA, each of the Services Agreements is scheduled to terminate in accordance with its terms on January 31, 2021.

NPA hereby represents and warrants to HCMLP that it has paid to HCMLP in cash, by wire transfer on the date of this Letter Agreement, an amount equal to $210,000.  HCMFA hereby represents and warrants to HCMLP that it has paid to HCMLP in cash, by wire transfer on the date of this Letter Agreement, an amount equal to $360,241 (together with the payment from NPA referenced in the prior sentence, the "Pre-Paid Fees").

Subject to and in reliance upon the payments by NPA and HCMFA of the Pre-Paid Fees, HCMLP hereby agrees to continue the term of each of the Services Agreements for an additional period of 14 calendar days, with the first of such calendar days being February 1, 2021 (the " Extension Period").  Thereafter, the undersigned parties, HCMLP, NPA, and HCFMA agree and acknowledge that each of the NPA Services Agreement and the HCMFA Services Agreement will terminate automatically and without any further action or notice.

The Pre-Paid Fees to HCMLP are exclusive of any additional expenses incurred under the terms of the Services Agreement during the Extension Period, which will be billed in arrears to NPA and/or HCMFA as applicable.

Except as explicitly referenced in this Letter Agreement, the terms of the Services Agreements shall remain in effect during the Extension Period.  Each party to this Letter Agreement reserves all rights it has, or may have, including all rights to pursue and defend any claims and/or causes of action, with respect to any matter, agreement, or understanding not explicitly addressed in this Letter Agreement.  This Letter Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas, The undersigned parties unconditionally and irrevocably consent to the exclusive jurisdiction of the exclusive jurisdiction of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (which court, for purposes of this Letter Agreement, is the only court of competent jurisdiction) and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Letter Agreement or the matters contemplated hereby.

Sincerely,

Highland Capital Management LP

_____
By: James P. Seery, Jr.
Its:  Chief Executive Officer


Agreed and Accepted:

NexPoint Advisors, L.P.


_____
By:
Its:

Highland Capital Management Fund Advisors, L.P.


_____
By:
Its:

ActiveUS 185052458v.2

000085

# EXHIBIT F

| **From:** | James Seery <jpseeryjr@gmail.com> |
| **Sent:** | Wednesday, January 27, 2021 2:47 PM |
| **To:** | Ethan Powell |
| **Cc:** | Thomas Surgent |
| **Subject:** | Response to KL Gates Letter Dated January 27, 2021 |

Mr. Powell:

I write to respond briefly to your counsel's letter to me dated today. I will not be communicating with your counsel.

Initially, as I stated on the phone to you prior to your termination of my call, either the Funds' Board is unaware of the actions taken by the Funds in court over the past week or the Board is complicit in those actions. In my opinion, the Funds' CCO perjured himself multiple times yesterday, and the advisors and the Funds fabricated a false claim that HCMLP breached the Advisors Act with respect to HCMLP's management of certain CLOs. Based on our prior dealings, I would not have expected the Funds and their Boards to participate in such a false narrative in the Bankruptcy Court and hope that it was a case of counsel and the CCO hiding their tactics from the Board. We can address these issues at a later time.

With respect to the KL Gates letter, as the Board is aware, HCMLP has been pursuing a plan of reorganization that calls for termination of the shared service agreements with the Funds and their advisors for months. HCMLP has given timely notice of termination of the shared service agreements. As the Boards are further aware, for the past several months, HCMLP has attempted to work on a transition of HCMLP employees to a Dondero controlled entity that could work with the Funds to provide the services previously provided by HCMLP. And as I specifically told the Funds' Board, that arrangement is dependent on cooperation from Mr. Dondero as the person in complete control of the advisors. Since Mr. Dondero is also the portfolio manager of the advisors, HCMLP assumes that the Board have been in regular communication with him about the transition, especially since the termination notices were sent. KL Gates is correct that the shared service agreements and all services thereunder terminate on January 31, 2021 (the "Termination Date").

For the past several months, Mr. Dondero has refused to permit the negotiation of a transition arrangement on behalf of advisors. In the past few weeks, HCMLP and its advisors have been attempting to work with Brian Collins and JP Sevilla (senior HCMLP employees) to construct a transition arrangement based on the terms HCMLP has been proposing for months. Those soon to be former HCMLP employees would form their own company (with other former HCMLP employees) to provide the services to the advisors, the Funds, and others. We believe that arrangement is potentially close to agreement and will be documented in a term sheet that will need to be executed prior to the end of the day on the Termination Date. If the term sheet is agreed to, properly executed, and its conditions precedent are met, it will govern the respective parties' arrangement and the provision of services while final documents incorporating the agreement are drafted during the first two weeks of February.

A key condition precedent is for the advisors and their related entities to pay all post-petition amounts due to HCMLP. (HCMLP has already commenced actions to collect certain other amounts due to it from those related entities.). The total post-petition amount owed is approximately $5.5 million.

HCMLP encourages the Board to reach out to Messrs. Collins and Sevilla to gain an understanding of the terms of the potential transition arrangement, the counterparties 'willingness to execute the term sheet, and the counterparties' ability to timely make the required payment.

I will not address the remainder of the KL Gates letter. By declining to address the letter, HCMLP does not agree with it, save for the recognition that termination of the shared service agreements has been properly given and that the agreements and services thereunder terminate on the Termination Date. HCMLP reserves all its rights and claims.

1

000087

Best. Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

000088

# EXHIBIT G

000089

*By Email and FedEx*

Board of Trustees of Highland Funds
c/o Stacy Louizos, Esq.
Blank Rome LLP
1271 Avenue of the Americas
New York, NY 10020
slouizos@blankrome.com

Ethan Powell, Trustee: ethanpowell@impactshares.org
John Honis, Trustee: Jhonis@RandAdvisors.com
Dr. Bob Froehlich, Trustee: drbobf@gmail.com
Bryan Ward, Trustee: bward2299@gmail.com
Ed Constantino, Trustee: enconstantino@gmail.com

February 8, 2021

Dear Members of the Board of Trustees:

I write regarding the transition of the Shared Services (as defined below) provided by
Highland Capital Management LP ("HCMLP") to NexPoint Advisors, L.P. and Highland
Capital Management Fund Advisors, L.P. (the "Fund Advisers"), which serve as
investment advisers to the investment companies registered under the Investment
Company Act of 1940 that are overseen by the Board (collectively, the "Funds").

As you are aware, HCMLP provides certain back- and middle-office services,
administrative, infrastructure, and other services to the Fund Advisers under Shared
Service Agreements between HCMLP and the Fund Advisers (the "Shared Service
Agreements").  These services include office space and facilities, personnel
sharing/human resources, information technology, trade desk services, compliance/risk
personnel, administrative, tax, document negotiation, valuation, and reporting services
as described more fully in the Shared Service Agreements (collectively, the "Shared
Services").

As the Board is also aware, HCMLP gave the required advance notice of termination of
its services under the Shared Service Agreements more than two months ago, and has
extended that notice for an additional two weeks, solely to accommodate the Fund
Advisers' need for additional time to transition services.  Accordingly, February 14, 2021
is now the extended termination date of the Shared Services Agreements and related
Payroll Expense Reimbursement Agreements that form the basis of the services
provided by HCMLP to the Fund Advisers.

As of today, the Fund Advisers have not confirmed that they are prepared to fully service
the Funds without interruption following the termination.  As discussed below, HCMLP is
in bankruptcy, has diminishing resources, and is subject to a creditor's committee and
plan of reorganization that does not contemplate HCMLP continuing to provide services
to the Fund Advisers after February 14, 2021.  As a result, we are once again providing
the Board with notice that it must exercise its oversight responsibility over the Funds to
assure that there is a replacement service provider by February 15, 2021.

1" = "1" "ActiveUS 185190916v.5" "" ActiveUS 185190916v.5

Board of Trustees
February 8, 2021
Page 2

Both before and after notice of termination was given, HCMLP has endeavored in good faith to negotiate an appropriate transition of the shared services to a newly-formed company ("NewCo") that will be owned and operated by the very same employees that oversee the provision of the shared services now (following their termination by HCMLP, that is).

Our interest in transitioning this business and these employees is not simply a desire, it is part and parcel of the reorganization and Chapter 11 restructuring plan for HCMLP that was approved by the federal bankruptcy court this morning.

Unfortunately, our negotiations with the Fund Advisers to bring this matter to a conclusion, while ongoing, have not resulted in an agreement.  And indeed, the Fund Advisers' conduct at times has been counterproductive to the transition of these services, requiring multiple instances of court intervention to prevent harm to HCMLP or the estate.

HCMLP recognizes the potential consequences of a material disruption in the Fund Advisers' services to the Funds and their investors, and therefore has at all times sought to ensure uninterrupted service to the Fund Advisers.  Most recently we offered to extend the termination date for an additional 14 days, despite not having been paid by the Fund Advisers for our services for months prior to the extension.  To be clear, however, HCMLP is a debtor in bankruptcy and is winding down its operations and employees.  At some point shortly after February 14, HCMLP will no longer have the resources to provide these services to the Fund Advisers.  Moreover, the bankruptcy creates uncertainty about future employment status for the HCMLP employees providing services to the Fund Advisers, creating risk to our future ability to provide these services, which we understand are necessary to the Funds.

We remain committed to attempting to transition the Shared Services to NewCo or any other successor servicer selected by the Board and/or the Fund Advisers.  We continue to actively negotiate a binding term sheet that would ensure a smooth and successful transition.  We cannot complete this negotiation without the Fund Advisers' participation and agreement.  For this reason, we reiterate that the Trustees must (i) make clear to the Fund Advisers their shared commitment to that transition, and (ii) specifically articulate to us their plan to ensure the Funds do not fail in the event the Fund Advisers do not agree to a plan of transition.

Without waiver to our claims against the Fund Advisers, including the Fund Advisers' material default in payments to HCMLP, in the interests of facilitating an orderly transition by February 15, HCMLP is also prepared to make the web and e-mail domains and data relevant to the shared services available to NewCo at the time of transition.

In closing, HCMLP has acted in good faith at all times to effectuate the orderly transition of the Shared Services.   Now that we face the loss of budget and personnel needed to provide these services, I think we can agree that the interests of the Funds and their shareholders are not served by the Fund Advisers' refusal to bring this matter to closure by the February 14 termination date.  The solution is at hand and we see no reason why,

Board of Trustees
February 8, 2021
Page 3

with your commitment, the transition cannot be completed in an orderly fashion in
advance of that termination.

Sincerely,

HIGHLAND CAPITAL MANAGEMENT, L.P.

James P. Seery, Jr.
Chief Executive Officer/Chief Restructuring Officer

000092

# EXHIBIT H

*By Email*

Board of Trustees of Highland Funds
c/o Stacy Louizos, Esq.
Blank Rome LLP
1271 Avenue of the Americas
New York, NY 10020
slouizos@blankrome.com

Ethan Powell, Trustee: ethanpowell@impactshares.org
John Honis, Trustee: Jhonis@RandAdvisors.com
Dr. Bob Froehlich, Trustee: drbobf@gmail.com
Bryan Ward, Trustee: bward2299@gmail.com
Ed Constantino, Trustee: enconstantino@gmail.com

February 12, 2021

Dear Members of the Boards of Trustees/Directors:

I write further to my letter of February 8, 2021 regarding the termination or transition of
the shared services provided by Highland Capital Management LP ("HCMLP") to
NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P. (the
"Fund Advisers"), which serve as investment advisers to the investment companies
registered under the Investment Company Act of 1940 that are overseen by the Board
(collectively, the "Funds").

Specifically, I am writing to be sure that the current status from our perspective is clear to
you as HCMLP seeks to resolve this matter:

*Negotiation of Term Sheet to Transition Services to an Alternative Service Provider*

In my February 8th letter, I indicated that our negotiations with the Fund Advisers are
ongoing, but an agreement remains beyond our collective grasp. HCMLP believes that
we are at a point where there are no open material business issues. Our most recent draft
of the Term Sheet to the Fund Advisers provides the Fund Advisers with access to all
necessary information, systems, and data.

Specifically, under the Term Sheet, in exchange for the agreed upon fees, HCMLP will
agree to:

(i) provide access for employees and personnel of the Fund Advisers and their
subsidiaries to and use of the offices, and facilities of HCMLP in a manner consistent
with customary access and use by employees and shared personnel (of the newco) of the
Fund Advisers and their subsidiaries,

(ii) provide employees and personnel of the Fund Advisers with access to and use
of the systems and resources of HCMLP as set forth on an extensive schedule of vendor
agreements, software platforms, IT services, trading systems, administrative systems, and

4096" = "1" "ActiveUS 185229688v.4" ""

Board of Trustees / Directors
February 12, 2021
Page 2

other resources, in each case as agreed by the parties, and

(iii) transfer to the Fund Advisers all of HCMLP's rights title and interest in the domain names required by the Fund Advisers. In turn, the cost of the leased space and other Shared Resources will be shared by the parties as agreed on the detailed schedule on an item-by-item basis, but generally reflecting a split of 60% payable by the Fund Advisers and 40% payable by HCMLP (except with respect to rent where the split is 75% payable by the Fund Advisers and 25% by HCMLP).

By way of background, after pushing to commence these negotiations since last summer, we finally got some engagement from the Fund Advisers and provided the revised draft Term Sheet to counsel for the Fund Advisers on January 28th. We have since collectively revised the draft several times, including sending a draft on February 2nd and most recently providing the current draft yesterday. We are prepared to execute the current draft of the revised Term Sheet today.

We write to share this information with the Independent Trustees/Directors of the Funds because HCMLP believes it cannot provide these services beyond February 19, 2021. It is for you and your counsel to assess whether the Board should take steps to assure that services to the Funds will be maintained beyond this date. Of course, our position is that it is your fiduciary duty to meet that obligation. We are confident we have met our obligations and are prepared to take steps to underscore that position.

*February 19th Deadline*

As you know, last November HCMLP provided the Fund Advisers with the requisite two-month notice under the Shared Services Agreements. The Fund Advisers did not arrange for an alternative service provider during this period, even though this issue has been on the table since last summer.

Nonetheless, in the interest of reaching a good faith resolution, HCMLP extended the termination of the shared services from January 31st to February 14th to provide additional time for the Fund Advisers to transition. We have now agreed to further extended the termination deadline an additional working week, to February 19th, conditioned on payment. But we have reached the point where our obligations to the Estate means that this is a firm deadline. After February 19th, HCMLP will not be in a position to continue to provide services to the Fund Advisers. This will result in the cessation of services that have been provided to the Fund Advisers, including, without limitation, pricing, striking of daily net asset values, compliance support, trading systems, email, and other IT functions. These services may be required for Funds' shareholders to purchase and sell shares of the Funds unless you have arranged alternative services from a successor provider.

HCMLP stands ready to cooperate to transition necessary data and files to a successor services provider identified by the Funds and/or the Fund Advisers.

Board of Trustees / Directors
February 12, 2021
Page 3

*Fund Board Involvement*

In my February 8th letter, I requested on behalf of HCMLP that the Board (i) make clear to the Fund Advisers their shared commitment to that transition, and (ii) specifically articulate to us their plan to ensure the Funds do not fail in the event the Fund Advisers do not agree to a plan of transition.

We await a written position on these issues.


Sincerely,

HIGHLAND CAPITAL MANAGEMENT, L.P.

James P. Seery, Jr.
Chief Executive Officer/Chief Restructuring Officer

# EXHIBIT I

Highland Capital Management LP
300 Crescent Court, Suite 700
Dallas, Texas 75201

NexPoint Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

Highland Capital Management Fund Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

February 11, 2021

Ladies and Gentlemen:

This letter agreement (the "Letter Agreement") is entered into by and among Highland Capital
Management LP ("HCMLP"), NexPoint Advisors, L.P. ("NPA"), and Highland Capital
Management Fund Advisors, L.P. ("HCMFA").

Reference is made to the following agreements (as amended to date, the "NPA Services
Agreements"):

1. Amended and Restated Shared Services Agreement dated effective as of January 1, 2018
   by and between NPA and HCMLP

2. Payroll Expense Reimbursement Agreement dated as of May 1, 2018 by and between
   NPA and HCMLP (as amended by Amendment Number One December 14, 2018)

Reference is made to the following agreements (as amended to date, the "HCMFA Services
Agreements" and together with the NPA Services Agreements, the "Services Agreements"):

1. Second Amended and Restated Shared Services Agreement dated effective as of
   February 8, 2013 by and between HCMFA and HCMLP

2. Payroll Expense Reimbursement Agreement dated as of May 1, 2018 by and between
   HCMFA and HCMLP (as amended by Amendment Number One December 14, 2018)

Each of the Services Agreements was scheduled to terminate in accordance with its terms on
January 31, 2021, and in each case such termination was extended to February 14, 2021 by that
certain letter agreement by and among the undersigned parties dated January 30, 2021 (the "First
Extension Letter").  Now, the undersigned parties wish to further extend such terminations to
February 19, 2021 in accordance with the terms of this Letter Agreement.

NPA hereby represents and warrants to HCMLP that it has paid to HCMLP in cash, by wire
transfer on the date of this Letter Agreement, an amount equal to $75,000.  HCMFA hereby
represents and warrants to HCMLP that it has paid to HCMLP in cash, by wire transfer on the
date of this Letter Agreement, an amount equal to $128,657 (together with the payment from
NPA referenced in the prior sentence, the "Pre-Paid Fees").

000098

Subject to and in reliance upon the payments by NPA and HCMFA of the Pre-Paid Fees, HCMLP hereby agrees to continue the term of each of the Services Agreements for an additional period of 5 calendar days, with the first of such calendar days being February 15, 2021 (the "Second Extension Period").  Thereafter, the undersigned parties, HCMLP, NPA, and HCFMA, agree and acknowledge that each of the NPA Services Agreement and the HCMFA Services Agreement will terminate automatically and without any further action or notice.

The Pre-Paid Fees to HCMLP are exclusive of any additional expenses incurred under the terms of the Services Agreement during the Second Extension Period, which will be billed in arrears to NPA and/or HCMFA as applicable.

Except as explicitly referenced in this Letter Agreement, the terms of the Services Agreements (as extended by the shall remain in effect during the Second Extension Period.  Each party to this Letter Agreement reserves all rights it has, or may have, including all rights to pursue and defend any claims and/or causes of action, with respect to any matter, agreement, or understanding not explicitly addressed in this Letter Agreement.  This Letter Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas, The undersigned parties unconditionally and irrevocably consent to the exclusive jurisdiction of the exclusive jurisdiction of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (which court, for purposes of this Letter Agreement, is the only court of competent jurisdiction) and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Letter Agreement or the matters contemplated hereby.

Sincerely,

Highland Capital Management LP

By: _James P. Seery, Jr_
Its: _CEO/CRO_

Agreed and Accepted:

NexPoint Advisors, L.P.

By: Dustin Norris
Its:  Executive Vice President

Highland Capital Management Fund Advisors, L.P.

By: Dustin Norris
Its:  Executive Vice President

ActiveUS 185255545v.1

000099

# EXHIBIT J

**Execution Version**

## CONFIDENTIAL BINDING TERM SHEET

This Confidential Binding Term Sheet (including the Schedules attached hereto, this "Term Sheet") is entered into effective as of February 12, 2021 (the "Effective Date") by and among Highland Capital Management, LP ("HCMLP") and the following parties (collectively, the "NexPoint Parties"): NexPoint Advisors, L.P. ("NPA"), and Highland Capital Management Fund Advisors, L.P. ("HCMFA").

The NexPoint Parties and HCMLP collectively are referred to as the "Parties" and each of them as a "Party".

## PREAMBLE

WHEREAS, HCMLP and the NexPoint Parties were parties to certain Shared Services Agreements and Payroll Expense Reimbursement Agreement pursuant to which HCMLP provided certain personnel and services to the NexPoint Parties in consideration of payments by the NexPoint Parties for such shared services (the "Shared Services Agreements").

WHEREAS, termination notices for such Shared Services Agreements were delivered to the NexPoint Parties in accordance with the terms of such Shared Services Agreements.

WHEREAS, the Parties have been engaged in discussions and negotiations prior to and since the delivery of such termination notices with respect to the potential extension of shared services by HCMLP to the NexPoint Parties.

WHEREAS, HCMLP, NPA, and HCMFA have entered into a Letter Agreement dated January 31, 2021 which extends the Shared Services Agreements applicable to NPA and HCMFA, which otherwise would have expired on January 31, 2021, for a 14-day period beginning on February 1, 2021.

WHEREAS, HCMLP, NPA, and HCMFA have entered into a Second Letter Agreement dated February 11, 2021 which extends the Shared Services Agreements applicable to NPA and HCMFA, which otherwise would have expired pursuant to the first Letter Agreement on February 14, 2021, for five days through February 19, 2021.

WHEREAS, certain employees of HCMLP intend to form a new company ("Newco") to provide services similar to those provided under the Shared Service Agreements to the NexPoint Parties and other third parties.

WHEREAS, the Parties wish to enter into a binding term sheet pursuant to which HCMLP will provide certain access and resources to the NexPoint Parties in consideration of payments and other agreements of the NexPoint Parties.

NOW, THEREFORE, in consideration of the covenants and agreements set forth in this Term Sheet and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## I.    RESOURCES AND PAYMENTS

Section 1.1    Payment of Past Due Amounts.  The NexPoint Parties will pay to HCMLP an amount equal to $3,054,253 (the "Past Due Payment Amounts") in immediately available funds as follows:  (i) $1,000,000 will be paid on the Effective Date and (ii) the balance shall be paid in fourteen

equal monthly installments on the first business day of each month following the Effective Date. The payment of the Past Due Payment Amounts will offset dollar for dollar amounts owed by the NexPoint Parties to HCMLP after the filing of HCMLP's bankruptcy petition on October 19, 2019, under the Shared Services Agreements.

Section 1.2    Access to Premises; Office Space.

(a)    Until the expiration of the current term of the HCMLP lease for 200 and 300 Crescent Court, Dallas, Texas 75201 (the "Premises") (April 30, 2022) (the "Lease"), employees and personnel of the NexPoint Parties and their subsidiaries and affiliates shall be afforded by HCMLP access to and use of the offices, and facilities of HCMLP located at the Premises in a manner consistent with customary access and use of employees and shared personnel of the NexPoint Parties and their subsidiaries and affiliates, and subject to any restrictions and conditions applicable under the Lease. Parties will work in good faith to enter a sublease for no less than 75% of the Premises to NexPoint Parties at the lease-rate set forth on Schedule A to this Term Sheet.

(b)    In consideration of the access and use of the offices and facilities by employees and personnel of the NexPoint Parties as set forth in Section 1.2(a), the NexPoint Parties shall make prompt payments in cash, by wire transfer, to HCMLP or its designee in such amounts and at such times as are set forth on Schedule A to this Term Sheet.

(c)    For the avoidance of doubt the access and limited use of the offices and facilities by employees and personnel of the NexPoint Parties as set forth in Section 1.2(a) shall not include sharing of any HCMLP information (with all such information being deemed confidential and for the exclusive use by and benefit of HCMLP employees and/or personnel) other than shared spaces such as conference rooms, reception areas, restrooms, and dining areas. The parties acknowledge that there will be certain areas subject to the exclusive use and control of either HCMLP or the NexPoint Parties as will be agreed to in the Definitive Agreement or in the sublease, which may be entered into prior to the Definitive Agreement. HCMLP information shall include all files, data, communications, and documents that are maintained and utilized by personnel of HCMLP and/or its general partner that are not necessary for the business of the NexPoint Parties, including without limitation all files, data, communications, and documents relating to the bankruptcy of HCMLP, the management and affairs of HCMLP, personnel matters of HCMLP, disputes to which HCMLP is a party, communications with counsel to HCMLP and other outside advisors, and communications with the members of the board of the general partner of HCMLP. Correspondingly, the parties agree that NexPoint Parties will continue to have, and HCMLP will not interfere with, access to certain Shared Resources as defined below. Further, HCMLP shall use reasonable efforts to avoid using or accessing any NexPoint Parties' privileged (*i.e.*, between any NexPoint Party and its outside or external counsel) e-mails and privileged information housed on certain Shared Resources, except as necessary to satisfy HCMLP's regulatory or legal requirements

(d)    HCMLP shall have no obligation to renew or extend the Lease beyond April 30, 2022.

(e)    The NexPoint Parties shall, and shall ensure that their employees and personnel, comply with and fulfill any obligations or responsibilities applicable to employees or personnel of HCMLP under the Lease and other documents and policies governing the use of the offices and facilities hereunder (including, but not limited to, the restriction against the access of any and all HCMLP information).

(f)    The Parties acknowledge and agree that one or more of the Parties may engage Newco to provide back-office services to such Party or Parties pursuant to a services agreement (or equivalent agreement or arrangement) between such Party or Parties and Newco. To the extent a Party enters into any such agreement or arrangement with Newco, the Parties shall cooperate to provide Newco personnel

2

with reasonable access to the facilities and resources set forth in <u>Schedule A</u> to the extent reasonably necessary for Newco to perform its services to such Party.

Section 1.3    <u>Access to Certain Shared Resources</u>.

(a)    HCMLP shall provide employees and personnel of the NexPoint Parties with access to and use of the systems and resources of HCMLP set forth on <u>Schedule A</u> to this Term Sheet (the "<u>Shared Resources</u>") during the periods set forth on <u>Schedule A</u>. Correspondingly, the parties agree that NexPoint Parties will continue to have, and HCMLP will not interfere with, access to certain necessary Shared Resources. For the avoidance of doubt, the parties agree that NexPoint Parties will have access to the same books and records as available under the applicable Shared Services Agreements. Further, to the extent permitted by the terms and agreements governing the Shared Resource, HCMLP agrees that NexPoint Parties shall have the right to share or sublicense such Shared Resource at NexPoint Parties' discretion.

(b)    In consideration of the provision of Shared Resources by HCMLP to employees and personnel of the NexPoint Parties as set forth in <u>Section 1.3(a)</u>, the NexPoint Parties shall make prompt payments in cash, by wire transfer, to HCMLP or its designee in such amounts and at such times as are set forth on <u>Schedule A</u> to this Term Sheet.  The NexPoint Parties shall pay all initial one-time payments set forth on <u>Schedule A</u> to HCMLP as a single lump sum within 30 days after the date of this Term Sheet. Thereafter, the NexPoint Parties shall make all monthly payments (or other periodic payments) set forth on <u>Schedule A</u> to HCMLP on or before the first day of the calendar month (or other period) to which such payment relates.  All payment obligations of the NexPoint Parties under this Term Sheet shall be joint and not several.  Except with respect to such payment obligations, the obligations and liabilities of the NexPoint Parties hereunder shall be several and not joint.

(c)    Each such Shared Resource shall be renewed only to the extent necessary to remain available to employees and personnel of the NexPoint Parties and HCMLP for such parties to perform their duties consistent with past practices during such periods set forth on <u>Schedule A</u>.  Thereafter, no Party to this Term Sheet shall be responsible for extension or renewal of any such Shared Resource or to provide access to any such Shared Resource with any other Party.  The aggregate cost of any renewal (even if such renewal extends beyond the term provided in <u>Schedule A</u>) shall be borne 60% by the NexPoint Parties and 40% by HCMLP.  The NexPoint Parties shall promptly pay their portion of such renewal costs to HCMLP or its designee at the request of HCMLP at least five (5) Business Days (as defined below) before the date such renewal payment is required to be made to the applicable vendor, and assuming timely receipt of such portion, HCMLP shall timely make the full renewal payment to the applicable vendor. For purposes of this Term Sheet, "Business Day" shall mean a day on which the New York Stock Exchange is open for regular trading. The parties hereby agree to discuss the renewal of such Shared Resource prior to renewal and agree that to the extent the one of the parties determines that a Shared Resource no longer necessary for one or both of the parties to operate, then either (i) such vendor contract shall not be renewed, or (ii) if renewed, such vendor contract shall be renewed and paid solely by the party that needs the contract to operate.

(d)    The NexPoint Parties shall, and shall ensure that their employees and personnel, comply with and fulfill any obligations or responsibilities applicable to employees or personnel of HCMLP under the policies governing the use of the Shared Resources hereunder.

Section 1.4    <u>Unexpected Costs; Repairs</u>.  In the event it is necessary for the Parties to incur any costs (*e.g.*, in the case of breakdowns or repairs) for the continued functionality of the Shared Services at their existing levels, such additional expenditures shall be (i) approved by HCMLP and NPA, and (ii) borne 60% by the NexPoint Parties and 40% by HCMLP.

ActiveUS 185044344v.7
DOCS_NY:42334.2

Section 1.5    <u>Failure to Pay; Cure Period</u>. In the event a NexPoint Party fails to satisfy any payments such NexPoint Party is obligated to make pursuant to this Term Sheet and such NexPoint Party fails to cure such failure to make prompt payment within five (5) Business Days of receipt of notice of such failure from HCMLP, HCMLP shall have the right to terminate access to all Shared Resources and all respective agreements in connection with such Shared Resources with respect to all of the NexPoint Parties. HCMLP further agrees that in the event that HCMLP fails to make any payment to a landlord or Shared Resource vendor required to be made hereunder, the NexPoint Parties shall have the right to make the payments necessary to retain such leased property, service or Shared Resource and deduct such the amount of such payments from future payments due to HCMLP under the Term Sheet.  If the amounts paid by the NexPoint Parties exceed what would otherwise be due to HCMLP from such NexPoint Parties, the NexPoint Parties may pursue recovery from HCMLP for such excess amount.

## II.    OTHER AGREEMENTS OF THE PARTIES

Section 2.1    <u>Certain Benefit Plan Matters</u>.

(a)    On or before February 19, 2021, HCMLP and NPA shall enter into a mutually acceptable Assignment and Assumption Agreement, pursuant to which HCMLP agrees to assign to NPA, and NPA agrees to assume, effective as of January 1, 2021, all of the rights and obligations of HCMLP as the "Primary Plan Sponsor" of the Highland 401(k) Plan, as amended and restated effective January 1, 2016 (as amended to date).

(b)    HCMLP and NPA shall use reasonable best efforts to enter into a mutually acceptable Assignment and Assumption Agreement (or equivalent agreement), pursuant to which HCMLP agrees to assign to NPA or its designee, and NPA or its designee agrees to assume all of the rights and obligations of HCMLP as the sponsor of Highland's defined benefit plan (as amended to date).

(c)    To the extent permitted under applicable law (including without limitation the Employee Retirement Income Security Act of 1974) the parties agree to enter into an arrangement with respect to employee benefit plan (including, without limitation, health, medical, dental, and other similar plans) whereby, as soon as reasonably practicable, NPA shall admit and maintain each employee of HCMLP and its sole limited partner of the Claimant Trust as a participant of each employee benefit plan (including, without limitation, health, medical, dental, and other similar plans) maintained by or on behalf of NPA for employees of NPA and/or the NexPoint Parties, on the same terms and subject to the same conditions as such employees of NPA and/or the NexPoint Parties.  The parties agree that the actual costs of such employee benefit plans attributable to HCMLP employees shall be borne by HCMLP.

Section 2.2    <u>Transfers of Property to NPA</u>.

(a)    As soon as reasonably practicable following the execution of this Term Sheet, HCMLP shall transfer to NPA or its designee, all of HCMLP's rights title and interest, if any, in the domain names set forth on <u>Schedule C</u> to this Term Sheet (the "<u>Domain Names</u>"), and, to the extent possible, all telephone numbers currently utilized exclusively by the NexPoint Parties.  The NexPoint Parties shall provide a list of such telephone numbers to HCMP as soon as practicable following the execution of this Term Sheet and HCMLP and the NexPoint Parties shall meet and confer in good faith to confirm that such telephone numbers are exclusively used by the NexPoint Parties.

(b)    If the NexPoint Parties (i) make all payments required by this Term Sheet (and any other Definitive Agreement that supersedes this Term Sheet), (ii) fulfill all of their obligations under this Term Sheet (and any other Definitive Agreement that supersedes this Term Sheet), and (iii) are not in breach of any material provision of this Term Sheet, any other Definitive Agreement that supersedes this Term

ActiveUS 185044344v.7
DOCS_NY:42334.2

Sheet, and/or any material provision of any other agreement between HCMLP and a NexPoint Party in each case through the full term of this Term Sheet (and any other Definitive Agreement that supersedes this Term Sheet) provided that in the event of any such breach the breaching NexPoint Party has notice thereof and a reasonable opportunity to cure (not to exceed 30 calendar days) if such breach is curable (collectively, the "NexPoint Conditions"), then upon the expiration of the term of this Term Sheet (or any other Definitive Agreement that supersedes this Term Sheet), HCMLP shall transfer to NPA or its designee, all of HCMLP's rights, title, and interest, if any, (1) in the furniture and fixtures and office supplies and equipment located on or used exclusively in connection with the operations at the Premises; (2) Flexential; (3) Evoque; and (4) the home offices or remote working spaces of its employees and personnel.

Section 2.3    Employee Matters.

(a)    Each the following shall terminate on February 20, 2021, in accordance with its terms: (i) that certain *Payroll Reimbursement Agreement*, dated May 1, 2018, by and between HCMFA and NPA, as subsequently amended on December 14, 2018, and (ii) (i) that certain *Payroll Reimbursement Agreement*, dated May 1, 2018, by and between HCMFA and HCMLP, as subsequently amended on December 14, 2018.

(b)    HCMLP agrees that (i) the NexPoint Parties or an entity formed by current or former HCMLP employees to provide services to the NexPoint Parties (the "Potential Employers") may, in each case in their sole and absolute discretion, make offers of employment to any HCMLP employee and (ii) HCMLP will not enforce any non-compete or similar agreement if any HCMLP employee accepts an offer of employment with a Potential Employer.  For the avoidance of doubt, nothing herein will prevent HCMLP from continuing to employ an HCMLP employee or require HCMLP to terminate an HCMLP employee if a Potential Employer makes an offer of employment.

Section 2.4    Limited Liability.

(a)    HCMLP shall not be liable to any person or entity, including any third party, for any action, inaction, or conduct of any NexPoint Party or that of such NexPoint Party's or its affiliates' employees, personnel, officers, directors, managers, members, representatives, agents, principals, owners, or partners (collectively, "Agents") in connection with use by the NexPoint Parties or their Agents of HCMLP's offices, facilities, and/or the shared resources under this Term Sheet.

(b)    The NexPoint Parties shall indemnify and hold harmless HCMLP from and against any and all costs and expenses (including advancing of reasonable attorneys' fees) of HCMLP or its affiliates or any of their Agents (including, without limitation, costs and expenses of any disputes, legal actions, examinations, investigations, and other legal or regulatory costs or expenses), related to or arising out of any action, inaction, or conduct by the NexPoint Parties or their Agents in connection with use by the NexPoint Parties of HCMLP's offices, facilities, and/or the shared resources under this Term Sheet.

(c)    No Party shall be liable to any other Party or to any other person or entity for the failure to provide services, access, or resources hereunder if such failure results from an event beyond the reasonable control of the Party obligated to provide such services, access, or resources.

## III.    BINDING TERM SHEET; DEFINITIVE AGREEMENTS

Section 3.1    Binding Agreement.  The Parties agree that this Term Sheet constitutes the legal, valid and binding obligation of each Party, enforceable against each Party in accordance with its terms.

Section 3.2    <u>Entire Current Understanding and Agreement</u>.  This Term Sheet constitutes the entire current understanding and agreement by and among the Parties hereto with respect to the subject matter hereof and supersedes any and all prior or contemporaneous negotiations, term sheets, covenants, agreements, undertakings and understandings (written or oral) and courses of conduct and dealing by or among the Parties with respect to the matters expressly set forth herein.

Section 3.3    <u>Term Sheet Controls</u>.  Any express terms and conditions set forth in this Term Sheet shall control any conflict or inconsistency with, and amend and supersede, the terms and conditions of any and all other agreements between or among the Parties, except to the extent that (x) another agreement is amended and/or restated or entered into after the Effective Date with the prior written consent of each of HCMLP and NPA and (y) such other agreement states that it shall control in the event of any conflict or inconsistency between such other agreement.

Section 3.4    <u>Definitive Agreement</u>.  The Parties agree that a definitive agreement among the Parties that supersedes this Term Sheet (a "<u>Definitive Agreement</u>") will be necessary, desirable and/or appropriate to implement the terms and conditions set forth in this Term Sheet.  Accordingly, the Parties agree to negotiate in good faith any additional terms and conditions relating to the matters herein in a manner to fully implement, and in a manner consistent with, the terms and conditions set forth in this Term Sheet, except to the extent that the Parties mutually shall otherwise agree in writing.  Nevertheless, until any such Definitive Agreement is effective, this Term Sheet shall remain in full force and effect.

Section 3.5    <u>Efforts, Authorizations and Consents; Cooperation; No Ulterior Actions</u>.

(a)    <u>Efforts</u>.  Each Party shall proceed diligently and in good faith, and agrees to use all reasonable best efforts to do, and cause to be done, all things necessary, desirable and/or appropriate to, as promptly as practicable and in accordance with the terms and timeline set forth herein, consummate the transactions contemplated by this Term Sheet, and shall direct and cause its affiliates and its affiliates' officers and employees to so proceed and to so act.

(b)    <u>Authorizations and Consents</u>.  Each Party shall use reasonable best efforts to obtain all authorizations, consents, registrations, orders and approvals that may be or become necessary, desirable and/or appropriate for such Party's execution and delivery of, and the performance of such Party's obligations pursuant to, this Term Sheet, and each Party agrees to cooperate fully and promptly with a requesting Party in its seeking to obtain all such authorizations, consents, registrations, orders and approvals.

(c)    <u>Cooperation</u>.  Each Party agrees to cooperate fully and promptly with the other Parties to consummate the Definitive Agreement in accordance with the terms and timeline contemplated herein and shall direct and use its reasonable best efforts to cause Persons under its control to so cooperate.

(d)    <u>Indirect Actions</u>.  Each Party acknowledges and agrees that he will not, on or after the Effective Date, avoid or seek to avoid, the economic and other rights, powers, privileges or interests of the other Parties set forth in this Term Sheet.  Each Party shall not, and each Party shall cause Persons under his control not to, do indirectly that which cannot be done directly under this Term Sheet.

Section 3.6    <u>Further Assurances</u>.  At any time and from time to time, at the request of any Party and without further consideration, the other Parties shall execute and deliver such instruments and take such action as such Party may reasonably determine is necessary, desirable and/or appropriate to carry out the actions contemplated by this Term Sheet.

Section 3.7    <u>NexPoint Parties Representative</u>.  For convenience of administration, all of the NexPoint Parties hereby appoint NPA as their sole representative for purposes of all actions, consents, notices, and communications hereunder to or from the NexPoint Parties.  HCMLP may rely upon any action by NPA or communication to or from NPA to serve as an action of, or communication to or from, and to bind, all of the NexPoint Parties.

## IV.   MISCELLANEOUS OTHER PROVISIONS

Section 4.1    <u>Term</u>.  This Term Sheet shall terminate without further action of any Party on April 30, 2022 (unless otherwise agreed in writing by HCMLP and NPA).  Any payments required to be made by a Party hereunder shall for periods through April 30, 2022 shall survive termination of this Term Sheet.  In addition, the following sections shall survive termination of this Term Sheet indefinitely: Sections 2.3 (Limited Liability), 4.4 (Notices) 4.7 (Governing Law; Submission to Jurisdiction; Service of Process), 4.9 (No Third-Party Beneficiaries).

Section 4.2    <u>Amendment</u>.  This Term Sheet shall be binding upon the Parties and may not be modified in any manner, except by an instrument in writing of concurrent or subsequent date signed by each of HCMLP and NPA.

Section 4.3    <u>Waiver of Rights</u>.  No delay or omission by any Party in exercising any right under this Term Sheet shall operate as a waiver of that or any other right.  A waiver or consent given by any Party hereto on any one occasion shall be effective only in that instance and shall not be construed as a ban or waiver of any right on any other occasion.

Section 4.4    <u>Notices</u>.  All notices, requests, demands, claims, and other communications hereunder shall be in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly delivered:  (a) four (4) Business Days after it is sent by registered or certified mail, return receipt requested, postage prepaid; (b) one (1) Business Day after it is sent for next Business Day delivery via a reputable nationwide overnight courier service; (c) when sent, if e-mailed on a Business Day; (d) the next Business Day following the day on which the e-mail is sent if e-mailed on a day that is not a Business Day; (e) when receipt is acknowledged, if facsimiled on a Business Day; and (f) the next Business Day following the day on which receipt is acknowledged if facsimiled on a day that is not a Business Day, in each case to the intended recipient as set forth below:

If to HCMLP:

James P. Seery, Jr.
c/o Highland Capital Management, LP
300 Crescent Court
Dallas, Texas 75201
Email:  jpseeryjr@gmail.com

With copies to:

Pachulski Stang Ziehl & Jones LLP
780 3rd Ave #34
New York, NY 10017
Attention:  Gregory V. Demo
Email:  GDemo@pszjlaw.com

and

Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Attention:  Timothy F. Silva
Email:  timothy.silva@wilmerhale.com

If to the NexPoint Parties:

D.C. Sauter
300 Crescent Court, Suite 700
Dallas, Texas 75201
Email:  DSauter@NexPointadvisors.com

With a copy to:

K&L Gates LLP
4350 Lassiter at North Hills Avenue
Suite 300
P.O. Box 17047
Raleigh, North Carolina 27619
Attention:  A. Lee Hogewood III
Email:  lee.hogewood@klgates.com

Any Party may give any notice, request, demand, claim, or other communication hereunder using any other means (including personal delivery, expedited courier, messenger service, telecopy, telex, ordinary mail, or electronic mail), but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it actually is received by the Party for whom it is intended.  Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

Section 4.5      Reservation of Rights.  For the avoidance of doubt, each Party reserves all rights it has, or may have, including all rights to pursue and defend any claims and/or causes of action, with respect to any matter, agreement, or understanding not explicitly addressed in this Term Sheet.  The Parties expressly reserve all rights with respect to amounts asserted in connection with the NexPoint Parties' administrative claim, including, without limitation the NexPoint Parties' right to amend such claim to assert additional or lesser amounts, including with respect to the Past Due Payment Amounts (but excluding the amounts payable for access and the Shares Services hereunder), the rights of HCMLP to object to such claim as well as all rights and defenses in connection with all pending and potential Adversary Proceedings between the Parties.  All such claims and defenses are expressly preserved for future resolution by the court.

Section 4.6      Successors and Assigns; Survival.  This Term Sheet shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.  No NexPoint Party may assign its rights or obligations hereunder without the prior written consent of HCMLP.  HCMLP may not assign its rights or obligations hereunder without the prior written consent of NPA.

Section 4.7      Voluntary Assent; Review of Term Sheet; Independent Counsel; Construction. Each Party acknowledges and agrees that no promises or agreements of any kind have been made to or

8

with him by the other or by any person or entity whatsoever to cause him to sign this Term Sheet other than those set forth in this Term Sheet, and that such Party fully understands the meaning and intent of this Term Sheet.  Each Party further states and represents that it is sophisticated, has carefully read this Term Sheet, understands its contents, and freely and voluntarily assents to all of its terms and conditions.  Each Party further states and represents that he has been represented by independent legal counsel of its own choosing with respect to the negotiation and preparation of this Term Sheet.  The Parties have participated jointly in the negotiation and drafting of this Term Sheet.  In the event any ambiguity or question of intent or interpretation arises, this Term Sheet shall be construed as if drafted jointly by HCMLP and the NexPoint Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Term Sheet.

Section 4.8    Governing Law; Submission to Jurisdiction; Service of Process.  This Term Sheet shall be interpreted and construed in accordance with the laws of the State of Texas, without regard to conflict of laws provisions.  Each Party hereby irrevocably submits to and acknowledges and recognizes the exclusive jurisdiction of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (which court, for purposes of this Term Sheet, is the only court of competent jurisdiction), over any suit, action or other proceeding arising out of, under or in connection with this Term Sheet or its subject matter.  Each Party irrevocably consents to service of process in any action or proceeding arising out of or relating to this Term Sheet in the manner provided for notices in Section 4.4.  Nothing in this Term Sheet shall affect the right of any Party to serve process in any other manner permitted by law.

Section 4.9    Severability; Remedies Cumulative.  The provisions of this Term Sheet shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions of this Term Sheet.  If any provision of this Term Sheet, or the application thereof to any Person or any circumstance, is found by a court or other regulatory authority of competent jurisdiction to be invalid or unenforceable, (a) the Parties shall negotiate in good faith to modify this Term Sheet so as to give effect to the original intent of the Parties of such invalid or unenforceable provision to the fullest extent permitted by law, and (b) the remainder of this Term Sheet and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.  The rights and remedies of the Parties to this Term Sheet are cumulative and not alternative, and each Party shall have the right in any particular circumstance to enforce any provision of this Term Sheet without regard to the availability of a remedy under any other provision of this Term Sheet.

Section 4.10    No Third-Party Beneficiaries.

(a)    It is the explicit intention of the Parties that no Person other than the Parties — and, for the avoidance of doubt, no employee or officer of any Party or any of its affiliates or any of a Party's or its affiliates' owners, officers or employees and no client or investor in any product managed or sponsored by any Party — is or shall be entitled to bring any action to enforce any provision of this Term Sheet against any Party or otherwise, and that the covenants, undertakings and agreements set forth in this Term Sheet are for the sole benefit of, and shall be enforceable only by the Parties (and their respective successors and permitted assigns), and they shall not be construed as conferring, and are not intended to confer, any rights on any other person or entity whatsoever.

(b)    No investors and no creditors of any Party shall have any right or entitlement to enforce any of the provisions of this Term Sheet or to require any Party to discharge its obligations hereunder.

9

Section 4.11 <u>Headings</u>. The headings of the Sections and sub-Sections of this Term Sheet are for convenience of reference only, and are not to be considered in construing the terms and provisions of this Term Sheet.

Section 4.12 <u>Construction</u>. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless otherwise indicated: (i) the words "herein," "hereof" and "hereunder," and words of similar import when used in this Term Sheet, shall be construed to refer this Term Sheet in its entirety and not to any particular provision hereof and (ii) all references in this Term Sheet to Exhibits, Schedules, Articles, Sections, paragraphs and sentences shall be construed to refer to Exhibits and Sections to, and Articles, Sections, paragraphs and sentences of, this Term Sheet. References to statues shall mean such statutes as amended.

Section 4.13 <u>Payments</u>. All payments and distributions required to be made pursuant this Term Sheet shall be made in cash and/or other immediately available funds to one (1) or more accounts as directed by the person or entity to whom such amounts are due.

Section 4.14 <u>Counterparts and Electronic Signatures</u>. This Term Sheet may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one (1) and the same instrument. This Term Sheet may be executed by facsimile and/or electronically by any one (1) or more of the Parties.

*[Remainder of page intentionally left blank; signature page follows]*

IN WITNESS WHEREOF, the Parties have executed this Term Sheet effective as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, LP**

By: _____

Name:

Title:

**NEXPOINT ADVISORS, L.P.**

By: _____

Name:

Title:

**HIGHLAND CAPITAL MANAGEMENT
FUND ADVISORS, L.P.**

By: _____

Name:

Title:

**Schedule A**

**Schedule of Shared Resources and Payments**

B-1

Case 21-03010-sgj    Doc 1-10    Filed 02/17/21    Entered 02/17/21 08:05:38    Desc
Exhibit 2  Page 114 of 214  Page 100 of 222

**Schedule B**

**Domain Names**

B-2

000113

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Highland Capital Management, L.P. | DEFENDANTS<br>Highland Capital Management Fund Advisors, L.P.,<br>and NexPoint Advisors, L.P. |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Hayward PLLC<br>10501 N. Central Expressway, Suite 106<br>Dallas, Texas 75231  Tel.: (972) 755-7100 | ATTORNEYS (If Known) |
|---|---|

| PARTY (Check One Box Only)<br>☑ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor      ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor      ☑ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Count 1:  Declaratory relief pursuant to 11 U.S.C. 105(a) and Fed. R. Bankr. P. 7001; Count 2: Breach of contract; Count 3: Injunctive relief pursuant to 11 U.S.C. 105(a) and Fed. R. Bankr. P. 7065

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation,
    actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
    (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☒ 72-Injunctive relief – other     [3]

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☒ 91-Declaratory judgment     [1]

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☒ 02-Other (e.g. other actions that would have been brought in state court
    if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ Damages in an amount to be determined at trial |

Other Relief Sought

Declaratory relief and injunctive relief

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br>19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas Division | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>*Zachery Z. Annable* | | |
| DATE<br>February 17, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Zachery Z. Annable | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

Tab 3

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
3800 Ross Tower
500 N. Akard Street
Dallas, TX 75202-2790
Telephone: (214) 855-7500
Facsimile:  (214) 978-4375

ATTORNEYS FOR THE DEFENDANTS

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 21-03010 (SGJ11) |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT FUND | ) | |
| ADVISORS, L.P., AND NEXPOINT ADVISORS, | ) | |
| L.P., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ORIGINAL ANSWER

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COME NOW NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management

Fund Advisors, L.P. ("HCMFA", and together with NexPoint, the "Defendants"), the defendants

in the above styled and numbered adversary proceeding (the "Adversary Proceeding"), and file

this their *Original Answer* (the "Answer"), responding to the *Plaintiff Highland Capital Management, L.P.'s Verified Original Complaint for Damages and for Declaratory and Injunctive Relief* (the "Complaint"), filed by Highland Capital Management, L.P. (the "Debtor").   Except where an allegation in the Complaint is expressly admitted, all allegations in the Complaint are denied.

## I.   ANSWER

1.   Admitted.

2.   The Defendants admit the first sentence of paragraph 2 of the Complaint and deny the second sentence thereof.

3.   Admitted.

4.   Admitted.

5.   The Defendants admit paragraph 5 of Complaint, except that they deny the allegation of more than $3 million in arrears under the Shared Services Agreements.

6.   Denied.

7.   The Defendants admit the second and third sentences of paragraph 7 of the Complaint, and they deny the balance of said paragraph.

8.   Denied.

9.   Denied.

10.   The Defendants admit that the Court has jurisdiction over the collection claim in the Complaint, but not the other relief requested.   The Defendants deny that the Court's jurisdiction is core, and they do not consent to the Court's entry of final judgment.

11.   Admitted.

12.   Paragraph 12 contains legal conclusions or statements to which no response is required.

ORIGINAL ANSWER—Page 2

13.     Admitted.

14.     Admitted.

15.     Admitted.

16.     Admitted.

17.     Admitted.

18.     Admitted.

19.     Admitted.

20.     Admitted.

21.     Admitted.

22.     Admitted.

23.     Admitted.

24.     Admitted.

25.     Admitted.

26.     Admitted.

27.     Admitted.

28.     Admitted.

29.     Admitted.

30.     Admitted.

31.     Admitted.

32.     Admitted.

33.     The Defendants have no knowledge about the Debtor considering strategic options, and therefore deny that allegation, but otherwise admit the balance of paragraph 33 of the Complaint.

34.     Denied.

35.     The Defendants have no knowledge of the Debtor's formulation of a transition plan and therefore they deny paragraph 35 of the Complaint.

36.     Denied.

37.     Admitted.

38.     Denied.

39.     Denied.

40.     Denied.

41.     Denied.

42.     Denied.

43.     Denied.

44.     Other than word "thus," which implications are denied, the Defendants admit paragraph 44 of the Complaint.

45.     Other than admitting ongoing negotiations during the two week period, the Defendants deny paragraph 45 of the Complaint.

46.     Other than admitting that the Debtor contacted the Funds' boards, the Defendants deny paragraph 46 of the Complaint.

47.     Admitted.

48.     Denied.

49.     Other than admitting the fact of the extension, the Defendants deny paragraph 49 of the Complaint.

50.     Other than admitting the fact of the term sheet and the Defendants' rejection thereof, the Defendants deny the allegations contained in paragraph 50 of the Complaint.

51.     Denied.

52.     The Defendants repeat and reurge their answers above.

ORIGINAL ANSWER—Page 4

53.    Denied.

54.    Denied.

55.    Admitted.

56.    The Defendants repeat and reurge their answers above.

57.    Admitted, prior to their termination.

58.    Denied.

59.    Denied.

60.    Denied.

61.    Denied.

62.    The Defendants repeat and reurge their answers above.

63.    The Defendants deny the Debtor is entitled to any injunction.

64.    Admitted.

65.    Admitted.

66.    Denied.

67.    Denied.

68.    Denied.

69.    Denied.

70.    Denied.

## II.    <u>AFFIRMATIVE DEFENSES</u>

71.    With respect to the amounts allegedly owing by the Defendants under the Shared Services Agreements, most if not all of those amounts are not properly chargeable by the Debtor or payable by the Defendants because the Debtor failed to provide the services, or have the employees, the subject of such charges.  The Debtor has charged/overcharged the Defendants for non-existing services and employees.

72.    The Debtor has failed to state a claim upon which relief can be given with respect to declaratory relief or injunctive relief.

### III.    <u>ARBITRATION</u>

73.    The Shared Services Agreement between the Debtor and HCMFA contains an arbitration provision requiring arbitration of any "unresolved legal dispute."  HCMFA accordingly demands arbitration of all disputes raised in the Complaint against it.

### IV.    <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, the Defendants respectfully request that the Court enter judgment as follows:

(i)    denying all relief requested in the Complaint;

(ii)    awarding the Defendants their reasonable attorney's fees and expenses incurred herein, including under section 38.001 of the Texas Civil Practice and Remedies Code;

(iii)    awarding prejudgment and postjudgment interest as provided for by law;

(v)    with respect to HCMFA, mandating that the Debtor's claims be arbitrated; and

(v)    granting the Defendants such other and further relief as may be appropriate.

RESPECTFULLY SUBMITTED this 22d day of March, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

/s/ *Davor  Rukavina*

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

**ATTORNEYS FOR THE DEFENDANTS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on March 22, 2021, a true and correct copy of this document was served electronically by the Court's CM/ECF system on all parties entitled to such notice, including counsel for the Debtor.

/s/ *Davor  Rukavina*

Davor Rukavina, Esq.

**000122**

# Tab 4

K&L GATES LLP
Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Tel: (214) 939-5659
artoush.varshosaz@klgates.com

Stephen G. Topetzes (*pro hac vice*)
1601 K Street, NW
Washington, DC 20006-1600
Tel: (202) 778-9328
stephen.topetzes@klgates.com

A. Lee Hogewood, III (*pro hac vice*)
4350 Lassiter at North Hills Ave., Suite 300
Raleigh, NC 27609
Tel: (919) 743-7306
Lee.hogewood@klgates.com

*Counsel for Highland Capital Management Fund
Advisors, L.P. and NexPoint Advisors, L.P.*

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
3800 Ross Tower
500 N. Akard Street
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
drukavina@munsch.com
jvasek@munsch.com

*Counsel for Highland Capital Management Fund
Advisors, L.P. and NexPoint Advisors, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | § Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § Case No. 19-34054-sgj11 |
| Debtor. | § |
| | § |

## APPLICATION FOR ALLOWANCE OF
## ADMINISTRATIVE EXPENSE CLAIM

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COME NOW Highland Capital Management Fund Advisors, L.P. ("HCMFA") and

NexPoint Advisors, L.P. ("NexPoint," and with HCMFA, the "Advisors"), creditors and parties in

interest in the above-captioned bankruptcy case (the "Bankruptcy Case"), and file this their

*Application for Allowance of Administrative Expense Claim* (the "Application"), respectfully

stating as follows:

Case 3:22-cv-02170-S Document 1   Filed 01/24/21   Page 122 of 888   PageID 3426

## I.     JURISDICTION AND VENUE

1.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.     BACKGROUND

**A.     SHARED SERVICES AGREEMENTS**

3.     On or about February 8, 2013, HCMFA entered into that certain *Second Amended and Restated Shared Services Agreement* (each such agreement, a "SSA") with Highland Capital Management, L.P. (the "Debtor").  On or about the same date, NexPoint also entered into a SSA with the Debtor.

4.     Under the SSAs, the Debtor agreed to provide the Advisors with certain services, including "all of the (i) finance and accounting services, (ii) human resources services, (iii) marketing services, (iv) legal services, (v) corporate services, (vi) information technology services, and (vii) operations services …."

5.     The SSAs contain the following detailed cost allocation provisions:

The Actual Cost of any item relating to any Shared Services or Shared Assets shall be allocated based on the Allocation Percentage. For purposes of this Agreement, "Allocation Percentage" means:

(a) To the extent 100% of such item is demonstrably attributable to HCMFA, 100% of the Actual Cost of such item shall be allocated to HCMFA as agreed by HCMFA;

(b) To the extent a specific percentage of use of such item can be determined (e.g., 70% for HCMLP and 30% for HCMFA), that specific percentage of the Actual Cost of such item will be allocated to HCMLP or HCMFA, as applicable and as agreed by HCMFA; and

(c) All other portions of the Actual Cost of any item that cannot be allocated pursuant to clause (a) or (b) above shall be allocated between HCMLP and HCMFA in such proportion as is agreed in good faith between the parties.

6.      "'<u>Actual Cost</u>' means, with respect to any period [under the SSA], one hundred percent (100%) of the actual costs and expenses caused by, incurred or otherwise arising from or relating to (i) the Shared Services and (ii) the Shared Assets, in each case during such period."

7.      In the event a party wishes to make changes to the shared services under the SSA, "The parties will negotiate in good faith the terms upon which a Service Provider would be willing to provide such New Shared Services to [the Advisors]."

**B.      <u>Payroll Reimbursement Agreements</u>**

8.      On or about May 1, 2018, HCMFA entered into that certain *Payroll Reimbursement Agreement* (each such agreement a "<u>PRA</u>") with the Debtor.  On or about the same date, NexPoint also entered into a PRA with the Debtor.

9.      Under the PRAs, the Debtor is entitled to seek reimbursement from the Advisors "for the cost of certain employees who are dual employees of [the Debtor and the Advisors] and who provide advice to registered investment companies advised by [the Advisors] under the direction and supervision of [the Debtor] …."

10.     The amount of such reimbursement is based on an actual cost allocation formula as follows: "The Actual Cost of any Dual Employee relating to the investment advisory services provided to a Fund shall be allocated based on the Allocation Percentage.  For purposes of this Agreement, "Allocation Percentage" means the Parties' good faith determination of the percentage of each Dual Employee's aggregate hours worked during a quarter that were spent on" certain matters set forth in the PRA.

11.     "'Actual Cost' means, with respect to any period [under the PRA], the actual costs and expenses caused by, incurred or otherwise arising from or relating to each Dual Employee, in each case during such period.  Absent any changes to employee reimbursement, as set forth in Section 2.02, such costs and expenses are equal to $252,000 per month."

---

12.     Section 2.02 provides the mechanism to modify employee reimbursement and also

provides, "The Parties will negotiate in good faith the terms of such modification."

## C.   <u>BANKRUPTCY FILING AND SUBSEQUENT EVENTS</u>

13.     On October 16, 2019 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for

relief under Chapter 11 of the Bankruptcy Code (11 U.S.C. §§ 101 *et seq.*) in the United States

Bankruptcy Court for the District of Delaware, thereby initiating the Bankruptcy Case.   On or

about December 4, 2019, the Bankruptcy Case was transferred to this Court.

14.     On January 9, 2020, the Bankruptcy Court entered its *Order Approving Settlement*

*with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and*

*Procedures for Operations in the Ordinary Course* (Dkt. No. 339, the "<u>Settlement Order</u>").

15.     In connection with the Settlement Order, an independent board (the "<u>Board</u>") was

appointed to manage the Debtor's general partner, Strand Advisors, Inc. ("<u>Strand</u>").   Its members

are John S. Dubel, James P. Seery, Jr., and Russel F. Nelms.   Several months later, the Board, with

court approval, appointed Mr. Seery as the Debtor's CEO and CRO.

16.     As the Bankruptcy Case progressed, the Court expressed concerns about the

Debtor's employees providing certain services to the non-debtor Advisors.   As a result, beginning

around July 2020, Mr. Seery directed the Debtor to cease providing services to the Advisors as

otherwise contemplated under the SSAs and the PRAs.

17.     Nevertheless, the Advisors continued to pay for those services under the SSAs and

the PRAs consistent with historical practice, despite the fact that the Debtor is not providing all

the required services in return.   For example, upon information and belief, the Debtor has booked

net income from the SSAs of approximately $10 million since the Petition Date.   Given that the

SSAs represent actual-cost sharing agreements, said net revenue represents Advisor overpayments

under the SSAs—the purpose of the SSAs is not to make a profit.   At the same time, the Advisors

---

APPLICATION FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM                          Page 4

have incurred significant additional expense obtaining services elsewhere that the Debtor was required to provide under the SSAs.

18.     There have also been similar overpayments under the PRAs.  There is a schedule attached to the PRAs of investment professionals whose compensation would be reimbursed by the Advisors.  But this schedule is incredibly outdated.  It includes many individuals, for example, who departed the Debtor before the Petition Date or during the Bankruptcy Case.  As a result, the Advisors estimate that, since the Petition Date, they have overpaid under the PRA's more than $9 million.

19.     The Advisors have brought these issues to Mr. Seery's attention, and in accordance with the Debtor's obligations under the SSAs and the PRAs, the Advisors expect Mr. Seery to negotiate in good faith.  Discovery will be necessary to determine the precise amount of the overpayments under the SSAs and PRAs.

### III.    ARGUMENTS AND AUTHORITIES

20.     Administrative expenses generally include "the actual, necessary costs and expenses of preserving the estate …."  11 U.S.C. § 503(b)(1)(a).  However, the list of administrative expense claims set forth in section 503(b) is not exclusive or exhaustive.  *In re Imperial Bev. Group, LLC*, 457 B.R. 490, 500 (Bankr. N.D. Tex. 2011) (citing various cases for the proposition that "the administrative expenses listed in the subsections of § 503(b)—preceded by 'including'—are not exclusive"); 11 U.S.C. § 102(3) ("In this title … 'includes' and 'including' are not limiting ….").

21.     Post-petition, pre-rejection performance under an executory contract gives rise to an administrative expense claim.  *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984) (superseded by statute on other grounds) ("If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the

contract, the debtor-in-possession is obligated to pay for the reasonable value of those services ….”); *In re MCS/Tex. Direct, Inc.*, 02-40229-DML-11, 2004 Bankr. LEXIS 379, *11-12 (Bankr. N.D. Tex. March 30, 2004) (“Even if the contract is rejected, the contract party is entitled to payment for postpetition value received by a debtor.”).

22.    Similarly, a post-petition, pre-rejection breach of contract gives rise to an administrative expense claim.  *See In re United Trucking Serv.*, 851 F.2d 159, 162 (6th Cir. 1988) (“the damages under the breached lease covenant, to the extent that they occurred post-petition, provided benefits to the bankrupt estate and were property accorded priority under § 503”); *Shapiro v. Meridian Auto. Sys. (Del.) (In re Lorro, Inc.)*, 391 B.R. 760, 766 (Bankr. E.D. Mich. 2008) (“the term ‘administrative expense’ has been construed to include claims based on tort, trademark infringement, patent infringement, and breach of contract”) (citing, *inter alia*, *Reading Co. v. Brown*, 391 U.S. 471 (1968)).

23.    Here, under the SSAs and the RPAs, the Advisors have paid for services they did not receive and for salaries of employees who no longer exist.  The Debtor, on the other hand, collected the Advisors’ payments without providing anything in exchange or incurring any actual costs.  While the Advisors continued to perform under the SSAs and the RPAs, the Debtor breached its obligations under those same agreements.  Accordingly, the Advisors are entitled to an administrative expense claim for the total overpayments, which, upon information and belief, total approximately $14 million.  Because the accounting information related to such costs and expenses are within the exclusive control of the Debtor, discovery will be necessary to determine the precise amount of the overpayments under the SSAs and PRAs.

## IV.    **PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Funds and Advisors respectfully request that the Court enter an order granting this Application, awarding them an administrative expense

claim in an amount to be determined at trial (which is expected to be approximately $14 million), and providing them such other and further relief to which they show themselves to be entitled, at law or in equity.

RESPECTFULLY SUBMITTED this 24th day of January, 2021.

MUNSCH HARDT KOPF & HARR, P.C.

/s/  Davor Rukavina
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
drukavina@munsch.com
jvasek@munsch.com

K&L GATES LLP

Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Tel: (214) 939-5659
artoush.varshosaz@klgates.com

Stephen G. Topetzes (*pro hac vice*)
1601 K Street, NW
Washington, DC 20006-1600
Tel: (202) 778-9328
stephen.topetzes@klgates.com

A. Lee Hogewood, III (*pro hac vice*)
4350 Lassiter at North Hills Ave., Suite 300
Raleigh, NC 27609
Tel: (919) 743-7306
Lee.hogewood@klgates.com

*Counsel for Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P.*

APPLICATION FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM                Page 7

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of this document was served (A) electronically by the Court's CM/ECF system on all parties entitled to such notice on January 24, 2021; and (B) by first class U.S. mail, postage prepaid, on the attached service list on January 25, 2021.

/s/ Davor Rukavina
Davor Rukavina, Esq.

Case 3:22-cv-02700-S    Document 18    Filed 12/02/24    Page 129 of 888    PageID 3413

| | | |
|---|---|---|
| **Abernathy, Roeder, Boyd & Hullett, P.C.**<br>Chad Timmons, Larry R. Boyd, Emily M. Hahn<br>1700 Redbud Blvd, Ste. 300<br>McKinney, TX 75069 | **Alston & Bird LLP**<br>Jared Slade<br>Chase Tower<br>2200 Ross Avenue<br>Dallas, TX 75201 | **Alston & Bird LLP**<br>Jonathan T. Edwards<br>One Atlantic Center<br>1201 West Peachtree Street<br>Atlanta, GA 30309 |
| **Ashby & Geddes, P.A.**<br>William P. Bowden, Esq., Michael D. DeBaecke, Esq.<br>500 Delaware Avenue, 8th Floor<br>PO Box 1150<br>Wilmington, DE 19899-1150 | **Baker & Mckenzie LLP**<br>Debra A. Dandeneau<br>452 Fifth Ave<br>New York, NY 10018 | **Baker & Mckenzie LLP**<br>Michelle Hartmann<br>1900 North Pearl<br>Suite 1500<br>Dallas, TX 75201 |
| **Barnes & Thornburg LLP**<br>Thomas G. Haskins, Jr.<br>2121 North Pearl Street, Suite 700<br>Dallas, TX 75201 | **BBVA**<br>Michael Doran<br>8080 North Central Expressway<br>Suite 1500<br>Dallas, TX 75206 | **Blank Rome LLP**<br>John E. Lucian, Josef W. Mintz<br>1201 N. Market Street, Suite 800<br>Wilmington, DE 19801 |
| **Bonds Ellis Eppich Schafer Jones LLP**<br>D. Michael Lynn, John Y. Bonds, III, Bryan C. Assink<br>420 Throckmorton Street, Suite 1000<br>Fort Worth, TX 76102 | **Buchalter, A Professional Corporation**<br>Shawn M. Christianson, Esq.<br>55 Second Street, 17th Floor<br>San Francisco, CA 94105-3493 | **Butler Snow LLP**<br>Martin A. Sosland and Candice M. Carson<br>2911 Turtle Creek Blvd.<br>Suite 1400<br>Dallas, TX 75219 |
| **Carlyon Cica Chtd.**<br>Candace C. Carlyon, Esq., Tracy M. Osteen, Esq.<br>265 E. Warm Springs Road, Suite 107<br>Las Vegas, NV 89119 | **Chipman, Brown, Cicero & Cole, LLP**<br>Mark L. Desgrosseilliers<br>Hercules Plaza<br>1313 North Market Street, Suite 5400<br>Wilmington, DE 19801 | **Cole, Schotz, Meisel, Forman & Leonard, P.A.**<br>Michael D. Warner, Esq.<br>301 Commerce Street, Suite 1700<br>Fort Worth, TX 76102 |
| **Condon Tobin Sladek Thornton PLLC**<br>J. Seth Moore<br>8080 Park Lane, Suite 700<br>Dallas, TX 75231 | **Cross & Simon LLC**<br>Michael L. Vild, Esquire<br>1105 N. Market Street, Suite 901<br>Wilmington, DE 19801 | **Dentons US LLP**<br>Lauren Macksoud, Esq.<br>1221 Avenue of the Americas<br>New York, NY 10020-1089 |
| **Dentons US LLP**<br>Patrick C. Maxcy, Esq.<br>233 South Wacker Drive<br>Suite 5900<br>Chicago, IL 60606-6361 | **Frontier State Bank**<br>Attn: Steve Elliot<br>5100 South I-35 Service Road<br>Oklahoma City, OK 73129 | **Frost Brown Todd LLC**<br>Mark A. Platt<br>100 Crescent Court, Suite 350<br>Dallas, TX 75201 |
| **Gibson, Dunn & Crutcher LLP**<br>Marshall R. King, Esq., Michael A. Rosenthal, Esq. & Alan Moskowitz, Esq.<br>200 Park Avenue<br>New York, NY 10066 | **Gibson, Dunn & Crutcher LLP**<br>Matthew G. Bouslog, Esq.<br>3161 Michelson Drive<br>Irvine, CA 92612 | **Hayward & Associates PLLC**<br>Melissa S. Hayward, Zachery Z. Annable<br>10501 N. Central Expy, Ste. 106<br>Dallas, TX 75231 |
| **Heller, Draper & Horn, L.L.C.**<br>Douglas S. Draper, Leslie A. Collins, Greta M. Brouphy<br>650 Poydras Street, Suite 2500<br>New Orleans, LA 70130 | **Highland Capital Management**<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | **Hunter Mountain Investment Trust**<br>c/o Rand Advisors LLC<br>John Honis<br>87 Railroad Place Ste 403<br>Saratoga Springs, NY 12866 |
| **Internal Revenue Service**<br>Attn Susanne Larson<br>31 Hopkins Plz Rm 1150<br>Baltimore, MD 21201 | **Internal Revenue Service**<br>Centralized Insolvency Operation<br>PO Box 7346<br>Philadelphia, PA 19101-7346 | **Internal Revenue Service**<br>Centralized Insolvency Operation<br>2970 Market St<br>Philadelphia, PA 19104 |

| | | |
|---|---|---|
| **Jackson Walker L.L.P.**<br>Michael S. Held<br>2323 Ross Avenue, Suite 600<br>Dallas, TX 75201 | **Jefferies LLC**<br>Director of Compliance<br>520 Madison Avenue, 16th Floor<br>Re Prime Brokerage Services<br>New York, NY 10022 | **Jefferies LLC**<br>Office of the General Counsel<br>520 Madison Avenue, 16th Floor<br>Re Prime Brokerage Services<br>New York, NY 10022 |
| **Jenner & Block LLP**<br>Marc B. Hankin, Richard Levin<br>919 Third Avenue<br>New York, NY 10022-3908 | **Jones Day**<br>Amanda Rush<br>2727 N. Harwood Street<br>Dallas, TX 75201 | **Jones Walker LLP**<br>Joseph E. Bain, Amy K. Anderson<br>811 Main Street, Suite 2900<br>Houston, TX 77002 |
| **K&L Gates LLP**<br>Artoush Varshosaz<br>1717 Main Street, Suite 2800<br>Dallas, TX 75201 | **K&L Gates LLP**<br>James A. Wright III<br>1 Lincoln Street<br>Boston, MA 02110 | **K&L Gates LLP**<br>Stephen G. Topetzes<br>1601 K Street, NW<br>Washington, DC 20006-1600 |
| **Kane Russell Coleman Logan PC**<br>John J. Kane<br>901 Main Street, Suite 5200<br>Dallas, TX 75242-1699 | **KeyBank National Association**<br>as Administrative Agent<br>225 Franklin Street, 18th Floor<br>Boston, MA 02110 | **KeyBank National Association**<br>as Agent<br>127 Public Square<br>Cleveland, OH 44114 |
| **King & Spalding LLP**<br>Paul R. Bessette<br>500 West 2nd St., Suite 1800<br>Austin, TX 78701-4684 | **Kurtzman Carson Consultants**<br>Joe Morrow<br>222 N. Pacific Coast Hwy Ste 300<br>El Segundo, CA 90245 | **Kurtzman Steady, LLC**<br>Jeffrey Kurtzman, Esq.<br>401 S. 2nd Street, Suite 200<br>Philadelphia, PA 19147 |
| **Latham & Watkins LLP**<br>Asif Attarwala<br>330 N. Wabash Avenue, Ste. 2800<br>Chicago, IL 60611 | **Latham & Watkins LLP**<br>Jeffrey E. Bjork<br>355 South Grand Avenue, Ste. 100<br>Los Angeles, CA 90071 | **Linebarger Goggan Blair & Sampson LLP**<br>Elizabeth Weller, Laurie A. Spindler<br>2777 N. Stemmons Freeway<br>Suite 1000<br>Dallas, TX 75207 |
| **Loewinsohn Flegle Deary Simon LLP**<br>Daniel P. Winikka<br>12377 Merit Drive, Suite 900<br>Dallas, TX 75251 | **Lynn Pinker Cox & Hurst, L.L.P.**<br>Michael K. Hurst, Esq.<br>2100 Ross Avenue, Ste 2700<br>Dallas, TX 75201 | **Mark K. Okada**<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 |
| **Morris, Nichols, Arsht & Tunnell LLP**<br>Curtis S. Miller, Kevin M. Coen<br>1201 North Market Street, Suite 1600<br>Wilmington, DE 19801 | **Morrison Cohen LLP**<br>Joseph T. Moldovan, Esq. & Sally Siconolfi, Esq.<br>909 Third Avenue<br>New York, NY 10022 | **NexBank**<br>John Danilowicz<br>2515 McKinney Ave<br>Ste 1100<br>Dallas, TX 75201 |
| **Nixon Peabody LLP**<br>Louis J. Cisz, III, Esq.<br>One Embarcadero Center, 32nd Floor<br>San Francisco, CA 94111 | **Office of General Counsel**<br>Securities & Exchange Commission<br>100 F St NE<br>Washington, DC 20554 | **Office of the Attorney General**<br>Ken Paxton<br>300 W. 15th Street<br>Austin, TX 78701 |
| **Office of the Attorney General**<br>Main Justice Building, Room 5111<br>10th & Constitution Avenue, N.W.<br>Washington, DC 20530 | **Office of the United States Attorney**<br>Erin Nealy Cox, Esq<br>1100 Commerce Street, 3rd Floor<br>Dallas, TX 75202 | **Office of the United States Trustee**<br>Lisa L. Lambert, Esq<br>1100 Commerce Street, Room 976<br>Earle Cabell Federal Building<br>Dallas, TX 75242 |

| | | |
|---|---|---|
| **Pachulski Stang Ziehl & Jones LLP**<br>John A. Morris and Gregory V. Demo<br>780 Third Avenue, 34th Floor<br>New York, NY 10017-2024 | **Pachulski Stang Ziehl & Jones LLP**<br>Richard M. Pachulski, Jeffrey N. Pomerantz,<br>Ira D. Kharasch, James E. O'Neill<br>919 North Market Street<br>17th Floor<br>Wilmington, DE 19801 | **Pachulski Stang Ziehl & Jones LLP**<br>Richard M. Pachulski, Jeffrey N. Pomerantz,<br>Ira D. Kharasch, James E. O'Neill<br>10100 Santa Monica Blvd, 13th Floor<br>Los Angeles, CA 90067 |
| **Pension Benefit Guaranty Corporation**<br>Michael I. Baird<br>Office of the General Counsel<br>1200 K Street, N.W.<br>Washington, DC 20005-4026 | **Perdue, Brandon, Fielder, Collins & Mott,<br>L.L.P.**<br>Linda D. Reece<br>1919 S. Shiloh Rd., Suite 310<br>Garland, TX 75042 | **Potter Anderson & Corroon LLP**<br>Jeremy W. Ryan, Esq., R. Stephen McNeill,<br>Esq. & D. Ryan Slaugh, Esq.<br>1313 North Market Street, 6th Floor<br>Wilmington, DE 19801 |
| **Prime Brokerage Services**<br>Jefferies LLC<br>520 Madison Avenue<br>New York, NY 10022 | **Richards, Layton & Finger PA**<br>Michael J. Merchant, Sarah E. Silveira<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801 | **Rochelle McCullough, LLP**<br>E. P. Keiffer<br>325 North St. Paul Street, Suite 4500<br>Dallas, TX 75201 |
| **Ross & Smith, PC**<br>Judith W. Ross, Frances A. Smith, Eric<br>Soderlund<br>700 North Pearl Street, Suite 1610<br>Dallas, TX 75201 | **Schulte Roth & Zabel LLP**<br>David J. Karp, James V. Williams III<br>919 Third Avenue<br>New York, NY 10022 | **Securities & Exchange Commission**<br>Andrew Calamari, Regional Director<br>New York Regional Office<br>Brookfield Place, Suite 400<br>200 Vesey Street<br>New York, NY 10281 |
| **Securities & Exchange Commission**<br>Sharon Binger, Regional Director<br>Philadelphia Regional Office<br>One Penn Center, Suite 520<br>1617 JFK Boulevard<br>Philadelphia, PA 19103 | **Sidley Austin LLP**<br>Matthew Clemente, Alyssa Russell, Elliot A.<br>Bromagen<br>One South Dearborn Street<br>Chicago, IL 60603 | **Sidley Austin LLP**<br>Penny P. Reid, Paige Holden Montgomery,<br>Charles M. Person, Juliana Hoffman<br>2021 McKinney Avenue Suite 2000<br>Dallas, TX 75201 |
| **Spencer Fane LLP**<br>Jason P. Kathman<br>5700 Granite Parkway, Suite 650<br>Plano, TX 75024 | **State Comptroller of Public Accounts**<br>Revenue Accounting Division-<br>Bankruptcy Section<br>PO Box 13258<br>Austin, TX 78711 | **State of Delaware**<br>Division of Corporations - Franchise Tax<br>401 Federal Street<br>PO Box 898<br>Dover, DE 19903 |
| **Strand Advisors, Inc.**<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | **Sullivan Hazeltine Allinson LLC**<br>William A. Hazeltine, Esq.<br>901 North Market Street, Suite 1300<br>Wilmington, DE 19801 | **Texas Attorney Generals Office**<br>Bankruptcy-Collections Division<br>PO Box 12548<br>Austin, TX 78711-2548 |
| **The Dugaboy Investment Trust**<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | **The Mark and Pamela Okada Family Trust -<br>Exempt Trust #1**<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | **The Mark and Pamela Okada Family Trust -<br>Exempt Trust #2**<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 |
| **U.S. Department of Justice, Tax Division**<br>David G. Adams<br>717 N. Harwood St., Suite 400<br>Dallas, TX 75201 | **United States Attorney General**<br>U.S. Department of Justice<br>William Barr, Esquire<br>950 Pennsylvania Avenue, NW<br>Room 4400<br>Washington, DC 20530-0001 | **US Department of the Treasury**<br>Office of General Counsel<br>1500 Pennsylvania Avenue, NW<br>Washington, DC 20220 |
| **Winstead PC**<br>Rakhee V. Patel, Phillip Lamberson<br>2728 N. Harwood Street, Suite 500<br>Dallas, TX 75201 | **Winston & Strawn LLP**<br>Attn: David Neier<br>200 Park Avenue<br>New York, NY 10166-4193 | **Winston & Strawn LLP**<br>Attn: Katherine A. Preston<br>800 Capitol Street, Suite 2400<br>Houston, TX 77002 |

**Winston & Strawn LLP**
Attn: Thomas M. Melsheimer; Natalie L. Arbaugh
2121 N. Pearl Street, Suite 900
Dallas, TX 75201

**Young Conaway Stargatt & Taylor, LLP**
Michael R. Nestor, Edmon L. Morton, Sean M. Beach, Esq., Jaclyn C. Weissgerber, Esq.
Rodney Square
1000 North King Street
Wilmington, DE 19801

**Zillah A. Frampton**
Bankruptcy Administrator
Delaware Division of Revenue
Carvel State Office Building, 8th Floor
820 N. French Street
Wilmington, DE 19801

000335

Tab 5

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) *(admitted pro hac vice)*
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

## DEBTOR'S OBJECTION TO APPLICATION FOR
## ADMINISTRATIVE CLAIM OF HIGHLAND CAPITAL MANAGEMENT
## FUND ADVISORS, L.P. AND NEXPOINT ADVISORS, L.P.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................. 1

II.   JURISDICTION .................................................................................... 3

III.  BACKGROUND ..................................................................................... 3

IV.  OBJECTIONS ........................................................................................ 10

     A.    The Advisors Waived Any Alleged Breaches, Defaults and Claims
          Relating to the Purported Deficient Services and Overcharges and the
          Prior Payments Made By  the Advisors Under the Agreements .......................... 10

     B.    The Voluntary Payment Rule Effectively Bars Any Administrative Claim ........ 13

V.   RESERVATION OF RIGHTS ................................................................. 13

VI.  CONCLUSION ....................................................................................... 14

## **TABLE OF AUTHORITIES**

**Page No.**

### **CASES**

*BMG Direct Mktg. v. Peake*,
   178 S.W.3d 763 (Tex. 2005)........................................................................................... 13

*EM Bldg. Contrs. Servs., LLC v. Byrd Bldg. Servs., LLC*,
   2020 Tex. App. LEXIS 6342 (Tex. App. Aug. 11, 2020) ................................................ 11

*In re National Steel Corp.*,
   316 B.R. 287 (Bankr. N.D. Ill. 2004) ............................................................................. 12

*Miga v. Jensen*,
   299 S.W.3d 98 (Tex. 2009)........................................................................................ 2, 13

*Motor Vehicle Bd. of Tex. Dep't of Transp. v. El Paso Indep. Auto. Dealers Ass'n,
Inc.*,
   1 S.W.3d 108 (Tex. 1999) ............................................................................................... 11

*Nat'l Steel Corp.*,
   316 B.R. 307 (Bankr. N.D. Ill. 2004) ............................................................................. 13

*Rex Performance Prods., LLC v. Tate*,
   2020 Tex. App. LEXIS 10465 (Tex. App. Dec. 31, 2020).............................................. 11

*Shields Limited Partnership v. Bradberry*,
   526 S.W.3d 471 (Tex. 2017) ........................................................................................... 12

*Sojitz Energy Venture, Inc. v. Union Oil Co.*,
   394 F. Supp. 3d 687 (S.D. Tex. 2019) .............................................................................. 8

*Straus v. Kirby Court Corp.*,
   909 S.W.2d 105 (Tex. App. 1995).................................................................................. 12

*Sun Expl. & Prod. Co. v. Benton*,
   728 S.W.2d 35 (Tex. 1987)............................................................................................. 11

*Tenneco Inc. v. Enter. Prods. Co.*,
   925 S.W.2d 640 (Tex. 1996)........................................................................................... 12

*Ulico Cas. Co. v. Allied Pilots Ass'n*,
   262 S.W.3d 773 (Tex. 2008)........................................................................................... 11

*United States Bank, N.A. v. Kobernick*,
   454 Fed. Appx. 307 (5th Cir. Dec. 16, 2011) ................................................................ 12

### **STATUTES**

11 U.S.C. § 1107(a) .................................................................................................................4

11 U.S.C. § 1108 .....................................................................................................................4

11 U.S.C. § 362(d) .................................................................................................................12

11 U.S.C. § 365(d)(2) ............................................................................................................12

28 U.S.C. § 1334....................................................................................................................3

28 U.S.C. § 1408....................................................................................................................3

28 U.S.C. § 1409....................................................................................................................3

000338

Case 3:21-cv-01700-S   Document 6-1   Filed 11/08/21   Page 197 of 888   PageID 3481

28 U.S.C. § 157 ....................................................................................................................... 3

28 U.S.C. § 157(b)(1) ............................................................................................................ 3

28 U.S.C. § 157(b)(2) ............................................................................................................ 3

## **RULES**

Fed. R. Bankr. P. 7008 ........................................................................................................... 3

000339

Highland Capital Management, L.P. (the "Debtor"), by and through its undersigned counsel, hereby files this objection (this "Objection") to the *Application for Allowance of Administrative Expense Claim* [Docket No. 1826] (the "Application") filed by Highland Capital Management Fund Advisors, L.P. ("HCMFA") and NexPoint Advisors, L.P. ("NexPoint," and with HCMFA, the "Claimants" or "Advisors").[1]   In support of this Objection, the Debtor represents as follows:

## I.      PRELIMINARY STATEMENT

1.      The Application should be summarily denied on several grounds.  The Claimants are owned and controlled by Mr. James Dondero ("Mr. Dondero").[2]  As alleged in the pending Complaints (as defined below) filed by the Debtor against Mr. Dondero, HCMFA, NexPoint, and certain other entities owned and/or controlled by Mr. Dondero (collectively, the "Dondero Entities"), Mr. Dondero and the Dondero Entities have been actively interfering with and impeding the Debtor's business and its reorganization under the confirmed Plan and have engaged in a coordinated litigation campaign to harass the Debtor and deplete its resources,[3] in each case to the substantial prejudice of the Debtor's estate and its stakeholders.  The Application is another improper attempt by Dondero-controlled entities to obstruct the Debtor's reorganization and harass the estate.  The Debtor performed under the applicable Agreements, and the Advisors know that.

---

[1] Capitalized terms not defined herein have the meanings ascribed to them below or in the Application.

[2] The Advisors objected to the Debtor's Plan (as defined below) [Docket No. 1670].  In the Confirmation Order (defined below) confirming the Plan, the Court found that the Advisors were controlled by Mr. Dondero.  Confirmation Order, ¶ 19.

[3] Confirmation Order, ¶¶ 77-78.

2.    After remaining silent for more than six months[4] while the Debtor allegedly failed to provide services and grossly overcharged the Advisors under the parties' Agreements, and having no prepetition claims against the Debtor, the Advisors seek to manufacture a purported administrative expense priority claim by creating "facts" and rewriting the Agreements, which have been terminated by the Debtor.  There will be no credible dispute that NexPoint and HCMFA stood by idly without ever (i) declaring a default under the Agreements; (ii) notifying the Debtor of any problem with the Debtor's services or billings; (iii) withholding payments under the Agreements (until notice of the termination of the Agreements); or (iv) seeking judicial relief regarding such matters.  In fact, as described below, the Advisors wrote five separate letters to the Debtor in late 2020 and complained about a litany of items but made only one generalized comment about the services being provided.  In short, the Advisors waived any right to dispute the sufficiency of the Debtor's services or the amounts payable to the Debtor under the Agreements.

3.    Independently, the Advisors' purported overpayments to the Debtor are barred from recovery under the voluntary payment rule under Texas common law.  As explained by the Texas Supreme Court, "[t]he voluntary payment rule precludes a party from 'pay[ing] out his money, leading the other party to act as though the matter were closed, and then be in the position to change his mind and invoke the aid of the courts to get it back.'"[5]

4.    Accordingly, the Application should be denied by the Court.[6]

---

[4] The Advisors allege that in July 2020, "Mr. Seery directed the Debtor to cease providing services to the Advisors as otherwise contemplated under the" applicable agreements (Application, ¶ 16) yet the Advisors sought no relief at any time and only filed the Application on January 24, 2021, on the eve of the Debtor's confirmation hearing.

[5] *Miga v. Jensen*, 299 S.W.3d 98, 103 (Tex. 2009).

[6] In the event that the Court does not resolve this matter on the pleadings, the Debtor expects to propound discovery on the Advisors, and reserves all rights with respect thereto and any other claims, causes of action, setoffs, recoupments, and rights of the Debtor against the Advisors.

000341

## II.      **JURISDICTION**

5.      The Court has jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and (b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The Debtor confirms its consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure, to the entry of a final order.

## III.      **BACKGROUND**

7.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

8.      On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the United States Trustee in the Delaware Court.

9.      On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's bankruptcy case to this Court [Docket No. 186].[7]

10.      On February 22, 2021, this Court entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "Confirmation Order"), which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808] (as amended, the "Plan").[8]

---

[7] All docket numbers refer to the docket maintained by this Court.

[8] The confirmed Plan included certain amendments filed on February 1, 2021.  *See Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Ex. B [Docket No. 1875].

000342

11.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

12.     Each of the Advisors is owned and controlled, directly or indirectly, by Mr. Dondero.

13.     The Debtor and NexPoint were parties to a Shared Services Agreement ("NexPoint SSA") and a Payroll Reimbursement Agreement ("NexPoint PRA" and together with the NexPoint SSA, the "NexPoint Agreements"), each as amended or amended and restated from time to time.[9]

14.     Likewise, the Debtor and HCMFA were parties to a Shared Services Agreement ("HCMFA SSA") and a Payroll Reimbursement Agreement ("HCMFA PRA" and together with the HCMFA SSA, the "HCMFA Agreements"), each as amended or amended and restated from time to time.  The NexPoint Agreements and the HCMFA Agreements (collectively, the "Agreements") were terminated by the Debtor in accordance with their terms.

15.     Neither of the Advisors has a prepetition claim against the Debtor.  HCMFA's proofs of claim (Claim Nos. 95 and 119) were expunged with HCMFA's consent [Docket No. 1233].  Similarly, NexPoint's proofs of claim (Claim Nos. 104 and 108) were also consensually expunged [Docket No. 1233].

16.     At the Debtor's request, Mr. Dondero resigned on or around October 9, 2020.  Less than a week after his ouster, Mr. Dondero and the Advisors he owns and controls initiated their campaign against the Debtor.  Thus, on October 16, 2020, the Advisors wrote to the Debtor and raised three issues, contending that:

---

[9] The Advisors assert that the Debtor and NexPoint entered into the applicable SSA on February 8, 2013, the same day the Debtor and HCMFA entered into a SSA.  Application ¶3.  This assertion is wrong as the Debtor and NexPoint entered into that certain *Amended and Restated Shared Services Agreement* effective as of January 1, 2018.

- the Debtor had allegedly refused to permit its "employees to work on certain [unidentified] matters that jointly affect HCMLP and the Advisors" and that allegedly caused the Advisors to unnecessarily incur third-party costs;[10]

- *if* the Debtor terminated employees at the end of the year, the Debtor "will no longer be able to carry out its duties and responsibilities under the Agreements" (the "<u>Prospective Complaint</u>"); and

- the Debtor's contemplated sale of certain assets held in CLOs could result in the loss of value, and the Advisors asked that no such assets be sold without their prior consent.

**<u>Morris Dec. Ex. A</u>**.[11]

17.     On November 24, 2020, the Advisors again wrote to the Debtor, this time only to reiterate their complaints about the Debtor's sale of CLO assets and their demand that all such sales cease in the absence of the Advisors' prior consent.  In this letter, the Advisors registered no complaints about the services the Debtor was providing or the amounts being charged or paid under the Agreements.  **<u>Morris Dec. Ex. B</u>**.

18.     The Advisors were clearly focused on the Debtor's sale of CLO assets because on December 8, 2020, the Advisors and other Dondero-related entities filed their *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [Docket No. 1528] (the "<u>Advisors' CLO Motion</u>").  **<u>Morris Dec. Ex. C</u>**.  The Advisors' CLO Motion was filed on an emergency basis [Docket No. 1523] (**<u>Morris Dec. Ex. D</u>**), but was later denied as "frivolous."  Notably, while the Advisors' CLO Motion proves that the Advisors know how to seek judicial relief (on an emergency basis, no less), the Advisors

---

[10] The Advisors have never identified any particular "matters that jointly affect[ed] HCMLP and the Advisors" and caused the Advisors to unnecessarily incur third-party costs.  Upon information and belief, the "matters" referred to in the October Letter were those related to the CLO issues and other Estate-Adverse Services, none of which are "services" the Debtor was ever obligated to provide.  *See infra* n. 12.

[11] Citations marked "Morris Dec. Ex. __" refer to the *Declaration of John A. Morris in Support of Debtor's Objection to Application for Administrative Claim of Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P.* filed contemporaneously with this Objection.

000344

registered no complaints in the Advisors' CLO Motion or at the hearing about the services the

Debtor was providing or the amounts being charged or paid under the Agreements.

19.     Unchastened, on December 22, 2020, the Advisors renewed their complaints about

the Debtor's CLO sales.  **Morris Dec. Ex. E**.  The Advisors also renewed their Prospective

Complaint, contending that the anticipated termination of employees on January 31, 2021 "will

result in a loss of the employees that [sic] have traditionally serviced the CLOs."  Other than the

renewal of their Prospective Complaint, the Advisors registered no complaints in their December

22, 2020, letter about the services the Debtor was providing or the amounts being charged or paid

under the Agreements.

20.     The next day, the Advisors sent the Debtor another letter, this one focused

exclusively on the issue of the Debtor's management of the CLOs.  In their December 23, 2020,

letter, the Advisors gave notice to the Debtor that they "had no choice but to initiate HCMLP's

removal as fund manager" for cause.  **Morris Dec. Ex. F**.  The Advisors registered no complaints

in their December 23, 2020 letter about the services the Debtor was providing or the amounts being

charged or paid under the Agreements.

21.     Finally, on December 31, 2020, the Advisors again wrote to the Debtor, this time

for the sole purpose of registering complaints about the Debtor's decision to evict Mr. Dondero

from the Debtor's offices.  **Morris Dec. Ex. G**.  Other than as specifically related to Mr. Dondero,

the Advisors registered no complaints in their December 31, 2020, letter about the services the

Debtor was providing or the amounts being charged or paid under the Agreements.

22.     As a result of this continued harassment and incessant interference, their failure to

pay, collectively, tens of millions of dollars due and owing under a series of demand notes and

other notes which were in default, and for other reasons, beginning in December 2020, the Debtor

000345

filed a number of complaints (the "Complaints") against Mr. Dondero (Adv. Proc. No. 20-03190,
filed on December 7, 2020; Adv. Proc. No. 21-03003, filed on January 22, 2021); HCMFA,
NexPoint, and certain other affiliated defendants (Adv. Proc. No. 21-03000, filed on January 6,
2021); HCMFA (Adv. Proc. No. 21-03004, filed on January 22, 2021); and NexPoint (Adv. Proc.
No. 21-03005, filed on January 22, 2021), among others.

23.     As set forth in the Complaints (as applicable), the Debtor has substantial claims
against Mr. Dondero, the Advisors and the other affiliated entities for, *inter alia*, interference with
the Debtor's business and operations (including threatening to have the Debtor removed as the
portfolio manager of certain collateralized loan obligation vehicles) and for failing to pay amounts
due and owing to the Debtor under certain promissory notes.  Such parties' continued disruptive
behavior caused the Debtor to notify Mr. Dondero in December 2020 that he would be evicted and
all services provided by the Debtor to him would be terminated.

24.     The Application was filed on January 24, 2021, obviously as retaliation for the
Debtor's filing of the Complaints and refusal to surrender to the Advisors' demands concerning
the CLOs.  The Application has no merit as the Debtor fulfilled its obligations under the applicable
Agreements.  Assuming for the sake of argument that the Debtor failed to fully perform, the
Advisors plainly waived (or should otherwise be estopped from asserting) their right to complain
and are otherwise barred under Texas law from recovering anything, and any claim would be
subject to substantial setoffs.

25.     During the chapter 11 case and prior to the termination of the Agreements, the
Debtor performed the services required under the Agreements.  The Debtor anticipates that if the
Advisors ever specifically identify any alleged service deficiencies or overcharges, they will likely
be predicated upon incredible factual assertions or absurd or other untenable contortions of the

000346

Agreements' provisions.[12]  Not surprisingly, the Advisors do not identify a single service that the Debtor failed to provide, and instead make only the generalized and uncorroborated assertion that they continued to make payments "despite the fact that the Debtor [was] not providing all the required services in return."  Application ¶ 17.

26.     The Advisors also try to belatedly manufacture a "breach" under the Payroll Reimbursement Agreements by asserting that certain unidentified employees did not provide services for some unidentified periods of time.  Specifically, the Advisors observe that there "is a schedule attached to the PRAs of investment professionals whose compensation would be reimbursed by the Advisors" that is "incredibly outdated," and complain that the list includes "many individuals . . . who departed the Debtor before or during the Bankruptcy Case."  Application ¶ 18.  The Advisors' complaints in this regard serve only to prove that (a) the Advisors did not care about these matters as long as Mr. Dondero was in control of both the Advisors and the Debtor (*i.e.*, at all relevant times since the Agreements were executed until no later than January 9, 2020); (b) until Mr. Dondero ceased to control both the Advisors and the Debtor, the relationship was not an arms'-length relationship, and (c) the Advisors were apparently obtaining the services they bargained for even if such services were not being provided by specified individuals, because there is no allegation (and there will be no evidence) that the Advisors ever sought an adjustment

---

[12] For example, in or after July 2020, the Debtor's new CEO reminded the Debtor's personnel that they should not provide legal services to the Advisors and other third parties that could be adverse to the bankruptcy estate ("Estate-Adverse Services"), especially in light of the Court's particularized concerns.  *Order on Motion for Clarification of Ruling [DE # 914] and Joinders thereto [DE ## 915 and 927]* [Docket No. 935 at 10] ("This could escalate to problematic territory in a hurry.  ***The court trusts the Debtor's independent directors and new CEO are scrutinizing the issue of in-house lawyers potentially advising both the Debtor and Highland Non-Debtor Entity targets.***") (emphasis in original).  To the extent that the Advisors may assert the Debtor's services under the Agreements were deficient because the Debtor refused to provide any Estate-Adverse Services, such assertion is patently illogical and unsupported.  It would be an absurd construction of the Agreements to have contemplated and required the Debtor to provide the Advisors with Estate-Adverse Services.  *See Sojitz Energy Venture, Inc. v. Union Oil Co.*, 394 F. Supp. 3d 687, 701 (S.D. Tex. 2019) ("We will not construe contracts to produce an absurd result when a reasonable alternative construction exists.").

000347

in the payments or even suggested to the Debtor that they were overpaying for departed employees. Moreover, as the Advisors' litany of letters proves, to the extent the Advisors *ever* registered a concern about particular employees, it was only as part of the Prospective Complaint.

27.     Tellingly, during the chapter 11 case, the Advisors did not, for instance, file an emergency motion to compel the Debtor to assume or reject the Agreements, file a motion for relief from the automatic stay to terminate the Agreements, or seek any other relief with respect to the Agreements.  Nor did the Advisors declare any breach or other problem with the Debtor's services and billings or the Advisors' payments under the Agreements.  Furthermore, neither in their objections to Plan confirmation nor any other filing prior to the January 24, 2021, Application did the Advisors disclose their alleged multi-million dollar administrative claim.

28.     It was only ***after*** the chapter 11 case became contentious and the Debtor began gaining traction with its asset monetization plan that the Claimants filed the Application and notified the Debtor, the Court, and the estate's other stakeholders of their purported administrative claim in an effort to create an "asset" that could be used by Mr. Dondero in his fruitless pursuit of a "pot plan."  Indeed, at all times post-petition and prior to the Debtor's notice of termination of the Agreements, the Advisors continued to pay the Debtor for the applicable fees and charges under the Agreements, without complaint or objection.

29.     Finally, assuming for the sake of argument only that the Advisors had a viable claim, the Debtor is entitled to offsets and has other claims against the Advisors, with respect to which the Debtor reserves all rights.  Among other things, the Advisors owe approximately $2.56 million under the Agreements, as well as approximately $2.22 million in unpaid expense

000348

reimbursements.  And HCMFA and NexPoint owe more than \$7.68 million[13] and \$23 million,[14] respectively, under various promissory notes owed to the Debtor.

## IV.     OBJECTIONS

### A.     The Advisors Waived Any Alleged Breaches, Defaults and Claims Relating to the Purported Deficient Services and Overcharges and the Prior Payments Made By the Advisors Under the Agreements

30.     The Advisors waited more than six months to declare that the Debtor allegedly provided deficient services and overcharged the Advisors under the Agreements ("Agreement Claims").  The Agreement Claims were made *after* the Debtor terminated the Agreements in accordance with their terms.  Moreover, the Agreement Claims were asserted as part of a disingenuous plan proposal which asserted the claims for the first time and then unsuccessfully tried to convince the Debtor and its creditors that a plan waiving the Agreement Claims provided the estate with \$14 million more value than the Debtor's Plan.  As explained above, in response to such developments and as part of Mr. Dondero's pervasive scheme to disrupt the Debtor's business and obstruct and delay the Debtor's reorganization under the confirmed Plan, the Advisors are attempting to invent *ex post facto* a multi-million dollar administrative claim against the estate.  But the Advisors' belated complaints are barred as a matter of law.

31.     The undisputed facts prove that the Advisors waived any Agreement Claims under applicable Texas law.  *See Rex Performance Prods., LLC v. Tate*, 2020 Tex. App. LEXIS 10465, at \*19 (Tex. App. Dec. 31, 2020) "Waiver is defined as 'an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right.'" *Id*. (quoting *Sun Expl. & Prod. Co. v. Benton,* 728 S.W.2d 35, 37 (Tex. 1987).  The elements of waiver include:  (1) an existing

---

[13] As asserted in the Debtor's Complaint against HCMFA in Adv. Proc. No. 21-03004.

[14] As asserted in the Debtor's Complaint against NexPoint in Adv. Proc. No. 21-03005.

000349

right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and
(3) the party's actual intent to relinquish the right or intentional conduct inconsistent with the right.
*Ulico Cas. Co. v. Allied Pilots Ass'n,* 262 S.W.3d 773, 778 (Tex. 2008).  Being largely a matter of
intent, waiver is ordinarily a question of fact, but when the surrounding facts and circumstances
are undisputed, the question becomes one of law.  *Motor Vehicle Bd. of Tex. Dep't of Transp. v. El
Paso Indep. Auto. Dealers Ass'n, Inc.,* 1 S.W.3d 108, 111 (Tex. 1999).").

32.    As discussed above, the Advisors were evidently so unconcerned with any
purported Agreement Claims that, *inter alia,* they (a) continued to pay the Debtor all amounts due
without protest or even a reservation of rights ("Unconditional Payments"), (b) failed to declare a
default or put the Debtor on notice of any deficiency with the Debtor's services and billings and
the Advisors' payments under the Agreements ("Contractual Notice Actions"), despite sending a
litany of letters in late 2020 detailing other purported concerns, and (c) failed to seek judicial relief
of any kind (*e.g.,* a motion to compel the Debtor to assume or reject the Agreements or a motion
for relief from stay to terminate the Agreements ("Bankruptcy Court Actions"), despite having
filed the Advisors' CLO Motion on an emergency basis.  *See, e.g., EM Bldg. Contrs. Servs., LLC
v. Byrd Bldg. Servs., LLC*, 2020 Tex. App. LEXIS 6342, *40 (Tex. App. Aug. 11, 2020) ("Silence
or inaction, for so long a period as to show an intention to yield the known right, is . . . enough to
prove waiver") (quoting *Tenneco Inc. v. Enter. Prods. Co*., 925 S.W.2d 640, 643 (Tex. 1996)); *In
re National Steel Corp*., 316 B.R. 287, 307 (Bankr. N.D. Ill. 2004) ("[I]t is most significant that
the Creditor failed to take timely action to seek appropriate relief during the term of the executory
Contract.  Specifically, the Creditor failed to come before the Court to seek relief from the
automatic stay under 11 U.S.C. § 362(d).  Nor did the Creditor seek to compel National Steel to
assume or reject the Contract pursuant to § 365(d)(2) [footnote omitted].  Instead of availing itself

000350

of the procedures set forth in the Bankruptcy Code to compel National Steel's decision to assume or reject the Contract, the Creditor paid National Steel the higher price pursuant to the Amended Price Proposal and chose to 'reserve its rights.'").  In short, the Advisors waived any right to dispute the sufficiency of the Debtor's services or the amounts payable to the Debtor under the Agreements.

33.    The Advisors cannot avoid the consequences of their inaction by relying on so-called "non-waiver provisions" in the Agreements.[15]   Texas law provides that ostensible "non-waiver provisions" can themselves be waived by the parties.  *See, e.g., United States Bank, N.A. v. Kobernick*, 454 Fed. Appx. 307, 315 (5th Cir. Dec. 16, 2011) (bank's actions were inconsistent with preserving contractual right to declare a certain default and thus, the bank had waived said right, notwithstanding non-waiver clause (citing *Straus v. Kirby Court Corp.*, 909 S.W.2d 105, 108 (Tex. App. 1995) and other cases)).[16]

34.    Here, the Advisors' monthly Unconditional Payments, failure to take any Contractual Notice Actions, and failure to take any Bankruptcy Court Actions relating to the Agreements prove that the Advisors waived any Agreement Claims, notwithstanding any non-waiver clauses in the Agreements.

35.    Any purported Agreement Claims of the Advisors were viewed and treated as non-issues by the Advisors during the chapter 11 case, and were thus not preserved for purposes of the Application or otherwise.

---

[15] For example, the Payroll Reimbursement Agreement entered into as of May 1, 2018, by and among the Debtor and HCMFA, provides in section 6.02: "No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof …."

[16] The Debtor is cognizant of the Texas Supreme Court's opinion in *Shields Limited Partnership v. Bradberry*, 526 S.W.3d 471 (Tex. 2017), wherein the court stated that "as a general proposition, nonwaiver provisions are binding and enforceable."  *Id*. at 481.  However, the *Shields* court also stated: "To the extent there has been any doubt up to this time, we affirm that a party's rights under a nonwaiver provision may indeed be waived expressly or impliedly."  *Id*. at 482-83.

000351

**B.**     **The Voluntary Payment Rule Effectively Bars Any Administrative Claim**

36.     Separately, the "voluntary payment rule" under applicable Texas law precludes the Advisors from recovering any alleged contractual overpayments under the guise of an administrative claim.   As explained above, the Advisors voluntarily and intentionally made postpetition payments under the Agreements to the Debtor.   "The voluntary payment rule precludes a party from 'pay[ing] out his money, leading the other party to act as though the matter were closed, and then be in the position to change his mind and invoke the aid of the courts to get it back.'"   *Miga v. Jensen*, 299 S.W.3d 98, 103 (Tex. 2009); *accord*, *BMG Direct Mktg. v. Peake*, 178 S.W.3d 763 (Tex. 2005) (applying the principle to prevent the recovery of a "late fee" paid by a customer who later claimed it was unlawful); s*ee also Nat'l Steel Corp*., 316 B.R. at 307-08 ("Nor is it disputed that the Creditor made the payment voluntarily, notwithstanding the fact that it announced the reservation of its rights to later 'evaluate the situation.'  Despite the Creditor's fervent denials that it agreed to the price increase and that such an increase was inappropriate under the Contract, the Creditor made an affirmative, voluntary decision to pay the price increase ….  The Court finds that the requirements of the voluntary payment doctrine [under Michigan law, which is similar to Texas law] have been met and that, accordingly, the Creditor cannot recover any portion of the payment at issue made to National Steel.").

## V.     RESERVATION OF RIGHTS

37.     The Debtor reserves all rights relating to NexPoint, HCMFA and/or the Agreements, including, without limitation, any claims, causes of action, setoffs, recoupments and other rights of the Debtor against the Advisors.

000352

# VI.    **CONCLUSION**

The Advisors' Application for an administrative claim is part and parcel of the Advisors' and Mr. Dondero's broad strategy to subvert and hinder the Debtor's reorganization to the substantial detriment of the estate and its stakeholders.  For the reasons set forth herein, the Debtor respectfully requests that the Court (i) deny the Application, (ii) disallow any asserted administrative claim of the Advisors, and (iii) grant such other and further relief as the Court deems just and proper.

000353

Dated: May 5, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717) (*pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*pro hac vice*)
John A. Morris (NY Bar No. 266326) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*pro hac vice*)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email:       jpomerantz@pszjlaw.com
             ikharasch@pszjlaw.com
             jmorris@pszjlaw.com
             gdemo@pszjlaw.com
             hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

000354

# Tab 6



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed September 13, 2022**

_____
**United States Bankruptcy Judge**
_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | §    Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § |
| | §    Case No. 19-34054-sgj11 |
|        Reorganized Debtor. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
|        Plaintiff, | §    Adversary Proceeding No. |
| | § |
| vs. | §    21-03010-sgj |
| | § |
| HIGHLAND CAPITAL MANAGEMENT FUND | § |
| ADVISORS, L.P., AND NEXPOINT ADVISORS, | § |
| L.P., | § |
| | § |
|        Defendants. | § |

## <u>JUDGMENT</u>

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

000001 EXHIBIT "A"

This matter having come before the Court following the consolidation of (a) certain breach of contract claims asserted by Highland Capital Management, L.P. ("Highland" or "Plaintiff") against Highland Capital Management Fund Advisors, L.P. ("HCMFA") and NexPoint Advisors, L.P. ("NexPoint" and together with HCFMA, the "Defendants," and Plaintiff and Defendants together, the "Parties") in the above-referenced adversary proceeding (the "Adversary Proceeding"), with (b) the administrative expense claims asserted by HCMFA and NexPoint against Highland in the *Application for Allowance of Administrative Claim* [Main Docket No. 1826];[2] and the Court having held an evidentiary hearing on April 12 and 13, 2022 (the "Trial") and considered (a) Defendants' arguments and contentions set forth in the *Advisors' Trial Brief* [AP Docket No. 90];  (b) Plaintiff's arguments and contentions set forth in *Highland's Proposed Findings of Fact and Conclusions of Law* [AP Docket No. 91]; (c) the *Joint Pretrial Order* [AP Docket No. 96] filed by the Parties; (d) the exhibits admitted into evidence during the Trial [AP Docket No. 115]; (e) the credibility of the witnesses who testified during the Trial; (f) the arguments presented by counsel during closing arguments held on April 27, 2022; and (g) all prior proceedings arising in or concerning the claims asserted in the Adversary Proceeding, and for the reasons set forth in the *Findings of Fact and Conclusions of Law in Support of Judgment: (A) Granting Breach of Contract Claims Asserted by the Reorganized Debtor; and (B) Denying Defendants' Request for Allowance of Administrative Expense Claims* [AP Docket No. 124] (the "Findings") issued by the Court on August 30, 2022; the Court hereby enters the following final judgment (the "Final Judgment").

**IT IS ORDERED, ADJUDGED, AND DECREED** as follows:

---

[2] *See Stipulation (A) Amending Scheduling Order and (B) Consolidating and Resolving Certain Matters*, Adv. Pro. No. 21-03010-sgj, Docket No. 36 (references to the docket maintained in the Adversary Proceeding are hereafter referred to as "AP Docket No. ___").

000005

1.      HCMFA owes Highland the aggregate sum of $1,756,000, and Highland shall have a money judgment against HCMFA in that amount.

2.      NexPoint owes Highland the aggregate sum of $840,000, and Highland shall have a money judgment against NexPoint in that amount.

3.      All relief requested by the Defendants in the *Application for Allowance of Administrative Claim* [Main Docket No. 1826], including with respect to (i) all alleged overpayments and (2) all alleged breaches of contract by Highland, is denied and all claims that were asserted or could have been asserted therein are dismissed with prejudice.

4.      The amounts set forth to be paid in this Final Judgment shall bear interest, pursuant to 28 U.S.C. § 1961, from the date of the entry of this Final Judgment, at a rate of 3.48 percent. Interest shall be computed daily to the date of payment, except as provided in 28 U.S.C. § 2516(b) and 31 U.S.C. § 1304(b), and shall be compounded annually.

### END OF JUDGMENT ###

000006

# Tab 7



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 30, 2022**

_____
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03010-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND | § | |
| ADVISORS, L.P. AND NEXPOINT ADVISORS, L.P., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF A JUDGMENT: (A) GRANTING BREACH OF CONTRACT CLAIMS ASSERTED BY THE REORGANIZED DEBTOR; AND (B) DENYING DEFENDANTS' REQUESTS FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIMS

1

000264

## I.    INTRODUCTION

The above-referenced adversary proceeding ("Adversary Proceeding") is related to the Chapter 11 bankruptcy case of Highland Capital Management, L.P. (the "Debtor" or "Highland"), which was filed on October 16, 2019 (the "Petition Date"). Highland is now a Reorganized Debtor (sometimes referred to as such, herein). It obtained confirmation of a plan on February 22, 2021. The plan went effective on August 11, 2021. On direct appeal to the Fifth Circuit, Highland's confirmation order was affirmed in substantial part, on August 19, 2022.

A few days before confirmation of its plan, Highland filed the complaint ("the Complaint") initiating this Adversary Proceeding.[1] The defendants in the Adversary Proceeding are two very significant **non-debtor entities** within the massive Highland complex of companies: one known as Highland Capital Management Fund Advisors, L.P. ("HCMFA") and the other known as NexPoint Advisors, L.P. ("NexPoint" or sometimes "NPA"). These two companies are sometimes collectively referred to as the "Advisors" or "Defendants." It is undisputed that, at all relevant times, the Advisors have been controlled by James Dondero ("Mr. Dondero"), the co-founder and former CEO of the Debtor.[2] Early during the Highland bankruptcy case (on January 9, 2020), Mr. Dondero's tenure as CEO of Highland was terminated, and three new independent directors (the "Independent Board") were appointed to manage the affairs of the Debtor, pursuant to a settlement

---

[1] Plaintiff Highland Capital Management, L.P.'s Verified Original Complaint for Damages and for Declaratory and Injunctive Relief, filed February 17, 2021, DE # 1 in the AP. Note: all references herein to "DE # ___" shall refer to the docket entry number at which a pleading appears in the docket maintained in the Highland main bankruptcy case. All references to "DE # ___ in the AP" refer to the docket entry number at which a pleading appears in the docket maintained in this Adversary Proceeding.

[2] Joint Pretrial Order, DE # 92 in the AP at p. 9, ¶ 35. *See also* Tr. Transcript 4/13/22, Part 2 of 2 [DE # 116], at 14:19-20.

000265

between the Debtor and Official Committee of Unsecured Creditors ("UCC"), approved by the

bankruptcy court.[3]

The Adversary Proceeding involves Highland's breach of contract allegations against the

two Advisors arising under four different agreements: (a) two Shared Services Agreements (one

between Highland and each of the two Advisors); and (b) two Payroll Reimbursement Agreements

(again, one between Highland and each of the two Advisors).[4]  As later further explained, the

Advisors are "registered investment advisors" who manage approximately $11 billion of assets for

numerous clients, including retail investors (the retail investor funds constitute about $3 billion of

the $11 billion of assets under management). [5]  Pursuant to the two Shared Services Agreements,

Highland provided the "back-office" and "middle-office" services (i.e., accounting, legal,

regulatory compliance, human resources, information technology, etc.) that enabled the Advisors

to operate as a business.  And pursuant to the two Payroll Reimbursement Agreements, Highland

provided "front-office" advisory services (i.e., investment advisory personnel) that enabled the

Advisors to provide investment services to the funds under their management.  To be clear,

Highland maintained a full staff of actual employees and essentially contracted out to the Advisors

---

[3] The settlement between the Debtor and UCC is sometimes referred to by the parties as the "corporate governance settlement," and it was entered into to avert the likely appointment of a Chapter 11 trustee.

[4] The Debtor originally asserted three claims in the Complaint: Count One, seeking declaratory relief, as to the parties' respective rights and obligations under the two Shared Services Agreements; Count Two for Breach of Contract under the two Shared Services Agreements; and Count Three, seeking injunctive relief requiring the Advisors to cooperate in an orderly transition of services away from the Debtor, under the Shared Services Agreement.  DE # 1 in the AP. On February 24, 2021, following an evidentiary hearing, the bankruptcy court entered an order resolving the claims for declaratory and injunctive relief (Counts One and Three) of Highland's Complaint. Subsequently, on August 4, 2021, the parties entered into a stipulation that the claims for declaratory and injunctive relief were finally resolved by the prior order. DE # 36 in the AP. Thus, the only claims remaining from Highland's Complaint to be considered are those for breaches of contract (Count Two). Notably, the parties' Joint Pretrial Order expanded Highland's Count Two to include breaches of the Payroll Reimbursement Agreements and not simply breaches of the Shared Services Agreements.  DE # 92 in the AP, ¶¶ 15, 69, 71, 73, 74, 75, 76, 78, 79, 80, 81 & 85.

[5] Tr. Transcript 4/13/22, Part 2 of 2 [DE # 116], at 106:13-16.

000266

for the necessary services, so that the Advisors could manage funds for their clients.  The Advisors themselves had relatively few employees.

The Shared Services Agreements, later more fully defined, will sometimes collectively be referred to herein as the "SSAs," and the Payroll Reimbursement Agreements, also more fully defined herein, will sometimes be referred to as the "PRAs." The cash flow streams from the SSAs and PRAs were a significant source of revenue and liquidity for Highland.  And, of course, the Advisors, themselves, earned significant fees from the contracts that they had with their clients to manage the $11 billion of assets (the Advisors' revenue numbers are not in evidence).

Highland asserts that breaches of contract occurred due to the Advisors' failure—late during Highland's bankruptcy case, when things had become very contentious between Highland and Mr. Dondero—to pay amounts due and owing under the four agreements (specifically, after Highland had given notice on November 30, 2020, of Highland's intent to terminate the SSAs, in 60 days, in connection with its chapter 11 plan).[6]   Highland asserts that the Advisors thereafter failed to pay some $2,747,000 due and owing under the four agreements, in late 2020 and early 2021.

Meanwhile, shortly before the filing of the Adversary Proceeding, on January 24, 2021, the Advisors filed their *Application for Allowance of Administrative Claim* in the underlying bankruptcy case.[7]  On May 5, 2021, Highland filed its *Objection to Application for Administrative Claim of Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P.*[8] Contrary to Highland's position that the Advisors owe Highland money for unpaid services that

---

[6] Highland planned to reduce its workforce in February 2021, in connection with confirmation of its plan, and anticipated it would have insufficient personnel to perform under the agreements thereafter.
[7] DE # 1826.
[8] DE # 2274.

000267

Highland provided, the Application asserted **claims back against Highland** for: (1) alleged post-petition overpayments by the Advisors to Highland under the PRAs, throughout the bankruptcy case (under a theory that the fees payable to Highland under the PRAs were tied to the headcount of employees providing services, and Highland allegedly improperly charged the Advisors the same fixed, monthly amount under the PRAs, over time, as employee headcount at Highland dwindled); (2) alleged post-petition breaches of the SSAs by Highland, for allegedly failing to provide certain legal and compliance services contemplated under the SSAs—causing the Advisors to have to hire their own employees to provide such services; and (3) alleged post-petition overpayments by the Advisors to Highland under the SSAs for the services that Highland allegedly failed to provide. The Advisors have asserted up to $14 million in administrative expense claims against Highland.

On August 6, 2021, the parties stipulated that the contested matter created by the Advisors' Application for Allowance of Administrative Claim (and Highland's objection thereto) should be consolidated with the Debtor's breach of contract claims within this Adversary Proceeding.[9]  All consolidated, competing claims of the parties were tried before the bankruptcy court on April 12 and April 13, 2022, with closing arguments heard on April 27, 2022 (the "Trial"). The court heard from six witnesses and admitted nearly 200 exhibits.

For the reasons set forth below, the bankruptcy court has determined that the Advisors have failed to meet their burden of proving: (i) that they made any "overpayments" under the PRAs; (ii) that Highland breached the SSAs; or (iii) that the Advisors "overpaid" under the SSAs.  The court also has determined that, even if the Advisors had met their burden of proving that they "overpaid"

---

[9] Stipulation (A) Amending Scheduling Order and (B) Consolidating and Resolving Certain Matters, DE # 36 in the AP.

000268

under the PRAs, the Advisors claims were waived.  The Advisors' claims for "overpayments" under the SSAs were likewise waived. No administrative expense claims will be allowed.

The bankruptcy court has further determined that Highland has met its burden of proving its breach of contract claims against the Advisors for failure to pay certain amounts due under both the SSAs and PRAs in late 2020 and early 2021.

Accordingly, the bankruptcy court **denies** the request for allowed administrative expense claims by the Advisors. Further, the bankruptcy court **grants** the relief requested by Highland under its claims for breach of contract in this Adversary Proceeding.  Highland is entitled to the damages set forth at the end of this document.

Set forth below are the court's Findings of Fact and Conclusions of Law, pursuant to Fed. R. Bankr. Proc. 7052.  Any Finding of Fact that should be more appropriately characterized as a Conclusion of Law should be deemed as such, and *vice versa*.

## II.    FINDINGS OF FACT

The Defendant/Advisor known as HCMFA was formed on or around February 2, 2009, and was previously known as Pyxis Capital, L.P. ("Pyxis").[10] The Defendant/Advisor known as NexPoint was formed on or around March 20, 2012. It is undisputed that, at all relevant times, both Defendants (i.e., the Advisors) were controlled by Mr. Dondero.[11]

The Advisors are registered investment advisors under the Investment Advisers Act of 1940.  They serve as the investment managers for, among other things, certain retail funds (the

---

[10] Joint Pretrial Order, DE # 96 in the AP at p. 10. *See also* Tr. Transcript 4/13/22, Part 2 of 2 [DE # 116], at 14:19-20.

[11] *Id.* at p. 9.

000269

"Retail Funds") that are regulated pursuant to the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Company Act of 1940.

The Advisors provide investment advisory services to their clients pursuant to written investment advisory agreements (the "Investment Advisory Agreements"). These Investment Advisory Agreements are: (a) the principal source of the Advisors' revenue, and (b) are the reason for the Advisors' existence.

An individual named David Klos ("Mr. Klos") served as Highland's Controller and Chief Accounting Officer during the times relevant in this Adversary Proceeding (including overseeing the SSAs and PRAs between Highland and the Advisors) and reported directly to an individual named Frank Waterhouse ("Mr. Waterhouse"), who served as both: (a) Highland's Chief Financial Officer ("CFO"), while simultaneously serving as (b) the Treasurer for each of the Advisors. Both Mr. Klos and Mr. Waterhouse testified at Trial and seemed to be the witnesses who were most involved with the Agreements at the time of their execution, implementation, and during performance thereof.

Mr. Klos now works as CFO of the Reorganized Debtor.  Mr. Waterhouse no longer has any employment position with the Reorganized Debtor, but he still serves as an officer and/or employee of both of the Advisors and of Skyview—the latter of which is an entity that many former Highland employees transitioned to around the time that the Highland plan was confirmed, and they were terminated from Highland (Skyview now provides middle- and back-office services to the Advisors).[12]  The court found Mr. Klos to be a credible and knowledgeable witness.  The court found Mr. Waterhouse's testimony to have been only moderately helpful.  Mr. Waterhouse

---

[12] *See* Tr. Transcript 4/13/22, Part 2 of 2 [DE # 116], at 55:3-21.

testified either "Not that I recall," "I don't recall," "Not that I'm aware of," or "I don't remember," more than 75 times, during two hours and 26 minutes of testimony regarding the SSAs and PRAs.[13]

### A. The SSAs

#### i. *The HCMFA SSA.*

On February 9, 2012, Highland and HCMFA (then operating as Pyxis) entered into a *Shared Services Agreement*, effective as of December 15, 2011 ("Original HCMFA SSA").[14] On September 12, 2012, the parties entered into an *Amended and Restated Shared Services Agreement*, effective as of December 15, 2011.[15] Subsequently, the parties entered the *Second Amended and Restated Shared Services Agreement*, effective as of February 8, 2013—which is the SSA that was in place between Highland and HCMFA during the bankruptcy case and is at issue in this litigation (the "HCMFA SSA").[16]

To understand the impetus for the HCMFA SSA (and, for that matter, all of the agreements at issue in this Adversary Proceeding) one must fully appreciate that the Defendants/Advisors had relatively few employees of their own during the times relevant in this Adversary Proceeding. Rather, the Defendants/Advisors essentially contracted for services and/or personnel employed by the mothership, Highland.  Pursuant to the HCMFA SSA, HCMFA agreed to pay Highland for costs relating to certain shared services requested by HCFMA and provided by Highland, including, in pertinent part: (i) finance and accounting, (ii) human resources, (iii) marketing, (iv) legal, (v) corporate, (vi) information technology, and (vii) operations.[17]   According to all

---

[13] With all due respect, the court realizes that most witnesses do not have perfect memories and occasionally testify "I don't recall" or "I don't know" during testimony. Indeed, during this Trial, other witnesses sometimes testified as such.  But Mr. Waterhouse's lack of answers to important questions was somewhat troubling to the court.
[14] Pl. Ex. 54.
[15] Pl. Ex. 55.
[16] Pl. Ex. 2.
[17] *See id.* at Article II, Section 2.01.

000271

witnesses, these services are commonly referred to in the industry as "middle- or back-office" services, in contrast to "front-office" services that would be investment advisory services.

Pursuant to the HCMFA SSA, HCMFA was required to pay Highland its allocable share of the "Actual Cost" of "Shared Services" and "Shared Assets" based on an "Allocation Percentage," as those terms are defined in the HCFMA SSA.[18] To determine the amounts owed, (a) Highland was to prepare Quarterly Reports setting forth the cost allocations and detailing amounts paid during the applicable quarter; (b) the parties were to agree on the allocations set forth in the Quarterly Reports and prepare invoices; and (c) the invoiced amounts were to be paid within 10 days.[19] In contrast to the other SSA with Nexpoint (described below) and the PRAs (also described below), the HCMFA SSA is stipulated to have been a ***variable fee arrangement*** between the parties.

  ii.  *The NexPoint SSA.*

On June 5, 2013, Highland and NexPoint entered into their original *Shared Services Agreement*, effective as of January 1, 2013 (the "Original NexPoint SSA").[20] The Original NexPoint SSA was modelled after the HCMFA SSA and included a formula for determining NexPoint's share of allocable cost of "Shared Services" and "Shared Assets," which did not rely on an actual analysis of cost, but rather a percentage of managed fund assets.[21] This contract covered the same "middle- or back-office" services provided under the HCMFA SSA.

Subsequently, Highland and NexPoint amended the Original NexPoint SSA. The parties entered into the *Amended and Restated Shared Services Agreement*, effective as of January 1, 2018—which is the SSA that was in place between Highland and NexPoint during the bankruptcy

---

[18] *See id.* at Section 4.01.
[19] *See id.* at Sections 5.01, 5.02, & 5.03.
[20] Pl. Ex. 29.
[21] *See id.* at Sections 4.01, 5.01, 5.02, & 5.03.

000272

case and is at issue in this litigation  (the "NexPoint SSA").[22] The notable changes made to the NexPoint SSA included that: (a) the "asset based" formula (which was calculated using the asset values of a fund advised by NexPoint) for determining the value of Highland's services was replaced with a monthly, "flat fee" arrangement; and (b) Highland was provided with exculpation and indemnification rights. The monthly flat fee charged by Highland to NexPoint in the amended NexPoint SSA was $168,000.[23]

NexPoint agreed to pay Highland the flat monthly fee of $168,000, due before the first business day each month, in exchange for the shared services provided by Highland.[24] Additionally, under Section 6.03 of the NexPoint SSA, Highland is entitled to recover its costs and expenses, including attorney's fees, incurred in connection with the defense or settlement of indemnifiable claims.[25]

The NexPoint SSA was signed by Mr. Waterhouse on behalf of **_both_** Highland (in his capacity as Treasurer of Strand Advisors, Inc., the general partner of Highland) and NexPoint (in his capacity as Treasurer of NexPoint Advisors GP, LLC, the general partner of NexPoint).

On November 30, 2020, Highland—with confirmation of its plan pending, which contemplated a separation of Highland from Dondero-controlled entities—exercised its right to terminate both the HCMFA SSA and NexPoint SSA, by providing a written termination notice to the Advisors, indicating Highland's intent to terminate them, effective January 31, 2021 (the "Termination Date").  However, on January 29, 2021, Highland agreed to extend the Termination Date by two weeks (to February 14, 2021), due to ongoing negotiations for an orderly transition of services, provided the Advisors paid for the services in advance. Highland has credibly

---

[22] Pl. Ex. 3.
[23] _Id._ at Article III, Section 3.01.
[24] _See id._.
[25] _See id._ at Section 6.03.

000273

represented that it believed termination without a service provider in place to fill Highland's role would have had dire consequences to the Retail Funds and their investors. The parties later agreed to extend the Termination Date one final time in February 2021, to extend the deadline through the end of February 2021.

The Advisors do not contend that Highland failed to perform under the SSAs, other than, perhaps, providing certain legal and compliance services to the Advisors a handful of times, at a point in time during the bankruptcy case when the Debtor believed it would be a conflict of interest to do so (as the Debtor and Advisors were becoming adverse). Further, it is agreed that the NexPoint SSA contemplated a fixed fee arrangement of $168,000 per month. To reiterate, the HCMFA SSA was ***not*** a fixed fee arrangement, but the amounts invoiced under the HCMFA SSA generally ranged between $300,000 to $310,000 each month.

### B.  The PRAs

In addition to the two SSAs, Highland and each of the Advisors/Defendants were parties to two "Payroll Reimbursement Agreements" (the "PRAs" and together with the SSAs, the "Agreements").  The PRAs—in contrast to the SSAs that were designed to compensate Highland for the Defendants' usage of "middle- and back-office" services—were designed to compensate Highland for the Defendants usage of ***"front-office"*** services.

There is a confusing history leading up to execution of the PRAs.  Notably, prior to the year 2018, Highland had provided "front-office" services to the Advisors ***for free***.  Also notably, in early 2018, the parties embarked on documenting a new arrangement whereby Highland would henceforth be compensated for "front-office" services through the mechanism of "sub-advisory agreements" with the Advisors (which would be typical in the industry generally, as a way to

000274

compensate a party for "front-office" services). But the parties ended up using the PRAs instead, as set forth below.

      *i.    Events Leading up to the PRAs.*

As noted above, prior to the year 2018, Highland had provided "front-office" services to the Advisors for free, for six years.[26] But at the end of 2017, Highland was operating at a loss and those losses were expected to increase in 2018.[27] According to the credible testimony of Mr. Klos at Trial, Mr. Dondero came up with a number of $6 million that the Defendant NexPoint should be paying Highland, every year in the aggregate, to compensate for the mounting operating losses at Highland—which also had the added benefit of reducing NexPoint's taxable income that it was generating, that happened to be flowing up to Mr. Dondero.[28]

So, on or about January 11, 2018, Highland and NexPoint entered into that certain *Sub-Advisory Agreement*, effective as of January 1, 2018 (the "Initial Sub-Advisory Agreement"). Notably, a typical sub-advisory agreement might provide for compensation for front-office services in a myriad of ways, including possibly: based on actual costs; flat fees; or percentage of assets under management ("AUM"), using basis points computed on assets managed.[29] Pursuant to the Initial Sub-Advisory Agreement, Highland would be providing certain "front-office" services to NexPoint to enable it to fulfill its obligations to its Clients under its Investment Management Agreements.[30] In exchange, NexPoint agreed to pay a flat monthly fee of $252,000, while each of the parties agreed to bear their own expenses.[31] As with the NexPoint SSA, Mr. Waterhouse signed the Sub-Advisory Agreement on behalf of **both** Highland and NexPoint. The

---

[26] Tr. Transcript 4/12/22, Part 1 of 2, [DE # 110] at 69:13-71:19.
[27] Pl. Ex. 86 at p. 2. *See* Tr. Transcript 4/12/22, Part 1 of 2 [DE # 110], at 65:13-22.
[28] Tr. Transcript 4/12/22, Part 1 of 2, [DE # 110] at 66:6-71:19.
[29] Tr. Transcript 4/13/22, Part 1 of 2, [DE # 114] at 37-47.
[30] Joint Pretrial Order, DE # 96 in the AP at p. 11.
[31] NexPoint Sub-Advisory Agreement, Pl. Ex. 5, §2(a)-(b).

000275

payment of $252,000 times 12 equaled $3,024,000; meanwhile NexPoint would be paying Highland $168,000 per month under the fixed fee NexPoint SSA, and $168,000 times 12 equaled $2,016,000.  Thus, by the court's calculations, this would mean that NexPoint would be paying Highland not quite $6 million per month for "back-", "middle-", and "front-office" services. However, the court understands that a subsidiary of NexPoint, called NREA, would be paying an additional $80,000 per month flat amount for "back- and middle-office" shared services, which would total $248,000 per month for shared services being paid from NexPoint (inclusive of its subsidiary) to Highland.[32]    $248,000 times 12 equals $2,976,000 and, when added to the $3,024,000 being paid for "front-office" sub-advisory services, this totaled exactly $6 million.

Each year, Mr. Waterhouse and Mr. Klos prepared a written analysis of Highland's past and projected financial performance (each, an "Annual Review") that they presented to Mr. Dondero and Mark Okada (the latter of whom was Highland's other co-founder).[33] The 2017/2018 Annual Review included statements and information that: (i) Highland was projected to incur operating losses of $12 million in 2018;[34] (ii) the agreements of NexPoint to pay $6 million in fees to Highland was to "remain unchanged;"[35] (iii) the aggregate of $6 million to be paid by NexPoint to Highland was projected to be unchanged in 2018, 2019, and 2020;[36] and (iv) changes through new hires, internal transfers, terminations, and compensation and benefits paid had been made across the Highland platform.[37]

But, a hugely significant event occurred that affected Highland's cash flow right after the 2017/2018 Annual Review was presented. On January 30, 2018, a former Highland employee

---

[32] Pl. Ex. 146.  *See also* Tr. Transcript 4/12/22, Part 2 of 2 [DE # 113], at 70:6-17.
[33] *See, e.g.,* Pl. Ex. 86 (2017/2018 Annual Review), Pl. Ex. 142 (2018/2019 Annual Review), & Pl. Ex. 143 (2019/2020 Annual Review).
[34] Pl. Ex. 86 at p. 2.
[35] *Id.* at p. 36.
[36] *Id.* at p. 46.
[37] *Id.* at pp. 29-33, 48.

000276

named Joshua Terry commenced an involuntary bankruptcy case against Acis Capital Management, L.P. ("Acis") in this bankruptcy court (Mr. Terry had obtained a large arbitration award and judgment against Acis and was being frustrated in his efforts to collect upon it). At that time, Acis was an affiliate of Highland that managed certain collateralized loan obligations ("CLOs"). To perform its duties, Acis had earlier entered into its own sub-advisory and shared services agreements with Highland (the "Acis Agreements"). The Acis Agreements were a vital source of Highland's revenue.  Highland was projected to receive almost $10 million in revenue in 2018 alone from the Acis Agreements—Highland's second-highest source of revenue representing nearly 12% of its total projected operating income.[38]

So, on March 7, 2018, just weeks after the 2017/2018 Annual Review was presented—and in an attempt to make up for anticipated lost revenue from Acis—Highland decided to create a Sub-Advisory Agreement *also for HCMFA*, initially for a flat monthly fee of $450,000, retroactive to January 1, 2018.  Recall that, heretofore, Highland had been providing front-office services to HCMFA for free. A week later, a draft Sub-Advisory Agreement modeled on the NexPoint Initial Sub-Advisory Agreement was prepared for HCMFA.[39]

Notably: (a) the 2017/2018 Annual Review presented to Mr. Dondero and Mr. Okada just six weeks earlier *did not contemplate that HCMFA would be party to a Sub-Advisory Agreement or otherwise would be compensating Highland for investment advisory services Highland was providing*, and (b) both the title and terms of the draft HCMFA Sub-Advisory Agreement corroborated Highland's contention that the parties intended to create a "fee for service" advisory relationship.

---

[38] Pl. Ex. 86 at p. 35 ("Highland 2.0 CLOs" refers to the CLOs managed by Acis).
[39] *See* Pl. Ex. 87 (e-mails between March 7 and March 15, 2018).

000277

But, alas, the Initial Sub-Advisory Agreements for both HCMFA and NexPoint were not to be, because Highland learned: (a) from its outside counsel that (i) the Advisors' Retail Board[40] needed to approve the Sub-Advisory Agreements during an ***in-person*** meeting, and that (ii) the two Sub-Advisory Agreements ***could not be made retroactive to January 1, 2018***, and (b) that the next in-person meeting of the Retail Board would not be until ***June 2018***.[41]  This was a problem because Highland needed cash-flow immediately and could not wait until June 2018.

Based on this legal advice, the parties concluded that they could not utilize the contemplated Sub-Advisory Agreement structure because: (a) Highland would not be able to earn any revenue for sub-advisory services until June, the earliest date the Retail Board could approve of the Sub-Advisory Agreements during an in-person meeting, and (b) it could not be retroactive to January 1, 2018, meaning that Highland would be unable to receive six months' of needed revenue. So, another method was needed to overcome these obstacles—and the Payroll Reimbursement Agreements were born.[42]

ii.  *The Use of PRAs instead of Sub-Advisory Agreements to Compensate Highland for "Front-Office" Advisory Services.*

So, the next month, Highland prepared a draft PRA that did not need the Advisors' Retail Board's approval and could be made retroactive to the beginning of the year.

While the Initial Sub-Advisory Agreements had clearly contemplated that a flat fee for front-office services would be paid to Highland, Mr. Klos expressed concerns, after reviewing the draft PRAs, about language therein—and an Exhibit A chart attached thereto, listing out 25 "Dual

---

[40] The "Retail Board" is essentially an independent board of trustees or board of directors for retail funds managed by the Advisors. Tr. Transcript 4/13/22, Part 1 of 2 [DE # 114], at 4:22-24.

[41] *See* Pl. Ex. 87 (March 15, 2018 e-mails from Lauren Thedford ("Ms. Thedford"), an attorney employed by Highland but who also served as an officer of the Advisors).

[42] No one ever explained at Trial the exact reasons that a document entitled "Sub-Advisory Agreement" would require in-person Retail Board approval and could not be retroactive in effect. But no one seemed to dispute this fact.

000278

Employees" who would be working both for Highland and the Advisors, and suggesting the

percentage of time they might be working for the Advisors—that payments to Highland would be

based on "actual costs" **associated with specific employees.** Mr. Klos was worried about the

cumbersomeness of the PRAs and wrote to Highland inhouse attorney Lauren Thedford ("Ms.

Thedford"), who also served as an officer of the Advisors, that:

> Does it have to be framed as reimbursement of actual costs? **We'd much rather it
> be characterized as just an agreed upon amount between the two entities**. It's not
> a small task and involves subjective assumptions to allocate individual employees,
> so as it's written, **it would be creating a ton of work that isn't creating any value
> to the overall complex**.[43]

In response, Ms. Thedford stated that she was "open" to changing the "definition of Actual

Costs" but observed that there "needs to be some method of determining the amounts" and that it

was "important" to treat the agreement as one for "reimbursement." In response, Mr. Klos stated:

> Could we say that Actual Cost is being determined **at the outset of the agreement,
> have a schedule as of Jan. 1, 2018 and say that Actual Cost shall be as set out in
> that schedule and shall be paid in monthly installments for the term of the
> agreement . . . that way the exercise is only performed once**.

> Beyond that year, termination provision kicks-in, so if there's a belief that Actual
> Costs have changed materially, either party could terminate and/or renegotiate for
> an amended agreement.[44]

At Trial, Mr. Klos credibly testified that the Exhibit A list of employees attached to the

PRAs, and the allocation made for employees created in connection with the PRAs, were created

to be the same monthly fees previously contemplated under the Initial Sub-Advisory Agreement.[45]

Further, Mr. Klos testified that the estimates, despite being made in good faith, were based on his

own subjective assessments and were only created as a proxy for the flat monthly fees previously

envisioned by Mr. Dondero, to get Highland needed cash flow.[46]

---

[43] Pl. Ex. 129 (emphasis added).
[44] *Id.* (Klos e-mail to Thedford sent on April 17, 2018, at 10:56 a.m.) (emphasis added).
[45] Tr. Transcript 4/12/22, Part 1 of 2, at 104:9-24.
[46] Tr. Transcript 4/12/22, Part 1 of 2, at 104:19-106:16.

000279

On or around May 1, 2018, Highland and NexPoint entered into that certain Payroll Reimbursement Agreement (the "NexPoint PRA").[47] The NexPoint PRA replaced the NexPoint Initial Sub-Advisory Agreement that had been effective as of January 1, 2018.[48] Then, on or around May 1, 2018, Highland and HCMFA entered into that certain Payroll Reimbursement Agreement, also effective as of January 1, 2018 (the "HCMFA PRA").[49]

Except for the (a) names of the parties, (b) the amount of monthly payments thereunder, and (c) the list of "Dual Employees" and their respective allocations set forth in Exhibit A to each of the PRAs, the NexPoint PRA and HCMFA PRA were identical.

So, to be clear, whereas the SSAs were to provide compensation for "middle-" and "back-office" services provided by Highland to each of the Advisors, the PRAs were, generally, structured for the Advisors to pay Highland amounts in recognition of the "front-office" services provided by the Dual Employees to the Advisors (which "Dual Employees" were technically employed by Highland).

To be further clear, both the NexPoint PRA and HCMFA PRA stated that the Advisors were required to pay Highland the "Actual Cost" to Highland for the Dual Employees pursuant to Section 2.01.[50] However, "Actual Cost" was defined in each of the PRAs as:

> with respect to any period hereunder, the actual costs and expenses caused by, incurred, or otherwise arising from or relating to each Dual Employee, in each case during such period. ***Absent any changes to employee reimbursement, as set forth in Section 2.02, such costs and expenses are equal to [$252,000 for NexPoint and $416,000 for HCMFA] per month***.[51]

---

[47] Pl. Ex. 6 (NexPoint PRA)
[48] Joint Pretrial Order, DE # 96 in the AP at p. 11.
[49] *Id.*
[50] Pl. Ex. 6 §§ 2.01, 3.01; Pl. Ex. 8 §§ 2.01, 3.01.
[51] Pl. Ex. 6 at Article I (fixing the costs and expenses at $252,000 per month for NexPoint) (emphasis added); Pl. Ex. 8 at Article I (fixing the costs and expenses at $416,000 per month for HCMFA) (emphasis added).

000280

Significantly, pursuant to Section 2.02, the parties could agree to modify the Actual Cost if they believed a change to employee reimbursement was appropriate, and each party was required to negotiate any change in good faith.[52]  The Advisors contend that Section 2.02, in conjunction with Section 4.02, imposed an affirmative obligation on Highland to update the Exhibit A list of Dual Employees and unilaterally adjust the monthly payments, but no such obligation exists under the clear language of the PRAs.[53]

The undisputed evidence establishes that: (a) neither Mr. Klos nor anyone else ever updated the Exhibit A list of Dual Employees attached to the PRAs; (b) neither Mr. Klos nor anyone else was ever instructed to update Exhibit A attached to the PRAs; (c) at all relevant times, the Advisors and Highland had access to the same information concerning the amounts paid under the PRAs, the amounts projected to be paid under the PRAs, the termination of Dual Employees, the compensation of Dual Employees, and the investment advisory services provided by Highland to each of the Advisors; and (d) as discussed below, the parties knew of and relied on Section 2.02 in December 2018 to amend the PRAs while Mr. Dondero was still fully in control of the entire Highland complex. The undisputed evidence was also that four out of the twenty-five Dual Employees listed on the Exhibit A's attached to the PRAs were no longer employed as of the May 1, 2018 date on which the PRAs were executed (although they had been employed as of the January 1, 2018 effective date of the PRAs).

Without considering any extrinsic evidence, the court finds the clear and unambiguous language of the definition of "Actual Cost" in the PRAs indicates that these were intended to be

---

[52] Pl. Ex. 6 § 2.02; Pl. Ex. 8 § 2.02 ("During the Term, the Parties may agree to modify the terms and conditions of [NexPoint's/HCMFA's] reimbursement in order to reflect new procedures or processes, including modifying the Allocation Percentage (defined below) applicable to such Dual Employee to reflect the then current fair market value of such Dual Employee's employment.  The Parties will negotiate in good faith the terms of such modification.").

[53] Pl. Ex. 6 § 4.02 ("Should either Party determine that a change to employee reimbursement is appropriate, as set forth in Section 2.02, the Party requesting the modification shall notify the other Party on or before the last business day of the calendar month"); Pl. Ex. 8 § 4.02 (same).

000281

fixed amount contracts, *simply plugging in a set monthly amount for front-office services that—absent agreed modifications—were never required to be adjusted based on particular employees' daily activities or their comings-and-goings, despite the use of the words "Actual Cost."* Further, the clear and unambiguous language of Sections 2.02 and 4.02 of the PRAs contemplated possible agreed modifications and required "the Party requesting modification [to] notify the other Party" before the end of the month to change the employee reimbursement amount and the parties had to agree on any change to in amount.[54] The requirement that such notification and agreement be made shows the monthly payment was intended to be fixed and provided no mandatory obligation to update it, based on the Dual Employees' allocation of time or employment at any time. The court finds these provisions, taken together, leave no ambiguity or lack of clarity that the terms of the PRAs generally intended to set a fixed monthly amount for front-office services, for ease of implementation.  The parties could always terminate with or without cause,[55] or seek to modify the PRAs if the plugged-in amount seemed unreasonable over time.[56]

       C.  <u>The Amendments to the PRAs</u>

On December 14, 2018, (a) Highland and NexPoint entered into that certain *Amendment Number One to Payroll Reimbursement Agreement* (the "NexPoint PRA Amendment"), pursuant to which NexPoint paid an extra $1,300,000 to Highland, and (b) Highland and HCMFA entered into that certain *Amendment Number One to Payroll Reimbursement Agreement* (the "HCMFA PRA Amendment" and together with the NexPoint PRA Amendment, the "PRA Amendments"), pursuant to which HCMFA paid an extra $1,200,000 to Highland.[57]

---

[54] *See id.*
[55] Pl. Exs. 6 § 5.02; Pl. Ex. 8 § 5.02.
[56] Pl. Ex. 6 § 2.02; Pl. Ex. 8 § 2.02.
[57] Pl. Ex. 7 (NexPoint PRA Amendment); Pl. Ex. 9 (HCMFA PRA Amendment).

000282

These PRA Amendments are short, sparsely worded documents.  They simply indicate that the Advisors are agreeing to pay the additional amounts to Highland "representing an estimate of additional Actual Costs owed under the [PRAs] for additional resources used."[58]  At Trial, Mr. Klos credibly testified that neither he, nor anyone else to his knowledge, ever performed an analysis of Highland's actual costs under the PRAs to determine the extra amounts that ended up being paid to Highland under the PRA Amendments, and the PRA Amendments were only made because Highland was losing money rapidly and the Advisors had taxable income.[59] Additionally, by December 1, 2018 (before the PRA Amendments were executed), the Advisors had knowledge that *nine of the twenty-five Dual Employees listed in Exhibit A to the original PRAs were no longer employed by Highland*.[60] Yet, the Advisors made **additional lump sum payments** exceeding the fixed monthly amounts set forth in the PRAs. The Advisors claim it was their standard practice to perform annual "true-ups" of the various contracts in the Highland complex and that these the PRA Amendments were a "true-up," which should be used to find that the PRAs did not contemplate flat amounts for services. But this would mean that the Advisors paid Highland $2.5 million on a PRA "true-up," when they knew that over one-third of the Dual Employees under the PRAs were terminated during the relevant time period. Further, neither the Advisors nor any individual ever requested Exhibit A to the PRAs to be amended at any time prepetition. As of the Highland bankruptcy Petition Date (October 16, 2019), fourteen of the twenty-five Dual Employees were no longer employed at Highland.  Mr. Dondero controlled both Highland and the Advisors at this time.  To be clear, the Advisors had never taken the position that there were "overpayments" under the PRAs as of the Petition Date or sought modification of the PRAs. Mr.

---

[58] *Id.*
[59] Tr. Transcript 4/12/22, Part 1 of 2, at 113:4-21.
[60] Pl. Ex. 14 (responses to Interrogatories 3 and 4).

000283

Waterhouse, who signed the PRA Amendments on behalf of both Highland and the Advisors, testified that he had no recollection of how the amounts set forth in the PRA Amendments were determined or whether it was actually a "true-up."

The court finds that nothing in the record suggests that the Advisors were doing a "true-up" when implementing the PRA Amendments. Nor do the additional amounts that were paid by the Advisors to Highland under the PRA Amendments suggest that the previously fixed monthly amount set forth in the PRAs was intended to be a variable amount. The court finds that the PRA Amendments were simply made with the purpose of funneling in more money to Highland to help with its liquidity crisis—with the added benefit of reducing the Advisors' taxable income.

D. Extrinsic Evidence: Post-Petition Communications and Continued Payments under the PRAs and SSAs

The court will now roll forward and consider the extrinsic evidence from the postpetition time period that might shed light on the disputes in this Adversary Proceeding.  Both Highland and the Advisors have taken the position that the Agreements are ***unambiguous***—although they each have different interpretations as to what the Agreements mean.  While the court is hard-pressed to find any ambiguity in the ***content*** of the Agreements,[61] the court will analyze the extrinsic evidence presented, since the parties have submitted it, and want the court to consider it if ambiguity is deemed to exist as to the Agreements.

In January 2020 (early during the Highland bankruptcy case), in response to inquiries from the Advisors' Retail Board, Ms. Thedford sought information concerning expense reimbursements and allocations under the PRAs.  Mr. Klos thereafter informed Ms. Thedford that such information "doesn't exist in terms of current percentages." Ms. Thedford then asked whether such information

---

[61] The court does think the ***title*** of the PRAs—Payroll Reimbursement Agreement—is rather ambiguous, given the content of the document. Also, the Exhibit A list of employees further injects some ambiguity, given the overall content of the Payroll Reimbursement Agreements.

000284

was contained in Exhibit A to the PRAs.  In response, Mr. Klos reminded Ms. Thedford that the

allocations in Exhibit A were:

> *a point in time estimate as of 2018.  Half the people are gone now and if you were to reallocate them now, all the percentages would be different*.  On top of that, we don't have anything comprehensive that is comparable for back office people so the only thing we can really provide is a stale percentage on a small subset of the overall population.

> Would be much more logical to do the yes/no and then as *a blanket statement say that HCMFA/NPA pay $x/$y annually to HCMLP for these employees' services*.[62]

Ms. Thedford responded by simply writing "Got it, thanks."[63]

Also, in January 2020 (again, early in the Highland bankruptcy case and the month Mr.

Dondero ceded control of Highland to the Independent Board under a stipulated corporate

governance order), Mr. Waterhouse, the Treasurer of each of the Advisors, requested information

from Mr. Klos concerning the "monthly amount for each agreement."[64] Mr. Klos responded to Mr.

Waterhouse confirming the fixed amounts under the Agreements:

> Monthly amounts below

> HCMFA
> $416k *flat* for investment support
> $290k-300k for shared services

> NPA
> $252k *flat* for investment support
> $248k *flat* for shared services ($168k from NPA directly; $80k from NREA, but assume you're looking for a consolidated number)[65]

There is no credible evidence that Mr. Waterhouse ever raised any concerns about the fixed

monthly amounts being charged and, in fact, he continued approving payments for these exact

---

[62] Pl. Ex. 151 (emphasis added).
[63] *Id.*
[64] Pl. Ex. 146.
[65] *Id.* (emphasis added).

22

000285

amounts.  Payments did not stop until December 2020, when Mr. Dondero, wearing his Advisors'

hat, directed Mr. Waterhouse to stop paying the amounts due under the Agreements.  Then the

Advisors filed their Application for Administration Expense Claim the very next month.[66]  While

there was some testimony suggesting that concerns had been raised in early January 2020

regarding possible overpayments under the PRAs to an individual named Fred Caruso (a financial

advisor for the Debtor at the firm DSI),[67] the court did not have compelling evidence of this—Fred

Caruso did not testify, and Frank Waterhouse had a generally poor memory for the details about

this.

The court finds that these continued communications to officers of the Advisors confirming

the amounts being paid under the Agreements, and the continued payments by the Advisors, after

obtaining this information, is further evidence of the intent of the parties to structure the

Agreements as fixed amount contracts.

### E.  Extrinsic Evidence:  Highland Performed under the Agreements Postpetition

Significantly, there was extensive evidence at Trial that Highland performed at all times

under the Agreements, and the Advisors made contemporaneous and repeated representations to

their Retail Board that Highland was providing all services required under the Agreements.

All parties agreed that, as required by the Investment Company Act, the Retail Board for

the Advisors conducts an annual review whereby it determines whether to extend its own

Investment Advisory Agreements with the Advisors.  This is referred to as a "15(c) review"

process. A witness Ethan Powell, a member of the Retail Board, credibly testified about all this.[68]

---

[66] Pl. Exh. 11.
[67] Tr. Transcript 4/13/22, Part 2 of 2 [DE # ], at 144.
[68] Tr. Transcript 4/13/22, Part 1 of 2 [DE # 114], at 4-34.

000286

As part of this "15(c) review" process, and at other times during Highland's bankruptcy case, the Advisors provided the Retail Board with information concerning the status of the shared services relationship, Highland's provision of services thereunder, and contingency planning in case the Advisors' shared services relationship with Highland was terminated.

The Advisors provided this information to the Retail Board either in writing or orally during meetings of the Retail Board (the "Retail Board Meetings"). Minutes from the Retail Board Meetings were created in the ordinary course (the "Retail Board Minutes"). Ethan Powell testified that the Retail Board Minutes were adopted only after, among other things, the Advisors had an opportunity to review and edit their content to assure their accuracy.[69]

The Retail Board Minutes recite, among other things, that one or more of the Advisors' officers (i.e., Mr. Waterhouse, Mr. Norris, Ms. Thedford, or Mr. Post) or their attorneys (i.e., Dennis C. Sauter, the Advisors' in-house counsel, or K&L Gates, their outside counsel) were present and participated in every applicable Retail Board Meeting.[70]

Mr. Powell further testified that the Retail Board: (a) assumed that the Advisors made the statements and representations reflected in the Retail Board Minutes on an informed basis after conducting due diligence, and (b) the Retail Board relied on the statements and representations made by or on behalf of the Advisors in the Retail Board Meetings.[71]

It is important to note that, in January 2020, Mr. Dondero had avoided the likely appointment of a Chapter 11 trustee in the Highland bankruptcy case, by ceding control of Highland to the three new Independent Board members. With Mr. Dondero's loss of control of Highland, the Retail Board naturally sought information about whether this change would impact

---

[69] *Id.*, at 9:15-10:24.
[70] *See generally* Pl. Exs. 57-73.
[71] *See* Tr. Transcript 4/13/22, Part 1 of 2 [DE # 114], at 11:22-12:6, 13:1-13.

000287

Highland's staffing.  Thus, the Retail Board Minutes from the Retail Board Meeting, held on

January 22, 2020, included the following entries:

> Ms. Thedford noted that ***the Meeting Materials included a headcount report that
> lists each employee associated with HCMLP and the Advisers and identifies
> whether the employee is dually employed by both HCMLP and an Adviser*** or
> pursuant to a separate arrangement, such as Mr. Norris' employment with the
> Funds' distributor, NexPoint Securities, Inc. . . .

> Mr. Norris discussed the shared services arrangements that each Adviser is a party
> to with HCMLP pursuant to which the Adviser may utilize employees from
> HCMLP for the provision of various services such as human resources, accounting,
> valuation, information technology services, compliance and legal.  Mr. Norris
> noted, however, that many of these "third party" services are readily available on
> the open market.[72]

In response to the Retail Board's request, the Advisors included in the "Meeting Materials"

a list of every person employed in the Highland complex, including (a) name, (b) title, (c)

department, (d) employing entity (e.g., Highland, HCMFA, NexPoint), (e) whether the person was

a Dual Employee, (f) office location, and (g) whether the person was an "investment professional"

or was providing "back office" services."[73]

In mid-June 2020, Jason Post ("Mr. Post"), the Advisors' Chief Compliance Officer,

assured the Retail Board that the Advisors were "monitor[ing]" the "level and quality" of

Highland's shared services and that he was unaware of any disruptions:

> Mr. Post described the team members providing compliance and legal support
> services to the Funds and the Advisers. . . . Mr. Post stated he believed the
> Compliance department was adequately staffed.

> Mr. Post also discussed the quality and continuity of services provided to the Funds
> by HCMLP pursuant to shared services agreements with the Advisers in the context
> of the HCMLP bankruptcy.  A discussion ensued during which Mr. Post responded
> to questions from the Board.  ***He noted the regular updates provided to the Board
> and also discussed how the level and quality of services are being monitored and***

---

[72] Pl. Ex. 57 at pp. 2-3.
[73] Pl. Ex. 75.

25

*confirmed that he is not aware of any disruptions in the service levels provided to the Funds*.[74]

In August 2020, Dustin Norris ("Mr. Norris"), an Executive Vice President of each of the Advisors, represented to the Retail Board that "there had been no issues or disruptions in services as a result of the HCMLP bankruptcy matter," although James P. Seery, Jr. ("Mr. Seery"), Highland's new CEO (and a member of the court-appointed Independent Board), advised the Retail Board that certain conflicts might arise, given the differing investment strategies being adopted by Highland, on the one hand, and the Advisors, on the other:

> Mr. Norris next provided an overview of the 15(c) review materials and process and discussed the expected timeline with respect to Board consideration of approval of the renewals. *He noted that there had been no issues or disruptions in services as a result of the HCMLP bankruptcy matter*.

> Mr. Seery then pointed out to the Board a potential conflict of interest that had arisen with respect to an investment held by both HCMLP-advised funds and certain of the Funds.  Mr. Seery explained that the HCMLP-advised funds were likely to seek to sell their interests in the investment.  This divergence of investment objectives of HCMLP and the Funds, and the overlapping portfolio and administrative personnel of HCMLP and HCMFA and the NexPoint Advisors working on the matter, created a potential conflict between the two groups.[75]

In advance of a Retail Board Meeting to be held in September 2020, the Advisors sent a memorandum to the Retail Board in which they stated, among other things, that the "Advisors and HCMLP believe the current shared services being provided are generally consistent with the level of service that historically been received," and further addressed potential conflict issues.[76]

During the two-day Retail Board meeting held on September 17-18, 2020, the Retail Board was advised that Highland continued to perform all of the shared services and was provided with additional information concerning potential conflicts:

---

[74] Pl. Ex. 58 at p. 20 (emphasis added).
[75] Pl. Ex. 59 at pp. 6, 11.
[76] Pl. Ex. 18 at ACL 080581 (response to question 3).

000289

Mr. Surgent joined the Meeting.  During the discussion, he responded to the 15(c) follow-up questions submitted by the Board relating to HCMLP matters.  ***He provided the Board with a status update on the HCMLP bankruptcy and discussed the impact of the HCMLP bankruptcy on the shared services arrangements with the Funds, noting he does not expect that the level and quality of services would change in the immediate term***.  Regarding the bankruptcy, Mr. Surgent reiterated Mr. Seery's stated goal to achieve a consensual, omnibus resolution by the end of the year.  To the extent this was not achievable, Mr. Surgent noted that an alternative plan had been filed by HCMLP. . . . ***He indicated that at this time it was business as usual with respect to the services provided to the Funds*** and that the Board would be notified immediately of any developments.[77]

On October 9, 2020, Mr. Norris sent an e-mail to the Retail Board and other officers and agents of the Advisors (including outside counsel) to provide an interim update in which he advised the Retail Board that NexPoint was working on contingency plans to "ensure that there is no disruption in services":

> We are working on full responses to your with [sic] 15(c) follow-up questions attached, however we want to keep you updated as it pertains to the continued developments with shared services and your first question on the attached.  As it stands today, NexPoint's senior management's plan as a backup/contingency plan is to extend employment offers to the vast majority of HCMLP's employees by 12/31/2020.  ***This will help ensure that there is no disruption in services to the Funds.  Once we have further details of this we will advise.  In the interim the plan is to continue with existing shared services***.[78]

A few days later, on October 13, 2020, Mr. Norris informed the Retail Board during a regularly scheduled meeting that, with respect to shared services, "all operations continued in the normal course there [sic] had been no material impact on the day-to-day operations of the Funds" and that contingency plans were "in place to continue to provide the same level and quality of services to the Funds":

> Mr. Ellington then explained three various potential scenarios contemplated during the ongoing negotiations, including a full or partial buyout of certain creditor claims by Mr. Dondero or no agreement, which could potentially lead to liquidation of HCMLP and termination of all HCMLP employees. . . .

---

[77] Pl. Ex. 60 at pp 12-13 (emphasis added).
[78] Pl. Ex. 81 (emphasis added).

000290

Mr. Sauter also discussed the status of the shared services agreements.  In response to another question, *Mr. Norris discussed the morale employees [sic] and noted that all operations continued in the normal course there [sic] had been no material impact on the day-to-day operations of the Funds*.  He indicated that there would not likely be any material developments with respect to the status of HCMLP until the end of the year at the earliest.  The Board requested that the Advisers continue working toward developing definitive plan to *ensure that the resources, both of personnel and equipment, are in place to continue to provide the same level and quality of services to the Funds* and to continue to report back to the Board on the status.[79]

On October 23, 2020, the Retail Board asked whether there were "any material outstanding amounts currently payable or due in the future (e.g., notes) to HLCMLP [sic] by HCMFA or NexPoint Advisors or any other affiliate that provide services to the Funds."[80] As to that question, the Advisors informed the Retail Board that "*[a]ll amounts owed by each of NexPoint and HCMFA pursuant to the shared services arrangement with HCMLP have been paid as of the date of this letter*."[81]

On October 28, 2020, the Retail Board was again told that: (i) Highland was expected to continue to provide shared services without interruption, (ii) the parties continued to work on a "seamless transition," (iii) according to Mr. [Brian] Collins [HR manager], there had been no "significant departures" of employees, and that (iv) the "quality and level" of services had not been negatively impacted by Highland's bankruptcy:

> Mr. Ellington provided an update on the HCMLP bankruptcy, focusing on the contingency plan for fund service providers if HCMLP is unable to perform its current functions. . . . He also noted that based upon on-going discussions with HCMLP, as well as in view of these alternative contingency plans, *the Advisers do not expect any interruption to the services to the Funds that are currently being provided by HCMLP pursuant to the Shared Services Agreement*.

> Mr. Collins noted that, although employees of HCMLP were not yet able to be released subject to confirmation of the plan of bankruptcy, *he was confident in the firm's ability to retain talent throughout this process based on discussions with*

---

[79] Pl. Ex. 61 at pp. 2-3.
[80] Pl. Ex. 22 at 2.
[81] *Id.*

000291

*the employees. He noted that every employee team leader had been spoken to and also noted that there have been no significant departures to date*. . . .

*The Advisers represented that the quality and level of services provided to the Funds by the Advisers and pursuant to the shared services arrangements had not been negatively impacted to date and that adequate plans were in place prevent any diminution of services as a result of any potential issues relating to the HCMLP bankruptcy that might arise*. . . .

*The Board noted that the level and quality of services to the Funds by the Advisers and its affiliates had not been materially impacted by the HCMLP bankruptcy and took into account the Advisers' representations that the level and quality of the services provided by the Advisers and their affiliates, as well as of those services currently being provided by HCMLP pursuant to the Shared Services Agreement, would continue to be provided to the Funds at the same or higher level and quality*.[82]

A week later, Mr. Norris again reassured the Retail Board that Highland continued to provide shared services on an uninterrupted basis and that no issues of "conflict" arose:

*Mr. Norris then noted that there has not been any disruption to the services provided to the Funds by HCMLP pursuant to the Shared Services Agreement and that he expects that such services will continue to be provided in normal course*. In addition, Mr. Norris noted that there have been no issues with an HCMLP employee being conflicted out since the last update.[83]

By December 1, 2020: (a) Highland had sent the Termination Notices, indicating its intent to termination the Agreements; and (b) the Advisors had allegedly discovered the "overpayments under the Agreements."[84] Yet, the Advisors continued to reassure the Retail Board that everything was proceeding normally and that the parties were working to achieve an orderly, seamless transition.

Indeed, on December 1, 2020, Mr. Post confirmed that Highland sent the Termination Notices and informed the Retail Board, among other things, that:

On November 30, 2020, HCMLP provided notice of termination of the Shared Services Agreement to HCMFA/NPA, effective January 31, 2021. However, based

---

[82] Pl. Ex. 62 at pp. 2-3, 7.
[83] Pl. Ex. 63 at p. 3.
[84] Pl. Ex. 13 ¶16.

000292

upon on-going discussions with HCMLP, ***HCMFA/NPA expects to be able to continue to receive these services through a transfer of personnel, equipment and facilities from HCMLP*** either to HCMFA/NPA or to a third-party service provider.[85]

On December 7, 2020, the Advisors provided written responses posed by Blank Rome, outside counsel to the Retail Board. In response to a question about who "is responsible for putting together the plan to continue to provide/transition shared services for the retail complex," the Advisors stated:

> The senior management team of the Advisors is responsible for the transition of services, and this group is made up of Jim Dondero, D.C. Sauter, Jason Post, and Dustin Norris. ***This group is working with HCMLP management to ensure an orderly transition***.[86]

The Retail Board also asked for a "matrix of current services provided and services that will be transferred." In response, the Advisors stated:

> Please see Appendix A below, which includes the list of services provided under the shared services agreement with HCMLP. These services fall into two broader categories: 1) Employees performing services and 2) Systems, infrastructure, software and supplies/equipment. As we understand it, the bankruptcy plan of reorganization approved by the bankruptcy court (the "Approved Plan") anticipates the termination of all HCMLP employees by 1/31/21. ***The Advisors anticipate extending employment offers to the vast majority of HCMLP's employees such that the employees would be rehired immediately upon termination of their employment with HCMLP. This will cover all of the services under category 1 above***.[87]

During a Retail Board meeting held on December 10-11, 2020: (a) Mr. Norris reviewed the "current services provided under the shared services agreement with HCMLP and discussed the current plans for ensuring the continuation of those services after a plan of reorganization is

---

[85] Pl. Ex. 16. (December 1, 2020 email from Mr. Post) (emphasis added).
[86] Pl. Ex. 10 at 1 (emphasis added).
[87] *Id.* at 2 (emphasis added).

approved"; and (b) Mr. Sauter "noted that there has been no material attrition to date with respect

to employees":

> Mr. Norris provided responses to the Board's follow up questions that had been
> submitted on their behalf prior to the Meeting.  Among these items, **_Mr. Norris_**
> **_reviewed a matrix of current services provided under the shared services_**
> **_agreement with HCMLP and discussed the current plans for ensuring the_**
> **_continuation of those services after a plan of reorganization is approved_**.  Mr.
> Norris noted that these shared services fell into two broader categories: (1)
> employees performing services and (2) systems, infrastructure, software and
> supplies/equipment.  With respect to the first category, Mr. Norris discussed plans
> by the Advisers to extend employment offers to the vast majority of HCMLP's
> employees such that the employees would be rehired immediately upon termination
> of their employment with HCMLP.  In the alternative, these employees could join
> a newly formed entity (New Co) and continue to provide services to the Funds
> through NewCo.  **_With respect to the second category, Mr. Sauter noted that the_**
> **_Advisers and HCMLP were in agreement that these would be assigned with a_**
> **_payment from the Advisers_** and that there were working groups set up that were
> pursuing an orderly transition of all of these items, which included orderly
> assignment and assumption of the relevant agreements needed to continue with all
> current services.  **_He noted that there has been no material attrition to date with_**
> **_respect to employees_**. . . .  Mr. Norris also discussed the Advisers' proposed
> alternative plan and confirmed that **_regardless of whether the Advisers and_**
> **_HCMLP came to an agreement on shared services, such services would be_**
> **_continued to be provided to the Funds without interruption_**.[88]

By January 2021, Highland had become embroiled in litigation with Mr. Dondero and had

obtained temporary injunctive relief against him.  However, the Advisors assured the Retail Board

that this had no impact on the Advisors' ability to obtain access to information and resources

concerning the Retail Funds:

> Mr. Norris confirmed that **_the Advisers did not feel limited by the temporary_**
> **_restraining orders relating to the HCMLP bankruptcy with respect to access to_**
> **_Fund information_**.  Mr. Norris then updated the board on a number of employee
> moves from HCMLP to NexPoint.  In response to a question, Messrs. Post and
> Norris confirmed that there was sufficient legal and compliance coverage for the
> Funds.

> Mr. Norris then provided an update on the negotiations with HCMLP on the
> transition of shared services.  He noted that both sides had agreed in principle on

---

[88] Pl. Ex. 64 at pp. 7-8.

000294

the transition of services and cost sharing but that it was not yet memorialized in a contract and a number of details still needed to be resolved. *He confirmed that the Advisers continued to receive full access to information and resources with respect to the Funds*.[89]

On January 29, 2021, Jackie Graham, NREA's[90] Director of Investor Relations and Capital Markets, sent an e-mail to Mr. Dondero, Mr. Sauter, and others in advance of a Board call in which she attached an outline of certain issues concerning shared services provided by Highland and stated, among other things, that:

> Because the [relevant Funds] are externally managed by external advisors (NexPoint Real Estate Advisors, L.P. and its affiliates (the "Advisors")), the [relevant Funds] rely on the Advisors to provide certain services to them. *The Advisors utilize Highland Capital Management, L.P. ("HCM") to provide a certain subset of these services under a shared services agreement between HCM and the Advisors*. . . .

> Employees of the Advisors are working with HCM to provide a transition of shared services from HCM to the Advisors or third party providers. . . . Specifically, the Advisors and affiliate advisors would pay a one-time fee of $400,000 and ongoing monthly costs of $270,000. Additionally, *HCM may require the Advisors and affiliate advisors to pay previously unpaid fees allegedly owed to HCM totaling $5.5m*. . . .

> Winston is reviewing potential legal remedies *in the event HCM breaches the shared services* by denying us access to our data held by HCM or otherwise attempts to cause harm to our shareholders . . .[91]

Eventually, a transition of shared services from Highland to a Newco entity known as Skyview was effectuated (Skyview being owned and operated by individuals previously employed by Highland). As the transition of the shared services from Highland to Skyview was nearing completion, the Advisors continued to reassure the Retail Board that all was well. On February 26, 2021, Mr. Norris provided an update on the transition:

> Mr. Norris provided an update on the shared services arrangements and employee transitions. *He indicated that there would be no impact as a result of certain*

---

[89] Pl. Ex. 66 at pp. 2-3.
[90] "NREA" stands for NexPoint Real Estate Advisors, L.P., a subsidiary of NexPoint.
[91] Pl. Ex. 84 at FUNDS 0000043-44 (emphasis added).

000295

*employees not transitioning to the Advisers* and discussed the team in place and their qualifications. He noted that the current shared services arrangements with HCMLP would cease at the end of February and that the Advisers wish to move forward with new Shared Services Agreements between each Adviser and NewCo. He then stated that these Agreements were in the process of being drafted and finalized and will be reviewed with the Board at its next meeting. *He indicated that there had been no major issues in connection with the transition and that the personnel from the Advisers had met with HCMLP with respect to data files and are comfortable that HCMLP will be providing the necessary information.* In response to a question from the Board, he indicated that there was not an immediate need for such data and confirmed that the Advisers had the data and information files they needed with respect to Fund operations and services.[92]

Based on all the information and representations made by the Advisors, the NexPoint Diversified Real Estate Trust (one of the Advisors' Clients) filed its annual report with the SEC in early *2022* (about a year after Highland commenced this Adversary Proceeding and the Advisors filed their administrative expense claims) in which it disclosed, among other things, the following:

> The Fund has retained NexPoint Advisors, L.P. (the "Investment Adviser") to manage the assets of the Fund pursuant to an investment advisory agreement between the Investment Adviser and the Fund (the "Agreement"). . . . *The Board of Trustees noted that the level and quality of services to the Fund by the Investment Adviser and its affiliates had not been materially impacted by the HCMLP bankruptcy* and took into account the Investment Adviser's representations that the level and quality of the services provided by the Investment Adviser and their affiliates, as well as of those services provided by Skyview to the Investment Adviser under the Skyview Services Agreement, would continue to be provided to the Fund at the same or higher level and quality.[93]

Pursuant to the evidence set forth above, the court finds that the Advisors made *numerous representations* to the Retail Board, before and after the Advisors allegedly became aware of the "overpayments" and ceased making payments to Highland under the Agreements, indicating that Highland had sufficiently performed all services provided under the Agreements. The court notes that, many times, the communications between the Advisors and the Retail Board (or the Retail

---

[92] Pl. Ex. 73 at pp. 9-10 (emphasis added).
[93] Pl. Ex. 77 at 41, 43

000296

Board Minutes) refer to no interruption in "shared services." The court interprets this to generically mean shared services under both the SSAs and PRAs. This is strong evidence that Highland, indeed, performed all services contemplated under the Agreements.

F. Extrinsic Evidence that the Advisors had Knowledge of Employees Hired and Terminated by Highland, Both Pre- and Post-Petition

In addition to the evidence detailed above, there is still more credible evidence that the Advisors had knowledge of when employees of Highland, including the Dual Employees, were hired and terminated by Highland. Among other things:

- In their written responses to interrogatories, the Advisors admitted that they had contemporaneous knowledge of the termination of every Dual Employee;[94]

- Every month from at least October 2017 through January 2021, Highland's Human Resources department (under the direction of a Mr. Brian Collins) prepared a "Monthly Headcount Report" (the "Monthly Headcount Reports") listing every employee in the Highland complex and highlighting new hires and terminations and distributed such reports to numerous people, including the Advisors' officers (i.e., Mr. Waterhouse, Ms. Thedford, and Mr. Norris);[95]

- Mr. Dondero was provided with extensive information concerning hires, terminations, and employee compensation and benefits during the Annual Reviews;[96]

- In early 2020, the Advisors provided detailed information to the Retail Board concerning all of Highland's employees;[97]

Yet, despite having knowledge of Highland terminating certain employees, both when it was controlled by the Independent Board and when it was controlled by Mr. Dondero, the Advisors continued to approve and make payments in the same monthly amounts under the Agreements.

---

[94] Pl. Ex. 14 at pp 12-13 (responses to Interrogatories 3 and 4).
[95] Pl. Exs. 88-127.
[96] Pl. Ex. 86 at pp. 29-33; Pl. Ex. 142 at pp. 6-10.
[97] Pl. Ex. 57; Pl. Ex. 75.

000297

As earlier noted, as of May 1, 2018, when the Advisors entered the PRAs, four of the twenty-five Dual Employees on Exhibit A had already been terminated, and Mr. Waterhouse had every reason to know that cost allocations for terminated employees were being used when he signed the Agreements.[98]

As also earlier noted, as of December 14, 2018, when the PRA Amendments paying Highland $2.5 million of extra compensation were entered, nine of the twenty-five Dual Employees on Exhibit A had already been terminated. Finally, as of the Petition Date, fourteen of the twenty-five Dual Employees on Exhibit A had already been terminated.

Still, no change in the monthly payments (only the unexplained *increase* in payment made by the Advisors under the PRA Amendments that had no analysis done in connection with it) were ever made or requested by the Advisors under the PRAs.

The court finds the Advisors had knowledge of the termination of Dual Employees under Exhibit A of the PRAs. Further, the court finds the Advisors continued making the same monthly payments under the PRAs, despite knowledge of the terminations, for 35 months.

G. <u>The Advisors Knowingly and Intentionally Made All Payments under the Agreements until November 30, 2020</u>

The evidence is undisputed that, from January 1, 2018 through November 30, 2020, the Advisors made all of the same monthly payments under the Agreements in exchange for the back-office, middle-office, and front-office services provided to them by Highland. Each of the payments that the Advisors made under the Agreements between January and November 2020 (when the new Independent Board controlled Highland) were exactly the same (or, in the case of the HCMFA SSA, utilized the exact same methodology) as the payments that the Advisors made

---

[98] Tr. Transcript 4/12/22, Part 2 of 2 [DE # 113], at 111:22-112:5.

000298

under the Agreements between January 1, 2018 and December 31, 2019 (when Mr. Dondero still controlled Highland).

It cannot be legitimately disputed that the Advisors had knowledge of the payments made under the Agreements. The evidence shows: (1) the Agreements were signed by Mr. Waterhouse, the Treasurer of the Advisors and the CFO of Highland;[99] (2) Highland sought and obtained permission from Mr. Waterhouse before making payments under the Agreements as the officer of the Advisors;[100] (3) Mr. Waterhouse testified that he, in his role as the Treasurer of the Advisors, was responsible for ensuring the Advisors paid the proper amounts under the Agreements;[101] and (4) the Advisors represented to the Retail Board that "[a]ll amounts owed by each of NPA and HCMFA pursuant to the shared services arrangement have been paid."[102]

The Advisors made an argument in their trial brief that Highland was simply paying itself without any involvement from any Advisor employee or officer. This statement is disingenuous, given Mr. Waterhouse's testimony that he was the officer in charge of making sure the proper amounts were transferred under the Agreements and his regular approval of payments.

The court finds, when considering the collective of this evidence, that the Advisors had knowledge of and authorized the payments by the Advisors to Highland under the Agreements.

### H. The Advisors' Stoppage of Payments under the Agreements Late in the Bankruptcy Case

As stated above, from the January 1, 2018 until November 30, 2020, the Advisors paid Highland the same fixed monthly amounts due and owing under the Agreements, without change or objection.[103]

---

[99] There is one exception. The NexPoint SSA, executed in 2013, was signed by James DOndero and by an individual named Brian Mitts. Pl. Exh. 2.

[100] *See, e.g.*, Pl. Exs. 147, 152.

[101] Tr. Transcript 4/12/22, Part 2 of 2 [DE # 113], at 69:19-25.

[102] Pl. Ex. 22 at ACL 080593 (response to Question 2).

[103] And, notably, without any request for a modification or "true-up" post-petition.

000299

By the end of November 2020: (i) the Independent Board had demanded Mr. Dondero's resignation (from his post-petition role as a portfolio manager for Highland); (ii) Mr. Dondero had begun interfering with Highland's business and engaging in conduct that ultimately led to the imposition of injunctive relief; and (iii) Highland had delivered the termination notices for the SSAs.[104]

It was around this time when Mr. Dondero instructed Mr. Waterhouse to stop making any payments to Highland on account of the Agreements. As a result, the Advisors failed to make payments under the Agreements for the months of December 2020 and January 2021 (and, in the case of the HCMFA SSA, also the month of November 2020). The court finds, and there is no dispute by the Advisors, that the Advisors intentionally did not make these payments to Highland under the Agreements.

I. <u>The Advisors' Lack of an Attempt to Modify the PRAs</u>

As earlier noted, the Advisors claim that, in late 2019 or early 2020, after Highland had filed bankruptcy, Mr. Waterhouse raised the existence of overpayments with Fred Caruso ("Mr. Caruso"), an employee of Development Specialists, Inc. ("DSI"), before the new Independent Board of Highland was even appointed. Another employee of DSI, Brad Sharp, serve as the Chief Restructuring Officer in the bankruptcy, at that time (again, before the Independent Board was appointed). However, despite what was alleged in the Advisors' pleadings, Mr. Waterhouse testified that he does not remember ever asking Mr. Caruso to amend the amounts under the PRAs, only that he made him aware that there might be overpayments.[105] The Advisors and Mr.

---

[104] The termination notices did not mention the PRAs. Mr. Seery credibly testified that he does not know why the PRAs were not mentioned in the termination notices, but that they were rejected as part of the confirmed plan. Tr. Transcript 4/13/22, Part 1 of 2 [DE #114], at 62:1-63:21.
[105] Tr. Transcript 4/12/22, Part 2 of 2, at 109:18-110:4.

000300

Waterhouse claim that Mr. Caruso told Mr. Waterhouse that the PRAs could not be amended because of the automatic stay in place from the bankruptcy. There is no documentation of this discussion or any subsequent documentation of what Mr. Caruso or Mr. Waterhouse discussed—only the testimony of Mr. Waterhouse where he couldn't remember specifics. Mr. Caruso did not testify at Trial.

There is no evidence that Mr. Waterhouse might have followed up with Mr. Caruso. Mr. Waterhouse never told anyone else affiliated with the Advisors that he had learned of potential overpayments, other than Scott Ellington ("Mr. Ellington") and Isaac Leventon ("Mr. Leventon") with Highland's legal department, and this included not telling Mr. Dondero.[106] Mr. Waterhouse never made Highland's new Independent Board aware of the alleged potential overpayments, despite many interactions with the Independent Board.[107] And notably absent from his testimony, was any claim that he made a formal request for modifications to the PRAs as the Advisors' Treasurer, despite having knowledge of the alleged overpayments since at least late 2019, and likely since the PRAs were signed.

Viewing the evidence in the light most favorable to the Advisors, they only raised the issue of potential overpayments to Highland in late 2019, through Mr. Caruso, Mr. Ellington, and Mr. Leventon. The Advisors never subsequently followed up with Mr. Caruso or informed Highland's new Independent Board of the alleged overpayments after the Independent Board was put in place shortly after the alleged conversations with Mr. Caruso. Further, and most importantly, the court finds that the Advisors, based on the testimony of Mr. Waterhouse, never made a request to modify

---

[106] Tr. Transcript 4/12/22, Part 2 of 2, at 111:18-112:8.
[107] Tr. Transcript 4/12/22, Part 2 of 2, at 114:15-25.

000301

the payments under the PRAs during the relevant period before payments were withheld in November 2020.

### III.   CONCLUSIONS OF LAW

#### A.  Jurisdiction and Venue

Bankruptcy subject matter jurisdiction exists in this Adversary Proceeding, pursuant to 28 U.S.C. § 1334(b), and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), and (O). The court has Constitutional authority to enter a final judgment in this Adversary Proceeding. While Defendants, in their Original Answer, initially contested that core matters were involved and they did not consent to bankruptcy court adjudication,[108] the parties later stipulated to final adjudication of these matters in the bankruptcy court.[109] Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

#### B.  Choice of Law

The four relevant documents in the Adversary Proceeding are the HCMFA SSA, NexPoint SSA, HCMFA PRA, and NexPoint PRA. All four of these contracts contain choice of law provisions that the Agreements "will be governed and construed in accordance with the laws of the State of Texas."[110] Accordingly, Texas law applies to the claims at issue.

#### C.  The Advisors' Claims for Overpayment under the PRAs

The Advisors seek an administrative expense claim for alleged overpayments they made under the PRAs from the Petition Date until November 30, 2020 (the date the Advisors ceased making any payments under the PRAs).

---

[108] DE # 33 in AP, ¶ 10.
[109] DE # 37 in AP, ¶ 2.
[110] Pl. Ex. 2 § 9.05; Pl. Ex. 3 § 8.04; Pl. Ex. 6 § 6.05; Pl. Ex. 8 § 6.05.

000302

As set forth in the Joint Pretrial Order filed in this Adversary Proceeding, the Advisors contend that each of the Advisors were required to reimburse Highland for its actual costs of the Dual Employees listed on the Exhibit A's to the PRAs, but that as of the Petition Date, many of the Dual Employees (fourteen out of twenty-five) were no longer employed at Highland. Therefore, the Advisors argue, during this period, they were essentially paying Highland for Dual Employees who were no longer employed by Highland and that such payments constituted overpayments under the PRAs. The Advisors maintain that their monthly payments under the PRAs resulted in overpayments by the Advisors to Highland totaling $7,649,942, broken down as $4,928,103 in post-petition overpayments by HCMFA and $2,721,839 in post-petition overpayments by NexPoint. The Advisors' overpayment claim is premised on the contention that the Advisors were only required to pay for "actual costs and expenses" relating to each particular Dual Employee.

Alternatively, the Advisors argue that if their interpretation of the PRAs is incorrect—such that the PRAs contemplated fixed monthly payments and Section 2.02 of the PRAs would have required a modification of the PRAs in order to reduce the required monthly payment to conform to a smaller number of Dual Employees—then the court should find that the Advisors did, indeed, seek to modify the fixed monthly amounts under Section 2.02, but that Highland failed to negotiate the same in good faith as required by such section.

In response, Highland argues that the PRAs clearly and unambiguously require that the Advisors pay a flat monthly amount for investment advisory services rendered, regardless of which employees actually performed those services, unless the parties agreed otherwise in writing pursuant to Section 2.02. Highland also argues that parole evidence and the parties' uninterrupted course of dealing proves that the parties intended for the Advisors to pay a fixed monthly amount

000303

for investment advisory services, unless modified pursuant to Section 2.02.  Highland further argues that the Advisors never sought modification and that their claims have been (a) waived and (b) are barred by the voluntary payment rule.

    i.    *The PRAs are Unambiguous as a Matter of Law*

Under Texas law, a party claiming breach of contract has the burden to prove the following elements: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff as a result of the defendant's breach." *Williams v. Wells Fargo Bank, N.A.*, 884 F.3d 239, 244 (5th Cir. 2018) (internal citations omitted). The court's primary role in interpreting a contract is "to determine the parties' intent as reflected in the [contract's] terms." *Chrysler Ins. Co. v. Greenspoint Dodge of Houston Inc.*, 297 S.W.3d 248, 252 (Tex. 2009). "Contract language that can be given a certain or definite meaning is not ambiguous and is construed as a matter of law." *Id.* "If the contract is capable of being given a definite legal meaning, parole evidence is generally not admissible to create an ambiguity." *Kendziorski v. Saunders*, 191 S.W.3d 395, 405 (Tex. App. – Austin 2006). "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered into." *BCC Merchant Solutions, Inc. v. Jet Pay, LLC*, 129 F.Supp.3d 440, 466 (N.D.Tex. 2015) (internal quotations omitted); *see also Watkins v. Petro-Search, Inc.*, 689 F.2d 537, 538 (5th Cir. 1982) ("[W]hen a question relating to the construction of a contract or its ambiguity is presented, the court is to take the wording of the contract in the light of the surrounding circumstances, in order to ascertain the meaning that would be attached to the wording by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration").

000304

A contract is unambiguous and will be enforced as written where it is "susceptible to only one reasonable construction." *BCC Merchant*, 129 F.Supp.3d at 477. "[A] cardinal rule of contract interpretation under Texas law is that the entire writing must be examined" and "no single provision taken alone [may] be given controlling effect." *Id.* (citing Texas law) (internal quotations omitted). "Where the language is clear and definite, the contract is not ambiguous, and a court must apply the plain language as a matter of law." *Main Street Bank v. Unisen*, No. H-06-3776, 2008 WL 11483415, at *4 (S.D.Tex. Feb. 15. 2008).

Thus, the court begins its analysis by looking at the plain language of the PRAs. In both of the PRAs, Section 2.01 mandated that the Advisors were required to pay Highland the "Actual Cost" of the services provided by the Dual Employees.[111] However, despite the use of the words "Actual Cost," and an Exhibit A attachment purporting to list out the Dual Employees, the PRAs defined that term "Actual Cost" under Article I as a specific dollar amount. The PRAs defined "Actual Cost" as equal to $252,000 per month for NexPoint and $416,000 per month for HCMFA.[112] There was no requirement of periodic reevaluation of the Actual Cost; no automatic adjustments to the Actual Cost amounts, for such things as employee comings-and-goings or employee changes in job duties; and no mention of a "true-up" annually or at any other time. The PRAs simply plugged in a decisive monthly amount.

Section 4.02 of the PRAs required any party seeking modifications to amounts paid under the definition of "Actual Cost" to make a request on the other party "on or before the last business day of the calendar month." Further, Section 2.02 permitted the parties to "agree to modify the terms and conditions" of the amounts paid and the parties were required to negotiate any

---

[111] Pl. Ex. 6 § 2.01; Pl. Ex. 8 § 2.01.
[112] Pl. Ex. 6 Article I; Pl. Ex. 8 Article I.

000305

modification requested in good faith. Finally, Section 6.02 required that any amendment to the PRAs to be in writing by all parties.

These are the PRA provisions that are germane to the disputes in this Adversary Proceeding. When reading these provisions within the entirety of the PRAs, the court concludes that the PRAs are unambiguous as a matter of law. Section 2.01 and an accompanying Article I definition of "Actual Cost" set forth a flat monthly amount; the parties agreed that this flat monthly amount would be deemed to be the "Actual Cost" of the front-office services that Highland was providing to the Advisors, through the Highland employees.  The accompanying Sections 2.02, 4.02, and 6.02 allowed for a modification of these amounts, but only if a party notified the other party on or before the last business day of a calendar month that it requested such a modification. If the parties agreed to a modification, there had to be a written agreement memorializing the amendment.

The Advisors seem to argue that Sections 2.02 and 4.02 imposed an affirmative obligation on Highland to update the list of Dual Employees and their respective Allocation Percentages, or to unilaterally adjust the "Actual Costs." The literal wording of these provisions does not support such an obligation.  Under the Advisors' interpretation of the PRA, Highland would have been obligated to invoke Section 4.02 (which is itself dependent on Section 2.02) on the Advisors' behalf and to adjust the Advisors' monthly payments as Dual Employees were terminated, or as changes were made in their compensation or Allocation Percentages.  But again, that is simply not what the PRAs provide. The PRAs use the words the "Parties may agree to modify the terms" when assigning the obligation under Section 2.02, which the preamble defines as both Highland and the Advisors. Further, Section 4.02 requires "the Party requesting modification" to notify "the other Party." Notably, Section 4.02 does not put this obligation solely on Highland as it uses

43

000306

"Party" to refer to either party to the contract, whereas it uses "HCMLP" specifically when assigning obligations to Highland elsewhere in the PRAs. The court concludes that the unambiguous language put no unilateral obligation on Highland to amend the PRAs to reflect changes in Dual Employees, but rather on both the parties to negotiate such amendments.

> ### ii. *Even if the PRAs Were Ambiguous, Extrinsic Evidence Supports a Fixed Payment Interpretation*

As stated above, the court concludes that the PRAs are not ambiguous, and that the only reasonable interpretation of the PRAs is they contemplate a fixed monthly payment. In fact, the only aspects of the PRAs that give the court any pause regarding ambiguity are as follow: (a) the title of the PRAs (i.e., Payroll **Reimbursement** Agreement—suggesting an intention to reimburse payroll costs); and (b) the fact that there was a list of employees attached as Exhibit A. Why use the term "reimbursement" or attach a list of employees if these words/concepts were not really dispositive of anything? If these two aspects of the PRAs make them ambiguous, then the court is required to consider the wording of the contract *in the light of the surrounding circumstances*, in order to ascertain the meaning the agreements, as might be given by a reasonably intelligent person acquainted with all operative usages, and knowing all of the circumstances prior to and contemporaneous with the making of the agreements. *See Watkins v. Petro-Search,* 689 F.2d at 538.

The Findings of Fact set out a plethora of evidence that established that the parties always contemplated fixed amounts being used to pay Highland for providing front-office services to the Advisors. This evidence included, among other things: (1) Mr. Klos credibly testifying that the PRAs, and Exhibit A's, were created to reflect payments, in conjunction with the other Agreements, that equaled the annual amounts that Mr. Dondero wanted transferred to Highland

000307

after the 2017/2018 Annual Review ***to deal with Highland's cash liquidity problems*** (recall that prior to 2018, Highland provided sub-advisory services to the Advisors for free and Highland was facing an imminent loss of its Acis sub-advisory fees); (2) Mr. Waterhouse testifying that he was aware that four of the Dual Employees had been terminated at the signing of the PRAs, yet did not seek to update the Dual Employee allocations on the Exhibit A's at any point to reflect this; (3) employees and officers of the Advisors received Monthly Headcount Reports from Highland, detailing the hiring and termination of employees, including the Dual Employees during the relevant period; (3) the Exhibit A's were never updated, even though Dual Employees were terminated over time, and no one was ever asked to update them; (4) Mr. Waterhouse, as the Advisors' Treasurer, had knowledge of Dual Employees being terminated or otherwise leaving Highland, and continued to approve payments under the PRAs on 35 separate occasions; (5) Mr. Klos communicated with Mr. Waterhouse in January 2020, during which Mr. Klos confirmed to Mr. Waterhouse that the Agreements were "flat" amount payments and the same amounts had been paid since the PRAs were signed; and (6) no request for an amendment to the PRAs was made through November 2020 (except for the 2018 PRA Amendments—pursuant to which $2.5 million extra was paid to Highland on account of the PRAs, even though five more employees on the Exhibit A lists had left Highland since execution of the PRAs).

In summary, this extrinsic evidence further supports a conclusion that the PRAs were fixed rate contracts, if the PRAs should be determined to be ambiguous.  This extrinsic evidence reveals that the Advisors were aware Dual Employees were being terminated, made no request for an amendment to the PRAs, and continued to make payments under the PRAs until Mr. Waterhouse, under the direction of Mr. Dondero, stopped making payments in November 2020.

000308

Given that the court has concluded that the PRAs were fixed rate arrangements, the Advisors have failed to meet their burden of proving overpayments under the PRAs.

### iii. Highland Did Not Fail to Negotiate in Good Faith

The court noted above that Section 2.02 of the PRAs included language that required the parties to negotiate in good faith when a party notifies the other party that it is requesting a modification, pursuant to Section 4.02, before the last business day of the calendar month. The Advisors allege that Highland never negotiated in good faith when the Advisors supposedly made Highland aware (through Highland's consultant, Mr. Fred Caruso) that overpayments under the PRAs may have been made, and Mr. Caruso told the Advisors that an amendment could violate the automatic stay in bankruptcy.

The court has already found and concluded that: (a) the PRAs unambiguously created a fixed amount contract; (b) Highland was under no duty to unilaterally modify the PRAs if it knew that Dual Employees were terminated; and (c) the Advisors failed to provide sufficient evidence that they made a formal request of Highland to modify the fixed monthly amount, pursuant to the terms of the PRAs.[113] Thus, the Advisors never triggered Highland's obligation under Section 2.02. Specifically, without a formal notification/request of the type set forth in Section 4.02 of the PRAs, Highland's obligation to negotiate in good faith could not exist. Discussing potential overpayments with a third-party consultant (Mr. Caruso)—assuming such overpayments could even be possible—is not enough. Additionally, if the automatic stay was a valid concern of the Advisors (potentially impairing their ability to exercise contractual rights under the PRA), there were options available to them, including filing a motion for relief from stay to exercise

---

[113] The Advisors, in their pleadings, claimed Mr. Waterhouse made such a request in late 2019 in his conversations with Mr. Caruso. However, Mr. Waterhouse testified that they talked about overpayments possibly being made, but that he never recalled requesting amendment of the PRAs.

000309

termination rights (termination was permissible under the PRAs, with or without cause, on 60-day notice)[114] or filing a motion to compel rejection of the PRAs pursuant to Bankruptcy Code section 365.

As such, the court concludes that Highland did not fail to negotiate in good faith under Section 2.02.

### iv.  Highland's Waiver Defense to Overpayments under the PRAs

Alternatively, if the PRAs should be construed to have contemplated variable amounts—that should have changed automatically as Dual Employees departed, as opposed to fixed rate amounts—Highland argues that the preset monthly amounts listed in the PRAs were controlling until the Advisors made a request under Section 2.02 to change those monthly amounts, and that the Advisors **waived** any right to overpayments by not making such a request or objecting to payments under the PRAs for all the many months during which Dual Employees were being terminated.

"Under Texas case law, waiver is the intentional relinquishment of a known right or the intentional conduct inconsistent with claiming that right."  *Sedona Contracting, Inc. v. Ford, Powell & Carson, Inc.*, 995 S.W.2d 192, 195 (Tex. App. 1999).  The elements of waiver include: (1) an existing right, benefit, or advantage held by a party; (2) the party's actual or constructive knowledge of its existence; and (3) the party's actual intent to relinquish the right or intentional conduct inconsistent with the right (which can be inferred from the conduct). *See id.*; *see also Ulico Cas. Co. v. Allied Pilots Ass'n,* 262 S.W.3d 773, 778 (Tex. 2008); *Tenneco Inc. v. Enter. Products Co.*, 925 S.W.2d 640, 643 (Tex. 1996) ("The affirmative defense of waiver can be

---

[114] Pl. Ex. 6 § 5.02; Pl. Ex. 8 § 5.02.

000310

asserted against a party who intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming that right.").

Waiver "results as a legal consequence from some act or conduct of the party against whom it operates" and is "essentially unilateral in character," meaning "no act of the party in whose favor it is made is necessary to complete it." *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 485 (Tex. 2017) (quotation marks omitted). "Silence or inaction, for so long a period as to show an intention to yield the known right, is also enough to prove waiver." *Tenneco*, 925 S.W.2d at 643.

While waiver is ordinarily a question of fact, when the surrounding facts and circumstances are undisputed, the question becomes one of law. *Motor Vehicle Bd. of Tex. Dep't of Transp. v. El Paso Indep. Auto. Dealers Ass'n, Inc.,* 1 S.W.3d 108, 111 (Tex. 1999); *Tenneco*, 925 S.W.2d at 643.

The first element is met here. Pursuant to Sections 2.02 and 4.02 of the PRAs, the Advisors had the right to seek a change to the fixed monthly rate if they believed a change was appropriate.

There is no dispute over the second element. The PRAs were signed by Mr. Waterhouse as an officer of both Highland and the Advisors. Further, the Advisors have never disputed having knowledge of Sections 2.02 and 4.02 under the PRAs during the relevant period.

The third and final element is the most pertinent under the analysis for waiver—the question being whether the actions or inactions of the Advisors were sufficient to show an intention to relinquish their right to modify the PRAs. Relevant here:  (a) the Advisors (through their officers Mr. Waterhouse, Mr. Norris, and Ms. Thedford) were kept up to date from before the PRAs were signed until after November 30, 2020, by Monthly Headcount Reports created by Highland and distributed to these officers; (b) the Advisors signed the PRAs on May 1, 2018, at which time, the Advisors knew four of the twenty-five Dual Employees under the attached Exhibit A's had been

48

terminated; (c) the Advisors entered into the PRA Amendments in December 2018, when they had knowledge that nine of the twenty-five Dual Employees had been terminated—instead of attempting to amend under Sections 2.02 and 4.02, to reduce the monthly payments, to reflect the reduced number of Dual Employees, the Advisors paid Highland an additional sum of $2.5 million and never requested an amendment thereafter; and (d) on the Petition Date in October 2019, the Advisors were aware that fourteen of the twenty-five Dual Employees had been terminated; yet, from the Petition Date to November 30, 2020, the Advisors never made a request to modify the PRAs under Sections 2.02 and 4.02 and continued to pay the fixed amounts, despite knowledge that over half the Dual Employees had been terminated.

In summary, the Advisors did not exercise their alleged right to correct the monthly flat amount, to account for alleged overpayments, for almost three years (from the time the contract was signed until November 30, 2020). Mr. Waterhouse authorized payments under the PRAs for almost three years—i.e., thirty-five times.

The court notes again that Mr. Waterhouse, when asked directly, did not recall ever requesting that the PRAs be amended in his conversations with Mr. Caruso and also failed to ever make a request to amend to Highland's new Independent Board.  The Advisors do not claim to have made a request for amendment to the PRAs, despite claiming that Highland failed to negotiate in good faith when Mr. Caruso allegedly suggested the automatic stay might prevent amendments to the PRAs.

The waiver here cannot be remedied by the general non-waiver provisions in the PRAs.[115] A nonwaiver provision in a contract that purports to absolutely bar waiver in the most general of terms might be wholly ineffective and itself can be waived. *Shields Ltd. P'ship v. Bradberry*, 526

---

[115] See Section 6.02 of Pl. Exh. 6 and Pl. Exh. 8.

000312

S.W.3d 471, 484 (Tex. 2017) (while contrarily noting that **specific** non-waiver provisions noting specific actions or inaction that will not result in waiver are wholly enforceable). Nothing in the general non-waiver provisions in the PRAs provided any specificity as to the above actions or nonactions of the Advisors regarding amendment to the PRAs that would prevent waiver.

The Advisors never exercised their rights under Sections 2.02 and 4.02 of the PRAs and, indeed, acted counter to those rights by continuing to make payments without requesting amendment to the fixed monthly amounts from the time that the PRAs were signed until November 30, 2020, while simultaneously having knowledge that many of the Dual Employees were gone. Accordingly, the court concludes that Highland has met its burden of proof that the Advisors waived any amounts of alleged overpayments that might have been properly remedied by amendment of the monthly rates under Sections 2.02 and 4.02.

       v.     *Highland's Defense to Overpayments under the Voluntary Payment Rule*

Highland also raised the voluntary payment rule as a defense to the Advisors claims of overpayments. Under the voluntary payment rule, "money voluntarily paid on a claim of right, with full knowledge of all the facts, in the absence of fraud, duress, or compulsion, cannot be recovered back merely because the party at the time of payment was ignorant of or mistook the law as to his liability." *Miga v. Jensen*, 299 S.W.3d 98, 103 (Tex. 2009). "The rule is a defense to claims asserting unjust enrichment; that is, when a plaintiff sues for restitution claiming a payment constitutes unjust enrichment, a defendant may respond with the voluntary-payment rule as a defense." *XTO Energy Inc. v. Goodwin*, 584 S.W.3d 481, 497 (Tex. App. 2017). Highland contends that the Advisors overpayment claims under the PRAs are essentially ones for unjust enrichment and, thus, the voluntary payment rule is a proper defense to such claims.

50

000313

In response, the Advisors contend that the voluntary payment rule cannot be asserted in regard to a breach of contract claim, which is what the Advisors contend they are claiming (i.e., not unjust enrichment). Texas case law cited by the Advisors states, "although the voluntary-payment rule may have been widely used by parties and some Texas courts at one time, its scope has diminished as the rule's equitable policy concerns have been addressed through statutory or other legal remedies." *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 771 (Tex. 2005). "Like other equitable claims and defenses, an adequate legal remedy may render equitable claims of unjust enrichment and equitable defenses of voluntary-payment unavailable." *Id.* at 770. While not completely abrogated, the rule today has only "limited application in Texas jurisprudence." *Id.* at 771.

The court need not decide the scope and applicability of the voluntary payment rule to the disputes under the PRAs at this time. The court has already found and concluded that the PRAs are unambiguous and created a fixed amount payment arrangement.  The court has also found and concluded that, even if the PRAs were ambiguous, the extrinsic evidence supports the interpretation that the PRAs created a fixed amount payment arrangement. Further, the court has found and concluded that, even if the PRAs were not intended to be fixed amount payment arrangements, the Advisors waived their right to modify by continuing to make payments with knowledge of terminated Dual Employees for three years.

    D.   <u>The Advisors' Claims under the SSAs</u>

       i.    *The Advisors' Claim for Breach of Contract under the SSAs*

Turning to the SSAs—which were less of a focus at Trial than the PRAs—the Advisors claim that Highland breached the SSAs by failing to perform certain services owing to the Advisors, including legal and compliance services, thereunder.  The Advisors contend that on or

51

around July 2020, Highland instructed its employees to cease providing certain services to the Advisors which Highland believed were adverse to the interests of Highland.  The Advisors maintain that this forced the Advisors to retain two new employees to "cover" for such lost services, resulting in $425,000 in damages.  The Advisors also contend that they were forced to pay Highland $1 million for legal services that Highland was no longer providing, resulting in $1.3 million in payments post-petition for services that Highland failed to provide.  The Advisors seek damages for overpayments and breaches of the SSAs totaling $1,725,000.

As stated above, the elements of breach of contract under Texas law are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff as a result of the defendant's breach. *Williams*, 884 F.3d at 244.

Highland argues that the Advisors have not met their burden of proving the elements of breach or damages. Highland argues that the evidence, to the contrary, shows that Highland continued to perform under the SSAs—not the least of which was the evidence of the Advisors' continuous representations to the Retail Board that the quality of services under the agreements with Highland had not deteriorated.

As discussed extensively in the court's Findings of Fact above, the Advisors made numerous repeated representations to the Retail Board that performance under the SSAs continued as normal following July 2020—despite the Advisors now alleging that legal and compliance services were withheld.

To recap, in August 2020, the Advisors represented to the Retail Board that "there had been no issues or disruptions in services as a result of the HCMLP bankruptcy matter" and that the Advisors believed "the current shared services being provided are generally consistent with the

52

level of services that historically have been received."[116] In September and October 2020, the Advisors continued their representations that shared services continued to be properly provided. During a two-day meeting of the Retail Board, on September 16-17, 2020, the Advisors told the Retail Board that they do "not expect that the level and quality of services would change in the immediate term, and Mr. Norris stated he was "comfortable with the level and quality of services being provided and has not seen any issue with the conflicts process."[117] On October 9, 2020, the Advisors told the Retail Board there were "contingency plans" being formulated but "[i]n the interim the plan is to continue with the existing services."[118] On October 13, 2020, Mr. Norris represented to the Retail Board that "all operations continued in the normal course [sic] there had been no material impact on the day-to-day operations of the Funds".[119] On October 28, 2020, the Advisors continued to reassure the Retail Board by saying Highland and the Advisors were working on a "seamless transition" and the "quality and level" of services had not been negatively impacted by Highland's bankruptcy.[120] A week after that, the Retail Board was told there "has not been any disruption to the services provided to the Funds by HCMLP pursuant to the Shared Services Agreement".[121] The Advisors continued to communicate with the Retail Board in December 2020 and January 2021 but never made any representation Highland had provided any less quality or level of services than it had previously under the SSAs.

Based on their own representations to the Retail Board, the court finds and concludes that the Advisors have failed to meet their burden for proving the element of breach by Highland for a lack of services provided under the SSAs.

---

[116] Pl. Ex. 59; Pl. Ex. 18.
[117] Pl. Ex. 60.
[118] Pl. Ex. 81.
[119] Pl. Ex. 61.
[120] Pl. Ex. 62.
[121] Pl. Ex. 63.

000316

Further, based on those same representations and no other evidence showing otherwise, the Advisors did not meet their burden of showing damages as a result of the alleged breaches. The Advisors failed to show that the "loss" from employing two new employees to provide certain legal services were caused by Highland's failure to perform under the SSAs.

### ii.    The Advisors' Claim for Overpayment under the SSAs

Finally, the Advisors also have brought a claim for overpayments under the SSAs, asserting that they overpaid Highland by $1 million for legal services that Highland stopped providing. This claim, like the Advisors' breach of contract claim, relies on the court concluding that the Advisors have satisfied their burden of showing Highland did not perform under the SSAs. Relying on the analysis above, the court concludes that the Advisors have not satisfied their burden of showing Highland failed to provide any services contracted for under the SSAs and, thus, cannot succeed on their claim for overpayment.

### iii.    Highland's Waiver Defense to the Advisors' Claims under the SSAs

If the court were to find that Highland had breached the SSAs, Highland alternatively pleaded the defense of waiver, similar as it did with regard to the Advisors' claims under the PRAs.

The elements of waiver, again, include: (1) an existing right, benefit, or advantage held by a party; (2) the party's actual or constructive knowledge of its existence; and (3) the party's actual intent to relinquish the right or intentional conduct inconsistent with the right (which can be inferred from the conduct). *Sedona Contracting, Inc.*, 995 S.W.2d at 195.

The Advisors don't dispute that they signed the SSAs and were aware of the terms of the SSAs.

Again, similar to waiver under the PRAs, the third element requires the most analysis here. The Advisors have admitted that Mr. Waterhouse oversaw and authorized all payments made

000317

under the SSAs. The Advisors never made objections to making such payments under the SSAs as they were making them. Further, the Advisors never raised any objection to the payments with Highland to put them on notice. In fact, quite the opposite, the Advisors made representations to the Retail Board, detailed above, that everything was running smoothly with regard to the services provided under the SSAs. The Advisors knowingly and intentionally made payments every month under the SSAs until November 30, 2020 but decided not to raise the issue at any point with Highland until they stopped paying under the SSAs.

The Advisors' conduct is inconsistent with asserting rights under the SSA. The Advisors hired two new employees to perform certain services under the SSAs, allegedly indicating that they thought the SSAs were being breached. Yet, the Advisors continued authorizing the same payments to Highland. The Advisors did not tell Highland that it believed required services were not being provided and did not assert an administrative expense claim at the time.

 If silence were not enough, as detailed above, the Advisors made numerous representations to the Retail Board after the supposed breach that everything was operating as normal under the SSAs, and Highland's service were of the same "quality and level" as always.

The Advisors conducted themselves intentionally in a manner inconsistent with asserting their claims of breach of the SSAs. Accordingly, the court concludes the Advisors have waived their claims resulting from the payments under the SSAs.

   D.    Highlands' Breach of Contract Claims Relating to All Four Agreements

Finally, Highland has claimed breaches of contract by the Advisors under all four of the Agreements due to nonpayment under each Agreement for certain months, starting in November

000318

2020. The months in which Highland claims nonpayment are as follows:

| Agreement | Months of Nonpayment | Amounts Unpaid |
|---|---|---|
| *HCMFA SSA* | November 2020, December 2020, and January 2021 | $924,000[122] |
| *HCMFA PRA* | December 2020 and January 2021 | $832,000 ($416,000/month) |
| *NexPoint SSA* | December 2020 and January 2021 | $336,000 ($168,000/month) |
| *NexPoint PRA* | December 2020 and January 2021 | $504,000 ($252,000/month) |

Highland also sought damages relating to the nonpayment of fees under its Shared Service Agreement with NREA. NREA is a wholly owned subsidiary of NexPoint. The SSA with NREA apparently had a monthly fee of $80,000 every month, the payment on which also ceased in November 2020. While there was evidence to support this arrangement existed (for example, Mr. Waterhouse confirmed there was an SSA between Highland and NREA),[123] the NREA SSA itself was not submitted into evidence and NREA is not listed as a defendant to this Adversary Proceeding. The court concludes that, even though NREA is apparently a subsidiary of NexPoint, no sufficient theory of liability has been argued as to why NexPoint should be held liable for an agreement Highland made with NREA. As such, the court will not grant relief related to the alleged NREA SSA in connection with this Trial.

The burden of proving the elements of breach of contract for its claims asserted now switches to Highland. As stated above, the elements are: (1) the existence of a valid contract; (2)

---

[122] The HCMFA SSA was the one and only agreement with a variable fee arrangement. Highland made this calculation by taking the most recent payment due in November of $308,000 and multiplying that number by three for the three months of nonpayment.
[123] Tr. Transcript 4/12/22, Part 2 of 2, at 70:6-17 [DE # 113}.

000319

performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff as a result of the defendant's breach. *Williams*, 884 F.3d at 244 (internal citations omitted).

Element one is quickly satisfied as neither party disputes the existence of valid contracts here.

The court relies on its Findings of Facts and previous Conclusions of Law to satisfy element two. As stated by the court above, the PRAs unambiguously established a fixed payment arrangement that was not variable based on the termination of certain Dual Employees. The remaining Dual Employees continued to provide front-office services and, thus, Highland performed under the PRAs. Further, Highland clearly performed under the SSAs at all times according to the Advisors' own representations to the third-party Retail Board that Highland was sufficiently performing at all times. The representations were constant and continued from July 2020 through early 2021, the entire period in which the Advisors now claim legal and compliance services were not being provided.

The third element is uncontested. The Advisors do not contest that they stopped making payments under all of the Agreements in November 2020 at the direction of Mr. Dondero.

The last element, damages, is also present and easily calculable. The nonpayment by the Advisors establishes Highland's alleged compensatory damages. Highland's damages are: (a) the amounts that were not paid in December 2020 and January 2021 under all four Agreement, plus for November 2020 in the case of the HCMFA SSA.

The court concludes that Highland has met its burden on breach of contract by the Advisors on each of the Agreements due to their nonpayment of amounts required.

000320

E.     <u>Do Equities Matter at All Here?</u>

This court often states that "facts matter".  Occasionally, facts suggest a certain equitable result contrary to what the law requires. This can sometimes make a court wrestle with a result. Are the Advisors being treated inequitably or unfairly here—by having to pay a fixed amount under the PRAs when the number of employees at Highland dropped precipitously during the term of the PRAs?

Putting aside for a moment the fact that the Advisors had a right to seek modification of the PRAs—a fact about which they profess confusion, because of the Bankruptcy Code's automatic stay—here are a few facts that detract from any equitable arguments that the Advisors might have.

First, prior to 2018—for six years—Highland provided "front-office" sub-advisory services to the Advisors for free.  *For free*. Perhaps this is the real reason why folks were not too worried about potential overpayments under the new PRAs that were executed in May 2018—at least not until the Advisors and Highland began their corporate divorce. Sounds like the Advisors had been getting a windfall.

Additionally, Mr. Seery credibly testified (and no one ever disagreed) that the SSAs (in contrast to the PRAs) were *money-losers* for Highland.  The SSAs were unprofitable for Highland. If the PRAs were profitable, well, that arguably balanced things out a bit.

The fact is that the Agreements were not arms-length agreements, and this cannot be overlooked here. They were intercompany agreements—i.e., entered into between parties that were friendly and affiliated, back at their time of execution. The arrangements were all about the perceived needs of the Highland complex at a time when there was no bankruptcy. The evidence

000321

suggests that everyone was just fine with the agreements for years.  But the parties are now hostile and disagree on just about everything.

The fact is that the Agreements, by their terms, could have been renegotiated or terminated by either party during the bankruptcy case. But the Advisors would have had to file a motion to lift stay and ask court permission.  This would not necessarily have been a good strategy for them, because the Advisors and Mr. Dondero thought/hoped he might gain back control of Highland eventually (and, therefore, would have the whole complex back under his control).  Thus, it might not make sense to change the status quo on the Agreements.  In any event, in such a scenario. the court might have denied relief from the stay (depending on the merits of arguments made).  Or, the court might have granted relief to the Advisors, in which case Highland might have decided it had to abruptly liquidate—due to a loss of a steady cash stream—which might have caused an abrupt departure of employees or, at best, an abrupt transition of employees away from Highland to the Advisors or an entity with whom the Advisors would contract (such as Skyview). This abrupt transition might not have been pretty.

Equities? Ultimately, the court has interpreted the contracts here (and other evidence—in case the Agreements should be construed as ambiguous) as it thinks is required.  But again, these were not arms-length contracts.  They were contracts among insiders, made at a time when everyone was friendly.  Made at a time when Highland needed cash, and at a time when Highland had been providing *free* front-office services to the Advisors for years.  Free services when—meanwhile--the Advisors were parties to investment contracts with Retail Funds, whereby the Advisors were no doubt earning many millions of dollars of fees therefrom for themselves (considering that they were managing many billions of dollars of assets).  If equities matter at all here, the result reached here seems entirely fair.

000322

## IV.     DAMAGES COMPUTATION FOR JUDGMENT

The court will grant damages in favor of Highland of: (i) $924,000 for unpaid fees under the HCMFA SSA for November 2020, December 2020, and January 2021; (ii) $832,000 for unpaid amounts under the HCMFA PRA for December 2020 and January 2021; (iii) $336,000 for unpaid fees under the NexPoint SSA for December 2020 and January 2021; and (iv) $504,000 for unpaid amounts under the NexPoint PRA for December 2020 and January 2021.

All relief requested by the Advisors for administrative expense claims for (i) alleged overpayments and (2) alleged breaches of contract by Highland under the Agreements are ***denied***.

Additionally, Highland has asserted that it is entitled to costs and expenses, including attorneys' fees, in connection with prosecuting its claims and defenses against the Advisors. No evidence was presented on the shifting of expenses, including attorney's fees. The parties agreed in their Joint Pretrial Order that "[t]he quantification of any attorney's fees awarded in this Adversary Proceeding, subject to defenses, will be handled through post-trial motion practice under Rule 54(d)(2), and no Party need present evidence on any attorney fee claim at the trial of this Adversary Proceeding."[124] Accordingly, Highland may file its post-trial motion forthwith. Unless the parties otherwise agree, Highland's post-trial motion for fees, costs, and expenses is due within 21 days of entry of these Findings of Fact and Conclusions of Law; with a Responses of the Advisors due 21 days thereafter, and any reply do 10 days thereafter.  The parties may seek a hearing thereafter.

### # # # END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW # # #

---

[124] DE # 96 in the AP at p. 16.

000323

Tab 8

Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201
(214) 855-7500

COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT
FUND ADVISORS, L.P. AND NEXPOINT ADVISORS, L.P.

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | § | Chapter 11 |
| | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03010-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. and NEXPOINT ADVISORS, L.P., | § | |
| | § | |
| Defendants. | § | |

**JOINT NOTICE OF APPEAL**

COME NOW NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors,
L.P. (together, the "Advisors"), the defendants in the above styled and numbered Adversary
Proceeding, and, pursuant to 28 U.S.C. § 158(a), hereby appeal to the United States District Court
for the Northern District of Texas that certain *Judgment* ("Judgment") entered by the Bankruptcy
Court on September 14, 2022 at docket no. 126.

000001

A copy of the Judgment is attached hereto as Exhibit "A."

The names of the parties to the Order, their roles in the appeal, and the contact information

for their counsel are as follows:

1.    <u>Appellants:</u>

      NexPoint Advisors, L.P.
      Highland Capital Management Fund Advisors, L.P.

          <u>Attorneys:</u>

          Davor Rukavina
          Julian P. Vasek
          MUNSCH HARDT KOPF & HARR, P.C.
          3800 Ross Tower
          500 N. Akard Street
          Dallas, Texas  75201-6659
          Telephone: (214) 855-7587
          Facsimile: (214) 855-7584
          Email: drukavina@munsch.com
          Email: jvasek@munsch.com

2.    <u>Appellee:</u>

      Highland Capital Management, L.P.

      <u>Attorneys:</u>

          PACHULSKI STANG ZIEHL & JONES LLP
          Jeffrey N. Pomerantz (CA Bar No. 143717)
          John A. Morris (NY Bar No. 2405397)
          Gregory V. Demo (NY Bar No. 5371992)
          Hayley R. Winograd (NY Bar No. 5612569)
          10100 Santa Monica Blvd., 13th Floor
          Los Angeles, CA 90067
          Telephone: (310) 277-6910
          Facsimile: (310) 201-0760
          jpomerantz@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com

          -and-

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

RESPECTFULLY SUBMITTED this 20th day of September, 2022.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ *Davor Rukavina*

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
500 N. Akard Street, Suite 3800
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: drukavina@munsch.com
Email: jvasek@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS,
L.P. AND HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the 20th day of September, 2022, true and correct copies of this document, including any exhibit(s), were electronically served via the Court's CM/ECF system on all parties entitled to such notice, including counsel for the appellee.

By: /s/ *Davor Rukavina*

Davor Rukavina, Esq.

Tab 9

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION

                                    )    Case No. 19-34054-sgj-11
In Re:                              )    Chapter 11
                                    )
HIGHLAND CAPITAL                    )    Dallas, Texas
MANAGEMENT, L.P.,                   )    Tuesday, April 12, 2022
                                    )    9:30 a.m. Docket
          Debtor.                   )
 _____        )
                                    )
HIGHLAND CAPITAL                    )    Adversary Proceeding 21-3010-sgj
MANAGEMENT, L.P.,                   )
                                    )
          Plaintiff,                )
                                    )
v.                                  )    TRIAL
                                    )
HIGHLAND CAPITAL MANAGEMENT )       )    ADVISORS' ADMINISTRATIVE CLAIM
FUND ADVISORS, L.P.,                )
et al.,                             )    Excerpt: 9:38 a.m. to 2:19 p.m.
                                    )
          Defendants.               )
 _____        )
```

                        TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                    UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Plaintiff:          John A. Morris
                            Gregory V. Demo
                            Hayley Winograd
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            780 Third Avenue, 34th Floor
                            New York, NY  10017-2024
                            (212) 561-7700

For the Plaintiff:          Zachery Z. Annable
                            HAYWARD, PLLC
                            10501 N. Central Expressway,
                              Suite 106
                            Dallas, TX  75231
                            (972) 755-7108

Case 21-03010-sgj    Doc 110    Filed 04/14/22    Entered 04/14/22 15:23:58    Desc Main
Case 3:22-cv-02170-S    Document 6-1    Filed 12/08/22    Page 224 of 888    PageID 3528

2

```
 1    APPEARANCES, cont'd.:

 2    For the Defendants:          Davor Rukavina
                                   Thomas Daniel Berghman
 3                                 MUNSCH HARDT KOPF & HARR, P.C.
                                   500 N. Akard Street, Suite 3800
 4                                 Dallas, TX  75201-6659
                                   (214) 855-7587
 5
       Recorded by:                Michael F. Edmond, Sr.
 6                                 UNITED STATES BANKRUPTCY COURT
                                   1100 Commerce Street, 12th Floor
 7                                 Dallas, TX  75242
                                   (214) 753-2062
 8
       Transcribed by:             Kathy Rehling
 9                                 311 Paradise Cove
                                   Shady Shores, TX  76208
10                                 (972) 786-3063

11

12

13

14

15

16

17

18

19

20

21

22

23

24            Proceedings recorded by electronic sound recording;
                 transcript produced by transcription service.
25
```

002906

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 12-20   Filed 12/30/22   Page 225 of 888   PageID 3529

3

1          DALLAS, TEXAS - APRIL 12, 2022 - 9:38 A.M.

2          THE CLERK:  All rise.  The United States Bankruptcy

3    Court for the Northern District of Texas, Dallas Division, is

4    now in session, The Honorable Stacey Jernigan presiding.

5          THE COURT:  Good morning.  Please be seated.  All

6    right.  We have a two-day setting in Highland.  It's both

7    Adversary 21-3010 as well as the Funds' request for

8    administrative claim.  Let's get appearances from the lawyers

9    first.

10          MR. MORRIS:  Good morning, Your Honor.  John Morris

11   from Pachulski Stang Ziehl & Jones for Highland Capital

12   Management, LP.  I'm here this morning with my colleagues Greg

13   Demo, Hayley Winograd, and Zachery Annable.

14          THE COURT:  Okay.  Good morning.

15          MR. RUKAVINA:  Your Honor, good morning.  Davor

16   Rukavina and Thomas Berghman here for the Advisors:  NexPoint

17   Advisors, LP and Highland Capital Management Fund Advisors,

18   LP.

19          THE COURT:  Good morning.  All right.  Do we have any

20   other appearances?  These are, of course, the only parties,

21   but ...

22      (No response.)

23          THE COURT:  All right.  Well, you all have given me a

24   lot of paper to prepare me.  Before we ask for opening

25   statements, I'm going to ask for housekeeping matters.  I see

Case 21-03010-sgj    Doc 110    Filed 04/14/22    Entered 04/14/22 15:23:58    Desc Main
Case 3:22-cv-02170-S    Document Document Filed Page 14/4f 85155 Page 226 of 888    PageID 3530

4

1  we have exhibit lists that have been filed and some written

2  objections, and I think your scheduling order said that if

3  there were no written objections then they were waived except

4  for relevance and privilege, I guess.  So do we have

5  stipulations on exhibits?

6          MR. MORRIS:  We do, in fact, Your Honor.  I apologize

7  for the late notice.  Mr. Rukavina and I just reached an

8  agreement about an hour ago that resolves all objections to

9  documents, --

10          THE COURT:  Okay.

11          MR. MORRIS:  -- as well as the objection to the

12  subpoenas that Highland had served upon the Advisors, --

13          THE COURT:  Okay.

14          MR. MORRIS:  -- which were the subject of the

15  objection that was filed at Docket No. 98 and the response

16  that was filed at Docket No. 101.  So, if I may, I'd just like

17  to read the stipulation into the record --

18          THE COURT:  All right.

19          MR. MORRIS:  -- and tell you where we go from there.

20          THE COURT:  That's fine.

21          MR. MORRIS:  So, the parties stipulate to the

22  admissibility of a single document, which will be marked as

23  Highland's Exhibit 161.  That document, Your Honor -- this is

24  not part of the stipulation -- but that document sets forth

25  amounts that were paid to certain former Highland employees

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 6-5   Filed 12/08/22   Page 227 of 888   PageID 3531

5

1   postpetition.  And so that document is going to be marked as

2   161, and the parties stipulate that the Advisors acknowledge

3   that they have no basis to challenge the facts that are

4   recited and reflected in the document.

5           THE COURT:  Okay.

6           MR. MORRIS:  Based on the foregoing, the parties

7   agree and stipulate that the objection to the trial subpoenas

8   that was filed at Docket No. 98 shall be deemed resolved.  I

9   don't know if Your Honor would like us to file some kind of

10  order or stipulation to that effect, or if this is sufficient.

11          THE COURT:  I think this is sufficient on the record.

12          MR. MORRIS:  Okay.

13          THE COURT:  Thank you.

14          MR. MORRIS:  The parties also agree that the Advisors

15  shall withdraw all of their objections to Highland's exhibits,

16  which were also filed on the docket.  And forgive me, but I

17  don't have that docket number.

18          THE COURT:  Let's see.  Docket 82 --

19          MR. MORRIS:  Okay.

20          THE COURT:  -- is where the Advisors' objection to

21  the Debtor's exhibits is.

22          MR. MORRIS:  Right.  And then, finally, Highland

23  stipulates that it does not contest the accuracy of the

24  mathematical calculations in the Advisors' Exhibits G and H

25  and that the charts are based on compensation information that

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 16-8 Filed 10/03/22   Page 228 of 888   PageID 3532

6

1  was maintained by Highland and that is accurate only as to the

2  compensation numbers paid to the listed employees.

3          MR. RUKAVINA:  And Your Honor, that is correct, and

4  you'll see as the trial progresses Exhibit G is a PDF of

5  Exhibit H, which is an Excel spreadsheet which is our damages

6  calculation.  So I think, with that, with that stipulation --

7  I understand that Highland has other objections -- but I think

8  that that stipulation will go some way.  And then there's a

9  couple more of my exhibits that are objected to.  We'll just

10  take those in due course.

11          THE COURT:  Okay.  All right.  So, are you asking me,

12  then, to pre-admit all of the exhibits that are not objected

13  to at this point?

14          MR. MORRIS:  Highland does move for the admission of

15  Exhibits 1 through 161, and at this point I understand there

16  are no objections.

17          THE COURT:  Okay.  And you confirm, Mr. Rukavina?

18          MR. RUKAVINA:  I do.

19          THE COURT:  All right.  So Highland Exhibits 1

20  through 161 are now admitted.

21     (Plaintiff's Exhibits 1 through 161 are received into

22  evidence.)

23          THE COURT:  And then turning to the Advisors' -- I

24  think I called them the Funds earlier.  Sorry.  I get my

25  nicknames mixed up at times.  The Advisors' Exhibits, it looks

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 6   Filed 12/03/15   Page 229 of 888   PageID 3533

7

1    like --

2           MR. RUKAVINA:  Your Honor, it's Exhibit A through DD.

3    I'd move for the admission of all of those, except G, H, L, Z,

4    CC.

5           THE COURT:  Okay.  So you aren't actually moving for

6    admission of G and H, which you just talked about?

7           MR. RUKAVINA:  Correct.

8           THE COURT:  There's just a stipulation about --

9           MR. RUKAVINA:  Correct.  Yeah.

10          THE COURT:  -- the correctness?

11          MR. RUKAVINA:  We'll address -- yeah.  We'll address

12   that admissibility tomorrow when Mr. Norris testifies.

13          THE COURT:  Okay.

14          MR. RUKAVINA:  But with respect to all other exhibits

15   other than G, H, L, Z, and CC, I'd move to admit them now.

16          THE COURT:  Okay.  So except for, you said, L, Z, CC?

17          MR. RUKAVINA:  Correct.

18          THE COURT:  Okay.  And you agree?

19          MR. MORRIS:  No objection to those exhibits.

20          THE COURT:  Okay.  So those are admitted by

21   stipulation as well.

22       (Defendants' Exhibit A through DD, exclusive of G, H, L,

23   Z, and CC, are received into evidence.)

24          THE COURT:  All right.  Is that all of our

25   housekeeping matters?

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 1-8   Filed 12/13/15   Page 230 of 888   PageID 3534

8

 1          MR. MORRIS:  It is.  I do have a copy of Exhibit 161,

 2    if I can approach --

 3          THE COURT:  You may.

 4          MR. MORRIS:  -- and give that to the Court.

 5          THE COURT:  And hopefully you have --

 6          MR. MORRIS:  And I have a couple of copies.

 7          THE COURT:  -- two copies.  One for Nate over here.

 8          MR. MORRIS:  Yeah.

 9          THE COURT:  Thank you.  All right.  You may proceed

10    when you're ready.

11          MR. MORRIS:  Okay.  Before I begin, I just do want to

12    give the Court some sense of what we expect to do today and

13    tomorrow.

14          THE COURT:  Okay.

15          MR. MORRIS:  We'll have our openings this morning.

16    Highland intends to call as its first witness David Klos.  Mr.

17    Klos will be followed by Mr. Waterhouse.  If time permits,

18    we'll examine Mr. Seery.  And then, regardless of what time we

19    complete, if we complete a little bit early, we'd like to stop

20    for the day.  We're trying to manage a lot of schedules --

21          THE COURT:  Uh-huh.

22          MR. MORRIS:  -- and witnesses and third-party people

23    who have said, I can do it Tuesday but not Wednesday, I can do

24    it Wednesday but not Tuesday.

25          THE COURT:  Uh-huh.

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 6-11   Filed 10/03/22   Page 231 of 888   PageID 3535

9

1              MR. MORRIS:  So that's the plan, and I hope, I really

2    do hope that we're able to get through those three witnesses

3    today.

4              THE COURT:  All right.  Well, you've answered one

5    question I had:  Who goes first?  Because we, you know, could

6    go either way because we have the breach of contract claim in

7    the adversary and the request for administrative expense.

8    There's an agreement that you go first?

9              MR. MORRIS:  We do have an agreement --

10             THE COURT:  Okay.

11             MR. MORRIS:  -- that Highland will call the witnesses

12   that are on its witness list, to the extent that it decides to

13   do so, first.  And Mr. Rukavina will then cross without

14   restriction to my direct.

15             MR. RUKAVINA:  Exactly.  Rather than me recalling

16   them, we'll just handle it all at one time, get the subpoenaed

17   witnesses out of here.

18             MR. MORRIS:  Because it's really the flip side of the

19   same coin.

20             THE COURT:  Okay.  All right.  Well, I have

21   flexibility as far as when and how long we stop for lunch, as

22   well as when we stop tonight.

23             MR. MORRIS:  Right.

24             THE COURT:  So it sounds like you're wanting maybe a

25   definite stopping point tonight, or no?

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 11-25   Filed 10/20/23   Page 232 of 888   PageID 3536

10

```
 1              MR. MORRIS:  No, not really.

 2              THE COURT:  Okay.

 3              MR. MORRIS:  The only -- the most important thing for

 4    me is to get Mr. Waterhouse off the stand.

 5              THE COURT:  Okay.

 6              MR. MORRIS:  Because he's not available tomorrow.

 7              THE COURT:  Gotcha.  I've got you.

 8              MR. RUKAVINA:  Yeah.  I think that the -- that's

 9    exactly right.  Really, the concern that I have is that we

10    actually finish early today.  So we're just informing the

11    Court that, if we finish early, we ask the Court's permission

12    to just resume tomorrow morning, because, again, we subpoenaed

13    certain witnesses tomorrow that are not available today.

14              THE COURT:  Okay.

15              MR. RUKAVINA:  So we may finish early.  We may finish

16    late.  Either way, we only have three witnesses for today, and

17    the other ones are going to appear tomorrow.

18              THE COURT:  Okay.  Gotcha.  All right.

19              MR. MORRIS:  So, with that, I'd like to just proceed

20    to my opening.

21              THE COURT:  Uh-huh.

22              MR. MORRIS:  And I do have -- I do have a slide deck

23    for use, if I can approach.

24              THE COURT:  Okay.  You may.  Thank you.

25              OPENING STATEMENT ON BEHALF OF THE PLAINTIFF
```

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 6-11   Filed 11/23   Page 11 of 155   Page 233 of 888   PageID 3537

11

 1          MR. MORRIS:  All right.  I don't -- I don't know if

 2   Ms. Canty is putting this on the screen.  Maybe it's blank

 3   because we're in the courtroom.

 4          THE COURT:  Ms. Canty?

 5          MR. MORRIS:  Ah, there we go.  Yeah.

 6          THE COURT:  Ah.

 7          MR. MORRIS:  All right.  So the expectation was that

 8   Ms. Canty would help me out in going through the slide deck.

 9      This is going to be, you know, a somewhat lengthier

10   opening than I'm used to, but this is a pretty fact-intensive

11   case.

12          THE COURT:  Uh-huh.

13          MR. MORRIS:  We submitted what we thought was a

14   fulsome description of the evidence in our proposed findings

15   of fact and conclusions of law.  You know, the Court either

16   has or will read that.  There is other evidence, obviously,

17   that's going to be in the record that we didn't include there.

18   And what I would do is I would describe what I'm about to say

19   for the next hour or so --

20          THE COURT:  Okay.

21          MR. MORRIS:  -- is the greatest hits.  It's kind of a

22   summary of what we think the evidence is going to show.

23          THE COURT:  Okay.

24          MR. MORRIS:  So if we can go to the next slide, Your

25   Honor.  This is just a quick overview of the parties'

Case 21-03010-sgj    Doc 110    Filed 04/14/22    Entered 04/14/22 15:23:58    Desc Main
Case 3:22-cv-02170-S    Document 6-11    Filed 12/23/22    Page 234 of 888    PageID 3538

12

1    competing positions.  Highland is here to recover for breach

2    of contract damages under an assortment of contracts.  There's

3    five different contracts at issue.  It believes that it's

4    entitled to unpaid fees and that it was -- that it will be

5    entitled to recover attorneys' fees.

6         Highland believes that the Advisors' claims, such as they

7    are, are without merit, and we take that position for the

8    following reasons.

9         We believe that the contracts are clear and unambiguous on

10   their face and they entitle Highland to a judgment.  But the

11   overwhelming evidence, Your Honor, we believe that even if the

12   Court found an ambiguity, that the parol evidence -- really,

13   the contemporaneous evidence at the time these contracts were

14   entered into, the parties' unequivocal, uninterrupted course

15   of dealing, and all of the surrounding circumstances, will

16   lead the Court to conclude that only Highland's interpretation

17   is reasonable.

18        Highland is going to prove that it fully performed, and

19   it's going to prove that performance not just through its own

20   witnesses but through the documentary evidence and through the

21   Advisors' witnesses, the Retail Board minutes.  Mr. Waterhouse

22   is going to acknowledge that.

23        Your Honor is going to have to deal with the fact that the

24   allegations of breach are particularly vague when it comes to

25   what it is that Highland supposedly did or didn't do and when

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document   Document Filed 11/23/23   Page 123 of 155   Page 235 of 888   PageID 3539

13

1  and how it didn't do it.

2       There's lawyers' letters that are part of the evidence of

3  performance, because from October 16th until December 31st the

4  Advisors sent five different letters by lawyers asserting all

5  kinds of things except breach of contract, which is kind of

6  telling.

7       The evidence is going to show that the Advisors had all of

8  the information that they claim Highland used to hide the

9  ball.  The evidence is going to show that they knew what

10  payments were projected.  They knew what payments were made.

11  They -- it's in their books, their own books and records, the

12  evidence is going to show.  They knew exactly when every dual

13  employee was terminated.  Right?  They told the Retail Board

14  time, time, time, time, and probably five more times again

15  that they knew exactly -- that they were monitoring the

16  services.

17       So we don't think -- we don't think the evidence is going

18  to show anything other than full performance.  But even if

19  they -- even if they had some basis for a claim, they've

20  either waived that claim or it's barred by the voluntary

21  payment rule.

22       If we can move to the next slide, please.

23       This is just the contractual language of the payroll

24  reimbursement agreements, Your Honor, and we believe that this

25  is clear and unambiguous on its face.  Paragraph -- Section

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 4-23   Filed 12/23/15   Page 236 of 888   PageID 3540

14

1   2.01 specifically states that NexPoint shall reimburse

2   Highland for the actual cost to HCMLP.  But note, Your Honor,

3   actual cost is not lower case, it's upper case.  It's a

4   defined term.  They could have used hamburger.  They could

5   have used tofu, if that's really to your liking.  Actual cost

6   has a meaning, a very specific meaning under this contract,

7   and that's in the box below.

8       Originally, the Advisors wanted to read out that second

9   sentence.  You know, Mr. Norris, I think, is going to testify

10  that he just assumed that Highland was adjusting the amounts

11  paid as each dual employee left.  There's no basis for that

12  assumption, and that assumption is completely undermined by

13  the second sentence of the definition of actual cost, which

14  says specifically that, absent changes pursuant to 2.02, this

15  is the fee.  Such costs and expenses are equal to $252,000 per

16  month.  Clear and unambiguous.

17      If we can go to the next slide, please.

18      Let's look at 2.02.  Right?  The argument is made, well,

19  Highland had a unilateral obligation to make adjustments.

20  Highland had a unilateral obligation to adjust the payments.

21  Highland had a unilateral obligation to do this, that, and the

22  other thing.  Where does the word Highland even appear in

23  2.02?  It refers to the parties.  It refers to the parties

24  reaching an agreement.  Highland can't act uni... not only is

25  it not required to, it can't.  It just can't.  The parties may

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 12/23/22   Page 237 of 888   PageID 3541

15

1    agree.  That's what 2.02 says.

2         If we can go to the next slide, please.

3         As Your Honor may have seen from the evidence from the

4    pretrial findings, proposed findings of fact, the parties

5    actually amended their agreement just seven months after they

6    signed it.  And I'm talking specifically about the payroll

7    reimbursement agreements.  And that payroll reimbursement

8    amendment specifically refers to what?  I mean, it does refer

9    to Section 2.02, which is stated in the paragraph above, I

10   believe.  But they're going to pay a flat fee of $168,000.

11        The evidence is going to show that this payment was not

12   based on any calculation of actual cost with an upper A and an

13   upper C or a lower A and a lower C.  There's no analysis

14   whatsoever.

15        You're going to hear an assertion that it was based on a

16   true up.  I think Dustin Norris is going to say that David

17   Klos conducted some true up in December of 2018.  No true up

18   exists.  Mr. Norris has absolutely no personal knowledge about

19   what happened in December of 2018.

20        Mr. Waterhouse, who signed the amendment, is going to

21   testify that he has no idea where the number came from.

22        So, so I actually think I'm a little bit confused.  The

23   $168,000, and I'm going to clear this up right now, the

24   $168,000 is the monthly charge in the original document.  So

25   we actually confused that.  This is the -- this is Paragraph

002919

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 16-23   Filed 11/23/23   Page 238 of 888   PageID 3542

16

1    3.01 from the original payroll reimbursement agreement, and

2    that's the flat fee from that particular document.  I think

3    that's the -- the HCMFA document.

4        So, here's the story, Your Honor.  The story is pretty

5    simple.  Late 2017, Highland had a horrible year.  They had to

6    get more cash to Highland.  Mr. Dondero knew that he had

7    personal tax exposure at the Advisors.  And so he just wanted

8    to push money from the Advisors to Highland.  It knocked off

9    two birds with one stone, right?  It got him a tax deduction

10   at the Advisors level.  It got more cash into the Highland

11   bank accounts.

12       And the way they originally did that was to say, let's

13   just do a subservice agreement.  The evidence is going to be

14   undisputed that prior to 2018 Highland provided subadvisory

15   front office services to both Advisors and never got paid a

16   nickel.  Okay?  But now they needed to get some more money to

17   Highland, so they came up with the concept of a subadvisory

18   agreement.

19       And what's on the screen, if we can go to Slide 5, is a

20   page from a deck that was presented to Mr. Dondero in January

21   of 2018 that showed -- the next slide, please, 5 -- that

22   showed that NexPoint and subs and subsidiaries would be --

23   would be paying $6 million for subadvisory and shared

24   services.  That was an increase from less than $2 million.  It

25   was a number that Mr. Dondero personally dictated.  Mr. Klos

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 11/23 155  Page 239 of 888   PageID 3543

17

1   is going to testify that Mr. Dondero came up with that number

2   and that they had to use these various agreements to come up

3   with a $6 million fee.  It's reflected in the document.  It's

4   reflected in the contracts.  $6 million doesn't change from

5   December 2017 until termination.  It's exactly what NexPoint

6   paid.

7        Interestingly, Your Honor, below it there's a reference to

8   Acis.  Acis, I know you're familiar with.  This is January

9   2018.  Highland is in control of Acis.  Acis has its own

10   subadvisory and shared services agreements with Highland.

11   It's not based on actual costs.  Nobody cares what the actual

12   cost.  It's based on basis points.

13        So they've got all of these -- you're going to hear

14   testimony that they've got a myriad of ways of compensating:

15   flat fees, percentage of assets under management, these basis

16   points.  There's no rhyme or reason to it.  But the evidence

17   is going to show and there'll be no dispute that in December

18   2017 the number was fixed at $6 million and never changed.

19        If we can go to the next slide.

20        So, Mr. Klos is going to testify that each January, maybe

21   early February, there was a meeting.  And the meeting was with

22   Mr. Klos, Mr. Waterhouse, Mr. Dondero, and Mr. Okada.  The

23   purpose of the meeting was to look back at the prior year and

24   to talk about the future year.  And the meeting would take

25   place at that particular moment in time because February 28th

Case 21-03010-sgj    Doc 110    Filed 04/14/22    Entered 04/14/22 15:23:58    Desc Main
Case 3:22-cv-02170-S    Document Filed 12/23/15 Page 240 of 888    PageID 3544

18

1    was bonus day and they used this information to decide how

2    much, you know, how the pie was going to be divided and what

3    bonuses were going to be paid.

4        So the documents that we're looking at right now come from

5    the deck that was prepared by Mr. Klos, under Mr. Waterhouse's

6    review, and was gone over with Mr. Dondero and Mr. Okada in

7    this meeting.

8        And this is -- this slide here shows Highland's projected

9    continued losses.  You see that they were projected to lose

10   $12 million on an operating basis in 2018.  Mr. Klos will

11   testify that they weren't projected to change that much at

12   all, but that -- you see the flip to a positive $46 million?

13   That $56 million, between a negative 12 and a positive 46 --

14   is I guess $58 million -- is really answered up above in 2019

15   by those incentive fees.

16       Those incentive fees were projected to occur.  That was

17   supposed to be the incentive fee for MGM.  If you remember,

18   Your Honor, that was going to be MGM.  It didn't happen.  And

19   Your Honor knows, if it had happened, Highland would have

20   gotten that $55 million, but according to Mr. Dondero and

21   Nancy Dondero, Highland would have had to cancel the $70

22   million of notes that they had signed.  But neither one of

23   those things ever happened.  Right?

24       The fact of the matter is if you reduce, if you eliminate

25   that $55 million, and you should, they still would have been

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 12/23 155   Page 241 of 888   PageID 3545

19

1    losing more than $12 million on an annualized basis.

2        If we can go to the next slide, please.  Because this is

3    another critical piece of evidence here.  You've got the

4    subadvisor fees and the shared services expenses.  You'll

5    recall, Your Honor, I said that they reached an agreement on

6    the $6 million number in December.  Well, here's the January

7    annual review.  It's presented to Mr. Dondero.  And we've

8    highlighted for you the projected subadvisor and shared

9    services expenses.  And if you add those two numbers up, it's

10   not a coincidence that they add up to $6 million.  And the

11   $3,024,000 number, divide it by 12, you come up with the

12   $252,000 that was in the subadvisory agreement and that

13   ultimately became the payroll reimbursement agreement.

14   $3,024,000 divided by 252 -- divided by 12 equals $252,000.

15       And the shared services expenses, there are actually two

16   pieces there.  And one of the things that I think is very

17   important for the Court to know is that, prior to 2018,

18   NexPoint's shared service agreement with Highland had a

19   complicated mechanism for calculating the fee for the shared

20   services.  One option was actually actual cost.  But Mr. Klos

21   is going to tell the Court, he's going to testify that they

22   didn't use that option, they used a different option, and they

23   wound up paying based on a percentage of AUM, A-U-M, Assets

24   Under Management.

25       But here's the important point.  At this moment in time,

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 12/20/23   Page 242 of 888   PageID 3546

20

1    to get to Mr. Dondero's $6 million number, they amend the

2    shared services agreement for NexPoint to provide for a flat

3    fee.  And when you combine the flat in the NexPoint shared

4    services agreement with the $80,000 flat fee in the NexPoint

5    Real Estate Advisors' shared services agreement, which is a

6    subsidiary of NexPoint, that's how you get to the $2,976,000.

7    Not a coincidence here.  It's three agreements.  It's the

8    subadvisory agreement.  It's the newly-amended and restated

9    shared services agreement with NexPoint.  It's the new shared

10   -- the newly-amended shared services agreement with NexPoint

11   Real Estate Advisors.  Add them up.  $6 million.  Right?

12       So, they're telling -- picture it.  They're in a meeting

13   room at Highland's offices.  Everybody's sitting in Mr.

14   Dondero's office.  They're walking through this.  And Mr. Klos

15   is going to testify that here's where we told Jim this is how

16   we're going to execute your plan.  You've given us an

17   instruction to get to $6 million.  Here's the plan.  Okay?  No

18   dispute.

19       So, a funny thing happens.  Right?  No so funny, actually.

20   The deck is dated January 26th.  I think Mr. Klos says the

21   meeting happened at or around that time.  But as Your Honor

22   knows, just a couple of days later, Josh Terry filed Acis for

23   bankruptcy.  And what you're going to see in the deck, which I

24   don't have the slide for, is that Highland had projected that

25   it was going to receive almost $10 million in revenue through

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 6 Filed 12/13/23   Page 243 of 888   PageID 3547

21

1    the Acis shared services and subadvisory agreement and that

2    the Acis revenue represented Highland's second-largest

3    projected source of revenue for 2018.  And days after they

4    have this meeting and go through this, Josh Terry files Acis

5    for bankruptcy and all of a sudden all of that revenue is

6    threatened.

7         So the very first thing they do in March, not in this deck

8    but it's in the proposed findings, the very first thing they

9    do when they realize all of this revenue is at risk is they

10   say, let's duplicate that subadvisory agreement that we just

11   prepared for NexPoint for HCMFA.  The projections that we just

12   looked at, you'll never find a projection showing that there

13   was any expectation in January 2018 that HCMFA was going to

14   pay subadvisory agreements.  They were supposed to just

15   continue getting them for free.  But after the Acis bankruptcy

16   was filed and there was a loss, a potential loss of up to $10

17   million in revenue, they needed to get more money to Highland,

18   because that revenue was going to be -- was threatened and

19   could be frozen.  So that this was the plan they came up with.

20   Just duplicate that agreement for HCMFA.  And that's what they

21   did, and that's what the evidence shows.

22        And the interesting thing, Your Honor, because I don't

23   remember what the exhibit number is, but you'll look -- we'll

24   look at the subadvisory agreement that was prepared.  There's

25   nothing about actual cost.  It is flat fee agreements.  And

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document File 09/22/23 155age 244 of 888   PageID 3548

22

1    for NexPoint it was $252,000.  Right?  This was the first way

2    they were going to address the crisis that was presented by

3    Acis.

4        Days later, after coming to that solution, a new problem

5    emerged.  Lauren Thedford, an attorney at Highland who also

6    served as the secretary of the Advisors -- she was a lawyer,

7    she was an officer of the Advisors -- she was told by outside

8    counsel, you can't use the subadvisory agreement.  Why?

9    Because (a) it can't be retroactive to January 1st; and (b) it

10   can only be used if it's approved at an in-person meeting of

11   the Retail Board.  And they realized that that meeting

12   wouldn't take place until June.

13       And so that meant Highland was going to be without all of

14   this revenue that it desperately needed at the time that they

15   intended to make retroactive to January 1st, they were going

16   to go six months without any of the subadvisory revenue that

17   they were hoping to place in Highland's lap through NexPoint

18   and HCMFA.

19       Needed a solution.  They came up with the payroll

20   reimbursement agreement.  It's the only reason it exists.  Had

21   they -- had Lauren Thedford not gotten the advice, and Mr.

22   Klos will testify to this, had Lauren Thedford not gotten the

23   advice that the subadvisory agreements couldn't be retroactive

24   and couldn't be adopted without Retail Board approval in an

25   in-person meeting, payroll reimbursement agreements would

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 12/23 155age 245 of 888   PageID 3549

23

1    never exist.  And so she said the only way around it is to use

2    this payroll reimbursement agreement, because that can be

3    retroactive and it doesn't need Retail Board approval.

4         And so if you go to Slide 8, please.  This is -- this is

5    the most classic parol evidence I have ever seen.  Because,

6    remember, the payroll reimbursement agreements aren't signed

7    until May.  And this is an email exchange between Mr. Klos and

8    Ms. Thedford, a lawyer, an officer of the Advisors.  And I'm

9    not going to read it here, Your Honor, but it shows Mr. Klos

10   saying, actual -- let's just start at the top.  He's

11   protesting.  He says, What do you mean, actual costs?  It

12   would be creating a ton of internal work that isn't adding any

13   value to the overall complex.  It would involve subjective

14   assumptions.  He doesn't want to do this.

15        And Lauren says, look, I'm open to changing the

16   definition, but we have to treat it as reimbursement.

17        And Dave's response at 10:56 the same day is, Could we say

18   Actual Cost?  Now he's using uppercase letters.  Can we say

19   Actual Cost is determined at the outset of the agreement?

20   Have a schedule as of January 1, 2018 and say the actual cost

21   will be set out in the schedule and paid in monthly

22   installments for the term of the agreement?  That way, the

23   exercise is performed only once.

24        And then he says, and if the parties don't like it, they

25   can terminate or renegotiate.

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 11/23/22 Page 246 of 888   PageID 3550

24

1    And that's exactly what the payroll reimbursement

2    agreement says.  She says -- Lauren's response is, I think

3    that's workable.  Do you have a methodology for the outset

4    determination?

5    And you'll see the rest of the email during Mr. Klos's

6    testimony.  He actually does create a list of dual employees

7    with allocations of how much time they're going to work with

8    these entities, but he's going to explain to you very clearly

9    it's just his own subjective numbers in his head.  And what he

10   -- the point of the exercise was to back into the $252,000

11   that was necessary so that we could get to the $6 million that

12   Mr. Dondero determined.

13   It's not a coincidence that you have a list of two dozen

14   or more employees, with allocations as random as nine percent,

15   that you wind up with a $252,000 number.  It's not a

16   coincidence.  It was, Mr. Klos is going to tell you, that was

17   the point of the exercise.  Okay?  This is parol evidence like

18   I've never seen before.

19   So they signed the agreement in May.  And you have to

20   understand -- this will be more evidence, Your Honor --

21   everybody -- nobody's going to contest this evidence.  The

22   dual employees on Exhibits A to the payroll reimbursement

23   agreements, they're being terminated before the document was

24   even signed.  Four of the dual employees had been terminated

25   before the document was even signed.  So they created a

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 12/23/22 155   Page 247 of 888   PageID 3551

25

1    document based on employees who weren't even there when Mr.

2    Waterhouse signed this agreement on behalf of the Advisors.

3        But wait.  There's more.  During the course of 2018, more

4    dual employees left.  So that by the time you get to December,

5    nine of the 26 dual employees have been terminated.  More than

6    a third of the people on the list have been terminated.  And

7    what do they do?  They amend the agreement.  This is the

8    amendment that I was mistakenly referring to earlier.  This is

9    the amendment, Your Honor, on Slide 9.  They amend the

10   agreement, because Highland was still needing cash, the

11   Advisors still had taxable income, so Mr. Dondero realized, I

12   can kill two birds with one stone again.  Let me shelter more

13   of the income, let me get some more cash to Highland because

14   they need some more cash.  And so he decides, send $2.5

15   million from Highland -- from the Advisors to Highland.  And

16   they do that with two amendments to the payroll reimbursement

17   agreements, one for $1.3 million, one for $1.2 million.

18       Mr. Klos is going to testify no true up -- this is the

19   point of the true up.  I think Mr. Norris is going to say that

20   Dave told him that there was a true up in December 2018.

21   These are random numbers that are designed just to keep

22   Highland chugging along and giving Mr. Dondero a tax break.

23   There's no analysis.

24       And it makes no sense.  The concept that there was a true

25   up is just categorically ridiculous.  Why?  Mr. Waterhouse is

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 7   Filed 12/23/21   Page 248 of 888   PageID 3552

26

1    going to tell you that NexPoint was paying on an annualized

2    basis an additional 40 percent over the annual cost based on

3    the $252,000 and that HCMFA was paying almost 25 percent more.

4    So they're paying 40 percent more, 25 percent more, at a time

5    when more than one-third of the dual employees have been

6    terminated.  How could that possibly be a true up?  How could

7    that possibly reflect actual costs?  It doesn't.  And it

8    didn't.

9        Dual employees continue to be terminated.  The calendar

10   turns to 2019.  By the time Highland files for bankruptcy, I

11   believe the number is 14.  Fourteen of the 26 dual employees

12   have been terminated.  And here is undisputed fact.  Not one

13   time -- you know what, I want to take a step back for a

14   second, Your Honor.  I'm talking quickly.

15       These agreements were in effect for three years.  They're

16   signed as of January 1, 2018, and they're in effect basically

17   until the end of 2020.  It's a three-year period.  It's 36

18   months.  There's no dispute that Mr. Dondero controlled the

19   Advisors and Highland for two of those three years.  For 2018,

20   even after the bankruptcy was filed, through the end of 2019,

21   Mr. Dondero was in sole control of everything.

22       Why is that important?  That's the course of dealing, Your

23   Honor.  The unequivocal, uninterrupted course of dealing.  In

24   those first two years, the Advisors paid a flat fee under the

25   payroll reimbursement agreement.  Nobody cared that dual

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 0 Document Filed 12/23/23 155 Page 249 of 888   PageID 3553

27

1   employees were leaving.  There will be no evidence that

2   anybody said, how come we're not paying actual costs?  They

3   just did it, and they did it because that was the plan.  And

4   they have a document and an agreement that effectuated that

5   plan, and everybody stuck to the plan.  For two years.  And

6   the undisputed evidence is going to show that nothing changed

7   after the bankruptcy, that the Advisors were charged and paid

8   the exact same amounts in the 12 months in 2020 that they paid

9   in the 24 months in 2018 and 2019. Nothing changed.

10      Nobody asked for a change in 2018.  Nobody suggested that

11  -- because everybody knew -- here's another piece of evidence.

12  It's enormous.  Your binders have dozens of what are called

13  monthly headcount reports.  Right?  And we may look at one of

14  them, but I'm going to tell you what they are right now in

15  case we don't.  Those monthly headcount reports identify --

16  name every single employee who ever worked for Highland since

17  like 2007.  It tells you when they were hired.  It tells you

18  when they were fired.  It tells you what position they had.

19  And it was distributed to a whole host of people, including

20  D.C. Sauter, Dennis Norris, Lauren Thedford, Frank Waterhouse

21  -- *i.e.,* every single officer of the Advisors.  Every single

22  officer of the Advisors got a report every single month that

23  told them exactly who was terminated.  And the reports would

24  actually highlight the terminations in yellow in case somebody

25  didn't know.  So that everybody, every one of the officers

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 12/23/15 Page 250 of 888   PageID 3554

28

1    knew, Frank Waterhouse knew, had the information in his lap

2    when he signed the agreements, that four of the 26 dual

3    employees had already been terminated.

4         There's going to be so much more evidence about what they

5    knew.

6         But fast forward to 2020.  So, Highland files for

7    bankruptcy.  Most of the dual employees are already gone.

8    Nobody is saying a word about it.  Nobody cares.  Why?

9    Because this is a pay-for-service agreement.  It has nothing

10   to do with who provides the services.  It's important that the

11   services be provided.  And Highland continued to perform.

12        There will be no evidence, there's been no allegation,

13   they filed an administrative claim, they have filed two

14   different -- a response, they filed their pretrial brief.

15   They don't make any allegation that Highland failed to perform

16   front office investment advisory services.  As their pleading

17   says, their position is simple.  Dual employees left.  We

18   shouldn't have to pay for dual employees that left.

19        The Advisors are not in the business of consuming dual

20   employees.  They're in the business of providing investment

21   advisory services to the Retail Funds and to other investment

22   vehicles.  That's the point of the exercise.  They are going

23   to testify that is the reason they exist, is to serve their

24   clients.

25        And so does it matter to the Advisors if one person or six

Case 21-03010-sgj    Doc 110    Filed 04/14/22    Entered 04/14/22 15:23:58    Desc Main
Case 3:22-cv-02170-S    Document Filed 12/23/15 Page 251 of 888    PageID 3555

29

1    people or 24 people provide the services?  It shouldn't.  The

2    important thing is that they're getting the services that

3    allow them to satisfy their contractual obligations to their

4    clients.

5        This is all -- it's just -- it's just all so simple.  It's

6    a lot of facts, but it's all just so simple.  They continued

7    to pay not because they didn't know dual employees had left.

8    They knew that.  They continued to pay because they were

9    getting uninterrupted service, as they told the Retail Board

10   time and time and time again.

11       If we can go to Slide 10, I'm going to try and pick it up

12   just a bit here.

13       The calendar turns to 2020, Your Honor.  This is more, you

14   know, particularly relevant evidence because it's another

15   back-and-forth between Ms. Thedford and Mr. Klos.  It's

16   January 2020.  And I note the timeline, Your Honor, because,

17   you know, this is the moment that Mr. Dondero is about to

18   surrender control to the Independent Board.  But there's no

19   disputes.  There's no disputes.  And that's the beauty of this

20   particular email exchange.  Nobody is questioning, how much am

21   I paying?  Nobody is questioning, what services are you

22   providing?  But Lauren does have some questions about --

23   because the Retail Board.  That's what prompts this.  This has

24   nothing to do with the Advisors or anything.  The Retail

25   Board.  And you'll see it in the full email.  The Retail Board

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 08/08/23   Page 252 of 888   PageID 3556

30

1    has asked some questions about, you know, how does the

2    Advisors pay for expenses?

3         And Lauren said to Dave, and you'll see it in the email,

4    wasn't there something about those Exhibit As?  And Dave's

5    response is, Those were a point-in-time estimate as of the

6    beginning of 2018.  Half the people are gone now.  And if you

7    were to reallocate them now, all the percentages would be

8    different.

9         And Mr. Klos is going to testify that the reason that the

10   percentages would be different is exactly what I just said,

11   and that is this is a pay-for-service agreement.  When the

12   dual employees were terminated, Highland didn't just stop

13   providing the services that those people were performing.

14   They reallocated them.  That's exactly what he's telling her.

15   It's exactly what everybody knew to be true.

16        So if in January 2018 one of the dual employees was

17   terminated and his job, let's say, was to give investment

18   advice on Asset A, Highland didn't just suddenly stop

19   providing investment advice on Asset A.  Somebody was given

20   the responsibility to do that.  And that's exactly -- Mr. Klos

21   is going to tell you that's exactly what that means there,

22   that all the percentages would be different if you did it

23   again today because you had the departure of all of these dual

24   employees and somebody picked up the slack.  Makes total

25   sense.  It's a pay-for-service contract.  That's what it is.

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 08/31/23 155   Page 253 of 888   PageID 3557

31

1    It's a flat fee contract.

2         Later the same month -- if we can go to the next slide --

3    Mr. Waterhouse, who is the CFO, asks Mr. Klos, how much --

4    remind me again, how much is paid under those agreements?

5    Without equivocation, without ambiguity, flat, flat, flat.

6    Except for the one HCMFA shared services agreement that had a

7    very, very narrow band, and Mr. Klos will testify as to why

8    that band existed.

9         But there's that $6 million number again, if you look at

10   NPA.  That's NexPoint.  $252,000 plus $248,000 equals $500,000

11   times 12.  Six million.  The $248,000 is for shared services.

12   It's broken out, as I mentioned earlier, between NexPoint and

13   NexPoint Real Estate Advisors.  Here we are, January 2020, Mr.

14   Klos again confirming for Mr. Waterhouse, flat fee, flat fee,

15   flat fee, $6 million.

16        If we can go to the next slide.

17        I've alluded to some of this, Your Honor.  The Advisors

18   contemporaneously had all of the relevant facts.  This is

19   just, again, the highlights here.

20        If you look at Exhibit 14, it's the Advisors' responses to

21   the Debtor's interrogatories.  And if you look at

22   Interrogatory 3 and 4, it's going to provide a list of each of

23   the dual employees that were attached as the Exhibit As to the

24   payroll reimbursement agreements and it's going to give you

25   the date of termination for each person.  And then

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 02/23/23   Page 254 of 888   PageID 3558

32

1    Interrogatory -- the response to Interrogatory No. 4 simply

2    says, we knew contemporaneously when these people left.

3    They've admitted it.

4        The monthly headcount reports, as I said, there's 12 plus

5    27, there's at least 39 of them.  Thirty-nine monthly.

6    Because I took it back to October 2017.  I think it goes back

7    much earlier, but that's what we produced, just to make sure

8    the Court had the evidence, that this was a process of

9    disclosure of hires and terminations that was provided before

10   these contracts even existed.  And it's a practice that

11   continued right up until January 2021, when these contracts

12   ended.  Every single month.  The same analysis.  Went to every

13   single officer of the Advisors.

14       And they're -- and Mr. Norris is going to sit in that box

15   tomorrow and he's going to say he was shocked, shocked, that

16   Highland was charging this money for these employees who were

17   terminated.  We'll see how that goes.

18       Annual reviews.  Exhibits 86 and 142.  These are portions

19   of the annual reviews where Mr. Dondero is just given a wealth

20   of information about hires, termination, compensation budgets,

21   everything one would need to know from the human resources

22   department.  If Mr. Collins comes in and testifies, he's going

23   to testify -- and I didn't depose him -- but he had no choice.

24   He's the human resources officer reporting to the owner of the

25   company.  If he says anything other than I kept him fully

002936

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 10/31/23   Page 255 of 888   PageID 3559

33

1    informed about staffing issues, I'll be shocked.

2        Representations to the Retail Board.  They represented to

3    the Retail Board a couple of times that there has been no

4    material attrition in employees.  How can they make that

5    representation if it's uninformed?  They didn't.  It was

6    completely informed.  The Advisors knew exactly what was going

7    to be paid.

8        We looked at the projections in the annual review that was

9    given to Mr. Dondero.  Mr. Waterhouse is going to testify that

10   there were 13-week forecasts that were prepared.  The

11   forecasts showed every single payment that was going to be

12   made by the Advisors under these intercompany agreements.

13   He's going to testify that before the Independent Board was

14   appointed he would go through those forecasts with Mr. Dondero

15   every week, and then after the Independent Board was appointed

16   he would still do it with Mr. Dondero, although with less

17   frequency.  And Mr. Waterhouse started going through those

18   forecasts with the Independent Board, and sometimes Mr.

19   Dondero would participate.  Right?  In the early -- in the

20   first six months of this case, everybody was looking to

21   cooperate.  Right?  Before the board said, we need to get this

22   done.

23       They knew what was going to be paid.  Mr. Waterhouse, the

24   unequivocal evidence will be that Mr. Waterhouse approved all

25   payments.  You may hear some argument about the shared

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/23/15   Page 256 of 888   PageID 3560

34

1   services agreement, and Highland was supposed to do this or

2   supposed to do that.  You're going to have the evidence in

3   front of you.  Mr. Waterhouse is going to admit he had to

4   approve all of the payments.  He is not just the CFO of

5   Highland.  He is the treasurer of the Advisors, charged with

6   the responsibility of finance and accounting.  He's the

7   approval person.

8        You're going to see emails from Kristen Hendrix that say,

9   Frank, here's the payments I'm going to make today.  Is it

10  okay?  And he would say, go ahead.  And you're going to see,

11  and we just have a couple of examples, but he's going to

12  testify that was the practice.  And you'll see in the examples

13  it says $252,000, payroll reimbursement.  Or subadvisory.

14  Right?  Mr. Waterhouse -- how do we know the Advisors knew

15  what would be paid?  From the projections.  How do we know

16  that they knew what would be paid?  Mr. Waterhouse approved

17  it.

18       But wait, there's more.  Mr. Waterhouse is also going to

19  admit that every single payment that was made by the Advisors

20  under these intercompany agreements is reflected in the

21  Advisors' books and records.  Right?  Their own books and

22  records.

23       They represented to the Retail Board on October 23rd that

24  all amounts due and payable under these agreements were paid

25  in full.  How do you make that representation if you don't do

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 35/23 155age 257 of 888   PageID 3561

35

1    the due diligence to know what was paid and whether -- whether

2    it should have been paid.  Right?

3        So they -- they've either got to -- Your Honor is going to

4    have to decide, did they lie to the Retail Board or are they

5    lying in this courtroom?  Because they can't be true.  You

6    can't reconcile what they told the Retail Board with what they

7    may tell you today and tomorrow.  It can't be reconciled.  You

8    can't tell the Retail Board Highland is fully performing,

9    we've paid everything we're supposed to pay Highland, and then

10   come into this courtroom with a contrived administrative claim

11   to say, oh, gee, they didn't provide services and we overpaid.

12   You can't reconcile the two.

13       I ask the Court to listen carefully to the testimony and

14   see if there's a credible witness for the Advisors who can

15   explain how they told the Retail Board fifty times that

16   Highland was performing and that they paid everything, and yet

17   somehow something fell through the cracks.

18       Again, think about the whole purpose of this.  The purpose

19   is for Highland to provide services to enable the Advisors to

20   fulfill their obligations to the Retail Board, to the Retail

21   Funds, and the other investment vehicles who were their

22   clients.  That's the purpose.  And that's exactly what

23   happened.

24       They knew what services were provided.  We're just going

25   to do a quick greatest hits here of some of the retail

Case 21-03010-sgj    Doc 110    Filed 04/14/22    Entered 04/14/22 15:23:58    Desc Main
Case 3:22-cv-02170-S    Document 6-20    Filed 10/26/23    Page 258 of 888    PageID 3562

36

1  representations by the Advisors.  You know, there had been an

2  objection that some of the statements were made by people

3  other than Advisors' representatives, so I took -- I took a

4  little timeline here and focused really solely on the

5  representations that were made by the Advisors and their

6  officers.

7      In June, Mr. Post told the Retail Board, the level and

8  quality of services are being monitored.  I mean, think about

9  that.  Being monitored.  It's a very active word.  He is not

10 aware of any disruptions in the service levels provided to the

11 Funds.

12     A couple of months later, Mr. Norris -- we'll hear from

13 him tomorrow -- he noted that there have been no issues or

14 disruptions, no issues or disruptions in the services as a

15 result of the bankruptcy.

16     The next month, the Advisors state in a memo -- I believe

17 it's in a memo -- the Advisors and HCMLP believe the current

18 shared services being provided are generally consistent with

19 the level of service that has historically been received.  How

20 do they come into this Court and tell you we breached the

21 agreement by failing to perform when they have told their

22 clients exactly the opposite?

23     On October 13th, Mr. Sauter, a lawyer, the general counsel

24 of the Advisors, noted that there has been no material

25 attrition to date with respect to employees.

002940

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 02/16/23   Page 259 of 888   PageID 3563

37

1      Somebody's going to come in here and say, oh, because of

2   the bankruptcy, Highland was firing people?  That's not true,

3   as a practical matter.  Maybe a couple people on a net basis.

4   Didn't have a material impact.

5      Ten days later, the Advisors told their Retail Board, all

6   amounts owed by each of the Advisors pursuant to the shared

7   services arrangement -- that's not a mistake there, it's a

8   lower case S, a lower case S, a lower case A, because it

9   encompasses both shared services and front office investment

10  advisory services -- all amounts owed pursuant to the shared

11  services arrangement with HCMLP have been paid as of the date

12  of this letter.  That's October 23rd.

13     Go to the next slide.  It continues.  Five days later, the

14  Advisors represent that the quality and level of services

15  provided to the Funds by the Advisors and pursuant to the

16  shared services arrangements have not been negatively impacted

17  to date.  No negative impact.  October 28th.  No negative

18  impact.

19     November 5.  Mr. Norris noted that there had not been any

20  disruption to the services provided to the Funds by HCMLP

21  pursuant to the shared services agreement and that he expects,

22  his expectation, is that such services will continue to be

23  provided in the normal course.

24     Your Honor may remember that on November 30th Highland

25  gave notice of termination.  We had just gotten our disclosure

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 08/23/15 Page 260 of 888   PageID 3564

38

1  statement approved and time to execute.  Right?  The world is

2  going to change.  So we give notice of termination on November

3  30th.  And the next day, the Advisors do what they're supposed

4  to and they tell the Retail Board, we finally got that notice

5  of termination that we were planning for.  And they say, we're

6  going to -- Mr. Post states that the Advisors expect to be

7  able to continue to receive the services through a transfer of

8  personnel.

9       You can't expect to continue to receive services that

10  you're not receiving.  Right?  This is the morning after.

11  This is what they report to the Retail Board.  Don't worry.

12  They've terminated.  Don't worry.  We're going to continue to

13  receive these services.

14       As late as December 10th and 11th, Mr. Sauter noted that

15  there had been no material attrition to date with respect to

16  the employees.  And they're here suing on a breach of contract

17  theory for failure to provide services?

18       Mr. Waterhouse, the Advisors' treasurer, is going to

19  testify that he knows of no services that Highland failed to

20  perform postpetition.

21       These are excerpts from his deposition, but you can

22  imagine that I might turn that into leading questions that'll

23  go something like this:  You were unaware of any specific

24  service under the shared service agreements that Highland

25  failed to perform at any time from the petition date until

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document   Filed 09/23/15   Page 261 of 888   PageID 3565

39

1   they were terminated in early 2021; isn't that correct?  And

2   he's going to have to say, I'm not aware of any.

3        Mr. Waterhouse is going to have to answer the question

4   this afternoon:  You never had any discussion with anybody at

5   any time about Highland's failure or alleged failure to

6   provide services under the shared services agreement at any

7   time from the petition date until they were terminated in

8   early 2021; isn't that correct, sir?  He's going to have to

9   say, I have no recollection of that.

10        This is their officer.

11        Last slide, 16.  It's really important that the Court

12   appreciate the complete change of position that the Advisors

13   have undertaken here, because until they filed their pretrial

14   brief their whole theory of the case was that, you know, the

15   -- Highland failed to perform some services under -- some

16   unidentified, vague services under the shared services

17   agreement and that Highland overcharged them and they overpaid

18   under the payroll reimbursement agreement because all these --

19   all these dual employees were gone.  That was their theory of

20   the case.

21        Their theory of the case was that we had the obligation,

22   right, Mr. Norris testified on March 5th and he's going to

23   testify tomorrow that he believed that Highland had the

24   obligation to charge the right fees based on the dual

25   employees.

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/14/23   Page 262 of 888   PageID 3566

40

1       In their pretrial brief, they've now completely changed

2   their position, and they're -- I think they're basically

3   agreeing with our interpretation of the contract, that it was

4   a fixed fee unless changed by the parties.  Because on March

5   28th or March 29th, I took Mr. Waterhouse's deposition and he

6   told -- he told -- you know, he testified.  I don't want to be

7   pejorative.  He testified that he recalled that in December

8   2019 Dave Klos did an analysis that showed that Highland was

9   making millions of dollars off these agreements and that --

10  and that Mr. Waterhouse took that information and went to

11  Isaac Leventon and Scott Ellington and Fred Caruso -- Mr.

12  Caruso was an employee of DSI, the Debtor's then-financial

13  advisor -- and he spoke to the three of them and he said,

14  guys, we're overpaying, the Advisors are overpaying.  And all

15  three uniformly told him:  Can't do anything about it because

16  of the automatic stay.  You can't do anything about it because

17  of the automatic stay.  That's what he's going to testify to.

18  That's what he said took place.

19      Now, complete about-face, and so now they're saying that

20  they should be relieved of any obligation to pay and they

21  should get all their money back because Highland breached its

22  duty under Section 2.02 of the payroll reimbursement agreement

23  that says the parties shall negotiate in good faith.  So

24  they're saying Highland didn't negotiate in good faith because

25  Frank spoke to Fred Caruso and Fred Caruso said there's

002944

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/14/23   Page 263 of 888   PageID 3567

41

1   nothing we can do about it because of the automatic stay.

2   That's the story.  That's their -- that's their theory today.

3       There's no excuse for them being surprised by Mr.

4   Waterhouse's testimony.  None.  You may hear somebody say we

5   couldn't speak to Mr. Waterhouse.  And I know that his counsel

6   has done the right thing, because he has an obligation under

7   his agreement with Highland not to cooperate in claims against

8   them, so he's done the right thing.  But that, that advice,

9   Mr. -- I don't know when the advice was given, obviously, but

10  I know from the representations that have been made by counsel

11  to the Advisors, that wall came down between them and Mr.

12  Waterhouse last summer.

13      And we know it didn't come down before that because Your

14  Honor already has a litany of evidence showing that D.C.

15  Sauter had multiple conversations with Mr. Waterhouse in the

16  spring of 2021.  Remember, he submitted not one but two

17  declarations in support of HCMFA's notes defense.  And

18  remember that?  We'll talk about this more next week.  Mr.

19  Sauter conducted an internal investigation in the spring of

20  2021 to try to figure out where did these HCMFA notes come

21  from.  And remember, Frank Waterhouse told him those notes

22  exist because we needed to document it for the auditors.  Mr.

23  Waterhouse knew exactly why those notes existed.

24      And so how do the Advisors do an investigation, interview

25  Mr. Waterhouse three times in the spring of 2021 about the

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/22/23 155   Page 264 of 888   PageID 3568

notes, and never ask him a question about this?  And Mr.
Waterhouse is going to testify he's never seen the
administrative claim and he's never spoken to anybody in the
world about the administrative claim until I deposed him,
other than his counsel.

     How do they do that?  Frank Waterhouse is in their
offices.  There's investigations being conducted about HCMFA's
notes.  They're trying to figure out the origin of the notes.
D.C. Sauter.  And nobody asks him, what about this
administrative claim?  Do you know why we kept paying that
money?  Never happened.  Maybe they would have learned at that
time that Mr. Waterhouse thought that something happened in
December of 2019 that was relevant.

     The story that they've now adopted completely contradicts
their early version, earlier theory of the case.  Their
earlier of the case, Your Honor, if you look at their
response, which was filed in December, it's filed as Exhibit
13, at Paragraph 6, their response to our waiver argument was
we could not have waived, we could not have waived because the
issue didn't crystallize until November 2020.  That's when
they said they first learned about all these problems.  And
now they've done a complete about-face and they say no, wait,
Frank knew about it, Frank -- Dave Klos told him about the
overpayments, Dave Klos told Frank, and Frank went to Caruso,
and Caruso said nothing we can do about it, and that's a

002946

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document   Filed 04/13/23   Page 143 of 155   Page 265 of 888   PageID 3569

43

1   violation of 2.02.  And that's their theory.  Really.

2   Completely contradicts.

3       So all they've actually done now, if the Court actually

4   buys that argument, is strengthen our waiver argument even

5   more.  Because now Frank knew in December 2019 -- I don't

6   think the Court's ever going to credit his testimony, but if

7   the Court did so, okay, fine, heads I win, tails they lose.

8   It's just waiver.  He knew -- he knew at the outset of the

9   overpayments.

10      And here's the really interesting thing.  He never told

11  Mr. Dondero.  And he never told Mr. Norris and he never told

12  Mr. Sauter and he never told Ms. Thedford and he never told

13  the Independent Board.  He never told anybody.  But if you buy

14  the story, you have to buy the whole story.  You can't just

15  buy the fact that Mr. Waterhouse didn't tell anybody.  You

16  also have to buy the fact that apparently Mr. Leventon never

17  told Mr. Dondero.  Mr. Ellington never told Mr. Dondero.

18  Because if they had told Mr. Dondero, we would have had this

19  story -- we would have heard about this story in the

20  administrative claim or we would have heard about the story in

21  the response.  Instead, we're told the issue didn't

22  crystallize until November 2020.

23      So not only did Mr. Waterhouse simply accept the advice of

24  two in-house counsel and a financial restructuring

25  professional, he didn't tell anybody, and nobody who he told

002947

Case 21-03010-sgj    Doc 110    Filed 04/14/22    Entered 04/14/22 15:23:58    Desc Main
Case 3:22-cv-02170-S    Document Filed 04/14/23 155age 266 of 888    PageID 3570

44

1    told anybody.  Kind of funny.  Kind of interesting.  I'll use

2    interesting.

3        There will not be a document or a witness who will

4    corroborate Mr. Waterhouse's assertions.  The contemporaneous

5    documents will actually completely contradict Mr. Waterhouse's

6    assertion.

7        Which documents am I referring to?  There actually was an

8    analysis that Mr. Klos prepared in December 2019.  He's going

9    to share with the Court what that analysis was.  And what that

10   analysis shows is that, after making adjustments to present

11   the analysis in the most positive light for the UCC, Highland

12   was still losing a million and a half dollars a year under

13   these intercompany agreements.

14       I can't explain Mr. Waterhouse's testimony.  I thought

15   originally when I was asking him about it that he was confused

16   with a later analysis that was prepared in December 2020 that

17   we'll talk about.  He insists it was in December 2019.  I

18   don't know what to say.  But there will be nothing that

19   corroborates it.  There won't be a witness in this courtroom

20   who corroborates it.  There's going to be -- it's going to be

21   challenged by Mr. Klos.  We're going to have documentary

22   evidence that shows he's mistaken.

23       I don't need to ascribe bad motive.  This guy's just

24   mistaken.  And given his lack of recollection about so many

25   things, it's not terribly surprising.

Case 21-03010-sgj    Doc 110    Filed 04/14/22    Entered 04/14/22 15:23:58    Desc Main
Case 3:22-cv-02170-S    Document Filed 04/14/22    Page 267 of 888    PageID 3571

45

1          Subsequent communications are inconsistent.  There's

2     another couple of exhibits.  And we just looked at one, the

3     one with Ms. Thedford from January.  Like a couple of weeks

4     after Dave supposedly told Frank that there's millions and

5     millions of dollars of profit being made under these

6     contracts, he's turning around and saying to Ms. Thedford,

7     we're not doing actual cost, it's a flat fee agreement.  He's

8     just ratifying everything that the parties have been doing for

9     the 24 months under Mr. Dondero's control.

10         I'm about done, Your Honor.  I just want to talk for a

11    moment about a couple of the witnesses.  You are going to hear

12    from Mr. Klos, and I'm delighted that you're going to do so.

13    Nobody is going to take Mr. Klos on.  He's a man of integrity.

14    And I know, I know the Court will find him very credible.

15    You'll find him credible for three reasons.

16         Number one, his story makes sense.  Every single thing

17    that he says, he's going to say, that makes sense on a

18    timeline, that makes sense from an economic perspective, that

19    makes sense based on what I know of this institution and these

20    individuals.

21         You're going to find him credible for the second reason.

22    His story is consistent.  There's no equivocation.  There's no

23    change of story.  I'm not worried about him being cross-

24    examined with his deposition transcript.  His story is going

25    to be consistent.  It's going to make sense.  It's going to be

002949

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 10/21/25   Page 268 of 888   PageID 3572

46

1 | consistent.

2 |     And the third reason is that it's all going to be

3 | corroborated by the contemporaneous documentation.

4 |     So I look forward to presenting Mr. Klos.  I think that he

5 | has more knowledge about these issues than anybody.  He was

6 | involved in structuring the entire economic relationship

7 | between the parties.  He was involved in the drafting of the

8 | agreements.  And he was the person primarily responsible for

9 | the administration of the agreements.

10 |     So that's one witness I hope the Court will pay particular

11 | attention to.

12 |     Mr. Waterhouse, obviously.  He wore dual hats.  He's going

13 | to say he wore dual hats.  He's going to tell you that Mr.

14 | Dondero gave him all of those hats.  But the Advisors can't

15 | get away from the fact that two of those hats were as the

16 | treasurer of HCMFA and as the treasurer of NexPoint.  There's

17 | nothing that's in his head that can be attributable to

18 | Highland that cannot also be attributable to him as an officer

19 | and the treasurer of the Advisors.  Right?  So anything he

20 | knows, anything they want to put in his head, he knew not just

21 | for Highland but he knew for the Advisors.

22 |     And then there's Mr. Norris.  I mean no ill will to Mr.

23 | Norris, but he has very little to offer here.  And why is

24 | that?  Because he's the executive vice president of the

25 | Advisors, and his responsibility was marketing.

002950

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 07/28/23   Page 269 of 888   PageID 3573

47

1        You're going to hear Mr. Klos and I believe you will hear

2    Mr. Waterhouse testify that Mr. Norris had absolutely no

3    responsibility or involvement in the structuring of the

4    economic relationship between the parties.  They are going to

5    testify that Mr. Norris had no involvement or personal

6    knowledge about how these contracts were executed.

7        Mr. Norris comes on the scene at the very last second.

8    And like Mr. Sauter did in the spring of 2021 when he insisted

9    that Mr. Waterhouse, the officer whose name appears on the

10   HCMFA's notes, made a mistake, even though Mr. Waterhouse had

11   absolutely no personal knowledge of anything, you're going to

12   hear Mr. Norris testify that he came onto the scene in October

13   or November and December 2020 and he was shocked, shocked, at

14   how much was being charged.  Where have you been?  Where have

15   you been?  Did you look?  Did you look in 2018 when Mr.

16   Dondero was in control and all of the dual employees were

17   leaving?  Did you say, hey, hey, what are we doing here?  No.

18   Did you do it in 2019?  No.  He did in Month 35 of a 36-month

19   relationship, without having had any involvement or

20   responsibility for the negotiation or administration of these

21   contracts.

22       I will be objecting as appropriate on foundation grounds,

23   because a witness can only testify based on personal

24   knowledge.  And he can testify to whatever he did, but he

25   should not be permitted to testify about the parties' intent.

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 08/23/23   Page 148 of 155   Page 270 of 888   PageID 3574

48

1    I have nothing further, Your Honor.

2         THE COURT:  All right.  Thank you.  Mr. Rukavina?

3         OPENING STATEMENT ON BEHALF OF THE DEFENDANTS

4         MR. RUKAVINA:  Respectfully, Your Honor, what you

5    just heard was misdirection, irrelevancy, things that are not

6    going to be in the record, things that are not in the record,

7    and parol evidence.

8         What Highland is trying to do here today is to ignore the

9    fact that there are four contracts.  Two of them are payroll

10   reimbursement agreements; two of them are shared services.

11   They are different contracts that provide for different

12   things.  And what you just heard was confusing the two, and I

13   think you even heard Mr. Morris say that the PRAs were

14   actually pay-for-services agreements.

15        They're trying to read these contracts into something that

16   they're not, using parol evidence.  And I find it particularly

17   ironic given that in all those promissory note cases Highland

18   is here hitting this table saying, follow those notes to the

19   letter, ignore everything else, and now they're trying to

20   shoehorn what is a very clear, unambiguous payroll

21   reimbursement agreement into some kind of parol evidence, it

22   was meant to be a flat payment every month for services.

23        What I first want you to focus on, because I really

24   believe that it's unbelievable misdirection, are all of these

25   references to representations that my clients made to the

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Document Filed 09/23 1 Page 149 of 155 Page 271 of 888   PageID 3575

49

1   board.  And if you have Slide 13 of the deck, Your Honor --

2   did Mr. Morris give you Slide 13 -- you see -- you see, for

3   example -- are you there, Your Honor?

4           THE COURT:  Uh-huh.

5           MR. RUKAVINA:  You see the first one, June 18th to

6   19th, level and quality of services are being monitored.

7       August 13th.  No disruptions in the services.

8       September 17th.  Current shared services are being

9   provided.

10      October 23rd.  Pursuant to the shared services agreements.

11      Yes, Highland performed under the shared services

12  agreements, except for two minor things that we've put in our

13  trial brief and that we'll talk about that total about $1.3

14  million in damages.

15      What we're talking about here today, the bulk of our claim

16  is under the payroll reimbursement agreement.  So as we

17  proceed with the evidence, the Court needs to be careful to

18  have that separation.  Because the fact that we told the board

19  the truth, that under shared services we were being provided

20  shared services, does not mean that we told the board that,

21  oh, wait, there's a problem under payroll reimbursement.  The

22  two are separate.

23      And I really want to point out two exhibits to Your Honor,

24  if Ms. Canty would do me the favor, or if Your Honor wants to

25  look at them in her binder.  It's Highland Exhibit 58.  Ms.

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document   Filed 05/23/155   Page 272 of 888   PageID 3576

50

 1  Canty, is it possible -- Mr. Morris, are you willing to share

 2  Ms. Canty?

 3       Yes.  Ms. Canty, if you have your own Exhibit 58.

 4       She might not even be listening.

 5       (Pause.)

 6           MR. RUKAVINA:  Is it just easier, Your Honor, if Your

 7  Honor gets a binder?

 8           THE COURT:  I can do that.

 9           MR. RUKAVINA:  Your Honor, it's -- I believe it's --

10  it's Volume 2.  Volume 2 of the Highland exhibits.

11       That's okay, Ms. Canty.  Thank you.  I think this will be

12  faster if we just use binders.

13       Your Honor, it's Exhibit 58, when you're ready.

14           THE COURT:  Minutes?

15           MR. RUKAVINA:  Yes, Your Honor.  On the bottom, it's

16  Page 20.  Just it's a few pages in.  The bottom, it says Page

17  20.

18           THE COURT:  Okay.

19           MR. RUKAVINA:  So, it says Mr. Post also discussed

20  the quality and continuity of services provided to the Funds

21  by HCMLP pursuant to shared services agreements with the

22  Advisors.  And then you'll see that he says that there's no

23  material disruptions in services.

24       What about that is not true?  What about that has anything

25  to do with a multimillion-dollar overpayment under payroll

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 6 Document File 06/21/23 155 Page 273 of 888   PageID 3577

51

1    reimbursement?  But that's what you're being told.  Again,

2    they're trying to confuse the issues.

3        And if Your Honor will quickly flip to Exhibit 61.

4            THE COURT:  Okay.

5            MR. RUKAVINA:  And it's the bottom of Page 3.  And in

6    the very middle you'll see it says, Mr. Sauter also discussed

7    the status of the shared services agreements.

8            THE COURT:  Okay.  The one I have is redacted.

9            MR. RUKAVINA:  Page -- the bottom of Page 3, Your

10   Honor?

11           THE COURT:  Yes.

12           MR. RUKAVINA:  Of this?  The top should not be

13   redacted.

14           THE COURT:  It's not.  Oh, okay.  Yes.  Mr. Morris

15   discussed.

16           MR. RUKAVINA:  And then, yeah, in the middle it says,

17   Mr. Sauter also discussed the status of the shared services.

18           THE COURT:  Okay.  Gotcha.

19           MR. RUKAVINA:  But look at what they say on Slide 13.

20   They say Sauter noted that there has been no material

21   attrition to date with respect to employees.  Where is that in

22   this document?  We'll talk about that later.  That's nowhere

23   in this document.

24       Again, they're intentionally conflating shared services,

25   that we're not saying we didn't get shared services, with

Case 21-03010-sgj    Doc 110    Filed 04/14/22    Entered 04/14/22 15:23:58    Desc Main
Case 3:22-cv-02170-S    Document Filed 02/23/15 Page 274 of 888    PageID 3578

52

1    payroll reimbursement.

2         The facts here matter, Your Honor.  And I caution the

3    Court to be careful because, again, these are separate

4    contracts that have separate provisions and they work

5    separately.

6         You're also going to be told about, oh, well, a lot of

7    these employees weren't even there when the payroll

8    reimbursement agreements were made.  I think Mr. Morris said

9    four.  Yeah, except that they were signed in May to be

10   effective as of January 1.  And if Mr. Klos really is this

11   impeccable, unbribable character of pristine morals, well, did

12   he create a fake agreement?  Did he lie?  Of course not.

13        Again, misdirection.  Misdirection.

14        You are told, well, a lot of these employees left.  What

15   you're going to hear is that a lot of those payroll

16   reimbursement employees, those dual employees, left because

17   the Advisors changed their business model to a real estate-

18   heavy business model, whereas before they had a lot of credit,

19   they had debt, equities.  They changed to real estate.  So

20   that's why 20 out of 25 employees that were dual employees

21   left, because they saw the writing on the wall, not for these

22   other reasons.  Because the argument that you're hearing is,

23   well, don't look at these two contracts, Judge, the payroll

24   contracts.  Consider it a services agreement.  And even though

25   those 20 employees were no longer there, Highland made it up

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 6-23   Filed 10/13/23   Page 275 of 888   PageID 3579

53

1    with other employees that were there.  Therefore, the spirit

2    and intent of the agreement is honored.

3         No.  No, Your Honor.  No.  Highland did not make up those

4    services.  Highland was providing those services pursuant to

5    the shared services agreements, and those dual employees left

6    and they were not replaced, their services were not replaced,

7    because they were no longer needed.  Except guess what?

8    Highland never told us that.  The one we contracted with to

9    review our contracts, to review our bills, to review our

10   invoicing, to make sure that we're paying only appropriate

11   amounts.  You're going to hear from everyone that that was one

12   of the services that we were paying pursuant to shared

13   services.  Highland never bothered telling anyone, oh, we're

14   still going to bill you for these 20 employees that are gone.

15        You've been told that everyone in the world knew those

16   employees were gone.  Of course.  But not that we were still

17   being billed for it.  Because it was only Highland people that

18   billed us for that and paid themselves from our bank accounts

19   which they have control over.

20        Mr. Dondero didn't know.  No officer of the Advisors knew.

21   Mr. Waterhouse knew.  And yes, Mr. Waterhouse was an officer

22   of the Advisors and an officer of the Debtor.  And you're

23   going to hear from Mr. Waterhouse what he tried to do about

24   that.

25        But, again, don't allow that misdirection to color the

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/24/23   Page 276 of 888   PageID 3580

54

1    true record here.  Our contractual counterparty, the one

2    providing services to us, a debtor in bankruptcy, every month

3    was billing us and paying itself from our funds for 20

4    employees who weren't there.

5        And Mr. Klos -- again, the man that we've all be told is

6    the most credible man in this court -- will confirm that.  And

7    he calculated our damages for us.  You're going to see all

8    that.

9        So let's, again, stick to the facts.  The payroll

10   reimbursement agreements are reimbursement agreements.

11   Everyone in the world knows what the word reimburse means.

12   There was not to be any profit margin on there.  We are to

13   reimburse for actual cost.  Actual cost means the actual cost

14   to Highland of a dual employee.

15       Yes, there are some issues with notices and when did we

16   know, when did we act?  You're going to hear all about that.

17   But at the end of the day, if the Court is looking for the

18   intent and purpose of the contract, it is a reimbursement.

19   And each of those have a schedule of 25 employees that was

20   accurate and current -- Mr. Klos himself performed those

21   percentages -- that was accurate and current when those

22   contracts were done.

23       You are then going to hear that Highland, pursuant to its

24   general practices, did a true up or a reconciliation of all of

25   its contracts on an annual basis.

Case 21-03010-sgj    Doc 110    Filed 04/14/22    Entered 04/14/22 15:23:58    Desc Main
Case 3:22-cv-02170-S    Document Filed 05/23/13   Page 277 of 888    PageID 3581

55

1        There is language in these contracts that talks about,

2    well, why don't the parties look at the actual costs every

3    month.  There is that language.  We will discuss that.  But

4    the course of conduct at Highland, both generally and in this

5    case, was to do it once a year at the end, because to do it

6    monthly was burdensome.

7        In the first year of that contract, the parties did a true

8    up, and my clients ended up paying $2.5 million more in

9    because we underpaid.  You're going to hear some fiction that

10   this was some means of getting a tax deduction for Mr.

11   Dondero.  Well, the contracts, again, say what they say, and

12   they say we did a true up -- they don't say that.  We did an

13   analysis and the Advisors underpaid, so now the Advisors are

14   going to pay $2.5 million.

15       So, again, is that a fraudulent document?  Is that

16   Highland document a fraudulent document?  Were people lying on

17   these documents?

18       Then the bankruptcy happens, and it's time for the next

19   true up in late 2019.  Coincidentally, at the same time that

20   the Committee, appropriately so, is asking DSI and asking the

21   Debtor, what are these intercompany agreements?  This -- these

22   are insider agreements.  Explain to us.  Is Highland losing

23   money?  Is Highland making money?

24       So what happens next?  Mr. Klos -- again, the most

25   credible man in this room, we're told -- does an analysis, and

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 05/23/25   Page 278 of 888   PageID 3582

56

1   he says that at that point in time Highland is making a $3

2   million annualized profit on the payroll reimbursement

3   agreements.  Okay.  He also says that Highland is losing money

4   on the shared services agreements.  That's true.  But, again,

5   don't allow that misdirection.  On the payroll agreements,

6   Highland is at that point in time making a $3 million profit.

7        He tells Mr. Waterhouse, his boss, did you know about

8   these overpayments?  You should do something about that.  And

9   Mr. Waterhouse, a professional man, does what he should do.

10   He talks to the general counsel at Highland and he talks to

11   the CRO and DSI and says, it's time that we revise these

12   numbers, because we're overpaying, the Advisors are overpaying

13   by $3 million a year, and that's not fair, it's not right.

14   That's extra-contractual.  The general counsel, the associate

15   general counsel, and the man who's been in bankruptcy for 30

16   years tell him there's nothing we can do because of the

17   automatic stay.  We will address it and deal with it in due

18   course.

19        What more was Mr. Waterhouse supposed to do at that time?

20   Call Mr. Dondero?  His own general counsel and his own CRO

21   just told him what the law is, and he relied on that and

22   believed them and said, okay, there's nothing to be done at

23   this time, we'll address it in due course.

24        Months go by.  Months go by.  The overpayments become

25   greater and greater and greater as there's fewer and fewer

002960

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 05/27/23   Page 279 of 888   PageID 3583

57

1    employees.  Mr. Waterhouse is still acting in reliance on

2    this.  You know that there were negotiations on a global plan.

3    Well, at some point in September or October 2020, the

4    situation was no longer tenable.  That's when Mr. Norris comes

5    in, my client's officer.  Yes, he's a marketing guy, but he's

6    a very sophisticated businessman with a lot of education, and

7    he's tasked with this.

8         He starts talking to Mr. Kos.  He starts talking to Mr.

9    Waterhouse.  He starts talking again to the lawyers.  Hey, we

10   are overpaying.  And Mr. Klos, you'll hear, repeatedly

11   acknowledged the fact of overpaying.  But he's again told the

12   automatic stay applies, you can't do nothing.  If you send a

13   letter, if you do anything, it's going to be a stay violation.

14        You'll recall we had a preliminary injunction hearing at

15   which the Court was none too happy about a letter sent from

16   K&L Gates to the Pachulski firm threatening action subject to

17   the -- subject to the automatic stay.  They hauled us in front

18   of Your Honor on an emergency hearing on that.  Imagine if we

19   sent them a letter saying, we're going to revise this

20   contract, or we're going to terminate this contract.  That

21   would have been a stay violation.

22        But all along, the contract says that once the issue is

23   raised, once a change is requested, the parties shall

24   negotiate in good faith.  Shall negotiate in good faith.

25   That's not meaningless language.  And there was no

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 05/23/15   Page 280 of 888   PageID 3584

58

1  negotiation.  Repeated admissions of overpayments, no

2  negotiations, but hiding behind the automatic stay, perhaps

3  appropriately, perhaps not.

4     And then finally in December 2020 I think the key evidence

5  here will come out, because it happened before litigation.  It

6  happened by a professional, honorable man of integrity that

7  you've heard, Mr. Klos.  It happened when we were not

8  contemplating being here today.  Mr. Klos was asked by Mr.

9  Waterhouse to calculate the profitability or the loss of

10  Highland on these four contracts.  He was told, or he assumed,

11  or he may -- well, the evidence differs.  Mr. Klos will say

12  Mr. Waterhouse told him to make assumptions.  Mr. Waterhouse

13  will say it was Mr. Klos's assumptions.  It doesn't matter.

14  There were two assumptions in the work product that Mr. Klos,

15  this professional accountant, prepared.  Use actual headcount

16  today.  Not the original 25, but the actual headcount today,

17  which was five.  And do not include bonuses.  Highland didn't

18  pay insider bonuses, which were a huge amount.  There were

19  other bonuses paid, so the numbers need to be adjusted a

20  little bit.  Mr. Klos didn't include any bonuses.

21     And he said at that point in time, in December 2020,

22  Highland was making an annualized $6.6 million profit on the

23  payroll reimbursement agreements and a $1 million annualized

24  profit on the shared services agreements, even though you

25  heard in this Court repeatedly from Highland employees and

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 59/26/15   Page 281 of 888   PageID 3585

59

1   witnesses that, oh, we're losing money on all these contracts.

2        So, is Mr. Klos a liar?  Is he -- is he a nincompoop who

3   can't do his job?  Is he changing his story now?  How could

4   there have been a $6.6 million profit on one and a $1 million

5   profit on the others when the contracts (inaudible) profits

6   then?  Did he create a fictitious document then?  No.  He did

7   his job as he should have, and that is the key evidence here.

8   That is the key evidence.

9        What this trial will come down to, Your Honor, is the

10  contract.  Whether my clients had an obligation under the

11  contract -- because, again, the fact of overpayment cannot and

12  will not be disputed.  Twenty of twenty-five employees weren't

13  there.  We can quibble about damages, but the fact of

14  overpayment will not be disputed.  Cannot be disputed.  The

15  question is, again, did my clients waive their rights because

16  they did not more frequently or more formally trigger the

17  process of revisiting the actual cost formula?

18       Those contracts are very clear.  There's no need for parol

19  evidence.  There's no ambiguity.  The fixed monthly amount

20  stays unless changed at the request of either party, upon

21  which time the parties shall negotiate such change in good

22  faith.

23       We requested it repeatedly.  They stood behind the

24  automatic stay.  And the Court will have to construe that

25  contract as a matter of law and decide whether that is a

Case 21-03010-sgj    Doc 110    Filed 04/14/22    Entered 04/14/22 15:23:58    Desc Main
Case 3:22-cv-02170-S    Document 6-23  Document  Filed 10/21/22  Page 160 of 155  Page 282 of 888    PageID 3586

60

1    waiver or not.

2        There's no other waiver.  There's no voluntary payment

3    rule.  The voluntary payment rule doesn't apply to contracts.

4    And we weren't paying these bills.  Highland was paying

5    itself.

6        And that's the thought I want to leave you with, Your

7    Honor.  That's the thought I want to leave you with, that your

8    Debtor, who has gotten immense protections from this Court,

9    fiduciaries to the estate, every single month billed my client

10   for almost a million dollars more than they were entitled to

11   under these contracts because there was no reimbursement by

12   this Debtor of its own employees.  Month after month, with

13   knowledge that these employees weren't there, with knowledge

14   that Highland was making a profit on these contracts when it

15   was not allowed to, they billed my clients and paid themselves

16   for employees who were not there.  Whether it's contract or

17   equity or just good business ethics or just being a good

18   debtor-in-position, that ought to bother the Court.  That

19   ought to bother the Court, and that's why we have an

20   administrative claim.

21       Thank you.

22           THE COURT:  All right.  Thank you.  It's 11:01.

23   We'll take a ten-minute break and come back and hear the

24   evidence.

25           THE CLERK:  All rise.

002964

 1        (A recess ensued from 11:01 a.m. until 11:15 a.m.)

 2             THE CLERK:  All rise.

 3             THE COURT:  All right.  Please be seated.  We're back

 4   on the record in the Highland matter.

 5        Mr. Morris, are you ready to call your witness?

 6             MR. MORRIS:  Good morning.  Yes, Your Honor.

 7   Highland calls as its first witness David Klos.

 8             THE COURT:  All right.  Mr. Klos?  Okay.  If you

 9   could approach the witness box, I'll swear you in.  Please

10   raise your right hand.

11        (The witness is sworn.)

12             THE COURT:  All right.  Thank you.  You may be

13   seated.

14                  DAVID KLOS, DEBTOR'S WITNESS, SWORN

15                       DIRECT EXAMINATION

16   BY MR. MORRIS:

17   Q    Good morning, Mr. Klos.

18   A    Good morning.

19   Q    So, I'm going to ask you some questions this morning.  And

20   I would ask you to listen carefully to my questions and do the

21   best you can to answer them.  Okay?

22   A    Absolutely.

23   Q    I've put before you, or Mr. Rukavina and I have put before

24   you some binders.  There is two binders that have Highland's

25   exhibits and there is one binder that has the Advisors'

                                                           002965

Klos - Direct                                    62

1    exhibits.  And from time to time I may ask you to pull

2    documents out.  But that's what those -- that's what those big

3    binders are in front of you.

4    A    Okay.

5    Q    Are you comfortable?  Are you prepared to proceed?

6    A    Yes.

7    Q    Okay.  Mr. Klos, you're familiar with Mr. Waterhouse,

8    obviously, right?

9    A    Yes.

10   Q    Okay.  And did you understand that Mr. Waterhouse served

11   as Highland's chief financial officer at least for the five-

12   year period through 2021?

13   A    Yes.  He -- he elevated to that role in the 2011-2012 time

14   frame.

15   Q    Okay.  And are you aware that at the same time he served

16   as Highland's CFO he also served as the treasurer of each of

17   the Advisors?

18   A    Yes.

19   Q    And are you aware that Mr. Waterhouse, in his dual

20   capacity as the CFO of Highland and as the treasurer of the

21   Advisors, he's the one who signed the payroll reimbursement

22   agreements?

23   A    Yes.  That's correct.

24   Q    And the payroll -- do you recall that the payroll

25   reimbursement agreements had the list of dual employees?

002966

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 10/13/23   Page 285 of 888   PageID 3589

Klos - Direct                                                    63

1    A    Yes.

2    Q    And from the time the -- for the three-year period from

3    December -- from January 1, 2018 until the end of 2020, was it

4    Mr. Waterhouse's practice to approve each and every payment

5    that was made on behalf of the Advisors pursuant to not just

6    the payroll reimbursement agreements but all of the

7    intercompany agreements?

8    A    Yes.  That was the general practice.

9    Q    Can you just describe for the judge your understanding of

10   how that practice operated?

11   A    For making the payments?

12   Q    Yes.

13   A    Yes.

14   Q    Approval.  Approval of the payments.

15   A    Yes.  Yeah, I mean, generally speaking, our assistant

16   controller, usually Kristin Hendrix, would -- would prep wires

17   on an ongoing basis, whether first of the month or just weekly

18   type wires.  She'd send an approval email to Frank saying,

19   here are the wires for today.  Okay to release?  Or something

20   like that.  And Frank would respond with yes, or if he had

21   questions then he might -- he might chime in.  But usually

22   just an approval.

23   Q    Okay.  Can you just -- are you currently employed, sir?

24   A    Yes.

25   Q    And who's your employer?

1    A    Highland Capital.

2    Q    And what's your title today?

3    A    CFO and COO.

4    Q    And when did you first join Highland?

5    A    End of March 2009.

6    Q    And during the period -- let's -- I'm going to use the

7    phrase "the relevant period" to mean from January 1, 2018

8    until the end of 2020, that three-year period.  Is that okay?

9    A    That's fine.

10   Q    Okay.  During the relevant period, what titles did you

11   hold at Highland?

12   A    I was controller through April of '20, and then I was

13   chief accounting officer from April '20 forward.

14   Q    Okay.  And you reported to Mr. Waterhouse, correct?

15   A    Yes.  Throughout.

16   Q    Okay.  Now, can you describe generally for Judge Jernigan

17   what your duties and responsibilities were as the controller

18   and the chief accounting officers during the relevant time?

19   A    Sure.  And I'll qualify that I had responsibilities over

20   different departments.  But as it pertains to this matter, I

21   was the department head for corporate accounting group, so the

22   group that does the Advisor accounting both for HCMLP as well

23   as other call it non-fund advisor or proprietary-type

24   entities, and oversaw a team of -- that encompassed the A/P

25   and the general accounting function for those entities.

002968

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 06/16/23   Page 287 of 888   PageID 3591

Klos - Direct                                    65

1  Q    I'm going to use another term, I'll just call it "the

2  intercompany agreements," to refer to the payroll service

3  agreements and the shared services agreements between Highland

4  and the Advisors.  Is that okay?

5  A    Yes, that's fine.

6  Q    Okay.  Did you personally play any role in the

7  preparation, creation, and administration of the intercompany

8  agreements during the relevant period?

9  A    Yes.  And even outside the relevant period, because one of

10  the shared services agreements is long in the tooth and goes

11  back to the 2012 time frame, and I was -- I was involved in

12  that one as well.

13  Q    Okay.  And can you just describe generally -- well, we'll

14  talk about the details of it.  Let's take you back to December

15  2017, the month before the beginning of the relevant period.

16  Do you have a recollection as to how Highland was performing

17  on an operating basis in 2017?

18  A    Yes.  It was performing poorly.  Assets were being shed.

19  A lot of our business had been CLOs, which had been steadily

20  declining over the years.  They were past their reinvestment

21  period, so assets declined, cash flow declined, and by that

22  time we were cash flow negative.  At HCMLP proper.

23  Q    Okay.  And did you participate in any discussions within

24  Highland in December 2017 as to how Highland might address

25  these operating losses?

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 06/23/22   Page 288 of 888   PageID 3592

Klos - Direct                                              66

1  A    Yes.  So we had standing weekly cash -- cash meetings

2  between myself, the CFO, and usually Kristin would participate

3  in those, and then we would also meet with Mr. Dondero from

4  time to time on those cash meetings.  And we did have such a

5  meeting in December of 2017.

6  Q    Can you describe for Judge Jernigan your recollection of

7  the meeting that was had in December of 2017 where the issue

8  of -- how the losses were going to be addressed?

9  A    Absolutely.  And I caution, I don't remember the

10 specifics, the specifics in terrible detail of that meeting,

11 but I'm certain that it was me, Frank, and Jim Dondero.  And

12 that the substance of that meeting -- again, I don't know if

13 this was coming from Jim or from Frank and I -- was we're

14 really bleeding cash quickly.  We need more cash at Highland

15 to operate, to pay bills, to do what we need to do, because we

16 always operated very lean across the entire structure.  And,

17 you know, Jim, can you -- can you help with that?  Help us

18 solve this problem.  And the solution that was given to us, my

19 recollection, I think that the -- the idea was that you would

20 just increase the shared services agreement that was already

21 in place with NexPoint, and Mr. Dondero had this idea of

22 bifurcating it, create a new agreement, such that NexPoint is

23 paying Highland six in the aggregate on a prospective basis.

24 Q    And six meaning $6 million?

25 A    $6 million.  I apologize.

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 06/27/23   Page 289 of 888   PageID 3593

Klos - Direct                          67

1    Q   And is your recollection that Mr. Dondero gave the

2    instruction to increase the amount that NexPoint was paying to

3    Highland for the services rendered, should be -- should be

4    increased to $6 million?

5    A   Yes.  Because at the time, NexPoint was paying Highland

6    about, annualized, $1.2 [million] per year.  So this was a

7    significant step up.

8    Q   Okay.  And did you personally do any work to try to figure

9    out how to execute on Mr. Dondero's instruction?

10   A   Just in the sense of -- I think I passed that off to one

11   of the employees that worked under me to work with Legal to

12   work through drafting of agreements to update to reflect that,

13   that desire.

14   Q   Okay.  I'm going to ask you to turn to Exhibit 130.

15   1-3-0.

16   A   Okay.  I'm there.

17   Q   And I'll just ask generally -- take a moment to look at

18   it.

19   A   Yep.  I'm there.

20   Q   Do you recall that in late December, early January of the

21   relevant period, you were engaged in discussions with some of

22   your colleagues about how to document the $6 million

23   direction?

24   A   Yes.

25   Q   Okay.  Directing your attention to the email that you sent

Klos - Direct                              68

1   on January 4th at 3:16 p.m., which can be found on the

2   document ending in Bates No. 47, --

3   A    I'm there.

4   Q    -- I see there's a chart.  Can you explain to the judge

5   what you're conveying in that chart?

6   A    Sure.  There are -- there are four agreements that are

7   going to be put in place to get to the -- to the $6 million

8   number in the aggregate.  You see one of them, the one that's,

9   at least on my thing, is highlighted, there's one that's an

10  intercompany between parent and sub, NexPoint/NREA.  For our

11  purposes today, that's kind of irrelevant.

12       But for the other three, you have Highland HCMLP as the

13  service provider, and you see the breakdown of those -- those

14  three agreements between $252,000 per month for subadvisory --

15  sorry.  $168,000 to NexPoint Advisors for shared services.

16  And then $80,000 for -- from NexPoint to NREA for shared

17  services.

18       And so the sum of those of three amounts to HCMLP,

19  $252,000 plus $168,000 plus $80,000, equals $500,000 a month,

20  times 12 is the $6 million number that we had talked to Jim

21  about, you know, within a month.

22  Q    Okay.  So, as of January 4, 2018, this was the idea that

23  you and your colleagues came up with on how to execute the $6

24  million directive; is that fair?

25  A    That's -- that's -- generally.  That's right.

002972

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 06/23/15age 291 of 888   PageID 3595

Klos - Direct                                69

1   Q   Okay.  I just want a stop for a second.  You know, you

2   refer in this to subadvisory, SubADV.  Can you just explain to

3   Court what your understanding is of what subadvisory services

4   are and -- I'll just stop there.

5   A   In the most general sense, investment advice to client

6   funds.  So, in the context of this, you have the Retail

7   Advisors that are the named advisor, but you also have

8   Highland people, HCMLP employees that are providing services.

9   So this is a mechanic for those employees to give that service

10  to the Funds, give investment advice, which is a little bit

11  different than the shared service, which tends to be back and

12  middle-office operational-type services.

13  Q   Okay.  Do you know if Highland provided subadvisory

14  services to the Advisors prior to January 1, 2018?

15  A   Yes.  Not pursuant to an agreement, but the services were

16  provided going back to -- to when those contracts were moved

17  from Highland back in the twenty -- I want to say 2012 time

18  frame.

19  Q   So, for approximately six years, Highland had provided

20  subadvisory services to the Advisors for no compensation?  Do

21  I have that right?

22  A   That's correct.

23  Q   Okay.  Did anybody during that six-year period from

24  Highland say, oh, gee, we should be getting paid for

25  subadvisory services?

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document File 04/17/23   Page 170 of 155age 292 of 888   PageID 3596

Klos - Direct                                    70

1    A    No.  No one said that.

2    Q    At this time, Mr. Dondero controlled the Advisors and

3    Highland, correct?

4    A    That's right.

5    Q    Why the change at this time, then?  Why go, after six

6    years of not paying for subadvisory services, to all of a

7    sudden creating an agreement pursuant to which subadvisory

8    services -- fees would be paid?

9              MR. RUKAVINA:  Your Honor, object.  There's a lack of

10   foundation.  He didn't sign those contracts and there's no

11   predicate been laid as to why.

12             THE COURT:  Response?

13             MR. MORRIS:  The witness has already testified that

14   he's the person -- I mean, look at his email.  He's the one

15   who's responsible for allocating money under these various

16   agreements.  I can -- I'll ask -- I'll ask a foundational

17   question.

18             THE COURT:  Okay.  He'll ask --

19   BY MR. MORRIS:

20   Q    As part of the discussions, did anybody talk about why the

21   subadvisory agreement was going to be adopted at that moment

22   in time?

23   A    In a general sense, yes.  It was going to be providing for

24   the services that had already been provided, but to have

25   Highland be able to start earning a fee for that service.

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 12/23/55 Page 293 of 888   PageID 3597

Klos - Direct                                    71

1    Q    And was there discussion at that time that the fee that

2    would be paid to Highland would not only give Highland access

3    to needed capital but it would also provide a shield to the

4    taxable income of the Advisors?

5              MR. RUKAVINA:  Your Honor, that's leading.

6              THE COURT:  Sus...

7              MR. RUKAVINA:  And again, what is the -- I'm sorry.

8    I'm sorry, Your Honor.

9              THE COURT:  I'm going to sustain on leading.

10             MR. MORRIS:  Okay.  Fine.

11   BY MR. MORRIS:

12   Q    Can you tell me what the reasons were for entering into

13   these agreements?  What were the -- what were all of the

14   reasons that were discussed at that time?

15   A    Yeah.  The reasons I remember specifically were need for

16   cash flow at Highland, because Highland was negative on cash

17   flow, and need for a deduction at NexPoint, because NexPoint

18   was generating taxable income that indirectly flowed -- flowed

19   up to Mr. Dondero.

20   Q    And when you wrote your email and you said that the

21   subadvisory fee should be $252,000 a month, had you done an

22   analysis of the actual cost to Highland of providing those

23   services?

24   A    No.

25   Q    Did anybody ask you to make sure that the $252,000 was

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document   Document Filed 06/17/22 155   Page 294 of 888   PageID 3598

Klos - Direct                                      72

1    tied to the actual cost of services being delivered?

2    A    Not at all.

3    Q    Was the $252,000 number that was allocated to the

4    subadvisory agreement related in any way to the cost of

5    providing services?

6    A    No, just in the sense that it was a -- you know, that

7    there was service being provided for value.  But in terms of

8    the actual number, no.

9    Q    Did the Advisors -- do you know whether Highland went out

10   and tried to determine what the value of their services were

11   to make sure that they were getting fair value for the

12   services?

13   A    Absolutely not.  It would have been a preposterous

14   proposition to do that.

15   Q    Was there any discussion at any time as to whether or not

16   the Advisors should go out into the marketplace to see whether

17   they could obtain these subadvisory services at a price less

18   than $252,000?

19   A    No discussion.  And you have to keep it in context,

20   because this all was a single complex.  So you had people that

21   were being used across different Advisors to support the

22   complex's goals.  And they were being used that way.  And, you

23   know, I think -- I think Mr. Dondero was generally happy with

24   the people and the team.  And so this is all behind the

25   scenes, just transferring money between, you know, pockets

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 07/23/23   Page 295 of 888   PageID 3599

Klos - Direct                                73

1   that he -- that he has.

2   Q   Was there any discussion at that time as to whether or not

3   Highland would make a profit off of a $252,000 subadvisory

4   contract?

5   A   No.

6   Q   Was there any discussion at that time as to whether

7   Highland should or shouldn't make a profit under the

8   subadvisory agreement?

9   A   No.

10  Q   You mentioned that -- in your email that the sub -- the

11  shared services would be at $168,000.  Do I have that right?

12  A   Correct.  With respect to the NexPoint Advisors, LP

13  agreement, --

14  Q   Okay.

15  A   -- yes.

16  Q   And do you have an understanding as to whether or not that

17  --

18          MR. RUKAVINA:  Your Honor, again, objection.

19  Leading.  The question should be, What is your understanding,

20  not, Do you have an understanding that--?

21          THE COURT:  Well, I'll let him ask the whole

22  question.

23          MR. RUKAVINA:  But that's the problem, because then

24  the witness will hear the question, and then my objection will

25  be irrelevant.

```
 1            MR. MORRIS:  Okay.
 2            THE COURT:  I'll sustain.  I'll let you rephrase the
 3    question.
 4            MR. MORRIS:  Okay.
 5    BY MR. MORRIS:
 6    Q   Was the hundred and -- so, were these -- were these
 7    numbers -- did you intend, when you wrote these numbers, --
 8            MR. RUKAVINA:  Objection, Your Honor.  Again,
 9    leading.  Did you intend?  It's -- the question should be,
10    What did you intend?
11            MR. MORRIS:  I don't --
12            MR. RUKAVINA:  It's a leading question.  Did you
13    intend that--?  The question, the question has the answer
14    within it, Your Honor.
15            THE COURT:  Okay.
16            MR. MORRIS:  Mr. Klos, --
17            THE COURT:  Sustained.
18    BY MR. MORRIS:
19    Q   -- were these numbers intended to be variable?
20    A   No.
21    Q   And when you say that, what do you mean?
22    A   What I mean by that is we already had the direction, $6
23    million was going to be the number from NexPoint Advisors,
24    including subsidiaries, to HCMLP.  So the numbers were already
25    known.  And just as I was explaining before, there's three
```

002978

Case 21-03010-sjg   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 07/25/23 155 Page 297 of 888   PageID 3601
Document   Page 175 of

Klos - Direct                                            75

1   components to it, but $252,000, $168,000, and $80,000 gets you

2   to the $500,000 per month or $6 million per year.

3   Q    And was the $168,000 for shared services by NexPoint, was

4   that a change in the methodology by which the fee would be

5   calculated?

6   A    Yes.  Yeah.  Yeah, it was a change.

7   Q    Can you get -- please turn to Exhibit 29?

8   A    Okay.  I'm there.

9          MR. MORRIS:  All right.  Let me know when you have

10  that, Your Honor.

11         THE COURT:  Uh-huh.

12  BY MR. MORRIS:

13  Q    Okay.  Do you know what that document is, Mr. Klos?

14  A    I do.  This appears to be the original shared services

15  agreement between Highland Capital Management, LP and NexPoint

16  Advisors that went all the way back to 2013.  So this was the

17  predecessor for the 2018 amendment.

18  Q    And can you turn to Page 4, Section 4.01?

19  A    Okay.  I'm there.

20  Q    Do you have an understanding as to how NexPoint paid

21  Highland for shared services prior to January 1, 2018 under

22  this provision?

23  A    Yes.  It was all -- it was all pursuant to 4.01(c) that

24  has a little bit of a long, convoluted discussion, but at the

25  end of the day, just boiling it down, what this -- what this

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 07/26/23 155age 298 of 888   PageID 3602

Klos - Direct                              76

1   section means is that Highland was going to be charging

2   NexPoint Advisors 10 basis points on assets managed by the --

3   I think it was NHF at the time, NexPoint Strategies Fund, and

4   it was going to be charging 15 basis points on basically all

5   other assets of that fund, and that that was going to be --

6   that was, I think it's a defined term, that was actual cost,

7   notwithstanding that that concept is completely divorced from

8   cost.

9   Q    And how is the issue of actual cost completely divorced

10  from cost?

11  A    Because the charge itself was being generated off of the

12  assets managed by a single fund, and that -- I don't know how

13  else to say it other than that has -- that has nothing to do

14  with cost.

15  Q    Okay.

16  A    What it does have to do with was that that was a charge --

17  that was a fund that charged 120 basis points, so NexPoint was

18  earning 120 basis points and it was paying some blend of 10 to

19  15, so it was pocketing 90 percent of the revenue.

20  Q    And can you explain to the judge why the change was made

21  from a formula depending on asset values to a fixed fee of

22  $168,000 a month?

23  A    Yeah.

24          MR. RUKAVINA:  Your Honor, objection, based on

25  foundation.

002980

 1          MR. MORRIS:  Your Honor, he has testified to

 2   everything already.

 3          MR. RUKAVINA:  No, he hasn't, Your Honor.  He hasn't

 4   testified that he knows why this change was made or that

 5   anyone told him why this change was made or that he made this

 6   change.  He's speculating.

 7          THE COURT:  I overrule the objection.

 8          THE WITNESS:  So, the reason to switch it to fixed

 9   is, again, you already know the answer, so the answer is $6

10   million, the answer -- the split is going to be roughly 50/50.

11   It's a little bit -- it's a little bit weighted to the -- to

12   the subadvisory.  Why are you introducing any variability when

13   you already know the answer?

14   BY MR. MORRIS:

15   Q    Okay.  And the answer here was what?

16   A    The answer here was $168,00 with respect to NexPoint

17   Advisors, $80,000 with respect to NexPoint Real Estate

18   Advisors.  And then, like I said, on the subadvisory,

19   $252,000.

20   Q    Okay.  Can you turn to Exhibit 3, please?  And can you

21   describe for the Court your understanding of what that

22   document is?

23   A    Exhibit 3, you said?

24   Q    Yes.

25   A    Ah.  So this, this is the amended and restated agreement

1   for NexPoint Advisors.

2   Q    Okay.

3   A    So this, this is the agreement that updates to the fixed

4   $168,000.

5   Q    Okay.  And if you can turn to last page, the one ending at

6   Bates No. 647.  Are you familiar with those signatures?

7   A    Yes, I am.

8   Q    And what's your understanding of who signed this contract?

9   A    So, this contract was by Frank Waterhouse.

10  Q    Okay.  And when was this contract effective?

11  A    This was effective January 1st of 2018.  I believe it was

12  executed in the early part, around -- on or around January

13  11th, my recollection.

14  Q    Okay.  Can you turn to Page 9, please?

15  A    I'm there.

16  Q    In Section 3.01, is that the section that sets forth the

17  provision for compensating Highland for shared services by

18  NexPoint?

19  A    I'm sorry.  What's the exhibit again?

20  Q    It's Exhibit 3, Page 9.

21  A    Oh.  I'm sorry.  I went to Exhibit 9.

22  Q    I may have -- I may have misspoken.

23  A    Exhibit 3, Page 9?

24  Q    Right.

25  A    Okay.  Okay.  I'm there.

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 07/29/23   Page 179 of 155   Page 301 of 888   PageID 3605

Klos - Direct                                    79

1   Q   And can you describe for the Court your understanding of

2   what Section 3.01 provides?

3   A   Yes.  It's providing for what I was -- what I was just

4   explaining, which is the flat fee of $168,000 per month.

5   Q   So, did this agreement put into practice what was in your

6   email?

7   A   Yes.

8   Q   Okay.  Did you personally, as the controller of Highland

9   at the time, did you have any view as to whether or not $6

10  million was the right number of compensation for subadvisory

11  and shared services by NexPoint?

12  A   I don't know that I had a view on that that was the right

13  number, but it was certainly a number in the right direction,

14  because the previous charges, like -- as you mentioned

15  earlier, there were no previous charges for any of the front

16  office services, and the back office services were locking in

17  a 90 percent profitability.  So it was -- it was a step in the

18  right direction.  Hard to say if that was the perfect number,

19  but a stopped clock tells the right time twice a day, so at

20  some point maybe.

21  Q   Did you personally do any analysis in late 2017 or early

22  2018 to determine whether $6 million was fair value for the

23  subadvisory services and shared services that Highland was

24  providing?

25  A   No.

Klos - Direct                              80

1   Q    Are you aware of anybody doing any such analysis?

2   A    No.

3   Q    Did you do any analysis to assess on a holistic basis

4   whether Highland was going to make a profit off of the $6

5   million for shared and subadvisory services?

6   A    In a way.  Maybe not directly, but, you know, around that

7   same time we were preparing our annual presentation for Jim,

8   so we had a sense of what the Advisors were -- where they were

9   shaking out in the future.

10  Q    Okay.  We'll look at that in a moment.  On your email,

11  there was the $80,000 for NREA.  Do I have that right?

12  A    Yes.

13  Q    Can you just explain to the Court what that referred to

14  and why that was part of your email?

15  A    Yes.  So, NREA, NexPoint Real Estate Advisors, LP, is a

16  wholly-owned subsidiary of NexPoint Advisors.  At the time, I

17  believe it just had a single entity that it provided services

18  for, which was a public REIT with a ticker NXRT.  And so there

19  were services being provided by Highland people to that

20  advisor to basically keep that REIT functioning.

21  Q    Okay.  You just mentioned an annual review.  Did you

22  participate in an annual review?

23  A    Yes.

24  Q    And can you describe for the Court the process of the

25  annual review?

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/14/22   Page 303 of 888   PageID 3607

Klos - Direct                                    81

1   A    Yes.  So, going back to I want to say 2013, myself and

2   Frank would generally meet with Mr. Dondero and Mr. Okada at

3   the end of the -- at the beginning of the year.  And, really,

4   the purpose of that agreement, or that meeting, was to sit

5   down, review the year that we just had, what happened, who

6   came, who went, what were our wins, what were our losses, and

7   then -- and then talk about the year to come, how we're

8   projecting what's on the horizon, and then also, you know, we

9   had -- our bonus process culminated at the end of February, so

10  this was a good opportunity to start getting initial feedback

11  from Jim on where he saw the compensation pool for that coming

12  year.  And this was a good way to wrap that all together, try

13  to be objective, and give him the data to kind of do his own

14  evaluation of what kind of a year we just had.

15  Q    Okay.  In connection with the annual review, did you

16  prepare written information?

17  A    Yes.

18  Q    Can you describe for Judge Jernigan what information you

19  prepared and how you went about preparing it?

20  A    Yes.  So, the information, my recollection, it was usually

21  like a 40 to -- 40- to 60-page type presentation, a slide

22  deck.  And it would include financials from the previous year,

23  a section on HR, a section on forward-looking projections, a

24  section on fund performance across the platform, and probably

25  a few other things that I'm forgetting up here.

1   Q   And did you obtain information from other areas of the

2   enterprise?

3   A   Yes.  So that was a -- it was a collaborative process.  I

4   would work on it, I would delegate some parts of it to my

5   team, and then also go to other departments for some of the

6   information as well.

7   Q   Would Mr. Waterhouse have an opportunity to review the

8   deck before it was presented to Mr. Okada and Mr. Dondero?

9   A   Yes.  Absolutely.  We would meet on it ahead of time, he

10  would provide comments, and we would -- I would work through

11  incorporating those comments.

12  Q   So do you recall preparing a deck for the review of 2017

13  and for the outlook of 2018?

14  A   Yes.

15  Q   Okay.  Let's take a look at Exhibit 86, please.

16  A   Okay.

17  Q   Do you know what this is?

18  A   Yes.  This is -- these are materials I was just referring

19  to.

20  Q   And do you recall meeting -- having the annual review

21  meeting on or around January 26, 2018?

22  A   Yes.  Right around that time.

23  Q   And can you describe for the Court just the setting that

24  you recall about this meeting?

25  A   Yes.  This was always an in-person meeting, so this would

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/18/23   Page 305 of 888   PageID 3609

Klos - Direct                                           83

1   have been in Jim's adjacent conference room, with, again, me,

2   Frank, Jim, Mark.  I can't remember, it's possible that Sean

3   Fox might have sat in, but I don't remember specifically.

4   Q   Okay.  Let's just take a look at some of the information

5   in here.  If we can turn to the second page, the executive

6   summary.

7   A   Okay.  I'm there.

8   Q   Do you see there's a bullet point that begins, The

9   platform will continue experiencing operating cash shortfalls?

10  A   Yes.  I see that.

11  Q   Can you just tell the judge what that and the bullet point

12  underneath were intended to convey?

13  A   Yes.  So, by cash shortfalls, hopefully self-explanatory.

14  On an operating basis, we're burning cash.  And what the sub-

15  bullet is saying is that overall operating income -- and by

16  that I mean operating income across all of the affiliate

17  Advisors -- is projected at, you know, positive $.9 million.

18  But on a standalone basis for HCMLP, it's negative 12.

19  Q   Uh, --

20  A   And I -- if I can add one more thing.  The clause at the

21  end there is just -- is -- this is -- this is kind of a

22  tickler for Jim to remind him you have substantial other

23  investment commitments.  You're invested in private equity

24  funds that call capital.  So Highland is losing 12, but then

25  you're also going to need to generate more cash to fund those

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/14/23   Page 306 of 888   PageID 3610

Klos - Direct                                          84

1    commitments as well.

2    Q    Can you turn to Slide 6 in this deck, the one with Bates

3    No. 308?

4    A    I'm there.

5    Q    Can you describe for the Court what this shows?  Just

6    generally?

7    A    Yes.  So this is a balance sheet, so it's a point-in-time

8    look at the assets and liabilities of -- we're saying

9    consolidated, meaning Highland -- it's in the -- it's

10   contained in the Footnote 1.  Highland, Highland Capital

11   Management Fund Advisors, NexPoint, including its

12   subsidiaries, Acis Capital Management, and then three other

13   kind of rounding error-type Advisors:  Falcon, Granite Bay,

14   and Highland Healthcare Advisors.

15   Q    And was it the practice in Highland at this time to look

16   at the enterprise from a holistic point of view?

17   A    Absolutely.

18   Q    Okay.  And if we could just flip some of the pages here,

19   would the same holistic enterprise view be reflected on Slide

20   11 and being in Bates No. 313?

21   A    Let me just make sure I'm on the right slide.  The -- it

22   has Consolidated P&L --

23   Q    Yes.

24   A    -- with a footnote?  Yes.  That's correct.  Same -- same

25   view.  Same entities incorporated.

002988

Case 21-03010-sgj    Doc 110    Filed 04/14/22    Entered 04/14/22 15:23:58    Desc Main
Case 3:22-cv-02170-S    Document Filed 08/15/23    Page 307 of 888    PageID 3611

Klos - Direct                                85

 1    Q    Meaning -- does that mean that the view on this slide was

 2    looking at the profits and loss for the Highland enterprise at

 3    a whole -- as a whole, without regard to its component pieces?

 4    A    Correct.  And along those same lines, all -- it's part of

 5    the reason we refer to them as intercompany.  They're all

 6    intercompany, so they all just eliminate.  So that activity

 7    isn't even shown on here because it all cancels each other

 8    out.

 9    Q    All right.  We'll talk about that more in a moment.  And

10    the same would be true of Slides -- tell me if it's different

11    or if you can confirm that the following slides are also

12    presented on a consolidated basis:  Slide 13, 14, 15, 16, 17,

13    18?

14    A    Um, yes, yes to all, although I'm not sure on 18, if you'd

15    just bear with me for a moment.

16    Q    Uh-huh.

17         (Pause.)

18    A    It -- it appears 18 is consolidated, but I'm not a hundred

19    percent sure.  I'm 90 percent sure.

20    Q    Okay.  Can you go to Slide 29, please?  Can you describe

21    for the Court what Slides 29 to 30 -- through 33 convey, what

22    type of information?

23    A    Yes.  So this was what I was referring to in terms of some

24    of the -- a refresh on what happened over the course of the

25    year.  So, hey, Jim, here's -- here's what happened over the

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 16/23/155   Page 308 of 888   PageID 3612

Klos - Direct                                    86

1   course of the year from an HR perspective.  Here are people

2   that transferred roles.  Here are people that were promoted

3   during the year.  Here's a view on headcount.  I'm flipping

4   from Slide 29 to Slide 30.

5       31, here's a summary of all the people we hired over the

6   year.  And, again, this is agnostic as to Highland Capital

7   Management versus the other Advisors.  This is looking at it

8   all holistically.  Although it is subdividing between our

9   broker-dealer and everybody else, so I should -- I should

10  point that out.

11      And then Slide 32, 2017 Terminations.  Here's a summary of

12  all the people that terminated over the course of the year.

13  Q   Did Brian Collins participate in these meetings at all?

14  A   He didn't participate in the meetings, but he would help

15  on some of the document-gathering and helping me validate the

16  accuracy.

17  Q   Okay.  Let's go to Slide 34, please.  The first bullet

18  point is about CLOs.  Can you explain to the Court what you

19  were conveying in the first bullet point about Acis CLOs?

20  A   Yes.  So what's being conveyed here was the current

21  thinking at the time, which was that the likely outcome for

22  the Acis CLOs -- and just for additional background, the Acis

23  CLOs were CLOs managed by Acis Capital Management that were

24  subadvised and shared services provided by HCMLP.  And so what

25  this bullet is saying is we expect that 3 through 6 are going

002990

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 08/17/23   Page 327 of 155 age 309 of 888   PageID 3613

Klos - Direct                                    87

1  to reset, they're going to reset under Highland, and --

2  directly or indirectly, and the reinvestment period and

3  maturity is going to shift out by two and a quarter years.

4  Q   Do you know if the expected reset was intended to have any

5  implications for the shared services and subadvisory

6  arrangement?

7  A   Up until the reset, the assumption was that Highland would

8  continue earning subadvisory and shared services, then post-

9  reset it would be -- I don't frankly recall if it was direct

10  or if it was indirect, but effectively Highland was going to

11  retain the management fees on a go forward basis.

12      And I should point out, there is a second bullet here

13  that's talking about new issuance.  So it's assuming that CLOs

14  continue to be churned out over the next several years and

15  that -- and that all that AUM goes to HCMLP.

16  Q   Okay.  Can you go to the next slide, please?  Can you

17  describe generally what Slide 34 depicts?  35 depicts?

18  A   Yes.  I can.  One moment.  Yeah.  So, 35 is depicting the

19  revenue that's coming in from all the various funds.  Again,

20  this is Highland as well as the affiliate Advisors.  And it's

21  just breaking it out by either fund or it's lumping the 2.0

22  and the 1.0 CLOs together to give you a picture of where's all

23  the revenue coming in from the complex from all these

24  different sources.

25  Q   And what is the second rank, the Highland 2.0 CLOs?  Do

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 88/23 155age 310 of 888   PageID 3614

Klos - Direct                                    88

1    you know what that's referring to?

2    A    Yes.  That's referring to the Acis deals that were assumed

3    to be up for reset, 2.0 meaning the post -- post prices.

4    Q    So am I reading this correctly that the Acis CLOs were

5    expected to generate fees for Highland in 2018 of

6    approximately $9.7 million?

7    A    Yeah, in that ballpark.

8    Q    Okay.

9    A    That's the projection.

10   Q    And was that projected to be approximately 12 percent of

11   Highland's entire revenue in 2018?

12   A    The royal Highland.  Not HCMLP, but the overall complex,

13   yes.

14   Q    Okay.  As part of this presentation, did you and your team

15   present forecasts?

16   A    We did.

17   Q    Okay.  And are those forecasts in this deck?

18   A    They are.

19   Q    Okay.  Let's go to Slide 36.  That's entitled Assumptions

20   in the Forecast.  Can you just describe for the Court what

21   assumptions are listed in the first piece concerning material

22   intercompany arrangements?

23   A    Yes.  So, the first piece on intercompany is describing

24   the HCMFA, NexPoint, and Acis relationships, and it's saying

25   that at this time we're projecting -- or, we're assuming for

1  purposes of the forecast that HCMFA will pay 2.7 to Highland.

2  NexPoint and subsidiaries will pay 6. That's the same 6 that

3  we've already spent some time on. And then the third bullet

4  point being Acis, saying that it'll continue to pay the then-

5  rates in effect of 20 basis points subadvisory, 15 shared

6  services. And then the Up to Reset is an allusion to the fact

7  that once they reset it'll just -- it'll be to Highland and

8  that mechanism goes away.

9  Q   Okay. Let's go to Slide 44, please. Can you describe for

10 the Court what Slide 44 is?

11 A   Slide 44, it's looking at a three-year forward forecast

12 for HCMLP. This is just HCMLP. Excuse me. So this is a

13 single -- a single entity view. And so, as a result, you do

14 have -- you have the intercompany agreements that are picked

15 up in this agreement. And the total operating income number

16 of 12 is -- is the very same that we were looking at on the

17 executive summary.

18 Q   And I see in 2019 the operating income is supposed to go

19 -- projected to go from negative 12 to positive 46. Do I have

20 that right?

21 A   Yes.

22 Q   And do you have an understanding as to what the cause of

23 that $58 million flip is?

24 A   Yes. So it's primarily driven by the lines, the second

25 line called Incentive Fees.

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 09/02/23   Page 312 of 888   PageID 3616

Klos - Direct                                            90

1    Q    Uh-huh.

2    A    And what we were using in this forecast -- again, it's

3    just a forecast, you know, it's -- it's never going to be

4    exactly right -- but this was assuming a monetization of MGM

5    that would trigger a large fee in 2019.  Obviously, that

6    didn't happen, but that was what was assumed in the

7    projections.

8    Q    And if you remove that assumption, where does that --

9    where does that leave Highland on a projected operating income

10   basis for 2019?

11   A    It would be -- it would be a dollar-for-dollar reduction,

12   so you'd just take the 45,919 of operating less the 55,298.

13   Q    Okay.

14   A    So, call it -- call it 10 negative.  I'm not going to do

15   the math.

16   Q    And these -- withdrawn.  Does the 2018 projection of $12

17   million loss, does that take into account the $6 million, --

18   A    It -- it does.

19   Q    -- or it does not?

20   A    It does.  It takes into account the $6 million from

21   NexPoint.  It -- those -- that amount is a component part of

22   the line that says Shared Services & Subadvisory Fee.  So it's

23   6 of the 10.

24   Q    So is my math right that if the amount hadn't been

25   increased from, let's say, 1.5 to 6, then the $12 million loss

1   would have been increased --

2   A    Be close to 17.

3   Q    -- by 4-1/2?

4   A    Yeah.  Yes.  Call it 16, 17.

5   Q    Okay.  Let's go to the next slide, please, which is Slide

6   45.  What's being depicted there?

7   A    So, again, this is a -- going to a standalone view, so

8   Highland Capital Management Fund Advisors standalone.  And it

9   -- it looks like this is also consolidating the broker-dealer

10  that sits under it.  But that's somewhat irrelevant.  But it's

11  depicting a three-year forecast for HCMFA.  Again, '18, '19,

12  '20.  And it's got a line item for shared services expenses,

13  which I believe is a reference to HCMLP, at least 2.7 of it,

14  if not the full 2.8.

15  Q    And there's a reference there to subadvisor fees, do you

16  see that, for several hundred thousand dollars?

17  A    I do.

18  Q    Does that relates the Highland or to somebody else?

19  A    No, no, that relates to -- there was a subgroup of -- I

20  think there was around three at the time -- of funds that were

21  subadvised by an actual -- an actual outside subadvisor.  And

22  so those are -- those are fees to that outside subadvisor, not

23  fees to Highland.

24  Q    As of the date of this deck, January 26, 2018, was HCMFA

25  projected to pay any subadvisory fees to Highland?

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 09/22/23   Page 314 of 888   PageID 3618

Klos - Direct                              92

1    A    No.

2    Q    Let's go to Slide 46, please.

3    A    Okay.  I'm there.

4    Q    Is this just the same three-year P&L for, this time,

5    NexPoint?

6    A    Yeah.

7    Q    Okay.  And focusing your attention to the lines Subadvisor

8    Fees and Shared Service Expenses, can you describe for the

9    Court what those line items reflect?

10   A    Yes.  Those are reflecting amounts to HCMLP for

11   subadvisory and shared services.  And we've spent a lot of

12   time talking about $6 million, but this is the $6 million.

13   $3,024,000 plus $2,976,000.  There's the six.  So that's

14   what's being assumed as far as the intercompany.

15   Q    And do you recall that the subadvisory agreement was

16   already in place at the time of this meeting?

17   A    Yes.  Yeah, it was.

18   Q    Okay.  And let's just -- let's just take a look at Exhibit

19   130 quickly.

20   A    Okay.  I'm there.

21   Q    Do you know what that is?

22   A    130.  This looks to be a continuation of the chain that we

23   were discussing earlier, going back and forth with the

24   internal attorneys on having these agreements executed in the

25   very early part of January and then culminating with the

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 09/19/23   Page 315 of 888   PageID 3619

Klos - Direct                                          93

1   actual execution of those agreements, it looks like, on

2   January 11th of '18.

3   Q    And are you specifically referring to Mr. Fox's email as

4   of January 11th, the very last email in the chain, looking in

5   reverse order?

6   A    Yes.

7   Q    Okay.

8   A    That's right.

9   Q    Okay.  So let's talk about the subadvisory agreement for

10  just a moment, if you can turn to Exhibit 5.

11  A    Okay.  I'm there.

12  Q    And if you can -- if you can, just tell the Court what

13  your -- do you have an understanding of what that document is?

14  A    Yes.  This is the subadvisory agreement between NexPoint

15  Advisors, LP and Highland Capital Management, LP.

16  Q    And can you turn to the page that ends in Bates No. 580?

17  A    I'm there.

18  Q    And do you -- are you familiar with the signatures on that

19  page?

20  A    Yes.  It's Frank's.  Frank Waterhouse.

21  Q    Okay.  And can you go back to the first page of the

22  document and let the Court know if you have an understanding

23  as to when this subadvisory agreement became effective?

24  A    It became effective January 1st of 2018.  But, as

25  discussed, it was -- it was executed, you know, a little -- a

Klos - Direct                    94

1   little less than two weeks later, but to be effective January

2   1st of '18.

3   Q    Okay.  And if you can turn, please, to Section 2 on the

4   page ending in Bates No. 570.

5   A    I'm there.

6   Q    And can you explain to the Court what Section 2 provides?

7   A    So, Section 2(a) provides for a monthly fee in the amount

8   of $252,000.

9   Q    And is that fee variable or fixed?

10  A    No, it's fixed.  It's just $252,000 a month.

11  Q    And is that -- do you recall if that's consistent with the

12  number that was in your earlier email at Exhibit 130?

13  A    I don't remember the exhibit number, but yes, it's

14  consistent with the email.

15  Q    Okay.  Is it fair to say that this agreement is another

16  agreement intended to execute on the direction that you

17  received from Mr. Dondero?

18  A    Absolutely.

19  Q    Is there anything in the subadvisory agreement that's

20  before you that concerns or relates to Highland's actual cost

21  of providing subadvisory services?

22  A    No.

23  Q    Do you recall anyone ever suggesting in late 2017 or early

24  2018 that NexPoint should only pay its allocable share of

25  actual costs for subadvisory services?

002998

Case 21-03010-sgj    Doc 110    Filed 04/14/22    Entered 04/14/22 15:23:58    Desc Main
Case 3:22-cv-02170-S    Document Filed 09/25/23 Page 317 of 888    PageID 3621

Klos - Direct                                              95

1    A    No.  Nobody said that.

2    Q    Okay.  So the meeting takes place on or around January

3    26th.  Does anything happen to upset the projections or any of

4    the information that you had just conveyed to Mr. Dondero and

5    Mr. Okada?

6    A    Yes.  So, contemporaneous, within days of that, of that

7    presentation, Acis is put into an involuntary by Mr. Terry.

8    And so this is -- at best case, we understood that a critical

9    fee stream was going to be tied up a while.  And worst case,

10   it might be -- it might be gone forever.  And so definitely an

11   important moment, and a big change relative to the

12   projections, because, as you pointed out, there was a $10

13   million assumption in there that, like I said, at least

14   temporarily is going poof, if not forever going poof.

15   Q    And did you personally participate in discussions about

16   how to address that development?

17   A    Yes.  So, you know, this wasn't a mystery to anybody, that

18   Acis had just been put into involuntary, so by the beginning

19   part of March we met again with Jim.  Kind of a similar

20   conversation to the December 2017 conversation of we're not

21   going to get any Acis fees for a while, if not forever.  We

22   need help to operate.  What do you want, you know, what --

23   what do you want to do?

24        And the response was, well, just do the same thing that

25   you guys just did for NexPoint.  Put in place a subadvisory

002999

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 09/19/23   Page 318 of 888   PageID 3622

Klos - Direct                                    96

1   agreement and -- and that's the -- it's not the solution

2   because it doesn't -- it doesn't completely cushion the fall,

3   but it at least mitigates the -- some of the loss that we

4   would be experiencing.

5   Q   And did you personally participate in the conversation and

6   the follow-up to that meeting?

7   A   Yes.

8   Q   Okay.  And do you recall whether a subadvisory agreement

9   was created for HCMFA?

10  A   It wasn't ultimately, no.

11  Q   Okay.  Let's turn to Exhibit 87.  And I apologize.  Before

12  you look at that, when you say it wasn't, do you mean it

13  wasn't drafted, or it was never executed?

14  A   It --

15  Q   If you recall.

16  A   It was -- I don't remember if it was drafted.  What I

17  recall was that there was communication with in-house counsel

18  to draft it and there were -- there were concerns expressed

19  about whether that agreement would -- would work, for lack of

20  a better term.

21  Q   Okay.  Do you recall how much was initially discussed that

22  HCMFA would pay for subadvisory services?

23  A   It was around $5 million.  I have a recollection of

24  exactly $5 million, but I have seen other emails that refer to

25  $450,000 a month, which annualizes to a little bit more than

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/17/23   Page 319 of 888   PageID 3623

Klos - Direct                                                    97

1   5, around 5.4.  But the number that I remember was 5, which

2   was the -- $5 million, which was the number that was

3   ultimately landed on.

4   Q    Okay.  Did there come a time after this discussion with

5   Mr. Dondero about duplicating that NexPoint subadvisory

6   agreement for HCMFA, did there come a time when you learned

7   that that wasn't a viable option?

8   A    Yes.  It was -- it was sometime in the late March, early

9   April time frame.  And the thinking going into that was this

10  shouldn't be a very difficult exercise, you've already got a

11  template, it's going to look exactly the same save for the

12  number on the page.  So the expectation was that that would be

13  a pretty quick and easy process to get documented through

14  Legal.  But, you know, when concerns were raised, obviously,

15  we had to pivot.

16  Q    And do you recall what those concerns were?

17  A    Yeah.  So the concerns as I understood them were that our

18  internal legal team, mainly Lauren Thedford, who is a -- she's

19  an HCMLP employee and an officer of the Advisors, and the

20  Funds, I believe.  But she, she highlighted a potential issue

21  that because it's -- it's subadvisory, that it would -- the

22  only way to have an agreement like that ratified was going to

23  be to go to the board in an in-person meeting.  The next such

24  meeting was going to be in June, later that year.  And that --

25  and that it couldn't be made retroactive.  It had to only be

003001

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 09/19/23   Page 320 of 888   PageID 3624

Klos - Direct                                    98

1    prospective.

2    Q    And just take a look at Exhibit 87 now.  Does that -- does

3    that comport with the recollection you just described for the

4    Court?

5    A    I'm sorry.  87?

6    Q    Yes.

7    A    Okay.  Ah, yes.  Yes, it does.  I was looking at the older

8    part of the chain.  But, yes, this is the email from Lauren

9    saying that it's in person, it can't be made retroactive.  So

10   that's, you know, that's the problem.

11        And another problem is that it also means that the

12   NexPoint agreement that was already in place doesn't work and

13   that needs to be -- that needs to be fixed as well.

14   Q    And what's the implications of being unable to use the

15   subadvisory agreements under those circumstances?

16   A    So, without being able to go back, you're talking about $5

17   million with respect to HCMFA and $3 million with respect to

18   NexPoint.  And the earliest you're going to be able to

19   implement that is the middle part of the year.  So, call it $8

20   million times 50 percent is the -- is the implication there.

21   Q    And you're getting those numbers by -- how are you getting

22   those?

23   A    Yeah.  Sorry.

24   Q    Yeah.  It's a little shorthand.

25   A    The $252,000 annualizes to $3,024,000.  The $416,000 for

1   HCMFA annualizes to $4,994,000.  So the sum of those two is

2   approximately $8 million per year.  Fifty percent of the year

3   is $4 million.

4   Q    Had -- was there any discussion prior to Ms. Thedford

5   sending her mail on March 15th, had there been any discussion

6   of using a model for the payment of subadvisory fees other

7   than the subadvisory agreements that had been drafted?

8   A    No, not that I can remember.

9   Q    Had anybody expressed any concern prior to March 15th that

10  the Advisors should be paying fees based on actual costs?

11  A    No.

12  Q    Had anybody done an analysis before March 15th about what

13  the cost was to Highland for providing subadvisory services to

14  the Advisors?

15  A    No.

16  Q    Okay.  After getting this news from Ms. Thedford, what

17  happened?

18  A    Um, definitely a reaction.  This is -- this is a problem.

19  That as we just looked at, we're already operating quite

20  negatively.  We're no longer getting a fee stream from Acis.

21  We're being told that we're not going to be able to start

22  getting a fee stream from these other Advisors for several

23  months, at the cost of millions more dollars.  So this needs

24  to be addressed.

25       Again, this is all in the spirit of one big happy family,

Case 21-03010-sgj    Doc 110    Filed 04/14/22    Entered 04/14/22 15:23:58    Desc Main
Case 3:22-cv-02170-S    Document 6    Filed 10/26/ Page 100 of 155 Page 322 of 888    PageID 3626

Klos - Direct                                  100

 1  one complex, so the whole exercise itself seems somewhat

 2  silly, for someone who just wants to move money from his right

 3  pocket to his left pocket, to have to go through all this

 4  brain damage, but we need to go through the brain damage to

 5  get this done.

 6  Q   And did you see a draft of a payroll reimbursement

 7  agreement after March 15th?

 8  A   Yes.  I think towards the end of April, to the best of my

 9  recollection.

10  Q   And did you participate in discussions with Ms. Thedford

11  about the terms and provisions of the draft agreement that you

12  saw?

13  A   Yes, I did.

14  Q   And did you communicate with Ms. Thedford in writing about

15  -- about that draft agreement that you saw?

16  A   I did.

17  Q   Okay.  Can we turn to Exhibit 129, please?  And I'm going

18  to start at the beginning, which is at the page with Bates No.

19  425.  Did -- do you recall in mid-April that Mr. Fox sent you

20  a draft of the payroll reimbursement agreement?

21  A   Yes.

22  Q   And can you review and then describe for the Court what

23  you told Ms. Thedford after you obtained a copy of the initial

24  draft of the payroll reimbursement agreement?

25  A   Yes.  So I think, similar to NexPoint, I had tasked Sean

Klos - Direct                               101

1   with running it down through Legal.  It looks like Sean was on

2   vacation, so he passed it along to me to review as well.  And

3   my -- from email and from my recollection, recall the way that

4   the agreement was stated being very clunky, because we don't

5   have a way to actually track actual costs in any sort of

6   scientific way.

7       And so I make the suggestion to Lauren that -- and it's

8   kind of a parenthetical; it's not necessarily apparent in the

9   email -- but can we just do this once?  Can we do an estimate

10  of cost as of some point in time, done in good faith, you

11  know, with a reasonable estimate, and not have to do it ever

12  again?

13      Because, again, there's not a way to really validate any

14  of the assumptions in such an analysis, and all it's going to

15  be doing is churning up a lot of work for people to do

16  internally to track amounts that ultimately benefit Jim.  It's

17  just not a -- it's not a useful -- it's not a good use of

18  time.

19  Q   And is that essentially what you're -- is that a fair

20  description of what you're saying to Ms. Thedford at 10:48

21  a.m. on April 17th?

22  A   Yeah.  That's exactly right.  Too much subject -- too much

23  subjectivity.  Too much time involved.  We already know what

24  the number is going to be.  So this is creating a lot of

25  unnecessary scrambling around.

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document   Filed 10/22   Page 324 of 888   PageID 3628
Document   Page 102 of 155

Klos - Direct                                          102

1  Q   And what did -- do you recall or can you read what Ms.
2  Thedford said in response?
3  A   So, she responds, she says she's open to changing the
4  definition.  There needs to be some method of determining
5  amounts.  To which I say, can we -- can we set it out as of
6  the beginning of the agreement, have a schedule, never update
7  that schedule unless -- with the only update ever being if the
8  -- if the parties come to a consensus and want to change it at
9  some point in the future.
10  Q   And is it your understanding that that's what became the
11  actual agreement that was signed?
12  A   Yes.
13  Q   And did you subsequently perform the -- create the numbers
14  that are reflected in the email above on Pages 423 and the top
15  of 424?
16  A   I did.
17  Q   Okay.  Why did you create that?
18  A   Well, you know, per the -- per the email chain, that was
19  going to check the box for what we needed to check the box.
20  So we were -- we were going to have a schedule that had
21  percentages set out.  And, you know, I was able to, you know,
22  work through a spreadsheet and put percentages in that ended
23  up resulting in the $252,000 a month number for NexPoint and
24  the $416,000 a month number for FA.
25  Q   Okay.

003006

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document   Filed 10/26/  Page 325 of 888   PageID 3629

Klos - Direct                                                    103

1  A    HCMFA.

2  Q    And when you are having these -- did you speak with Ms.

3  Thedford beyond the emails, or does the emails --

4            MR. MORRIS:  God bless you, Your Honor.

5  BY MR. MORRIS:

6  Q    Or do the emails reflect the entirety of your

7  communications?

8  A    I think they reflect the substance of it.  There may have

9  been some -- some additional -- some minor additional

10  discussion.  I don't remember specifically.

11  Q    And are these, are these allocations -- can I call these

12  allocations?  Is that fair?

13  A    That's okay.

14  Q    Okay.  Are the allocations on this email the allocations

15  that were ultimately adopted in what became Exhibit As to the

16  two --

17  A    Yes.

18  Q    -- payroll reimbursement agreements?

19  A    Yes.

20  Q    Did anybody change it?

21  A    No.

22  Q    Did anybody ask you how you calculated the numbers?

23  A    No.

24  Q    Did anybody ask to see your work?

25  A    No.

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document   Filed 10/20/   Page 326 of 888   PageID 3630
Document   Page 104 of 155

Klos - Direct                                          104

1   Q    Did anybody suggest that maybe these allocations weren't

2   right?

3   A    No.

4   Q    Did anybody -- did you have any discussion with anybody at

5   any time as to how you came to these numbers?

6   A    Not that I remember.

7   Q    In this time period?

8   A    No, not that I can remember.

9   Q    Okay.  At the top of Page 423, which is really the

10  beginning of your email that contains the allocations, there's

11  -- can you just read out loud what that sentence says or what

12  those two sentences say?

13  A    I'm sorry.  It's this that starts, Here are the listings?

14  Q    Yes.

15  A    Yes.  It says, Here are the listings for the reimbursement

16  agreements.  Monthly amounts should be $416,000 for HCMFA and

17  $252,000 for NPA.

18  Q    And how did you come up with those numbers?

19  A    So, these were already-known numbers.  The $252,000 in

20  respect of NPA, consistent with what we had talked about for

21  the past several months and what was already in effect via the

22  subadvisory agreement, and then the $416,000 based on further

23  conversation in the March time period where he was comfortable

24  to do a $5 million a year run rate payment from FA.

25  Q    So the $252,000 is the same $252,000 that was in your

Case 21-03010-sgj    Doc 110    Filed 04/14/22    Entered 04/14/22 15:23:58    Desc Main
Case 3:22-cv-02170-S    Document Filed 04/10/26 of 155    Page 327 of 888    PageID 3631

Klos - Direct                                    105

1    December email, in the January deck, in the subadvisory

2    agreement, --

3    A    Yes.

4    Q    -- and now it's still there?

5    A    Yes.  Of course.

6    Q    The allocations there, what information did you rely on to

7    create those allocations?

8    A    So, I relied on compensation information for the -- for

9    the list of employees.  And then the, in terms of the

10   percentages, it was at the time, I believe, based in part for

11   some people on AUM across the platform, and then for some

12   other people it was just -- basically, just subjective

13   percentages based on my general understanding of what those

14   people tended to work on.

15   Q    Did you -- did you speak to any of the dual employees to

16   see if those allocations were accurate from their perspective?

17   A    No.

18   Q    Did you have any records that you could rely upon to

19   confirm your subjective assessments?

20   A    No.  There were no such records.

21   Q    If we wanted to know today how much time each dual

22   employee spent working on matters for the Advisors, how would

23   we create such an analysis?

24   A    There's not a -- there's not a good way to do it.

25   Q    Is there -- is there any way to do it?

003009

Klos - Direct                                    106

1   A   No.  Not -- not any -- not any good way.  The reason I'm

2   hedging a little bit is, if it was important enough, you could

3   talk to every single employee, ask them how they think they

4   spend their time.  And then even that's flawed, because

5   people's compensation isn't necessarily tied to how they were

6   -- to how much time they spend on something.  They could have

7   spent a little time on something, had a great return, got paid

8   a huge bonus, and it has nothing to do with time.

9        So no matter how you do it, it's going to be incredibly

10  subjective and really fatally flawed.

11  Q   Is this fatally flawed?

12  A   It's -- it's maybe flawed -- it's flawed from the

13  standpoint that it has all those subjective assumptions baked

14  into it.  It's not fatally flawed from the standpoint that

15  there's a -- there was a general effort to assess where people

16  were likely spending their time.

17  Q   Were investment professionals ever asked to keep time

18  entries so that actual costs could be accurately calculated?

19  A   No.

20  Q   Did you ever update Exhibit -- withdrawn.  So I think

21  you've testified, these -- this analysis became the Exhibit

22  As.  Do I have that right?

23  A   Yes, that's right.

24  Q   Okay.  Did you ever update Exhibit A at any time from the

25  date of this email until today?

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 6   Filed 10/26/22   Page 329 of 888   PageID 3633
Document   Page 107 of 155

Klos - Direct                                    107

```
 1   A    No.

 2   Q    Did anyone ever ask you or instruct you to update Exhibit

 3   A from the time you sent this email to today?

 4   A    No.

 5   Q    Are you aware of anybody at Highland or the Advisors ever

 6   making any effort --

 7   A    If I could take a step back, there was -- there was a

 8   request from Lauren in the early 2020 time range.  So I should

 9   be fair, she did ask the question, and I basically pushed back

10   and said that's a ridiculous exercise, we should do it a

11   different way.

12   Q    Okay.

13   A    I didn't really take that as a request to update it, but

14   she was -- she was implicitly asking for that information, --

15   Q    All right.

16   A    -- so I should qualify that.

17   Q    We'll take a look at that.  You're aware that a number of

18   investment professionals, these dual employees, were

19   terminated even at the time you wrote this email, right?

20   A    Yes.  Yes.

21   Q    Why would you include dual employees in this analysis if

22   they'd already been terminated?

23   A    So, I'm not sure if it's in this email chain, but as I

24   mentioned in one of the email chains, we were going to be

25   doing a roster as of a specific point in time, that time being
```

003011

1   the effective date of the agreement, or January 1st.

2   Q   And I think, just to be clear, if you can look back at

3   your April 17 email sent at 10:56 a.m., is that the one you're

4   referring to?

5   A   10:56?  Yes.  That's -- that's exactly right.  That's the

6   one.

7   Q   And can you just explain to the judge what you're telling

8   Ms. Thedford in that email?

9   A   Yes.  So I'm really laying out what would ultimately be

10  the agreement, which is that we're going to have a schedule,

11  it's going to be as of January 1st, it's going to have the

12  roster that was in place at that time, and that's -- that's

13  where the schedule's going to originate, and we'll -- we're --

14  we're not planning to update.  We're only going to perform

15  this exercise once.

16  Q   Okay.  Did anyone express any concern to you that you were

17  using a -- you were setting the costs of subadvisory services

18  based on employees that were known to have already been

19  terminated?

20  A   No.  No concern.

21  Q   Did that ever come up before December 2020?

22  A   I don't know if I would go so far as December.  Certainly,

23  by summer of 2020, no one had ever brought it up.

24  Q   Okay.  During the two-year period that Mr. Dondero was in

25  control of Highland and the Advisors, did anybody ever ask you

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document   Filed 10/26/1   Page 331 of 888   PageID 3635

Klos - Direct                                    109

1    if that number should be adjusted to take into account

2    terminated dual employees?

3    A    No.

4    Q    Okay.  Do you recall that, after the payroll reimbursement

5    agreements are entered into, that dual employees continue to

6    be terminated throughout 2018?

7    A    Yes.

8    Q    And do you have a recollection to the magnitude of the

9    dual employees on the Exhibit As that were terminated as of

10   December 2018?

11   A    Yes.  It was -- it was around ten, nine or ten.

12   Q    Okay.  Can we just take a quick look at Exhibit 14,

13   please?

14   A    14?

15   Q    And I'll represent to you that these are the Advisors'

16   responses to interrogatories.  If you could turn to Page 12 of

17   18.

18   A    Okay.  I'm there.

19   Q    Okay.  Do you recall that this list of people here that

20   continues to the top of the next page, that's the list of --

21   is that the list of dual employees?

22   A    It appears to be.  I can't quickly reconcile it, but it

23   looks to be the same list.

24   Q    Okay.  And do you have any reason to doubt the dates of

25   termination set forth in the Advisors' response to

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document   Filed 11/22   Page 120 of 155   Page 332 of 888   PageID 3636

Klos - Direct                              110

1    Interrogatory No. 3?

2    A    No, no reason to doubt any of those.

3    Q    Okay.  And if you can turn the page to Interrogatory No.

4    4, do you see the Advisors stated that they were, quote,

5    generally aware of the employees' terminations and departures

6    as they occurred?

7    A    Yes.

8    Q    And is that consistent with your understanding of how

9    information was shared and conveyed within Highland?

10   A    Yes.  Absolutely.  Both informally and formally.

11   Informally, you had everyone sharing the same office space,

12   sitting next to each other.  More formally, there were --

13   there were things like monthly reports that would go out,

14   again, agnostic as to HCMLP versus NexPoint or others, just

15   looking at it all as a complex, that would be distributed

16   pretty broadly to -- to, you know, among others, officers of

17   HCMFA and NexPoint, but also including a pretty wide swath of

18   the rest of the overall complex for multiple different

19   entities.

20   Q    Okay.  So do you recall that in December 2018 the payroll

21   reimbursement agreements that had just been signed the prior

22   May were amended?

23   A    Yes.

24   Q    Okay.  Did you participate in discussions concerning those

25   amendments?

003014

Klos - Direct                                    111

1    A    Yes.

2    Q    Can you describe for the Court what you recall about the

3    discussions that led to the execution of the December 2018

4    amendments?

5    A    Yes.  I remember a meeting early December of 2018,

6    early/mid-December, I can't remember the specific date, with

7    -- with Jim and Frank.  I don't believe anyone else was in

8    that meeting.  And part of the concern expressed in that

9    meeting was that NexPoint in particular, but both Advisors,

10   but particularly NexPoint, taxable income was -- was looking

11   like it was running a little too hot for 2018.  Too hot as in

12   too high, so too much tax liability.  And, you know, should

13   there be -- what can be -- what can be done over the course of

14   the next several weeks to generate taxable deductions for

15   those Advisors?

16   Q    And what was the solution?

17   A    So, the solution was to amend the two payroll

18   reimbursement agreements.  I don't think we got into that

19   level of detail in the meeting with Jim, but when we -- we

20   took that away and worked with internal Legal, the amendment

21   that was ultimately produced was just an amendment to add an

22   additional amount for both of the Advisors in the sum of 2.5

23   in the aggregate.  And the split amount was 1.3 and 1.2 to the

24   two respective Advisors.  I can't remember which one was 1.3

25   and which one was 1.2.

003015

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 11/26/22   Page 334 of 888   PageID 3638
Document   Page 1 of 155

Klos - Direct                                112

1   Q   Okay.  Let's take a look at Exhibit 7, please.  Can you

2   tell the Court what that is?

3   A   Yes, it's the amendment itself.  And I can clarify that

4   the 1.3 was for NexPoint Advisors, the 1.3 of additional

5   annual costs as it's defined in the amendment.  And that tells

6   me that the identical agreement for Fund Advisors was also put

7   in place except with the amount being 1.2 even.

8   Q   Okay.  Did you update Exhibit A before executing -- before

9   Mr. Waterhouse executed this document?

10  A   No.

11  Q   Do you know if anyone took any steps to try to determine

12  HCMLP's actual costs of providing front office services before

13  signing this?

14  A   No.

15  Q   Did you do a true up?

16  A   No.

17  Q   Did you ever do a true up in your life?

18  A   I suppose I've done true ups, but not as it pertains to

19  this agreement.  This was -- this was a mechanism to send

20  another $2-1/2 million of cash --

21  Q   Did you --

22  A   -- from these Advisors.

23  Q   Did you tell Dustin Norris at any time that the amounts

24  set forth in the amendments were the result of a true up?

25  A   Not that I remember.  I'm sure I told him that there was

003016

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document   Filed 11/28/2 Page 335 of 888   PageID 3639

Klos - Direct                                      113

1    an end-of-the-year amendment, so it's possible that he mistook

2    me or misunderstood.  But no, never a true up.  This was an

3    end-of-the-year amendment.

4    Q    Do you know whether the $2.5 million, or the amount that

5    each of the Advisors paid, was that in any way based on any

6    assessment of actual costs?

7    A    No.  (Pause.)  If I can -- the answer is no, but if I can

8    expand on that.  There wasn't an analysis done.  However, we

9    had a current view of who's making money and who's not making

10   money.  And the reality is that, at this point in time, much

11   of the revenue at Highland Capital Management, LP is coming

12   from these intercompany agreements.  Highland Capital

13   Management, LP is losing money hand over fist.  The other

14   Advisors are making money.

15        So that's not an analysis, obviously, that 2.5 is the

16   right number, but it tells you that it's directionally right,

17   because these are effectively the same people doing the same

18   type of business for the same types of client, earning a fee.

19   In what -- on what planet does one of those operate at a

20   massive operating loss while the other two operate really

21   strongly?

22   Q    Did anybody suggest that it was terribly unfair that

23   Highland was performing these services at an operating loss?

24   A    I don't -- no.  I don't remember anyone saying that.

25   Q    Was there any guarantee in any agreement that you're aware

Klos - Direct                                             114

1    of that prevented Highland from incurring operating losses

2    through the performance of these intercompany agreements?

3    A    No.

4    Q    By the time Highland filed for bankruptcy in October of

5    2019, more investment professionals or dual employees had been

6    terminated, correct?

7    A    Yes.  A handful.  Maybe four or five.

8    Q    And do you --

9    A    In that area.

10   Q    Do you have a recollection as to how many of the dual

11   employees, roughly how many of the dual employees had been

12   terminated in the 21-month period between January of 2018 and

13   the end of September 2019, just prior to the petition date?

14   A    It was -- it was on the magnitude of half.

15   Q    So roughly half of the dual employees were already gone?

16   During that period, did anyone request an analysis of actual

17   costs?

18   A    This is around the time of the petition date?

19   Q    Yep.

20   A    Um, --

21   Q    Up to the petition date.

22   A    Up to the petition date?  No.

23   Q    Okay.  Up to the petition date, did anyone request that

24   Exhibit A be updated?

25   A    No.

003018

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document   Filed 12/26/ 1   Page 337 of 888   PageID 3641

Klos - Direct                                    115

1   Q   Up to the petition date, did anybody ever suggest that the

2   Advisors should only be paying the actual costs under the

3   payroll reimbursement agreement?

4   A   No, other than the amounts were fixed per the agreement,

5   so that what's had been paid all along.

6   Q   In fact, do you recall if, during this two-year period

7   when Mr. Dondero was in control, the Advisors made monthly

8   payments under the PRAs that differed in any way from the

9   initial amounts set forth in those agreements?

10  A   No.  They paid exactly the amounts, those amounts each

11  month.

12      The one caveat on that is, because it was executed a few

13  months in arrears, I think there was some sort of a catch-up.

14  But notwithstanding that initial catch-up, it was exactly the

15  same amount per the agreements every single month.

16  Q   And did that practice continue after the bankruptcy as

17  well?

18  A   Yes.  It continued until November of 2020.

19  Q   And what happened in November?

20  A   So, on November 30th, there were notices of termination of

21  the shared services agreement, and shortly thereafter there

22  was a directive that I understood to have come through Mr.

23  Dondero to stop all payments.

24  Q   Do you have an understanding as to who that directive was

25  given to?

Klos - Direct                          116

1    A    Yes.  To Frank.

2    Q    And did Mr. Waterhouse follow that directive?

3    A    Yes.  He conveyed that to the accounting team, and -- in

4    uncertain terms, that that's the -- that's the directive from

5    Mr. Dondero.

6    Q    So when Mr. Dondero wanted the payments stopped, was he

7    able to effectuate that desire?

8    A    Yes.

9    Q    Okay.  So, Highland files for bankruptcy in October 2019.

10   Were you given any instructions by anybody concerning the

11   continued administration of these agreements post-bankruptcy?

12   A    I don't remember specific to these agreements, but more

13   generally there was a business as usual, keep -- Team, keep

14   doing what you're -- what you've been doing.  That was the --

15   that was the go-forward direction.

16   Q    Do you recall the intercompany agreements being the topic

17   -- a topic of discussion with the UCC and FTI after the

18   bankruptcy filing?

19   A    Yes.  It was a -- it was a very -- it was immediately a

20   point of issue.  I had conversations with Fred Caruso as well

21   as Jack Donoghue from the DSI team.  And it was my

22   understanding that this was a -- this was an issue that was

23   very hot on the minds of both the UCC as well as their

24   financial advisors, FTI, and that there was -- there was going

25   to be -- there was going to need to be some work done to get,

003020

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document   Filed 04/14/22   Page 117 of 155   Page 339 of 888   PageID 3643

Klos - Direct                                      117

 1   you know, help them get comfortable with where we stood on

 2   those agreements.

 3   Q    When you say the issue was hot, can you just explain for

 4   Judge Jernigan specifically what the hot issue was, as you

 5   understood it?

 6   A    Yes.  So, I mean, the hot issue was really just that these

 7   were all agreements with affiliates.  These are -- these are

 8   creditors who have been fighting with Jim for years.  And the

 9   fear on their part would have been these are wildly

10   unprofitable contracts for Highland, value is siphoning out to

11   these other advisors that he owns and controls and that are

12   separate and apart from the bankruptcy, so if that is in fact

13   happening, we, the UCC, need to intervene quickly.

14   Q    Did you undertake any analysis of these contracts in

15   response to the issues and concerns raised by the UCC?

16   A    Yes.

17   Q    And who did you work with on that analysis?

18   A    I worked with a number of people.  That included the two

19   gentlemen from DSI that I just mentioned, Fred and -- Fred and

20   Jack, as I recall.  Frank, internally, as well as Isaac.  And

21   then it was my understanding -- I don't know that I had direct

22   conversations with Scott Ellington, but it was my

23   understanding that he had at least -- kind of was aware of the

24   analysis.  Put it that way.

25   Q    Okay.  Can you turn to Exhibit 144, please?  And can you

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/12/23 Page 340 of 888   PageID 3644

Klos - Direct                                              118

1   tell the Court what's depicted on that analysis there?

2   A    So, this is -- sorry.  This is a -- this is an early

3   iteration of that analysis sent to Isaac with the overall

4   summary of the output of that analysis.  And I'd be happy to

5   walk through it.

6   Q    Yes, please.

7   A    Okay.

8   Q    Well, let me try and speed this up a little bit.  Can you

9   just explain for the judge the portion of the analysis that

10  deals with the intercompany agreements?

11  A    Yes.  So, the portion that deals with the intercompany

12  agreements is, if you have it in front of you, it's the top --

13  it's the top box.  And that box is summarizing what was being

14  paid and charged under those agreements.  It's the four

15  agreements -- there's technically five here because the

16  NexPoint and NREA are both being included as a single number.

17  But this box is showing you the 6 that's being charged to

18  NexPoint and then the 8.6 that's being charged to Fund

19  Advisors, broken out between five of -- we're calling it

20  investment support fee here, but that's a reference to the

21  PRA.  And then 3.6 of shared services.  So a total of 14.6

22  being charged.

23       And then the other number that I suppose indirectly

24  pertains to the agreements is the number directly below that

25  of estimated cost to provide services of 16.9.

Klos - Direct                                    119

1    Q    Okay.  So, under this analysis, how does the cost of

2    providing services under the intercompany agreements compare

3    with the revenue?

4    A    So, the cost is higher by approximately $2.3 million,

5    which is just the 16.9 less the 14.6.

6    Q    Okay.  And why is that 16.9, why is there a, you know,

7    really a reduction of $900,000 to the 1.4?

8    A    Yes.  So this is -- you know, with this being a hot issue

9    for the UCC, projecting this in the best possible light, there

10   were -- Highland had a few other small shared services

11   agreements with other parties that it was generating it looks

12   like less than a million dollars a year of shared services

13   revenue.

14        So, for presentation purposes, the takeaway is,

15   notwithstanding that Highland might be -- might, again, very

16   subjective, might be losing $2.3 million on these contracts

17   collectively, well, we're getting some fees from other places,

18   too, so it's not really 2.3, it's really 1.4, which -- which

19   is a little bit of a stretch.

20   Q    Until the time that you prepared this analysis for the

21   UCC, had you ever undertaken any attempt to try to look at how

22   the costs of providing services compared to the revenue under

23   the intercompany agreements?

24   A    No.  No, this was the -- this was the first.

25   Q    Until the UCC made this request, had anybody in the world

003023

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 12/02/22   Page 342 of 888   PageID 3646

Klos - Direct                                                   120

 1  ever asked you at any time whether you could analyze the costs

 2  under the intercompany agreements as compared to the revenues?

 3  A    No.

 4  Q    Okay.  Did you give this document to the UCC?

 5  A    Not this document, no.

 6  Q    How come?

 7  A    So, like I said, this was an iteration.  We're within a

 8  few weeks of having filed.  So this analysis continued to get

 9  refined over the next couple weeks.  And ultimately an updated

10  version was presented to FTI in the offices in December of

11  '19.

12  Q    Okay.  Can you tell me how you calculated, how you -- it

13  says estimated costs to provide services.  What's -- how do

14  you get to that $16.9 million number?

15  A    Yeah.  So, the methodology that was used, and I don't

16  think I'm underestimating when I said I mentioned this to FTI

17  probably 50 times in the thee-hour call -- was goalposts.

18  Subjective ranges of how people might have been spending their

19  time around the time of the bankruptcy.

20       So we took a September -- sorry.  We took an October 15th

21  roster at the time and we put -- we put big ranges on people.

22  This, you know, Person A, they might be spending between 30

23  and 70 percent of their time on NexPoint-related matters.  And

24  so we had a low end of the goalpost and a high end of the

25  goalpost.  And the sausage that's being made to have the 16.9

003024

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/12/26 1 Page 1226 of 155 Page 343 of 888   PageID 3647

Klos - Direct                                    121

1  spit out is the midpoint of those huge goalposts.

2  Q   Did you do this analysis only for the dual employees, or

3  did you do it for all employees?

4  A   Everybody.  And also including the people that were

5  brought in to replace the dual employees that had left between

6  2018 and 2019.

7  Q   Does this have anything to do with an analysis of the

8  actual costs of any particular contract?

9  A   Only in the sense that all the contracts are spelled out.

10  It's not necessarily apparent on this page.

11  Q   Uh-huh.

12  A   But they are, they are spelled out within the body of the

13  analysis.

14  Q   And when you did the analysis for the payroll

15  reimbursement agreements, did that include -- did that exclude

16  all of the terminated employees?

17  A   It excluded anybody that would have terminated up until

18  the petition date.

19  Q   Okay.  And did you have a conversation with the UCC about

20  what was being paid under the agreements at that time?

21  A   Not with -- not with the UCC.  But we -- but we met with

22  FTI, their financial advisor, in December and discussed, you

23  know, what was being paid at the time.

24  Q   Okay.  Did you modify this analysis in the future?

25  A   The updated analysis that was done was from -- I just want

Case 21-03010-sgj    Doc 110    Filed 04/14/22    Entered 04/14/22 15:23:58    Desc Main
Case 3:22-cv-02170-S    Document Filed 04/12/26 Page 1 of 155 Page 344 of 888    PageID 3648

Klos - Direct                                  122

| | |
|---|---|
| 1 | to make sure I'm on the same page -- but from this November |
| 2 | iteration to Isaac for the actual version that was presented |
| 3 | to the -- to the -- to FTI. |
| 4 | Q   Okay. |
| 5 | A   In December.  Mid-December of 2019. |
| 6 | Q   Okay.  Let's go to -- |
| 7 |     THE COURT:  Mr. Morris, I had hoped to -- |
| 8 |     MR. MORRIS:  Yes? |
| 9 |     THE COURT:  -- break for lunch when the direct is |
| 10 | over.  How much more, do you think? |
| 11 |     MR. MORRIS:  I've got a bit.  I would suggest that we |
| 12 | break for lunch now.  I would respectfully request that we try |
| 13 | to limit that to maybe a half hour or 45 minutes, if we could. |
| 14 |     THE COURT:  Well, it's easier for us to take a short |
| 15 | lunch break than it is for you all. |
| 16 |     MR. MORRIS:  Yeah. |
| 17 |     MR. RUKAVINA:  Your Honor? |
| 18 |     THE COURT:  Mr. Rukavina? |
| 19 |     MR. RUKAVINA:  Your Honor, I think the cafeteria |
| 20 | downstairs -- the cafeteria downstairs is closed, so we're |
| 21 | going to -- we didn't bring a box lunch, not knowing that, so |
| 22 | -- |
| 23 |     THE COURT:  Okay. |
| 24 |     MR. RUKAVINA:  We'll go to the nearest place, though. |
| 25 |     THE COURT:  Okay. |

003026

1              MR. RUKAVINA:  Post-pandemic, I'm not even sure

2     what's here anymore.

3              THE COURT:  Well, let's take a 45-minute break.

4     We'll come back at 1:30.

5              MR. MORRIS:  Okay.

6              THE COURT:  Okay.

7              MR. MORRIS:  Thank you, Your Honor.

8              THE COURT:  Thank you.

9              THE CLERK:  All rise.

10        (A luncheon recess ensued from 12:45 p.m. to 1:35 p.m.)

11             THE CLERK:  All rise.

12             THE COURT:  All right.  Please be seated.  We're

13    going back on the record in the Highland matter.  Let's see.

14    Are we ready to proceed?

15             MR. MORRIS:  Yes, Your Honor.

16             THE COURT:  Okay.  Mr. Klos, you're still under oath.

17             THE WITNESS:  Yes.

18             THE COURT:  Thank you.

19             MR. MORRIS:  Okay.  May I go ahead, Your Honor?

20             THE COURT:  You may.

21             MR. MORRIS:  Okay.

22                   DIRECT EXAMINATION, RESUMED

23    BY MR. MORRIS:

24    Q   Mr. Klos, just to kind of reset after the lunch break,

25    before we left we had looked at a November 2019 analysis that

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 6   Document   Filed 09/12/20 1420f 155age 346 of 888   PageID 3650

Klos - Direct                                    124

1    you had prepared and had shared with Isaac Leventon.  Do you

2    remember that?

3    A    Yes.

4    Q    And did you revise that analysis in December of 2019?

5    A    Yes.

6    Q    Can you turn to Exhibit 145 in your binder?  Oh, you know

7    what, hmm, I think we need Ms. -- oh, no.

8           THE COURT:  Mine says, Document provided in native

9    format.

10          MR. MORRIS:  Yes.  Okay.  So we're just going to have

11   to wait a moment for Ms. Canty, because that's an Excel

12   spreadsheet.

13          THE COURT:  Okay.

14          MR. MORRIS:  So I'm going to cross my fingers and

15   hope --

16          MS. CANTY:  Which document, John?  I'm sorry.

17          MR. MORRIS:  145.

18      (Pause.)

19          MS. CANTY:  I'm sorry, John.  I'll need a minute for

20   that one.  It's not in my -- yeah, I'll need a minute on that

21   one.

22          MR. MORRIS:  Okay.

23          MR. RUKAVINA:  John, we have it ready right now, if

24   you want.

25          MR. MORRIS:  If you can -- in hard copy, or you can

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document   Filed 12/26 of 155 age 347 of 888   PageID 3651

Klos - Direct                                    125

```
 1   put it on the screen?
 2            MR. BERGHMAN:  Well, I have to be able to share my
 3   screen on WebEx.
 4            MR. MORRIS:  Yeah.
 5            MR. RUKAVINA:  We just printed it out and just
 6   brought it to court.
 7       (Pause.)
 8            MR. RUKAVINA:  I mean, yeah, John, if you want Thomas
 9   to screen-share, we can put it up.
10            MR. MORRIS:  You know, I'm just going to wait for Ms.
11   La Asia, and I'm going to -- I'm going to detour for a second
12   --
13            THE COURT:  Okay.
14            MR. MORRIS:  -- while we wait for her.
15            THE COURT:  Okay.
16   BY MR. MORRIS:
17   Q   Mr. Klos, do you remember having a conversa... or,
18   communicating with -- with Ms. Thedford in approximately
19   January of 2020 concerning the payroll reimbursement
20   agreements?
21   A   Yes.
22   Q   And do you recall generally -- so we're going to just jump
23   a little bit in time, we're going to come back to your revised
24   analysis in December of 2019.  But after you prepared that, do
25   you recall talking to Ms. Thedford about the payroll
```

Case 21-03010-sgj    Doc 110    Filed 04/14/22    Entered 04/14/22 15:23:58    Desc Main
Case 3:22-cv-02170-S    Document    Filed 12/26/1 55age 348 of 888    PageID 3652

Klos - Direct                                            126

1    reimbursement agreements?

2    A    Yes, I do.

3    Q    And what do you recall about that?

4    A    I recall, generally speaking, around that January time

5    frame, the Retail Board that's the trustees over the Retail

6    Funds understandably was asking questions about who's

7    providing services and digging in maybe more than they had

8    previously.

9        And one of the questions and where I got pulled into it

10   with Lauren was asking about the schedule, the Schedule A, if

11   we're able to provide an update to the Retail Board on that,

12   on that schedule, to which I basically responded to say it

13   doesn't exist.  You know, again, as a refresher from when we

14   put this agreement in in the first place, this was a -- this

15   was a one-and-done deal.  This was something that we were

16   going to do as of January.  We can be more general and say,

17   you know, these are the amounts that are being paid for these

18   services, but not get to the granularity of employee by

19   employee.

20   Q    So your recollection is that this was an exchange that was

21   intended to provide information to the Retail Board; is that

22   right?

23   A    That's my recollection.

24   Q    All right.  Can you go to Exhibit 151 in your binder?

25   Okay.  And do you see Lauren's email at the bottom of the

003030

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 6   Filed 12/12/22   Page 349 of 888   PageID 3653

Klos - Direct                                    127

 1  first page?  She's got some boxes there.

 2  A    Uh-huh.  Yes.

 3  Q    And do you recall what -- what it is she was asking to be

 4  done here?

 5  A    Yes, although just give me one moment to --

 6  Q    Yeah.  Take your time.

 7  A    -- to refresh myself on this one.

 8  Q    Sure.

 9       (Pause.)

10  A    Yeah.  So, this is the -- oh, this is actually -- this is

11  an interesting example.  So this is -- just starting at the

12  back of the chain, this is that monthly process that we were

13  describing earlier with the effective headcount report that's

14  -- that's pushing out to a number of people within the

15  organization anybody who is termed hired during that period.

16  And so, responding to that email that would have gone out

17  every month, Lauren is saying to Brian and Kelly, who are the

18  HR department at Highland, we have a request from the Retail

19  Board.  You know, they want to understand the contractual

20  employer, the ultimate payor, and their starting point is

21  going to be -- is going to be headcount.  So, you know, I

22  explained that the payment is accomplished through the shared

23  services and the expense reimbursement.  That's a reference to

24  the PRAs, as we've been describing them.

25  Q    Uh-huh.

003031

Klos - Direct                                    128

1    A    And then Lauren asked me to fill out a chart that says --

2    although actually I'm not sure if this was directed at me or

3    HR -- but saying, can we have a list of employees, show their

4    contractual employer?  And then she's asking for, can we do

5    the percentages like you did for Schedule A?  And I'm sorry,

6    this is a lot of background, but it's helpful for me to see

7    it.  Where I say, basically, it doesn't exist.  It was a

8    point-in-time estimate.

9         And that's the email that's at 11:45 a.m., where I say,

10   this was a point-in-time estimate.  January 1.  Estimate is --

11   is definitely the word.

12   Q    Can you just read the email?

13   A    Sure.  Sure.

14   Q    I'm sorry to interrupt, but --

15   A    Sure.  Sure.  Sure.

16   Q    -- let's make sure the record is clear.

17   A    Yeah.

18   Q    Go slowly, because --

19   A    Yeah.  Yeah.

20   Q    -- I know that you know this stuff, but Judge Jernigan

21   didn't live it like you did.

22   A    Yes.  Yeah.

23   Q    So can you just read your 11:45 a.m. email to Ms.

24   Thedford?

25   A    Yes.  So, in response to Lauren asking, wouldn't this just

Klos - Direct                                   129

1   be the Exhibit A percentages, I say, Those were a point-in-

2   time estimate as of beginning of 2018.  Half the people are

3   gone now.  If you were to reallocate them, all their

4   percentages, all the percentages would be different.  On top

5   of that, we don't have anything comprehensive that is

6   comparable for back office people.  So the only thing we can

7   really provide is a stale percentage on a small subset of the

8   overall population.  It would be much more logical to do

9   Yes/No and then have a -- and then as a blanket statement say

10  that NPA/HCMFA pay $x$ and $y$ dollars annually to HCMLP for these

11  employees' services and overhead.

12  Q    And from your perspective, is that consistent with the

13  email communication and exchange you had with Ms. Thedford in

14  April of 2018 before the payroll reimbursement agreements were

15  signed?

16  A    Yes, it's consistent.

17  Q    And did -- did Ms. Thedford accept your response?

18  A    Yes.  She said, Got it.  Thanks.  And I don't remember

19  ever having any follow-up beyond that.

20  Q    Okay.  So did -- do you know, to the best of your

21  knowledge, did Highland or the Advisors ever provide to the

22  Retail Board any updated analysis of the allocation of costs?

23  A    No.

24  Q    To the best of your recollection, did Highland or the

25  Advisors ever provide to the Retail Board any assessment of

003033

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/13/26 155 Page 352 of 888   PageID 3656

Klos - Direct                                              130

1  the costs that the Advisors were bearing under the payroll

2  reimbursement agreements?

3  A    No, not specifically.  No.  No.  The answer is no.

4  Q    And why is it not specifically?

5  A    Because, as part of the 15(c) process that happens every

6  year, there is some disclosure to the board about the

7  profitability of the Retail Advisors.  And so kind of implicit

8  in that is some of the underlying information from what

9  they're paying under these -- the PRAs and the SSAs.

10  Q    And --

11  A    So, that's why I was a little hesitant there.

12  Q    And so I really appreciate the specificity.  Within the

13  analysis that you're thinking of, would the flat monthly fees

14  that were paid under the payroll reimbursement agreements,

15  would that be one component of the profitability of the

16  Advisors?

17  A    Yes.

18  Q    And that's what you were referring to, --

19  A    That's right.

20  Q    -- right?

21  A    That's right.

22  Q    Okay.  Let's go back.  Now we've got the document up on

23  the screen.  This is Exhibit 145.  Can you just describe for

24  the Court what's happened here?  And, again, just to level

25  set, this is an update of the analysis that we looked at

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document   Filed 11/28/22   Page 353 of 888   PageID 3657
Document   Page 132 of 155

Klos - Direct                                    131

 1  before lunch that you did in November, right?

 2  A    Yes.

 3  Q    What's -- what's changed?  What is this?

 4  A    Yes.  So this is the same summary output in terms of the

 5  overall presentation.  I'm looking at these side by side, so

 6  I'll try to -- try to walk through.

 7  Q    Uh-huh.

 8  A    But you have the same top box with the same number, 14.6.

 9  This is what's being charged, $14.6 million, across the -- the

10  several contracts.

11  Q    Uh-huh.

12  A    You have the same line just below it of estimated cost to

13  provide services.  This number has come in between iterations,

14  so what was 16.9 on the previous analysis is now 16.1.

15       And then the other difference that's rolling through here

16  is that there is another offset that doesn't really have,

17  really, relation to these agreements, which is an offset of

18  nondebtor employees that are -- were providing services.  So

19  that's the -- that's the .9.  And it looks like we did a sign

20  flip on the -- on the shared services agreement.

21       So, net-net, our loss went from -- estimated loss went

22  from 2.3 on the original analysis to 1.5.  And then when you

23  start to take in these factors that are outside of the

24  agreements, we picked up another $900,000 of offsets.

25       And this was the version that was ultimately presented to

003035

Klos - Direct                                    132

1  FTI, showing that -- what, net, net, net, with all the -- with

2  all the disclaimers about subjectivity, these shared services

3  agreements -- and when I say shared services, I'm lumping in

4  the lot of them -- all of the intercompany are kind of a net,

5  it's kind of a net neutral.  It's basically a breakeven,

6  understanding that there's tremendous subjectivity.

7  Q   And did you have a goal?  Like, were you trying to

8  accomplish anything other than running numbers when you

9  prepared this analysis for the UCC?

10 A   Yeah.  Absolutely.  The goal here was to be able to, in

11 good faith, be able to come up with an analysis that we could

12 share with the UCC that would effectively buy time in the

13 bankruptcy process.  We were still very early.  We understand

14 Jim Dondero was working really hard to come to some sort of a

15 resolution.  And we really wanted space before something

16 drastic would happen.  So there was definitely a bias in this

17 exercise to put the profitability of these contracts in the

18 best possible light that we could and still -- and still have

19 our credibility.

20 Q   Okay.  I appreciate that.  So, in the span of the one

21 month, the difference between the -- the deficit or the loss

22 under the intercompany agreements was reduced by $800,000,

23 right?  6.9 to -- $800,000, right?

24 A   $800,000.  Yeah.  16.9 to 16.1.

25 Q   And you got there solely by adjusting the expense side,

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/13/26 of 155 age 355 of 888   PageID 3659

Klos - Direct                                    133

 1   right?

 2   A    Correct.  Correct.  The fee side stayed exactly the same.

 3   Q    Right?  Because the fee side is fixed and that can't

 4   change, right?

 5   A    Correct.  That's the 15.6 --

 6   Q    Okay.

 7   A    -- in the box in both analyses.

 8   Q    And so did anything actually happen between November and

 9   December to change the expenses?

10   A    No.  I think we had one employee who left right at the end

11   of December who was a -- not a highly-compensated employee.

12   Q    So that -- so that the difference is the result solely of

13   the change in assumptions that you were making; is that fair?

14   A    Right.  More tweaking and -- yeah, that's right.

15   Q    Okay.  And can -- okay.  Fine.  So you prepared this

16   analysis.  You give it to the UCC.  You speak with Ms.

17   Thedford.  We looked at that.  And I'm just trying to finish

18   this up.  Do you recall that at the end of November Highland

19   had given notice of termination of the shared services

20   agreements?

21   A    Yes.

22   Q    Okay.  Do you recall the very next day you exchanged some

23   emails with Dustin Norris?

24   A    Yes.

25   Q    You knew Dustin, right?

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document   Filed 04/14/22   Page 356 of 888   PageID 3660

Klos - Direct                                    134

1    A    Yes.

2    Q    Okay.  And how did you know him?

3    A    We -- we've worked together for a long time.  Never

4    particularly closely, but he was hired at Highland in the

5    2010-2011 time frame, and then a few years in moved to

6    Highland Capital Management Fund Advisors.  And then in 2019

7    transferred again from Highland Capital Management Fund

8    Advisors to NexPoint Advisors, LP.  And so we've interfaced

9    from time to time on a variety of issues.

10   Q    Do you have an understanding of what his role is at the

11   Advisors?

12   A    Yes.  You know, generally speaking, marketing and

13   distribution and investor and wirehouse interface for the

14   (inaudible) funds, as well as for some of the private

15   offerings done through NexPoint.

16   Q    To the best of your recollection, did Mr. Norris

17   participate in any way in the discussions in late 2017 through

18   May 2018 about the creation of these agreements and the

19   economic relationship between the Advisors and Highland?

20   A    No.

21   Q    To the best of your recollection as you sit here today,

22   did Mr. Norris play any role at all in formulating, drafting,

23   or administering the subadvisory agreements that were

24   originally prepared for NexPoint and HCMFA in early 2018?

25   A    No.

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document Filed 13/26 of 155   Page 357 of 888   PageID 3661

Klos - Direct                                    135

1    Q    To the best of your recollection, did Mr. Norris play any

2    role at all in the formulation, drafting, or administration of

3    the payroll reimbursement agreements?

4    A    No.

5    Q    To the best of your recollection, did Mr. Norris play any

6    role in formulating, drafting, or executing the amendments to

7    the payroll reimbursement agreements in December 2018?

8    A    No.

9    Q    To the best of your recollection, did Mr. Norris play any

10   role at all in the formulation, drafting, or administration of

11   the NexPoint or HCMFA shared services agreements?

12   A    No.

13   Q    Prior to December 2020, had you ever discussed with Mr.

14   Norris how the amounts paid under the payroll reimbursement

15   agreements were calculated?

16   A    Not that I can remember, no.

17   Q    Prior to December 2020, had Mr. Norris ever asked you any

18   questions about the actual costs of services rendered under

19   the shared services or payroll reimbursement agreements?

20   A    Maybe -- maybe in the November time frame, but it really

21   became acute in December and January.

22   Q    Okay.  If Mr. Norris testifies that the December 2018

23   amendments to the PRAs was the result of a true up that you

24   prepared, what would you say?

25   A    I would say there was -- there was no true up.  There was

 1  no analysis done.  And I'm sorry to put it so bluntly, but you

 2  weren't there, and so it just didn't happen.

 3  Q    And did you ever tell him that?

 4  A    Not -- certainly not in those -- in those words, no.

 5  Q    Okay.  Let's go -- let's grab the Advisors' binder and go

 6  to Exhibit P, please.  P as in Peter.  I think -- I think you

 7  testified that you recall the notice of termination of the

 8  shared services agreement was November 30th.  Do I have that

 9  right?

10  A    Yes.

11  Q    Okay.

12  A    Yes, you do.

13  Q    Let's take a look at this.  If you could just -- are you

14  familiar with this email exchange?

15  A    Yes.  Yes.

16  Q    Okay.  And can you describe generally for Judge Jernigan

17  what's happening on December 1, 2020, the morning after notice

18  of termination is given?

19  A    Yes.  So, I think there's a lot of running around, hair on

20  fire going on around that time, particularly for the Retail

21  Advisors.  So the notice was I think the evening of November

22  30th.  And it's my understanding that that notice was quickly

23  provided to the -- to the Retail Board, who certainly,

24  understandably, wanted assurance that there would be no

25  disruption in services and that there would be a smooth

Case 21-03010-sgj  Doc 110  Filed 04/14/22  Entered 04/14/22 15:23:58  Desc Main
Case 3:22-cv-02170-S  Document  Filed 04/13/22  Page 359 of 888  PageID 3663

Klos - Direct                                                137

1   transition.

2        So I think there was a flurry of activity right after that

3   point to help, you know, answer those types of questions that

4   the Retail Board had.  And then also really get serious about

5   an actual transition plan.

6   Q   And if you look on the page ending in Bates No. 107,

7   you'll see an email from Mr. Norris at 8:53 a.m.  Do you see

8   that?

9   A   Yes.

10  Q   Okay.  And is -- are the emails that followed a discussion

11  about kind of amounts that were paid under the payroll

12  reimbursement agreements?

13  A   Yes.  As well as the shared services agreements.

14  Q   Okay.  And do you see Mr. Norris included a chart there of

15  fees?

16  A   I do.

17  Q   And did you give him that information?

18  A   I don't believe so.  Based on the date being 6/30 of 2020,

19  I assume he -- he likely pulled it himself from the 15(c)

20  materials that I was discussing earlier, because those

21  materials were presented each year through 6/30.  So that

22  would have been -- that's my guess, is that that's where he

23  pulled those, those numbers.

24  Q   Any idea why NexPoint paid $5,040,000, why it's shown as

25  -- for the 12-month period, and not the $6 million?

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 6   Filed 12/12/1 Page 360 of 888   PageID 3664

Klos - Direct                                          138

1   A    Yes.  And actually, that's contained in my response at

2   9:00 o'clock a.m.

3   Q    Uh-huh.

4   A    So, yeah, so he sent this at 8:53.  And it looks like,

5   from his -- from his email, he's wanting to, first and

6   foremost, make sure the numbers are right, but -- but is

7   starting to think about these termination notices.  So the

8   reason it's -- to answer your question, the reason it's

9   $5,040,000 is because the numbers that he pulled were NexPoint

10  standalone, and so it's missing the $80,000 a month from

11  NexPoint Real Estate Advisors.  And that's what I clarify in

12  the email that I sent back to him seven minutes later, is just

13  saying that, you know, note that while these, you know, these

14  amounts are what they are, there is an additional $960,000 per

15  year in shared services through NREA.

16  Q    So, if we went back and looked at your -- not that I'm

17  going to do this -- but if we went back and looked at your

18  December 2017 email that we started a couple of hours ago

19  with, it would show the exact same numbers that are on this,

20  but for the addition of that $80,000 a month from the NexPoint

21  Real Estate Advisors shared services agreement.  Do I have

22  that right?

23  A    Yes.  And that was -- and that was there, too.  It's just

24  that it's not included in this specific chart.

25  Q    Okay.  Now, do you see Mr. Norris's email at the top?

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 6   Filed 13/26 155   Page 361 of 888   PageID 3665

                              Klos - Direct                        139

 1   A    Yes.

 2   Q    Okay.  And can you just describe for the judge what your

 3   recollection and understanding is of what the back-and-forth

 4   here, what's going on?

 5   A    Yeah.  So he's -- he's highlighting the fact that some of

 6   the people that were originally part of schedules aren't there

 7   anymore.  Mark, which that's a reference to Mark Okada.  Jim.

 8   That's a reference to Jim Dondero.  Pogs.  That's a reference

 9   to Jon Poglish, who -- who term'd in, I think, September of

10   2020.

11   Q    Uh-huh.

12   A    Trey is a reference to Trey Parker, who term'd in February

13   of 2020.  Parm is a reference to Andrew Parmentier, who term'd

14   in May -- May-ish 2019.  And many others.  So he's -- he's

15   asking me about, are we still paying the same amounts because

16   of the BK?

17   Q    Okay.  And what's your response?  What do you tell Mr.

18   Norris at this point?

19   A    So, I say the amounts have not changed since BK.  And then

20   I go on to point out that -- that given the changes in

21   headcount, profitability would have increased from HCMLP's

22   perspective.

23   Q    And why did you -- why did you tell Dustin that?

24   A    I think mainly it's -- it's a statement that's somewhat

25   obvious, which is that if revenue stays exactly the same and

Klos - Direct                                    140

1  expensive people leave, then profitability is going to

2  increase for the -- for the party that's receiving the revenue

3  and bearing the burden of the expense.  So it's -- I think

4  it's a pretty straightforward statement.  And recognizing

5  that, you know, we have been paying -- sorry, we had been

6  receiving those flat amounts throughout the period.

7  Q   And is it your understanding, after your negotiations --

8  withdrawn.  I'll just leave it.

9      After you had this exchange with Mr. Norris, do you recall

10 being asked by Mr. Waterhouse to update the analysis that you

11 had prepared in December 2019?

12 A   Yes.  So, about a week later, December -- I think it was

13 December 8th, --

14 Q   Uh-huh.

15 A   -- I got a call from Frank with a request to update the

16 analysis that we had done for the UCC the previous year.

17 Q   And do you recall discussing that with Frank?

18 A   Yes.  I'll say, this -- the agreements had just been

19 terminated the week before.  It was, I guess, my -- my Spidey

20 senses were up a little bit.  It was -- it seemed like an odd

21 request.  We hadn't -- we hadn't looked at this in a long

22 time.  And so I did, I asked him in that moment what are --

23 can you -- can you confirm for me that this is not for any

24 sort of adverse purpose?  And he told me that -- that it

25 wasn't.

003044

1      And then in terms of the actual analysis, the analysis

2  that was requested was, you know, roll forward that schedule

3  from last year that you shared with the UCC, update it for the

4  current headcount -- so remove people who terminated; add

5  people who were hired -- and delete everyone's bonus, and

6  don't touch any of the percentages.

7  Q    And do you understand that that became the foundation of

8  the administrative claim that was filed the following a month?

9  A    I believe it probably was.

10  Q    And the assumptions that you were just asked to make, were

11  those assumptions that you on your own decided to make, or

12  were those assumptions that Mr. Waterhouse asked you to make?

13  A    They were -- they were given.

14  Q    Did you believe -- let's see.  Let's take a look.  We're

15  at Exhibit Q.  That's your email to Mr. Waterhouse.  Do I have

16  that right?

17  A    Yes.

18  Q    Okay.  And let's look at the attachment for a second.  So,

19  the attachment -- tell -- explain to Judge Jernigan what's

20  happening in this attachment to Exhibit Q.

21  A    Yes.  So this attachment, it actually -- it looks

22  different from some of the other analyses that we were looking

23  at before.  In reality, it's just another tab on the same

24  analysis in the Excel spreadsheet.

25      And so what it is, what it is doing is it's doing a -- the

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document   Filed 14/14/22   Page 364 of 888   PageID 3668
Document   Page 142 of 155

Klos - Direct                                   142

 1    -- I'll point out the individual numbers.  The front office

 2    current charge is a reference to the -- to the PRAs of $8

 3    million a year.  So, $3 million for NexPoint, $5 million for

 4    HMCFA.  And then the shared services, again, current charge is

 5    the $3 million of shared services to NexPoint plus NREA and

 6    the $3.6 million for HCMFA that was running around -- it was

 7    300 a month-ish, but it would vary slightly from month to

 8    month.

 9         And then all the other numbers that are -- that are -- for

10    example, the investment support, directly below current

11    charge, is -- is the build up from the assumptions that I had

12    layered in:  namely, updating the headcount, not touching the

13    percentages, and deleting everyone's bonuses.

14    Q    Did you ever discuss this document with anybody prior to

15    confirmation of the Debtor's plan on February 2, 2021?

16    A    I don't believe so, other than Frank.

17    Q    Do you know what Frank did with the document?

18    A    No, I don't.

19    Q    Did you believe at that time that this document accurately

20    and fairly reflected Highland's profitability under the

21    payroll reimbursement agreements or the shared services

22    agreements?

23    A    Absolutely not.

24    Q    And why is that?

25    A    Well, bonuses are a big component of compensation for

003046

Klos - Direct                                      143

1    asset managers.  So there are some -- there are some definite

2    flaws here in terms of leaving that out, both the bonuses as

3    well as the deferred bonuses, which were material for some

4    people.

5         Another factor that would have skewed this result is not

6    touching any of the allocations, because the reality is, after

7    the petition date, investment activity of Highland, at HCMLP-

8    managed funds, dropped tremendously, because you had investor

9    redemptions, you had funds getting closed.  So those same

10   employees were -- would have been spending more time and

11   working more on Retail Advisor issues.  And you also did have

12   people whose roles changed in the interim time period.

13        For example, Trey Parker left, who was an investment

14   professional, and his roles and responsibilities were

15   transferred to the legal team which took over the distressed

16   PE management, which was pretty active for the -- for the

17   Retail Funds.

18   Q    So, on that topic, can you go to -- let's flip through

19   these real quick -- Exhibit 36?

20   A    Bear with me.

21        MR. MORRIS:  Your Honor, this is a good time to tie

22   one other tiny loose end.  I think on Friday the Reorganized

23   Debtor filed an emergency motion to I think redact or file

24   under seal certain documents.  The documents we're about to

25   look at are those documents.

Klos - Direct                       144

```
 1              THE COURT:  Okay.

 2              MR. MORRIS:  And they have been redacted to take out

 3    addresses, home addresses of certain people.  I just want you

 4    to know that what you have in your binder is not going to be

 5    the official exhibit, --

 6              THE COURT:  Okay.

 7              MR. MORRIS:  -- the only difference being that if

 8    that motion is granted -- I don't think Your Honor has tended

 9    to it yet -- but we're just going to redact addresses.  That's

10    the only purpose of the motion.

11              THE COURT:  Okay.  I have not tended to it, --

12              MR. MORRIS:  Yet.

13              THE COURT:  -- but I presume it's not opposed.

14              MR. MORRIS:  I just -- correct.

15              THE COURT:  Okay.

16              MR. MORRIS:  He certainly is familiar with all these

17    people.

18              THE COURT:  Okay.  Mr. Rukavina, you're --

19              MR. RUKAVINA:  No, Your Honor, of course --

20              THE COURT:  The motion to redact is not opposed?

21    It's just addresses?

22              MR. RUKAVINA:  No, of course not.

23              THE COURT:  All right.

24              MR. RUKAVINA:  Yeah.

25              THE COURT:  All right.  I'll be signing an order on
```

003048

Klos - Direct                              145

1    that.

2              MR. MORRIS:  Okay.

3    BY MR. MORRIS:

4    Q    So, starting with -- we're just going to look at these

5    very quickly.  In February 2020, do you recall that the titles

6    of certain employees at Highland were changed?

7    A    Yes.  For a number of people.

8    Q    And were the -- were the title changes related in any way

9    to the changing responsibilities that these employees

10   undertook?

11   A    Yes.  And specifically for the ones that I think we're

12   about to look at, it's -- it was in relation to Trey Parker

13   leaving, who he was the head of private equity at Highland,

14   and so his responsibilities were carved up amongst a number of

15   people.

16   Q    So, did Ms. Irving take on responsibility as a managing

17   director of distressed, as reflected in Exhibit 36?

18   A    Yes.

19   Q    And let's go to Exhibit 37.  As of February 28th, was Ms.

20   Vitiello given responsibility in the area of distressed?

21   A    Yes.

22   Q    Exhibit 38.  Was Mr. DiOrio made a managing director of

23   private equity?

24   A    Yes.

25   Q    The next exhibit is 39.  Was Mr. Leventon, in February

003049

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document   Filed 04/14/22   Page 368 of 888   PageID 3672

Klos - Direct                                    146

1   2020, given the new title, the new additional title of

2   managing director, distressed?

3   A    Yes.

4   Q    Exhibit 40, Mr. Cournoyer.  Was he also given a new title,

5   co-head of private equity?

6   A    Yes.

7   Q    And were all of these changes related to changes in

8   responsibilities?

9   A    Yes.  Expansion of responsibilities and, you know,

10  coinciding with the termination of Mr. Parker, which was on

11  the same date as all these letters, February 28th of 2020.

12  Q    And did those individuals we just looked at, do you know

13  if those individuals kind of filled the void of Mr. Parker's

14  departure?

15  A    Yes.  Again, group effort, so it's not -- it's one

16  person's big responsibilities getting carved up amongst a

17  number of different people.

18  Q    So when you talked about with Ms. Thedford, really, in the

19  exact -- I guess the month before all of this happened, you

20  mentioned that there would be reallocations if somebody was

21  actually to go back and look and review the exhibit, the

22  exhibits.  Do I have that right?

23  A    Yeah.  That's -- that's correct.  Everyone's role -- and

24  this was true prepetition and postpetition -- people's roles

25  evolved and changed.  And so any sort of a point-in-time

Klos - Direct                    147

```
 1   estimate, however flawed, is just that.  It's a point in time.

 2   Q    Are you aware of any -- the changes that you just

 3   described for the individuals that you just described, would

 4   it be fair to describe those new responsibilities as

 5   investment advisory services?

 6   A    I believe so.

 7   Q    And they were within Trey Parker's bailiwick; is that

 8   right?

 9   A    Yeah, within his bailiwick.  You know, managing and

10   monitoring those PE investments.

11   Q    Okay.  Are you aware of anybody ever saying at any time

12   prior to November 2020 that Highland was failing to provide

13   investment advisory services of the type that they provided

14   for a decade before?

15   A    No, with the only small exception was that there was a --

16   there was a conflict identified on a single private equity

17   asset in the summer, call it August-ish time frame.

18   Q    What's the name of that asset?

19   A    That one was OmniMax.

20   Q    So, other than with respect to OmniMax, did -- are you

21   aware of any statement, suggestion, allegation prior to

22   November 2020 where somebody alleged that Highland was failing

23   to provide investment advisory services?

24   A    Never.

25   Q    Okay.  Two very short topics.  Let's turn to Exhibit 159.
```

Klos - Direct                                148

1    Can you tell Judge Jernigan what that is?

2    A    Sorry.  Bear with me.  1-5-9?

3    Q    Yes.

4    A    Okay.  I'm there.

5    Q    Can you just describe for the Court what that document is?

6    A    Yes.  This is the September monthly invoice from Highland

7    Capital Management, LP to Highland Capital Management Fund

8    Advisors under the shared services agreement.  We haven't

9    spent too much time on it, but most of the agreements were

10   fixed.  This was the one that did have a little bit of

11   variability because we would -- we would charge these invoices

12   each month.

13   Q    Okay.  And that was the practice going back to about 2013;

14   is that right?

15   A    Might have even been 2012, but a long way back.

16   Q    Okay.  And when we talk about the five intercompany

17   agreements today, is this the only one that was variable?

18   A    Yes.

19   Q    Okay.  And did you have any responsibility for the --

20   would Highland prepare four HCMFA monthly invoices for shared

21   services?

22   A    Yes.

23   Q    And did you have any responsibility for the preparation of

24   those invoices?

25   A    Like I said, this was a practice for many years, so early

003052

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document   Filed 14/22   Page 1 of 155   Page 371 of 888   PageID 3675

Klos - Direct                                    149

1    on I did, maybe the first year or two.  And then that became a

2    task that was passed among the team.  And so for years that

3    process rolled up through me as the -- as the head of the

4    department.

5    Q    Okay.  And did -- did the invoiced amount stay fairly

6    consistent within a small band over time?  During the relevant

7    period?

8    A    Yeah.  During the relevant period, during the relevant

9    period it would have crept up a little bit as compensation

10   went up, and I believe there was a small net increase in

11   headcount.  Postpetition, it barely moved.  It was always

12   between call it $290,000 and maybe just over $300,000 per

13   month.

14   Q    Okay.  I just want to ask about one particular entry on

15   here.  There's an entry in the middle for legal.  Do you see

16   that?

17   A    Yes.

18   Q    And it's $10,000?

19   A    Yes.

20   Q    Does that mean that for legal services rendered by

21   Highland under the shared service agreement HCMFA paid $10,000

22   per month?

23   A    Yes.  At this time, that's right.

24   Q    That's the total of what they paid?

25   A    Yes.

Case 21-03010-sgj    Doc 110    Filed 04/14/22    Entered 04/14/22 15:23:58    Desc Main
Case 3:22-cv-02170-S    Document    Filed 04/15/2025    Page 372 of 888    PageID 3676

Klos - Direct                                    150

 1   Q    So, $120,000 for a whole year?

 2   A    Yes.  There's a five percent markup on it, so it's $10,500

 3   per month times 12.

 4   Q    How did that -- did anybody do an analysis to see if HCMFA

 5   was actually responsible for $10,000 a month --

 6   A    No.

 7   Q    -- in legal fees?

 8   A    No.

 9   Q    Anybody ever say at Highland, gee, we should be charging

10   HCMFA more money because the actual cost of their services is

11   much greater?

12   A    No.  Nobody said that.

13   Q    Finally, let's just talk about damages.  Have you done an

14   analysis of the damages that Highland alleges that it has

15   sustained from the Advisors' breach of contract?

16   A    Yes, in part.

17   Q    Okay.  Let's talk about the part that you prepared.  Can

18   you describe for the Court your damage analysis?

19           MR. RUKAVINA:  And Your Honor, I do have to object

20   here.  This witness has not been qualified as an expert,

21   designated as an expert.  There's no expert report.

22       Now, if the damages are just they didn't pay per month and

23   they owe us for that month, that's not an expert deal.  But I

24   hear damages analysis and I hear that this person did an

25   analysis, so --

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 6   Filed 12/12/2 Page 373 of 888   PageID 3677

Klos - Direct                                    151

1           MR. MORRIS:  He's going to -- he's going to add the

2       amounts in the contracts, multiply them by the number of

3       months that weren't paid, and come up with a number.

4           MR. RUKAVINA:  That's -- that's easy.

5           THE COURT:  Okay.

6           MR. RUKAVINA:  We know what that number is.  That's

7       easy.

8           THE COURT:  Okay.

9           MR. MORRIS:  So will you stipulate?

10          MR. RUKAVINA:  Huh?

11          THE COURT:  Okay.  I overrule the objection if

12      there's still one pending.

13          MR. MORRIS:  Okay.  All right.

14      BY MR. MORRIS:

15      Q   Mr. Klos, can you describe for the Court how we arrive at

16      our breach of contract damages?

17      A   So, to summarize, NexPoint was paying $500,000 per month.

18      It didn't pay for two months.  So that's a million from

19      NexPoint.

20          HCMFA had the payroll reimbursement, the $416,000 per

21      month.  It didn't pay for two months.  So that's $832,000.

22          And then on the shared services agreement, HCMFA actually

23      didn't pay for three months, because the -- the November of

24      twenty -- let get my year right -- November of 2020, HCMFA

25      invoice hadn't been created at the Mr. Dondero said to stop

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document 6   Filed 11/22/22   Page 374 of 888   PageID 3678

Klos - Direct                    152

 1   payments.

 2        So three months of HCMFA shared services, two months of

 3   PRA, and then two months of NexPoint for everything.

 4   Q   And if we could just quickly look at Exhibit I in the

 5   Advisors' exhibits so we can get a number for the HCMFA shared

 6   services three-month piece.

 7   A   I?

 8   Q   Yes.

 9   A   Do you have a page, by any chance?  Is it in the back?

10   Q   It's the last page.

11   A   In the last --

12   Q   It's Exhibit A.  And I'll just represent to you that this

13   is the Debtor's responses to the Advisors' discovery requests.

14   A   This -- this, to me, looks like payments made as opposed

15   to amounts outstanding.

16   Q   I understand that.

17   A   Okay.

18   Q   Okay.  So, so the Advisors -- did the Advisors pay for

19   shared services in November, December of 2020, or January of

20   2021?

21   A   Oh, I understand.  Not as it pertained to Highland Capital

22   Management Fund Advisors shared services.

23   Q   Okay.  And if you look at the middle of the page, the

24   amount that was paid each month for the preceding six months

25   is approximately two hundred and -- $308,000 or $305,000?  Is

Klos - Direct                          153

1  that right?

2  A   I'm sorry.  One -- can you ask that again, please?

3  Q   The amount -- do you know what Exhibit A is?

4  A   Yes.  Exhibit A is a listing of all the payments that were

5  made postpetition by the Retail Advisors.

6  Q   Okay.  So in the middle of the page, there are payments

7  that were made each month by HCMFA under the shared services

8  agreements.  Am I reading that correctly?

9  A   Yes.  Yes, you are.

10 Q   And how much were they paying in 2020?

11 A   Got it.  Yes.  So they were paying, just looking at it

12 quickly, it looks like the lowest was about $294,000 and the

13 highest was around $308,000.

14 Q   Okay.  And how would you calculate the damages for the

15 three months that they didn't pay, looking at this?

16 A   It would be approximately -- the best proxy for it would

17 be the November payment, so it would be approximately three --

18 three more of the November 30th payment of about $308,000.

19 Q   Okay.  So 308 times three?

20 A   Yes.

21 Q   Plus the million dollars from NexPoint?

22 A   Yes.  Plus the 832 of PRAs.

23 Q   Ah.  Correct.  Okay.  And is it your understanding that

24 Highland also seeks to recover its attorneys' fees, costs, and

25 expenses under the contracts?

Case 21-03010-sgj   Doc 110   Filed 04/14/22   Entered 04/14/22 15:23:58   Desc Main
Case 3:22-cv-02170-S   Document   Filed 04/15/26   Page 376 of 888   PageID 3680

Klos - Direct                                    154

1   A    That's my understanding.

2   Q    Okay.

3           MR. MORRIS:  Your Honor, I have no further questions.

4           THE COURT:  All right.  Pass the witness.  Mr.

5   Rukavina?

6       (Transcript excerpt concluded at 2:19 p.m.  Proceedings

7   concluded at 6:19 p.m.)

8                           --oOo--

9

10

11

12

13

14

15

16

17

18

19                         CERTIFICATE

20       I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
21  above-entitled matter.

22   /s/ Kathy Rehling                        04/14/2022

23  _____      _____

24  Kathy Rehling, CETD-444                         Date
    Certified Electronic Court Transcriber

25

                                                    003058

Klos - Direct                                                    155

                                  INDEX
                    *Excerpt: 9:38 a.m. to 2:19 p.m.*

PROCEEDINGS                                                        3

OPENING STATEMENTS

- By Mr. Morris                                                   10
- By Mr. Rukavina                                                48

WITNESSES

Plaintiff's Witnesses

David Klos
- Direct Examination by Mr. Morris                               61

EXHIBITS

Plaintiff's Exhibits 1-161                           Received 6

Defendants' Exhibits A through DD (exclusive of      Received 7
G, H, L, Z, and CC)

RULINGS

Motion to Redact - *Granted*                                    144

END OF PROCEEDINGS                                              154

INDEX                                                          155

003059

# Tab 10

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 64-1   Filed 11/28/22   Page 879 of 888   PageID 23683
HCM V. HCMFA, et al.                                                    1

```
 1                IN THE UNITED STATES BANKRUPTCY COURT

 2                FOR THE NORTHERN DISTRICT OF TEXAS

 3                          DALLAS DIVISION

 4
     IN RE
 5
     HIGHLAND CAPITAL MANAGEMENT, L.P.  §
 6                                      §   CASE NO. 19-340540SGJ11
                                        §   DALLAS, TEXAS
 7                   Debtor             §   TUESDAY, APRIL 12, 2022
                                        §   2:19 P.M. - 6:18 P.M.
 8
     HIGHLAND CAPITAL MANAGEMENT, L.P., §
 9                   Plaintiff,         §
     vs.                                §   ADVERSARY PROCEEDING
10                                      §   NO.  21-03010-SGJ
     HIGHLAND CAPITAL MANAGEMENT FUND   §
11   ADVISORS, L.P., et al.             §
                     Defendants.        §
12

13                             TRIAL

14          BEFORE THE HONORABLE STACEY G. JERNIGAN
                 UNITED STATES BANKRUPTCY JUDGE
15

16

17

18

19

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.
```

002482

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 41-1   Filed 11/28/23   Page 380 of 888   PageID 25684
HCM V. HCMFA, et al.                                                              2

1                          <u>APPEARANCES:</u>

2

3   FOR HIGHLAND CAPITAL MANAGEMENT,    JOHN A. MORRIS, ESQ.
    LP                                  HAYLEY R. WINOGRAD, ESQ.
                                        PACHULSKI STANG ZIEHL &
4                                        JONES, LLP
                                        10100 SANTA MONICA BVD
5                                       13TH FLOOR
                                        LOS ANGELES, CA  900067

6

7

8   FOR HIGHLAND CAPITAL MANAGEMENT     DAVOR RUKAVINA, ESQ.
     FUND ADVISORS, L.P.                THOMAS D. BERGHMAN, ESQ.
9                                       MUNSCH, HARDT, KOPF & HARR
                                        500 N. AKARD STREET
10                                      SUITE 3800
                                        DALLAS, TX  75201

11

12  COURT RECORDER:                     ME
                                        Clerk's Office
13                                      U.S. Bankruptcy Court
                                        501 W. 10th Street
14                                      Fort Worth, TX  76102

15
    TRANSCRIPTION SERVICE:              ACORN TRANSCRIPTS, LLC
16                                      3572 Acorn Street
                                        North Port, FL  34286

17

18

19

20

21

22

23

24

25

002483

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 24-31   Filed 12/28/21   Page 831 of 1865   PageID 23635
HCM V. HCMFA, et al.                                                          3

```
 1        DALLAS, TEXAS; TUESDAY, APRIL 12, 2022; 2:19:25 P.M.

 2        (Counsel confer)

 3                          CROSS-EXAMINATION

 4   BY MR. RUKAVINA:

 5   Q    Mr. Klos, you and I have met in deposition a couple of

 6   times but not in person, so good afternoon.

 7   A    Good afternoon.

 8   Q    I guess I'm a little bit conceptually perplexed.  Is it

 9   your understanding of these contracts that if every single

10   Highland employee quit, that the advisors would still have

11   to keep paying under the payroll reimbursement and shared

12   service agreements?

13   A    If every single employee of Highland quit, would they

14   still have to continue paying?

15   Q    Yeah.

16   A    I don't know.  I don't know that practically that is

17   ever a possibility.

18   Q    But if it happened, is it your understanding as the

19   controller and CFO and having administered these contracts

20   for years that my clients would still have to be paying

21   every month?

22   A    I don't know as a legal matter.  As a practical matter,

23   no.

24   Q    Okay.  Now, just go a few background things.  You're a

25   CPA, correct?
```

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 24-1   Filed 04/26/23   Page 882 of 1888   PageID 23686
HCM V. HCMFA, et al.                                                           4

```
 1    A     Yes.

 2    Q     Your -- you consider yourself a professional, correct?

 3    A     Yes.

 4    Q     You've never been disciplined as an accountant or CPA,

 5    correct?

 6    A     Correct.

 7    Q     You pride yourself in doing a professional job for your

 8    employer, correct?

 9    A     Yes, I pride -- I take pride in my job.

10    Q     Okay.  Would you not deceive anyone with your work

11    product or your professionalism, would you not

12    intentionally?

13    A     Never intentionally, no.

14    Q     Okay.  You wouldn't assist someone else intentionally

15    with deceiving the IRS or deceiving contract counterparties,

16    would you?

17    A     No.  No.

18    Q     You wouldn't deceive intentionally any auditor, would

19    you?

20    A     No.

21    Q     Okay.  You wouldn't deceive intentionally Mr.

22    Waterhouse your boss back then, would you?

23    A     No.

24    Q     Or FTI or the unsecured creditor's committee, would

25    you?
```

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 41-31    Filed 10/28/21    Page 93 of 163    PageID 2657
HCM V. HCMFA, et al.                                                              5

1   A     No, we do things in good faith.

2   Q     Or DSI too, right?

3   A     Correct.

4   Q     So you consider yourself as an ethical professional

5   accountant now CFO.

6   A     Yes, I consider myself ethical, yes.

7   Q     Before I get into the meat of the matter, there's a

8   couple of things I thought I heard you say that we can

9   clarify.  I thought I heard you say that the advisors had

10  not been paying for investment advice services before the

11  subadvisory agreements; isn't that correct?

12  A     Yes, that's correct I believe, yeah.

13  Q     Yeah.  I think you said that the advisors were paying

14  under shared services agreements, but there was no similar

15  front office investment reimbursement agreement, correct?

16  A     Correct.  There was no front office equivalent.

17  Q     Okay.  How do you know that?

18  A     I was a part of the corporate team throughout the

19  period from the very beginning of NexPoint and

20  (indiscernible) existence and wasn't aware of such an

21  agreement or certainly any amount paid under such

22  agreements.

23  Q     Would you please turn to your Exhibit 29?  It's the --

24  yeah, it's the -- one of the thick binders.

25        Let me know when you're there, sir.  This has been

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 1-1 Filed 06/28/26   Page 384 of 888   PageID 2636
HCM V. HCMFA, et al.                                              6

```
 1   admitted into evidence.  This is the shared services
 2   agreement with NexPoint going back to 2013.  Do you see
 3   that, sir?
 4   A    Yes.
 5   Q    And on the third page, Section 2.01 if you'll flip with
 6   me there, that's the services that are contracted for and
 7   being paid for, correct?
 8   A    I'll take your word for it, but it appears so, yes.
 9   Q    Well, yes, I mean, we can all read better.  It talks
10   about the services more fully, described more fully on Annex
11   A, do you see that, sir?  And if we please look to Annex A
12   which is at the end, it's going to be page -- it's going to
13   end with Bates label 625.
14   A    Sorry --
15   Q    Bottom of 625, yeah.
16   A    -- 665.  I'm with you.
17   Q    See the very bottom there it says investments,
18   investment research and recommendations on an ad hoc basis
19   as requested.  Do you see that?
20   A    Yes, I do see that.
21   Q    Isn't that front office services?
22   A    It depends on your definition of front office services.
23   It doesn't look to me like advisory services, but it's -- it
24   is a reference to front office.
25   Q    Okay.  And do we have to look through the same one for
```

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 31-2    Filed 02/22/26    Page 385 of 868    PageID 2639
HCM V. HCMFA, et al.                                                    7

```
 1  HCMFA or do you agree that there's a similar protegent price

 2  in the --

 3  A    If -- I would take your representation if you said it

 4  was.

 5  Q    Did you look -- when was the last time, if ever, you

 6  looked at this original shared services agreement with

 7  NexPoint?

 8  A    I don't recall specifically.

 9  Q    Would it have been in the last few weeks?

10  A    I'm certain I've looked at it in the context of this --

11  of today's events.

12  Q    Is it possible that you made a mistake when you

13  testified a little bit ago to the five years the advisors

14  were not paying for investment services to Highland?

15  A    No, I don't think I misspoke on that.

16  Q    Because you said that there was no separate contract

17  for investment services, right?

18  A    Correct, there was no -- there was none.

19  Q    But we see at least these contracts that just -- that

20  investment services were actually being paid for, just not

21  by a separate contract.

22  A    We see a reference to investment research and

23  recommendations on an ad hoc basis, as requested.

24  Q    And I had another question for you that I was confused

25  about.
```

002488

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 1-81 Filed 12/28/26 Page 382 of 868   PageID 2690
HCM V. HCMFA, et al.                                                8

```
 1              MR. RUKAVINA:  Mr. Bergham, if you'll pull up your

 2   deposition or not your deposition, Mr. Klos' deposition.

 3   Q    Do you remember me deposing you on March 14th?

 4   A    Yes, sir.  I don't remember the day, but I assume

 5   that's right.

 6   Q    And you testified earlier today that when Mr. Dondero

 7   told you $5 million from HCMFA and $6 million for NexPoint

 8   because of cash needs at Highland and because they wanted

 9   deductions at the advisors, right?

10   A    I don't know that those were my specific words.

11   Q    What did you testify earlier today about how the 5 and

12   $6 million were arrived at?

13   A    I don't specifically remember my testimony but that

14   certainly those numbers originated from Mr. Dondero.

15   Q    Okay.  Well, let's look at how you answered my question

16   less than a month ago, beginning on the bottom of page 10.

17   Can you see, Mr. Klos?

18              MR. MORRIS:  Objection, Your Honor, there's

19   nothing to impeach.  Why is he going to the deposition

20   testimony?

21              THE COURT:  It doesn't seem like he's done

22   anything to impeach yet?

23              MR. RUKAVINA:  Of course he does.  Your Honor,

24   this morning he testified that Dondero told him to make the

25   numbers 6 million and 5 million because Highland needed cash
```

002489

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 28-1    Filed 04/22/26    Page 387 of 868    PageID 2699
HCM V. HCMFA, et al.                                                            9

 1  and the advisors needed tax deductions.  When I asked him

 2  that question a month ago, you'll see he says he's

 3  speculating.  I asked him.  I asked him, why do you think

 4  it's 5 and 6 and he says I'm speculating.  So, yes, I'm

 5  impeaching him.

 6  BY MR. RUKAVINA:

 7  Q    Are you -- or, Mr. Klos, let's ask it this way.

 8       Do you have personal knowledge as to how Mr. Dondero

 9  arrived at the 5 and $6 million numbers he gave you for his

10  analysis?

11  A    These are two different questions, but.

12            THE COURT:  Are we moving on from the other

13  question?

14            MR. MORRIS:  No, Mr. Klos is with Mr. Rukavina,

15  they're doing fine.

16            THE COURT:  Okay.  Go ahead.

17            MR. RUKAVINA:  Okay.  So do you want to go a page

18  higher.  Go up a page higher, Mr. Bergham, page 9.

19  Q    So you see there in line 16 to 18, we're talking about

20  the two payroll reimbursement agreements.  Do you see that,

21  Mr. Klos?

22            MR. MORRIS:  I'm still objecting.  There's no --

23  nothing to impeach.

24            MR. RUKAVINA:  Your Honor, I haven't shown him yet

25  what there is to impeach because again a month ago he

002490

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 11/28/22   Page 388 of 868   PageID 2690
HCM V. HCMFA, et al.                                              10

1  testified that he would be speculating if -- to determine

2  how the 5 and $6 million numbers were arrived at.  This

3  morning he testified that Dondero told him at a meeting with

4  Mr. Waterhouse and others that Highland needed money and

5  that the advisors needed tax deductions.  That is -- I'm

6  allowed to impeach him if he didn't -- if a month ago he's

7  saying he's speculating and today he's saying that's what

8  Dondero told him.

9         MR. MORRIS:  Your Honor, if I may there's two

10  different questions.  One is, where did the number come

11  from, the other, how was it arrived at.  Mr. Klos testified

12  unequivocally that the numbers came from Mr. Dondero, and if

13  he wants to ask him the question do you know how they were

14  calculated, he should ask him the question.  There's nothing

15  to impeach.

16         MR. RUKAVINA:  That's fine.

17  BY MR. RUKAVINA:

18  Q    Do you know how the numbers were calculated?

19  A    I don't know where Mr. Dondero -- I would be

20  speculating as to --

21  Q    Okay.

22  A    -- whether -- as to where Mr. Dondero came up with

23  those numbers.  I'm not speculating that the numbers came

24  from Mr. Dondero.

25  Q    I understand.  So if this morning, if I heard you or

002491

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 13   Filed 01/12/23   Page 389 of 888   PageID 2693
HCM V. HCMFA, et al.                                           11

 1  someone heard you say that Mr. Dondero told you it was 5 and

 2  6 million because of the tax deductions and cashal (ph)

 3  needs, you would have been speculating if that's what you

 4  testified?

 5  A    Again, I think -- I don't think that's correct as you

 6  characterized.

 7  Q    Let's just be very clear because this is very

 8  important.  Right now, you're telling me that you do not

 9  know how Mr. Dondero arrived at the $5 million number for

10  HCMFA, true or false?

11  A    How Mr. Dondero arrived at the number, no, I don't.  I

12  would be speculating.

13  Q    Okay.  And the same question for NexPoint of $6

14  million.  Do you know how Mr. Dondero arrived at that

15  number?

16  A    Same answer, not specifically, no.

17  Q    Okay.  And we'll talk more about your December 2020

18  analysis.  I think you testified, correct me if I'm wrong,

19  that Mr. Waterhouse told you to use the current head count,

20  correct?

21  A    Sorry, just to be clear on the time frame.

22  Q    Yeah, let's --

23  A    On December of 2020?

24  Q    Yes, sir, we'll -- we can just to refresh your --

25  pardon, to refresh your recollection it's in my exhibit

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 1    Filed 01/22/81    Page 390 of 888    PageID 2694
HCM V. HCMFA, et al.                                                    12

```
 1  binder, my binders are smaller.

 2              MR. RUKAVINA:  Which one -- the December analysis.

 3              MR. BERGHAM:  Double C.

 4  BY MR. RUKAVINA:

 5  Q    It's Q, Mr. Klos.

 6  A    Q?

 7  Q    Yes.

 8  A    Yes, I'm there.

 9  Q    Okay.  So Q, this is the cover e-mail from you to Mr.

10  Waterhouse and you attach at least the first page of an

11  Excel spreadsheet that you PDF'd, correct?

12  A    I attached the PDF.

13  Q    Yeah.  So I'm -- that's what I'm asking you about.

14  When you testified earlier about this, you said that Mr.

15  Waterhouse told you to use current head count, correct?

16  A    Correct.  Yeah, then current head count.

17  Q    Then current.

18       And you said that Mr. Waterhouse told you to assume no

19  bonuses, correct?

20  A    Correct.

21  Q    And you said that Mr. Waterhouse told you to use the

22  same allocations as in the contracts, correct?

23  A    No.  No, I did not.

24  Q    Okay.  So did he tell you anything about the

25  allocations?
```

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11 Filed 02/28/23   Page 397 of 868   PageID 2695
HCM V. HCMFA, et al.                                                    13

1  A    We have to be careful with allocations, two different

2  things.  The allocations that I testified to not being

3  adjusted were the allocations that were given to the UCC,

4  not the allocations from the PRAs.

5  Q    So when you created Exhibit Q and we'll look at the

6  Excel spreadsheet, if necessary, what allocations did you

7  use?

8  A    The same percentages that had been part of the previous

9  year analysis for the UCC, to the best of my recollection.

10 Q    Okay.  Is that when you said that you did a goalpost

11 here and a goalpost there and you took an average?

12 A    Correct.

13 Q    Okay.  So just to be clear again, Exhibit Q it is -- it

14 was your good faith analysis, at least as of December 2019,

15 regarding the percentages.

16 A    You said 2019.

17 Q    Okay.  Exhibit Q you created in December 2020, correct?

18 A    Exhibit Q --

19 Q    Yeah.

20 A    -- yes.

21 Q    But you used the percentage allocations from your

22 December 2019 analysis that you gave to FTI, correct?

23 A    Correct with a small caveat in that there had been new

24 employees that had come on since then.  So obviously they

25 didn't have a percentage in the original because they didn't

002494

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 11    Filed 01/22/23    Page 392 of 888    PageID 2696
HCM V. HCMFA, et al.                                        14

1    exist for purposes of that analysis.  And then in the '20,

2    you know, percentages were added for those people.

3    Q    I just want to make sure again that Judge Jernigan

4    understands when we talk about Exhibit Q some more, that the

5    percentage allocations you used were not the ones from May

6    2018, but the ones from December 2019 done in conjunction

7    with Evers at Highland and given to the committee and FTI.

8    A    Yes, I believe that's correct.

9    Q    Okay.  Thank you.

10        Exhibit A, please, that's one of the payroll

11    reimbursement agreements you have it in front of you and go

12    to the last page which are the employee allocations.

13    A    Okay.  I'm there.

14    Q    Are you saying, sir, that you pulled these percentage

15    allocations out of thin air?

16    A    I wouldn't say I pulled them out of thin air.

17    Q    So did you apply any logic and did you at least attempt

18    to try to get a reasonable estimate?

19    A    Yes, I applied some logic.

20    Q    Okay.  I think we established that it's quite

21    subjective to determine how much an employee may work for an

22    advisor, but that even though it's very subjective you tried

23    in good faith to find a reasonable estimate whenever you

24    prepared these percentage allocations, correct?

25    A    I think the main purpose of this analysis was to get

002495

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 13   Filed 01/22/21   Page 399 of 868   PageID 2695
HCM V. HCMFA, et al.                                                              15

1   back to the numbers that we already had and the percentages

2   on the page are -- were at the time not completely

3   unreasonable.  And to take an easier example, if I can find

4   one.

5       Asanji Gulati (ph), for example, who's at a hundred

6   percent for HCMFA, there's a logic to that, in that he was

7   charged with a single fund that was managed by HCMFA hence

8   he's a hundred percent.

9       Everybody who's not a hundred percent or zero, it's a

10  lot more subjective.

11  Q    Sir, but even though it's objective, again you

12  established that you in good faith and employing your skill

13  and expertise tried to find a reasonable estimate, correct?

14  A    I tried to find a reasonable estimate that would also

15  validate the outcome that was already known.

16  Q    Sure.  Because you had to divide a number given to you

17  by Mr. Dondero by a certain amount of employees, right?

18  A    Yes.

19  Q    And then you had to use these, you had to calculate the

20  percentages with those two metrics already known, correct?

21  A    I don't know that I had to do anything, but that was

22  the approach that was taken.

23  Q    That's what you did.  You were given here's the number,

24  whatever it is per month or per year, here's the employees,

25  now please, Mr. Klos, calculate the percentages.  That's

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 1   Filed 09/28/21   Page 390 of 868   PageID 2696
HCM V. HCMFA, et al.                                                    16

1   what you were told to do, correct?

2   A    I wouldn't put it that way.  I was told here's the

3   number.

4   Q    Did you pull this list of employees or did somebody

5   give you the list of employees?

6   A    I believe I would've pulled that.  I might have

7   verified it with somebody.

8   Q    I didn't hear you.  Did you pull it or just verify it?

9   A    I believe I pulled it.

10  Q    Okay.

11  A    If -- I may have, you know, I may have checked with

12  somebody but I don't recall that specifically.  I believe I

13  probably would have pulled this list.

14  Q    Okay.  So not only did you try to apply some analysis

15  to the percentage allocations, you actually picked the 25

16  employees here?

17  A    Again, picked is the wrong word, these were the

18  Highland --

19  Q    You knew that these were employees --

20  A    -- Investment professionals.

21  Q    -- that were working --

22          MR. MORRIS:  Excuse me.

23  Q    -- as Highland advisors.

24          MR. MORRIS:  If he could allow the witness to

25  finish his answer.

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 13   Filed 01/22/24   Page 395 of 868   PageID 2699
HCM V. HCMFA, et al.                                    17

```
 1              THE COURT:  Yeah, he was in the middle of an
 2   answer, go ahead.
 3              THE WITNESS:  Sorry, could you -- I lost my train
 4   of thought.
 5   BY MR. RUKAVINA:
 6   Q    I was asking, did you pick these 25 employees?
 7   A    Oh, yes.  And what I was saying was, these were the
 8   employees of HCMLP so this wasn't like a subset, these were
 9   the front office professionals at HCMLP at the time.
10   Q    Got it.  This was the universe of front office
11   professionals?
12   A    Yes, to the best of my recollection.
13   Q    Okay.
14   A    Yes.
15   Q    So we've established that Mr. Dondero picked the
16   resulting number that he wanted.  We've established that you
17   picked the front office professionals --
18   A    I didn't pick the front office professionals.  The
19   front office professionals were who they were.
20   Q    Sir, there's no subjectivity in identifying these
21   employees, correct?
22   A    I don't believe there was, no.
23   Q    Okay.  The subjectivity goes to the allocation
24   percentages and you already testified about that, correct?
25   A    Correct.
```

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 11    Filed 01/22/21    Page 392 of 868    PageID 2506
HCM V. HCMFA, et al.                                                        18

1    Q    Okay.

2    A    And I would point out there is additional subjectivity

3    in the analysis beyond just the percentages.  So I should

4    make that point.

5    Q    Well, let's make that.  Let's talk about that.  Let's

6    go to Exhibit J please.

7    A    Okay.  I'm there.

8    Q    This is -- you might need to read several pages here to

9    refresh your memory.  I'm going to ask you about your e-mail

10   from January 3rd, 2018 at 10:28 a.m. where you highlight

11   certain language.  Do you need to read that, sir?

12   A    No, you can ask the question and I'll do my best.

13   Q    Okay.  Well, do you remember -- I'll represent to you

14   that you highlighted that language, do you remember that, do

15   you have any reason to disagree with that?

16   A    No reason to disagree with that.

17   Q    Okay.  And is it fair to say that here you were taking

18   a form, a contract and talking to others about language

19   you'd like to remove from that form contract as you prepared

20   a new search service agreement?

21   A    This I'm not sure.

22   Q    Well, if you read above, sir, it says, "is there a way

23   to pare back the language in Section 2.03?  I highlighted

24   the sections below, that I prefer to exclude or modify as

25   this looks like we're just creating work that will certainly

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 1   Filed 09/29/22   Page 397 of 868   PageID 2509
HCM V. HCMFA, et al.                                           19

 1  slip through the cracks."  You wrote that, right?

 2  A    Yes.

 3  Q    So you were suggesting to Evers that the highlighted

 4  language down there be removed, correct?

 5  A    It does appear that's what I'm --

 6  Q    Okay.

 7  A    -- identifying.

 8  Q    And if we read the first highlighted part it says, "the

 9  name, location, and such other matters as the parties desire

10  to reflect with respect to each shared employee shall be

11  identified on the books and records of each of the

12  management company and the staff and services provider,

13  which may be amended in writing from time to time by the

14  parties to add or remove any shared employee to reflect the

15  employment or lack thereof of such employee."

16       Do you remember -- did I read that correctly?

17  A    Yes.

18  Q    And why were you asking that that language be removed?

19  A    Because all -- this is accomplishing -- the language

20  itself is accomplishing nothing for the agreement.  From my

21  perspective, again, this is all just creating internal work

22  for no value to the overall complex.  So it seems

23  unnecessary.  It seemed unnecessary to me in my review.

24  Q    Here you're referring to the shared services

25  agreements, correct?

002500

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 11    Filed 12/28/21    Page 398 of 888    PageID 2501
HCM V. HCMFA, et al.                                    20

1    A     It appears so.

2    Q     Because it talks about shared employee and management

3    company, right?

4    A     Well not because it talks about shared -- I'm basing

5    that mainly on the fact that it's -- we're referring the

6    NREA and NPA SS agreements and the subject less about

7    management company and staff and services provider.

8    Q     And ultimately as we determined and as the contracts

9    read the shared service agreements with the advisors were

10   flat monthly fee agreements, correct?

11   A     The shared service -- in respect to NREA and NPA.

12   Q     Yeah.

13   A     Yes.

14   Q     Now, if we go to Exhibit K you discussed this some with

15   Mr. Morris.  This is your communication with Ms. -- and I

16   apologize because of my accent, but Ms. Fedford (ph) --

17   A     Uh-huh.

18   Q     -- that's just an impossible word for me to pronounce.

19   And this led up to the payroll reimbursement agreements,

20   correct?

21   A     Yes, this is just a few days before it was executed.

22   Q     Okay.  So similar to the e-mail we just looked at for

23   the shared services agreement, on April 17th, 2018 at 10:48,

24   you write, "Lauren, does it have to be framed as

25   reimbursement of actual costs?"  Are you there, sir?

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 10/27/22   Page 399 of 868   PageID 2593
HCM V. HCMFA, et al.                                              21

```
 1  A     Sorry.

 2  Q     No problem, it's my fault.  It's Bates labeled bottom

 3  400.

 4  A     I'm with you, the 10:48 e-mail?

 5  Q     Yes, sir.  "Does it have to be framed as reimbursement

 6  of actual costs?  We'd much rather it be characterized as

 7  just an agreed upon amount between the two entities.  It's

 8  not a small task and involves subjective assumptions to

 9  allocate individual employees.  So as it's written, it would

10  be creating a ton of internal work that isn't adding any

11  value to the overall complex."  You wrote that to her,

12  right?

13  A     I did.

14  Q     Okay.  And now she -- and she's an officer of the

15  advisors, right?

16  A     I believe so at the time.

17  Q     Yeah.  And she writes back to you, "I'm open to

18  changing from definition of actual costs but my understand"

19  -- and I apologize, apparently, she's writing very poorly --

20  "but my understand from Fox was that there needs to be some

21  method of determining the amounts, per counsel, treating

22  this as a reimbursement is important, however."  She wrote

23  that, right?

24  A     She did.

25  Q     Okay.  So you made requests from her to change the --
```

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 10/27/22   Page 400 of 868   PageID 2592
HCM V. HCMFA, et al.                                                    22

1   or negotiate the contract and she basically rejected your

2   proposal, correct?

3            MR. MORRIS:  Objection to the -- Your Honor, he

4   should use the whole e-mail which we put in front of the

5   witness because she -- he actually has her answer.  If you'd

6   give me just one second, I can tell you what the exhibit

7   number is.

8            MR. BERGHAM:  It is the whole thing.

9            MR. RUKAVINA:  This is the whole thing.

10           MR. MORRIS:  It's not.  Give me one moment.

11           MR. RUKAVINA:  If he wants to read a

12   (indiscernible) optional completeness, this is the e-mail

13   and I'm asking a very limited question which is, he made a

14   request and she, the contractual counterparty, rejected it.

15           MR. MORRIS:  Hold on one second.

16           MR. RUKAVINA:  This e-mail's been admitted into

17   evidence anyway.

18           MR. MORRIS:  You go right ahead; I'll do it on

19   redirect.

20           MR. RUKAVINA:  Okay.

21           THE COURT:  Continue.

22   BY MR. RUKAVINA:

23   Q   Mr. -- you made a suggestion to Ms. Fedford and she

24   rejected it, correct?

25           MR. MORRIS:  Objection to the form of the

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 10/23/23   Page 401 of 888   PageID 2505
HCM V. HCMFA, et al.                                              23

1  question.

2          THE COURT:  To the form of the question?

3  Overruled.  I mean he can answer what he thinks the answer

4  is.

5          THE WITNESS:  I don't think this is a rejection.

6  She's -- to me it's a continuation of the discussion.

7  BY MR. RUKAVINA:

8  Q    Okay.  You say, we'd much rather it be characterized as

9  just an agreed upon amount between the two entities.  You

10 wrote that, right?

11 A    Yes.

12 Q    And she wrote back saying basically this needs to be

13 treated as a reimbursement, didn't she?

14 A    She said treating this as a reimbursement is important,

15 however.

16 Q    And ultimately it was treated as a reimbursement,

17 correct?

18 A    No.

19 Q    So you're saying that the payroll reimbursement

20 agreements are not reimbursement?

21 A    I'm saying the -- no, what I'm saying is that the

22 payroll reimbursements, are the amount for those agreements

23 is C-A-C actual cost, which is a defined term at a fixed

24 amount per month.

25 Q    Unless it's changed, correct?

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 1   Filed 02/22/22   Page 402 of 868   PageID 2505
HCM V. HCMFA, et al.                                                    24

1   A    Correct, yeah, with the agreement of the two parties.

2   Q    Okay.  And, in fact, you respond back then to Ms.

3   Fedford, "could we say that actual costs is being determined

4   at the outset of the agreement, have a schedule as of

5   January 1, 2018 instead of actual costs shall be as set out

6   in that schedule and shall be made in monthly installments

7   for the term of the agreement, that way the exercise is only

8   performed once."  You wrote that, right?

9   A    I did.

10  Q    Okay.  And was that ultimately your understanding as to

11  what happened, did it work itself into the agreement?

12  A    It did through that definition of actual costs.

13  Q    And then you write, "beyond that year, termination

14  provisions kick in, so there's a belief that the actual

15  costs have changed materially, either party could terminate

16  and/or renegotiate for an amended agreement.  You wrote

17  that, right?

18  A    I wrote that.

19  Q    Okay.  And did that concept also work itself into the

20  agreement?

21  A    I believe so.  It may have already been in there, I

22  don't recall.  So I don't know if this was my addition or if

23  it was something that was already in there.

24  Q    Okay.

25  A    But the concept ended up there.

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 10/25/22   Page 409 of 868   PageID 2507

Document   Filed 01/25/21   Page 4 of 16   PageID 2595

HCM V. HCMFA, et al.                                    25

1  Q    That if either party had a problem with amounts being

2  charged or paid they could terminate or renegotiate,

3  correct?

4  A    I don't recall specifically what the agreement says.

5  Q    Then Ms. Fedford writes back, "I think it's workable.

6  Do you have a methodology for the outset determination?"

7       What did you understand she meant by outset

8  determination?

9  A    Outset determination I have to assume is a reference to

10 my e-mail where I'm saying a schedule as of January 1st, so

11 a schedule.

12 Q    That's how -- that's what you assumed back then what

13 she meant, right?

14 A    Yes, I believe so.

15 Q    And you write back, "will have to work on one.  It'll

16 be so sort of fully loaded compensation amount times an

17 allocated percentage which will have to be reasonable."  You

18 wrote that, right?

19 A    Uh-huh.

20 Q    And I'm sorry, you've got to say yes or no in court.

21 A    Oh, I'm sorry, I apologize.  Yes, I wrote that.

22 Q    And what you wrote back, those percentages that you put

23 in there, did you intend them to be reasonable?

24 A    Yes, I did.

25 Q    Did you intend Ms. Fedford to rely on them?

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 01/22/21   Page 400 of 868   PageID 2508
HCM V. HCMFA, et al.                                            26

1  A    No, I didn't intend for Ms. Fedford to rely on them.

2  Q    Why not?

3  A    I don't know that I was -- I don't know that I really

4  -- Lauren's assistance on this was in her capacity as legal

5  counsel.  So whether she was convinced or unconvinced or

6  partially convinced wouldn't have been the topic that was on

7  my mind at that point.

8  Q    You know it was a poor question of mine.

9       Did you understand or intend that she would take these

10 numbers and put it into final work product?

11 A    Yes, yes, certainly, yes.

12 Q    And that she would, based on this e-mail, consider

13 those numbers to be reasonable.  Did you think that this

14 would consider them to be reasonable?

15 A    Same answer as before, I don't know that I cared or

16 thought about what she thought about the numbers.  So I

17 don't know that I can really answer that.

18 Q    Did you flag anything for Ms. Fedford at that time

19 about anything fishy or that you didn't like about these

20 payroll reimbursement agreements?

21 A    Not that I can remember, other than as I testified

22 earlier, a little bit of frustration that there's this level

23 of work that needs to go on for what I had assumed in my

24 mind was going to be a simple reproduction of the NexPoint

25 subadvisory agreement that we had put in a few months

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 11    Filed 12/28/21    Page 405 of 868    PageID 2509
HCM V. HCMFA, et al.                                                              27

 1  before.

 2  Q    So let's see if I can walk you through this, just so

 3  that I understand completely.  On the shared service

 4  agreements you had, pardon me, suggested that a periodic

 5  change be removed and there just be a flat monthly fee,

 6  correct?

 7  A    I don't know that that was my suggestion.

 8  Q    Okay.  You want to go back to Exhibit J, Mr. Klos, the

 9  highlighted language.  It's Bates labeled 428.

10  A    Sure, I'm there.

11  Q    The top highlighted language, do you recall whether

12  that language that you wanted removed was, in fact, removed

13  from the shared service agreement?

14  A    I'm not sure if it was or wasn't.

15  Q    Okay.  But you remember that the shared services

16  agreement was a flat monthly fee.

17  A    Which services -- which shared services agreement.

18  Q    NexPoint.

19  A    NexPoint.  NexPoint advisors, yes, it was a fixed

20  amount.

21  Q    And HCMFA?

22  A    It varied.

23  Q    Okay.  But that concept was a similar concept of just a

24  flat fee was rejected or not -- it was not accepted by Ms.

25  Fedford and then your alternative of let's have a set amount

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 11    Filed 02/28/23    Page 406 of 868    PageID 2590
HCM V. HCMFA, et al.                                                28

1   up front subject to revision, that was accepted, correct?

2   A    It's hard for me to characterize it that way, accepted,

3   not accepted.  This was a discussion happening in real time

4   and a resolution was reached fairly quickly.

5   Q    You understand, sir, that it is Highland's position at

6   this trial today that the payroll reimbursement agreements

7   just provided for basically I think Mr. Norris said in the

8   beginning just shared services for a flat monthly amount.

9   A    I don't know that I'm in a position to fully articulate

10  the argument that our side is making.

11  Q    The only thing that I find of real importance from you

12  is that when you discussed this with Ms. Fedford, you and

13  her agreed that there would be some ability to periodically

14  adjust the amounts under the payroll reimbursement

15  agreements or they could be terminated, correct?

16  A    Again, I struggle with the word agreement.  We worked

17  through comments to a document that was going to get

18  executed and that document was ultimately executed.

19  Q    You gave her --

20  A    And the document says what it says.

21  Q    You gave her a concept and she put that concept into

22  the agreement?

23  A    I'm not sure.

24  Q    Okay.  Do you know whether those payroll reimbursement

25  agreements still provide a monthly or quarterly or annual or

002509

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 11    Filed 12/22/21    Page 407 of 868    PageID 2599
HCM V. HCMFA, et al.                                    29

 1  any kind of potential variance to the amounts?

 2  A    I don't recall specifically, but I'd be happy to look

 3  at the agreement.

 4  Q    Well, did you see the final agreement before it was

 5  executed by Mr. Waterhouse?

 6  A    Yes, I believe I did.

 7  Q    Okay.  Do you remember whether you reviewed it before

 8  he signed it?

 9  A    Yes, I believe I did.

10  Q    Do you remember if anything in there caught your

11  attention as something outside of what you had understood

12  the final version to be?

13  A    Don't remember specifically.

14  Q    Okay.  So now let's go please to your December 2019

15  analysis which you did with Mr. Waterhouse for FTI and the

16  committee.

17  A    Uh-huh.

18          MR. RUKAVINA:  Now, Your Honor, briefly we have

19  that printed out on paper.  It's an Excel spreadsheet and

20  there was a misprint.  So while during the lunch break, we

21  had a runner bring in a new one, so maybe during the next

22  break we'll give you and the clerks the new print, the

23  printout.  In the meantime, we'll pull it up in Excel

24  format.

25          THE COURT:  Okay.

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 1    Filed 08/02/22    Page 408 of 888    PageID 2600
HCM V. HCMFA, et al.                                                            30

```
 1              MR. RUKAVINA:  This is the December 2019.  Which
 2   one is it?  It's L.  Is that it, Thomas?
 3   BY MR. RUKAVINA:
 4   Q    Now, Mr. Morris asked you a little bit about this, just
 5   so that we're clear, this was the one that actually went to
 6   the committee and DSI, right?
 7   A    Can you go to the summary tab please?
 8              MR. RUKAVINA:  Go to the summary.
 9              THE WITNESS:  It appears to be.
10   BY MR. RUKAVINA:
11   Q    Okay.  And you're not the only one who worked on this,
12   but you were one of the people that worked on this, correct?
13   A    I was one of the people that worked on this.
14   Q    Okay.  What was your role, I mean, summarize for me
15   what, if anything, in here are you the one that principally
16   analyzed or prepared?
17   A    What in here did I -- sorry, one more time.
18   Q    What was -- yeah.  So we've established that you --
19   you're the one that actually revisited the original
20   allocation percentages by taking goalposts and averaging
21   them, right?
22   A    I wouldn't say it's a revisitation of the allocation
23   percentages.
24   Q    You're the one that testified that you took the
25   goalposts on this one and went down the averages to find the
```

002511

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 13   Filed 02/28/23   Page 409 of 868   PageID 2603
HCM V. HCMFA, et al.                                                    31

1  allocation percentages for this report, correct?

2  A    Yes.

3  Q    You did that.

4  A    Yes.

5  Q    Okay.  So I'm asking --

6  A    With -- you know, with collaboration with others, yes.

7  Q    Okay.  So anything else in here what did you if

8  anything else do in here, as opposed to someone else?

9  A    Well, I'm the -- I created the spreadsheet and

10 populated the information throughout.  I don't know --

11 Q    The employees?

12 A    Yes, the employees --

13 Q    Their compensation?

14 A    Yes.

15 Q    Okay.

16 A    Yes.

17 Q    And when you did all that, you understood that this

18 would be shared with an official committee of unsecured

19 creditors, right?

20 A    No.  I don't know that I specifically knew exactly who

21 the audience was going to be.

22 Q    Who did you think the audience was going to be?

23 A    Some combination of the UCC, FTI and DSI.

24 Q    You knew that it was going to be important for the

25 bankruptcy case, right?

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 11    Filed 08/22/22    Page 410 of 888    PageID 2604
HCM V. HCMFA, et al.                                                          32

```
 1  A     Important?  I knew that it was an issue that had been

 2  identified very early on, so you know, from that standpoint

 3  it was the item that was on my plate and people were asking

 4  about.

 5  Q    And you knew that others would rely on this

 6  information, correct?

 7  A     No, I don't think that's correct.

 8  Q    You did not think people would be relying on the

 9  information you put in this analysis?

10  A     I assumed and what actually happened was that we had

11  the opportunity to present this to FTI over the course of

12  half a day, which is what we did.  That they would have the

13  opportunity to ask questions, dig in wherever they felt they

14  wanted to and we'd be able to respond to those questions.

15       And as I mentioned earlier, relying on is really

16  difficult with an analysis like this and it was very

17  clearly, very clearly maintained with in that meeting and in

18  meetings leading up to the meeting that these were highly,

19  highly, highly subjective assumptions.  They were being put

20  together in good faith, but there is no right answer.

21  Q    And is that part of why you took the goalposts and

22  averaged them because you knew that it was highly, highly,

23  highly subjective so you tried to find a more reasonable

24  middle point?

25  A     My recollection of the goalposts was to recognize the
```

002513

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 13   Filed 02/28/23   Page 437 of 868   PageID 2603
HCM V. HCMFA, et al.                                                      33

1  inherent subjectivity and say that, you know, in all

2  likelihood somewhere between those goalposts is probably the

3  right answer but the right answer isn't knowable.  That's

4  not to say the midpoint is the right answer, just somewhere

5  is most likely the right answer.

6  Q    Because any time you're dealing with averages one might

7  be higher than the average, one might be lower, but the more

8  data you have the more likely or reasonable a result is?

9  A    No, I don't agree with how you phrased that.

10 Q    Okay.  Did you intend to deceive anyone when you

11 prepared this exhibit?

12 A    No.

13 Q    Okay.

14       MR. RUKAVINA:  So if we go to by department,

15 Thomas.

16 Q    So this is a tab that says by department.  And you see

17 down there it says current charge, 3.0 for NPA, ACMFA 5.0,

18 do you see that, sir?

19 A    Yes.

20 Q    Those are the charges under the payroll reimbursement

21 agreements, correct?

22 A    Yes.

23 Q    Okay.  The line below that says investment support.

24 What does that mean?

25 A    It's a reference to the front office allocations.

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 10/17/22   Page 432 of 868   PageID 2606
HCM V. HCMFA, et al.                                                    34

```
1   Q    The -- what you were trying to do here was to calculate
2   the costs of those front office allocations to Highland,
3   correct?
4   A    Estimate them.
5   Q    Estimate them.  And according to this estimate that you
6   prepared and that went out to the committee at -- that
7   estimate at that point the profitability to Highland with
8   the payroll reimbursement agreements together was $3
9   million, correct?
10  A    That's what this tab is indicating, yes.
11  Q    That's what you prepared, correct?
12  A    Yes, I prepared this.
13  Q    Okay.  And let's go to allocations.  I'm not sure this
14  is very relevant but there's does (indiscernible) opinion
15  tabs here.
16          MR. RUKAVINA:  Thomas --
17          MR. BERGHMAN:  (Indiscernible).
18          MR. RUKAVINA:  Yeah, employee listing.  Yeah, so
19  let's hide the employees.  Are we hiding the employees,
20  Thomas, so that the people on the WebEx can't see it?
21          MR. BERGHMAN:  Yeah, it doesn't show any --
22          MR. RUKAVINA:  So where's the hidden tabs?
23          MR. BERGHMAN:  We don't want these.
24          MR. RUKAVINA:  Your Honor, I'm sorry, Mr. Berghman
25  and I are just trying to not let people on the WebEx see
```

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 09/25/23   Page 439 of 868   PageID 2605
HCM V. HCMFA, et al.                                                    35

1  employee data, which is why we're struggling how to do this.

2          Okay.  Are there any hidden tabs on here?

3          MR. BERGHMAN:  There are (indiscernible) because

4  that's where the data is.

5          MR. RUKAVINA:  I'm sorry, Your Honor.

6      (Pause)

7  BY MR. RUKAVINA:

8  Q    So let's look at the first person -- Mr. Klos, I need

9  glasses, I can't read that close, what is that person's

10 name?

11 A    It's Sahan -- I apologize --

12 Q    Let's pick an easy one, let's pick an easy one.  Lauren

13 Baker.

14 A    Okay.  Lauren Baker, I guess I see her.

15 Q    Okay.  So these are the allocation percentages that you

16 created there in AC, AB, AE, AF, et cetera?

17 A    AC -- yeah, AC through AF is one goalpost and then AN

18 through AQ is the other goalpost.

19 Q    Okay.  And we can look at the original agreement,

20 that's Exhibit A for Ms. -- well, we got it on the first

21 person because Ms. Baker isn't on it.  So --

22 A    She's not on the PRA.

23 Q    I was trying to save us --

24 A    As you noticed.

25 Q    The first person, though, say the first name.

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11-3   Filed 10/20/22   Page 440 of 868   PageID 2708
HCM V. HCMFA, et al.                                          36

```
 1    A    Sahan (ph).

 2    Q    So where is the midpoint of the two goalposts for Sahan

 3    that you selected?

 4    A    So -- well, I'll focus on HCMLP, somewhere between 10

 5    percent and when I'm referring to -- I don't know what

 6    people can see here, so AN9.

 7    Q    Yes.

 8    A    Somewhere between 10 percent and 55 percent of his time

 9    is on HCMLP.

10    Q    Okay.  What about HCMFA for him?

11    A    HCMFA somewhere between 30 percent and 55 percent.

12    Q    How did you get those goalposts, 30 and 55?

13    A    30 and 55.

14    Q    Did you talk to him?

15    A    No, I didn't.

16    Q    Did you talk to HR?

17    A    I did not talk to HR.

18    Q    Okay.  So what methodology, if any, did you use to get

19    those 30 and 55 goalposts?  I'm sorry, 15 and 55 goalposts?

20    A    10 and 55.

21    Q    Yeah, 10 and 55.

22    A    Subjectivity.

23    Q    Just subjectivity, did you just pull numbers out of the

24    air?

25    A    My -- so what's the midpoint on those, about 32 and a
```

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 13   Filed 12/28/21   Page 445 of 868   PageID 2609
HCM V. HCMFA, et al.                                          37

 1  half percent.

 2          MR. RUKAVINA:  Are there any problems in this one,

 3  Thomas, or did you want to hide them?  Just a second.  We

 4  might make it easier.

 5      (Pause)

 6  BY MR. RUKAVINA:

 7  Q    This is your Excel spreadsheet.  Walk us through

 8  please, are there, first of all to your knowledge, are there

 9  any unshown or hidden columns right now?

10  A    Yes, there are unshown columns.

11  Q    Which -- where please?

12  A    Looks like --

13          MR. RUKAVINA:  I'm just telling Mr. Berghman how

14  to open them because I don't know Excel.

15          THE WITNESS:  Sure.  It's -- you've got to be -- I

16  don't know if he's watching this right now, but there's

17  quite a bit of sensitive compensation information on here.

18  Q    Okay.  So the hidden ones have the sensitive

19  compensation information?

20  A    Yeah, and probably some information that's not

21  sensitive, but until we open it --

22  Q    Okay.

23  A    -- up, I'm not going to be able to tell you.

24  Q    Well, here, just walk me through then as best you can

25  without showing everyone sensitive information, go back to

002518

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 02/28/21   Page 44 of 868   PageID 2600
HCM V. HCMFA, et al.                                    38

1   Sahar or Sahan.

2   A     Uh-huh.

3   Q     Where is the goalpost that is the lowest for him, where

4   is the goalpost that is the highest for him and then what is

5   the one that you picked?

6   A     Sure.  So the --

7   Q     I mean, for let's take HCMFA.

8   A     Yeah, for HCMFA so on the lowest shared allocation 30

9   percent and on the highest 55 percent.  And so what is that

10  42 and a half percent as a midpoint.  You can't see the 42

11  and a half percent on the screen right now, but that's the

12  midpoint of 30 and 55.

13  Q     Oh, so the 42 and a half might be in the hidden fields

14  to do the math?

15  A     I don't think the 42 and a half is even on the

16  spreadsheet, but I'm just doing the math.

17  Q     Okay.  But for him on Exhibit -- on that Exhibit A to

18  my Exhibit A he's shown at 29 percent.  You can just look at

19  it.  So in this case, in this case, at the end of 2019 you

20  applied the methodology to try to make it more reasonable

21  and current, correct?

22  A     In 2019, yes, I did.

23  Q     Okay.  So now we'll go to your December 2020 analysis,

24  please.

25  A     Okay.

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 13    Filed 09/28/23    Page 447 of 868    PageID 2609
                          HCM V. HCMFA, et al.                                    39

1    Q    So we've already seen the summary of it, Q and let's

2    look at Q please.  So this is the one that you prepared at

3    the request of Mr. Waterhouse where Mr. Waterhouse told you

4    use these assumptions, correct?

5    A    Yeah, he gave me assumptions to use.

6    Q    The assumptions again being current head count, assume

7    no bonuses and use the December 2019 allocation percentages

8    we just looked at, correct?

9    A    Correct with a small caveat that, yeah, I don't state

10   that explicitly in the e-mail but that's my recollection.

11   And further as I testified before, there were some new

12   employees so there wasn't a previous analysis to --

13   Q    Did you include the --

14   A    -- leave this in.

15   Q    -- new employees in this one?

16   A    I did.

17   Q    Okay.  So you took into account the fact of new

18   employees.

19   A    Yes.

20   Q    Okay.  And just to summarize, isn't it true that here,

21   you are estimating unadjusted gain on the payroll

22   reimbursement agreements at $6.6 million on an annualized

23   basis as of the snapshot in time in December 2020?

24   A    Yes, with no bonus compensation.

25   Q    Yes, I understand.  We've talked about the assumptions.

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 04/28/22   Page 443 of 868   PageID 2620
HCM V. HCMFA, et al.                                        40

```
 1  A     Yep, yep.

 2  Q     But I'm not asking you to validate those assumptions --

 3  A     Sure.

 4  Q     -- I'm just asking that to the best of your ability

 5  knowing that they're subjectivity and employing those

 6  assumptions, this is the calculation that you prepared?

 7  A     Yes, employing those assumptions, this is the output.

 8  Q     Okay.  And then what's the next line, offset for non-

 9  debtor employees providing services to the debtor.

10  A     That's a reference to people who weren't employed by

11  HCMLP but who, you know, from time to time would help on

12  HCMLP related issues.

13  Q     And that happened, correct, the advisors had certain of

14  their own employees and they would basically let HCMLP

15  sometimes use those employees.

16  A     Like I said there was a time when we were all one big

17  happy family and everybody used --

18  Q     And that continued to some degree post petition until

19  certain things happened later in 2020 when Mr. Dondero

20  forbade some employees from executing Mister Series (ph)

21  trades; isn't that correct?

22  A     Sorry, can you --

23  Q     Strike that.

24  A     Okay.

25  Q     How did you calculate the $1.1 million here?
```

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 04/28/22   Page 419 of 888   PageID 2623
HCM V. HCMFA, et al.                                          41

1  A    I believe it was by looking at a few of those employees

2  and applying effectively the same logic but in reverse.  So

3  instead of Highland -- HCMLP absorbing all the costs and

4  allocating it elsewhere, there were a couple of employees

5  who were employed elsewhere and allocating some part of

6  their time back to HCMLP, you know, notwithstanding that

7  that's not how the agreement works, but it's identifying as

8  an offset which would, you know, you can further, you know,

9  be an addition.

10 Q    And Highland never paid the advisors for the periodic

11 use of the advisor's employees, right?

12 A    Correct.

13 Q    Now, walk us through please the next box there that

14 talks about shared services.  Those were the shared services

15 agreements with the advisors I take it?

16 A    These are the shared services with the advisors as well

17 as NexPoint Real Estate advisors.

18 Q    Okay.  And what's the line on incurring charge?

19 A    That's the amount that was being charged at the time.

20 Q    Okay.  And what's the line-item shared services?

21 A    It looks to me --

22 Q    Isn't that --

23 A    I'm not sure, I'm not sure.

24 Q    Isn't that you trying to calculate the actual cost of

25 the shared services to Highland?

002522

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 11    Filed 10/28/21    Page 420 of 868    PageID 2622
HCM V. HCMFA, et al.                                              42

1  A    No.  No, I wouldn't characterize it that way.

2  Q    Well, when you take the current charge and you delete

3  shared services, you delete litigation to get to estimated

4  point in time profitability, right?

5  A    Correct --

6  Q    So --

7  A    -- current charge less shared services less litigation,

8  yeah.

9  Q    So what -- so if you're conducting shared services you

10 have no memory of what that was?

11 A    My -- I'm speculating a bit here, but my guess is that

12 this is just a simple summation of everything in that top

13 box that has shared services next to it.

14 Q    Uh-huh.

15 A    Notwithstanding that that may or may not be an exact

16 one-for-one with the actual agreement.

17 Q    Okay.  And what about the line litigation, what is

18 that?

19 A    I believe it's the same thing and because there isn't

20 anything up above with litigation it's pulling nothing.

21 Q    Okay.  And then estimated point in time profitability

22 .4 and .6, let's just 1 million together, was that your

23 estimate based on Mr. Waterhouse's assumptions given to you

24 of the profitability to Highland of the shared service

25 agreements as of December 2020?

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 11    Filed 10/13/22    Page 421 of 888    PageID 2625
HCM V. HCMFA, et al.                                                    43

1   A     No.

2   Q     What -- then what did that -- what did those .4 and .6

3   mean?

4   A     Sitting here today they're -- to me they're numbers on

5   a page.  They're the output of an analysis that manages to

6   exclude pretty relevant data.

7   Q     Okay.  What about the next line, unadjusted gain on

8   material shared services agreement, 1.0 -- I'm sorry, 1.0

9   million.

10  A     Uh-huh.

11  Q     What does that mean?

12  A     That number is just the summation of the .4 and the .6

13  directly above.

14  Q     Okay.  Sir, didn't you have to somewhere in here deduct

15  the actual cost to Highland of providing the shared services

16  to arrive at a $1 million annualized profit?

17  A     Sorry, can you ask that again, it's just --

18  Q     You are here concluding, right or wrong, it's okay, you

19  were here on --

20  A     If I can stop, I don't know if I'm concluding anything

21  with this.  I'm taking a direction from my boss and I'm

22  returning that analysis to him.  I've spent a lot more time

23  in the last 20 minutes thinking about this than when the

24  request was given to me.  I didn't have a belief that --

25  Q     I'm asking you a --

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 04/22/23   Page 422 of 868   PageID 2626
HCM V. HCMFA, et al.                                                  44

```
 1  A    -- matched what's --

 2  Q    -- very simple question, Mr. Klos.  I'm asking you a

 3  very simple --

 4          MR. MORRIS:  Your Honor, he's interrupting him

 5  again.

 6          MR. RUKAVINA:  No, I'm not.  He started -- he

 7  answered my question and then elaborated.

 8          THE COURT:  Okay.  Overruled.

 9  BY MR. RUKAVINA:

10  Q    I'm asking a very simple question.  Is there anywhere

11  on this page an estimate by you of the actual costs to

12  Highland of providing the shared services under the shared

13  services agreements?

14  A    No, it's not.  It's not called out on this page.

15  Q    Okay.  And you're not prepared to say that this report

16  at least shows that you estimated at that point in time of

17  $1 million annualized gain on the shared services agreements

18  to Highland?

19  A    I would never put my reputation on the line for this

20  analysis.  This is not at all reflective of what my views

21  were then, what my views were -- are now.  This is like I

22  said a response to a request.

23  Q    Okay.  So on the cover e-mail to Mr. Waterhouse, where

24  did you tell him, hey, Frank, this may not make sense, this

25  may be bogus, this may be junk math?  Where here do you
```

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 13   Filed 10/13/22   Page 429 of 868   PageID 2625
HCM V. HCMFA, et al.                                                    45

1  caution him at all about that this might not reflect your

2  views or reality?

3  A    I don't know that that's contained in my e-mail to

4  Frank.

5  Q    In fact, you tell him output here is roughly an

6  annualized $9.6 million gain primarily attributable to the

7  front office payroll reimbursement agreements, that's what

8  you write, correct?

9  A    Yes.

10 Q    And again, those front office payroll reimbursement

11 agreements are the what we call here the payroll

12 reimbursement agreements, correct?

13 A    Yes, it looks to be one in the same.

14 Q    And then you write, "which makes sense, given the

15 material reduction in head count, especially at the senior

16 level."  You wrote that, right?

17 A    I wrote that.

18 Q    Yeah, and that's very logical because a lot of those

19 employees that the advisors were paying for simply weren't

20 employed anymore, correct?

21 A    I disagree with the characterization of the question; I

22 don't believe they were paying for a portion of individual

23 employees' time.

24 Q    Then you tell the judge what you meant by which makes

25 sense given the material reduction in head count especially

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 04/22/23   Page 430 of 868   PageID 2628
HCM V. HCMFA, et al.                                          46

 1  at the senior level.

 2  A    So we had three departures that in my mind were fairly

 3  material.  Those were from a dollar perspective, Trey Parker

 4  (ph), John Poglich (ph), and Ajit Jain.  I feel like I'm

 5  forgetting someone on the front office side, but my point is

 6  the same point I was making earlier, which is that when

 7  revenue stays the same and expenses go down, profitability

 8  improves.

 9  Q    And expenses went down because Highland didn't have

10  some of those employees that were listed on the attachments

11  to your exhibits to the payroll reimbursement agreements?

12  A    I wouldn't characterize it that way.

13  Q    How would you characterize it?

14  A    I would say it had certain of the employees did leave,

15  some of them weren't on the original list, Agit is a good

16  example of that, as someone who was not on the PRA list,

17  notwithstanding that he did all of his work for us,

18  substantially all of his work for the advisors.

19       So when he departed, Highland became more profitable in

20  a short term from the standpoint that it no longer has an

21  expense that it has to bear.  But again, he's not a great --

22  he's not even on the PRA.

23  Q    "Biggest difference between this sort of analysis and

24  actual P&L being recorded on HCMLP's books is that on the

25  books HCMLP has been accruing for 2020 bonus expenses

002527

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 1 Filed 04/22/22   Page 425 of 868   PageID 2629
HCM V. HCMFA, et al.                                        47

1  throughout the year."  What did you mean by that, sir?

2  A    What I meant by that is HCMLP had been accruing bonuses

3  throughout the year of 2020.

4  Q    On it's -- accruing on its financials, right?

5  A    Yes.

6  Q    But not necessarily paying the bonuses to all

7  employees, right?

8  A    It was accruing -- it had paid bonuses to virtually all

9  employees except for the insiders that weren't allowed to be

10  paid.

11  Q    Yes.  And those are the ones that got the seven figure

12  bonuses, right?

13  A    I don't remember.  I don't remember their specific

14  bonuses, I think some were lower, some were higher.

15  Q    Some were in the seven figures, right?

16  A    Yes, none who were part of the payroll reimbursement

17  agreement though.

18  Q    Understand.  But you took all that into account --

19  well, strike that.

20       Are you, sir, today saying that your analysis on

21  Exhibit Q was not your good faith estimate of the

22  profitability of these contracts for Highland?

23  A    No, because that's not the exercise I was asked to

24  undertake.

25  Q    You undertook the exercise that you were given which

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 04/28/22   Page 432 of 868   PageID 2630
HCM V. HCMFA, et al.                                                          48

 1  was to in good faith estimate the profitability of these

 2  contracts --

 3  A    That's not the exercise I was given.  It's not.

 4  Q    Then telling me exactly what exercise you were doing.

 5  A    The exercise I was given was take the work product from

 6  last year, update it with these assumptions and send it to

 7  me.

 8  Q    And what was the exercise of the work product from last

 9  year?

10  A    The exercise of the work product was admittedly a much

11  more thoughtful analysis with all compensation included and

12  with, you know, at least a good faith effort to estimate the

13  then current percentages with the caveat that they were

14  within a huge -- was in a huge band of goalposts, like we

15  saw for Sahan or it's somewhere between, you know, 10 and 55

16  percent, you can drive a truck through.

17  Q    Okay.  Did you ever discuss -- I'm just going to call

18  them overpayments, okay, they're alleged overpayments, you

19  don't have to say that they're overpayments we can call them

20  something else if you want.  Did you ever discuss the

21  advisors' alleged overpayments under the payroll

22  reimbursement agreements with anyone internally at Highland

23  like Mr. Waterhouse?

24  A    I'd prefer to call them something other than that

25  word --

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 04/22/21   Page 427 of 868   PageID 2639
HCM V. HCMFA, et al.                                                              49

1  Q    Tell me what to call them.

2  A    -- overpayments.

3  Q    Tell me what to call them.

4  A    It's the amounts that Highland was paying under those

5  agreements would be my preference.

6  Q    The amounts that Highland was paying?

7  A    Sorry, sorry, the amount that the advisors were paying.

8  Q    I'll just call them alleged overpayments, okay?

9  A    Okay.

10 Q    Did you discuss the alleged overpayments with anyone

11 internally at Highland?

12 A    I'm sorry I can't get over the alleged overpayments.  I

13 discussed --

14 Q    Did you discuss with anyone at Highland the fact that

15 the advisors were paying under the payroll reimbursement

16 agreement for employees who were no longer there?

17 A    Not sure, maybe.

18 Q    Did you discuss it with Mr. Waterhouse during the

19 process in 2019 when y'all were preparing the analysis for

20 the committee?

21 A    I don't believe so.

22 Q    Do you know whether Mr. Waterhouse or did you hear Mr.

23 Waterhouse tell Frank -- I'm sorry, tell Fred Caruso that

24 the advisors were overpaid?

25 A    Did I hear him ask that?

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 01/03/23   Page 428 of 868   PageID 2620
HCM V. HCMFA, et al.                                                          50

1   Q     Yeah.

2   A     I don't believe so.

3   Q     Okay.  Did Mr. Waterhouse ever tell you that he told

4   Mr. Caruso that the advisors were overpaid?

5   A     Not that I remember.

6   Q     Okay.  Did you ever hear anything about the automatic

7   stay being mentioned as preventing any adjustment of the

8   payroll reimbursement agreements?

9   A     I heard of the automatic stay; I can't say I was

10  entirely vassaled with what the provisions of it.

11  Q     Okay.  But did you hear at some point in time that the

12  automatic stay, whatever it is, prevented any adjustment of

13  those reimbursement amounts under the PRA?

14  A     I don't remember specifically, no.

15  Q     Okay.  Do you remember anything not specifically?

16  A     No.

17  Q     Did you ever discuss that with Mr. Norris?

18  A     Did I ever discuss what with Mr. Norris?

19  Q     The possibility that the advisors were overpaying

20  because employees weren't there anymore?

21  A     Yes.  I remember Dustin bringing that issue to me.

22  Q     And did you tell him that the automatic stay prevented

23  any adjustment of those?

24  A     Not that I remember.  I don't ever remember using

25  automatic stay.

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 1    Filed 02/28/21    Page 429 of 868    PageID 2633
HCM V. HCMFA, et al.                                                      51

1   Q    Okay.  Would you have used something similar,

2   bankruptcy stay, bankruptcy laws?

3   A    Since we've been in BK, that kind of --

4   Q    Okay.

5   A    Since we've been in BK, this is what we've been paying.

6   Q    Do you remember any discussions that because we're in

7   BK we can't adjust the amounts under the PRAs?

8   A    I don't remember those discussions with Dustin, no.

9   Q    Do you remember them with anyone like Mr. Waterhouse,

10  Mr. Levenger --

11  A    No, not --

12  Q    -- Mr. Dondero?

13  A    -- specifically.

14  Q    Okay.  Not specifically, so okay.

15       So you're not saying they didn't happen you just don't

16  remember specifically?

17  A    I suppose so, yeah, I just don't remember.

18  Q    Okay.  Now, you mentioned that the notices of

19  termination of the shared services agreements went out

20  November 30th or December 1st, somewhere along there.

21  A    Yeah, I think it was the evening of November 30th, yes.

22  Q    Were the PRAs ever terminated?

23  A    I don't believe so.

24  Q    Why?

25  A    I don't know.

002532

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 02/28/16   Page 430 of 888   PageID 2632

HCM V. HCMFA, et al.                                                          52

 1  Q    Didn't you tell Mr. Norris that it was because they
 2  were too profitable for Highland to terminate?
 3  A    No.
 4  Q    Did you discuss with Mr. Norris at all as to why
 5  Highland was not terminating the PRAs even at the same time
 6  that it was terminating the shared service agreements?
 7  A    I don't remember any of those discussions.
 8  Q    Did it not strike you as strange that Highland is
 9  terminating two agreements, but not ones that you calculated
10  the profit on?
11  A    Did I find it strange?
12  Q    Yes.
13  A    I thought about it, I don't know if I would use the
14  word strange, but I thought about it.
15  Q    And you didn't discuss it with anyone?
16  A    I might have discussed it with Frank, I don't remember
17  specifically but.
18  Q    Were you part of the negotiations for the transitions
19  services agreement?
20  A    A small part.
21  Q    Do you remember that one of the conditions that the
22  advisors made to enter into that transition service
23  agreement was that Highland does, in fact, terminate the
24  PRAs?
25  A    I'm not aware.

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 13    Filed 09/12/22    Page 431 of 868    PageID 2635
HCM V. HCMFA, et al.                                                    53

1  Q    Okay.  So sitting here today you don't remember any

2  discussion about the fact that Highland didn't terminate the

3  PRAs because they were profitable?

4  A    No, not specifically.

5  Q    Okay.  Go to Exhibit P, I think we looked at Exhibit P

6  before.  P as in Paul.  In particular, the bottom e-mail

7  from you to Mr. Norris, Mr. Sauter, Mr. Waterhouse.

8  A    Uh-huh.

9  Q    Where you write that, these have not changed since BK,

10  which given the changes in head count, you point out along

11  with not paying inside the bonus compensation has increased

12  the profitability of the contracts from HCMLP's perspective.

13  Do you see that?

14  A    I see that.

15  Q    And by that point in time, according to the December

16  2019 analysis you had calculated that there was a $3 million

17  profit on the PRAs.

18  A    In December 19th --

19  Q    Yeah, December 2019 the one that we looked at that

20  went to the committee and FTI.  You remember that you

21  had calculated or estimated, I'm sorry, estimated a $3

22  million --

23  A    I think that was the output of the midpoint of that

24  analysis.

25  Q    Yeah.  And in which you're -- so when you write, it has

002534

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 13   Filed 05/26/23   Page 432 of 888   PageID 2636
HCM V. HCMFA, et al.                                              54

1   increased the profitability of the contracts in your own

2   mind, you're acknowledging that since that time it's even

3   more profitable to Highland, aren't you?

4   A    There's a lot of conflating here.  We're talking about

5   insider bonus compensation which isn't even relevant for the

6   PRAs, so I don't -- I think it's kind of apples and oranges.

7   Q    Okay.  But no where in any of these e-mails we've

8   looked at do you tell anyone that it's apples and oranges or

9   this might not be reliable data, do you?

10  A    No, I can't imagine why I would do that.

11  Q    Because at that point in time you believe in good faith

12  that your estimates were reasonable, correct?

13  A    Which estimates are we referring to?

14  Q    The profitability, sir, the December 2019, the December

15  2020.

16  A    So some of those are reasonable, some of them aren't,

17  some are less reasonable, some are more, they're all

18  varied.

19  Q    That's not my question.

20  A    Okay.  Okay.

21  Q    I'm saying at that point in time, at that point in

22  time, you believe that they were reasonable enough not to

23  alert anyone in any of these e-mails we've looked at that

24  maybe they shouldn't rely on them?

25  A    No, nothing rose to the point of having to interject in

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 1   Filed 09/22/22   Page 459 of 868   PageID 2625
HCM V. HCMFA, et al.                                                          55

1   this e-mail.

2   Q    Okay.  You mentioned that dual employees were hired in

3   2018 and 2019, who were you referring to?

4   A    In 2018 and 2019 in terms of hires, there's Ajit Jain

5   and Bailika Jain, no relation.  There's -- what's -- I'm

6   sorry, what's the time period, 2018?

7   Q    I believe -- yes, 2018 and 2019.  I recall you

8   testifying to Mr. Morris that although a number of dual

9   employees had left, some had been hired, some replacement

10  ones had been hired.

11  A    Yes, yes.  So more thoroughly, there were around 11 or

12  so effectively backfills through either transfers, new

13  hires, or -- when I say transfers, transfers of employer,

14  new hires, or transition of role.  A good example of those

15  being the ones that Mr. Norris took me through for the legal

16  and distress team where their roles were modified, expanded

17  to perform those services.

18  Q    Okay.

19       MR. RUKAVINA:  Pass the witness, Your Honor, thank

20  you.

21       THE COURT:  Okay.  Redirect?

22       MR. MORRIS:  I think this will be brief.

23       THE COURT:  Okay.

24                    REDIRECT EXAMINATION

25  BY MR. MORRIS:

002536

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 11    Filed 09/15/22    Page 434 of 868    PageID 2636
HCM V. HCMFA, et al.                                                                56

```
 1   Q    Mr. Klos, are you familiar -- we looked at the invoice

 2   for --

 3   A    Uh-huh.

 4   Q    -- the HCMFA shared services agreement.  Do you

 5   remember that?

 6   A    I remember.

 7   Q    And am I correct that that invoice is calculated on

 8   cost plus 5 percent?

 9   A    Yes.

10   Q    And is that what the contract -- is that your

11   understanding of what the contract between HCMFA and

12   Highland provided?

13   A    Yes, that's what the contract says.

14   Q    So there was an agreement to limit Highland's profit in

15   that contract; is that correct?

16   A    Yes.

17   Q    Was there any limit on the profit that Highland could

18   earn under the payroll reimbursement agreements?

19   A    No.

20   Q    So the parties to the payroll reimbursement agreement

21   knew how to enter into an agreement that would limit profit

22   as they did under the share's services agreement, but your

23   recollection is that they didn't do that under the payroll

24   reimbursement agreement; is that right?

25   A    Correct.
```

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 12/28/21   Page 435 of 868   PageID 2639
HCM V. HCMFA, et al.                                                    57

1   Q    Okay.  Your analysis showed profit under the payroll

2   reimbursement agreement but it showed losses under the

3   shared services agreement, is that generally, correct?

4   A    That's generally correct as of that December analysis.

5   Q    Is there any protection anywhere for Highland against

6   losses?

7   A    No, if I'm understanding.

8   Q    Right.  So they're upset that Highland was making a

9   profit.  Did they care, did they express, were they -- are

10  you aware of any discussions where the advisors promised to

11  make Highland whole for all the losses they suffered under

12  the shared services agreement?

13  A    No.  No, no.

14  Q    Okay.  Let's go to Exhibit Q in their binder.  This is

15  the December 2020 analysis.

16  A    Yes.

17  Q    I believe I heard you when you were asked about the

18  estimate point and time profitability, I think that's the

19  spot where you said that there was material data that was

20  excluded.  Did I hear that correctly?

21  A    Yes, yes.

22  Q    Would you describe for the Court what material data was

23  excluded?

24  A    The material data that's in the analysis you mean?

25  Q    Yeah.

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 13    Filed 09/28/21    Page 402 of 868    PageID 2620
HCM V. HCMFA, et al.                                                        58

1   A    Yes.  So primarily the bonuses themselves, cash bonus,

2   deferred bonus, those were the main amounts that are not in

3   there whatsoever.

4   Q    And those bonuses were all paid in 2020 except for the

5   senior executives; is that right?

6   A    Correct.

7   Q    Okay.  And all of this is taking place in December

8   2020; is that right?

9   A    Yes.

10  Q    And that's not only after Highland had given notice of

11  termination of the shared services agreements, do you recall

12  that that's also the moment in time where Highland had an

13  approved plan and disclosure statement or an approved

14  disclosure statement?

15  A    Yes.  I think the disclosure statement was around the

16  November time frame, yes.

17  Q    And do you remember that in or around December you and

18  others and my firm were preparing for confirmation?

19  A    Yes.

20  Q    And so was there any expectation that somehow Highland

21  was going to terminate the shares services agreement, but

22  somehow retained these enormously profitable payroll

23  reimbursement agreements for the future?

24  A    Certainly not that I was aware of and it's patently

25  ridiculous that they would continue.

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 13   Filed 09/28/21   Page 437 of 888   PageID 2629
HCM V. HCMFA, et al.                                              59

1   Q    Was there some secret plan to somehow get out from

2   under the burdensome shared services agreements but go

3   forward with these profitable agreements with the payroll

4   reimbursement agreement?

5   A    No, and it's a pretty ridiculous proposition.

6   Q    That's what I thought.  Mr. Rukavina spent a lot of

7   time trying to get you to embrace the reasonableness of the

8   percentages in Exhibits 80.  Do you remember that?

9   A    Uh-huh.  Yes, sorry.

10  Q    And you would agree that that was your best good faith

11  estimate to try to come to an allocation; is that fair?

12  A    Are we referring to the '19 and '20 or the '19 analysis

13  or are we referring to the Exhibit A?

14  Q    Exhibit A.

15  A    Exhibit A.  And, sorry, ask -- please repeat the

16  question.

17  Q    You did that in good faith, right?

18  A    The 2018?

19  Q    Yeah.

20  A    Yeah, yeah, I did.

21  Q    But it was within the bounds of the 252 number, wasn't

22  it?

23  A    Yes, absolutely.

24  Q    And --

25  A    And if I could add one more thing, it was also in the

002540

Case 21-03010-sgj  Doc 113  Filed 04/15/22  Entered 04/15/22 11:33:11  Desc Main
Case 3:22-cv-02170-S  Document 11  Filed 10/03/22  Page 438 of 888  PageID 2632
HCM V. HCMFA, et al.                                                    60

1  bounds of the fact that we had -- I'm going to estimate, in

2  the neighborhood of 3 million -- $3 billion of ACIS funds

3  that were part of that allocation and then would disappear

4  within the matter of months.

5  Q    If the number in the subservice -- the subadvisory

6  agreement was not 352, but 452, let's say it was 500, twice

7  as much, would you have used the same allocations that are

8  in Exhibit A?

9  A    No, the allocations would have been different, up to

10 some boundary.  There would be some point where the

11 allocations would get just -- at some point the allocations

12 would get beyond a hundred percent, right, but within the

13 boundaries, yes.

14 Q    Is it fair to say that the allocation that you came up

15 with was a reasonably good faith estimate in the bounds of

16 the restrictions of 252?

17 A    Yes.

18 Q    Okay.  Just one or two more questions here going back

19 to December '19 the analysis that was given to the UCC.

20 A    Yes.

21 Q    I think you've testified pretty extensively that it was

22 a very subjective analysis.  Do I have that right?

23 A    Yes.

24 Q    And can you just remind Judge Jernigan what your goal

25 was in preparing that analysis?

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 13   Filed 01/02/23   Page 489 of 868   PageID 2633
HCM V. HCMFA, et al.                                                    61

1  A    Yes.  The main thing is, more time and demonstrate that

2  on the whole these are neither making nor losing a

3  tremendous amount of time and with the focus on the whole.

4  What was presented to the UCC, was the total costs, the 16.1

5  if I remember correctly.  So focusing on the fact that

6  putting our best foot forward with them, these contracts are

7  neither making you nor losing you significant amounts of

8  money to give time for what I understood to be a process of

9  trying to work through the bankruptcy fairly quickly.

10 Q    Did you ever expect when you prepared those analyses in

11 late 2019 that they would somehow be used as the basis for

12 the advisors to claim profitability under the payroll

13 reimbursement contracts?

14 A    No, absolutely not.

15 Q    Was it prepared for that purpose at all?

16 A    No.

17        MR. MORRIS:  I have no further questions, Your

18 Honor.

19        THE COURT:  All right.  Recross?

20                  RECROSS-EXAMINATION

21 BY MR. RUKAVINA:

22 Q    Under the payroll reimbursement agreements the advisors

23 are paying for 25 employees, correct?

24        MR. MORRIS:  Objection to the form of the

25 question.  No, it's okay.

002542

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 11    Filed 10/22/21    Page 440 of 868    PageID 2634
HCM V. HCMFA, et al.                                                    62

 1          THE COURT:  All right.  I think he withdrew his

 2    objection.

 3          MR. MORRIS:  Withdrawn.

 4          THE WITNESS:  They were paying -- no, there may be

 5    25, I don't know the exact number, but there are

 6    approximately 25 people on the schedule to the PRAs.

 7    BY MR. RUKAVINA:

 8    Q    And of those approximately 25 by the end, 20 had been

 9    gone, correct?

10    A    Of the original 25 around that.  I don't have the

11    number --

12    Q    Around that?

13    A    -- memorized, but yeah, in that ballpark.

14    Q    And you don't have a single problem with that, that for

15    more than a year your department was billing the advisors

16    for about 20 employees that weren't there anymore?  You

17    don't have any problem with that?

18    A    I have no issues with that whatsoever --

19    Q    Okay.

20    A    -- because if I may --

21    Q    No, you may not.

22    A    Okay.

23    Q    Was your department not charged under the shared

24    services agreements to periodically review the advisors'

25    contracts with vendors and advise the advisors about

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 10/03/22   Page 447 of 868   PageID 2635
HCM V. HCMFA, et al.                                          63

 1  potential overpayments, set-offs, credits, et cetera?

 2  A    I don't recall those provisions specifically, no.

 3  Q    Okay.  Well maybe Mr. Waterhouse will.

 4       Go to Exhibit A, please, my Exhibit A, Section 5.02,

 5  please.  That's about termination.  Termination on at least

 6  60 days advanced written notice, do you see that?

 7  A    Yes, I see that.

 8  Q    So if it was Highland's intent to terminate these

 9  agreements contemporaneously with the shared services

10  agreements why in the world wouldn't they have sent us

11  notice at least 60 days in advance?

12            MR. MORRIS:  Objection, Your Honor, assumes facts

13  not in evidence.

14            MR. RUKAVINA:  He testified --

15            THE COURT:  Overruled.  He can answer.

16  BY MR. RUKAVINA:

17  Q    Go ahead.

18  A    Sorry, again please.

19  Q    Yeah.  You testified on redirect there was no master

20  plan to keep sucking money out of the advisors by not

21  terminating these, I'm exaggerating obviously, but that's

22  basically what you testified about, right?  That there was

23  no plan to just keep charging the advisors.  Let me just ask

24  it again.

25  A    I don't --

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 11    Filed 02/28/22    Page 442 of 868    PageID 2636
HCM V. HCMFA, et al.                                                        64

1  Q    I'm going to ask it again, Mr. Klos, because you

2  can't --

3  A    I don't know what the plan was.

4  Q    But when Mr. Morris asked you, you said that you knew

5  that there was no plan.

6  A    It would -- it struck me as --

7  Q    Are you just answering whatever he asks you?

8  A    No.

9  Q    Okay.  So can you think of a reason why Mr. Seery would

10 not have sent a notice terminating the payroll reimbursement

11 agreement contemporaneously with the notice terminating the

12 shared services agreement?

13 A    I don't know the reason behind --

14 Q    Okay.

15 A    -- it.

16 Q    That's what I wanted to know, because I think a lot of

17 things you've testified about today are speculation.

18         MR. RUKAVINA:  Thank you.

19         THE COURT:  All right.  You are excused, Mr. Klos.

20         THE WITNESS:  Thank you.

21 (Witness excused)

22         THE COURT:  All right.  We should take a break.

23 You're going to call Mr. Waterhouse next?

24         MR. MORRIS:  Yes, Your Honor.

25         THE COURT:  You said he needs to finish today.

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 06/28/21   Page 449 of 868   PageID 2635
HCM V. HCMFA, et al.                                    65

```
 1              MR. MORRIS:  Yes.

 2              THE COURT:  Do we have a time estimate?

 3              MR. MORRIS:  I'm hoping it's an hour or less.

 4              MR. RUKAVINA:  I'll have an hour or less.

 5              THE COURT:  Okay.  We'll take a ten-minute break.

 6              THE MARSHAL:  All rise.

 7         (Recessed at 3:35 p.m.; reconvened at 3:51 p.m.)

 8              THE MARSHAL:  All rise.

 9              THE COURT:  Please be seated.  All right.  We're

10    back on the record in Highland.  Mr. Morris, are you ready

11    to call Mr. Waterhouse?

12              MR. MORRIS:  Yes, Your Honor.

13              THE COURT:  You may.

14              MR. MORRIS:  Highland calls Frank Waterhouse.

15              THE COURT:  Mr. Waterhouse, please approach the

16    bench and the witness box.

17              MR. WATERHOUSE:  Right here?

18              MR. MORRIS:  Yeah.

19              THE COURT:  Please raise your right hand.

20                  FRANK WATERHOUSE, WITNESS, SWORN

21              THE COURT:  All right.  Please be seated.

22                       DIRECT EXAMINATION

23    BY MR. MORRIS:

24    Q    Good afternoon, Mr. Waterhouse.

25    A    Good afternoon.
```

002546

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 10/28/22   Page 444 of 868   PageID 2636
HCM V. HCMFA, et al.                                                66

```
 1   Q    Just get comfortable for a moment.  Okay.  So in front

 2   of you are a few witness -- a few exhibit binders.  We try

 3   not to bind our witnesses.

 4        Exhibit binders, so that the two big ones are

 5   Highland's exhibits, the smaller one to your right are the

 6   advisor's agreement -- exhibits and I may ask you to refer

 7   them time to time, just so you know what they are there.

 8   Okay?

 9   A    Okay.

10   Q    Mr. Waterhouse, prior to February 2021 you were

11   Highland's CFO, correct?

12   A    Yes.

13   Q    And you held that position for roughly a decade; is

14   that right?

15   A    Yes.

16   Q    And as Highland's CFO you were responsible for

17   overseeing Highland's corporate accounting group, correct?

18   A    Yes.

19   Q    And Mr. Klos, David Klos was in that corporate

20   accounting group, correct?

21   A    Yes.

22   Q    And Mr. Klos reported directly to you, correct?

23   A    Yes.

24   Q    You were his boss, right?

25   A    He -- yes.
```

002547

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 13   Filed 06/28/22   Page 445 of 868   PageID 2639
HCM V. HCMFA, et al.                                                        67

1  Q    Okay.  You wore many hats when you were at Highland,

2  right?

3  A    I don't know what many hats is but I managed several

4  different teams.

5  Q    You served as an officer of more than a half a dozen

6  entities; is that fair?

7  A    I don't recall how many entities that I was an officer

8  of.

9  Q    You don't recall if it's more or less than a half a

10 dozen?

11 A    It's around that.  I mean, I don't recall, John.

12 Q    Do you know how many entities for which you served as

13 an officer today?

14 A    Three or four.

15 Q    Okay.  And among them, are NexPoint advisors and HCMFA?

16 A    Yes.

17 Q    And you served as the treasurer of those entities,

18 right?

19 A    Yes.

20 Q    And you served as the treasurer of those entities from

21 at least some time before January 1st, 2018, correct?

22 A    I'm sorry, did I serve as treasurer prior to January

23 1st, 2018 for those entities?

24 Q    You've been -- let me try to be clear.  You've been

25 serving as the treasurer of the advisors on a continuous

002548

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 13   Filed 10/28/21   Page 442 of 868   PageID 2630
HCM V. HCMFA, et al.                                                    68

 1  basis from some time prior to January 1st, 2018 until today,
 2  correct?
 3  A    Yes.
 4  Q    Okay.  And is the treasurer of your advisors, you're
 5  personally the person responsible for the advisors'
 6  accounting, correct?
 7  A    No.
 8  Q    As the treasurer, you're not the person who's
 9  responsible for the advisors' accounting?
10  A    I don't -- I don't believe I'm personally responsible,
11  you know, again it's -- there's a team of people, right,
12  that are involved in putting together other books and
13  records for the advisors and things like that.  Yes, I am
14  the treasurer, but I'm not a lawyer, but I don't know if I'm
15  personally responsible.  There's a team of people that does,
16  you know, put together -- you know, it's quite an endeavor.
17  Q    And they -- and that whole team reports to you,
18  correct?
19  A    Are you saying in 2018 or what time period?
20  Q    That's fair.
21       Let's focus on the period January 1st, 2018 until the
22  time you left Highland a little bit more, you know, February
23  of 2021.  Okay.  So that three plus year period.  I'll call
24  it the relevant period; is that fair?
25  A    Okay.

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 13   Filed 06/28/21   Page 447 of 868   PageID 2659
HCM V. HCMFA, et al.                                                    69

1  Q    Okay.  During the relevant period, you were the officer

2  of the advisors who was responsible for the advisors'

3  accounting, correct?

4  A    Yes.

5  Q    Thank you.  You were the person acting on behalf of the

6  advisors who was expected to make sure that the advisors

7  paid the proper amount due under the advisors' contracts,

8  correct?

9  A    Yeah, I would say, I mean, that is a team approach as

10 far as -- I'm not processing payables or every contract or

11 things like that.  Yes, I'm the treasurer, but, yeah, I'm

12 not personally responsible.

13 Q    Can you identify the officer of the advisors who was

14 responsible for making sure that the advisors only pay the

15 proper amounts due under the advisors' contracts?  Who is

16 responsible for that if it's not you?

17 A    I mean, as treasurer, I mean, I guess I'm referring to

18 it is a team approach, right, so I'll just say.

19 Q    I appreciate that.  I'm not asking you to identify

20 every person who does work in connection with the advisors'

21 accounting.  I'm asking you if you are the officer who is

22 ultimately responsible for making sure that the advisors'

23 pay the proper amounts due under the advisors' contracts.

24 A    Yes, I mean, look at the other officers, I would be the

25 one.

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 13   Filed 07/28/22   Page 448 of 888   PageID 2650
HCM V. HCMFA, et al.                                          70

```
 1   Q     Thank you very much.

 2         And among those contracts that you had responsibility

 3   for making sure were properly administered, were the

 4   intercompany agreements with Highland, correct?

 5   A     There were intercompany agreements.  I mean, yes.

 6   Q     And during the relevant period that three-year period,

 7   2018, '19 and '20 there were shared services agreements

 8   between Highland, NexPoint, NexPoint Real Estate Advisors

 9   and HCMFA, correct?

10   A     There were shared service agreements between Highland

11   and NexPoint advisors and Highland and Highland Capital

12   Management Fund Advisors.

13   Q     And there was also a shared services agreement between

14   Highland and NexPoint Real Estate Advisors, correct?  That

15   $80,000 monthly, does that ring a bell?

16   A     Yeah.  Well, you're refreshing my memory from my --

17   from the deposition, yeah, I forget about that one.

18   Q     And there were also what became known as the payroll

19   reimbursement agreements, right?

20   A     Yes.

21   Q     Okay.  And I'm going to refer to those contracts that

22   we just identified as the intercompany agreements, okay?

23   A     Okay.

24   Q     Okay.  And so you were responsible for making sure that

25   the advisors paid the proper amount under the intercompany
```

002551

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 11    Filed 07/22/22    Page 449 of 888    PageID 2663
HCM V. HCMFA, et al.                                            71

```
 1  agreements, correct, on behalf of the advisors?

 2  A    Yes.

 3  Q    Okay.  Do you know Dustin Norris?

 4  A    I do.

 5  Q    Mr. Norris is the advisors' executive vice-president;

 6  is that right?

 7  A    I don't recall his exact title.

 8  Q    But you do know that he's an officer of the advisors,

 9  correct?

10  A    Yes.

11  Q    And he didn't have any responsibility for administering

12  the advisors' intercompany agreements with Highland, did he?

13  A    Not that I'm aware.

14  Q    Okay.  You're not aware of Mr. Norris having had any

15  responsibility for drafting any of the intercompany

16  agreements with Highland, correct?

17  A    Not that I'm aware.

18  Q    You're not aware of Mr. Norris having any involvement

19  at all in determining in the ordinary course of business how

20  much was due under the intercompany agreements, correct?

21  A    Not that I'm aware.

22  Q    Is it fair to say that until late 2020, you never

23  discussed with Mr. Norris how the amounts paid under the

24  intercompany agreements with Highland were going to be

25  determined?
```

002552

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 1   Filed 09/27/22   Page 450 of 868   PageID 2553

HCM V. HCMFA, et al.                                                72

1   A    It's hard to -- can you repeat that, please?

2   Q    Sure.  I'm just thinking time, right, you left Highland

3   in February of 2021, correct?

4   A    Yes.

5   Q    Do you remember in December of 2020, Highland had just

6   given notice of the termination of the shared services

7   agreements and there were a number of communications among

8   people about the consequences of that?

9   A    Yes.

10  Q    Okay.  Up until that month, December '20, December 2020

11  you had never discussed with Mr. Norris how amounts paid

12  under the intercompany agreements were going to be

13  calculated, correct?

14  A    I had a conversation with Mr. Norris about

15  overpayments.  That's what I recall.

16  Q    And that took place in December 2020?

17  A    It was in Q-4 of 2020, I don't recall the -- it was at

18  the end of 2020.

19  Q    Okay.  But prior to that time, you've never had a

20  conversation of any kind with Mr. Norris about how amounts

21  under the intercompany agreements with Highland would be

22  calculated, correct?

23  A    Not that I can recall.

24  Q    Okay.  Let's talk about the NexPoint shared services

25  agreement.  If you can open up one of the binders that has

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 13   Filed 07/22/21   Page 457 of 868   PageID 2685
HCM V. HCMFA, et al.                                                    73

1   Exhibit 3.  Do you have that, Mr. Waterhouse?

2       Can you just confirm if you look at the signature page

3   that you signed this document?  It's the last page of the

4   document.

5   A    This is the NexPoint amended restated.

6   Q    Yes.

7   A    Yes.

8   Q    Those are your signatures, right?

9   A    Yes.

10  Q    And you signed this document on behalf of both Highland

11  and NexPoint, correct?

12  A    Yes.

13  Q    And you don't recall ever seeing any drafts of this

14  agreement before you signed it, correct?

15  A    I don't recall.

16  Q    And you don't recall going through the terms and

17  conditions of this agreement within in-house counsel or

18  outside counsel before you signed it, correct?

19  A    Yeah, I don't recall.

20  Q    You have no recollection whether this agreement was the

21  subject of any negotiations, correct?

22  A    I don't recall.

23  Q    To the best of your recollection, the advisors never

24  considered obtaining shared services from the source other

25  than Highland, correct?

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 07/22/22   Page 452 of 888   PageID 2555
HCM V. HCMFA, et al.                                                    74

1  A     Yeah, I don't recall.

2  Q     And if you take a look at Section 3.01 which is on the

3  page ending in Bates number 637, you understood when you

4  signed this agreement that Highland was going to receive a

5  flat monthly fee of $168,000 for shared services from

6  NexPoint, correct?

7  A     Yeah, it's what it says in Section 3.01, correct.

8  Q     And NexPoint paid that exact flat fee each and every

9  month from the time you signed this agreement until the time

10 it was terminated, notice of termination was given in -- at

11 the end of 2020, correct?

12 A     I don't believe that's right.

13 Q     You don't think NexPoint paid $168,000 for each and

14 every month from January 1st, 2018 until November 2020?

15 A     I thought you said through December of 2020.  There was

16 a time in Q-4 in 2020 where payments on these intercompany

17 agreements were suspended.

18 Q     Okay.  We'll talk about that in a minute.

19       Do you know why you signed this agreement in 2018?

20 Withdrawn.

21       Before you signed this agreement there was already in

22 place an agreement with NexPoint, right?

23 A     Yes.

24 Q     And there was an agreement between NexPoint and

25 Highland for the provision of shared services, correct?

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 13   Filed 01/23/23   Page 459 of 888   PageID 2655
HCM V. HCMFA, et al.                                              75

1    A    We reviewed an agreement from 2013.  If that is that

2    agreement, that's what's coming to mind, but I don't

3    remember who.  If that was NexPoint or HMFA, but if it's a

4    2013 agreement that you're referring to, there was an

5    agreement.  I don't remember what entity that was with.

6    Q    Do you have any recollection as you sit here right now

7    as to why the new agreement was entered into with NexPoint

8    in early 2018 for shared services?

9    A    I don't recall.

10   Q    Let's go to Exhibit 8 please.  Before we do that, let's

11   go to Exhibit 5.  Do you know what Exhibit 5 is?

12   A    It says a sub-advisory agreement between NexPoint

13   advisors and Highland Capital Management LP.

14   Q    And if you can go to the page ending in Bates number

15   580.

16   A    Okay.  Is that your signature, sir?

17   A    Yes, it is.

18   Q    And did you sign this agreement on behalf of Highland

19   and NexPoint?

20   A    Yes.

21   Q    And if you go back to the first page, do you understand

22   that this agreement was effective as of January 1st, 2018?

23   A    That's what it says in the first paragraph.

24   Q    Okay.  Do you have a recollection as to why you signed

25   this document?

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 07/28/21   Page 480 of 868   PageID 2556
HCM V. HCMFA, et al.                                          76

 1  A    I don't recall.

 2  Q    You don't recall?  Do you recalling have any

 3  discussions with anybody at any time concerning the sub-

 4  advisory agreement that you signed on behalf of Highland

 5  and NexPoint?

 6  A    I mean sub-advisory agreements are in place to provide

 7  front office services, but I don't remember -- I don't

 8  recall why we put this agreement in at that time.

 9  Q    Okay.  Can you turn to page 3 please?  Do you see that

10  the compensation is $252,000 a month?  I apologize, it's

11  page 3 of Exhibit 5.

12  A    Yes.

13  Q    Do you know how that number was arrived at?

14  A    I don't.

15  Q    Did you do any analysis to determine the value of the

16  sub-advisory services that Highland was going to be

17  providing pursuant to this agreement?

18  A    I didn't perform an analysis, but there was an analysis

19  that was performed as part of, you know, when there's

20  amounts like this in agreements there's a back-up.  Dave

21  Klos would typically do something like this.

22  Q    I know he might typically do it; I'm asking you

23  specifically if you have a recollection of Dave Klos

24  preparing an analysis to justify the $252,000 number that's

25  reflected in this document?

002557

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 13   Filed 12/28/22   Page 455 of 868   PageID 2689
HCM V. HCMFA, et al.                                                    77

```
 1  A    I don't.

 2  Q    Okay.  Do you recall any discussion with anybody at any

 3  time about this particular agreement?

 4  A    I just recall generally that, you know, there's -- an

 5  agreement was needed, but I don't -- I mean, I don't recall

 6  anything else about it.

 7  Q    Okay.  Do you recall if a sub-advisory agreement was

 8  ever prepared for Highland Capital Management Fund Advisors

 9  LP?

10  A    I don't.

11  Q    Do you have any recollection at all of having any

12  conversations about the creation of a sub-advisory agreement

13  for HCMFA?

14  A    I don't.

15  Q    Okay.  Let's go to Exhibit 8 now.  Do you see this is a

16  payroll reimbursement agreement for NexPoint?  Oh, I

17  apologize, this is --

18  A    It says Highland Capital --

19  Q    -- for HCMFA.

20  A    -- Management Fund Advisors.

21  Q    Let's get the one for NexPoint, so we stay consistent.

22  I apologize.

23       Can you go to Exhibit 6?  Do you see this is a payroll

24  reimbursement agreement for NexPoint and its effective

25  January 1st, 2018?
```

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 01/18/22   Page 482 of 868   PageID 2660
HCM V. HCMFA, et al.                                              78

1   A    Yes.

2   Q    Do you have any knowledge as to why NexPoint entered

3   into this agreement after you signed the sub-advisory

4   agreement on its behalf?

5   A    I don't recall.  I think I said that earlier.

6   Q    Do you have any recollection as to why this agreement

7   was entered into on May 1st, 2018 effective as of January

8   1st, 2018?

9   A    I don't.

10  Q    Do you have any recollection that personnel at Highland

11  had received advice that the sub-advisory agreement couldn't

12  be used because it couldn't be made retroactive and it

13  couldn't be approved unless approved in an in-house, in-

14  person meeting by the retail board.  Does any of that ring a

15  bell?

16  A    It doesn't.

17  Q    Do you recall that ASIS, that Josh Carey (ph) filed the

18  involuntary petition against ASIS at the end of January

19  2018?

20  A    I don't remember dates in the ASIS case.

21  Q    So back to the payroll reimbursement agreement, even

22  though you signed it, you don't recall anything about why

23  this agreement was prepared in the spring of 2018 other than

24  it was a general need for it, correct?

25  A    Yeah, I don't recall.

002559

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 1   Filed 07/28/21   Page 457 of 888   PageID 2669
HCM V. HCMFA, et al.                                          79

1  Q    And you don't remember having any conversations with

2  anybody at any time concerning the substance of this

3  agreement prior to the time you signed it other than the

4  fact that it was needed, correct?

5  A    Yes.

6  Q    You don't recall receiving any legal advice before

7  signing this agreement, correct?  I'm sorry?

8  A    Prior to signing documents, I mean, if a document is

9  left at my office, I have a cover sheet which if it's a

10 legal document which basically says legal reviewed and

11 approved this document or someone walks in with a document

12 like this for signature, I always ask them has legal

13 reviewed and approved this document.

14 Q    Okay.  But you personally didn't receive any legal

15 advice before you signed it, correct?

16 A    Not that I recall.

17 Q    You don't recall seeing any drafts of this agreement

18 before you signed it, correct?

19 A    Not that I recall.

20 Q    You never provided any comments to this agreement,

21 correct?

22 A    Not that I recall.

23 Q    You don't know who drafted this agreement, correct?

24 A    Aside from what I mentioned earlier about Highland or

25 in-house counsel reviewing and approving it, I don't know.

002560

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 1   Filed 09/28/22   Page 458 of 888   PageID 2660
HCM V. HCMFA, et al.                                                     80

 1  Q    Okay.  Do you see in the definition of actual costs it

 2  says, quote, absent any changes to employee reimbursement as

 3  set forth in Section 2.02, such costs and expenses are equal

 4  to $252,000 per month?  Do you see that?

 5  A    Yes.

 6  Q    And is it your understanding that NexPoint paid

 7  $252,000 each and every month from the beginning of 2018

 8  until the time Mr. Dondero gave his directive to stop

 9  paying?

10  A    Yes.

11  Q    Okay.  You don't remember how that $252,000 number was

12  calculated, correct?

13  A    I don't recall.

14  Q    Okay.  Can you turn to Exhibit A -- you know, we'll get

15  to it.  We'll get to Exhibit A.  Yes, turn to Exhibit A of

16  this agreement.  Do you recall that you also signed a

17  payroll reimbursement agreement on behalf of HCMFA and

18  Highland at the exact same time that you signed this one?

19  A    We'd have to look at the document, I don't -- you say

20  Exhibit A?

21  Q    Yeah.  You know before we do that, let's just stick

22  with that binder that you had and go to Exhibit 8.  And do

23  you see that this is the payroll reimbursement agreement

24  that was also entered into on May 1st, 2018 but this one was

25  entered into between Highland and HCMFA?

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 13   Filed 08/22/22   Page 489 of 868   PageID 2763
HCM V. HCMFA, et al.                                                81

1    A    I do.

2    Q    And if you turn to the document with Bates number 602

3    and 603, those are your signatures, correct?

4    A    It is.

5    Q    And do you have any recollection of any facts and

6    circumstances concerning the preparation and your review of

7    this document before you signed it that differs from the

8    questions that I just asked you about, the NexPoint payroll

9    reimbursement agreement.  Is there anything different about

10   this?

11   A    No, not that I recall.

12   Q    Yeah, I'm just trying to speed this up a little bit.

13   A    Okay.

14   Q    You don't recall getting legal advice, correct?

15   A    I don't.

16   Q    You don't recall providing any comments to this

17   document, correct?

18   A    I don't.

19   Q    You don't recall having any discussions with anybody at

20   any time about this document before you signed it, correct?

21   A    I don't.

22   Q    You don't recall why it was signed, correct?

23   A    Aside from a general need, I don't recall.

24   Q    Okay.  So now let's look at Exhibit A, it doesn't

25   matter which agreement, let's just take a quick look at

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 11    Filed 12/28/21    Page 460 of 868    PageID 2563
HCM V. HCMFA, et al.                                                          82

```
 1   Exhibit A.  Before you signed it, did you know -- I

 2   apologize.  It's Exhibit A to the agreement, so whether

 3   you're at Exhibit 6 or Exhibit 8, the last page is something

 4   called Exhibit A.  Do you have that?

 5   A    Yes.

 6   Q    That's a list of employees.

 7   A    Uh-huh.

 8   Q    Did you know that Exhibit A was attached to these

 9   agreements before you signed it?

10   A    I have a general recollection that there was an exhibit

11   to this agreement with employees, yes.

12   Q    You don't know who prepared the Exhibit A that's

13   attached to each of these agreements, correct?

14   A    I don't.

15   Q    You don't know how the exhibits were prepared, correct?

16   A    I don't know the person who specifically put this

17   together.

18   Q    And you don't recall discussing the Exhibit A's with

19   Mr. Klos before you signed these two payroll reimbursement

20   agreements, correct?

21   A    Correct.  This was again four years ago, I don't

22   remember.

23   Q    Okay.  And you have no recollection of ever discussing

24   Exhibit A with anybody at any time, correct?

25   A    I don't recall.
```

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 11    Filed 10/13/22    Page 487 of 868    PageID 2663
HCM V. HCMFA, et al.                                                            83

1   Q    And at around the time you signed this agreement you

2   didn't have any discussions with anybody about whether the

3   parties would make an effort to determine the dual employees

4   -- to determine whether the dual employees were spending the

5   allocated percentages set forth on this document, correct?

6   A    I mean, there was a general understanding.  If it's in

7   a document of this type, I mean, it's not -- you know, there

8   aren't just going to be numbers that are thrown into an

9   exhibit.

10  Q    Well, you had no expectation that Exhibit A's would

11  ever be updated, did you?

12  A    I don't -- I mean, potentially.

13  Q    Well, you don't recall ever instructing Mr. Klos to

14  update Exhibit A, did you?

15  A    I don't recall.

16  Q    You're not aware of anybody in the world who ever

17  instructed Mr. Klos to update Exhibits A, are you?

18  A    I'm not aware.

19  Q    And you have no recollection of anybody ever updating

20  Exhibits A, correct?

21  A    I'm not aware.

22  Q    And just more broadly, you have no recollection of ever

23  asking anybody in the world at any time to update this

24  chart, correct?

25  A    Well, in Q-4 in 2019, you know, this agreement and

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 13   Filed 02/28/23   Page 462 of 888   PageID 2565
HCM V. HCMFA, et al.                                                    84

 1   others were brought to the attention of Fred Caruso at DSI

 2   after Highland filed.  And You know, at the time, Dave

 3   brought up the -- Mr. Klos brought up the overpayments by

 4   the advisors on the various agreements.  This was presented

 5   to Mr. Caruso at the time.

 6        So again, I -- you said there was no intent to ever

 7   update these numbers.  I mean, there was an analysis put

 8   together and presented to basically the person in charge of

 9   Highland at the time because we were educating Mr. Caruso

10   and DSI on everything Highland in Q-4 of 2019 and trying to

11   get him up to speed as quickly as possible and this was one

12   of the items.

13   Q    And did you ever see a draft of the revision to Exhibit

14   A at any point?

15   A    Not that I recall.

16   Q    Okay.  No records exist today that could be used to

17   determine whether the dual employees actually spent the

18   allocated time working for the advisors; isn't that correct?

19   A    Aside from going through work product, e-mails, or

20   having discussions of that nature.

21   Q    So it'd have to be a forensic examination?

22   A    I mean, if you're saying today to go back in time, I

23   mean, you know, none of the employees are there, so yeah,

24   you'd have to do an estimate and again, on this Exhibit A

25   there's a percentage allocation to HMFA to determine what

HCM V. HCMFA, et al.                                    85

1  that allocation is.

2  Q    Did you do anything to satisfy yourself that Exhibit A

3  was accurate before signing this agreement?

4  A    I remember generally having conversations on these

5  allocations, but again like I said it was four years ago.

6  If I didn't feel comfortable with these allocations at the

7  time, I wouldn't have signed the document.

8  Q    Okay.  Nobody was at -- none of the dual employees were

9  ever instructed to keep track of their time, so that

10 somebody could actually determine the allocations with

11 accuracy, correct?

12 A    Not that I'm aware.

13 Q    And you never personally -- and you personally never

14 instructed any dual employee to keep track of their time so

15 that an accurate determination of their allocation could be

16 made, correct?

17 A    Not that I recall.

18 Q    And because no one was instructed to keep time records,

19 you're unaware of any records that exist today that could be

20 relied upon to accurately determine how much time the dual

21 employees spent working for the advisors, correct?

22 A    As I said earlier, aside from e-mails or work product

23 or things like that that existed -- that exists on

24 Highland's systems, you know, I don't know of any -- I don't

25 know anything outside of that.

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 1   Filed 08/26/21   Page 400 of 888   PageID 2566
HCM V. HCMFA, et al.                                                    86

1   Q    Before you signed this agreement, did you make any

2   determination as to whether there was any prohibition or

3   limitation on Highland's ability to make a profit under the

4   payroll reimbursement agreements?

5   A    That -- well, it's a payroll reimbursement agreement,

6   right, as you described, so this agreement from the advisors

7   to Highland is to basically reimburse Highland for any costs

8   incurred by Highland Capital Management LP.

9   Q    So then why did you personally authorize the advisors

10  to pay the fixed fees that are set forth in each of the

11  agreements each and -- for each and every of the 35 months

12  between January 1st, 2018 and the end of November 2020 or Q-

13  4?

14          MR. RUKAVINA:  Object, Your Honor, there's no

15  predicate, there's no foundation that he personally

16  authorized any such payment.

17          THE COURT:  Response?

18          MR. MORRIS:  I'm happy to do that right now.  I'll

19  just skip to that and then we'll come back to it.

20          THE COURT:  So I'll sustain.

21  BY MR. MORRIS:

22  Q    Remember earlier you agreed that as the treasurer of

23  the advisors you were responsible for making sure that

24  Highland paid -- that the advisors paid the proper amounts

25  under their intercompany agreements with Highland?

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 1    Filed 03/28/22    Page 465 of 888    PageID 2567
HCM V. HCMFA, et al.                                                87

1   A     Yes.

2   Q     Okay.  One of the ways you did that was by approving

3   the payments in advance, correct?

4   A     I mean, I think I said earlier payments and things of

5   that nature are a team approach, but the -- yes, I mean, I

6   do approve, you know, I do approve payments.

7   Q     You did.  In fact, you approved -- withdrawn.

8       It was your practice to approve every payment under the

9   intercompany agreements before they were made; is that fair?

10  A     I don't know if I approved every single one of these

11  payments under these agreements.  I would have to go back

12  and see if I actually made approvals.  I don't know.

13  Q     Okay.  And that's why I framed it as I did.  I

14  appreciate the fact that you can't testify with specificity

15  as to every single payment, but your practice was to do

16  that; is that fair?

17  A     The team would communicate payments to myself on a

18  weekly basis, you know, for again the purpose was to provide

19  transparency into what was being paid for the week, provide

20  another set of eyes on, you know, what payments are going

21  out and since it's a team approach there may be payments

22  that were inappropriate or left off of the list that others

23  may know about.

24      So it was -- there was a review process in that regard,

25  yes.

002568

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 1-1   Filed 09/28/22   Page 402 of 888   PageID 2650
HCM V. HCMFA, et al.                                                    88

 1   Q    And at the end of that process Kristen Hendricks (ph)

 2   would send you an e-mail with a list of the payments that

 3   were going to be made on behalf of the advisors and she

 4   would seek your approval before effectuating those payments,

 5   correct?

 6   A    It may not have always been Kristen and it depends on

 7   -- I don't know what time period you're talking about; it

 8   may not have always been Kristen.  There may have been

 9   others involved and, you know, again hopefully their list

10   was accurate and complete.

11   Q    Okay.  So without regard to any particular individual,

12   is it fair to say that the practice was to have somebody

13   from the corporate accounting group during the three-year

14   relevant period prepare a list of wire transfers that were

15   going to be made, to send that list to you and to seek your

16   approval before the wires were transferred.  Was that the

17   practice even if it didn't happen every single day, even if

18   somebody different did it every single day?

19   A    Not always, no.

20   Q    Not always, but was it the practice?

21   A    No.

22   Q    Okay.  Can you turn to 147 in your binder please?

23   A    147.

24   Q    Uh-huh.  It may be the other book.  Can you explain to

25   Judge Jernigan what Exhibit 147 is?

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 13   Filed 09/28/23   Page 467 of 868   PageID 2659
HCM V. HCMFA, et al.                                                    89

1   A    This is an e-mail from Kristen Hendricks dated Tuesday,

2   February 11th, 2020 and it's subject -- and it's cc'ing

3   David Klos, subject is wires for today.  It has HCMFA and is

4   an HCMLP amount of $300,797 for shared services and as

5   amounts under NexPoint advisors, it says GPM Dugerboy (ph)

6   for $209,790.05 with a note of Trip Grosa (ph) --

7   Q    Okay.  We don't have to -- I'm going to apologize for

8   interrupting, but is this an e-mail from Kristen to you

9   seeking approval for the initiation of wire transfers one of

10  which is on behalf of HCMFA for the purpose of paying shared

11  services that were due?

12  A    This e-mail is, yes.

13  Q    Okay.  And at the bottom of it, do you see just above

14  her name, it says, okay to send?

15  A    Yes.

16  Q    Did Ms. Hendricks have a practice of sending e-mails to

17  you with wire transfers in which she sought your approval

18  before initiating?

19  A    Yes, but I said again, I said no earlier because this

20  is unique.  This is unique because you've -- this is from

21  February of 2020.  Prior to filing at Highland, Highland

22  didn't have a bank account at East West.  They needed an

23  East West bank account because of the bankruptcy, right, it

24  needed a special bank account.

25       So because of that, the -- there were wires that were

002570

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 13    Filed 10/28/22    Page 408 of 868    PageID 2670
HCM V. HCMFA, et al.                                                    90

1  sent by the advisors to the East West bank account.  Prior

2  to filing, Highland did not have an East West bank account.

3  It had a bank account at NexBank.  So the advisors had bank

4  accounts at NexBank as well.

5      Those payments weren't sent by wire.  They were

6  typically like a book -- like an ACH or they're a different

7  form.  And I don't recall Ms. Hendricks or Mr. Klos on every

8  single one of them, a lot of ACHs were done without my

9  knowledge.

10 Q    And that would've been prepetition?

11 A    That'd be prepetition, right, because the East West

12 bank account was set up after we filed in October of 2019,

13 that is a new bank account.  And there's a new process in

14 place.

15 Q    And describe the process for Judge Jernigan that was

16 put in place after the petition date.

17 A    What -- the process for Highland wires?

18 Q    For HCMFA and NexPoint wires.

19 A    So this e-mail is descriptive of that process to, you

20 know, again post-petition if there were wires that was sent

21 out, yes, I was made aware of those wires.

22 Q    You weren't just made aware, but your approval was

23 sought, correct?

24 A    I was made aware; I didn't go back and recalculate this

25 $300,797.  Again, like for the shared service or any of

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 09/22/22   Page 409 of 868   PageID 2663
HCM V. HCMFA, et al.                                                        91

1   these other payments.  Again, you know, this is a team

2   approach.  These look routine and customary.

3   Q    Okay.  So routine and customary and you respond by

4   telling Kristen, okay, correct?

5   A    I -- yes, it's in this e-mail.

6   Q    And under the process that was put in place after the

7   petition date, could Ms. Hendricks or any person in the

8   accounting team were they expected to initiate these wire

9   transfers without obtaining your approval?

10  A    That was the expectation, but I don't -- I mean, I

11  don't think that -- if they didn't get my answer timely, I

12  think it's my understanding that, you know, wires did go out

13  from time to time.

14  Q    And do you recall if that ever happened where you

15  learned about it and you told them you made a mistake, you

16  shouldn't have executed that wire, I've looked at it now,

17  I've seen what you've done and you shouldn't have done that?

18  A    I don't recall.

19  Q    Go to Exhibit 152, please.  Is it fair to say that this

20  is just another example of the process that you just

21  described having been put in place after the petition date

22  with the corporate accounting group would create a list of

23  the proposed wires and seek your approval?

24  A    Yes.

25  Q    Okay.  And, in fact, this one specifically relates to

002572

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 09/28/22   Page 470 of 888   PageID 2573
HCM V. HCMFA, et al.                                                           92

1  the HCMFA sub-advisory agreement in the amount of $416,000,

2  right?

3  A    For 416,000, yes.

4  Q    So you personally approved in April of 2020 a payment

5  of $416,000 which is exactly the number that was in the

6  payroll reimbursement agreement that you signed back in May

7  of 2018, correct?

8  A    I said okay after reviewing it.  Again, this is after

9  being aware of this I said, okay.

10 Q    And the thing is, Mr. Waterhouse, this wasn't coming

11 into an -- this wasn't coming to you in a vacuum.  You

12 expected to get these wired requests.  You expected them to

13 be at the numbers that you received, right?  You knew this

14 was going to happen before you even got this e-mail from Ms.

15 Hendricks, correct?

16 A    What do you mean I expected to?

17 Q    Well, your accounting group prepared 13-week forecasts

18 in the ordinary course of business; isn't that right?

19 A    Yes.

20 Q    And those 13-week forecasts detailed every single

21 payment that was projected to be made under the intercompany

22 agreements during the three-year relevant period, correct?

23 A    Yeah, I mean, more or less, yes.

24 Q    What's less?

25 A    Again, if something was missed here or there, but yeah,

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 13   Filed 09/23/22   Page 497 of 868   PageID 2673
HCM V. HCMFA, et al.                                                    93

1   13-week forecasts were prepared on a weekly basis.  I can't

2   remember if everyone was done a hundred percent accurately,

3   but yes, that was done on a weekly basis.

4   Q    Can you describe for Judge Jernigan any recollection

5   you have of there being a payment under any of the

6   intercompany agreements during the three-year relevant

7   period that wasn't properly recorded in one of the 13-week

8   forecasts?

9   A    So you're -- I mean, that's over 150 13-week forecasts.

10  I can't recall every single thing over that -- going back

11  three years.

12  Q    I appreciate that.

13  A    You know.

14  Q    But you also can't remember one error that was ever

15  made with respect to a forecasted payment that was due under

16  any of the intercompany agreements, correct?

17  A    What I can recall over the relevant time period is yes,

18  there were times where there were updates and comments made

19  on 13-week cash or things that were left out or misbucketed

20  or things of that nature or people not made aware.

21      I don't recall, you know, related to these agreements,

22  but that doesn't mean to say it didn't happen.

23  Q    Okay.  These 13-week forecasts they were sent to you on

24  a weekly basis and reviewed in group meetings, right?

25  A    Yes.  We -- yes.

002574

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 09/26/22   Page 492 of 868   PageID 2676
HCM V. HCMFA, et al.                                              94

1   Q    And prior to the petition date the 13-week forecasts

2   were also sent to Mr. Dondero, correct?

3   A    The -- Mr. Dondero received them on a very ad hoc

4   basis.

5   Q    Well, for the first few months of the bankruptcy you

6   and DSI routinely went through the 13-week forecasts with

7   Mr. Dondero when Highland filed for bankruptcy, correct?

8   A    I don't recall meeting with Mr. Dondero and DSI on a

9   weekly basis for 13-week cash.

10  Q    Okay.  I'll just ask the question again.

11       For the first few months of the bankruptcy, you and DSI

12  routinely went through the 13-week forecast with Mr. Dondero

13  once Highland was in bankruptcy, correct?

14  A    I recall a meeting here and there with Mr. Dondero and

15  Mr. Caruso and Mr. Klos.  I wouldn't say it was routine or

16  on a weekly basis.

17  Q    All right.  Do you remember the deposition that we had

18  a couple of weeks ago?

19  A    Yes.

20  Q    Okay.

21       MR. MORRIS:  Your Honor, do you want to follow the

22  transcript?

23       THE COURT:  Do I want to follow the transcript --

24       MR. MORRIS:  Yeah, as I cross-examine with it?

25       THE COURT:  Well, I guess I can.

002575

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 13    Filed 09/28/22    Page 499 of 868    PageID 2575
HCM V. HCMFA, et al.                                                          95

```
 1              MR. MORRIS:  Okay.  That was a loaded question.
 2              THE COURT:  Yeah.
 3              UNIDENTIFIED:  John, I don't mind putting it on
 4  the screen.
 5              MR. MORRIS:  Yeah, you don't have to.
 6              UNDIENTIFIED:  Okay.
 7              MR. MORRIS:  Mr. Rukavina has it, correct?  Okay.
 8  BY MR. MORRIS:
 9  Q    Mr. Waterhouse, do you remember attending the
10  deposition with me virtually a couple of weeks ago?
11  A    Yes.
12  Q    And my only question is whether you remember being
13  asked this question and giving this answer.  And I'm looking
14  at page 173 and its line 20 through page 174, page 3 (sic).
15              "Q   Did Mr. Dondero every receive any of the
16              forecasts that you've just described?
17              "A   Yeah, I mean, we, we would walk Jim through
18              cash, the 13-week cash from time-to-time.  We did
19              -- I mean, that was one thing.  We met with Mr.
20              Dondero and DSI and went through 13-week cash
21              routinely with Mr. Dondero once we were in
22              bankruptcy."
23      Was that -- is that -- did you give that answer to that
24  question?
25              MR. RUKAVINA:  Well, and Your Honor, I think he's
```

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 26-31    Filed 04/18/22    Page 474 of 885    PageID 32566
HCM V. HCMFA, et al.                                                            96

```
 1   entitled to know that on line 7 he said,

 2              "It was sporadic.  So I wouldn't say it was

 3              every week."

 4              So let's have optional completion.

 5              THE COURT:  Okay.

 6              MR. MORRIS:  We're going to get to that.

 7              No, I actually had the context --

 8              MR. RUKAVINA:  I just think the witness should

 9   have a copy of the transcript.

10              MR. MORRIS:  Yeah, okay.  Asia, can you put it up

11   on the screen please because I'm going to get to that very

12   point.  Here you go, Mr. Waterhouse.

13   BY MR. MORRIS:

14   Q    Sir, if you can turn to page 173, my next question was

15   actually going to be do you recall that in the beginning of

16   2020 Mr. Dondero surrendered control of Highland to the

17   independent board?

18   A    This says deposition of Dustin Norris, is this the

19   right one?

20              MR. RUKAVINA:  No, actually.  We have one.

21              THE WITNESS:  Okay.

22   Q    So do you recall that -- I'm sorry, Mr. Waterhouse,

23   take your time, I don't need to rush you.  You're at 173?

24   A    I am.

25   Q    And I just asked you that question that began at the
```

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 16-31    Filed 04/19/22    Page 475 of 885    PageID 32567
HCM V. HCMFA, et al.                                                97

1   bottom of 173 and then continued to the top of 174.  And

2   now, if you could just look at me because I'm going to ask

3   you a couple of foundational questions, Mr. Waterhouse.

4   A    Okay.

5   Q    Do you recall that after -- in January 2020 Mr. Dondero

6   surrendered control of Highland to an independent board,

7   correct?

8   A    Yes.

9   Q    Okay.  And thereafter as the calendar turned to 2020,

10  you still went over the 13-week forecast with Mr. Dondero

11  just on a less frequent basis, correct?

12  A    I'm trying to -- we probably met with Mr. Dondero -- I

13  don't recall how many times we met with Mr. Dondero at the

14  end of 2019, but it doesn't feel like a lot.  Going into

15  2020, we did meet with Mr. Dondero I think a few -- you

16  know, I think a few times versus at the end of 2019.

17  Q    And that's my point.  In the first few months of the

18  bankruptcy when he was still in control, you met with him as

19  you testified -- you met with him routinely.  And then when

20  the independent board was put in place, you met with him

21  sporadically is the word; is that fair?

22  A    I don't recall meeting with Mr. Dondero at any time for

23  cash after Highland filed.  Mr. Dondero was very busy at the

24  time with the filing and all that happened around the

25  filing.  So I don't recall having any meetings with Mr.

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 1631   Filed 01/18/23   Page 476 of 885   PageID 37668
HCM V. HCMFA, et al.                                                98

1  Dondero at the end of 2019.

2  Q    Okay.  Then I'm just going to go back and read the same

3  testimony I just did if that's where we are.  Page 173 --

4         MR. RUKAVINA:  Your Honor, I object.  Object,

5  first of all this is now five minutes, there's no relevance

6  to this.  Mr. Morris hasn't established any relevance as to

7  how many times that he might have met with Mr. Dondero on

8  13-week cash forecast, has anything to do with this admin

9  claim.  Moreover, good -- the goose and the gander rule.  He

10  has not stated anything that requires impeachment from a

11  prior deposition, the testimony is identical.

12         THE COURT:  Response?

13         MR. MORRIS:  Number one, I can't imagine too many

14  more relevant issues than the person who's in control of the

15  advisors receiving 13-week forecasts that deal every single

16  payment that the advisors were projected to make under the

17  intercompany agreements during the relevant period,

18  including during the period in question, that's number one.

19         Number two, I thought we had an agreement based on

20  his deposition testimony that, in fact, Mr. Waterhouse and

21  DSI routinely went over this stuff after the bankruptcy

22  filing in 2019 and I'm -- I just want to establish that Mr.

23  Dondero continued to receive 13-week forecasts on a sporadic

24  basis in 2020 and continued to meet with the independent

25  board and Frank to go over it.  That's what the testimony

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 16-1   Filed 09/22/22   Page 477 of 865   PageID 32660
HCM V. HCMFA, et al.                                          99

1  is.  I could just read it into the record if you'd like.

2          THE COURT:  Okay.  I overrule the objection.

3  BY MR. MORRIS:

4  Q    So, Mr. Waterhouse, in 2020, Mr. Dondero continued to

5  receive the 13-week forecast, even if it was sporadically,

6  correct?

7  A    He -- yes.

8  Q    And, in fact, it's fair to say that Mr. Dondero

9  personally participated in the review of the 13-week

10  forecast with the independent board from time to time,

11  correct?

12  A    I don't recall Mr. Dondero and the independent board

13  meeting together for a 13-week cash.

14  Q    Can we go to page 175 please?  Lines 4 to 13, were you

15  asked these questions and did you give these answers?

16          "Q   And then in 2020 once the board was

17          appointed, the board also got involved in the

18          review of the 13-week forecast, correct?

19          "A   Correct, so they were part of that process

20          as well.

21          "Q   And Mr. Dondero, I'll just say from time to

22          time also participated in that process; is that

23          correct, is that fair?

24          "A   Yes.

25          "Q   And the 13-week forecast would, if a

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 26-16    Filed 01/12/25    Page 478 of 885    PageID 32620
HCM V. HCMFA, et al.                                           100

1              payment was due under either the shared

2              services agreement or the payroll reimbursement

3              agreements those projected payments would be

4              included in the forecast, right?

5              "A   It would."

6     Did you give those answers to my questions a couple of

7  weeks ago?

8  A    Yes, it's in the testimony, I mean, my understanding at

9  the time of your questions were did the independent board

10 get involved in reviewing the 13-week forecast, correct,

11 yes.  We -- and when you said Mr. Dondero, did he

12 participate in the process I didn't link the independent

13 board with Mr. Dondero.  I -- this -- Mr. Dondero did see

14 cash from time to time, like I said sporadically.  But I

15 don't recall Mr. Dondero and the independent board in a room

16 reviewing 13-week cash together.

17 Q    Okay.  As the CFO you were generally aware -- let's

18 shift gears a little bit to the question of hires and

19 terminations, right, and staffing at Highland.

20     As the CFO, you were generally aware each time there

21 was a new hire in the Highland complex, correct?

22 A    Yes.

23 Q    And you were also generally aware of all employee

24 terminations from the Highland complex, correct?

25 A    Yes.

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-10   Filed 01/11/25   Page 479 of 865   PageID 32673
HCM V. HCMFA, et al.                                                      101

1  Q    The human resources department had a process that it

2  used to communicate to the operational groups when someone

3  was terminated or resigned from the Highland complex,

4  correct?

5  A    Yes.

6  Q    And in 2018 and 2019 Mr. Dondero personally approved

7  the compensation for every team in the Highland complex,

8  right?

9  A    I believe so, yes.

10 Q    And that would include salary, bonuses and deferred

11 compensation if any, correct?

12 A    Yes.

13 Q    And you would walk him through every single employee

14 and he would have to personally approve their compensation;

15 is that correct?

16 A    Yes.

17 Q    Okay.  And every month, the human resources department

18 prepared a monthly head count report; isn't that right?

19 A    Let me go back to the prior question about me walking

20 Mr. Dondero through every single employee.  I didn't walk

21 him through every single employee.  There were certain

22 groups that I did not participate, but Mr. Dondero -- I did

23 walk Mr. Dondero through several employees.

24 Q    Can you go to page 96 of your transcript please?

25 A    Sure.

002582

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 6-10   Filed 01/10/23   Page 480 of 885   PageID 32672
HCM V. HCMFA, et al.                                                           102

```
 1   Q    Were you asked this question and did you give this

 2   answer, tell me when you're there.

 3              "Q    But to the best of your knowledge as the

 4              CFO Mr. Dondero would have had to personally

 5              approve any changes in compensation including

 6              salary, bonus, and deferred compensation for

 7              anybody in the Highland platform, correct?

 8              "A    Yes.  He -- well, he reviewed all

 9              employees' base salary, bonuses, cash bonuses

10              and deferred and we walked him through every

11              single employee, you know, he would approve it,

12              make changes, do what he needed to do at his

13              discretion."

14        Is that the answer you gave a couple of weeks ago?

15   A    Yes, that's the answer.  I guess when I referred to we,

16   we means myself and other Highland employees.  So that we

17   wasn't -- so when you asked did you personally walk him

18   through every single employee, I didn't personally.  There

19   were others that participated in the process that I did not

20   participate in.

21   Q    Okay.

22   A    And that's the we.

23   Q    Okay.  Thanks for the clarification.

24   A    Sure.

25              MR. MORRIS:  Ms. Canty, can you put up on the
```

002583

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 6-10   Filed 01/02/25   Page 481 of 885   PageID 32653

HCM V. HCMFA, et al.                                                          103

 1   screen the spreadsheet that is Exhibit 93?

 2   Q    And while she does that, let's look at the document.

 3   If you can turn to Exhibit 93.  And do you see that that's

 4   an e-mail from Kelly Stevens (ph) to a bunch of people?

 5   A    I see it.

 6   Q    And did Ms. Stevens work in Highland's human resources

 7   department during the relevant period?

 8   A    Yes.

 9   Q    And did Ms. Stevens send each and every month a head

10   count report, an effective head count report?

11   A    That's my general understanding.

12   Q    Okay.  It was the general practice that she would

13   distribute an effective head count report at the beginning

14   of each month or at the end of each month for the prior

15   month, correct?

16   A    Yes.

17   Q    And you received those in the ordinary course of

18   business, correct?

19   A    I did.

20   Q    And Mr. Norris, to the best of your recollection, would

21   have received that in the ordinary course each and every

22   month, correct?

23   A    Again I think we went through this in -- I don't know

24   if Mr. Norris was on every single one of these e-mails that

25   Ms. Stevens sent during the relevant period.  He is on this

002584

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-16   Filed 04/14/25   Page 483 of 865   PageID 27364
HCM V. HCMFA, et al.                                              104

```
 1  e-mail dated March 4th, 2019.
 2  Q    Okay.  And Jason Post and Lauren Bedford, would they be
 3  people that in your recollection you would have expected to
 4  receive information of this type?
 5  A    I don't know how this distribution was -- got formed,
 6  but they're on the -- they received this e-mail.  They are
 7  in the to line.
 8  Q    Okay.  And that monthly head count report identified
 9  every single person who was employed in the Highland complex
10  as of the date of the e-mail, right?
11  A    These have graphs of the head count.
12  Q    But there was always a spreadsheet attached, correct,
13  an Excel spreadsheet?
14  A    There were spreadsheets, yes.
15  Q    And the spreadsheet identified each and every employee
16  in the Highland complex, right?
17  A    I believe so.
18  Q    And --
19  A    I didn't really -- I think I said in my deposition I
20  didn't really pay much attention to these reports.
21  Q    Okay.  You didn't pay attention to it, but you got it,
22  right?
23  A    I'm on the to line, yes.
24  Q    And so if you had just clicked it open, you would've
25  seen a list of all the employees in the Highland complex,
```

002585

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-10   Filed 01/06/23   Page 483 of 865   PageID 32675
HCM V. HCMFA, et al.                                                          105

1  correct?

2  A    From what I recall, I don't -- again, I didn't -- I

3  don't remember (indiscernible) every single one of these, I

4  didn't pay a lot of attention to these e-mails.

5  Q    Okay.  And do you recall that these reports

6  specifically identified every single person who was

7  terminated from the Highland complex and the date of

8  termination?

9  A    Yes.  Actually you walked that tab -- I remember that

10 in our deposition, I said that was the first time I've ever

11 actually clicked on that tab and walked through what was on

12 that tab.

13        MR. MORRIS:  Thank you, Ms. Canty.

14 Q    We've got the exhibit up on the screen and this is the

15 attachment to the document we're just looking at, so it's

16 the head count report for 2/28.

17        MR. MORRIS:  And, Your Honor, I just want to spend

18 a minute or two on this or three, so that -- because there's

19 three dozen of them in the exhibit binders and the evidence

20 as to who it was distributed, those documents have been

21 admitted so you can see, you know, I believe -- well, I

22 won't make any representations.

23        Can we click, Ms. Canty, on the tab that says

24 terms?  And just scroll to the top.

25 Q    Do you see that it has a list of people there, Mr.

002586

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-10   Filed 01/12/23   Page 484 of 885   PageID 32686
HCM V. HCMFA, et al.                                                      106

1   Waterhouse?  You're not familiar with this information

2   that's on this sheet?

3   A    These are terminations, again like I said, I had never

4   clicked on this tab to my recollection until we went through

5   it in my deposition a few weeks ago.

6   Q    Okay.  So do you see that there's a list of people and

7   in columns B and C are the dates of hire and the dates of

8   termination?

9   A    I see that.

10         MR. MORRIS:  And can we scroll down to the end of

11  this document?

12  Q    Okay.  And do you see that it shows -- it highlights in

13  yellow the two people that were terminated in February 2019?

14  A    It has two individuals that have a term date in

15  February 2019.

16  Q    Does that refresh your recollection that these head

17  count reports that were sent every single month specifically

18  highlighted every single employee who was terminated in the

19  prior month?

20  A    That is what's detailed in this spreadsheet.

21  Q    Okay.  Now --

22         MR. MORRIS:  We can take that down off the screen.

23  Q    I believe you testified and I may not get this

24  accurate, I don't mean to characterize your testimony, but I

25  think you testified that in or around December 2019 you had

002587

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-10   Filed 01/27/25   Page 485 of 888   PageID 37697
HCM V. HCMFA, et al.                                                    107

1  a conversation with Mr. Klos where you reached a conclusion

2  that there were overpayments on the payroll reimbursement

3  agreement.  Do you remember that just generally?

4  A    Yeah, I believe I testified, you know, in Q-4 of 2019

5  or could have been early Q-1 of 2020, yes, I had a

6  conversation with Mr. Klos.  I believe I testified that Mr.

7  Klos identified the issue and we had a subsequent discussion

8  with Mr. Caruso.  Again, I -- we were educating DSI and Mr.

9  Caruso because they were in charge of Highland at the time

10 and we were trying to get them up to speed on everything

11 Highland.

12      You know, as you went through the approval process for,

13 you know, or they're approving all these payments, we were

14 taken through all the revenue contracts, I mean, just you

15 know, everything at the time.

16 Q    Okay.  You were not aware at that time that one of the

17 UCC's initial focuses was on the business relationships

18 between the debtor and other non-debtor entities that were

19 controlled by Mr. Dondero, correct?  You didn't know at that

20 time that that was the UCC's focus, correct?

21 A    I don't recall that ever being communicated to us.

22 Q    Okay.  You don't recall any discussions at any time

23 about the UCC and FTI's interest in knowing about the

24 economics between Highland and the Advisors; correct?

25 A    I don't recall.

002588

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 56-16   Filed 04/28/25   Page 486 of 885   PageID 32970
HCM V. HCMFA, et al.                                                      108

1  Q    You don't recall having any discussion in October,

2  November, or December 2019 with Mr. Klos about preparing an

3  analysis for the UCC and FTI that would attempt to show how

4  Highland's costs compared with its revenues under its

5  agreements with the Advisors.  You don't have any

6  recollection of that at all; isn't that correct?

7  A    I don't have a recollection.  At the time, you know,

8  DSI was getting information from the various teams.  They

9  were interfacing with Mr. Klos tremendously.  I am not aware

10  of that coming -- myself having that conversation with Mr.

11  Klos.

12  Q    And you have no recollection of ever participating in a

13  meeting with the UCC or FTI in November or December of 2019

14  or January 2020 where the topic of the profitability of

15  Highland's agreements with its affiliates was discussed;

16  correct?

17  A    I don't recall.

18  Q    You don't recall ever discussing with Mr. Klos whether

19  he ever made a presentation to the UCC and to FTI concerning

20  Highland's profitability under its agreements; correct?

21  A    I don't recall.

22  Q    Did Mr. Klos tell you -- did Mr. Klos prepare the

23  analysis that you just referred to as having discussed with

24  Mr. Caruso?

25  A    Are you referring to the analysis of -- that outlined

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-01170-S    Document 26-10    Filed 04/29/25    Page 487 of 888    PageID 32979
HCM V. HCMFA, et al.                                                              109

1  overpayments?

2  Q    Sure.

3  A    Yes.  Mr. Klos did prepare that.

4  Q    Do you know why he prepared it?

5  A    Yeah.  My general recollection is he wanted to make DSI

6  aware that there were overpayments on these agreements.

7  Q    What would be the purpose of doing that?

8  A    Again, amending the agreements to reflect, you know,

9  the actual costs incurred by Highland.

10 Q    Why would that be in Highland's interest at that moment

11 in time?

12 A    I -- we felt like we needed to make him aware of it.  I

13 mean, again, these are, you know, these are agreements that

14 we felt that weren't, you know, that needed change and we

15 alerted Mr. Caruso to that fact.

16 Q    Who's we?

17 A    Myself and Dave.

18 Q    It's your testimony that Dave Klos said that he thought

19 the agreements needed to be changed at the end of 2019 or

20 the beginning of 2020?

21 A    It's my testimony that we had a meeting with Mr.

22 Caruso, notified him of the overpayments that were related

23 to these agreements.  You know, again, nothing came of the

24 meeting.  There were no changes or anything.  And I don't --

25 I don't recall specifically talking about hey, you know,

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 26-10    Filed 01/12/25    Page 488 of 865    PageID 37380
HCM V. HCMFA, et al.                                                              110

```
 1  Highland needs to amend these agreements.  But we made him

 2  aware of these overpayments that were related to the

 3  agreements, saying it was primarily the payroll

 4  reimbursement agreement.

 5  Q    Were Mr. Leventon and Mr. Ellington present in this

 6  meeting?

 7  A    No, they were not.

 8  Q    But you told them the same thing; didn't you?

 9  A    Well, so in that discussion with Mr. Caruso, Mr. Caruso

10  said we -- that nothing could be changed, right?  There was

11  an automatic stay as part of the bankruptcy so you know,

12  like thank you for letting me know this issue, but nothing

13  can be changed.  There's an automatic stay.

14       I, you know, at some point after that, I talked to

15  Mr. Leventon and Mr. Ellington to ask them, you know, is

16  there an automatic stay in place?  And yeah, I mean, they --

17  that's what they told me.

18  Q    Did you tell them that there were overpayments?

19  A    Yeah, I told them that there were, you know, agreements

20  between the advisors and Highland that, you know, were --

21  there were overpayments.  And, you know, and DSI said we're

22  going to -- a stay and like I'm not a lawyer, and you know,

23  this -- this process was obviously new to myself and a lot

24  of team members at Highland.  And Mr. Leventon and Mr.

25  Ellington were closer to, you know, they're lawyers and so I
```

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-10   Filed 01/12/27   Page 489 of 865   PageID 27981
HCM V. HCMFA, et al.                                               111

asked them as well.

Q    Did you tell them the magnitude of the overpayments?

A    Not that I recall.

Q    Did you tell them, do you know now when the overpayments started?

A    I mean, if it's related to the payroll reimbursement agreement, it would have been at the time of any -- if there were any costs incurred by Highland, or costs not incurred by Highland, that the advisors reimbursed for, so I mean, it could have been as early as 2018.  But if you look at the list of employees on your Exhibit A, the higher-dollar employees like Mr. Okada and Mr. Parker that had just left, that issue -- those, if something hadn't changed, those overpayments would become larger over time.

Q    Are you aware that under the theory you just described, the advisors were overpaying Highland the very second you signed those agreements?

A    I think in my deposition, you had -- you had pointed out an employee that had left prior to the signing of the payroll reimbursement agreement but yet -- but it was a -- it was that they were employed after the effective date.

Q    There were four dual employees who were terminated before you signed that agreement; isn't that right?

A    Yes.  The agreement was dated January 1, 2018, so I mean, you know, I think we established that's why we signed

002592

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 25-16    Filed 01/12/23    Page 490 of 865    PageID 32792
HCM V. HCMFA, et al.                                                    112

1   as of that date.

2   Q    And you understood that the agreement included the

3   compensation for every one of the employees on Exhibit A

4   regardless of whether or not they were terminated; correct?

5   A    Yes.

6   Q    And in fact, half of the employees had been terminated

7   before anybody heard of Jim Seery or the independent board;

8   isn't that right?

9   A    I don't remember the -- the total number.

10  Q    Did you ever try to do an analysis of Highland's

11  profitability under the payroll reimbursement agreement

12  until Mr. Klos did it in late 2019?

13  A    I did not.

14  Q    Was it ever a concern of yours as to whether or not

15  Highland was making a profit under these payroll agreements

16  until Mr. Klos prepared this analysis at the end of 2019?

17  A    I don't -- I don't recall that.

18  Q    Did you share Mr. Klos's analysis with Mr. Leventon and

19  Mr. Ellington?  Did you give them a copy?

20  A    I did not.

21  Q    Did you tell Mr. Dondero, there's overpayments here?

22  A    I did not.

23  Q    You didn't tell Mr. Sauter.  You didn't tell Mr.

24  Norris.  You didn't tell Ms. Fedford.  You didn't tell any

25  officer or control person of the advisors about these

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-16   Filed 12/22/22   Page 491 of 865   PageID 32953
HCM V. HCMFA, et al.                                                        113

1    overpayments when you learned about them in November and

2    December or January 2020; right?  Late 2019, 2020.  You

3    didn't tell anybody in the world except for Mr. Leventon and

4    Mr. Ellington and Mr. Caruso; isn't that right?

5    A    Yes.  I mean, I told Mr. Caruso.  Like my expectation

6    was Mr. Caruso was in charge of Highland so if he needed to

7    speak to Mr. Dondero or others, that was Mr. -- Mr. -- that

8    was Mr. Caruso's, you know, purview.

9    Q    Did you believe that Mr. Caruso had the authority to

10   renegotiate agreements on behalf of Highland?

11   A    I mean, he -- he was in charge.  I mean, that's -- I

12   mean, that's how we treated him from my group's perspective.

13   Q    Do you know who Brad Sharp is?

14   A    Yes.

15   Q    Do you know Brad Sharp was actually the CRO, not Fred

16   Caruso?

17   A    I mean, Fred Caruso was the person we -- he was in the

18   office every day that we talked to and were educating on

19   everything Highland.  We were not educating Brad Sharp on

20   everything Highland.  We were educating Fred Caruso, and

21   then Fred Caruso was, you know, doing whatever he was doing

22   with that.

23        You know, I -- Fred, my understanding, started DSI.  He

24   had 30 years of experience in bankruptcy.  I, you know, I

25   had no reason not to rely on Fred and his expertise in

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-10   Filed 04/12/22   Page 493 of 865   PageID 32364
HCM V. HCMFA, et al.                                                    114

1   communicating with Brad Sharp or anyone else.

2   Q    Okay.  I'm asking you what the base -- you believed

3   that Fred Caruso had the authority to renegotiate these

4   agreements with the advisors.  Is that your testimony?

5   That's your belief?

6   A    If Fred Caruso felt like it was something that was

7   important, then yeah, he could have -- if he said talk to

8   Brad Sharp, who's CRO, or others, or he had a relationship

9   with Mr. Dondero, yes.  I mean, if that was something that

10  needed to be done, yeah.  Mr. Caruso was -- was involved on

11  a day -- he was -- he was on the ground at that time.

12  Q    The independent board got put in place on January 9th,

13  2020; correct?

14  A    Yes.

15  Q    And you spent an awful lot of time with Mr. Seery and

16  the independent board, getting them up to speed too.  You

17  kind of had round two.  Isn't that fair?

18  A    That's fair.

19  Q    You never told the independent board about these

20  overpayments; correct?

21  A    I didn't.

22  Q    And there's no question in your mind that the

23  independent board was in control of Highland as of January

24  9th, 2020; correct?

25  A    They were in charge.

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 26-16    Filed 04/25/25    Page 493 of 885    PageID 32635
HCM V. HCMFA, et al.                                                115

1    Q    And this is really at the -- I mean, you said it could

2    be late 2019, early 2020.  This conversation with Mr. Klos

3    and with Mr. Caruso could have happened really after the

4    independent board was appointed; isn't that right?

5    A    No.  Because this was when, I mean, the independent

6    board wasn't there, so if it was January 9th, it would have

7    been prior to the independent board being appointed.

8    Because it was - Fred was there on a daily basis and we

9    were, I mean, educating Fred, and you know, the board -- the

10   board wasn't there.  And if -- if the board was there, and

11   they were in charge at the time, you know, after that

12   period, it would have made more sense than to have gone to

13   the independent board.  So again, we went when Fred was in

14   charge.  We viewed Fred, you know, as being in charge.

15   Q    So the conversation didn't happen in January 2020.  Now

16   you're sure it happened in December 2019?

17   A    Well, if the date was January 9th of the independent

18   board, yes.  I mean, it -- it -- that date was right after

19   the new year.  And again, what I'm saying is, is that

20   conversation with Fred didn't happen with the independent

21   board so having that date as kind of more, of a frame of

22   reference, would, you know, in my mind pushes that

23   conversation more to Q4 of 2019.

24   Q    Was there any question in your mind that on January

25   9th, 2020, the independent board-controlled Highland and not

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-01170-S   Document 26-10   Filed 04/12/25   Page 494 of 885   PageID 27986
HCM V. HCMFA, et al.                                                            116

1  Fred Caruso?

2  A    The independent board was in charge.

3  Q    No question; right?

4  A    Yes.

5  Q    And that happened, at most, a couple weeks after you

6  had this conversation with Mr. Klos and Mr. Caruso; correct?

7  A    I -- again, it was in Q4 of 2019, so yes it could have

8  been a couple weeks.  It could have been a month.  I don't

9  -- I don't, you know, again --

10 Q    Did the thought occur to you that maybe you ought to

11 tell the independent board?

12 A    Like -- we had communicated.  I had communicated that

13 to Mr. Caruso.  Mr. Caruso was talking to the independent

14 board and also getting them up to speed from their

15 perspective.  Mr. Caruso had every opportunity to let the

16 independent board know as well.  I did not tell the

17 independent board.

18         MR. MORRIS:  Move to strike, Your Honor.  I'm

19 going to do this because I want to move this along.

20         THE COURT:  Sustained.

21 BY MR. MORRIS:

22 Q    Did the thought occur to you for you to tell the

23 independent board of what you learned?

24 A    No.  because I thought it was Mr. Caruso's

25 responsibility.

002597

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-10   Filed 04/27/25   Page 495 of 865   PageID 32397
HCM V. HCMFA, et al.                                               117

1  Q    Okay.  You met with the independent board on a weekly

2  basis throughout at least the first -- for most of 2020;

3  right?

4  A    Yes.

5  Q    And part of those weekly meetings would be to go

6  through the 13-week forecast; right?

7  A    Yes.

8  Q    And the 13-week forecast would include all the payments

9  that were projected to be made by the Advisors under each of

10 the intercompany agreements that it had with Highland;

11 correct?

12 A    Yes.

13 Q    And at no time during those 52 meetings that you had

14 approximately -- whatever weekly meetings you had with the

15 independent board, at no time during the meetings, did it

16 occur to you that you might want to alert the independent

17 board that there were overpayments; right?

18 A    No.  It didn't occur to me, because as I found out with

19 talking to Mr. Caruso, and Mr. Leventon, and Mr. Ellington,

20 that Highland was under an automatic stay and nothing could

21 be changed in relation to these agreements.  So when I deal

22 with board members that I served, you know, with board

23 members, I want to focus them -- I don't want people, you

24 know -- my energy and time need to be spent on things that

25 can be changed and we can work on.

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 25-10   Filed 04/12/25   Page 492 of 865   PageID 36808
HCM V. HCMFA, et al.                                                    118

 1        So my energy, again, at the end of 2019, once I learned
 2   that nothing could be changed, I was dealing with the 20,000
 3   other things that I had to deal with, with the bankruptcy as
 4   I testified earlier.  And so I treated the independent board
 5   in the same manner.  They stepped into Highland not knowing
 6   anything and we were educating them as you just -- we had a
 7   round two.
 8        So as part of that education, I didn't feel like it was
 9   a need to educate them on something that they couldn't
10   change.  I focused -- board members' time is valuable, and
11   so it's more -- you know, my view was, let them focus on
12   things that they can change or you know, that they need to
13   work on.  And if Mr. -- again, I viewed it as Mr. Caruso's
14   responsibility.  If you want to tell the independent board
15   and have them focus on things that couldn't change and
16   really didn't matter, at the time, then that was his
17   responsibility.
18   Q    Did you ever tell them, gee, Highland's making a lot of
19   money on those contracts without even talking about
20   overpayments?  Did you characterize the payroll
21   reimbursement agreements to the independent board as a real
22   positive asset for the estate?
23   A    I don't -- I don't recall that.
24   Q    You didn't tell them that either?  You don't have a
25   recollection of telling them that?

002599

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-01170-S    Document 26-10    Filed 01/12/25    Page 497 of 865    PageID 36089
HCM V. HCMFA, et al.                                                        119

1    A    I don't recall.

2    Q    Do you recall putting anything in writing that

3    memorialized the conversations that you had with either Mr.

4    Caruso or Mr. Klos about the overpayments?  Did you ever

5    send anybody an email and say, I just want to confirm, or I

6    just want to memorialize what I've been told and what I've

7    heard from Mr. Caruso?

8    A    Mr. Morris, you have all my email records.  I -- I

9    don't recall.

10   Q    You don't recall doing that, right?

11   A    But -- you have all my email records, sir.

12   Q    And did the thought occur to you that you might want to

13   save your own butt by sending an email to Mr. Caruso that

14   says, "hey, Fred, I told you about these overpayments but

15   you told me nothing can be done about it because of the

16   automatic stay and I'm relying on you."

17       Did you ever think that maybe you should do something

18   to protect yourself?

19   A    No.  It was -- it was a collaborative work process.  I

20   don't -- I don't view working with people as saving butts.

21   I mean, it's a collaborative work process.

22       I've always had a collaborative work process with

23   everyone that I work with.  And you know, at any time, I

24   never felt threatened by Mr. Caruso or anyone at the

25   independent board.  So I didn't feel the need, again,

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 56-11   Filed 01/22/25   Page 498 of 865   PageID 38890
HCM V. HCMFA, et al.                                     120

1  because it was a collaborative work process.  And Mr. Caruso

2  was very appreciative of all of the efforts of myself, Mr.

3  Klos, and others were doing to get him up to speed.

4  Q   By the way, so is Mr. Seery.  Okay.  I don't -- we're

5  having a cross-examination here but I don't want you to

6  think that the independent board wasn't also appreciative of

7  your efforts.

8       Let's speed it up.  December of 2020, Q4, you don't

9  remember exactly but you have a conversation with Mr.

10 Dondero where Mr. Dondero instructs you not to make any

11 payments to Highland.  Do I have that right?

12 A   In Q4 of 2020?

13 Q   Correct.

14 A   Yes.

15 Q   And that's the only reason that the Advisors stopped

16 paying the amounts that were due under the intercompany

17 agreements that it had with Highland, correct?

18 A   Yes.

19 Q   It was Mr. Dondero's specific instruction, correct?

20 A   Yes.

21 Q   Okay.  Later in December, you asked Mr. Klos to update

22 that analysis we've been talking about that he prepared in

23 December 2019.  Do you remember that?

24 A   Yes.

25 Q   And you did that because you understood that the

002601

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-10   Filed 04/12/23   Page 495 of 865   PageID 36081
HCM V. HCMFA, et al.                                                            121

1   Advisors were in negotiations with Highland; correct?

2   A    They're -- I was -- I was made aware that there were

3   negotiations by the advisors.  I -- my asking Mr. Klos to

4   update the analysis, I think was predicated on those

5   negotiations.  That there were negotiations going on.

6   Q    And you were told that by the Advisors?  Who at the

7   advisors told you about these negotiations?

8   A    I recall Mr. Dondero and Mr. Norris.

9   Q    And Mr. Dondero and Mr. Norris ask you for information

10  that they could use in these negotiations?

11  A    Not that I recall.

12  Q    Is that what prompted you to ask Mr. Klos to update his

13  analysis?

14  A    Not that I recall.

15  Q    But you asked Mr. Klos to update the analysis because

16  the negotiations were ongoing; correct?

17  A    There were negotiations that were ongoing.  I didn't --

18  I don't recall asking him to update the analysis

19  specifically because of the negotiations.

20  Q    Ca you turn to Page 344 of your transcript, please?

21  Lines 11 through 14.  You were asked this question, and did

22  you give this answer?

23       "Question:  What prompted you" -- I'm going to start at

24  the prior question for context, at Page -- at Line 6.

25             "Just a last question or two.  You said that

002602

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 26-13    Filed 01/12/23    Page 506 of 865    PageID 36042
HCM V. HCMFA, et al.                                                    122

1          in December 2020, you asked Mr. Klos to update the

2          analysis that he had done the prior December.  Do

3          I have that right?

4              "Answer:  Yes.

5              "Question:  What prompted you to ask him to

6          do that?

7              "Answer:  Again, it was these negotiations

8          that were going on with the Advisors and

9          Highland."

10         Have I read your answers correctly to my questions?

11    A    Yeah, you have.

12    Q    And so you asked Mr. Klos to update this analysis for

13    use in the negotiations, correct?

14             MR. RUKAVINA:  Your Honor, that's not a prior

15    inconsistent statement.  What prompted hm to do it is

16    different from why he asked him to do it.  So I don't think

17    that this is a fair impeachment or a fair characterization.

18    I think he was prompted to do something for one reasons, you

19    do it for other reasons.

20             THE COURT:  Overruled.

21    BY MR. MORRIS:

22    Q    What prompted you to ask him to do that was the

23    negotiations that were ongoing; correct?

24    A    There were ongoing negotiations.  Again, like I -- I

25    mean, there were ongoing negotiations.  You know, like I

002603

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-16   Filed 04/12/22   Page 501 of 865   PageID 36953
HCM V. HCMFA, et al.                                                         123

1  testified, Mr. Dondero and Mr. Norris did not ask me to do

2  it for these numbers.  And you know, and it was, you know,

3  as I testified earlier about like the payroll reimbursement

4  program, the overpayments on the payroll reimbursement

5  program would likely grow over time as the high-dollar

6  employees -- you know, as payments were made throughout the

7  year to the high-dollar employees that just left Highland

8  prior to filing.  So you know, it's just -- it's just

9  knowing numbers and updating analyses that I think that --

10  knowing that there are negotiations that are going on.

11  Q    You weren't participating in those negotiations;

12  correct?

13  A    I was not.

14  Q    And Mr. Seery didn't tell you about these negotiations;

15  did he?

16  A    Not that I recall.

17  Q    Nobody other than Mr. Dondero and Mr. Norris told you

18  about these negotiations; correct?

19  A    Again, not that I recall.

20  Q    Okay.  So when you asked Mr. Klos, you were prompted to

21  ask Mr. Klos to update the analysis that was done at the end

22  of 2019 for use in negotiations that you weren't

23  participating in; correct?

24  A    They weren't used in the negotiations.  You know,

25  again, I wasn't participating.  I didn't communicate, you

002604

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-16   Filed 04/22/25   Page 503 of 865   PageID 38964
HCM V. HCMFA, et al.                                                    124

1  know, any of Dave's -- Mr. Klos's analysis to Mr. Norris or

2  Mr. Dondero.  Yet negotiations were going on at the time.

3  Q    So explain to Judge Jernigan why you would ask Mr. Klos

4  to update an analysis for a negotiation that you weren't

5  participating in, and that you didn't give to anybody.  Why

6  did you ask him to do this?

7  A    Again, I mean, people that know me, that work with me,

8  I like to know numbers.  I'm a CFO.  I'm an accountant.  I'm

9  a CPA.  And you know, knowing that there were negotiations

10 go on, again, it's kind of just my nature to be curious and

11 say, okay, well, we did an analysis last year.  Oh, you

12 know, what is this number now, look like today?

13 Q    When you asked Mr. Klos to update the analysis, he

14 asked you if you were going to use it for an adverse reason;

15 didn't he?

16 A    I don't recall talking to Mr. Klos about that.

17 Q    But if Mr. Klos testified that he believed that you had

18 an ulterior motive for asking him to update the report, by

19 eliminating dual employees who had been terminated, your

20 view is that he's entitled to his opinion; correct?

21 A    Mr. Klos is entitled to his opinion.  You know, I -- I

22 would never put Mr. Klos in a position, and it was never my

23 practice of putting him in a position where he was doing

24 something wrong or incorrect.

25 Q    How much money did you receive from NexPoint after the

002605

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 16-16   Filed 01/12/25   Page 509 of 865   PageID 36095
HCM V. HCMFA, et al.                                    125

1    petition date?

2    A    Approximately $90,000.

3    Q    And you didn't disclose that to the independent board;

4    correct?

5    A    I did not.

6    Q    And you don't recall why you got that money; correct?

7    A    Correct.

8    Q    And you spoke with Brian Collins.  He's the one who

9    told you you'd be receiving the money; correct?

10   A    Correct.

11   Q    And he also told you that Isaac Leventon and Scott

12   Ellington and Thomas Surgent were also going to be receiving

13   payments from NexPoint; correct?

14   A    That's correct.

15   Q    And you don't recall him explaining to you why this

16   money was coming to you from NexPoint?

17   A    I don't.

18   Q    Do you recall if the payments had anything to do with

19   the bonuses that were not going to be paid as a result of

20   the Court's decision?

21   A    I wasn't aware of the Court's decision.

22   Q    You don't recall that in the spring of 2020, there was

23   a motion to pay bonuses and an order was entered, permitting

24   all bonuses to be paid to all employees except for the

25   senior four?

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-16   Filed 04/22/25   Page 504 of 885   PageID 32696
HCM V. HCMFA, et al.                                    126

 1  A    I -- I wasn't aware of that.  It was my understanding

 2  that the senior employees were still eligible.

 3           MR. MORRIS:  Just one second, Your Honor.

 4           I have no further questions, Your Honor.

 5           THE COURT:  Pass the witness, Mr. Rukavina.

 6                     CROSS-EXAMINATION

 7  BY MR. RUKAVINA:

 8  Q    Mr. Waterhouse, it's unusual that I examine my own

 9  officer without a chance to prepare you but have you and I

10  -- have we met before in person?

11  A    Not in person.  Just over Zoom.

12  Q    And through all the times that we met on Webex, was it

13  at depositions?

14  A    Correct.

15  Q    I have not had a chance to prepare you before today;

16  have I?

17  A    You have not.

18  Q    Okay.  This 90 --

19           MR. MORRIS:  I'm sorry.

20  BY MR. RUKAVINA:

21  Q    This $90,000 payment; the insinuation is that somehow

22  that motivated you to take actions that you wouldn't have

23  otherwise.  Is there any merit to such an insinuation?

24  A    No.

25  Q    Is $90,000 material to a man like you that makes over

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 26-10    Filed 04/22/25    Page 505 of 888    PageID 36697
HCM V. HCMFA, et al.                                          127

1  seven figures every year?

2  A    It's not.

3  Q    Okay.  Whose idea was it that the $90,000 be paid?

4  A    It's my understanding Mr. Dondero authorized it.

5  Q    But do you know whose idea it originally was to ask Mr.

6  Dondero to authorize the payment?  Was it your idea?

7  A    It was not.

8  Q    Was it Mr. Surgent's idea?

9  A    I don't know whose idea it was.

10  Q    Okay.  And that payment happened sometime prior to your

11  December 2020 interaction with Mr. Klos; is that correct?

12  A    Yes.

13  Q    Okay.  So just very clearly, did that $90,000 payment

14  have anything to do with your discussion with Mr. Klos to

15  walk forward his prior analysis for FTI and DSI?

16  A    No.

17  Q    Did that -- could that payment have any -- have had

18  anything to do with the results that Mr. Klos reached?

19  A    No.

20  Q    Did Mr. Klos receive some kind of bonus or hidden

21  payment or whatever they want to call it?  From the

22  Advisors?

23  A    Not that I'm aware.

24  Q    So even if somehow you were on the take, which is

25  offensive, Mr. Klos certainly wasn't; was he?

002608

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-16   Filed 04/22/25   Page 506 of 865   PageID 36698
HCM V. HCMFA, et al.                                    128

```
 1   A    I'm not aware of any payments to Mr. Klos.
 2   Q    And are you aware that one of the assumptions that Mr.
 3   Klos used in his December analysis was to use current
 4   headcount?  Do you want to see that email to refresh
 5   yourself?
 6   A    Yeah.  I think that'd be --
 7   Q    I think that would be fair to you.  It's Exhibit Q in
 8   the small binder.
 9        (Witness reviews document)
10   BY MR. RUKAVINA:
11   Q    You'll remember this, sir.  We discussed it at your
12   deposition.  You see that one of the things that Mr. Klos
13   says is that changes from that analysis -- that analysis
14   serves the prior DSI analysis; right?  That you talked
15   about?
16   A    Yes.
17   Q    Okay.  And Mr. Klos says, "reflects current headcount.
18   Terms removed, new hires added."  Do you see that?
19   A    Yes.
20   Q    Okay.  Did you tell Mr. Klos to make that assumption?
21   A    Not that I recall.
22   Q    If one was trying to get an accurate sense of the
23   profitability of the payroll reimbursement agreements to
24   Highland, can you think of anything wrong with using the
25   current, then real-world, headcount?
```

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-16   Filed 04/12/25   Page 507 of 888   Page ID 36999
HCM V. HCMFA, et al.                                            129

1  A    So if I'm understanding you right, again, he only had

2  -- reflects current headcount on the payroll reimbursement

3  agreement.

4  Q    Yes, I'm asking you as a CPA, as a professional, as a

5  CFO of a very large company, what's wrong with making that

6  assumption?  Whoever's idea it was, what's wrong with it?

7  A    I'm just -- if this is the payroll reimbursement

8  agreement, look, I -- I honestly don't, as I sit here today,

9  know what the current headcount relates to --

10 Q    Mr. Waterhouse, I'm not asking you that.  I'm saying,

11 as the CFO, you asked your subordinate to walk forward a

12 prior analysis of profitability.  Is that accurate?

13         MR. MORRIS:  Your Honor, I'm going to object as

14 leading.  Mr. Rukavina may have never met Mr. Waterhouse.

15 He is the advisors' officer.  He is their treasurer today.

16 He should not be leading this witness.

17         THE COURT:  Sustained.

18         MR. RUKAVINA:  Your Honor, I'm not really leading.

19 I'm just bringing him up to the next question.  I'm allowed

20 to recap prior -- to set -- to phrase the next question.

21         THE COURT:  I think it was leading.  Sustained.

22         MR. RUKAVINA:  Okay.  Okay.

23 BY MR. RUKAVINA:

24 Q    Well, listen to my question, okay.

25 A    Okay

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-16   Filed 01/12/25   Page 508 of 865   PageID 38700
HCM V. HCMFA, et al.                                                    130

 1  Q    So I'm not going to lead you, okay?  Why did you ask --
 2  you already testified, but we already spent a half an hour
 3  on this, so why did you ask Mr. Klos to walk forward his
 4  December 2019 analysis?
 5  A    Again, I just wanted to see what those numbers
 6  reflected.
 7  Q    Did you want his analysis to be reasonable?
 8  A    Yes.
 9  Q    What did you expect him to do when you gave him that
10  instruction?
11  A    To again walk forward the analysis that was done in the
12  prior year.
13  Q    Did you expect him to do it in good faith?
14  A    Yes.
15  Q    As a professional?
16  A    Yes.
17  Q    What about what numbers should he have used?  What
18  would have been your expectation if you were looking for a
19  real-world analysis?
20  A    I mean, he would have used, again, --
21  Q    Well, we know --
22  A    -- he would have used all, again, he would have used
23  all costs in relation to this analysis.  So if there were,
24  you know, again, if there were terms that renewed but costs
25  that were incurred for those terms; right, that would have

002611

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-01700-S    Document 26-10    Filed 04/22/25    Page 509 of 865    PageID 38701
HCM V. HCMFA, et al.                                                        131

1   been if you're looking at costs that were incurred by

2   Highland and would be paid in the reimbursement program, it

3   would have been inappropriate to remove those costs.

4   Q    Okay.  That's not the question though.  The question is

5   as follows:  The assumption there says reflects current

6   headcount.  Do you see that?

7   A    Mm-hmm.

8   Q    So I'm asking you, as his boss, as a CPA, as a

9   professional man for a long time, can you think of anything

10  wrong with using the current headcount for what Mr. Klos was

11  doing for you?

12  A    Again, if -- if there were prior headcount that should

13  be used in the analysis --

14  Q    Please look at the analysis.  It's in the binder.

15  A    -- that should be used in the analysis, then you know,

16  those prior employees likely should have been included in

17  the, you know, in the analysis.

18  Q    Did you think that Mr. Klos's analysis was reasonable

19  when you received it?

20  A    I -- I didn't -- when Mr. Klos sent me this analysis, I

21  didn't look at the -- at any of the detail or the backup to

22  this analysis.

23  Q    What did you think when you got this from Mr. Klos?

24  A    You know, I thought that Mr. Klos made some assumptions

25  that he put in.

002612

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 26-16    Filed 04/12/22    Page 511 of 865    PageID 33712
HCM V. HCMFA, et al.                                                              132

1   Q    Okay.  And stop that -- stop there.  What did you think

2   about his assumptions?  Were they fair?  Were they unfair?

3   A    Well, if you are looking at the costs incurred on the

4   payroll reimbursement program, let's take that one for

5   example.  That agreement is -- was put in place, again, to

6   reimburse Highland for costs that it incurred, right?  And

7   to reimburse them.  And that was a -- a fully loaded cost.

8   So if there were costs that were excluded from that

9   analysis, yeah, they may not have been appropriate.

10  Q    What would you have expected Mr. Klos to do with

11  respect to those potential costs, removed from that

12  analysis?  In other words, would you have expected him to

13  account for that or not account for it?

14  A    No, I mean, those cost should have been accounted -- I

15  mean, again, if you -- if we're looking in, for -- this is

16  done in December of 2020, you look at all of the costs that

17  were incurred by Highland for the relevant employees if

18  we're talking about the payroll reimbursement program.  And

19  that would include, on a cash basis, any bonuses or anything

20  else that were paid to those employees.  Because that was

21  incurred.  That was cash paid to those employees by

22  Highland; right?  And the agreement is going to reimburse

23  from the Advisors for those costs that were actually

24  incurred.

25  Q    Did Mr. Klos tell you anything about is analysis other

002613

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 26-16    Filed 04/12/24    Page 511 of 865    PageID 28705
HCM V. HCMFA, et al.                                    133

1  than what's in this Exhibit Q?  That email?

2  A    I don't recall having -- I don't recall discussing

3  anything outside of this.

4  Q    Did Mr. Klos tell you anything to the effect of that

5  his analysis might be unreasonable or unreliable?

6  A    No.  I mean, Mr. Klos put -- detailed assumptions that

7  he used in this analysis.  Mr. Klos and I have, over the

8  years, he's put together hundreds of analyses and pro

9  formas, and there are, you know, certain things that can be

10  assumed in an analysis, and you know, I mean, maybe it's

11  right.  Maybe it's wrong.

12  Q    One more question, Mr. Waterhouse, and then we'll move

13  on, because I don't think you're understanding my question.

14     The insinuation is that for your $90,000 payment,

15  somehow you had Mr. Klos prepare an unreliable document for

16  an ulterior motive.  And I'm asking you, even if you had any

17  such motive, which I find, and you find offensive, what

18  could you have told Mr. Klos to do that would have made his

19  resulting analysis unreliable?  Did you tell him to lie?

20  A    No.

21  Q    Did you tell him to fabricate numbers?

22  A    No.

23  Q    Did you tell him to have a prearranged result in sight?

24  A    No.

25  Q    Did you tell him to have any particular result or

002614

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-10   Filed 04/12/27   Page 513 of 865   PageID 32704
HCM V. HCMFA, et al.                                          134

```
 1  conclusion in mind?

 2  A    No.  I --

 3  Q    You told him to walk forward the numbers.  Is that

 4  correct?

 5  A    Bless you.

 6  Q    Is that correct?

 7  A    Mm-hmm.

 8  Q    You have to say yes or no.

 9  A    Yes.

10  Q    And maybe you told him to use these assumptions, maybe

11  you didn't.  You don't remember; right?

12  A    I don't recall.

13  Q    And very quickly now, one more thing that caught my

14  attention.  Look at Exhibit I, please, in my binder.  And go

15  to the last page.

16       Now keep that open and go to Exhibit 147 in Mr.

17  Morris'.  This is going to get a little bit complicated but

18  go to Exhibit 147 in Mr. Morris'.

19       Now, you asked about this.  You see that there is a

20  transfer of $300,000 -- $300,797.  Do you see that, sir?

21  A    I do.

22  Q    Okay.  And you see the date that Ms. Hendrix (ph) is

23  asking you about that?  What's that date?

24  A    It's Tuesday, February 11th, 2020.

25  Q    And that's the same date that you went back to her in
```

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-10   Filed 01/12/25   Page 513 of 865   PageID 38705
HCM V. HCMFA, et al.                                    135

1   the morning or I'm sorry, what time did you go back?  12:34

2   p.m.?

3   A    Yes.

4   Q    Now in Exhibit I, can you locate that same $300,797

5   transfer?  It's in the top third.

6   A    Yes.

7   Q    What's that date?

8   A    February 10th.

9   Q    And what's the --

10  A    2020.

11  Q    What's the heading of that column?

12  A    Receipt date.

13  Q    Do you have any idea how Highland could have received

14  that letter the day before Ms. Hendrix sought your approval

15  and you gave it?

16  A    I don't.

17  Q    Okay.  Returning to the payroll reimbursement

18  agreements, let's go through some things rather quickly.  Do

19  you know, sir, how the monthly preset reimbursement rates

20  were arrived at in those two agreements?

21  A    I don't.

22  Q    Okay.  Do you know whether anyone in particular set

23  those numbers?

24  A    I don't.  I think I testified earlier that, you know,

25  there's an analysis to back up numbers that are put into

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-10   Filed 04/12/25   Page 514 of 865   PageID 38706
HCM V. HCMFA, et al.                                                    136

1   these agreements.

2   Q    And did you believe that that analysis had been done in

3   good faith?

4   A    Yes.

5   Q    And did you believe that that analysis was a reasonable

6   estimate of the actual reimbursable amounts that should have

7   been payable to Highland?

8   A    Yes.

9   Q    Would you have signed those agreements if you believed

10  that there was anything misleading or deceptive about them?

11  A    No.  I would not have.

12  Q    Okay.  I have the same question with the shared

13  services agreements.  Do you know how the monthly payable

14  amounts were arrived at in those agreements?

15  A    I don't.

16  Q    And before signing or -- I'm sorry.  You didn't sign

17  those agreements.  But do you know whether or do you have

18  any idea of whether an analysis was actually done for what

19  those monthly reimbursable rates should be?

20  A    Same as I answered earlier.  An analysis, you know,

21  again, is put together to support these numbers.  I think I

22  also, you know, I testified earlier in my deposition, that

23  you know, for contracts of this type, when we're audited,

24  you know, we have to provide support to auditors for these

25  -- for these numbers.  Again, you know, there is an analysis

002617

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-10   Filed 01/27/25   Page 515 of 865   PageID 38707
HCM V. HCMFA, et al.                                     137

1  that is there for those purposes.

2  Q     Did you ever hear Mr. Dondero just pick a number and

3  tell anyone that that's -- unilaterally, that that's the

4  number that should be used for those monthly or annual

5  reimbursement rates?

6  A     I don't -- I don't recall.

7  Q     And I think you were asked about this but those payroll

8  reimbursement agreements and shared services agreements, do

9  you know whether they were approved by the internal lawyers

10 at Highland, the Highland legal department?

11 A     I don't but I testified earlier about you know, if I

12 have a document that is dropped off at my office, for

13 signature, there is a section which asks, you know, has

14 Legal reviewed it and approved, or if someone walks a

15 document of this nature into my office for signature, I

16 would ask them that -- the same.

17 Q     And go to Exhibit C, please.  C and D are very similar.

18 You can look at both of them.  They're identical except one

19 is for HCMFA and one is for NexPoint, and they're in

20 different amounts.  Do you recall these two documents?  I

21 mean, from your deposition, do you recall these two

22 documents?

23 A     I do.

24 Q     And you signed these two documents; right?

25 A     Yes, I did. d

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-16   Filed 04/28/25   Page 514 of 865   PageID 38708
HCM V. HCMFA, et al.                                          138

1   Q    So do you know how the $1.2 million amount in one

2   agreement and the $1.3 million amount in the other agreement

3   was arrived at?

4   A    I don't recall.

5   Q    Did you ever hear Mr. Dondero or anyone else say

6   something like we need tax deductions at the advisors so

7   let's channel some money over to Highland?

8   A    I don't recall.

9   Q    If Highland -- if there were a series of promissory

10  notes with Highland and various insiders, you're generally

11  aware of that; correct?

12  A    Yes.

13  Q    And from time to time, as Highland's finances were not

14  doing well and Highland would need some cash, did sometimes

15  some of these note parties prepay certain obligations on the

16  most of Highland in order to get Highland cash?

17  A    There were promissory notes between Highland and the --

18  you know, and the insiders.  I don't recall every -- you

19  know, I don't recall --

20  Q    Sure.

21  A    -- every instance where money was lent to Highland.

22  Q    Okay.  But I'm asking on occasion, if Highland needed

23  immediate liquidity, would sometimes Highland ask one of

24  these note parties to prepay or pay quicker its obligations?

25  A    Yes.

002619

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 26-16    Filed 04/29/25    Page 517 of 865    PageID 38709
HCM V. HCMFA, et al.                                                                    139

```
 1   Q    Okay.  And that was a way sometimes for Highland to get

 2   immediate liquidity?

 3   A    Yes.

 4   Q    So can you think of a reason why someone would have

 5   done these Exhibits C and D to get $2.5 million to Highland,

 6   as opposed to just working on one of the notes?

 7   A    I don't recall.

 8   Q    Okay.  So these -- both of these contracts here say

 9   that the payments are a one-time payment of estimated

10   additional actual costs owed to HCMLP for additional

11   resources used by HCMFA.  Do you see that, sir?

12   A    Uh --

13   Q    It's the second whereas.

14   A    Yes, I see that.

15   Q    Okay.  Do you have any reason to disbelieve that what

16   this here says is true?

17           THE COURT:  I apologize.  What exhibit are you on?

18           MR. RUKAVINA:  I'm on Exhibit C.  C and D are,

19   again, identical.

20   BY MR. RUKAVINA:

21   Q    Do you have any reason to believe that what Exhibit C

22   says there in the second whereas is not true?

23   A    I don't.

24   Q    Okay.  What about Exhibit D?  Do you have any reason to

25   disbelieve that what Exhibit D says is true?  The second
```

002620

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-10   Filed 01/12/25   Page 514 of 865   PageID 38720
HCM V. HCMFA, et al.                                                      140

1  whereas.

2  A    I don't.

3  Q    Okay.  Now, you don't have -- I'm sorry.  Do you have

4  any specific recollection of these two amendments: C and D?

5  A    I don't.  I don't recall.

6  Q    Okay.  So separate from these two, was there a process

7  at Highland, whereby Highland would periodically review or

8  true up or reconcile long-term contracts?

9  A    I mean, if it was stated -- yes.

10 Q    Okay.  What was that process, generally, before we talk

11 about any particular contract?

12 A    I mean, if there was, you know, something stated in an

13 agreement, you know, and needed -- you know, needed truing

14 up, yes.  I mean, things like that would be trued up on a

15 periodic basis.

16 Q    And what was that -- what is the general practice of

17 that period?  What was the period?

18 A    I just remember generally, but it is -- I mean, that

19 would be, like, more on a yearly basis.  From what I recall,

20 in years past, there were -- it was just too onerous to true

21 up agreements on less than a yearly basis.  So yearly is

22 kind of more of the practice.  But again, this is just a

23 general recollection.

24 Q    Do you have any specific recollection that there was an

25 annual true-up like that for the two payroll reimbursement

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 26-10    Filed 01/12/27    Page 514 of 865    PageID 3721
HCM V. HCMFA, et al.                                    141

1    agreements?

2    A    I don't -- from what I recall from the DIPs, I don't

3    think there was a true-up mechanism in the agreements.

4    Q    Okay.  You're, of course, familiar with the services

5    agreements and the services that Highland was providing to

6    the advisors under those agreements, are you?

7    A    Yes.  I'm generally aware.

8    Q    Okay.  So the services that Highland is providing to

9    the advisors under shared services, would those services

10   have related to reviewing the advisor's payables?

11   A    There was a list of shared services or services to be

12   provided to the advisors that were in the agreements and

13   detailed in the shared services agreements.  Yeah, I mean,

14   the advisor did not have back-office personnel, so payroll

15   review or things of that nature would be covered.

16        But again, there's a list of shared services to be

17   provided to the advisors by Highland Personnel that's

18   detailed in those agreements.

19   Q    And did those services, to your understanding, include

20   reviewing invoices and bills to the advisors for whether

21   those invoices and bills were proper and payable?

22   A    Yes.

23   Q    Did those services include reviewing the advisor's

24   contracts for whether rebates, setoffs, or deductions were

25   appropriate?

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 6-16   Filed 04/12/22   Page 520 of 865   PageID 38242
HCM V. HCMFA, et al.                                              142

1   A     I mean, if there were items of those -- of that nature,

2   you know, in an invoice, yeah.  I mean, it would have been

3   the team's responsibility to look at items of that nature.

4   Q     Well, you talked about the overpayments.  When you

5   learned about the overpayments, you took them, and you told

6   Mr. Caruso about that.  Did you feel like you had some duty

7   as the Highland employee under the services agreements to

8   tell Mr. Caruso about that?

9   A     Wait.  I don't know -- I'm not a lawyer, and I don't

10  know about duty, but I provided services.  We provided

11  services under those agreements.  And that's what we --

12  that's what I was providing, and that's what others on the

13  team were providing, the services that were detailed under

14  the agreements.  We felt the need to tell Mr. Caruso in Q4

15  of 2019, because we felt it was important when we were

16  educating him on all things Highland for him to be made

17  aware of this.

18  Q     Okay.  The services that Highland was providing to the

19  advisors, as you understand them -- forget about the

20  contract.  Forget about the law.  You're not a lawyer.  As

21  you understand, and understood those services for almost ten

22  years, would they have or should they have included catching

23  alleged overpayments that the advisors were making to some

24  vendor?

25            MR. MORRIS:  Objection to the form of the

002623

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-10   Filed 04/12/22   Page 521 of 888   PageID 3825
HCM V. HCMFA, et al.                                                    143

1   question.

2            MR. RUKAVINA:  Form is a deposition objection, not

3   a trial objection, Your Honor.

4            MR. MORRIS:  Fine.  It assumes a fact not in

5   evidence.

6            MR. RUKAVINA:  It's a hypothetical question

7   intentionally.

8            THE COURT:  Overruled.  Overruled.

9   BY MR. RUKAVINA:

10  Q    Do you remember my question?

11  A    No.

12  Q    Okay.  Again, not based on you being a non-lawyer or

13  the contracts, just based on your experience of providing

14  shared services as Highland's CFO for almost ten years, do

15  you -- would you have expected that those services would

16  have included Highland reviewing advisor contracts with

17  vendors for potential overpayments that the advisors might

18  be making?

19  A    I mean, it should have been applied to all -- you know,

20  any vendors, any invoices, that the advisors were paying.  I

21  mean, it was, you know, again, the advisors don't have these

22  back-office personnel, so it's the Highland employees that

23  are providing those services, if they're overpayments to

24  vendors or, you know, other third-party contracts as well.

25  Q    Okay.  And we saw from that example, Exhibit 147, where

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-01170-S   Document 26-1   Filed 04/12/23   Page 523 of 865   PageID 38264
HCM V. HCMFA, et al.                                        144

1   Ms. Hendricks is sending you a list to approve.  To

2   summarize, did Highland accounting employees under your

3   direction have access to the advisor's bank accounts post-

4   petition?

5   A    Yes.

6   Q    Okay.  Did they have the ability to cause the advisors

7   from the advisor's bank accounts to wire funds to vendors,

8   when approved of by you and other people?

9   A    Yes.

10  Q    Okay.  And is that how the advisors paid Highland post-

11  petition under the payroll reimbursement agreement and the

12  shared services agreement?  Meaning that Highland employees

13  would basically pay Highland from the advisor's bank

14  accounts?

15          MR. MORRIS:  Objection to the form of the

16  question.

17          MR. RUKAVINA:  Again, Your Honor --

18          THE COURT:  Overruled.

19          THE WITNESS:  I think he said was it -- it was --

20  sorry, back to your question.  I think you said it was the

21  advisor's employees that effectuated --

22  BY MR. RUKAVINA:

23  Q    Let me start again.  Let me start again.  Was it the

24  practice -- strike that.

25          The Advisors paid Highland under the payroll

002625

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-10   Filed 01/14/25   Page 529 of 865   PageID 3827
HCM V. HCMFA, et al.                                                    145

```
 1  reimbursement agreement and the shared services agreement by
 2  wiring funds to Highland.  We've established that, correct?
 3  A    Yes.
 4  Q    Which human beings actually facilitated those wire
 5  transfers?  Actually inputted them and actually made them?
 6  A    It would have been members on the corporate accounting
 7  team, which were Highland employees.
 8  Q    That's my point.  Were they also advisor employees at
 9  that time?
10  A    They were not.
11  Q    So if we can summarize, Highland employees would make
12  sure that the advisors would pay Highland under these
13  agreements, but from the advisor's funds.
14             MR. MORRIS:  Objection.  Leading.
15             MR. RUKAVINA:  I'm just summarizing, Your Honor.
16             THE COURT:  Overruled.
17             THE WITNESS:  That's correct.
18  BY MR. RUKAVINA:
19  Q    And I think you mentioned, did the advisors themselves
20  have any employees prior to the termination of these
21  agreements that would have or could have facilitated the
22  payment of invoices?
23  A    Mr. Dondero is authorized signatory on the advisor
24  accounts, but he doesn't -- I mean, he's never sent a
25  payment, to my knowledge.
```

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-01170-S   Document 26-10   Filed 04/14/25   Page 524 of 885   PageID 38726
HCM V. HCMFA, et al.                                                        146

1   Q     And going back briefly to those shared services

2   agreements, you established that one of the services that

3   Highland should have or could have been providing was

4   reviewing payables.  Is that something that you personally

5   would have done?

6   A     I wasn't reviewing invoices or payables.  That was the

7   team's responsibility.

8   Q     You were a C-level executive?

9   A     Yeah.  I did that earlier in my career.

10  Q     Sure.  Sure.

11  A     But as CFO, I did not do that.

12  Q     So if there were alleged overpayments from the advisors

13  to Highland, is that something that you feel like you

14  personally should have gone investigating and figured out?

15  Or something that someone lower level than you should have

16  brought to your attention?

17  A     Yeah.  I mean, I'm not reviewing all the invoices or,

18  you know, things to that degree.  Like I said, it's a team

19  effort.  If there's others that were aware of that, yes --

20  Q     Okay.

21  A     -- they need to be brought to, you know, my attention

22  and things of that nature.

23  Q     So that's my point.  If there are alleged overpayments,

24  would you have known about it without one of your team

25  members bringing it to your attention?

002627

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-16   Filed 04/14/25   Page 525 of 888   PageID 38297
HCM V. HCMFA, et al.                                    147

1   A    Unless I was intimately aware, yes -- I mean, it -- I

2   would have relied on my team members for that.

3   Q    But were you aware of these overpayments prior to Mr.

4   Klos bringing it to your attention in Q4 2019?

5   A    I don't -- no, I don't remember being concerned or

6   anything to that effect.

7   Q    Okay.  And based on what Mr. Klos told you, you talked

8   to Mr. Caruso, and the two lawyers, just to be clear, Mr.

9   Scott -- Ellington.  He was the general counsel of Highland,

10  was he?

11  A    I believe that was his title.

12  Q    And what was Mr. Leviton?  Associate General Counsel?

13  A    I don't know.

14  Q    So just -- I'm asking you.  You're now the CFO of

15  Highland.  And the COO and the GC, the general counsel, tell

16  you about the automatic stay, and you mentioned that after

17  that, you felt that there was nothing really more to

18  discuss.  Do you remember that?

19  A    Yes.

20  Q    Okay.  Who else could you have gone to if you suspected

21  the voracity of these people's -- these experts' statements

22  to you?

23  A    I didn't feel the need to talk to anybody else.  Again,

24  as I testified earlier, nothing could have changed based on

25  what I was told by, you know, the firm that was now in

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 16-1    Filed 04/14/22    Page 526 of 865    PageID 38738
HCM V. HCMFA, et al.                                                    148

1   control, and Mr. Caruso, by in-house counsel, and you know,

2   there was so much going on at that time.  Again, I wanted to

3   focus my efforts, my team's efforts on things that we needed

4   to work on, or we could change, or you know, we could be

5   helpful on.

6   Q    Did you discuss with Mr. Caruso or these two lawyers

7   that these overpayment issues would be addressed in due

8   course in the future?

9   A    That was my understanding.

10  Q    Okay.  Do you remember anything that any one of them

11  told you about that, specifically?

12  A    He was just, you're under a stay, and you know --

13  Q    And there's nothing that can be done.

14  A    Nothing can be done, and it would be, you know, again

15  addressed, you know, down the line.

16  Q    So let me ask you now.  Now, you're wearing your

17  treasurer hat for the advisors, okay?  Are you following me?

18  Now, you're not the CFO of Highland.  Now, you're the

19  treasurer of the advisors, okay?  Who would you have gone to

20  seek legal advice from, having heard what you just heard

21  about the automatic stay?  Who was providing legal services

22  to Highland at that time?

23  A    Highland in-house counsel.

24  Q    The same two people we just mentioned?

25  A    Yes, amongst others.

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 16-1    Filed 04/29/22    Page 523 of 885    PageID 3839
HCM V. HCMFA, et al.                                        149

1  Q    So both as the CFO of Highland and the treasurer of the

2  advisors, it would have been the same people, who would have

3  told you the same thing; is that correct?

4  A    That's correct.

5  Q    Okay.  Did you have any reason to disbelieve what they

6  were telling you about the automatic stay?

7  A    No.  I'm not an attorney, and they are.  And I'm going

8  to my general counsel, and others that are intimately

9  involved with the bankruptcy.  I had no reason to doubt them

10  or think otherwise.

11  Q    Did you rely on what they told you about the automatic

12  stay?

13  A    Yeah, 100 percent.

14  Q    Did you believe, based on what they told you, that it

15  would eventually be worked out in the bankruptcy?

16  A    Yeah.  I didn't have reason to believe otherwise.

17  Q    And I think you mentioned also that you did not discuss

18  the matter with Mr. Dondero until sometime in late 2020,

19  correct?

20  A    That is correct.

21  Q    Okay.  And is that also for the same reasons that you

22  just mentioned, because you felt that there was nothing that

23  could be done?

24  A    That -- yes.  I mean, again, I think I testified

25  earlier, Mr. Dondero was very busy with the bankruptcy.  And

002630

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-10   Filed 04/12/23   Page 529 of 885   PageID 38320
HCM V. HCMFA, et al.                                                              150

1  if nothing can be done, you know, and again I said Mr.

2  Caruso wanted -- and Sarah wanted to talk to Mr. Dondero,

3  they certainly could have.

4  Q    How did you find Mr. Klos to be as your employee for

5  years and years?  As far as his professional abilities.

6  A    I always found Mr. Klos as a tremendous employee.  I've

7  enjoyed working with him for many years.  He's a great

8  individual.

9  Q    Okay.  Would you have expected him to inform you of any

10  red flags that he would see or suspect?

11  A    What do you mean by red -- like just --

12  Q    Issues.  Would you have expected him to flag issues to

13  raise with his boss if he found them?

14  A    Yes.  I mean, Mr. Klos is very good at doing things

15  like that.

16  Q    Would you have expected Mr. Klos to advise you that

17  perhaps certain numbers or analysis are less reliable than

18  they should be, for whatever reason?

19  A    Mr. Klos was always good when he would put together a

20  pro forma estimate.  He would list the assumptions in his

21  analysis.  Yeah.  And if there were some that maybe were --

22  if he made an assumption and maybe he's like okay, you know,

23  maybe this isn't the best assumption to make, but I did do

24  it, it'd be something that we would discuss over time, or we

25  would discuss -- we would discuss that assumption when he

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-1   Filed 04/21/22   Page 529 of 888   PageID 38321
HCM V. HCMFA, et al.                                        151

 1  would go through the analysis of the pro forma.  You know,

 2  again, I'm speaking generally over the years.

 3  Q    Because some of what you guys do, by definition, is

 4  subjective, right?

 5  A    Yeah.  There are always estimates, or you put together

 6  pro formas, there are certain assumptions that need to be

 7  made.

 8  Q    So did Mr. Klos ever tell you that there was anything

 9  with respect to the December 2019 DSI analysis that we

10  discussed?  Did he ever tell you that there's anything in

11  there that he red flagged for you as potentially a problem?

12  A    Not that a recall.

13  Q    What about the December 2020 analysis he did at your

14  direction, Exhibit Q?

15  A    In the December 2020, Dave changed assumptions versus

16  the 2019 analysis, that he detailed in the email.

17  Q    But he told you what those changes were.

18  A    Yes.  It was detailed in that email.

19  Q    Yeah.  Did he tell you that those assumptions might be

20  dangerous, or unwarranted, or anything like that?

21  A    I don't recall having a conversation with Mr. Klos

22  about that.

23  Q    Okay.  And Mr. Morris asked you when you were

24  suggesting to Mr. Caruso that the payroll agreements be

25  updated or changed, he asked you how that could possibly be

002632

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-10   Filed 04/12/22   Page 536 of 885   PageID 3732

HCM V. HCMFA, et al.                                          152

 1  in the best interest of Highland.  Do you remember that?

 2  A    Yes.

 3  Q    But if Highland was contractually obligated under the

 4  shared services agreement to do that, then do you have a

 5  different answer?

 6  A    I mean --

 7  Q    I mean, Highland might lose 7 or $8 million a year, but

 8  what would be the appropriate business ethics thing to do in

 9  your mind?

10  A    Look, I don't -- I mean, again, I go back to there was

11  an automatic stay put in place.  And I don't know what

12  could've been changed.

13  Q    So was Mr. Morris's question to you academic because

14  nothing could be changed anyway?

15  A    Yeah.  I mean, that's what -- again, that's what we

16  found out in these discussions, right, that there was an

17  automatic stay.  And so at that point, again, I didn't worry

18  about it.  I can't speak for Mr. Klos, but, you know, we

19  moved on to other things.

20  Q    Okay.

21          MR. RUKAVINA:  Thank you.  I'll pass the witness,

22  Your Honor.

23          THE COURT:  All right.  Redirect.

24                     REDIRECT EXAMINATION

25  BY MR. MORRIS:

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 26-16    Filed 04/28/25    Page 557 of 865    PageID 38253
HCM V. HCMFA, et al.                                                          153

1  Q    Mr. Waterhouse, do you understand that my firm is a

2  bankruptcy boutique?

3  A    Yes.  You all deal with bankruptcies.

4  Q    Do you understand that we're bankruptcy specialists,

5  right?

6  A    Yes.

7  Q    And you communicated with me and my colleagues in late

8  2019 and early 2020 about a lot of things, right?

9  A    Yes.  It was primarily around -- was it the first day

10 or day one filings.  That was primarily my involvement with

11 communicating with you all.

12 Q    I spent a lot of time with you.  I defended you in a

13 deposition that was taken by the UCC after this case got

14 transferred here to Dallas, right?

15 A    Yes.

16 Q    And you never asked me, or any of my colleagues if the

17 automatic stay would somehow prevent the redress of these

18 overpayments, right?

19 A    I did not.

20 Q    You understand that neither Mr. Ellington, nor Mr.

21 Leviton are bankruptcy lawyers, right?

22 A    They aren't bankruptcy lawyers, but they were talking

23 -- again, they had -- Mr. Ellington and Mr. Leviton were

24 talking to Mr. Pomerantz and others on a routine basis.  But

25 again, I'll go back to when I was informed by Mr. Caruso

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-10   Filed 04/12/23   Page 553 of 865   PageID 38364
HCM V. HCMFA, et al.                                          154

1    that we were in a stay, the counsel I talked to in-house, if

2    I remember right, hired Pachulski, right, and recommended

3    Pachulski.  So I had no reason not to believe Mr. Ellington

4    or Mr. Leviton.

5    Q    Okay.  Last question on the topic.  Just to be clear.

6    At no time did you ask any bankruptcy lawyer that was

7    retained by your employer, about the automatic stay in the

8    context of these overpayments, correct?

9    A    I did not.

10   Q    Okay.  Thank you.  Mr. Rukavina asked you a bunch of

11   questions about shared services and who was responsible for

12   certain services.  Do you remember that?

13   A    Yes.

14   Q    Okay.  You are not aware of any specific service under

15   the shared services agreement that Highland failed to

16   provide at any time from the petition date until the

17   agreements were terminated in early 2001, correct?

18   A    Yeah.  I'm not aware.

19   Q    Okay.  You never had any conversation with anybody at

20   any time about Highland's failure or alleged failure to

21   provide any services under the shared services agreement at

22   any time from the petition date until they were terminated

23   in early 2021, correct?

24   A    Yeah.  I'm not aware.

25   Q    Okay.  The issue of overpayments, it's pretty simple,

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-10   Filed 04/12/23   Page 559 of 865   PageID 38737
HCM V. HCMFA, et al.                                                              155

```
 1   right?  There's only two pieces of information that one
 2   needs to know if the advisors are paying for employees who
 3   are no longer employed, right?
 4   A    I mean, so if you break down every agreement -- the
 5   payroll reimbursement agreement, you need to know what costs
 6   were incurred by Highland, and then any -- the time
 7   allocation that was in the Exhibit A.  And if I remember
 8   correctly from our deposition for one of the HCMFA or it was
 9   the HCMFA shared service agreement, there was a calculation
10   done with a markup that you walked me through.  So there's
11   more to that calculation.
12   Q    All right.  Maybe I'm being too simplistic.  One of the
13   things you have to know is how much money was paid.  If you
14   want to know if there was an overpayment, you have to know
15   how much money was paid, correct?
16   A    Yes.
17   Q    Okay.  And if you just want to know if the advisors
18   were paying for dual employees who had been terminated, all
19   you have to do is know which employees were terminated,
20   right, and then you could back out their compensation from
21   the analysis?
22   A    I'm sorry.  I'm trying to follow your question.  You're
23   saying the advisors are making payments, right, on a monthly
24   basis.  And you're saying there are -- if you want to see if
25   they overpaid, I mean, you have to look at the costs that
```

002636

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 26-10    Filed 04/12/23    Page 534 of 865    PageID 38736
HCM V. HCMFA, et al.                                                          156

1  were incurred by Highland, you know, during that time

2  period.

3  Q    Correct.  And one way to do that is to say I'm not

4  going to pay for dual employees who have been terminated,

5  right?  Isn't that part of why you think there was an

6  overpayment, because the advisors were paying for dual

7  employees who were terminated?  Isn't that the bulk of this

8  analysis, if not the entirety?

9  A    Yes.  And a time allocation as well.

10 Q    Okay.  But if they had been terminated, the time

11 allocation is irrelevant, right?

12 A    That is correct.

13 Q    So if you know how much money was paid, and when the

14 dual employees were terminated, you'll be able to know that

15 there was an overpayment if the advisors had been paying for

16 these terminated employees, right?

17 A    Correct.

18 Q    Okay.  Can you think of one single payment that was

19 made after the petition date on account of any of the

20 intercompany agreements that the advisors had with Highland

21 that you questioned?  Where you questioned the execution of

22 the payment.  Where you said that payment shouldn't have

23 been made; or that payment was made for too much.

24 A    No, because we were in an automatic stay.

25 Q    Okay.  Did you -- I may have misheard you.  Did you

002637

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-10   Filed 04/27/25   Page 535 of 885   PageID 38327
HCM V. HCMFA, et al.                                                              157

 1  testify a moment ago that you actually discussed the issue

 2  of overpayments with Mr. Dondero in December 2020?

 3  A    I don't think I said that.  I mean, I --

 4  Q    So let me ask you the question.  Did you discuss the

 5  issue of overpayments with Mr. Dondero at any time in the

 6  year 2020?

 7  A    Yes.  I mean, Mr. Dondero, when he -- we talked earlier

 8  with what I talked with Mr. Rukavina, Mr. Dondero instructed

 9  me to not make any additional payments from the advisors to

10  Highland.  In that conversation, he said there were

11  overpayments that had been made.

12  Q    Okay.  Mr. Rukavina spent a fair amount of time on the

13  $90,000 that you received from NexPoint.  Do you remember

14  that?

15  A    Yes.

16  Q    And you testified that that wouldn't influence you in

17  any way because it didn't really matter to somebody who --

18  of a man of means, like yourself?

19  A    Yes.

20  Q    Did you receive any other payments from any other

21  entities that are owned indirectly or directly by Mr.

22  Dondero or Mr. Ellington in 2020?

23  A    Yes.

24  Q    How much more money did you receive from them?

25  A    I don't recall the exact amount.

002638

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-10   Filed 04/28/25   Page 536 of 865   PageID 38423
HCM V. HCMFA, et al.                                      158

1  Q    Was it more than a half a million dollars in total?

2  A    Yes.

3  Q    Okay.  Is that an amount of money that causes you to

4  think about what you're doing?

5  A    No.

6         MR. MORRIS:  I have no further questions, Your

7  Honor.

8         THE COURT:  Any recross?

9         MR. RUKAVINA:  One moment, Your Honor.

10  (Pause)

11         MR. RUKAVINA:  I have no further questions, Your

12  Honor.

13         THE COURT:  All right.  You are excused, Mr.

14  Waterhouse.

15  (Witness excused at 6:17 p.m.)

16         THE COURT:  All right.  Well, we're going to stop.

17  It's 6:17 p.m.  Do you think you're going to be able to

18  finish tomorrow?

19         MR. MORRIS:  I expect at some point during the day

20  I might move for a directed verdict.  But if not, if I

21  decide not to do that, I still remain optimistic that we'll

22  finish tomorrow.  That is definitely my goal.

23         THE COURT:  Okay.  Are you optimistic, Mr.

24  Rukavina?

25         MR. RUKAVINA:  Not if he makes a motion for a

002639

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-1   Filed 04/29/22   Page 537 of 865   PageID 3429
HCM V. HCMFA, et al.                                                159

 1   directed verdict.  That's the first I've heard of that.  And

 2   I would note that because we're going out of sequence, it

 3   would be a little bit unfair.

 4        But provided that that doesn't happen, then yes,

 5   we'll be finished with the witnesses and closing arguments

 6   tomorrow.

 7        THE COURT:  Okay.  All right.  Well, we'll go

 8   ahead and start at 9:30 in the morning.  And I'll let you

 9   know that I do have to give a CLE presentation, a Zoom

10   presentation, at noon tomorrow.  So I've got to take the

11   full one-hour lunch tomorrow.  We'll probably stop at about

12   11:45 to allow me to get hooked in.

13        MR. MORRIS:  All right.  So just to keep the Court

14   informed, while I had suggested that we would call Mr. Seery

15   this afternoon if time permitted, we're going to be calling

16   the retail board first, because it's a third-party witness

17   and --

18        THE COURT:  Okay.

19        MR. MORRIS:  -- I want to be respectful to them.

20   I expect it to be a relatively brief examination and then

21   we'll go to Mr. Seery.

22        THE COURT:  Okay.  All right.

23        (WHEREUPON, the proceeding adjourned at 6:18 p.m.)

24                         * * * * *

25

002640

Case 21-03010-sgj   Doc 113   Filed 04/15/22   Entered 04/15/22 11:33:11   Desc Main
Case 3:22-cv-02170-S   Document 26-16   Filed 04/18/23   Page 534 of 865   PageID 38430
HCM V. HCMFA, et al.                                                      160

```
 1                          I N D E X

 2     WITNESS              DIRECT      CROSS       REDIRECT    RECROSS

 3

 4     DAVID KLOS                         3           55          61

 5     FRANK WATERHOUSE      65          126         152

 6

 7

 8

 9

10                          R U L I N G S

                                                               PAGE
11

       None
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 21-03010-sgj    Doc 113    Filed 04/15/22    Entered 04/15/22 11:33:11    Desc Main
Case 3:22-cv-02170-S    Document 26-10    Filed 04/16/24    Page 539 of 865    PageID 38431
HCM V. HCMFA, et al.                                                  161

1

2                C E R T I F I C A T I O N

3

4        We, Sheila Orms and Nancy B. Gardelli, Court approved

transcriptionists, for Acorn Transcripts, LLC, certify that

5

the foregoing transcript is a correct transcript from the

6

official electronic sound recording of the proceedings in

7

the above-entitled matter.

8

9

FOR ACORN TRANSCRIPTS, LLC            April 14, 2022

10

11

12      /s/ _____

13

SHEILA ORMS

14

15      /s/  Nancy B. Gardelli            April 14, 2022

16

Nancy B. Gardelli

17

Operating Manager

18

19

20

21

22

23

24

25

002642

# Tab 11

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 6-11   Filed 12/21/23   Page 541 of 888   PageID 3845
Document    Page 1 of 84
HCM V. HCMFA, et al.                                                    1

```
 1                  IN THE UNITED STATES BANKRUPTCY COURT

 2                  FOR THE NORTHERN DISTRICT OF TEXAS

 3                            DALLAS DIVISION

 4
      IN RE
 5
      HIGHLAND CAPITAL MANAGEMENT, L.P.  §
 6                                       §   CASE NO. 19-340540SGJ11
                                         §   DALLAS, TEXAS
 7                         Debtor        §   WEDNESDAY, APRIL 13, 2022
                                         §   9:39 A.M.- 11:17 A.M.
 8    HIGHLAND CAPITAL MANAGEMENT, L.P., §
                           Plaintiff,    §
 9    vs.                                §   ADVERSARY PROCEEDING
                                         §   NO.  21-03010-SGJ
10    HIGHLAND CAPITAL MANAGEMENT FUND   §
      ADVISORS, L.P., et al.             §
11                         Defendants.   §

12
                          TRIAL - DAY TWO
13
              BEFORE THE HONORABLE STACEY G. JERNIGAN
14                 UNITED STATES BANKRUPTCY JUDGE

15

16

17

18

19

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
             transcript produced by transcription service.
```

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 61   Filed 12/28/23   Page 542 of 888   PageID 3846
HCM V. HCMFA, et al.                                                    2

<pre>
 1                       APPEARANCES:

 2

   FOR HIGHLAND CAPITAL MANAGEMENT,    JOHN A. MORRIS, ESQ.
 3 LP                                  HAYLEY R. WINOGRAD, ESQ.
                                       PACHULSKI STANG ZIEHL &
 4                                      JONES, LLP
                                       10100 SANTA MONICA BVD
 5                                     13TH FLOOR
                                       LOS ANGELES, CA   900067
 6

 7

 8 FOR HIGHLAND CAPITAL MANAGEMENT     DAVOR RUKAVINA, ESQ.
    FUND ADVISORS, L.P.                THOMAS D. BERGHMAN, ESQ.
 9                                     MUNSCH, HARDT, KOPF & HARR
                                       500 N. AKARD STREET
10                                     SUITE 3800
                                       DALLAS, TX   75201
11

12 COURT RECORDER:                     ME
                                       Clerk's Office
13                                     U.S. Bankruptcy Court
                                       501 W. 10th Street
14                                     Fort Worth, TX   76102

15
   TRANSCRIPTION SERVICE:              ACORN TRANSCRIPTS, LLC
16                                     3572 Acorn Street
                                       North Port, FL   34286
17

18

19

20

21

22

23

24

25
</pre>

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 61   Filed 04/23/23   Page 543 of 888   PageID 3847
HCM V. HCMFA, et al.                                                              3

 1        DALLAS, TEXAS; WEDNESDAY, APRIL 13, 2022; 9:39 A.M.

 2            THE MARSHAL:  All rise.

 3        (Call to Court)

 4            THE COURT:  Good morning, please be seated.  All

 5    right.  We're back for day two of our trial in Highland

 6    Capital Management versus the advisors, Highland Capital

 7    Management Fund Advisors and NexPoint Advisors.

 8            All right.  We have everyone here we need.  We got

 9    plaintiff -- well, debtor's counsel and the advisor's

10    counsel.  All right.  Do you have something to present,

11    counsel?

12            MS. WINOGRAD:  Good morning, Your Honor, Highland

13    is calling the retail board.

14            THE COURT:  Okay.

15            MS. WINOGRAD:  And the representative Ethan Powell

16    hasn't yet arrived.

17            THE COURT:  Okay.

18            MR. RUKAVINA:  He's right here.

19            UNIDENTIFIED:  He's right here.

20            MS. WINOGRAD:  Oh, I'm sorry about that.  Okay.

21            THE COURT:  Okay.  Is that our first --

22            MS. WINOGRAD:  Yes.

23            THE COURT:  -- witness today?

24            MS. WINOGRAD:  Highland would like to call Ethan

25    Powell please.

003062

Case 21-03010-sgj    Doc 114    Filed 04/15/22    Entered 04/15/22 11:35:55    Desc Main
Case 3:22-cv-02170-S    Document 1    Filed 04/28/23    Page 544 of 888    PageID 3848
HCM V. HCMFA, et al.                                                    4

 1              THE COURT:  Okay.  Tell me the name again.

 2              MS. WINOGRAD:  Ethan Powell.

 3              THE COURT:  Ethan Powell.  Okay.  Welcome.  If you

 4  could approach our witness box.  That box right there, if

 5  you'll -- I'll swear you in before you take a seat.  Please

 6  raise --

 7              MR. POWELL:  Okay.  So --

 8              THE COURT:  If you could stand and I'll swear you

 9  in first.

10              MR. POWELL:  Oh, sorry.

11                  ETHAN POWELL, WITNESS, SWORN

12              THE COURT:  All right.  Now you may be seated.

13              THE WITNESS:  Thanks.

14                      DIRECT EXAMINATION

15  BY MS. WINOGRAD:

16  Q    Good morning, Mr. Powell.

17  A    Good morning.

18  Q    My name is Hayley Winograd, I'll be asking you some

19  questions over the next few minutes.  Thank you for being

20  here.

21  A    Okay.  Of course.

22  Q    You're a member of the board of trustees or the board

23  of directors of certain retail funds, correct?

24  A    I am, yes.

25  Q    Can I refer to these retail funds as the funds?

003063

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 12/23/23   Page 545 of 888   PageID 3849
HCM V. HCMFA, et al.                                                5

```
 1   A     You may.

 2   Q     Are you familiar with an entity called Highland Capital

 3   Management Fund Advisors LP?

 4   A     I am.

 5   Q     Can I refer to them as HCMFA?

 6   A     You may.

 7   Q     And are you familiar with an entity called NexPoint

 8   Advisors LP?

 9   A     I am.

10   Q     Can I refer to them as NexPoint?

11   A     You may.

12   Q     And can I refer to them collectively as the advisors?

13   A     Sure.

14   Q     These two entities -- the funds are managed by the

15   advisors, correct?

16   A     Correct.

17   Q     And I want to talk a little bit about the relationship

18   between the regional funds and the advisors.  The funds

19   entered into certain investment advisory agreements with

20   each of the advisors, correct?

21   A     Correct.

22   Q     And pursuant to those advisory agreements, the advisors

23   provide advisory services to the funds, correct?

24   A     Correct.

25   Q     And the regional board was aware that Highland filed
```

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 61   Filed 12/15/23   Page 546 of 888   PageID 3850
HCM V. HCMFA, et al.                                                            6

1   for bankruptcy in October 19th of 2019, correct?

2   A      Yep.

3   Q      And the retail board is aware that Highland provided

4   certain shared services to the advisors, correct?

5   A      Correct.

6   Q      And Highland provided these services pursuant to

7   various shared services agreements, correct?

8   A      Correct.

9   Q      And the retail board was aware that these shared

10  service contracts enabled the advisors to satisfy their

11  obligations under the investment advisory contracts,

12  correct?

13  A      Correct.

14  Q      And the retail board was aware that at some point in

15  February of 2021 the shared services agreements between

16  Highland and the advisors were terminated, correct?

17          MR. RUKAVINA:  Your Honor, at this time I will

18  object.  We're past the preliminaries, counsel is leading,

19  this is not a hostile witness or a party opponent, so I

20  object on leading.

21          THE COURT:  Sustained.

22          MS. WINOGRAD:  Okay.

23  BY MS. WINOGRAD:

24  Q      Can I refer to the period between Highland's bankruptcy

25  filing and the termination of the shared services agreement

Case 21-03010-sgj    Doc 114    Filed 04/15/22    Entered 04/15/22 11:35:55    Desc Main
Case 3:22-cv-02170-S    Document 61    Filed 02/27/23    Page 547 of 888    PageID 3851
Document Page 7 of 84
HCM V. HCMFA, et al.                                                    7

 1   as the relevant period?

 2   A    You may.

 3   Q    Okay.  And during the relevant period, did the retail

 4   board regularly hold meetings?

 5   A    We did.

 6   Q    Did the retail board keep minutes of its meetings?

 7   A    We do.

 8   Q    And did those minutes generally reflect the

 9   conversations that were had at those meetings?

10   A    Correct.

11   Q    And one of -- did -- was one of the topics that was

12   covered at those board meetings Highland's performance under

13   the shared services arrangements?

14   A    Collectively with the advisors, yes.

15   Q    Okay.  And do the board minutes reflect all material

16   communications between the retail board members concerning

17   Highland's performance under these shared services

18   arrangements?

19   A    It represents the conclusions reached.

20   Q    Okay.  Can you think of any material communications

21   that weren't represented in those meetings?

22   A    Well, the meeting minutes are --

23   Q    In the meeting -- in the minutes, I'm sorry.

24   A    Yeah, the meeting minutes themselves aren't intended to

25   be a transcript.

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 61   Filed 08/18/23   Page 548 of 888   PageID 3852
Document Page 8 of 84
HCM V. HCMFA, et al.                                                        8

1  Q     Uh-huh.

2  A     And our meetings sadly can go very, very long.  So

3  oftentimes there will be material considerations that are

4  presented that aren't necessarily documented in the meeting

5  minutes, but the conclusions reached are.

6  Q     Okay.  During the relevant period, did the retail board

7  ever allege that either of the advisors ever breached any of

8  their obligations owed to the funds under the investment

9  advisory agreements?

10 A     Can you repeat that question?

11 Q     During the relevant period, did the retail board ever

12 allege that either of the advisors breached their

13 obligations under the investment advisory agreements?

14 A     No, we did not.

15 Q     Did the retail board ever notify the advisors of any

16 breach of their obligations under the investment advisory

17 agreements?

18 A     No.

19 Q     From the retail board's perspective, were the advisors

20 fully able to perform their obligations under the investment

21 advisory agreements?

22 A     Yes.

23 Q     Do the board meetings substantively reflect the

24 communications between the board members and the advisors

25 concerning Highland's performance under these shared

003067

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 61   Filed 12/28/23   Page 549 of 888   PageID 3853
HCM V. HCMFA, et al.                                                          9

1    services arrangements?

2    A    Our assessment was never Highland versus the advisors,

3    it was always collectively.  And we were always given

4    assurances that collectively they could fulfill the

5    obligations.

6    Q    Do the board minutes materially reflect the

7    communications between the board members and the advisors

8    concerning the advisors' performance under the investment

9    advisory agreements?

10   A    They do.

11   Q    Now, I want to talk to you a little bit about the board

12   meetings and the minutes, and specifically the process that

13   went into them.

14   A    Uh-huh.

15   Q    Was there a process in place to prepare and finalize

16   the board minutes?

17   A    There is.

18   Q    And as part of this process, did the funds

19   administrator FTI send the draft minutes to certain

20   individuals and entities for review?

21   A    They do.

22   Q    Did one of these entities include the funds counsel?

23   A    It did.

24   Q    And did one of these entities also include the

25   advisors?

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 12/26 of 84   Page 550 of 888   PageID 3854
HCM V. HCMFA, et al.                                    10

1    A    Yes.

2    Q    Was this to give the advisors the opportunity to review

3    the minutes before they were finalized?

4    A    Yes.

5    Q    And it was the -- was it the secretary of the advisors

6    who reviewed the board minutes on behalf of the advisors?

7    A    I'm not sure.

8    Q    Okay.

9    A    But that would be typical.

10   Q    Okay.

11   A    Yeah.

12   Q    Was that person, to the best of your recollection,

13   Lauren Bedford?

14   A    She was the secretary during the period.

15   Q    Did the -- did SCI send the draft board minutes to the

16   advisors to give the advisors the opportunity to provide

17   feedback on those minutes?

18   A    They did.

19   Q    Did they specifically do this so that the advisors

20   could confirm the accuracy of those minutes?

21   A    They did.

22   Q    Was this process for finalizing the board minutes

23   generally the same throughout the relevant period?

24   A    It was.

25   Q    I'm going to ask you now about the advisors'

003069

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/15/22 of 84   Page 551 of 888   PageID 3855
Document   Page 1126 of 84
HCM V. HCMFA, et al.                                    11

1   representations to the retail board about Highland's

2   performance under the shared services arrangements.

3       Did the advisors provide regular updates to the retail

4   board concerning the quality and continuity of the services

5   provided to the advisors pursuant to these shared services

6   arrangements?

7   A   Collectively with the advisors, yes, but individually

8   as HCMLP service provider, no.

9   Q   I'm going to turn your attention to some documents that

10  I'll be referring to for a few minutes and those documents

11  are located in the binders as exhibits in front of you in

12  Volume 1 and 2.  So I might ask you to open one.

13      Can you please turn to Exhibit 58?

14  A   So that would be binder --

15  Q   That would be Volume 2 I believe.

16  A   Volume 2, all right.  58.  I should have brought my

17  glasses.  Okay.

18  Q   Are these the June 18th to 19th of 2020 board minutes?

19  A   They appear to be.

20  Q   Okay.  Can you please turn to page 20?

21  A   Page 20.  Okay.

22  Q   Do you see there in a June 2020 board meeting Mr. Klos,

23  the advisors' chief compliance officer represented to the

24  board that the advisors were monitoring the level and

25  quality of the shared services being provided by Highland?

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 12/26/22   Page 552 of 888   PageID 3856
Document   Page 1226 of 84
HCM V. HCMFA, et al.                                      12

1   A    Give me one second, I'm not finished reading.

2   Q    Uh-huh.

3   A    Yep, I see that.

4   Q    Did the board rely on the advisors to monitor the

5   quality of those shared services?

6   A    We did.

7   Q    Does the retail board conduct an annual 15-C review

8   process?

9   A    We do.

10  Q    Is this the process whereby the retail board decides

11  whether or not to extend its --

12          MR. RUKAVINA:  Objection, Your Honor, leading.

13  The proper question is what is that process.

14          THE COURT:  Sustained.

15  BY MS. WINOGRAD:

16  Q    What's the process whereby the regional board decides

17  whether or not to extend its investment advisory agreements?

18  A    It's very long and arduous process, I don't think we

19  want to get into the details here but --

20  Q    But is that called the 15-C process?

21  A    It is the 15-C, yes, that's right.

22  Q    Okay.  Can you please turn to Exhibit 59?

23  A    Okay.

24  Q    Are these the August 13th of 2020 board minutes?

25  A    They appear to be.

003071

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 6   Filed 12/22/22   Page 553 of 888   PageID 3857
HCM V. HCMFA, et al.                                          13

1  Q    Can you turn to page 6 please?  Do you see that Mr.

2  Norris, the executive vice-president of the advisors, quote,

3  "provided an overview of the 15-C review materials and

4  process and discussed the expected timeline with respect to

5  board consideration of approval of the renewals?"  He noted

6  that there had been no issue or disruption in services as a

7  result of the HCMLP bankruptcy matter.  Do you see that?

8  A    I do.

9  Q    Did the retail board rely on this statement?

10 A    We would have.

11 Q    Did the retail board expect that the statement was made

12 on an informed basis?

13 A    We would have.

14 Q    Can you please now turn to Exhibit 60?  Do you see that

15 these are the board minutes from September 17th and 18th of

16 2020?

17 A    I do.

18 Q    Can you please turn to the bottom of page 12, which --

19 and going on to the rest of 13.  In September of 2020, Mr.

20 Surgent, the chief compliance officer of the advisors

21 assured the retail board that it -- that in response to

22 certain 15-C follow-up questions that at that time, quote,

23 "it was business as usual with respect to the services

24 provided to the funds and that the board would be notified

25 immediately of any developments."  Do you see that?

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/14/26 of 87 Page 554 of 888   PageID 3858
HCM V. HCMFA, et al.                                              14

 1  A     Give me one second, finish reading.

 2        I do see it.

 3  Q     Okay.  As part of the 15-C review process, was the

 4  retail board also required to assess the financial

 5  wherewithal of the advisors?

 6  A     We were.

 7  Q     Can you please turn to Exhibit 22?

 8  A     22, so that's Volume 1?

 9  Q     Yeah.

10  A     Okay.  I'm there.

11  Q     Do you see that these are the advisors October 23rd of

12  2020 responses to questions raised by the retail board to

13  the advisors in connection with the 15-C review process?

14  A     I do.

15  Q     If you could turn your attention to question 2, please.

16  Do you see that the regional board asked the advisors

17  whether there were any amounts payable or due to Highland

18  from either of the advisors?

19  A     I see that.

20  Q     Do you see that the advisors represented in their

21  response to the regional board that as of the date of that

22  letter, all amounts owed by each of NexPoint and HCMFA

23  pursuant to the shared services arrangement with HCMLP have

24  been paid as of that date?

25  A     I do see that.

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed Page 1526 of 87 Page 555 of 888   PageID 3859
HCM V. HCMFA, et al.                                          15

```
 1  Q    Did the retail board rely on the accuracy of this

 2  statement in making its decision as to whether or not to

 3  extend the advisory agreements?

 4  A    We would have.

 5  Q    And did the retail board assume that that statement was

 6  true and accurate?

 7  A    We would have.

 8  Q    Did the retail board assume that the statement was

 9  based on the advisor's due diligence and actual knowledge?

10  A    Correct.

11  Q    Can you please turn to Exhibit 62?

12  A    Yes.  Okay.

13  Q    These are the October 28th of 2020 board minutes.  Do

14  you see that?

15  A    I do.

16  Q    Directing your attention to page 3 about halfway

17  through the second paragraph, do you see that the advisors

18  represented to the board at the end of October of 2020 that

19  quote, the quality and level of services provided to the

20  funds by the advisors and pursuant to the shared services

21  arrangements have not been negatively impacted to date?

22  A    Oh, boy, I'm going to have to find that.  Give me one

23  second.

24  (Pause)

25  Q    Uh-huh.
```

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 12/26 of 8 Page 556 of 888   PageID 3860
HCM V. HCMFA, et al.                                      16

 1  A    You said halfway through?

 2  Q    It's about halfway through the second big paragraph.

 3  A    Oh, the second paragraph --

 4  Q    Uh-huh.

 5  A    -- okay, I got you.  Okay.  I see it.

 6  Q    Did the retail board assume that this representation as

 7  made on an informed basis?

 8  A    We would have, yes.

 9  Q    Did the retail board rely on this representation in

10  deciding whether to extend its advisory contracts?

11  A    Among other things, but yes.

12  Q    Was one of the retail board's concerns during the

13  relevant period related to the continuation of material

14  services to the funds?

15  A    Correct.

16  Q    Was one of the assurances the retail board had been

17  asking for related to the sufficient employees at Highland,

18  whether there was a sufficient amount of employees at

19  Highland to be able to provide services that the advisors

20  needed in order to fulfill its obligations under the

21  investment advisory contracts?

22  A    It would have been at the advisors and Highland.

23  Q    Uh-huh.  Can you please turn to Exhibit 64?  This is

24  December of 2020 minutes, correct?

25  A    Yep.

003075

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 11/22 of 84 Page 557 of 888   PageID 3861
HCM V. HCMFA, et al.                                          17

1  Q    If you could turn to page 7 at the very bottom.  Do you

2  see there that the advisors assured the retail board that

3  there was sufficient personnel to continue the shared

4  services to the regional funds?

5  A    I see that.

6           MS. WINOGRAD:  Your Honor, can I confer with

7  counsel for a minute?

8           THE COURT:  Sure.

9       (Pause)

10          MS. WINOGRAD:  That's all I have.  Thank you very

11  much.

12          THE COURT:  Okay.

13          THE WITNESS:  Thank you.

14          THE COURT:  Pass the witness.  Wait.  I can tell

15  you don't do this very often, right?

16          THE WITNESS:  I try not to to the extent possible.

17          THE COURT:  All right.  Mr. Rukavina, you have

18  questions?

19          MR. RUKAVINA:  Yes, I do, Your Honor.

20                        CROSS-EXAMINATION

21  BY MR. RUKAVINA:

22  Q    Mr. Paul, good morning.

23  A    Good morning.

24  Q    Just to confirm, you're on the board of those retail

25  funds, right?

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/15/22 Page 558 of 888   PageID 3862
Document Page 226 of 87
HCM V. HCMFA, et al.                                              18

1   A    Correct.

2   Q    Okay.  And would Mr. Seery sometimes participate in

3   these board meetings during the period that counsel has

4   called the relevant period?

5   A    He would.

6   Q    Do you have an understanding as to why Mr. Seery would

7   participate?

8   A    I do.

9   Q    What's your understanding?

10  A    To provide updates on the HMLP bankruptcy/implications

11  to HCMLP's services provided under the services agreement.

12  Q    And what did you understand generally to be the

13  services that HCMLP was provided to the advisors under the

14  shared services agreements?

15  A    Primarily back-office accounting, finance, HR, IT,

16  support services.

17  Q    Was that of relevance to the funds?

18  A    It would have been, yeah.

19  Q    Why?

20  A    So our primary focus is the nature and quality of

21  services being provided to the investors, particularly as it

22  relates to investment selection monitoring of the funds and

23  ensuring that the financial outcomes to our investors are

24  maximized.

25       There are lots of service providers involved and it's

003077

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 06/12/22   Page 559 of 888   PageID 3863
Document   Page 1226 of 84
HCM V. HCMFA, et al.                                              19

 1  our job to assess each service provider's role and whether

 2  or not they are fulfilling their role within the context of

 3  an agreement we have with them, we being the investors in

 4  our funds.

 5      So we have separate administration agreements with SCI

 6  for example.  They actually do fund accounting.  Our

 7  advisory contract with the advisor, their primary role is

 8  investment selection.  They need support staff in order to

 9  help facilitate that.  So we really looked to the advisor to

10  assess what they needed and whether or not they were getting

11  from HCMLP all of the, you know, various back office and

12  mid-office support services that they needed to order to

13  perform their primary function.

14  Q    So we'll break that down just a little bit.  So first

15  of all, let's give the judge an order -- an idea of the

16  order of magnitude of the assets under management that the

17  funds have that the advisors are advising for --

18  A    For these?

19  Q    Yes.

20  A    3 billion we'll call it.

21  Q    How much?

22  A    3 billion.

23  Q    3 billion with a B?

24  A    Uh-huh.

25  Q    And you mentioned back-office services, you described

003078

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/15/22 of 87 Page 560 of 888   PageID 3864
Document   Page 226 of 87
HCM V. HCMFA, et al.                                          20

```
 1   those -- you mentioned mid-office services, can you give a

 2   generalized description of your understanding of middle

 3   office service?

 4   A    Sure.  Middle office would be trade settlement, trade

 5   reconciliation, performing some of the fund analysis and

 6   portfolio compensation analysis.  Back office would be more

 7   accounting and audit support services.

 8   Q    Have you also heard of the phrase front office

 9   services?

10   A    I have.

11   Q    What's your understanding of that phrase?

12   A    Front office is the primary investment selection and

13   monitoring decisions.

14   Q    And I think you mentioned that's what the advisors did.

15   A    Yes, correct.

16   Q    Okay.  Did you understand that that -- did you

17   understand that shared services, those contracts did not

18   include front office services?

19   A    I did.

20   Q    Okay.  Have you heard of payroll reimbursement

21   agreements between the advisors and Highland?

22   A    I believe so, yes.

23   Q    And we'll go through those in some details.  Are these

24   board meetings that counsel took you through, who actually

25   prepared those meetings?
```

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 01/12/26f 84Page 561 of 888   PageID 3865
Document   Page 126 of 84
HCM V. HCMFA, et al.                                    21

```
 1   A     That would be SCI's regulatory administration group.

 2   Q     Okay.  Did Ms. Bedford have a -- I can't pronounce her

 3   name I apologize, I'm a foreigner, did Ms. Fedford have a

 4   role in that?

 5   A     You did a good job on that.  She would have, yeah.

 6   Q     Okay.  Was she primarily the one that put it together?

 7   A     She would have been the primary review party from the

 8   advisors.

 9   Q     Do you have an understanding with whose employee she

10   was?

11   A     She was I believe HCMLPs, but it's also important to

12   note that lots of people had multiple hats and were employed

13   by multiple different entities.

14   Q     And you mentioned multiple times or at least twice when

15   counsel was asking you about services being provided by

16   HCMLP, which we also call the debtor here, which is why.

17   A     Uh-huh.

18   Q     And you mentioned that what was interest -- of interest

19   to you was the services being provided by both the advisors

20   and the debtors.  Do you remember testifying?

21   A     Yes.

22            MS. WINOGRAD:  Objection, leading.

23            MR. RUKAVINA:  Well, I'm phrasing my next

24   question.  I'm just phrasing -- it's a predicate to my next

25   question.
```

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 12/22 of 87 Page 562 of 888   PageID 3866
HCM V. HCMFA, et al.                                                    22

1            THE COURT:  Overruled.

2    BY MR. RUKAVINA:

3    Q    What did you mean by that when you said that for both

4    the advisors and HCMLP?

5    A    So, yeah, our contract is primarily with the advisors

6    period.  What they choose to do with what's called their

7    bona fide profits, which is their management fee is really

8    up to them, right.

9         A lot of fund complexes don't have multiple advisory

10   entities and it's just a single advisor without any sort of

11   shared services arrangement in and amongst the various

12   entities.

13        So we really just looked at the advisor to make sure

14   that first and foremost that the financial outcomes for our

15   investors were what we set out to provide them, right, and

16   that was front office.

17        To the extent that the front office function was using

18   HCMLP to support them it was somewhat ancillary because, you

19   know, as long as they had what they needed to perform their

20   job and the performance results were as intended, how they

21   got there and how they used the management fee that the

22   funds paid them was really up to them.

23   Q    Did you have an understanding during what was described

24   as the relevant period as to whether the advisors had their

25   own employees?

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 1-1   Filed 01/28/22   Page 563 of 888   PageID 3867
HCM V. HCMFA, et al.                                                    23

```
 1   A    Yes.
 2   Q    Okay.  What was your understanding as to the advisors'
 3   own employees?
 4   A    That the advisors' employees that were, you know, very
 5   experienced, capable financial professionals, capable of
 6   stepping in as needed in the event that there was any, you
 7   know, misstep from a shared services perspective.
 8   Q    And what was your understanding as to what services the
 9   advisors own employees were providing during the relevant
10   period to the funds?
11   A    In any --
12   Q    You mentioned front office, middle office and back
13   office.
14   A    Right.
15   Q    Can you kind of put them into one or more of those
16   buckets?
17   A    Oh, they were front office primarily, yeah.
18   Q    And during this relevant period, were you concerned or
19   to your knowledge was the board concerned about Highland
20   employees leaving en masse?
21   A    Yes.
22   Q    Was that discussed internally?
23   A    Yes.
24   Q    Was that discussed with Mr. Seery?
25   A    Yes, I imagine it was.
```

Case 21-03010-sgj    Doc 114    Filed 04/15/22    Entered 04/15/22 11:35:55    Desc Main
Case 3:22-cv-02170-S    Document Filed 12/26/22    Page 564 of 888    PageID 3868
                    HCM V. HCMFA, et al.                                      24

1  Q    What was the concern, why were -- why was the board

2  concerned?

3  A    Again, (indiscernible - 10:04:36) services you're

4  talking about a pretty public bankruptcy, it's a competitive

5  job market, you know, Highland has a pretty complex and

6  nuanced investment philosophy and strategy.  So finding and

7  retaining quality candidates in any one of those three

8  buckets you outlined, you know, in that environment might be

9  difficult.

10 Q    And you also mentioned that these meetings were present

11 the conclusions reached and you mentioned that the meeting

12 sometimes took a long time.

13 A    Correct.

14 Q    Can you help us understand some more the relationship

15 between the meetings and what was actually discussed during

16 these sometimes lengthy meetings?

17 A    As it relates to the meeting minutes or?

18 Q    Yes, sir.

19 A    Right.  So like I said the idea isn't that the meeting

20 minutes aren't a transcript because that would be cumbersome

21 and not productive.  You know, at least on a quarterly basis

22 we would have two-day meetings.  We, during the period, had

23 I don't even know how many meetings, but many, many

24 meetings.

25      And the idea of the meeting minutes was really to

003083

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/15/22   Page 565 of 888   PageID 3869
HCM V. HCMFA, et al.                                                    25

1   memorialize the conclusions reached, material questions

2   asked and answered.  And any supporting documentation that

3   may be relevant to reach those conclusions.

4   Q    Could it be that things were discussed at those

5   meetings that did not end up in the minutes?

6   A    Yes, absolutely.

7   Q    Do you recall whether there was ever discussed with the

8   advisors that various employees at Highland pursuant to

9   certain payroll reimbursement agreements were no longer

10  there, were no longer providing services?

11  A    At some point we did hear about that, yes.

12  Q    And I asked you whether you'd heard of the payroll

13  reimbursement agreements.

14  A    Uh-huh.

15  Q    What is your understanding of the payroll reimbursement

16  agreements between the advisors and Highland?

17  A    That part of the compensation under the shared services

18  agreement was to share in some of the costs of the actual

19  labor resources at HCMLP.

20  Q    Did you understand the payroll reimbursement agreements

21  were separate from the shared service agreements or did you

22  just kind of think that they were one in the same?

23  A    Yeah, they were one in the same as far as we were

24  concerned.

25  Q    What -- the concern to you was that you were getting

1  the services that you needed and how they were contractually

2  done didn't necessarily matter.

3  A    That's right.  We did not dive into that and we did not

4  dive into the bankruptcy.

5  Q    Do you recall ever at these meetings specifically

6  discussing the payroll reimbursement agreements themselves?

7  A    Not in detail.

8  Q    What is your best recollection about the discussion

9  that you said you do remember at some point in time about

10 Highland employees leaving and no longer being available to

11 the advisors?  What do you remember?

12 A    That there was some attrition and we really always come

13 back to how is the attrition impacting our investors.  And,

14 you know, some of the quotes in the meeting minutes include

15 the assessment that, you know, as it relates to our

16 investors, either HCMLP debtor employees were picking up or

17 the advisors' employees were stepping in and performing

18 services.

19 Q    Did you have an understanding that the advisors

20 actually hired a number of their own employees to provide

21 front office service?

22 A    Yes.

23 Q    Okay.  Also briefly do you have an understanding --

24 well, strike that.  I won't burden you with that.

25      Let's go through some of these same exhibits, please,

003085

Case 21-03010-sgj    Doc 114    Filed 04/15/22    Entered 04/15/22 11:35:55    Desc Main
Case 3:22-cv-02170-S    Document 4-14    Filed 12/22/22    Page 567 of 888    PageID 3871
Document    Page 127 of 84
HCM V. HCMFA, et al.                                    27

```
 1   that counsel took you through.  Please start with Exhibit
 2   No. 57.
 3   A    57.
 4   Q    Yeah.
 5   A    Okay.
 6   Q    Okay.  So let's look at page 3 please, the bottom
 7   paragraph.  Are you there, sir?
 8   A    I am.
 9   Q    Okay.  Mr. Norris discussed the shared services
10   arrangements that each advisor is a party to with HCMLP.
11   Did I read that correctly?
12   A    You did.
13   Q    Okay.  Is there any mention of payroll reimbursement
14   agreements there?
15   A    There is not.
16   Q    Okay.  And he concludes or he discusses further on that
17   the advisors may use employees from HCMLP for the provision
18   of various services such as human resources, accounting,
19   valuation, information technology services, compliance and
20   legal.  Did I read that correctly?
21   A    You did.
22   Q    Please put those services into one or more of your
23   three buckets that you mentioned earlier.
24   A    Okay.  All right.
25        I'll go with human resources as back office, as with
```

Case 21-03010-sgj    Doc 114    Filed 04/15/22    Entered 04/15/22 11:35:55    Desc Main
Case 3:22-cv-02170-S   Document Filed Page 1226 of 84   Page 568 of 888   PageID 3872
HCM V. HCMFA, et al.                                    28

1  accounting, information technology services and compliance

2  and legal.  Valuation would be more of a mid-office

3  function.

4  Q    None of those front office functions, are they?

5  A    None of those are front office.

6  Q    Okay.  And let's go to Exhibit 58, please.

7  A    Okay.

8  Q    And, sir, if you'll back to page 20, the same one that

9  Ms. Winograd asked you about.

10  A    Okay.

11  Q    And it starts by Mr. Post also discussed the quality

12  and continuity of services provided to the funds by HCMLP,

13  pursuant to shared services agreements with the advisors.

14  Did I read that correctly?

15  A    You did.

16  Q    Anything in there about payroll reimbursement

17  agreements?

18  A    There is not.

19  Q    And Exhibit 59, we're going to burn through these.  I'm

20  going to have the same question for every one.

21  A    Okay.

22  Q    Exhibit 59, page 6 please.  Okay.  Page 11 please.  The

23  larger bottom paragraph it starts with Mr. Seery then

24  pointed out to the board a potential conflict of interest.

25  Do you recall what Mr. Seery was discussing?  Please read

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 09/19/22   Page 569 of 888   PageID 3873
HCM V. HCMFA, et al.                                        29

 1  that to refresh your memory.

 2  A    Sure, yeah.

 3  Q    Do you have a memory of what was being discussed?

 4  A    I do.

 5  Q    What is it?

 6  A    We held a position in our funds that were also held as

 7  debtor collateral in the bankruptcy and we had collectively

 8  a large position and debtor was going to liquidate their

 9  position and was interested in us joining the liquidation

10  and we were not.

11  Q    So that's the complex that was created?

12  A    Correct, yeah.

13  Q    Do you know who Jason Post is?

14  A    I do.

15  Q    What was Jason Post's role during the relevant period

16  vis-a-vis the funds?

17  A    He was the chief compliance officer.

18  Q    Okay.  Do you understand whether at some point in time

19  Mr. Post left HCMLP to join the advisors?

20  A    I do.

21  Q    Okay.  Do you have an understanding as to why that

22  happened?  Well, let me ask it this way.  Did it have

23  anything to do with this conflict of interest?

24  A    Not directly, but yeah, it was definitely a considering

25  factor.

Case 21-03010-sgj    Doc 114    Filed 04/15/22    Entered 04/15/22 11:35:55    Desc Main
Case 3:22-cv-02170-S    Document 1    Filed 06/13/22    Page 570 of 888    PageID 3874
                                    Document    Page 130 of 84
HCM V. HCMFA, et al.                                                            30

1   Q    This conflict of interest was identified, was it a

2   concern that there might be future ones?

3   A    Yep, yes.

4   Q    So was Mr. Post's reason, to your understanding, for

5   changing from HCMLP to the advisors to, in effect, remove

6   these potential conflicts?

7   A    That's right.

8   Q    Do you have an understanding as to whether Mr. Seery

9   approved Mr. Post leaving HCMLP to work for the advisors

10  directly?

11  A    I believe he did, yes.

12  Q    If we continue with these exhibits, Mr. Powell, Exhibit

13  60 please.  And it's going to page 7 and it's the big full

14  paragraph, it's too long for me to read, but you see that it

15  talks about Mr. Seery discussing the shared services

16  agreements and services under the shared services

17  agreements.  Do you see that, sir?

18  A    Yes, I do.

19  Q    Any mention in here of payroll reimbursement

20  agreements?

21  A    Oh, boy, give me a second.

22       No.

23  Q    Okay.  And if we go to -- your answer was no, correct?

24  A    No, that's correct.

25  Q    And if you flip to the next exhibit, please which is

003089

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Document 13-26 of 84 Page 571 of 888   PageID 3875
HCM V. HCMFA, et al.                                                      31

1  60, or I'm sorry, we're still on 60, aren't we?

2  A    Yeah, we're on 60.

3  Q    Go to page 12, review of the 15-C materials.

4  A    All right.

5  Q    And it talks about in there that Mr. Surgent, who did

6  you understand Mr. Surgent to be?

7  A    Thomas Surgent, complex CCO.

8  Q    Okay.  CCO.  And it talks about he provided the board

9  with a status update on the HCMLP bankruptcy and discussed

10 the impact of the HCMLP bankruptcy and the shared services

11 arrangements with the funds noting he does not expect that

12 the level and quality of services would change in the

13 immediate term.  Did I read that correctly?

14 A    You did.

15 Q    Any discussion there about the payroll reimbursement

16 agreements?

17 A    There's not.

18 Q    Okay.  Exhibit 61, please, sir.

19 A    All right.

20 Q    And if you'll flip to page 3.

21 A    Okay.

22 Q    And take as much time as you need to read, but it talks

23 about Mr. Sauder.  Who did you understand Mr. Sauder to be?

24 A    D.C. Sauder, one of the counsel for the advisor.

25 Q    Mr. Sauder also discussed the status of the shared

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 12/12/22   Page 572 of 888   PageID 3876
Document   Page 322 of 847
HCM V. HCMFA, et al.                                                    32

 1   services agreements, et cetera, et cetera.  Any mention in

 2   there about payroll reimbursement agreements?

 3   A    There is not.

 4   Q    And I'll spare the Court, we're going through the next

 5   10 of these and I'll address them during closing, but do you

 6   remember the advisors ever telling you that everything was

 7   fine under the payroll reimbursement agreements, as opposed

 8   to the shared services agreements?

 9   A    Yeah, we would have just said is everything fine

10   relative to the shared services.

11   Q    The shared services.

12   A    Yeah.

13   Q    Okay.  And let's look at Exhibit 22 real briefly before

14   we conclude.  You looked at that earlier.

15   A    Yeah.  Okay.

16   Q    So are you there, sir?

17   A    I am.

18   Q    "A-1, please provide to the extent practical the

19   contingency plans with respect to the services provided

20   under the shared services agreements."  Did I read that

21   correctly?

22   A    You did.

23   Q    And then there's an answer.  Anything in here about

24   payroll reimbursement agreements?

25   A    No.

003091

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/13/22   Page 573 of 888   PageID 3877
Document Page 322 of 87
HCM V. HCMFA, et al.                                                33

1  Q    And then in number 2 at the end of the response, the

2  advisors respond to you, all amounts owed by each of

3  NexPoint and HCMFA pursuant to the shared services agreement

4  with HCMLP have been paid as of the date of this letter.

5  Did I read that --

6            MR. MORRIS:  One second, please, Your Honor, what

7  exhibit is that?

8            MR. RUKAVINA:  Exhibit 22, the supplemental 15-C.

9            MR. MORRIS:  Okay.  Can we please read that more

10 accurately?

11           MR. RUKAVINA:  I'm sorry, I need new reading

12 glasses.

13           MR. MORRIS:  Okay.

14           MR. RUKAVINA:  I'm trying.  It says, all --

15           MR. MORRIS:  It doesn't say shared services --

16           MR. RUKAVINA:  Arrangement, arrangement.

17           MR. MORRIS:  It says shared services --

18           MR. RUKAVINA:  Yeah, and I apologize.

19           MR. MORRIS:  -- arrangement.

20           MR. RUKAVINA:  That's true and I apologize.

21 Again, you'll see that I can't --

22           MR. MORRIS:  No problem.

23           MR. RUKAVINA:  I'm of that age where I need

24 reading glasses and I'm too embarrassed to admit it.

25 BY MR. RUKAVINA:

003092

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 16-1   Filed 12/12/22   Page 574 of 888   PageID 3878
HCM V. HCMFA, et al.                                                        34

1   Q    All amounts owed by each of NexPoint and HCMFA pursuant

2   to the shared services arrangement with HCMLP had been paid

3   as of the date of this letter.  I apologize for my mistake.

4   Did I read that correctly now?

5   A    You did, yes.

6   Q    Any mention about payroll reimbursement agreements?

7   A    There is not.

8           MR. RUKAVINA:  Okay.  Thank you, Mr. Powell, for

9   your time.  Pass the witness, Your Honor.

10          THE COURT:  All right.  Redirect?

11                     REDIRECT EXAMINATION

12  BY MS. WINOGRAD:

13  Q    Mr. Powell, you were aware of the payroll reimbursement

14  agreements; is that right?

15  A    Conceptually, yes.

16  Q    Did you view them -- did you view the shared services

17  and the front office services as one in the same?

18  A    Shared services and front office?

19  Q    Uh-huh.

20  A    No, we do not.

21          MS. WINOGRAD:  Thank you.

22          THE WITNESS:  Okay.

23          THE COURT:  Any recross?

24          MR. RUKAVINA:  No, Your Honor, thank you.

25          THE COURT:  All right.  Thank you, Mr. Powell,

003093

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 41-1 Page 326 of 84   Page 575 of 888   PageID 3879
HCM V. HCMFA, et al.                                                    35

 1   you're excused now.

 2             THE WITNESS:  Okay.  Thank you.

 3             THE COURT:  All right.  Your next witness?

 4        (Witness excused)

 5             MR. MORRIS:  Good morning, Your Honor, John Morris

 6   from Pachulski Stang Ziehl & Jones for Highland Capital

 7   Management.

 8             Highland next calls Mr. James P. Seery, Jr.

 9             THE COURT:  Mr. Seery.

10             MR. SEERY:  Good morning, Your Honor.  Off the

11   record, I've been wearing a mask because I have a cold and

12   I've been testing, so I'm -- every day, so.

13             THE COURT:  Well, you may have noticed I've

14   been sniffling a lot up here and I'm pretty sure it's

15   allergies.

16             MR. SEERY:  My apologies.  If the Court would like

17   me to wear the mask under testimony, I can do that,

18   otherwise, I will be a bit raspy.

19             THE COURT:  Well, you know, it's up to you.  I'd

20   say whatever makes each individual feel comfortable, so

21   please raise your right hand.

22              JAMES P. SEERY, WITNESS, SWORN

23             THE COURT:  All right.  Please be seated.

24             THE WITNESS:  Thank you.

25             THE COURT:  Okay.

003094

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 4 Filed 12/06/22   Page 576 of 888   PageID 3880
                              Document     Page 36 of 84
                        HCM V. HCMFA, et al.                              36

```
 1                          DIRECT EXAMINATION
 2    BY MR. MORRIS:
 3    Q    Good morning, Mr. Seery.
 4    A    Good morning.
 5    Q    You were appointed in January of 2020; is that right?
 6    A    As an independent board member, yes.
 7    Q    Okay.  And at the time -- and you were appointed with
 8    two other gentlemen, correct?
 9    A    Yes, Mr. John Dubell (ph) and Mr. Ruff Snelms (ph).
10    Q    After the independent board was appointed on January
11    1st, 2020 did the independent board meet with Frank
12    Waterhouse to go after financial information concerning
13    Highland?
14    A    Yes.  We met with the whole team.  Often individually
15    including Frank individually for the senior people and then
16    each group.  So with finance and accounting it was Frank and
17    Dave Klos.
18    Q    Okay.  And do you recall the topics of discussion
19    during the early period after the independent board was
20    appointed that you had with Frank and with Mr. Klos?
21    A    Yes.
22    Q    Can you describe for the Court what you recall
23    generally about the substance of those discussions?
24    A    These were multiple topics, multiple meetings starting
25    on the afternoon of the 9th and going forward I was in
```

003095

Case 21-03010-sgj    Doc 114    Filed 04/15/22    Entered 04/15/22 11:35:55    Desc Main
Case 3:22-cv-02170-S    Document Filed 12/26/87 Page 577 of 888    PageID 3881
Document    Page 37 of 84
HCM V. HCMFA, et al.                                          37

 1   Dallas most days usually at least Monday to Wednesday or

 2   Thursday, sometimes Tuesday to Friday but most of the days

 3   up until COVID hit.  And we had in-depth conversations

 4   regarding each of the funds that Highland managed, each of

 5   the sources of revenue, each of the obligations that

 6   Highland had, the employees, everything that rolled up to

 7   Waterhouse and Klos, which included HR, which rolled up to

 8   Waterhouse.  And then we show up -- the investing in a

 9   distressed company we show up in a bankruptcy it's like real

10   estate, there's three important things, liquidity, liquidity

11   and liquidity.

12   Q    Did the issue of the relationship between Highland and

13   affiliates who were owned and/or controlled by Mr. Dondero

14   come up?

15   A    Yes.  Right out of the gate.  So Highland, the way it

16   was set up --

17          MR. RUKAVINA:  Your Honor, excuse me.  Your Honor,

18   he's not allowed to testify narratively, he answered the

19   question, what do you recall about that topic.

20          THE WITNESS:  So right out of the gate one of the

21   important considerations were what were the contractual

22   relationships that Highland had, what were the revenues you

23   could receive from those contractual relationships, what

24   were the obligations you had to do to manage those

25   obligations, and what were the risks with respect to those

003096

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 12/26 Page 1326 of 8 Page 578 of 888   PageID 3882
HCM V. HCMFA, et al.                                                    38

 1   obligations.  Did they -- were they ultimately -- were they

 2   worthwhile keeping, were they things you should think about

 3   getting rid of, how to staff them, were there ways to manage

 4   that exposure.

 5          And the interrelationship of the Highland entities

 6   was front and center in the case.  So even from before the

 7   case got transferred here, one of the big issues for the UCC

 8   which was mentioned at a lunch we had with some of the UCC

 9   members which I don't -- it may have been the day of the

10   appointment was issues with respect to is Dondero -- is

11   Dondero or are Dondero entities siphoning value from

12   Highland to the detriment to the creditors and to the

13   Highland estate.

14   BY MR. MORRIS:

15   Q    And did that topic continue to be discussed between you

16   and the independent board and the committee into March?

17   A    These are front and center major issue and the reason,

18   the reason it was is sort of obvious.  But it was not just

19   ultimate value, but it would have to do with liquidity.  So

20   when we considered the various contractual arrangements what

21   were the ways that we got revenue and was that revenue

22   important enough to keep.

23          So we thought about it as the big four in terms of

24   revenue.  You had the 1.0 CLOs and they would pay management

25   fees based upon the fee stream that they had, which was at

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 45-2   Filed 12/12/22   Page 579 of 888   PageID 3883
HCM V. HCMFA, et al.                                                    39

1  that point simply just the management portion of the CLO

2  fee.  And then you had the HCMFA which was paying a

3  combination of fees, flat fees under the -- about a flat

4  fee, a flat fee under the payroll reimbursement and a

5  relatively flat fee although it had a slight fluctuation, I

6  can go into detail on that, on the shared services.  And

7  their flat fee from NPA on shared services and a flat fee

8  from NPA on the PRAs.

9      The structure of that, that was the vast majority of

10 the revenue on a regular basis that you'd get.  Everything

11 else was kind of a rounding error.

12 Q   Do you recall having a meeting in which Josh Carey (ph)

13 participated where the topic of the shared services and sub-

14 advisory or payroll reimbursement agreements was discussed?

15 A   Well, Mr. Terry had a -- yes, and Mr. Terry --

16 Q   Do you recall the meeting?

17 A   Yeah.

18 Q   I just want to satisfy counsel, let me just ask the

19 questions.  Do you recall the meeting?

20 A   I recall the meeting, yes.

21 Q   Okay.  Can you explain to the judge what you recall

22 about the meeting?

23 A   It was actually multiple meetings.  So it started at

24 this lunch which was we stayed at the Jewel the first night

25 of the first hearing and I think our lunch was there or

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/20/23   Page 580 of 888   PageID 3884
Document   Page 140 of 87
HCM V. HCMFA, et al.                                        40

 1  right in and around there.  And Mr. Terry and his counsel

 2  peppered us with information regarding their perspective on

 3  certain things went on at Highland.

 4       And Mr. Terry had a unique perspective because he was

 5  part of the ASIS arrangement.  So ASIS which managed the CLO

 6  business, which had been Highland's business and then got

 7  put off to ASIS, ASIS had a shared service arrangement.

 8  ASIS had a -- didn't have a -- I don't think it had a PRA,

 9  but it didn't really make a difference.  If it did, it might

10  have been a nominal fee.  And ASIS also had a sub-advisory

11  fee.

12       So ASIS was paying sub-advisory to Highland at a very

13  low rate.  And ASIS was paying shared services amounts at a

14  very low rate and getting lots of value.  How did Mr. Terry

15  know this?  Because he was one of the partners in ASIS that

16  benefitted from this value transfer.

17       ASIS was getting value from Highland.  When the ASIS

18  bankruptcy happened and it started stripping out assets,

19  they upped the fees on the management fee from I think five

20  bips to 25.  ASIS was probably making around 40.  So he knew

21  exactly that these arrangements and from his perspective

22  took value away from Highland for the benefit of these other

23  entities.  That was ASIS and he was focused on HCMFA and NPA

24  because NPA's completely owned by Dondero through Dougaboy

25  (ph) and HCMFA had been completely owned by Dondero but then

003099

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/15/22 Page 426 of 84 Page 581 of 888   PageID 3885
                                   HCM V. HCMFA, et al.                                41

1   it was owned by Dondero and Okada through entities.

2   Q    And after having these conversations and leading up to

3   these conversations, did you communicate with Mr. Waterhouse

4   about the economics of the intercompany agreements that you

5   just described?

6   A    Well, right out of the gate that was important, not

7   only for as I said earlier for Mr. Terry's inquiry, and it

8   became a larger committee inquiry, but because of the

9   liquidity issues.

10       So I needed to know what was coming in from each of

11  these contracts, what were the risks.  The 1.0 CLOs while

12  they had a lot of assets under management, they were lumpy

13  because some of them didn't have cash.  They -- we've talked

14  about it before, they weren't really CLOs.  They're

15  basically closed in funds because they don't go buy any

16  assets, they don't have anything that's really income

17  producing.

18       They own reorganized equity, defaulted debt, so when

19  those paid off, then one would come in and get paid fees,

20  otherwise the fees accrued.  So that was lumpy.  Then you

21  had direct fees from HCMFA, in the form of the two

22  agreements, indirect fees from NPA.

23       And I had a very specific conversation with Mr.

24  Waterhouse and Mr. Klos and I recall it vividly, I'm

25  burdened by that, and I can picture Mr. Waterhouse on the

003100

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/22 of 84   Page 582 of 888   PageID 3886
                           HCM V. HCMFA, et al.                              42

 1  table telling me, well -- because I looked at the exhibits

 2  and I said how do I know this money's coming in.  And they

 3  told me it was a flat fee coming in so we could count on

 4  that.

 5       And I asked about the specific schedule at the back of

 6  these agreements and I said, who came up with this, where

 7  Sirhan (ph) is 29 percent for one and 9 percent for another,

 8  how do I know that that's an accurate number.  And they said

 9  well -- and it's going to keep coming in every month.  They

10  said, well, that's a fixed number one day, it's just a plug,

11  it was topped down, don't worry about it, that comes in

12  every month.

13       And I said, well, HCMFA does that come in every month.

14  And the answer was, well, it has a variable on the shared

15  service by it's very small, it's 290 to 300,000 a month.

16  Q    I just want to --

17  A    So that was the focus on the first time we talked about

18  the shared service arrangements was liquidity.  We didn't

19  talk about at that point whether Mr. Terry's concern that

20  value was getting sucked out.  It was first how much money I

21  have to keep the lights on here.

22  Q    Okay.  And you were actually looking at the exhibits to

23  the payroll reimbursement agreements --

24  A    Yeah.

25  Q    -- do I have that right?

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/12/22 of 84 Page 583 of 888   PageID 3887
Document Page 423 of 87
HCM V. HCMFA, et al.                                                    43

1    A    Uh-huh.

2    Q    All right.  I'm not going to take the time to go

3    through that.  Did --

4    A    Yeah, you'll see each of them, he's the first guy.  And

5    I remember, I just remember specifically asking 9 percent,

6    how did you guys come up with that, maybe I'm too simple,

7    but I think in 5s and 10s if I'm rounding and they laughed

8    and said it's a plug number, you needed to adjust it to get

9    the output.

10   Q    Okay.  Did either Mr. Klos or Mr. Waterhouse tell you

11   ever that the advisors were overpaying under the payroll

12   reimbursement agreements?

13   A    Absolutely not.

14   Q    Okay.  You sat here yesterday.  You saw the analyses

15   that Mr. Klos prepared in late 2019 before the independent

16   board was appointed.  Did either Mr. Klos or Mr. Waterhouse

17   show you either one of the analyses that Mr. Klos prepared

18   in 2019?

19   A    I never saw those until we started preparing for this

20   trial.  And this was a front and center issue.  So the

21   committee was pushing very early for Highland to terminate a

22   lot of employees.  Because as I said, Mr. Terry knew the

23   arrangements and knew how it worked.  And it worked as I

24   described.  And the committee, other members, picked that

25   up.

003102

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 1-1 Filed 04/20/22   Page 584 of 888   PageID 3888
HCM V. HCMFA, et al.                                              44

1       And so the first meeting, we had a face-to-face meeting

2  on March 9th in New York City at the Pachulski offices.

3  What I remember it was the last chopper out of Saigon as

4  they say, it was the last meeting before COVID really shut

5  down New York and literally that night it was over.  And it

6  was a very tense meeting for a whole bunch of reasons.

7  Including UBS issues which were separate, but Mr. Terry was

8  very focused and I don't recall if he was there, but it was

9  a packed conference room, so in hindsight felt very

10  unhealthy.

11      A lot of focus on the value being sucked out by Dondero

12  entities.  And I was ill prepared.  I don't show up very

13  often unprepared and I was not at my best and he was giving

14  it to me pretty good.

15      And so that became a major focus for us to start

16  figuring out how -- what are we burning cash on and why are

17  we burning so much cash and why don't these arrangements,

18  the big four, CLOs which were fixed, HCMFA, NPA, why don't -

19  - I forget the fourth, why don't we have enough money

20  because we knew by then we were burning cash.

21  Q    Did you communicate with Scott Ellington (ph) and Isaac

22  Leviton (ph) during the six months after the appointment

23  about various matters?

24  A    Absolutely.

25  Q    Did either Scott Ellington or Isaac Leviton tell you at

003103

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/15/22 Page 585 of 888   PageID 3889
Document   Page 45 of 84
HCM V. HCMFA, et al.                                    45

1  any time in the history of the world that they had

2  information from Frank Waterhouse showing that the advisors

3  were overpaying under the payroll reimbursement agreement?

4           MR. RUKAVINA:  Your Honor, that's going to be

5  hearsay, objection.  Those are not our officers, not a party

6  admission.

7           THE COURT:  Okay.  Let me think through that.

8           Okay.  Not a party opponent because they're

9  technically Highland employees, so.

10          MR. MORRIS:  I want to know what the newly

11  appointed independent board knew, right, isn't it important

12  to know based on their entire case -- all right.  I'll ask

13  this question.

14          THE COURT:  Okay.

15  BY MR. MORRIS:

16  Q    Did anybody in the world, anybody in the whole wide

17  world ever tell you or any member of the independent board

18  that Highland was overcharging the advisors under the

19  payroll reimbursement agreements?

20  A    It didn't happen and it couldn't happen and the reason

21  it couldn't happen was because these arrangements were

22  massive money losers.

23          So the issue that Mr. Terry raised on the first day and

24  beat me up on March 9th on didn't stop on March 9th, it

25  continued.  Again, the committee's focus was how do we stop

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/28/22   Page 586 of 888   PageID 3890
Document   Page 46 of 87
HCM V. HCMFA, et al.                                                    46

1  the burn.  We did 13-week cash flow meetings every single

2  week.  I am not comfortable with a 13-week cash flow where

3  the numbers have parenthesis around them.  That means

4  they're negative.  And so I don't like looking out five

5  weeks and see we're running out of cash.

6        So we were continually working to figure out why --

7  where we were burning cash, where we could offset, at the

8  same time not going through a wholesale firing of employees

9  because my view at the time and the board concurred with me

10  and held the same view, was that we should try to hold the

11  organization together and get a larger reorganization, which

12  would have required Mr. Dondero's participation and it

13  wouldn't have made sense for Mr. Dondero to participate if

14  the entity had lost all its employment and utility to him

15  and his companies.

16  Q    If the contracts were losing so much money, why didn't

17  you just immediately move to reject?  You were getting this

18  pressure from Mr. Terry, why didn't you just reject the

19  contracts?

20  A    Well, precisely because we wanted to hold the business

21  together.  So what we did was, we did -- by the time we got

22  to June-ish, May/June, we had really analyzed these

23  arrangements.  And we found that the arrangement with DAF,

24  which was one of the big four was profitable, it had a

25  shared service but I don't think there was a fee under it,

003105

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/26/22   Page 587 of 888   PageID 3891
Document Page 472 of 847
HCM V. HCMFA, et al.                                                      47

 1  but it was a typical 2 and 20 arrangement.

 2       So you've got 2 percent of the assets under management

 3  and then you've got 20 percent of the upside and I think it

 4  was annual, I don't think it had an earlier advancement of

 5  the profit up.  So that was a good arrangement.  You got a

 6  good sense of where that was coming in.  That was a

 7  profitable arrangement.

 8       The other contracts by the time we had the next meeting

 9  with the committee were in the 8 to $10 million loser range.

10  That's what we were burning at Highland ex-restructuring

11  costs.  So not including counsel and committee counsel and

12  financial advisors.

13  Q    Okay.  Let's shift gears a little bit to the provision

14  of services.  From your perspective, did Highland perform

15  the services required under the payroll reimbursement

16  agreements and the shared services agreements?

17  A    Absolutely.  That was what the employees did and it was

18  middle, front and back.  And we didn't, to be fair, look and

19  say, oh, look at this one contract versus this one.  They

20  were arrangements.  They were the complete arrangement with

21  HCMFA.

22       And let's be clear about what we're talking about and

23  everybody else knows this, HCMFA and NPA aren't real

24  separate entities, they've now developed.

25            MR. RUKAVINA:  Your Honor, I object.  Now, this is

003106

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 1-1   Filed 4/25/22   Page 588 of 888   PageID 3892
HCM V. HCMFA, et al.                                                    48

1  narrative, this is all kinds of legal conclusions, expert

2  conclusions that has no relevance to this.

3          THE WITNESS:  This is factual.

4          MR. RUKAVINA:  To say that my clients are not

5  separate legal elements -- entities, the man is just

6  narratively telling you a story that has some tangential

7  relevance.  He should be asked questions and give clear

8  answers.

9          MR. MORRIS:  Okay.

10          THE COURT:  All right.  Well, there is some

11  narrative but we've got two days for this trial, you know.

12  I mean, I'm trying to balance the narrative versus we don't

13  want this going on four days.  So let's just try to keep it

14  in check.

15  BY MR. MORRIS:

16  Q    Mr. Seery, from the date that the independent board was

17  appointed on January 9th, 2020 until November 30th, 2020

18  when Highland gave notice of termination under the shared

19  services agreements, did you -- do you recall receiving any

20  complaints about Highland's performance of back, middle and

21  front office services to -- withdrawn.  I'm going to start

22  this differently.

23      Let's call that the relevant period from your

24  appointment until November 30th, 2020.  Okay.

25          I'll start with the advisors.  Do you recall receiving

003107

Case 21-03010-sgj    Doc 114    Filed 04/15/22    Entered 04/15/22 11:35:55    Desc Main
Case 3:22-cv-02170-S    Document Filed Page 4926 of 87 Page 589 of 888    PageID 3893
HCM V. HCMFA, et al.                                                    49

1   any complaints at any time during that period that the

2   advisors -- that Highland was failing to perform back,

3   middle, or front office services under the three agreements

4   -- under the agreements?

5   A    From the advisors?

6   Q    Yes.

7   A    Not at all, never, not once.

8   Q    Not once.

9   A    Not once.

10  Q    Okay.  Is there anybody in the world that you recall

11  complaining about the provision of services by Highland

12  during the relevant period?

13  A    Yes.

14  Q    Who made the complaint?

15  A    John Holt.

16  Q    Who's John Holt?

17  A    He's the CEO of NexBank.

18  Q    And do you recall the nature of the complaint, just

19  briefly?

20  A    Yes.  He thought he was being charged too much for his

21  various service arrangements and didn't think he was getting

22  quality service, particularly from the legal department, Mr.

23  Allenton (ph), Leviton, compliance, et cetera.

24  Q    And did you -- what happened as a result of the

25  complaint that you received?

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 05/06/22   Page 590 of 888   PageID 3894
HCM V. HCMFA, et al.                                    50

1  A    I investigated it.  I talked to Allenton and the rest

2  of the legal team.  They came back with specifics that Mr.

3  Holt was in their opinion mistaken, that they had been

4  providing significant services for NexBank and that he may

5  not have been aware of them as the CEO.

6       They complained that he as paid on an EBITDA basis so

7  that his incentive was to reduce costs wherever he could and

8  get services for free.  I found Mr. Holt to be a

9  sophisticated, straight businessman.  We had a discussion on

10 the phone.  We agreed to disagree and defer discussion on it

11 until we could figure out how to best separate the

12 relationship between Highland Capital Management and

13 NexBank.

14 Q   Do you recall receiving a letter from D.C. Sauder (ph)

15 in mid-October, 2020?

16 A    I believe I got a letter from Mr. Sauder.  I'm not sure

17 if I even knew who he was when I got it.  And it was right

18 after, I believe it was right after things had really gone,

19 I would say south with Mr. Dondero.

20 Q   Do you recall -- when you say it went south, did there

21 come a time when Mr. Dondero resigned from Highland?

22 A    Beginning of October.

23 Q   Okay.  And your recollection is that you received this

24 -- give me just one second.

25 A    In or around that time.

003109

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 1-1   Filed 12/26/22   Page 591 of 888   PageID 3895
Document   Page 526 of 847
HCM V. HCMFA, et al.                                    51

 1              MR. MORRIS:  I apologize, but give me just one

 2    second.

 3    Q    It's Exhibit 148 in your book, if you can get that.

 4              THE COURT:  I'm sorry, what number?

 5              MR. MORRIS:  148.

 6              THE COURT:  Okay.

 7    BY MR. MORRIS:

 8    Q    And if you could just take a look at that, Mr. Seery.

 9    A    I thought you said it was from Sauder.  This says from

10    Norris.  Did I miss --

11    Q    Oh, no.  I may just be mistaken, I apologize.  This is

12    a letter from Mr. Norris.

13    A    I don't think I knew who he was either.

14    Q    Okay.  So do you recall receiving this letter then?

15    A    I recall getting a letter in or around this time from

16    NexPoint.

17    Q    And can you take a quick look at that letter and see if

18    you can let the Court know if you recall whether Mr. Norris

19    put Highland on notice about any failure to provide back,

20    middle, front office services of any kind?

21    A    It looks to me to be a complaint about the OmniMax

22    issue.

23    Q    Is that -- do you understand that that's the issue that

24    Mr. Powell just testified about?

25    A    He -- I heard Mr. Powell's testimony and he mentioned

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 05/26/22   Page 592 of 888   PageID 3896
Document   Page 522 of 847
HCM V. HCMFA, et al.                                            52

1   the OmniMax issue.  He -- to be clear, I was invited to the

2   board meetings.  I didn't volunteer to go to the retail

3   board meetings and I said I would do that.  And I did raise

4   the issue around the OmniMax transaction.

5        And what happened was Highland had a big position.  The

6   retail funds had a small position.  We thought the

7   transaction was a good transaction because the company --

8   this other guy is going to file and the buyer of the company

9   was willing to take out the whole piece.

10       I had been in discussions with Mr. Dondero.  Mr.

11  Dondero had agreed to a price.  When I came back with the

12  price, he said I never agreed to that price.  I said fine,

13  we're going to trade these because this is a good price.

14  And the structure of the trade was such that with the buyer,

15  if need be, would be put into bankruptcy and the hold out

16  would be crammed down.  And we were happy to do that.

17       Mr. Dondero ultimately held out.  The funds held out.

18  They cut a deal with the buyer and then we had to pick part

19  of it because it was less expensive than filing the company

20  for bankruptcy.

21  Q    And --

22  A    So they got bought out at a little bit higher level.

23  Q    Is it fair to say that there was simply difference in

24  investment strategy between you and Mr. Dondero?

25  A    Yes, I think that's fair.

003111

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 05/26/22   Page 593 of 888   PageID 3897
HCM V. HCMFA, et al.                                                    53

```
 1   Q    And is that when we talk about conflict is that what
 2   you're talking about?
 3   A    That's correct.
 4   Q    Can you think of any other transaction -- oh.  Was it
 5   possible that conflicts would arise with respect to other
 6   jointly held assets?
 7   A    Definitely could be.
 8   Q    And that's really -- did you understand that's what Mr.
 9   Norris was referring to?
10   A    I do.
11   Q    In the second paragraph.
12   A    That's what it looks like he's referring to.  I'm not
13   remember spending that much time thinking about this letter
14   frankly.
15   Q    Okay.  Do you -- I'm -- do you recall receiving other
16   letters from the advisors and from their lawyers at K&L
17   Gates?
18   A    Definitely lawyer letters, yes.
19   Q    Do you recall whether any lawyer -- withdrawn.
20        Do you recall whether any letter because I don't want
21   to go through all of them, they speak for themselves, so I'm
22   asking for your recollection; do you recall receiving any
23   letter sent by the advisors or by their lawyers where they
24   made any complaint at all about the provision of front, back
25   or middle office services?
```

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 12/426f 887   Page 594 of 888   PageID 3898
HCM V. HCMFA, et al.                                              54

1   A    Never received, other than the Holt complaint related

2 to NexBank, never received a complaint about the amount of

3 the services or the quality of the services that were being

4 provided front, middle or back.  And it was all three.

5   Q    In the administrative claim there's an allegation that

6 you instructed Highland's employees to stop providing

7 services in July 2020.  Are you familiar with that

8 allegation?

9   A    I'm familiar with the allegation.

10   Q    Did you instruct anybody in July 2020 to stop providing

11 services to anybody?

12   A    No, never happened.

13   Q    Do you have any understanding or recollection as to

14 what you said at that time that they might be referring to?

15   A    Very distinct recollection, yes.

16   Q    Can you explain to Judge Jernigan what your

17 recollection is as to what you actually said?

18   A    There was a discovery dispute between the committee and

19 Highland at the time.  And the discovery dispute was

20 actually quite surprising to me because I'd instructed the

21 Pachulski team and the Highland team to produce information

22 because there was really no point in wasting a lot of time

23 fighting about discovery.

24      And frankly Mr. Levinson found a different way to deal

25 with discovery that was less than cooperative.  And the

003113

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 15/26 of 88 Page 595 of 888   PageID 3899
Document Page 52 of 84
HCM V. HCMFA, et al.                                              55

1   committee raised the issue about multiple parties wearing

2   multiple hats to the Court.  And it was a bit Alice in

3   Wonderland in terms of Mr. Leviton and others saying, well,

4   I'm the advisor to the -- I'm the counsel to the advisor and

5   I have a fiduciary duty to them, you're our lawyer, you have

6   to do what we direct you to do.  And it was very

7   manufactured.

8        And my recollection, and I took it very directly

9   because I was on video, but I took this as if the Court were

10  talking to me directly was that you better make sure you

11  have your house in order regarding people with conflicts

12  what they are doing, especially lawyers, who claim to be

13  wearing multiple fiduciary hats and forsaking their duties

14  to the debtor.

15       I left that hearing really informed and nervous isn't

16  the right word, but focused, that we needed to make sure

17  that everyone got the message.  So I had a specific call

18  with the entire legal department.  And the legal department

19  at Highland, it may be a misnomer, because there were a

20  number of non-lawyers in that department and they did

21  different things in the Cayman Islands or other places that

22  didn't have much to do with Highland.

23       And I had very direct discussion and I used the word

24  and it seems to show up now inimical but any -- taking any

25  adverse action to the Highland estate and if anybody felt

003114

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 26-2 Filed 09/26/23   Page 596 of 888   PageID 3900
Document   Page 36 of 84
HCM V. HCMFA, et al.                                    56

 1  that they had a reason that they couldn't do something for

 2  the Highland estate I better hear about it directly.

 3      And it was a very direct discussion.  I had then had

 4  the same call with Mr. Waterhouse, Mr. Klos, Ms. Hendricks,

 5  Mr. Darquentin (ph) may have been on it, he may have been

 6  too junior, but very direct.  And then a similar discussion

 7  with Brian Collins, head of HR, that we better -- I better

 8  not hear about this again because you do it, you be fired

 9  for cause and we will take action.  It was, I took it very,

10  very seriously.

11  Q    So there was no direction to stop performing services?

12  A    No, absolutely not.  You still had to do your job and

13  if something raised a conflict, I needed to know about it,

14  like ultimately the OmniMax transaction which was after this

15  time, but if you didn't think you could produce documents

16  because you had some other duty, I needed to know about

17  that.

18      If you thought that you represented any other entity,

19  Dougaboy, whomever and that interest was averse to the

20  estate, I needed to know about it.  And I was very clear.

21  And I think it had the desired effect.  We had a larger call

22  with the team that was not nearly as forceful, but people

23  needed to know that this is an estate and as employees of

24  the estate, you have duties to the estate.  And as officers

25  of the estate, you have fiduciary duties to the estate.

003115

Case 21-03010-sgj    Doc 114    Filed 04/15/22    Entered 04/15/22 11:35:55    Desc Main
Case 3:22-cv-02170-S    Document 17-2    Filed 11/07/22    Page 597 of 888    PageID 3901
Document    Page 57 of 87
HCM V. HCMFA, et al.                                                          57

```
 1  Q    And did you -- going back you mentioned OmniMax, you
 2  mentioned the possibility that there might be other
 3  conflicts that arose as a result of jointly held assets.
 4  Other than OmniMax did, in fact, any other conflict ever
 5  arise prior to the termination of the agreements?
 6  A    Not that I recall.  And just so we're clear, you used
 7  the term jointly held assets.  They're not actually jointly
 8  held.  Highland owns its own assets.  The 1.0 CLO owned
 9  their own assets.  HCMFA had their assets in their name.
10  NPA, et cetera, Dougaboy, et cetera, DUC, DAF (ph).
11  Q    So let me restate the question.  Were there any other
12  issues that arose where Highland and another entity
13  controlled by Mr. Dondero owned assets of the same kind
14  where investment decisions diverged?
15  A    Not that I recall.  Certainly not during this period,
16  not that I recall at all.
17  Q     Okay.  Did there come a time that Jason Post left the
18  employ of Highland and became the chief compliance officer
19  at the advisors?
20  A    Yes.
21  Q    And when did that happen?
22  A    It was right after Mr. Dondero resigned, right in that
23  time frame.
24  Q    So sometime in October?
25  A    I believe so.
```

Case 21-03010-sgj  Doc 114  Filed 04/15/22  Entered 04/15/22 11:35:55  Desc Main
Case 3:22-cv-02170-S  Document Filed 05/02/22  Page 598 of 888  PageID 3902
HCM V. HCMFA, et al.                                          58

1  Q    So he served in that capacity for six weeks before the

2  notice of termination was given?

3  A    Roughly, I believe.

4  Q    And do you have any understanding as to why that move

5  was made by Mr. Post?

6  A    The reason was they requested it.  I agreed that it was

7  a good idea because it was evolving and becoming more and

8  more likely that there was not going to be a grand bargain

9  or a settled solution to this case.  There wasn't a moment

10 in time where you knew that, but Mr. Dondero required to --

11 we had got through mediation, very successful vis-à-vis

12 settlement with ASIS, productive vis-à-vis UBS, wholly

13 unproductive for a global settlement.  We continued to try

14 to work on those things, but it became less and less likely.

15      And so by October the plan, I don't know when we filed

16 it, but it was clear it was going to get filed if we had not

17 yet filed it.  And where we thought that was the crucible to

18 bring a settlement, it was having the desired effect on the

19 creditors' side to have them think about compromising their

20 claims, it wasn't bringing Mr. Dondero and the creditors

21 close enough together.  Although there were efforts, but by

22 that time it looked like the --

23      MR. RUKAVINA:  Your Honor, again, this is just --

24      THE WITNESS:  -- the advisors could have the

25 issue.

003117

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 6   Filed 12/19/22   Page 599 of 888   PageID 3903
Document   Page 592 of 847
HCM V. HCMFA, et al.                                    59

 1              MR. RUKAVINA:  -- just narrative now about

 2    negotiations.  The question was why did Post leave.  He

 3    answered that question.

 4              THE COURT:  Sustained.

 5    BY MR. MORRIS:

 6    Q    All right.  Let's talk about the payroll reimbursement

 7    agreements.  Do you recall that the Court-approved

 8    Highland's disclosure statement in mid-to-late November

 9    2020?

10    A    Yes.

11    Q    And do you recall that Highland gave notice of the

12    shared service agreements that it had with the advisors on

13    November 30th, 2020?

14    A    Notice of termination?

15    Q    Yes.

16    A    Yes.

17    Q    Was there a relationship between the Court's approval

18    of the disclosure statement in mid-to-late November and the

19    sending of the notices of termination concerning the shared

20    services agreements on November 30th --

21    A    Yes.

22    Q    -- 2020?

23    A    Yes.

24    Q    Can you describe the Court -- for the Court what the

25    relationship was between those two events?

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 16-22   Filed 01/26/24   Page 600 of 888   PageID 3904
HCM V. HCMFA, et al.                                                60

```
 1  A    The relationship was purely timing so that once we knew
 2  we had a disclosure statement approved, then we could set a
 3  confirmation date, and we looked at where that confirmation
 4  date is and we needed to be able to terminate the agreements
 5  before we got to the confirmation date or right at and about
 6  to that time.  Then it would, assuming it got confirmed, it
 7  would go to the monetization plan.
 8  Q    Is it fair to say that the termination of the shared
 9  services agreements was consistent with the plan of
10  reorganization that Highland was hoping to get approved?
11  A    Yes.
12  Q    Okay.  Did this -- did the debtor ever seek to assume
13  the payroll reimbursement agreements?
14  A    No.
15  Q    Did the debtor ever consider assuming the payroll
16  reimbursement agreements?
17  A    No.
18  Q    Why not?
19  A    The arrangements with HCMFA and NPA, as I said, were
20  money losers.  There was -- I think I was even asked about
21  it at the confirmation hearing, why not assume these,
22  because they're money losers.  So there was never a plan to
23  do that.  And we weren't going to keep around staff to be
24  able to work on retail funds.  The idea was to focus on
25  assets that would produce value to the creditors of the
```

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 06/26/24   Page 601 of 888   PageID 3905
                        Document   Page 126 of 847
                        HCM V. HCMFA, et al.                                    61

 1  estate, not to provide money losing services to third-party

 2  funds.

 3  Q    Are you familiar with the termination provisions in the

 4  payroll reimbursement agreements?

 5  A    Generally.

 6  Q    Can we take a look at them just quickly?  Go to Exhibit

 7  6, please.

 8       Do you have that in front of you?  And we're on the

 9  page ending in Bates Number 622.  And I would direct your

10  attention down to Section 5.02.

11  A    Yes.

12  Q    If Highland had assumed the payroll reimbursement

13  agreements, is it your understanding that they have -- would

14  have had to assume the entirety of the agreement?

15  A    I know Counsel doesn't like me talking about the law,

16  but that is the law.

17  Q    Okay.  And --

18  A    (Indiscernible) as we say.

19  Q    And so it would have had to also assume Section 5.02,

20  right?

21  A    That's correct.

22  Q    And what does Section 5.02 provide?

23  A    It provides that either party can terminate on 60 days'

24  advance written notice.  It -- I think it's the same in most

25  of the shared service arrangements as well.

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed Page 622 of 87 Page 602 of 888   PageID 3906
HCM V. HCMFA, et al.                                              62

 1  Q    Well, but I'm just focused on the payroll reimbursement

 2  agreements.

 3  A    Yeah.

 4  Q    Okay.  They could terminate on 60 days' notice.  Is it

 5  your understanding based on this agreement that the advisors

 6  needed a reason to terminate?

 7  A    No, neither party needs a reason.

 8  Q    And that's -- and where do you get that idea from?

 9  A    There's no provision in 5.02 that would require a

10  reason.

11  Q    It says, with or without cause, right?

12  A    Yeah.

13  Q    Just to close this topic, can you go to Exhibit 8,

14  please, which is the one -- 6, I think, was the next payroll

15  reimbursement agreement.  8 is the HCMFA payroll

16  reimbursement agreement.  And does it also have the same

17  Section 5.02 that would have permitted the advisors or HCMFA

18  to terminate the payroll reimbursement agreement without

19  cause on 60 days' notice?

20  A    Yes.  These two agreements are identical say for the

21  party names and the actual amount paid each month.

22  Q    Do you recall -- I'm not going to dig it up.  I'm just

23  going to ask you if you recall that the plan specifically

24  provided that any contract not specifically assumed would be

25  deemed rejected?

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 06/26/24   Page 603 of 888   PageID 3907
Document   Page 622 of 87
HCM V. HCMFA, et al.                                          63

 1  A    Yes.  That's a pretty standard provision.  You only

 2  want to assume the agreements that you intend to assume.

 3  Excuse me.

 4  Q    Okay.  So how come -- are you aware of any -- did

 5  Highland give notice of termination of the payroll

 6  reimbursement agreements?

 7  A    I frankly don't recall.  Mr. Rukavina asked me that at

 8  my deposition.  I thought we did with the tiered service

 9  arrangements because they -- we viewed them as one in the

10  same.  But apparently, I've now learned that we didn't, and

11  they were just rejected as part of the plan.

12  Q    During -- were you involved in the discussions

13  concerning the transition of Highland's employees and assets

14  to the advisors that took place in early January/February

15  2020?

16  A    Yes.

17  Q    During those discussions did Highland make a demand to

18  keep the employees that were performing front office

19  investment advisory services?

20  A    If I understand your question, did we make a demand to

21  keep the employees?  No.  We were going to terminate them.

22  Q    Okay.  And which employees were you intending to

23  retain?

24  A    At that point I was working on my team, but I was not

25  going to have more than 10 to 15 employees.  I didn't need

Case 21-03010-sjg   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 04/26/22   Page 604 of 888   PageID 3908
Document   Page 162 of 87
HCM V. HCMFA, et al.                                              64

1  them.

2  Q    And the team that you were constructing, was it a team

3  that was expected to provide front office investment

4  advisory services to the advisor's post-confirmation?

5  A    No.

6  Q    Okay.  I just --

7  A    I may not be understanding your question.  I --

8  Q    No, you are.

9  A    -- apologize.

10 Q    I mean, it's -- but that's -- that was suggested

11 yesterday.

12     I heard you say, I think, in October, you know, as part

13 of the Jason Post move you thought that part of the factor

14 was that negotiations didn't -- weren't bearing fruit with

15 Mr. Dondero.  Is that just generally fair?

16 A    Yeah.  That's fair.  I think it was --

17 Q    Okay.

18 A    -- just the idea that there was more and more tension

19 and that even though there had not arisen another conflict,

20 but OmniMax at that time that there could be one and that it

21 would be better for the advisors to have their own chief

22 compliance officer as opposed to -- Jason worked for Thomas

23 Surgent who provided -- I think Mr. Ethan testified that it

24 was found that Thomas was the CCO for the complex.  He was

25 Jason's boss.  And it just seemed -- they brought it to me.

003123

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 06/26/2 Page 1052 of 87 Page 605 of 888   PageID 3909
HCM V. HCMFA, et al.                                              65

```
 1  I think -- I don't remember if Jason did or Thomas did.  It

 2  just seemed a better way that if another conflict arose,

 3  that Surgent or someone else wouldn't be put in the position

 4  that I had admonished people about in July.

 5  Q    Nevertheless, do you recall that really through

 6  December up until the confirmation hearing, without

 7  characterizing your views as to the likelihood of success,

 8  did negotiations with Mr. Dondero continue?

 9  A    Yes.

10  Q    Okay.

11  A    Not with me directly because he wasn't allowed to talk

12  to me, which was all fine by me at some point in there, but

13  through counsel.

14  Q    Through counsel.  Did Mr. Waterhouse play any role in

15  those negotiations?

16  A    None whatsoever.  These are the negotiations with Mr.

17  Dondero around a larger plan.

18  Q    Correct.

19  A    Yeah.  None whatsoever.

20  Q    None.  Did you ever ask him to prepare any kind of

21  analysis of profitability for the inter-company agreements

22  between the advisors and Highland for use in the

23  negotiations?

24  A    Never.

25  Q    You've sat here, you know, for more than a day and
```

Case 21-03010-sgj    Doc 114    Filed 04/15/22    Entered 04/15/22 11:35:55    Desc Main
Case 3:22-cv-02170-S    Document 16-22    Filed 06/26/24    Page 606 of 888    PageID 3910
HCM V. HCMFA, et al.                                                         66

1  you've heard about the allegations about overpayments.  Do

2  you recall when the first time you heard about the issue of

3  overpayments?

4  A    I think the first time I recall hearing about

5  overpayments was an allegation that Mr. Dondero put in a

6  January term sheet that was part of negotiations where he

7  basically said in addition to all the value I'm getting, I'm

8  going to pick up the $14 million advisor admin claim.  And I

9  wrote an acronym for something that basically indicates that

10 I was saying, what does this mean.

11       It was nothing I had ever heard of and it was -- that

12 was the first time was in January.

13 Q    And the first time you heard it was --

14 A    That I recall.

15 Q    -- in connection with a proposed plan of reorganization

16 that Mr. --

17 A    It was a pot plan.

18 Q    Pot plan.

19 A    Yeah.  And I think at the time it was -- I can't

20 remember the exact date, but the first couple of weeks of

21 January.  And I believe he and his counsel had filed a plan

22 under seal right around that time, and this was -- which I

23 never saw.  This was the term sheet for it.

24 Q    We can look at them, but I'll test your memory first.

25       So that's the first time.  So is it fair to say that

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 16-7   Filed 10/26/22   Page 607 of 888   PageID 3911
Document   Page 67 of 84
HCM V. HCMFA, et al.                                                67

1  you have no recollection of the issue of overpayments being
2  raised in any of the K&L Gates letters that were sent as
3  counsel to the advisors to Highland in December 2020?
4  A    Not that I recall.
5  Q    Do you recall if K&L Gates or any lawyer acting on
6  behalf of the advisors ever sent any kind of demand for the
7  return of money that they alleged was overpaid under the
8  payroll reimbursement agreements?
9  A    They never did.  And I'll just expand for a second
10 here.  It didn't make sense because we were also negotiating
11 the transition.  And as part of the transition I required --
12 I wasn't going to keep providing services for free.  By this
13 time it's pretty hot in January and we required NPA and
14 HCMFA to pay the shared service amount and the PRA amounts
15 in January and February, and they were doing it by a weekly
16 basis.  And our term sheet demanded that they pay the
17 November and December amounts that they had failed to pay.
18        And they came back and said, well, we're going to have
19 trouble with that with Mr. Dondero and they tried to agree
20 that they could pay it over time, and ultimately I acceded
21 to that.  So the transition services arrangement that was
22 going to move the employees to either NPA or an affiliate or
23 an employee-owned entity contemplated that we were going to
24 get paid back the money from November and December.  Nobody
25 ever said, we don't owe you that money.  You've been

003126

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 08/26/24   Page 608 of 888   PageID 3912
HCM V. HCMFA, et al.                                          68

1   overpaying us or we've been overpaying you or some such

2   thing.

3              MR. MORRIS:  I have no further questions, Your

4   Honor.

5              THE COURT:  All right.  Pass the witness.

6              Mr. Rukavina.

7              MR. RUKAVINA:  Your Honor, may Mr. Morris and I

8   confer for a moment?

9              THE COURT:  Sure.

10        (Pause)

11             MR. RUKAVINA:  Your Honor, we've been conferring

12  about schedules and we've been, I think, very cooperative

13  with each other.  We've told Mr. Dondero to be here at one,

14  so we have an hour right now and I hate to tell the Court

15  that we're -- we don't want to use that hour.  I would like

16  to recall Mr. Seery when my case begins.

17             We will get done today.

18             MR. MORRIS:  Oh, no.  Why aren't you going to

19  cross-examine him?

20             THE COURT:  No.  I have to stop -- my presentation

21  starts at noon.  They wanted me to patch in --

22             MR. RUKAVINA:  Then I'll cross-examine Mr. --

23             THE COURT:  -- 10 or 15 minutes early.

24             MR. RUKAVINA:  I'll cross-examine Mr. Seery now.

25             THE COURT:  Okay.

003127

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 06/22 Page 609 of 888   PageID 3913
                         Document   Page 692 of 87
HCM V. HCMFA, et al.                                                    69

 1              MR. RUKAVINA:  And then --

 2              MR. MORRIS:  I thought you said you had five

 3    minutes.

 4              MR. RUKAVINA:  Yeah, I do.

 5         And then -- yeah.  But I'm just telling the Court

 6    that we're going to give you back some time, but it's

 7    because we had agreed to have Mr. Dondero here at one.

 8              THE COURT:  Okay.  Yeah.  But I'll need to stop at

 9    11:45.

10              MR. MORRIS:  All right.  But I just -- I need to

11    just clarify, the whole idea is to call witnesses once.

12    We're not going to --

13              MR. RUKAVINA:  Yeah.  I'll call --

14              MR. MORRIS:  -- recall him in your case --

15              MR. RUKAVINA:  Yeah.  That's fine.

16              MR. MORRIS:  -- later, right?

17              MR. RUKAVINA:  That's fine.

18              MR. MORRIS:  Okay.

19              THE COURT:  Okay.

20                         CROSS-EXAMINATION

21    BY MR. RUKAVINA:

22    Q    Mr. Seery, good morning.

23    A    Good morning.

24              MR. RUKAVINA:  Mr. Berghman, if you'll please pull

25    up Exhibit 10 to Mr. Seery's deposition.

003128

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 21   Filed 12/02/22   Page 610 of 888   PageID 3914
Document   Page 702 of 847
HCM V. HCMFA, et al.                                    70

 1          Your Honor, this is being printed and will be

 2    couriered to the Court as a paper exhibit prior to 1:00.

 3          THE COURT:  Okay.

 4          MR. RUKAVINA:  So we'll just have it

 5    electronically for now.

 6          THE COURT:  Okay.

 7          MR. BERGHMAN:  You said Exhibit 10, right?

 8          MR. RUKAVINA:  Yeah.

 9    BY MR. RUKAVINA:

10    Q    Mr. Seery, you'll have to scroll down through this, but

11    do you -- this is a December 11th letter from K&L Gates.  Do

12    you recall having received this letter through your counsel?

13         And please take -- tell my partner just scroll down at

14    your pace.

15    A    Okay.

16    Q    Next page.

17         (Pause)

18    A    Okay.

19    Q    Next page, please.

20    A    I'm skimming, just to be clear.

21    Q    Well, you tell us when you want the next page, please.

22    A    I -- do you want me to read the whole letter?

23    Q    I want to ask you just about what's written in here

24    about PRAs and shared services.  But you have the right to

25    read every word of this if you need to.

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 1-11   Filed 12/26/22   Page 611 of 888   PageID 3915
HCM V. HCMFA, et al.                                                    71

1  A     Just can you go to the next page?

2        And then take me back to the top.

3        Ask away.

4  Q     Do you recall receiving this letter through counsel on

5  or about December 11th, 2020?

6  A     I don't specifically recall this letter.  There's

7  another K&L Gates letter, I believe.  I thought there were

8  multiple, but I may be --

9  Q     Would you please pull up --

10 A     -- I may be mistaken.

11 Q     -- Mr. Seery's deposition transcript.  See if I can

12 refresh your memory.

13        MR. RUKAVINA:  Page 42, Thomas.

14        It's not going to be in there, Mr. Seery.

15        MR. MORRIS:  What exhibit is this?  I apologize.

16        MR. RUKAVINA:  It's Exhibit 10 to his deposition.

17 This is an impeachment exhibit that is --

18        MR. MORRIS:  Oh, okay.

19        MR. RUKAVINA:  -- an exhibit to his deposition.

20        MR. MORRIS:  Okay.  Thank you.  Can I have a copy?

21        MR. RUKAVINA:  That's what I told the judge.  It's

22 being couriered.  Paper copies are being couriered.  They'll

23 be --

24        MR. MORRIS:  Thank you very much.

25        Go ahead.

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 07/22/22   Page 612 of 888   PageID 3916
Document   Page 72 of 87
HCM V. HCMFA, et al.                                          72

 1              MR. RUKAVINA:  -- here before lunch.

 2              MR. MORRIS:  Go ahead.  Yeah.

 3    BY MR. RUKAVINA:

 4    Q    Mr. Seery, you're in the wrong binder, please.  It's

 5    not --

 6    A    Oh, you can do what you like.  I got binders.  Am I not

 7    allowed --

 8    Q    But I'm telling you --

 9    A    -- to look at them?

10    Q    I'm telling you this is not in those binders, sir.

11    A    That's okay.  I'm just thumbing through the binders.

12    Q    Okay.  No problem.  No problem.

13         Mr. Seery, if you'll look, please, I asked you at your

14    deposition.  We marked Exhibit 10.  I asked, do you remember

15    seeing this letter on or about December 11th, 2020 and you

16    answer, yes.  Does that refresh your memory that you did, in

17    fact, see this letter on or about December 11th, 2020?

18    A    Truly I don't recall seeing this letter.

19    Q    Okay.

20    A    It -- because it deals a lot with the notes.  I just

21    don't recall it.  There's another K&L Gates letter that I'm

22    quite sure that I did get from counsel.  They were not

23    addressed to me.  I don't recall seeing this letter.  So I

24    quoted I said, yes.  If this is the same letter, I just

25    don't recall it.

                                                    003131

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 06/22/22 of 87 Page 613 of 888   PageID 3917
HCM V. HCMFA, et al.                                          73

1          MR. RUKAVINA:  You can pull down this deposition

2    transcript, Thomas, and go back to the letter.

3    BY MR. RUKAVINA:

4    Q    Would you like to revise your prior testimony, sir,

5    that at no point in time in the history of the world did

6    anyone for the advisors or their lawyers ever inform you of

7    alleged overpayments and alleged failure to provide

8    services?

9    A    No.  I wouldn't.  I don't recall receiving this letter.

10   This letter does complain in the one paragraph I did read

11   about shared services, about some sort of failure of

12   services.  Where's the overpayment section?

13   Q    Go back to payroll.

14        And, again, sir, I apologize.  We'll have this on paper

15   momentarily.

16          MR. RUKAVINA:  Scroll down, Thomas.

17          MR. BERGHMAN:  You want the next page?

18          MR. RUKAVINA:  Yes.

19          THE WITNESS:  I just don't -- you know, I don't

20   recall you giving me exhibits, correct?  You just put them

21   on the screen during our deposition, right?

22          MR. RUKAVINA:  Sir, I ask the questions, not you.

23   I did --

24          THE WITNESS:  But I'm just --

25          MR. RUKAVINA:  I did send them to your counsel

003132

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 06/17/22   Page 614 of 888   PageID 3918
Document   Page 74 of 87
HCM V. HCMFA, et al.                                        74

 1  prior to the deposition.

 2          THE WITNESS:  Yeah.  I didn't --

 3  BY MR. RUKAVINA:

 4  Q    You see, sir, in --

 5  A    We looked at them on a screen.

 6  Q    You see, sir, in there that it talks about -- you can

 7  please read it, but it talks about based on a preliminary

 8  analysis -- this is near the bottom -- next point, HCMFA

 9  believed they have over-reimbursed HCMLP under the payroll

10  reimbursement agreements of approximately $5 million.

11  A    I see that, yes.

12  Q    You have no recollection of having heard about that on

13  or about December 11th?

14  A    No, I don't.

15  Q    Then let's go back to your deposition transcript,

16  please, Page 42.  Well, not yet, but do you remember I asked

17  -- well, let me ask you right now.

18      Sir, do you remember whether in light of this letter

19  there were any negotiations to try to revise the amounts

20  under the payroll reimbursement agreements?

21  A    There never were, no.

22  Q    Okay.  And I asked you about that at your deposition

23  and you said --

24  A    Yes.

25  Q    -- there never were any.

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 05/25/22   Page 615 of 888   PageID 3919
Document   Page 175 of 87
HCM V. HCMFA, et al.                                     75

```
 1   A     Correct.

 2   Q     Okay.  So let me ask you again.  You don't want to

 3   revise whatever prior testimony you gave that no one from

 4   the advisors, no one at K&L prior to Dondero complaining in

 5   January 2021.  You never heard about potential overpayments

 6   under the payroll reimbursement agreements?

 7   A     I don't recall ever hearing about potential

 8   overpayments.  Obviously, this December 11th letter was

 9   received by my counsel.  I am certain they gave it to me.  I

10   do not recall it.  So when you showed it to me at the

11   deposition I just missed because there is another K&L Gates

12   letter that's pretty lengthy in and around this time.

13   Q     So when you said you were --

14   A     There might be two or three.

15   Q     So when you said you read it on or about December 11th

16   at your deposition, you're now saying that you were

17   incorrectly testifying at your deposition?

18   A     That's correct.

19   Q     You --

20   A     Yes.

21   Q     -- confused it with another K&L letter?

22   A     Correct.

23   Q     Okay.

24   A     I just don't recall seeing this letter.

25   Q     Okay.  But --
```

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed 12/26 of 84   Page 616 of 888   PageID 3920
HCM V. HCMFA, et al.                                                    76

1   A    I'm sorry.

2   Q    -- would you expect your professional counsel at

3   Pachulski to forward this to you, this letter --

4   A    Absolutely.

5   Q    -- or advise you of its substance?

6   A    They certainly would have forwarded it to me.  I'm --

7   Q    Okay.

8   A    I suspect they would have talked to me about it.  I do

9   not recall those conversations, not because it's privileged.

10  I just don't recall having a discussion about this letter.

11  There were multiple letters at the time.

12  Q    Okay.  Do you think that the advisors could have

13  terminated the payroll reimbursement agreements or shared

14  services agreement post-petition without violating the

15  automatic stay?

16  A    Absolutely.

17  Q    Okay.  You're a lawyer?

18  A    Yeah.

19  Q    And you've been a bankruptcy professional for decades?

20  A    Yes.

21  Q    And you're telling the Court that the automatic stay

22  does not prevent a counterparty to an unassumed executory

23  contract from terminating that contract?

24  A    That's not what I said and that's not what you asked

25  me.

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 11   Filed 12/26/22   Page 617 of 888   PageID 3921
Document    Page 177 of 847
HCM V. HCMFA, et al.                                        77

1   Q    I asked you -- I'll ask it differently.

2        Do you think that had the advisors tried to terminate

3   these contracts, all four of them, post-petition, that that

4   would have been a stay violation?

5   A    Not if they did it correctly, no.

6   Q    And how would they have done it correctly?

7   A    They would file a motion to terminate the contract and

8   set forth why --

9   Q    That's a little different --

10  A    -- they wanted to term --

11  Q    That's a little different.

12       MR. MORRIS:  Let him -- please let him finish his

13  answer.

14       THE WITNESS:  Except what -- why?

15       MR. RUKAVINA:  That's a little different.

16       THE WITNESS:  You can fight with me all you want.

17  You asked me, could they do this, and the answer is yes.

18       MR. RUKAVINA:  Is it --

19       THE WITNESS:  You file a motion to terminate the

20  contract and they set forth their reasons.  And even though

21  it's without cause, the debtor is protected.  But that

22  doesn't give the debtor the right to just receive money and

23  not get services.  That happens all the time.  That's what

24  happens in Bankruptcy Court.

25       MR. RUKAVINA:  Word plays, Mr. Seery.  Word plays.

```
 1   BY MR. RUKAVINA:

 2   Q    What about the January --

 3   A    It's not.

 4   Q    What about the January 9th injunction prohibiting Mr.

 5   Dondero from causing any related entity from terminating a

 6   contract?

 7   A    The --

 8   Q    Do you believe that that order would have prevented the

 9   advisors from terminating these four contracts?

10   A    No.  They have to come in to the court and file a

11   motion.

12   Q    Okay.

13   A    Now I guess you're admitting that Mr. Dondero

14   completely controls --

15   Q    Stop talking, sir.

16   A    -- the advisors.

17   Q    I've answered -- you've answered my question.  I've

18   asked a question.  You've answered it.  Okay.

19   A    Oh, I'm sorry.

20   Q    You're not here to pontificate.  You're here to answer

21   questions.

22        MR. MORRIS:  Your Honor, I know Mr. Seery is a

23   seasoned professional, but there ought to be a limit to the

24   badgering.

25        THE COURT:  Okay.  Mr. Rukavina --
```

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 1-2   Filed 09/29/22   Page 619 of 888   PageID 3923
                      HCM V. HCMFA, et al.                        79

 1              MR. RUKAVINA:  I'm actually done --

 2              THE COURT:  -- I know you --

 3              THE WITNESS:  I'm okay.

 4              THE COURT:  -- can keep it in check here.

 5              MR. RUKAVINA:  Okay.

 6              THE COURT:  Okay.

 7   BY MR. RUKAVINA:

 8   Q    And I think you testified that you never instructed

 9   Highland employees not to provide services.  Did I get that

10   correct?  You never -- when Mr. Morris was asking you about

11   whether you ever issued --

12   A    No.  I never instructed any Highland employees not to

13   provide services.  I did instruct Highland employees not to

14   take an adverse position to the estate, and if one arose,

15   they had to come to me.

16   Q    Okay.  You taught me a word that I never heard before.

17   It's a cool word.  Inimical.  Is that --

18   A    You've got to expand your vocabulary.

19   Q    I agree.  You -- did you not issue instructions that if

20   any Highland employee undertook an action inimical to the

21   interest of Highland they would be fired?

22   A    Yes.

23   Q    Thank you.

24              MR. RUKAVINA:  I'll pass the witness.

25              THE COURT:  Redirect?

                                                      003138

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document Filed Page 806 of 84   Page 620 of 888   PageID 3924
HCM V. HCMFA, et al.                                                          80

1          MR. RUKAVINA:  And just so Your Honor knows, we'll

2   supplement the record with that Exhibit 10 to the deposition

3   as soon as it comes in.

4          THE COURT:  All right.

5          MR. MORRIS:  Just one question, Mr. Seery.

6                        REDIRECT EXAMINATION

7   BY MR. MORRIS:

8   Q    At no time prior to the termination of the shared

9   services agreements did you ever hear the word -- no.  Let

10  me rephrase.

11      Did you ever hear the word, overpayment, at any time

12  prior to the date that Highland gave notice of termination

13  on November 30th, 2020?

14  A    No.

15  Q    At any time prior to November 30th, 2020 did anybody

16  ever tell you that Highland was failing to perform back

17  office middle office or investment advisory services on

18  behalf of the advisors?

19  A    No.

20          MR. MORRIS:  No further questions.

21          THE COURT:  Any recross?

22          MR. RUKAVINA:  Just very briefly.

23                      RECROSS-EXAMINATION

24  BY MR. RUKAVINA:

25  Q    Mr. Seery, I want to be very respectful, but I heard

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 41-2   Filed 12/12/22   Page 621 of 888   PageID 3925
HCM V. HCMFA, et al.                                                              81

1   you say earlier that you're cursed with apparently a very

2   good memory because you remember exactly how Mr. Waterhouse

3   was seated opposite of you when you were having that

4   discussion.

5   A    Typically, yes.

6   Q    So --

7   A    When I tie the verbal to the visual, I actually have a

8   pretty good memory.

9   Q    I'll share that with you.

10       But sitting here today you still don't remember the

11  December 11th K&L letter raising the overpayments and the

12  failure to provide services?

13           MR. MORRIS:  Objection, Your Honor.  Beyond the

14  scope of redirect.  I asked questions going to November

15  30th, 2020, period, full stop.

16           MR. RUKAVINA:  That's fair enough, Your Honor.

17           THE COURT:  Okay.  Sustained.

18           MR. RUKAVINA:  Thank you.

19           THE COURT:  All right.  Mr. Seery, you're excused

20  from the witness stand.

21           Thank you.

22           THE WITNESS:  Thank you, Your Honor.

23           THE COURT:  Okay.

24           MR. MORRIS:  So, Your Honor, as discussed with Mr.

25  Rukavina, respectfully we would like to break now.

003140

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 41-2   Filed 12/13/22   Page 622 of 888   PageID 3926
HCM V. HCMFA, et al.                                                          82

```
 1              THE COURT:  Okay.

 2              MR. MORRIS:  What time do you think the Court will

 3    be available to reconvene?

 4              MR. MORRIS:  I would say five after one.

 5              MR. MORRIS:  Okay.  We'll --

 6              THE COURT:  I just, the meeting is supposed to --

 7              MR. MORRIS:  We'll --

 8              THE COURT:  -- stop at one and --

 9              MR. MORRIS:  We'll be back at five after one, and

10    after conferring with Mr. Rukavina, we do remain confident

11    that we're going to finish today.  There are only two more

12    witnesses.  I expect my examination of both Mr. Dondero and

13    Mr. Norris to be under an hour each --

14              THE COURT:  Okay.

15              MR. MORRIS:  -- for sure.

16              THE COURT:  So we just have Dondero and Norris.

17              MR. MORRIS:  Yeah.  That's it.

18              THE COURT:  All right.  Thank you.

19              MR. MORRIS:  All right.  Thank you, Your Honor.

20              THE COURT:  We'll see you at five after one.

21              THE COURT OFFICER:  All rise.

22         (Recessed at 11:17 a.m.)

23                           * * * * *

24

25
```

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 19-15   Filed 12/13/22   Page 623 of 888   PageID 3927
Document   Page 82 of 87
HCM V. HCMFA, et al.                                              83

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ETHAN POWELL | 4 | 17 | 34 | |
| JAMES P. SEERY, JR. | 36 | 69 | 80 | 80 |

R U L I N G S

PAGE

None

003142

Case 21-03010-sgj   Doc 114   Filed 04/15/22   Entered 04/15/22 11:35:55   Desc Main
Case 3:22-cv-02170-S   Document 6-1   Filed 11/16/22   Page 624 of 888   PageID 3928
Document   Page 84 of 84
HCM V. HCMFA, et al.                                    84

1

2                   C E R T I F I C A T I O N

3

4        We, Sheila Orms and Nancy B. Gardelli, Court approved

    transcriptionists, for Acorn Transcripts, LLC, certify that
5
    the foregoing transcript is a correct transcript from the
6
    official electronic sound recording of the proceedings in
7
    the above-entitled matter.
8

9
    FOR ACORN TRANSCRIPTS, LLC          April 14, 2022
10

11

12        _Sheila Orms_

13   _____

14   SHEILA ORMS

15        _Nancy B.Gardelli_

16   _____          April 14, 2022

17   Nancy B. Gardelli

18   Operating Manager

19

20

21

22

23

24

25

003143

# Tab 12

```
                 IN THE UNITED STATES BANKRUPTCY COURT
               FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

IN RE:                        .    Case No. 19-34054-11(SGJ)
                              .
HIGHLAND CAPITAL              .    Earle Cabell Federal Building
MANAGEMENT, L.P.,             .    1100 Commerce Street
                              .    Dallas, Texas  75242
          Debtor.            .
. . . . . . . . . . . . . .   .
                              .    Adv. No. 21-AP-3010(SGJ)
HIGHLAND CAPITAL              .
MANAGEMENT, L.P.,             .
                              .
          Plaintiff,          .
                              .
      v.                      .
                              .
HIGHLAND CAPITAL,             .
MANAGEMENT, FUND              .
ADVISORS, L.P., et al.,       .
                              .
          Defendant.          .    Wednesday, April 13, 2022
. . . . . . . . . . . . . .        1:09 p.m.

                        TRANSCRIPT OF TRIAL
                          PM SESSION
               BEFORE HONORABLE STACEY G. JERNIGAN
               UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For Plaintiff Highland    Pachulski Stang Ziehl & Jones LLP
Capital Management        BY:  JOHN MORRIS, ESQ.
L.P.:                     780 3rd Avenue, 34th Floor
                          New York, NY 10017

For Defendant Highland    Munsch, Hardt, Kopf & Harr
Capital Management         By:  DAVOR RUKAVINA, ESQ.
Fund Advisors, L.P.:       500 N. Akard Street, Ste 3800
                           Dallas, TX 75201

Audio Operator:            Michael F. Edmond

 Proceedings recorded by electronic sound recording, transcript
                produced by a transcript service.
```

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail:  DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-01170-S   Document 8-4   Filed 11/23/23   Page 627 of 888   PageID 2987

2

**INDEX**

|                                                    | **PAGE** |
|----------------------------------------------------|---------:|
| **WITNESSES**                                       |          |
| **FOR THE PLAINTIFF:**                              |          |
| James Dondero                                       |          |
|   Direct Examination by Mr. Morris        | 4        |
|   Cross-Examination by Mr. Rukavina       | 47       |
|   Redirect Examination by Mr. Morris      | 73       |
| Dustin Norris                                       |          |
|   Direct Examination by Mr. Morris        | 83       |
|   Cross-Examination by Mr. Rukavina       | 102      |
|   Redirect Examination by Mr. Morris      | 156      |
|   Recross-Examination by Mr. Rukavina     | 171      |
|   Examination by the Court                | 174      |
| **FOR THE DEFENDANT:**                              |          |
|   (None)                                   |          |

|                    | **ID** | **EVD** |
|--------------------|-------:|--------:|
| **EXHIBITS**       |        |         |
| **FOR THE PLAINTIFF:** |    |         |
|   (None) |        |         |
| **FOR THE DEFENDANT:** |    |         |
| Exhibit EE         | 4      | 4       |
| Exhibit G          | 98     | 98      |
| Exhibit H          | 98     | 98      |

Dondero - Direct                                3

1      (Proceedings resumed after the lunch recess at 1:09 p.m.)

2            THE CLERK:  All rise.

3            THE COURT:  Please be seated.

4            All right.  We're back on the record in the Highland

5  trial.  Mr. Morris, Mr. Rukavina, what do you have?

6            MR. MORRIS:  Just before we proceed with the next

7  witness, I think Mr. Rukavina just wants to present the exhibit

8  that he used on --

9            MR. RUKAVINA:  Yes, Your Honor.

10           THE COURT:  Okay.

11           MR. MORRIS:  -- with Mr. Seery.

12           MR. RUKAVINA:  As I promised, we do have paper copies

13 couriered.  I've marked it as EE.

14           THE COURT:  Okay.

15           MR. RUKAVINA:  If I may approach and move for the

16 admission of EE as an impeachment exhibit.

17           THE COURT:  Okay.  And there's no objection?

18           MR. MORRIS:  No objection.

19           THE COURT:  Okay.  You may approach.

20           Thank you.  EE will be admitted.

21      (Defendant's Exhibit EE admitted into evidence)

22           MR. MORRIS:  I do want to note that -- maybe I spoke

23 too fast.  I object to the extent it's being offered for the

24 truth of the matter asserted.  Mr. Rukavina specifically said

25 it was for impeachment, and I have no objection to its use for

002645

1  that purpose.

2          THE COURT:  Okay.  So impeachment in an attempt to

3  impeach Mr. Seery saying he had never heard anything --

4          MR. MORRIS:  Correct.

5          THE COURT:  -- until January 2021 --

6          MR. MORRIS:  Correct.

7          THE COURT:  -- about the alleged overpayments.  Okay.

8          MR. RUKAVINA:  Yeah.  That's all it's offered for,

9  Your Honor.

10         THE COURT:  It's admitted for that purpose.

11         MR. RUKAVINA:  That's fine by me.  That's all I'm

12  offering it for.

13         THE COURT:  Okay.

14         MR. MORRIS:  Okay.  So Highland's next witness is Mr.

15  James Dondero.

16         THE COURT:  All right.  Mr. Dondero, if you could

17  approach the witness box, I will swear you in.

18         Please raise your right hand.

19          JAMES DONDERO, PLAINTIFF'S WITNESS, SWORN

20         THE COURT:  All right.  Please be seated.

21                     DIRECT EXAMINATION

22  BY MR. MORRIS:

23  Q    Good afternoon, Mr. Dondero.

24  A    Good afternoon.

25  Q    Let me know when you're comfortable.

1  A    Good afternoon.

2  Q    Are you okay there?

3  A    Yes.

4  Q    Okay.  So there's three binders in front of you.  From

5  time to time, I may ask you to look at a particular document.

6  There's water there if you need it.  I don't expect my

7  examination of you to be very long.  We'll see what happens.

8       But are you ready to proceed?

9  A    Yes.

10 Q    Okay.  Frank Waterhouse is the treasurer of the Advisors.

11 Correct?

12 A    I -- I don't know his title specifically.  I think he's

13 the CFLA.  I don't know.

14 Q    He's an officer of the Advisors.  Correct?

15 A    Yes.

16 Q    And when I use the phrase Advisors, you understand I mean

17 NexPoint Advisors LP and Highland Capital Management Fund

18 Advisors L.P.  Is that fair?

19 A    I don't know specifically.

20      I believe HFAM.  I don't know about NexPoint.  I think

21 NexPoint has its own CFO now.  I don't know if he's treasurer.

22 I -- I don't know these things.  I know these things -- I know

23 these things on a current basis, but I want to be refreshed.

24 Q    You don't -- do you know if Mr. -- let's take it one at a

25 time.  Do you know if Mr. Waterhouse serves as an officer of

Dondero - Direct                                    6

1  NexPoint Advisors, LP today?

2  A    I don't know for sure.

3        I believe so, but I -- I don't know.  But Nexpoint has its

4  own -- excuse me -- it's own CFO and it has its own C-Suite in

5  the various (indiscernible) separate from Frank.  But I don't

6  know the corporate ownership of NexPoint.

7  Q    Okay.

8  A    I don't believe so.

9  Q    I'm not asking you about ownership.  I don't mean to

10 interrupt.  I'm not asking about ownership.  I'm just asking

11 specifically whether Mr. Waterhouse has a role or a title at

12 NexPoint today?

13 A    I -- I don't know.

14 Q    Okay.  Do you know if Mr. Waterhouse has a role or a title

15 today at HCMFA?

16 A    I -- I don't know post the restructuring with Skyview, et

17 cetera.  I -- I don't know.  I believe so, but I don't know.

18 Q    Okay.  Let's focus on the period January 1st, 2018 until

19 the end of 2020, that three-year period, okay.  So 2018, 2019,

20 and 2020.  I'm going to refer to that as the relevant period.

21 Are you with me?

22 A    Yes.

23 Q    Do you recall if Mr. Waterhouse had a role or a title at

24 NexPoint during the relevant period?

25 A    I -- I believe he was an officer of all the major entities

002648

Dondero - Direct                          7

 1  during that period.

 2  Q    And when you use the phrase "all the major entities," what

 3  are you referring to when you use that phrase?

 4  A    Highland, Strand, NexPoint, HFAM.  I believe he was an

 5  officer of all the -- all the major operating entities.

 6  Q    And do you recall that he served as either the treasurer

 7  or the CFO of the Advisors at all times during the relevant

 8  period?

 9  A    I believe so.

10  Q    And do you have an understanding of what Mr. Waterhouse's

11  duties and responsibilities were as the treasurer or the CFO of

12  the Advisors during the relevant period?

13  A    Yes.

14  Q    Can you describe for the Court your understanding of what

15  Mr. Waterhouse's duties and responsibilities were in that

16  capacity at that time?

17  A    To be the chief financial accounting officer above

18  corporate accountants, above the tax accountants, above

19  anything accounting and regulatory-wise other than compliance

20  reporting.  Other -- other than compliance didn't report to

21  him.

22  Q    And did you understand that as an officer that

23  Mr. Waterhouse was a fiduciary of the Advisors during the

24  relevant period?

25  A    I -- I don't want to broadly answer that question

002649

1   generally, but it varies depends on -- depending on the level

2   of fiduciary responsibility, depends on whether it's a public

3   entity or a listed fund or a -- or a private entity.

4   Q    Okay.  I appreciate that distinction, and I just want you

5   to focus on the two advisors, NexPoint Fund Advisors, L.P., and

6   NexPoint -- Highland Capital Management Fund Advisors.

7        Is it your understanding as the person in control of those

8   entities that Mr. Waterhouse owed those entities a fiduciary

9   duty during the relevant period?

10  A    Yes.

11  Q    Okay.  And was one of his duties as the treasurer or the

12  chief financial officer of the Advisors, was that to make sure

13  that the Advisors only paid the amounts that they owed under

14  the contracts that they had?

15  A    I would describe it more generally as to administer

16  contracts according to the contracts, the spirits of the

17  contracts and best industry practices.

18  Q    Okay.  And to the best of your knowledge, did

19  Mr. Waterhouse fulfill the responsibility of administering

20  contracts in accordance with their terms during the relevant

21  period?

22  A    I -- I don't know and I can't make a blanket statement.

23  Q    Do you have any knowledge about any failure on

24  Mr. Waterhouse's part to fulfill his responsibility of

25  administering contracts in accordance with their terms during

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 4-11 Filed 9/26/28 Page 634 of 888   PageID 2933

Dondero - Direct                                    9

 1  the relevant period?

 2  A    When does the relevant period end again?

 3  Q    December 31st, 2020.

 4  A    I think there are a lot of issues in the last year or in

 5  that 2020 year.

 6       I think his employment was -- or his responsibilities or

 7  who reported to him changed materially in that year.  And what

 8  other people performed or responsibilities or DSI had, I don't

 9  know.  I -- yeah,  I don't know how long he had responsibility

10  or control.

11  Q    Is it your understanding that DSI had any responsibility

12  whatsoever for anything having to do with either of the

13  Advisors after the petition date?

14  A    I'm just saying as Frank got neutered and

15  compartmentalized and we moved from various different roles,

16  somebody else filled them, and I don't know who.  But I -- I

17  can't say that Frank was responsible if he wasn't in his same

18  position of responsibility and authority.

19  Q    Did Frank Waterhouse fail to administer the contracts that

20  the Advisors entered into with Highland after the petition

21  date?

22  A    I -- I think there was a failure by Highland to administer

23  the contracts.  Whether it was Frank's responsibility or

24  somebody else's, I don't know.

25  Q    Who on behalf of the Advisors was charged with the

Dondero - Direct                                    10

1  responsibility of making sure that the contracts that the

2  Advisors were party to were properly administered after the

3  petition date?  Who is the person?

4  A    There -- there's almost nobody at the Advisors, period.

5      The Advisors were paid a fee for Highland to administer

6  the contracts.  Highland had all the accountants, compliance,

7  and lawyers.  The Advisors had either no employees or they had

8  a portfolio manager or trader or somebody who is front office

9  focused on the investor funds.  So there wouldn't have been

10 anybody to make sure or double check or be persistent if

11 Highland wasn't doing it.

12 Q    So did Frank Waterhouse have the duty and the obligation

13 to administer contracts in accordance with their terms on

14 behalf of the Advisors or did he not?

15 A    It depends on the time frame.  Pre -- pre-bankruptcy,

16 sure.  And any of his group were doing it for everybody, and

17 they were doing it well.  But by the time 2020 came along, his

18 authority and responsibilities changed materially along the

19 way.

20 Q    Who changed his authority?

21 A    Seery.

22 Q    Jim Seery changed Frank Waterhouse's authority with

23 respect to the Advisors?

24 A    With respect to everything in his role at Highland, which

25 is -- his role at Highland was administering -- one of his

1  roles at Highland or his group's roles were administering the

2  contracts with NexPoint and HFAM.

3  Q    And it's your testimony that Jim Seery told Frank

4  Waterhouse that he couldn't do the exact same thing with

5  respect to the administration of these contracts after he got

6  appointed than he was before he got appointed?

7  A    I'm saying by middle of '20 when Seery kind of started

8  betraying the estate and moving for his own self-interest, he

9  started making material changes to the employee and

10  responsibility base of the Highland employees, and one of those

11  people were Frank Waterhouse.  And Frank Waterhouse's authority

12  and functions changed materially.

13       And I don't know -- I -- I wasn't privy to a lot of that,

14  and some of it was negotiating part of a settlement or a lease

15  with him and some other stuff.  But his -- his responsibilities

16  and his role changed materially.  I'm not sure how it changed.

17  I wasn't privy to it, but I can't broad-brush Frank as being

18  responsible or liable for the fact that the Advisors were

19  overbilled by Highland.

20  Q    Did Frank Waterhouse tell you at any time that he was no

21  longer able to continue to perform the function of

22  administering the Advisors' contracts in accordance with their

23  terms?  Did he tell you that?

24  A    Not specifically.

25  Q    Did anybody in the world ever tell you you're not going to

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 14   Filed 01/27/23   Page 637 of 888   PageID 2947

Dondero - Direct                                    12

1  believe what Seery did, Seery told Frank cut it out, you're not

2  allowed to administer the contracts on behalf of the Advisors

3  anymore?  Anybody say that?

4  A    No.

5       But no one said he still could in his reduced, diminished,

6  changed role, either.  I wasn't -- I wasn't aware.  But I

7  assumed Highland was still performing the functions that it was

8  getting paid for.

9  Q    Can you tell Judge Jernigan your understanding of exactly

10 what Frank Waterhouse was allowed and not allowed to do with

11 respect to the administration of the Advisors' contracts?  What

12 was he not allowed to do?

13 A    I wasn't privy to those reductions of his responsibility.

14 I was really handed to a portfolio management position that was

15 not managerial, and Seery was cutting side deals and bribing

16 people and doing all kinds of crap.

17            MR. MORRIS:  I move to strike, Your Honor.

18            THE COURT:  You move to strike the words "bribe?"

19            MR. MORRIS:  Yes.  Yes.  The entirety of the last

20 portion because the question was about Frank Waterhouse.

21            THE COURT:  Okay.  Sustained.

22 BY MR. MORRIS:

23 Q    This would go a lot smoother if you'd just stick to the

24 issues.

25      What is the basis for your testimony that Frank Waterhouse

Dondero - Direct                                              13

1   was not permitted to administer the contracts on behalf of the

2   Advisors in the exact same way after the Independent Board was

3   appointed as he did before the Independent Board was appointed?

4   What's the basis for that?

5   A    His role was changed.

6        His responsibility -- responsibilities and people who

7   reported to him diminished and changed at least a couple of

8   times starting in the summer of '20.  I can't represent that he

9   was told not to administer contracts, but I also can't

10  represent that he was still administering contracts and didn't

11  do them.  I'm just saying it's not logical -- it's not logical

12  for me to be able to represent any of that.

13  Q    Okay.  When did you learn this?

14  A    I don't want to say contemporaneously, you know, because

15  there was always -- again, I wasn't privy to it.  I wasn't

16  supposed to be part of management.  I would hear it with a

17  delay either at water-cooler conversations or from lawyers.

18  But I don't even -- I don't remember who.

19  Q    So you don't remember who told you this and you don't

20  remember when you learned it.  Is that fair?

21  A    I'm saying a lot of the times it happened in second half

22  of '20.

23  Q    So you learned about it in the second half.  What did you

24  do when you heard this?  Did you try to make sure that there

25  was somebody who was going to look out to make sure that the

Dondero - Direct                                    14

1  contracts for the Advisors were properly administered when you

2  learned that Frank couldn't do it?  What did you do?

3  A    In the early, early summer of '20, nothing because I

4  assumed that with the monies we were paying from TSI and with

5  the staff -- accounting staff that was still at Highland, that

6  they would be administering and providing the services that we

7  were paying for.  I didn't do anything until I found out we had

8  overpaid by $14 million and that the overpayments were continue

9  -- or they were continuing.  That's the only time I did

10 something which was a couple -- three or four months later.

11 Q    Do you know how that $14 million was calculated?

12 A    It was -- part of the contracts with Highland were for

13 people, and I think people plus a five or ten percent

14 processing surcharge.  And a lot of the people have left or the

15 percentage of time that they were spending on our stuff changed

16 such that we had been billed as if people were still there and

17 as if people were still working on our accounts when they

18 weren't.

19 Q    So you controlled the Advisors.  Correct?

20 A    Yes.

21 Q    And you learned sometime early in the summer of 2020 that

22 Frank Waterhouse was no longer going to be able to perform his

23 function of administering the contracts on behalf of the

24 Advisors.  You learned that in the early part of the -- in the

25 summer?

002656

                         Dondero - Direct                    15

1  A    No.  That's not what I've said.

2  Q    So when did you -- I thought you said early summer.  When

3  did you learn it?

4  A    I said his roles were diminished, but I didn't know what

5  his roles were diminished to, nor did I make the assumption

6  that in his diminished roles, no one would pick up the contract

7  administration if he wasn't.

8  Q    Did you --

9  A    But he might still have been.

10 Q    Did you ask Frank how did your role change?

11 A    No.

12 Q    Did you ask anybody in the world how did Frank's role

13 change?

14 A    I wasn't supposed to be part of management.  I wasn't

15 supposed to talk to anybody.  Do you remember all the stupid

16 shit you put through?

17         MR. MORRIS:  I move to strike, Your Honor.

18         THE COURT:  I will strike, and I'll ask you, Mr.

19 Dondero, to refrain from the profanity.

20         THE WITNESS:  Excuse me.  I apologize for that.

21         THE COURT:  Okay.

22 BY MR. MORRIS:

23 Q    You and I didn't have a court experience together until

24 December of 2020.  Right?

25         MR. RUKAVINA:  Your Honor, this really now is just a

002657

Dondero - Direct                                16

1  point of badgering and repetitiveness.  He has his answer and

2  now he's just haragging [sic] this witness just to intimidate

3  him on an irrelevant topic.

4         MR. MORRIS:  I wish I had the ability to intimidate

5  Mr. Dondero, but the fact of the matter is I don't have an

6  answer yet as to who was responsible for administering the

7  contracts in accordance with their terms on behalf of the

8  Advisors after the Independent Board was appointed.

9         MR. RUKAVINA:  He does.

10         MR. MORRIS:  And that's what I'm trying to get to.

11         MR. RUKAVINA:  He has his answer.  Mr. Dondero

12  testified that it was Highland's responsibility.

13  Mr. Waterhouse was here yesterday.  He could have asked Mr.

14  Waterhouse these questions.

15         MR. MORRIS:  And --

16         MR. RUKAVINA:  He didn't.

17         THE COURT:  All right.  I'll overrule and give you a

18  little bit more latitude.

19         MR. MORRIS:  Thank you.

20         THE COURT:  But I think he's --

21  BY MR. MORRIS:

22  Q    Did you make sure that there was a fiduciary for the

23  Advisors who was looking out for the Advisors' interest after

24  the time that you learned that Mr. Waterhouse's wings had been

25  clipped?

Dondero - Direct                              17

1   A    Not until 2021.  Not until later.

2   Q    Did you do anything to make sure that Highland was

3   actually doing what you now claim you expected?  Did you do

4   anything to satisfy yourself that Highland was going to

5   administer the Advisors' contracts in accordance with their

6   terms or did you just assume that that was going to happen?

7   A    I assumed Highland would honor the contracts we were

8   paying for --

9   Q    But --

10  A    -- and they were paying for.

11  Q    But you didn't do anything other than make that

12  assumption.  Right?  You didn't have your lawyers write a

13  letter, you didn't pick up the phone and call anybody.  You

14  were still in open communication with Mr. Seery at this time,

15  right, in the summer of 2020?

16  A    It ended in the summer of 2020.

17  Q    There was no prohibition for you to pick up the phone and

18  call Mr. Seery and say, hey, what's happening with Waterhouse,

19  are you guys going to just make sure you're doing this right?

20  A    I don't know when the prohibition of talking to him

21  started.  I don't remember.

22  Q    But you're not relying on that prohibition to excuse your

23  failure to call Mr. Seery to complain about this change.

24  Right?

25       MR. RUKAVINA:  Your Honor, it's been almost 30

Dondero - Direct                                    18

1   minutes on the same topic which he has answered repeatedly.

2   That Mr. Morris might not agree with that answer, doesn't

3   matter.  And this is a matter for closing arguments, not to

4   take this witness for a two-hour road as to what Mr.

5   Waterhouse's clipped wings meant when he said he doesn't know.

6            THE COURT:  Well, it hasn't been 30 minutes,

7   technically, but what is your response?

8            MR. MORRIS:  I think this is an incredibly important

9   topic because our position, among many others, is that Mr.

10  Waterhouse did exactly the same thing after the petition date

11  as he did before the petition date.  In fact, he testified to

12  it yesterday.  Mr. Waterhouse testified very clearly that a new

13  process was put in place after the petition date where,

14  generally, he would have to approve all of the payments that

15  were made on behalf of the Advisors under these contracts.

16           And now I have a witness here who is completely

17  contradicting the witness himself, Mr. Waterhouse.  And I don't

18  understand -- I don't understand the basis for this testimony.

19  We haven't heard anything about who told him, when he learned

20  of this, what he did in response.  I just -- I'll move on.

21           MR. RUKAVINA:  But the point is --

22           MR. MORRIS:  I'll move on, Mr. Rukavina, okay?

23           MR. RUKAVINA:  The point is, Your Honor, that

24  Mr. Waterhouse is the best evidence of what Mr. Waterhouse did.

25  And Mr. Morris opened a door to this just for the purpose of

002660

 1  trying to badger my witness.

 2          MR. MORRIS:  That's not fair.  Mr. Dondero controls

 3  these entities.

 4          THE COURT:  Okay.

 5          MR. MORRIS:  He should know that there is somebody

 6  looking out for the interests of these entities.  He should

 7  know that.

 8          THE COURT:  Okay.  I overrule the objection.

 9          MR. MORRIS:  But I will move on.

10          THE COURT:  Okay.

11  BY MR. MORRIS:

12  Q    Mr. Dondero, in 2020, entities directly or indirectly

13  owned by you and Mr. Ellington made payments to Mr. Ellington,

14  Mr. Waterhouse, Mr. Surgent, and Mr. Leventon.  Correct?

15  A    Yes.

16  Q    And did you decide to have those payments made to those

17  individuals in 2020?

18  A    Yes.

19  Q    How much was paid to them in the aggregate?

20  A    An amount equal to exactly what they would have been

21  entitled to if they had been rooked by Highland.

22  Q    Do you understand that Highland made a motion to try to

23  have those bonuses paid to those individuals?

24  A    Highland could have paid it at any time.

25  Q    Didn't it need the Court's permission to do that?  Are you

Dondero - Direct                          20

1  aware of that?

2  A    Not -- not in my opinion.  Not for prior-year bonuses and

3  not for prior -- and not for earned bonuses and -- and not for

4  amounts that Seery told everybody he was going to pay them.

5  Q    So you don't have a recollection of Highland under Mr.

6  Seery's direction making a motion to this Court to have those

7  very bonuses paid?  You don't remember that?

8  A    No.

9  Q    Do you remember that every single person in the Highland

10 complex had their bonus paid except for those four individuals?

11 A    No.  That's not true.

12 Q    Okay.  So you paid them.  And how much were the bonuses

13 that Mr. Seery stiffed them off?

14 A    It's all in -- it's all in the Highland servers, the exact

15 amounts.  I believe it was close to ten million bucks.

16 Q    Okay.

17 A    You -- you guys have all this information.

18 Q    Okay.  But your recollection is that you caused entities

19 owned and controlled by you and Mr. Ellington to pay something

20 around $10 million to Mr. Waterhouse and Highland's most senior

21 legal and compliance officers.  Correct?

22 A    What was the first part of the question, please?  I didn't

23 --

24 Q    You caused entities owned and controlled by -- directly or

25 indirectly by you and Mr. Ellington to pay somewhere

 1  approximately $10 million in 2020 to Mr. Waterhouse and

 2  Highland's senior legal and compliance officers --

 3  Mr. Ellington, Mr. Leventon, and Mr. Surgent.  Is that right?

 4  A    Yes.

 5       So I just want to emphasize it wasn't a targeted amount.

 6  It was an amount meant to be exactly what they would have been

 7  paid if Highland had not been in bankruptcy and just paid

 8  normal bonuses in the normal course.

 9  Q    So --

10  A    It's exactly that amount.

11  Q    So -- and you didn't disclose that to the Court, did you?

12  Those payments?

13            MR. RUKAVINA:  Your Honor, I object to the

14  implication that Mr. Dondero had any requirement to disclose

15  anything to this Court.  It would have been those individuals'

16  obligations.  So that is an unfair question.  Why would Mr.

17  Dondero have to disclose to this Court that he's paying

18  bonuses?

19            MR. MORRIS:  If Your Honor thinks it's an irrelevant

20  question --

21            MR. RUKAVINA:  I didn't say it's about relevant.  I

22  said that the question was improperly phrased as assuming that

23  he had any legal obligation to inform the Court.

24            MR. MORRIS:  I --

25            THE COURT:  Overruled.

Dondero - Direct                                                22

1  BY MR. MORRIS:

2  Q    Mr. Dondero, did you or anybody on your behalf ever inform

3  the Court that entities owned, directly or indirectly, by you

4  and Mr. Ellington were going to pay approximately $10 million

5  to Mr. Waterhouse, Mr. Leventon, Mr. Ellington, and

6  Mr. Surgent?

7  A    I know we were counseled.  I know counsel told us we had

8  no obligation.

9  Q    Okay.  Did you tell Mr. Seery?

10 A    Seery knew.  But I didn't tell him.

11 Q    Okay.  That's my question.  My only --

12       MR. MORRIS:  -- and I move to strike, Your Honor.  He

13 ought to answer my question.

14 BY MR. MORRIS:

15 Q    Did you tell Mr. Seery?  That's the only question there

16 is.

17 A    No.

18       THE COURT:  Okay.  Strike what you asked.

19       MR. MORRIS:  Thank you.

20 BY MR. MORRIS:

21 Q    Do you know if anybody told Mr. Seery about these payments

22 at the time they were made?

23 A    I know -- I know he knew from either Frank or from Thomas

24 Surgent.  But I don't know from which party.

25 Q    Did Thomas Surgent tell you that he had informed Mr. Seery

002664

Dondero - Direct                                        23

1   of these payments?

2   A    No.

3   Q    Did Frank Waterhouse ever tell you that he had informed

4   Mr. Seery of these payments?

5   A    I -- I can't recall specifically.

6        And I -- I want to use that as the same answer on Thomas

7   Surgent.  I can't recall specifically.  But I know -- I know

8   one of the -- one of the two of them contemporaneously

9   discussed it with Seery.

10  Q    How did you learn that?

11  A    From one or the other.  I just can't specifically remember

12  --

13  Q    Did they --

14  A    -- a conversation.

15  Q    Did they report to you what Mr. Seery said?

16  A    No.

17  Q    Each of these individuals subsequently filed a proof of

18  claim in the bankruptcy court for their bonus.  Isn't that

19  correct?

20  A    Yes.

21  Q    And those claims were subsequently assigned to entities

22  owned, directly or indirectly, by you or Mr. Ellington.

23  Correct?

24  A    Yes.

25  Q    Sir, you personally knew how much the Advisors were going

Dondero - Direct                                    24

1   to pay Highland under the Payroll Reimbursement Agreement and

2   the Shared Services Agreement.  Correct?

3   A     No.

4   Q     Did you ever ask?

5   A     No.

6   Q     You determined in late 2017 that NexPoint would pay

7   Highland $6 million per year for subadvisory and shared

8   services effective January 1st, 2018.  Correct?

9   A     I -- I don't know the specific agreements from each year.

10        There was an agreement each year.  The agreements changed

11  from being a flat fee to a back-service -- back-office fee plus

12  a reimbursement of employees fee sometime more recently.  But I

13  -- I don't know the exact dates on -- of specific contract.

14  Q     Do you recall in late 2017 speaking with Mr. Klos and

15  Mr. Waterhouse about having to get more money from the Advisors

16  to Highland because Highland was losing a lot of money?

17  A     No.

18  Q     Do you recall discussing with them that Highland should

19  receive $6 million from NexPoint for services rendered?

20  A     The -- no.  All the efforts were to be fair and accurate

21  and compliant from a regulatory and tax standpoint.  All the

22  centralized cost allocation things.

23  Q     Was your personal tax liability ever a factor in

24  determining how much money would be paid from the Advisors to

25  Highland?

Dondero - Direct                                    25

1    A    No.

2    Q    Do you recall that there was a substantial change in the

3    method and amount of money that was paid from the Advisors to

4    Highland on account for services rendered at the beginning of

5    2018?

6    A    I recall there was an old agreement from '13, which was

7    neither best practices nor compliant from a regulatory or tax

8    standpoint, that had to be improved and made more specific.

9    And a team from accounting, legal, and compliance re-crafted

10   the Shared Services Agreement and front-office allocation

11   appropriately in that 2017-'18 time period.

12   Q    Are you aware that Frank Waterhouse signed the Payroll

13   Reimbursement Agreements, the Sub-Advisory Agreements, and the

14   New NexPoint Shared Services Agreement in 2018, in the first

15   half of 2018?

16   A    I'm not specifically aware.  It doesn't surprise me.

17   Q    Did you ever review any of those agreements?

18   A    No.  Yeah, no.

19   Q    Okay.  You didn't participate in the drafting of those

20   documents.  Correct?

21   A    No.

22        It was a typical shared services of a complicated

23   financial services firm that centralizes functions.  It was a

24   -- it was a typical agreement that would be put together and

25   administered by accounting.

002667

Dondero - Direct                                26

1  Q    But people like Frank Waterhouse actually wore multiple

2  hats.  Correct?

3  A    Sure.

4  Q    And he wore the hats of the Advisors and he wore the hats

5  of Highland at the exact same time.  Right?

6  A    Sure.  It's possible to be fair doing that.

7  Q    And you're the one who decided that he should wear these

8  multiple hats.  Right?  You're the one who appointed him to

9  these positions?

10 A    Yes.

11 Q    Okay.  Do you recall that you participated in annual

12 review meetings with Mr. Waterhouse and Mr. Klos and Mr. Okada?

13 A    Yes.

14      It would be multiple, generally.  Sometimes there were tax

15 ones, sometimes there were budgeting, sometimes it was

16 performance reviews.  Yeah.  Yes.

17 Q    You know, I just want to go back to that issue of taxes

18 for just a moment.  Do you recall that in 2017 and 2018, the

19 Advisors earned millions of dollars of income?

20 A    Not specifically, but --

21 Q    Do you recall that they earned positive income in those

22 years?

23 A    I believe so.

24 Q    And do you recall that Highland had negative income in

25 those years?

002668

Dondero - Direct                                     27

1   A    I don't know.

2        Highland's a giant solvent pool of assets.  So the

3   liquidity, it varies from year to year.  But -- and, also, the

4   mark-to-marketing of those assets varied from year to year.  So

5   whether or not Highland made money in a given year, I don't

6   know.  There's some years it makes a lot but has limited cash

7   flow; other years, it has material cash flow and makes a lot.

8   Some years it has material cash flow and loses a lot.

9   Q    All right.  Let me just focus on operating profits.  On an

10  operating basis, Highland lost a lot of money in 2017 and 2018.

11  Correct?

12  A    I don't know.

13  Q    Okay.  Can you grab your book there, please?

14  A    Sure.

15  Q    And turn to Exhibit 86.  I think it's in Volume 2 of 2.

16       Mr. Dondero, if there's any portion of the book that you

17  in particular want to read, just let me know.  But I'd ask you

18  to just turn to Page 2.

19  A    Page -- I'm on Page 2.

20  Q    Okay.  And do you see near the top, it says, quote,

21  overall operating income projected at $900,000, but there's a

22  $12 million loss for HCMLP which doesn't account for some other

23  items?  Do you see that?

24  A    Yes.

25  Q    Does that refresh your recollection that Highland was

Dondero - Direct                                      28

1  projected to lose $12 million in 2018?

2  A    Well, it actually refreshes my recollection on what I

3  said.

4       And there's substantial underlies in expected investment

5  and investment commitments.  There's a balance sheet that's

6  moving around that dwarfs the $12 million, which is what my

7  point was.

8  Q    I'm not talking about assets, sir.  I'm talking about

9  operating income, the ability to pay your bills.

10 A    Right.

11      What I'm talking about is if you have 650 million of

12 assets, which we still have today, you have more than enough

13 solvency to cover 12.

14 Q    So this wasn't a problem from your perspective?

15 A    Correct.

16 Q    Okay.

17 A    It never had been.

18 Q    Okay.  Let's go to Slide 29, please.

19 A    In the same book?

20 Q    Yeah.

21           THE COURT:  I'm sorry, you said 29?

22           MR. MORRIS:  29, yeah.

23 BY MR. MORRIS:

24 Q    And if you could just -- I'm just going to ask you quickly

25 29, 30, 31, 32, that's all information about human resources.

Case 21-03010-sgj    Doc 116    Filed 04/18/22    Entered 04/18/22 09:05:40    Desc Main
Case 3:22-cv-02170-S    Document 14    Filed 12/28/21    Page 654 of 888    PageID 2768

Dondero - Direct                                    29

 1  Correct?

 2  A    I'm sorry.  Exhibit 29, the Shared Services Agreement?

 3  Q    No, no.  I'm sorry.  In 86, just Page 29.

 4  A    Oh, okay.

 5  Q    Yeah.

 6  A    Page 29, yes.

 7  Q    Okay.  So if you look at 29, 30, 31, 32, you're given a

 8  lot of -- this deck was presented to you by Mr. Waterhouse and

 9  Mr. Klos.  Right?  If you look at the front?

10  A    Okay.  I don't know.  I assume so.

11  Q    Okay.  So on that assumption, if you look at 29, 30, 31,

12  whether this is the exact book or not, you would agree that you

13  were presented with a lot of information about the Highland

14  platform's employees.  Correct?

15  A    Yes.

16  Q    And did you personally have to approve everybody who was

17  hired?

18  A    No.

19  Q    But you were informed of everybody who was hired.

20  Correct?

21  A    Generally.

22  Q    And you were generally informed about everybody who was

23  fired.  Correct?

24  A    Generally.

25  Q    And everybody who was terminated?  If you look at 32, for

Dondero - Direct                                    30

 1  example, they tell you exactly the number of people who were

 2  terminated and they identified by name the names of the

 3  individuals who were terminated.

 4       Do you see that?  If you look at 32.

 5  A    Sure.  Okay.

 6  Q    So there's no question that you were given that

 7  information.  Right?

 8  A    Once a year at the end of the year.  Is that what you're

 9  asking me?

10  Q    In this deck.

11  A    Right.

12  Q    And you met with Brian Collins from time to time to

13  discuss personnel matters.  Right?

14  A    Yes.

15  Q    And you're the person who set the compensation for

16  everybody who worked for Highland.  Right?

17  A    No.  Just generally.

18  Q    Nobody got a raise without your approval.  Did they?

19  A    Yes.  I mean I get told about it afterwards or something.

20  Q    Who had the authority to give raises without your prior

21  approval?  Who in the organization had the ability to hand out

22  money without your approval?

23  A    Well, if it was a large amount, they would seek my

24  approval.  But I'm saying small amounts, unit heads would have

25  that ability.

002672

Case 21-03010-sgj    Doc 116    Filed 04/18/22    Entered 04/18/22 09:05:40    Desc Main
Case 3:22-cv-02170-S    Document 14    Filed 12/28/21    Page 656 of 888    PageID 2966

Dondero - Direct                            31

1  Q    Okay.  So you had to approve -- let's -- can we use the

2  word "material?"

3  A    Yeah.

4  Q    Okay.  You had the authority and the responsibility for

5  approving all material changes in compensation for Highland's

6  employees.  Right?

7  A    Yes.

8  Q    Okay.  Go to Slide 36, please.

9       Do you remember that these annual reviews included

10 forecasts?

11 A    Yes.

12 Q    And those forecasts would contain assumptions, right?

13 A    Yes.

14 Q    And in this particular forecast, if you look at the top,

15 you were told to assume that the material inter-company

16 arrangements remained unchanged and it specifically said that

17 NexPoint and its subsidiaries would pay $6 million per year for

18 subadvisory and shared services.  Do you see that?

19 A    Yes.

20 Q    Where did that number, six million, come from?

21 A    I assume it was -- I don't know.

22      It was -- these are the assumptions they're using.  They

23 probably flatlined prior years.  There were probably prior

24 years where five or six or based on growth, you know, of prior

25 years five.  There's maybe a mixture of six.  I don't -- I

Dondero - Direct                                                32

 1    don't know the answer.

 2    Q    Did you play any role in determining how much money would

 3    be paid by the Advisors to Highland for services?

 4    A    No.  It was done via the shared services contracts that

 5    are meant to be for a variety of regulatory and tax purposes

 6    appropriate and fair.

 7            MR. MORRIS:  All right.  I move to strike.  I'm just

 8    asking him about what he did.

 9            THE COURT:  Sustained.

10    BY MR. MORRIS:

11    Q    Did you play any role in establishing the fees that were

12    paid by the Advisors to Highland under any of the inter-company

13    agreements?

14    A    Not the specifics, just the general direction to be

15    compliant in best practices.

16    Q    Okay.  But you were told here -- right?  We don't really

17    have to debate the point.  You were told, you will admit, in

18    the beginning of 2018 that the assumption was that NexPoint and

19    their subsidiaries would be paying $6 million a year for

20    subadvisory and shared services.  Correct?

21    A    Yes.  That -- I was told here that they had to make an

22    assumption, and they made an assumption.

23    Q    Okay.  Can you turn to Page 46, please?

24         Do you see that that's the NexPoint three-year profit and

25    loss forecast?

002674

Dondero - Direct                        33

1   A    Yes.

2   Q    And do you see that in the middle of the page, there's a

3   reference to subadvisor fees and shared service expenses?

4   A    Yes.

5   Q    And do you see that if you add those two numbers up for

6   any of the years, it equals $6 million?

7   A    Yes.

8   Q    So, again, the projections that you were given showed that

9   NexPoint would be paying Highland exactly $6 million for these

10  services for each of those three years.  Is that right?

11  A    That's the assumption in this forecast.

12       They -- they missed the bankruptcy.  They missed the fact

13  that the revenue wouldn't change, but they had to make some

14  assumptions that, you know -- whatever.  But they don't know

15  what they don't know.  But they had to make some assumptions,

16  so they -- they put a flatline assumption in there.

17  Q    Well, do you know that with the exception for -- with the

18  exception of December 2020, that assumption proved 100 percent

19  correct?  That's exactly what NexPoint paid for the first 35

20  out of the 36 months on that forecast?

21  A    We didn't have a lot of turnover before the bankruptcy,

22  and it was based on head count and it was based on percentages

23  of people.  So, yeah, the assumption probably played out until

24  people started moving in and out and until the assets under

25  management changed.  But, yeah, that makes sense.

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 14   Filed 10/03/22   Page 659 of 888   PageID 2969

Dondero - Direct                                    34

1  Q    This is what you were told they would pay, and this is

2  exactly what, in fact, they did pay with the exception of

3  December 2020.  Do you know that?

4  A    I don't know that except for you're telling me that and

5  showing me that here.

6       And I'm reluctant to give any credence to a projected

7  (indiscernible) forecast based on a lot of assumptions having

8  to have been -- happened to have been right in a year or two

9  somehow overrides the contracts that's very specific and very

10 clear.

11 Q    Well, if you take $6 million a year and you divide it by

12 12, that's $500,000 a month.  Right?  Simple math.

13 A    Roughly, sure.

14 Q    Not even roughly.  Exactly.  Right?

15 A    Okay.  It's not exactly six million, but yes.  Okay.

16 Q    Well, if you add 3,024,000 plus 2,976,000, you actually

17 come to exactly 6,000,000.  Right?

18 A    Okay.  Yeah, then it's exactly 500,000.

19 Q    It is.

20 A    Yes.

21 Q    And you were told in April of 2020 that NexPoint would pay

22 exactly $500,000 for each and every month through the end of

23 the year.  Isn't that correct?

24 A    No.  No.

25      And all I'm saying is there's a responsibility to

Case 21-03010-sgj    Doc 116    Filed 04/18/22    Entered 04/18/22 09:05:40    Desc Main
Case 3:22-cv-02170-S    Document 11-14   Filed 10/25/23   Page 660 of 888   PageID 2977

Dondero - Direct                                                     35

1   administer a contract beyond the assumptions in a -- in a pro

2   forma. This is meant to be an overall year-end review.  It's

3   not meant to be a detailed review of all contracts.  It's --

4   it's meant to be approximate.  It's summarizes everything to

5   six, seven line items instead of a hundred line items.  It's

6   not a -- it's for planning purposes.  That's -- that's what

7   this document is.

8   Q    Are you aware that the corporate accounting group prepared

9   in the ordinary course of business 13-week forecasts?

10  A    Yes.

11  Q    And do you understand that those 13-week forecasts

12  included the amount of money that the Advisors were going to

13  pay to Highland for the services?

14  A    We have similar assumptions on a variety of things, also,

15  yes.

16  Q    And were those forecasts given to you?

17  A    Sometimes we -- we went over them periodically.

18  Q    And when you say "we would go over them," you went over

19  the 13-week forecasts with Mr. Waterhouse and Mr. Klos.

20  Correct?

21  A    Generally.

22  Q    And you continued to get forecasts after the bankruptcy.

23  Correct?

24  A    Not much.  A little bit.  I -- things changed with the

25  bankruptcy.

Dondero - Direct                                    36

1    Q    All right.  So before the bankruptcy, there is no question

2    before the bankruptcy, you got the 13-week forecasts that

3    showed exactly how much the Advisors were projected to pay

4    under their contracts with Highland.  Right?

5    A    Yes.

6    Q    And after the bankruptcy filing, certainly before the

7    Independent Board was appointed, you continued to get the

8    13-week forecast.  Right?

9    A    There was only a few weeks in between there.  I don't know

10   if I saw anything in that few weeks.

11   Q    And Highland filed disclosures on the docket showing how

12   much revenue they generated and the sources of their revenue.

13   Right?

14   A    Scant -- scant detail.  But yes, a little bit regarding

15   revenue.

16   Q    And even after Mr. Seery was appointed, Mr. Waterhouse and

17   Ms. Hendrix would still give you information about NexPoint and

18   the advisors and their projections.  Right?

19   A    I did get information on the advisors after the

20   bankruptcy, the advisors and entities that weren't part of the

21   bankruptcy.

22   Q    Can you go to Exhibit 150, please, sir?

23        And do you see that this is an email that Ms. Hendrix sent

24   to you in April 2020, where she attached a NexPoint cash

25   forecast?

Dondero - Direct                                37

1   A    Yes.

2   Q    And do you see that she invited you to discuss the

3   forecast if you had any questions?

4   A    Yes.

5   Q    And do you see the forecast is not a big document.  Right?

6   It's just a one pager?

7   A    Yes.

8   Q    It's a cash forecast?

9   A    Yes.

10  Q    And it shows that for every single month from May 2020

11  until December 2020, NexPoint was projected to pay Highland how

12  much?

13  A    (No audible response)

14  Q    $500,000.  Right?

15  A    Yes.

16  Q    So, here they are in April 2020 repeating exactly what

17  they told you was going to happen, what they projected to

18  happen, back in January of 2018.  Right?

19  A    Okay.  Those are projected numbers.  They're not

20  reconciled.  They're not trued up.  They're part of contracts

21  that need to be administered.  The fact that they're putting in

22  a flat line with an expectation to reconcile it later is not a

23  surprise.

24       People don't reconcile things on a daily basis or minute-

25  by-minute basis.  It happens in due course when it's efficient.

Dondero - Direct                                    38

1  I don't know if -- I don't know when they normally reconcile,

2  if it's quarterly or monthly or yearly, but those are questions

3  for Frank and Klos.  But you would never have a specific

4  contract that isn't reconciled when it has a lot of variables

5  in it.

6  Q    At this point, Frank Waterhouse's wings had not been

7  clipped.  Right?  It's April.

8  A    Correct.

9  Q    And so he's still the person who is responsible for

10 administering the contracts in accordance with their terms.

11 Right?

12 A    He's the one -- he and his group are responsible for

13 administering the contract, due course, best practices, yes.

14 Q    And he is telling you in April 2020 exactly what he told

15 you in January of 2018, and that is the cost of NexPoint's

16 contracts with Highland would be $500,000 a month.  Correct?

17 A    That was his -- for cash flow purposes, that was his

18 assumption, yes.

19 Q    Okay.  And do you understand, do you know that for every

20 single month from January 2018 until the end of November 2020,

21 NexPoint paid exactly $500,000?

22 A    I don't know exactly when he told me to stop paying, but

23 hopefully they stopped paying when I told them to stop paying.

24 Q    Well, you told them to stop paying after you got notice of

25 termination of the shared services agreements.  Correct?

Dondero - Direct                                    39

1  A    No.  I told them to stop paying once we realized we were

2  being over billed.

3  Q    And that occurred after you got notice of termination of

4  the shared services agreements.  Correct?

5  A    I don't know.  I have no recollection of that.

6  Q    All right.  We'll deal with Mr. Norris on that topic.

7       But there's no question -- you don't have any reason to

8  question the assertion that NexPoint paid exactly $500,000

9  every single month for 35 months until the end of November 2020

10 when you directed Mr. Waterhouse not to make any further

11 payments, fair?

12 A    Yeah.  I've no reason to know that they didn't.

13 Q    All right.  Okay.  I want to go back in time a little bit.

14      Are you aware that in January 2018, Frank Waterhouse

15 signed a sub-advisory agreement on behalf of both advisors?

16      Do you know that?

17 A    Not specifically.  And, again, I knew there was a task

18 force that changed and improved it to be compliant.  And I

19 assume that's what you're referring to.

20 Q    It's not.

21      Can you grab Volume 1 of 2, please, and go to Exhibit 5.

22      Do you see that's a sub-advisory agreement?

23 A    Yes.

24 Q    And do you see, if you look at the end, that Mr. -- and

25 his signatures appear on the page ending in Bates Number 580.

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 14   Filed 04/03/28   Page 665 of 888   PageID 2769

Dondero - Direct                                    40

1    Do you see Mr. Waterhouse signed this sub-advisory

2  agreement on behalf of both NexPoint and Highland?

3  A    Yes.

4  Q    Did you authorize him to do that?

5  A    Not specifically.

6  Q    No.

7    Do you have any knowledge that Mr. Waterhouse signed a

8  sub-advisory agreement effective as of January 1, 2018, on

9  behalf of both Highland and NexPoint?

10 A    I have general awareness there was a tax legal compliance

11 accounting task force to make this agreement as accurate and

12 proper and best practices as possible.  And this is their work

13 product that Frank, as leading the group signed, and I'm fine

14 with him signing it.  But I was not specifically involved and I

15 don't have direct recollection.

16 Q    Okay.  That's fair.

17    Can you just turn to Page 3?

18 A    3 of this contract?

19 Q    Yes.

20    Do you see it required a monthly fee of $252,000 in

21 Section 2(a)?

22 A    I'm sorry.  Section 2(a)?

23 Q    Yes.

24 A    Two dot zero one.  Is that -- I'm sorry.  Maybe I'm in the

25 wrong --

002682

Dondero - Direct                                    41

1  Q    We're in Exhibit 5.  It's Exhibit 5, Page 3.

2  A    Hang on.  I'm sorry.  I was in Exhibit 6.

3  Q    Take your time.

4  A    Exhibit 6, Page 2.  Okay.

5  Q    Yeah, we're at Exhibit 5, Page 3.

6  A    Page 3.  Okay.

7  Q    Do you see the compensation there is $252,000 a month?

8  A    Yeah.

9  Q    And do you see that it's a fixed fee?

10 A    Yes.

11 Q    And it doesn't have anything to do with costs, does it?

12 A    Hold on a second.

13 Q    Take your time.

14 A    I think what's happening here is I think there's two

15 agreements.  There's one for back-office people, or back office

16 function, in general, which has a fixed fee to it which is

17 probably what this is.

18      And then, there's one that looks like the other one we

19 were looking at that has a list of people in the back and the

20 percentages of their time.  And that's the one that's cost plus

21 and reimbursement.

22      And this -- this one I believe was more fixed based on

23 just general services provided.

24 Q    Okay.  So would you agree that sub-advisory services are

25 what's commonly known as front-office services?  They're

002683

Dondero - Direct                          42

1  investment advisory services.

2  A    Everybody uses different names.  The front-office one is

3  generally a people-oriented one and, then, the other one is

4  generally a more fixed overhead.

5  Q    Are you aware that this sub-advisory agreement was

6  replaced with the payroll reimbursement agreement five months

7  later?  Do you know that?

8  A    Well, that's what I had said earlier, that from 2013 on,

9  there was a general fixed structure one that wasn't best

10 practices, wasn't compliant from a regulatory or tax

11 standpoint, that was with a task force made to be compliant and

12 split into two.  And if it happened six months after this one

13 was signed, I don't have specific knowledge, but I know the

14 compliant improved, enhanced one. Was enforced in '18.

15 Q    All right.  I'm really not trying to trick you.

16 A    Well, that's how it feels.

17 Q    So I want to clear this up because that's exactly what I'm

18 not trying to do.  I'm trying to get your best recollection.

19 And if you don't recall, you don't recall.

20      But if you look at Exhibit 3, you'll see that's the shared

21 services agreement for NexPoint as of January 1, 2018.  And

22 that's a fixed fee contract.

23      Take your time and look at it.  I don't mean to rush you.

24 A    Right.

25 Q    But if you take a look at -- right.  That's the amended

Case 21-03010-sgj    Doc 116    Filed 04/18/22    Entered 04/18/22 09:05:40    Desc Main
Case 3:22-cv-02170-S    Document 14    Filed 01/23/23    Page 668 of 888    PageID 2978

Dondero - Direct                                          43

1  and restated NexPoint agreement.  It's a fixed fee agreement.

2  If you take a look at Page 9, the consideration, its says "flat

3  fee of $168,000 per month."

4  A    Yes.  Okay.  I understand what you're doing now.

5  Q    Okay.

6  A    NexPoint had the front-office people working at NexPoint

7  because we had public greets, people or officers there.  There

8  were investment professionals there.  NexPoint didn't have

9  investment professionals at Highland.

10  Q    So you created a new sub-advisory agreement for that

11  purpose?

12  A    Well, what I'm saying is the sub-advisory agreement should

13  be different for the -- or should be somewhat different, either

14  in amounts or mechanism, between Hfam and NexPoint.  And I

15  don't know if that's --

16  Q    No.  I'm just not --

17  A    And, again, I know you're trying to trick me, but if --

18  Q    I'm not.

19  A    -- you're saying there's one agreement here, and ah ha,

20  there's two agreements with Hfam, they're different entities.

21  Q    I'm not even talking about HCMFA.

22  A    Okay.

23  Q    I'm really just focused on NexPoint.

24        Are you aware that on January 1, 2018, NexPoint entered

25  into two new agreements with Highland, one of which was a

Dondero - Direct                                    44

1   shared service agreement for back and middle office services

2   and one was a sub-advisory agreement for investment advisory

3   services.  Do you know that?

4   A    My general understanding is they both, Hfam and NexPoint,

5   signed two that were better and more accurate, appropriate to

6   reconcile, proper split, not art, more science-based on, on

7   formula, and they both did.

8        I was just -- I thought you were trying to go down a path

9   and only one of them did, or one of them was different than the

10  other.

11       I wasn't that involved in the process, but there were

12  great efforts made by the people involved to make them

13  appropriate and complaint.

14  Q    Okay.  And, in fact, HCMFA did not sign the sub-advisory

15  agreement at the beginning of 2018.  Are you aware of that?

16  A    No.

17  Q    One was prepared, but they didn't sign it.

18       Do you know that?

19  A    No.  I have no awareness of that.

20  Q    And are you aware that the sub-advisory agreement that was

21  signed by Mr. Waterhouse on behalf of NexPoint and the sub-

22  advisory agreement that was prepared for HCMFA but not signed

23  by anybody, were actually replaced by these payroll

24  reimbursement agreements.

25       Do you have any recollection of any of that or any

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 14   Filed 04/28/23   Page 670 of 888   PageID 2970

Dondero - Direct                                          45

 1  knowledge?

 2  A     Frank would be your person.

 3  Q     Okay.

 4  A     If the timing was so close, they might've held off on one

 5  agreement because they knew it was coming.  Maybe they signed

 6  one in due course because an auditor needed it.

 7  Q     I don't want you to speculate.

 8  A     You know, I mean, I have no idea, but you ask him.

 9  Q     You're the person in control, so I'm asking you.  If you

10  don't know, just say I don't know.

11  A     I don't know.  I have no idea.

12  Q     Okay.  Did you ever read the Payroll Reimbursement

13  Agreement before it was signed?

14  A     No.

15  Q     Have you read it today?

16  A     No.

17  Q     Do you ever look at that Exhibit A that was attached to it

18  cause you referred to it?  Do you ever look at that Exhibit A?

19  A     I saw it, but it was exactly what I expected, a list of

20  people and percentages.

21  Q     Are you aware that some of those people had been

22  terminated from Highland before the agreement was even signed?

23  A     The day I became aware of that, and we were still paying

24  for them, is the day we stop paying.

25  Q     Oh, that's when you first learned?

Dondero - Direct                                      46

1  A    No.  I mean, I knew -- I mean, I knew people had left the

2  company, but the day I first knew that we were still paying for

3  people who had left the company was the day we stopped paying.

4  Q    Ah, okay.  But there's no question that you knew when the

5  people on that Exhibit A left the company.  You knew that.

6  Right?

7  A    Sure.

8  Q    Sure.  Okay.

9       Was it your understanding that when one of the individuals

10  listed on Exhibit A was terminated that the amount of money

11  that NexPoint would pay to Highland would be reduced?

12       Was that your understanding?

13            MR. RUKAVINA:  Your Honor, I'll object on

14  speculation.  The witness said he did not read that payroll

15  reimbursement agreement, negotiate it, so this is all based on

16  speculation.

17            THE COURT:  Overruled.

18            THE WITNESS:  Absolutely.  But when it was

19  reconciled, I don't know.  I wasn't, you know --

20  BY MR. MORRIS:

21  Q    So it's your understanding that every time a dual employee

22  left Highland, that NexPoint should have gotten a reduction in

23  the amount of money it paid under the payroll reimbursement

24  agreement.  Do I have your understanding correctly?

25       Is that fair?

002688

Dondero - Cross                          47

1  A    Yeah.  Absolutely.  Why would you have a list of people

2  and percentages otherwise?

3  Q    Okay.

4  A    You wouldn't have it.

5  Q    Okay.  And did you ever take any steps to make sure that

6  when dual employees left, there was a reduction in the amount

7  of money that NexPoint was paying to Highland?

8  A    We relied on Highland for that in the fees we were paying

9  Highland.  We didn't have the staff to do it in our entities.

10 Q    Well, in fact, I think you testified, and I'll just ask

11 you to confirm, that until the summer of 2020, Frank

12 Waterhouse, as the treasurer or the CFO of the advisors, who

13 had a fiduciary duty, one of his responsibilities was to

14 administer the contracts in accordance with their terms.

15     Do I have that understanding correct?  He was the one,

16 until the summer of '20, until Mr. Seery did what you contend

17 Mr. Seery did, until that moment, he is the one on behalf of

18 the advisors who had the responsibility of administering

19 contracts.  Right?

20 A    Yes.  Administering.

21          MR. MORRIS:  I have no further questions, Your Honor.

22          THE COURT:  All right.  Pass the witness.

23                    CROSS-EXAMINATION

24 BY MR. RUKAVINA:

25 Q    Mr. Dondero, what was your title at Highland in 2018 and

002689

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 14   Filed 10/28/21   Page 53 of 888   PageID 2973

Dondero - Cross/Rukavina                          48

 1  2019?

 2  A     President.

 3  Q     Okay.  Were you at the top?

 4  A     Yes.

 5  Q     For the record, what was the size of Highland at that

 6  time, revenue, assets under management, employees?

 7  A     Very similar to today, really, in terms of asset size.

 8  About 650 million in assets.

 9  Q     Owned assets.

10  A     Owned assets.

11  Q     What about managed assets?

12  A     Well, I can't -- I know it was bigger.  The CLOs were

13  bigger.

14  Q     Are we talking about billions?

15  A     Yeah.  It was --

16  Q     And approximately how many employees in 2018?

17  A     Boy, maybe 40, 50 more than today.

18  Q     So how many in total?

19  A     150 maybe.

20  Q     Okay.  And just approximate annual revenue back then?

21  A     I don't know.

22  Q     Well, let me ask you this.

23  A     Yeah, sure.

24  Q     As the president of an entity that had hundreds of

25  millions of dollars in assets, billions of dollars under

Dondero - Cross/Rukavina                                    49

1  management, and hundreds of employees, would you expect that

2  you would know every detail about every contract or every

3  negotiation?

4  A    No.  No, we had a good accounting staff.  We had a good

5  compliance staff.  We had a good legal staff.  And they did

6  their jobs respectively to administer things appropriately, the

7  way we were operating, which was typical of other asset

8  management firms.

9  Q    So I take it you would get advice from subordinates from

10 time to time.

11 A    Yeah, sometimes.  Yeah, it --

12 Q    Would you act on that advice?

13 A    Yeah.  And it was --

14 Q    Would you receive instructions?

15       MR. MORRIS:  Objection.  Leading.

16       THE COURT:  Overruled.

17 BY MR. RUKAVINA:

18 Q    Would you receive instructions?

19 A    Yes.  And --

20 Q    And who would execute those instructions?

21 A    It would depend on the area.  But, you know --

22 Q    Would it be you?

23 A    No, I wouldn't execute it.  But, it would depend on the

24 area.  If it, you know -- we would -- we act very quickly to

25 anything coming from compliance that was a concern.  Anything

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 14   Filed 05/08/23   Page 675 of 888   PageID 2939

Dondero - Cross/Rukavina                                      50

1  from tax would also be a priority.  And then, you know, the

2  accounting or GAAP accounting kind of caught up around the --

3  Q    And let me interrupt you.

4  A    -- annual audit.

5  Q    Let me interrupt you because --

6  A    Sure.

7  Q    -- I really do want to move on.

8       And Mr. Waterhouse, he was a senior executive like

9  yourself.  Is that accurate?

10 A    Yes.

11 Q    Would you have expected Mr. Waterhouse to know the details

12 of all contracts and all transactions?

13 A    He had a staff, and he needed to have a significant staff.

14 They were the --

15 Q    Why did he need to have a significant staff?

16 A    There were a lot of audits.  There were a lot of public

17 company responsibilities.  There were a lot of private equity

18 company expenses.

19 Q    Were their contracts to manage?

20 A    Yeah, there was lots of things.  Everything from personnel

21 to --

22 Q    Would you have expected --

23 A    -- contracts to tax, you know.

24 Q    Would you have expected Mr. Waterhouse to personally

25 manage or administer contracts?

002692

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 14   Filed 12/28/21   Page 676 of 888   PageID 2986

Dondero - Cross/Rukavina                                        51

1  A    No.  He would have mechanisms set up for it.  And, again,
2  you can't administer contracts every 15 minutes.  You would
3  have some cost benefit to when you administered them or
4  reconciled them.
5  Q    So how would you expect Mr. Waterhouse to learn of a
6  potential problem with administering a contract?
7  A    Either one of his people would alert him to it or one of
8  the groups that were paying it would alert it to him -- alert
9  him to it or he would notice.
10 Q    Would you have expected him to notice for each contract
11 being administered if there were hundreds of contracts?
12 A    I mean, eventually.
13      I mean, a lot of things catch up at year-end or at the
14 audit.  But eventually, he or his team would -- or are
15 responsible for administering contracts.  It's rare it's a
16 major gaff and it's not good for people's career if -- let's
17 say you have a lease contract that's supposed to escalate every
18 year and someone forgets to escalate the rents for five years.
19      You know, it's -- that's -- that would be a bad reflection
20 on a lot of people because then it's a project to go back and
21 try and get it and argue it and whatever.
22 Q    Didn't Mr. Waterhouse, in fact, at some point in time,
23 inform you that he had learned of the overpayments.
24            MR. MORRIS:  Objection.  Leading.  I just --
25            THE COURT:  I didn't even hear the question --

Dondero - Cross/Rukavina                                    52

```
 1              MR. RUKAVINA:  I'm sorry, Your Honor.
 2              THE COURT:  --  to be honest.
 3   BY MR. RUKAVINA:
 4   Q    Did Mr. Waterhouse, at some point in time, inform you that
 5   he had learned of the overpayments?
 6   A    Yeah.  That was in --
 7              THE COURT:  Oh, overruled.  He can answer.
 8              THE WITNESS:  -- November or December of '20?
 9   BY MR. RUKAVINA:
10   Q    And was that -- and just to confirm, was that the first
11   time you learned of the overpayments?
12   A    Yeah, the first time I had learned that there were
13   overpayments that weren't reconciled or that we weren't getting
14   credit for.
15   Q    What do you mean by reconciled?
16   A    Well, that there wasn't a -- either a reduction in future
17   payments or something for overpayments in the past.  There's
18   lots of ways to --
19   Q    Was there a -- but --
20   A    -- satisfy a --
21   Q    Was there a general --
22   A    -- deficiency.
23   Q    Was there -- and I'm sorry to keep interrupting you, sir.
24   We just want to try to get done today.
25        Was there a general practice at Highland as far as
```

002694

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 14   Filed 10/13/22   Page 678 of 888   PageID 2982

Dondero - Cross/Rukavina                                          53

 1  reconciling or chewing up contracts?

 2  A    Not that I'm aware of.  I'm sure they had one, but not

 3  that I'm aware of.

 4  Q    Okay.  Are you aware that the two payroll reimbursement

 5  agreements were amended to provide $2.5 million of additional

 6  cash from the advisors to Highland?

 7  A    In what year was that?  Or that was --

 8  Q    At the end of 2018?

 9  A    Yeah.  I believe there was a reconciliation of some sort

10  there, yes.

11  Q    That's what I'm asking you.

12  A    Yes.

13  Q    What do you understand, if anything, about that

14  reconciliation?

15  A    That they did the proper true-up in the accounting and,

16  whether it was based on assets under management, work, or

17  people, they made the proper adjustments.

18  Q    Is that the only true-up to your understanding?  Because I

19  asked you about a general practice, and you said that there was

20  not.

21  A    I said I didn't know if there was.  If they did it at

22  year-end and you're telling me they did it year-end '18, it

23  sounds like it was a year-end process.

24  Q    Do you remember authorizing the advisors to pay $2.5

25  million in additional payroll reimbursement expenses at the end

Dondero - Cross/Rukavina                                              54

 1  of 2018?

 2  A    I don't remember.  I don't know if I would've had to

 3  authorize it if it was part of the true-up process.

 4  Q    And you were also asked whether, in light of what you

 5  described as Mr. Waterhouse's diminished role or clipped wings

 6  -- whatever words were used -- you expected someone else to

 7  administer the contracts with the advisors.  I want to follow

 8  up on that.

 9       Do you know who Dustin Norris is?

10  A    Yes.

11  Q    And what's your understanding of who he is for the

12  advisors?

13  A    That's a good question.  I don't want to -- I don't want

14  to fumble this one.

15  Q    Let me ask you this.  Is he an officer?

16  A    The broker-dealer, in some of the entities, yes.  I don't

17  know if all of the entities.

18  Q    Did you ask Mr. Norris to involve himself in any way with

19  these overpayments and these contracts?

20  A    Well, we were trying to do an amicable split.  After we

21  found out about the overpayments, Dustin was front and center

22  trying to have a soft landing instead of having everybody

23  kicked out of the building and then coming back and all that

24  nonsense.

25       But my recollection is in that November-December time

Dondero - Cross/Rukavina                                    55

1   frame, hearing about it from Frank, and then stopping excess

2   payments until we were trued up.

3   Q    And also, you were asked about Frank's official titles

4   with the advisors.  To your understanding, who was actually --

5   who actually employees Frank?  What company is his employer?

6   A    In the time frame we're talking about?

7   Q    No.  Today, sir.  When you were asked about today.

8   A    Today, he works for a Skyview.

9   Q    And what's Skyview?

10  A    Skyview is an amalgamation of the accounting staff and

11  legal staff in a separate entity.

12  Q    Former Highland employees?

13  A    Yes.

14  Q    And is that why you're not technically sure as to whether

15  he's an officer because he's an employee of Skyview?

16  A    That's right.

17  Q    Okay.  I think you've testified that whatever his role is,

18  he is in charge of accounting for the advisors?

19  A    Yes.

20  Q    Okay.  Today?

21  A    Yes.

22  Q    Okay.  And just for the record, the Court may or may not

23  know, but when you refer to Hfam, are you referring to HCMFA?

24  A    Uh-huh.  Yes.

25  Q    Okay.  Now, I don't think there's any point in showing you

Dondero - Cross/Rukavina                          56

1  the payroll reimbursement agreements since I think you

2  testified you never read them.  But there are amounts in those

3  agreements and those amounts total up to certain amounts per

4  year.  Are you following me so far?

5  A    Yes.

6  Q    Do you know how those yearly amounts were determined for

7  the two payroll reimbursement agreements?

8  A    Some of the fixed numbers are relevant to what's the fixed

9  expense base and then divided based on --

10 Q    Well, let me pause you.  Let me pause you.  I apologize.

11      I'm talking about just the payroll reimbursement now, not

12 the shared services.

13 A    Oh, the payroll --

14 Q    The payroll of --

15 A    Yeah.

16 Q    -- the employees.

17 A    Yeah, the payroll of the employees and they're, and I

18 don't want to call them unallocated, but some of the employees

19 are employees that represent various entities.  And then,

20 there's a percentage allocation of their time.

21 Q    And all that rolls up into a number.

22      Are you following me so far?

23 A    That's right because the percentage of their time is then

24 a percentage of their total comp.

25 Q    So what I'm asking you is, did you determine -- so

002698

Dondero - Cross/Rukavina                           57

1  remember, all those percentages and all that rolls up into a
2  number, okay?  Let's call that number X.  Are you with me?
3  A    Yes.
4  Q    Did you set or determine what X would be?
5  A    No.
6  Q    Do you know how X was determined?
7  A    By having the relevant people on the list and that the
8  less would hopefully be comprehensive and complete.  And the --
9  Q    Do you know who prepared --
10 A    And then, the percentage allocations would be appropriate.
11 Q    Do you know who prepared X?  X, again, being the number
12 that all this roles up into?
13 A    Yeah.  The starting -- the starting appendix with all
14 those people on it was that task force of legal, compliance,
15 and accounting to provide the starting point.  And those
16 documents that are based on people and percentages are living
17 documents that change over time.
18 Q    Do you know whose idea it was originally to have those
19 payroll reimbursement agreements?  In other words, you talked
20 about how the prior agreements were changed for best practices.
21      Do you know whose idea that was?
22 A    I believe it came from the auditors which came from -- the
23 auditors from a tax and a regulatory standpoint.  You can't
24 just have whimsical numbers.  There has to be a basis for the
25 allocations.  And the more directly you can tie it to people

Dondero - Cross/Rukavina                              58

1  and contribution and a percentage of overhead, the better.  And

2  that's -- that's why the new contracts were presented best

3  practices.

4  Q    Because they have to withstand regulatory and tax

5  scrutiny?

6  A    Yeah.

7  Q    Okay.

8  A    Yeah -- or yeah, that's right.  Scrutiny or challenge if

9  --

10 Q    So if someone suggests that you pulled numbers out of thin

11 air, $5 million for HCMFA, on an annual basis, and $6 million

12 for NexPoint on an annual basis, would you agree with that?

13 A    No.

14 Q    Okay.  And if someone suggests that you pulled those

15 numbers for a reason involving trying to get liquidity into

16 Highland, would you agree with that?

17 A    No.  I would say --

18 Q    And if someone -- hold on, sir.

19 A    Yeah.

20 Q    And if someone suggested that you pulled those numbers in

21 order to get tax deductions for the Advisors, would you agree

22 with that?

23 A    No.

24 Q    Okay.

25 A    Yeah.

Dondero - Cross/Rukavina                               59

1  Q    What were you going to say, sir?  You were going to

2  explain.

3  A    I was going to say that the purpose of best practices was

4  to avoid any assertions by regulatory or GAAP accountants or

5  tax accountants that it was tax fraud.

6       What you're describing is tax fraud, which means the

7  people who did it, instead of -- if they did it and they said

8  they did it, and they said they did it because I told them,

9  then they committed tax fraud, and their defense is they didn't

10 do anything about it.  Or --

11 Q    That's the Nuremberg Defense I think, sir.  But let me --

12 A    -- or complained.  And instead they just --

13 Q    Let me --

14 A    -- their defense is going to be I told them?

15 Q    Let me interrupt you again.  Let's assume it's the

16 Nuremberg Defense.  How long have you known David Klos?

17 A    Several -- you know, a bunch of years.  Ten years,

18 probably.

19 Q    Do you have an opinion of his professionalism?

20 A    He's --

21 Q    Prior to this litigation.

22 A    Prior to him being co-opted by --

23 Q    Yes.

24 A    Okay.

25           MR. MORRIS:  Move to strike, Your Honor.

002701

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 4   Filed 10/03/22   Page 685 of 888   PageID 2999

Dondero - Cross/Rukavina                          60

1          THE COURT:  Sustained.

2    BY MR. RUKAVINA:

3    Q    Prior to the confirmation of the bankruptcy plan, did you

4    have an opinion of Mr. Klos' professionalism?

5    A    I would divide it into two portions.  It was before he was

6    enticed --

7    Q    Well, let me --

8    A    -- to work for the --

9    Q    Because we're going to have motions to strike.  Let me ask

10   a different question.

11         MR. MORRIS:  I move to strike the word enticed.

12         THE COURT:  Sustained.

13   BY MR. RUKAVINA:

14   Q    Let me ask a different question.  In 2018, would you have

15   believed that David Klos could be -- could possibly create

16   deceptive documents for tax fraud or tax cheat purposes?

17   A    No.

18   Q    What about Mr. Waterhouse?

19   A    No.

20   Q    What about Ms., and I apologize, I count pronounce her

21   name, Thedford.  You know who I'm talking about, Lauren.

22   A    Right.  No.

23   Q    Okay.  Anyone at Highland?

24   A    No.  We were a very compliant organization.

25   Q    What about at the end of 2018 when the $2.5 million was

Dondero - Cross/Rukavina                                                61

1  paid as additional money under the payroll agreements.  Can you

2  imagine of anyone at Highland that would have done that for

3  some kind of tax cheat or tax fraud purposes?

4  A    No.

5  Q    And if someone testified here that the whole purpose of

6  these contracts was for the Advisors to suck money out of

7  Highland, would you have an answer to that?

8  A    I would say they're not telling the truth, and they're

9  incentivized to not tell the truth.

10 Q    And before Mr. Klos -- well, before -- through the year

11 2020, would you have expected Mr. Klos to flag any potentially

12 deceptive or potentially unlawful activities or documents to

13 you?

14 A    Yes.

15 Q    You met with Mr. Klos, you met with him regularly, didn't

16 you back then?

17 A    Yes.

18 Q    Would you have expected Mr. Waterhouse to flag or raise

19 issues with you if there was anything deceptive or potentially

20 fraudulent?

21 A    Yes.

22 Q    And did either of those ever raise any issue to you, or a

23 red flag with respect to the Shared Services Agreements or

24 Payroll Reimbursement Agreements?

25 A    Not to me, not to the auditors, not to compliance, not to

Dondero - Cross/Rukavina                              62

1  HR, not to anybody.

2  Q    Were you surprised when you learned towards the end of

3  2020 about the overpayments?

4  A    Yes.

5  Q    Were you angry?

6  A    Yeah.

7  Q    Why?

8  A    Why.  This has been a most unusual bankruptcy.  Right?

9  You have an initial assessment that after getting rid of a

10 couple people the first few months, that everybody else is

11 critical and needs to stay around.  And then you work everybody

12 extremely hard, particularly legal and accountants, to really

13 do all the work that Pachulski and DSA filed, and take tens of

14 millions of dollars of fees out.  But most of it was prepared

15 by our guys.

16      And then you get to the second half of '20, and the

17 decision is made that not only is there not going to be any

18 kind of key employee retention, but there's going to be an

19 attack on the employees, and they're not going to get paid

20 their '18 or '19 bonuses, or amounts for '20 either.  And then

21 some people who were most critical for preserving the estate

22 get fired for cause.  I mean, it's just crazy town.

23 Q    But --

24 A    So that's the backdrop.

25 Q    That's the back drop.  So --

002704

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 14   Filed 10/13/22   Page 687 of 888   PageID 2998

Dondero - Cross/Rukavina                                    63

1  A    So people were being paid and then --

2  Q    Are you aware, sir --

3  A    I have --

4  Q    Pardon me.  Pardon me.  Pause.

5  A    Sure.

6  Q    Are you aware, sir, that during all that time, the

7  Advisors were actually paying to Highland bonuses for these

8  employees that didn't get bonuses?

9  A    That's right.  And so --

10 Q    So were you angry about that?

11 A    So I was angry we were -- we were overpaying.  We were

12 having to make up rightful compensation to people from other

13 pockets to just keep people flat.  And at the same time, we're

14 getting overpaid, or we're getting overcharged for the services

15 we are using from Highland.

16 Q    Who are we being overcharged by?

17 A    Highland.

18 Q    And who was supposed to be monitoring our contracts for

19 appropriateness before we paid an invoice?

20 A    Highland.

21 Q    And who has maligned you for the last year and a half in

22 this court and everywhere else?

23         MR. MORRIS:  Objection to the form of the question.

24 This is just --

25         THE COURT:  Sustained.

Dondero - Cross/Rukavina                                    64

1  BY MR. RUKAVINA:

2  Q    We'll move on.  You were asked about the I think you said

3  upwards of about $10 million of payments to the senior

4  executives?

5  A    Yes.

6  Q    And you were asked whether you authorized those, and you

7  said yes?

8  A    Yes.

9  Q    Why did you authorize those?

10 A    Those were deferred payments that they were due.  In any

11 other bankruptcy in any normal court, they would have been paid

12 multiples of that.

13 Q    Well, whose idea was it to have those payments made?

14 A    Whose idea?  It was -- it was the employees who were

15 short-shifted.

16 Q    Did they talk to you --

17 A    I agree with -- yes.  They did.

18 Q    Okay.  And did they make any representations to you as to

19 whether such payments would be above-board or not?

20 A    We had legal -- like I said, we did check with legal --

21 Q    Okay.

22 A    -- counsel.

23 Q    Well, let's not get too --

24 A    Yeah.

25 Q    -- far into that.  Okay.  And you mentioned that you

Dondero - Cross/Rukavina                                65

1  believe that Mr. Surgent or Mr. Waterhouse informed Mr. Seery

2  of those payments?

3  A    Yes.

4  Q    And what is the basis of your understanding on that?

5  A    They were both having -- at that time, both having

6  negotiations with Mr. Seery regarding liability, severance, and

7  potentially staying on with Highland.  So I know it was part of

8  those conversations.

9  Q    Were those senior employees the core of your team at

10 Highland?

11 A    Yeah.  Part of it, for sure.  Yeah.

12 Q    Were you concerned about them disbursing to the wind, so

13 to speak?

14 A    Well, I was concerned that they would be treated unfairly,

15 unprecedented in bankruptcy really, in terms of being deprived

16 of prior bonuses by an estate that's twice as solvent as its

17 debts.  You know?

18 Q    And Isaac Leventon was one of those people.  Right?

19 A    Yes.

20 Q    And without going into a long sob story, did he have some

21 health issues with his children?

22 A    Yeah.  He's got a handicapped kid and a wife in a

23 wheelchair.  And somehow they wanted to screw him out of his

24 '18 and '19 bonuses.

25         MR. MORRIS:  I move to strike, Your Honor.  This is

Dondero - Cross/Rukavina                              66

1   just -- this is so irrelevant, and it's so --

2          MR. RUKAVINA:  And Mr. Morris opened the door.

3   Mr. Morris opened the door.

4          MR. MORRIS:  To what?

5          MR. RUKAVINA:  To the $10 million of bonuses.

6          THE COURT:  Okay.  Well, that is not the family

7   situation of Mr. Leventon.

8          MR. RUKAVINA:  I'm developing the answers as to why

9   he authorized those bonuses.  Mr. Seery was allowed, Your

10  Honor, respectfully, to pontificate for a long time.  This

11  gentleman needs to have the ability to tell his story.  People

12  are coming to your court saying that he paid $10 million under

13  the table in some nefarious plot to basically have moles and

14  cheats at Highland.  Even though Mr. Surgent is still there, I

15  remind you.  So I'm giving the man a chance to explain why he

16  authorized that.  I'm not allowed to lead, which is why I'm

17  asking it this way.

18         THE COURT:  I'll allow a little more on this topic,

19  that's it.

20  BY MR. RUKAVINA:

21  Q    Did other of these senior executives also have issues such

22  that they needed money?

23  A    Isaac's was the most acute.  And --

24  Q    But did that form a part of your reasoning for authorizing

25  the payments?

**WWW.LIBERTYTRANSCRIPTS.COM**

Dondero - Cross/Rukavina                          67

1  A    Yeah, absolutely.  But again, they were entitled to it.

2  They worked hard, they had maximized value in the estate, and

3  then the professionals in the estate decided to take the

4  estate.

5  Q    Okay.  And you mentioned a solvency, and twice the

6  solvency of the estate and liquidity.  What did you mean?  And

7  if you can, explain because you were also asked about whether

8  Highland was making or losing money in '18 or '19.  Explain

9  what you meant when Mr. Morris was asking you those questions.

10 A    The value of Highland estate today is $650 million.  And

11 it's sitting on 200 million in cash.  The Highland estate

12 really has not changed that much in terms of value.  It's

13 really just gone up over the last two years.  Okay?  There were

14 great efforts to hide and deceive the value of, and not

15 disclose the value of relevant assets.  But the value today is

16 650.

17 Q    What was the value in 2018, 2019, to the best of your

18 recollection?

19 A    Probably a low of 500.  Maybe 550.

20 Q    What prompted the bankruptcy filing?

21 A    We one arbitration award that we wanted to term out in

22 Delaware.  We wanted to term it out for -- into a one- or

23 two- year note.  And then that's it.  But we had --

24 Q    Was there --

25 A    We had a settlement with UBS four months, five months

002709

Dondero - Cross/Rukavina                              68

1  before we -- before we filed for $7 million and 10 million of

2  future business.  And HarbourVest was never really a liability.

3  Q    Did Highland file because of solvency issues?

4  A    No.

5  Q    Did Highland file because of liquidity issues?

6  A    No.  Well, liquidity issues, we -- we had -- we needed

7  time to raise the money for the -- we needed time to raise --

8  Q    And --

9  A    -- the money for the arbitration award.

10 Q    And sir, you're aware of certain promissory notes that

11 various affiliates and you have with Highland?  Are you

12 generally aware of those?

13 A    Yes.

14 Q    And prior to bankruptcy, on occasion would Highland come

15 to you and ask that some of those notes be prepaid for

16 liquidity purposes?

17 A    Yes.  Often.  And we generally did.  Yeah.

18 Q    Was that the primary way that if Highland needed to have a

19 pinch in a liquidity issue, it would raise money?

20 A    Yes.  I think once we were down to 50, 60 million.  At one

21 point they were as high as 90.  I think I paid 9 million in

22 notes in '19.  Yeah.

23 Q    Well, the point being can you think of why someone would

24 say that these contracts and the amendments, the 5, 6, and 2.5

25 million were used to finance Highland if Highland would come to

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 14   Filed 02/28/23   Page 694 of 888   PageID 2893

Dondero - Cross/Rukavina                                    69

1  you to prepay notes?

2  A    They were incentivized.  I have no idea why they would say

3  that.

4  Q    Mr. Seery testified earlier, you weren't here, he

5  testified about negotiations in the -- now we can't talk about

6  what happened in mediation.  Are you with me there?

7  A    Sure.

8  Q    But he testified generally that the mediation led to a

9  couple deals with the creditors.  But as far as you and your

10 businesses, it didn't really go well.  Without talking about

11 what was going on at the mediation, did you participate in

12 negotiations on a global or plot (phonetic) plan?

13 A    Sure.

14 Q    Did you participate in those discussions with the

15 principle creditors, the committee members?

16 A    I tried.  But the committee members had sold their claims

17 without telling the Court.  And we didn't find that out until

18 later.

19 Q    So in fact, they did file at some point in time notices of

20 transfer of their claim.  Right?

21 A    About eight months later.

22 Q    What do you know about those transfers?

23        MR. MORRIS:  Your Honor, I guess, like, it's his

24 witness, he can ask.  But I'm just going to object on relevance

25 grounds.  What on Earth does anything that he's testified to

Dondero - Cross/Rukavina                                    70

1  for the last 20 minutes have to do with overpays?

2          MR. RUKAVINA:  Your Honor, Mr. Morris and Mr. Seery

3  went on at length about how all these were contrived contracts

4  to suck value out of Highland from their creditors.  If you

5  look at their proposed findings, they're asking you for

6  findings on that, extraneous findings that will be used in

7  collateral litigation by the way.

8          So I think that just as that came in, even though I

9  objected on narrative, I objected on relevance, I think he has

10 the right for me to put on some evidence to rebut that.  Or if

11 Mr. Morris agrees that all of this is irrelevant, then

12 Mr. Seery's testimony should be struck in toto.

13         MR. MORRIS:  No, number one.  Number two, I have

14 nothing to do with any litigation that's being prosecuted by

15 Mr. Kirschner.  Let me make that very clear to the Court.  I

16 don't communicate with them about what I do.  They don't

17 communicate with me about what they do.  Like, I don't know

18 what he's doing, but this is a waste of time.

19         THE COURT:  Okay.  Well, I think some of it has been

20 arguably responsive to Seery testimony.  But things like the

21 claimants sold their claims and didn't disclose it for eight

22 months, I mean, clearly we're going down irrelevant trails

23 there.

24         MR. RUKAVINA:  Okay.  Well, we'll wrap it up.

25         THE COURT:  Okay.

Dondero - Cross/Rukavina                        71

1  BY MR. RUKAVINA:

2  Q    You mentioned that the assets of Highland are 600 million

3  today, including 200 mil in cash.  What's the debt against

4  Highland today?

5  A    There's just the claims.  There's --

6  Q    How much?  How much in total?

7  A    There's 260 million in class eight that were projected to

8  get 60 cents.

9  Q    Just tell me how much in total.

10 A    And there's another 85 of class nine.  So it was about 370

11 of claims.  There's 650 advance, there's 200 cash on the

12 balance sheet today.  All the claims traded to Fairlawn and

13 Stonehill (phonetic) for $155 million.  They were happy to buy

14 them because it was representative they were going to get

15 three --

16 Q    We'll stop --

17 A    -- plus others.

18 Q    We'll stop there.

19 A    Yes.

20 Q    We'll stop there.

21 A    Okay.

22 Q    We'll stop right there.  But the point is that to your

23 understanding, there's more than enough assets at Highland

24 today to pay all creditors in full?

25 A    Yes.  And by the way --

Dondero - Cross/Rukavina                         72

```
 1  Q    Let's talk --

 2  A    -- Highland could have paid the 150 million, retired all

 3  the claims, and given us the keys.

 4  Q    I understand.

 5  A    Seery gave the claims to his friends that he used to work

 6  for and with --

 7           MR. MORRIS:  You know, Your Honor, I'm just moving to

 8  strike.  This is ridiculous.

 9           THE COURT:  Sustained.

10           THE WITNESS:  It's all going to be in the trustee

11  letter.

12  BY MR. RUKAVINA:

13  Q    Mr. Dondero, it will all come up --

14  A    It's what we were --

15  Q    Hold on.  Hold on.

16  A    We're doing every recusal --

17  Q    Please stop.  Please stop.

18  A    We're doing every --

19  Q    Mr. Dondero, please stop.

20  A    Okay.

21  Q    All this will come out --

22  A    Okay.

23           MR. RUKAVINA:  -- into the light at the appropriate

24  time.  Thank you, Your Honor.  I'll pass the witness.

25           THE COURT:  Okay.  Redirect?
```

002714

Dondero - Redirect                    73

                              REDIRECT EXAMINATION

1                              REDIRECT EXAMINATION

2    BY MR. MORRIS:

3    Q    You're really angry, aren't you?  You're really, really

4    angry, aren't you?

5    A    No.  I'm trying to weigh the what should have been a

6    normal bankruptcy and it's turned into a financial mugging.  We

7    had 50 million.  Your firm was going to make 100 million.

8    Q    I work pretty hard.

9    A    Not enough.

10            MR. RUKAVINA:  This is ridiculous, Your Honor.  He's

11   taunting my witness.  I mean, you're really, really angry.

12   This is badgering, Your Honor.  This has gone the point of

13   professionalism.

14            THE COURT:  Okay.  Sustained.

15   BY MR. MORRIS:

16   Q    Frank Waterhouse told you about the overpayments?

17   A    That's my --

18   Q    That's how you learned.  Right?

19   A    That's my recollection.

20   Q    Frank told you.  Right?

21   A    That's my recollection.

22   Q    And when did he tell you?

23   A    November, December.

24   Q    He actually told you after December 8th, 2020.  Correct?

25   A    That's my recollection, yes.

Dondero - Redirect                                74

 1   Q    Okay.  Take a look in the Advisor's binder, Exhibit Q.

 2   A    Exhibit which one?

 3   Q    Q.  Do you see that's an email from Dave Klos to Frank

 4   Waterhouse?

 5   A    Yes.

 6   Q    And attached to it is the analysis that purports to show

 7   the overpayment?

 8   A    Yes.

 9   Q    So would you agree with me that you learned from

10   Mr. Waterhouse about the overpayment on or after

11   December 8th, 2020?

12   A    No.

13   Q    No?  Even though Mr. Waterhouse is just receiving the

14   analysis as of this time?

15   A    You're assuming this is the first analysis that was done,

16   and this is the first time Frank knew.  I don't know those

17   things.  My recollection is November, December.

18   Q    So it's possible that it was on or after December 8th.

19   It's at least possible, right, that it's December.

20   A    I don't want to speculate.

21   Q    What did he tell you?

22   A    That we had been over billed for people that no longer

23   worked at the company.

24   Q    Did he tell you when he learned that these people no

25   longer worked at the company?

Dondero - Redirect                                      75

1   A    No.

2   Q    Did he share that analysis with you?

3   A    No.  Not that I recall.  I don't remember seeing that

4   before.

5   Q    Had you ever learned of this analysis?

6   A    I know that detailed analyses were prepared.  I just -- I

7   just don't recall receiving that one.

8   Q    Did you speak with Mr. Waterhouse on the phone or in

9   person, or by email?  How did he tell you?  Do you recall?

10  A    I don't remember.

11  Q    Do you recall if anybody else was present when he told

12  you?

13  A    I don't recall.

14  Q    And is it your understanding that the basis for the

15  overpayment is that the Advisors were being charged for

16  employees who were no longer on the list that was attached to

17  the agreement?

18  A    Yeah, I think that was the bulk of it.  And then probably

19  percentages changed also.

20  Q    Okay.  Do you know how many people on the list were

21  terminated before the petition date?

22  A    No.

23  Q    Do you know -- so you were in control of both Highland and

24  the Advisors from January 1st, 2018 until the end of 2019.

25  Correct?

Dondero - Redirect                                    76

1   A    Yes.

2   Q    And Mr. Waterhouse was responsible during that period for

3   overseeing the administration of the Advisors' contracts.  Is

4   that right?

5   A    Yes.

6   Q    And it's your -- the reason why you're so mad is because

7   the Advisors were paying for employees who were on that list

8   who had been terminated.  Is that right?

9   A    No.  I'm mad because Seery's trying to steal the company

10  for his friends.

11  Q    Listen.  You're mad because -- I just want to focus on the

12  overpayments, okay?  On the overpayments, you're mad because

13  Highland has charged the Advisors for employees that you

14  believe they shouldn't be doing because they've been

15  terminated.  Right?

16  A    I answered this question already.  I was potentially angry

17  with the overpayments because the debtor decided not to pay

18  bonuses for people for '18 and '19, decided not to pay any

19  bonuses for senior people, and then rough handled and sued

20  hardworking employees that did most of your work out the door.

21  Q    Can you open your exhibit binder please, sir, to Exhibit

22  14?  And go to Page 12 of 18.

23  A    Page 12 of 18?

24  Q    Yes.

25  A    Exhibit 18?

002718

Dondero - Redirect                                77

1  Q    It's Exhibit 14, Page 12 of 18.

2  A    Exhibit 14.  Page 12, yes.

3  Q    Okay.  Do you see there's a list of people there, and it

4  continues to the top of the next page with Scott Wilson?

5  A    Sure.

6  Q    Okay.  Are you familiar with the concept of dual

7  employees?

8  A    Yes.

9  Q    And do you understand that the dual employees were listed

10  on the exhibits attached to the payroll reimbursement

11  agreement?

12  A    If that's what it says.  I'm not -- I know what dual

13  employees are.  I don't know how this contract worked.

14  Q    Okay.  Do you see -- so you don't know how the contract

15  worked?  But yet you think that there's overpayments.  Right?

16  A    I know generally how it works.  I don't know specifically

17  on dual employees.  But there are people who are allocated and

18  it's based on generally a percentage of time.

19  Q    Okay.  So I just want to really get your understanding and

20  to the heart of your allegation that there's an overpayment

21  here.  Do you see that the interrogatory asked, and I'll

22  represent to you that these are interrogatories that were

23  answered by the Advisors.  Okay?

24       We asked identify the date you believe each form of dual

25  employee identified on the exhibits to the Payroll

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 14   Filed 01/18/23   Page 703 of 888   PageID 2007

Dondero - Redirect                                                      78

1  Reimbursement Agreements departed the debtor.  And do you see

2  that they've listed each of the dual employees with the dates

3  of departure?

4  A    Yes.

5  Q    Okay.  And do you see for example that -- I want to pick

6  the right one here -- Michael Phillips (phonetic).  Do you see

7  Michael Phillips was terminated in February 20, 2018?

8  A    I don't know if he was terminated.  But yeah, that's the

9  date.  Right?

10  Q    That's the date he left.  Right?

11  A    Yes.

12  Q    And that's the date the Advisors admit knowing that he

13  left.  Right?

14  A    It appears so, yes.

15  Q    And if you look at interrogatory number four on the next

16  page, it says the Advisors were generally aware of the

17  employee's terminations and departures as they occurred.  Okay?

18  So would you agree with me that the Advisors were generally

19  aware of Michael Phillips' departure on February 20th, 2018?

20  A    Yes.

21  Q    And is it your testimony that if the Advisors paid for

22  Mr. Phillips in March of 2018 there was an overpayment?  Is

23  that the overpayment you're talking about that they shouldn't

24  have paid for Mr. Phillips in March because he had been

25  terminated?

Dondero - Redirect                                     79

 1  A     I assume this is the last day that they were getting paid.

 2  Right?  So I don't want to quibble on whether this was their

 3  exit date and they got paid for severance or something else.

 4  But I think what the overpayment is is that most of these

 5  people were continuing to be factored into the number nine,

 6  ten, twelve months later.

 7  Q     They were factored into the number for every single month

 8  in 2018 and 2019 when you were in control of the entities.  Are

 9  you aware of that?

10  A     But then there should have been a true-up.

11  Q     And Frank Waterhouse was responsible for that.  Correct?

12  A     Him and his group, yeah.  There should have been a true-

13  up.  Correct.

14  Q     And do you know if a true-up was required by the contract?

15  A     There always is in living, breathing contracts.

16  Q     Let's turn to the contract and you point me to the

17  provision where you believe that there's an obligation --

18         MR. RUKAVINA:  Your Honor, this is nonsense.  He's

19  said that he's never read these contracts, that he has no

20  personal knowledge.  He's badgering and it leads to legal

21  conclusions.

22         MR. MORRIS:  Your Honor, he is testifying that he

23  believes that there is a contractual obligation to do a true-

24  up.  If he wants to say that I'm not aware of anything but I

25  just assumed that one would happen, I'm happy to live with

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 1-4   Filed 10/22/21   Page 705 of 888   PageID 2009

                          Dondero - Redirect                    80

 1  that.  If that's --

 2              THE WITNESS:  I'm not aware, but I assume there would

 3  be a true-up.

 4  BY MR. MORRIS:

 5  Q    Okay.  So you assumed that there would be a true-up.

 6  Right?

 7  A    Yes.

 8  Q    Did anybody ever tell you there was a true-up?

 9  A    I would assume there would be a true-up.  No one told me

10  until November, December of '20.

11  Q    Okay.  Did you ever ask anybody at the end of 2018 if

12  there was a true-up?

13  A    No, I never asked.

14  Q    Did anybody tell you at the end of 2018 that there was a

15  true-up?

16  A    I don't know if it was material.  It might have been just

17  this one kid that left.  I have no idea.

18  Q    We can look at the whole list if you want to do that.

19  Okay?

20  A    No.  But I don't know.  And no one told me there was a

21  true-up.

22  Q    That's my only question.

23  A    Or no one told me there wasn't, either.  I'm not aware.

24  Q    Okay.  So you didn't ask if there was a true-up, and

25  nobody told you there was a true-up at the end of 2018.

Dondero - Redirect                                    81

1   Correct?

2   A    Correct.

3   Q    You didn't ask if there was a true-up, and nobody told you

4   that there was a true-up at the end of 2019.  Correct?

5   A    I don't know.

6   Q    Okay.  In fact, you have no knowledge that there was ever

7   a true-up of any kind done with respect to the payroll

8   reimbursement agreements.  Correct?

9   A    I don't know.  I don't know if it was material.  You guys

10  were both implying a few minutes ago that there was a two and a

11  half million dollar true-up one year, an additional payment for

12  something.

13  Q    Let --

14  A    So, but I don't know the specifics.  All I know is when

15  they alerted me at the end of 2020 that oh my God, we've been

16  overpaying, it's not reconciled, they're not cutting back the

17  payment, they had an expectation in the way they told me such

18  that I'd stop paying because we were paying over.  They had an

19  expectation that there was some kind of true-up or they

20  wouldn't have told it to me to get a stop paying this

21  immediately out of me --

22  Q    Who's they?

23  A    -- which is what happened.

24  Q    Who's they?

25  A    Frank.

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 4   Filed 02/28/18   Page 707 of 888   PageID 2017

Norris - Direct                                    82

1  Q    Frank is they?

2  A    Yeah, Frank is they.  Yeah.

3  Q    And did Frank tell you that the way that the methodology

4  for his decision that there was an overpayment was to say that

5  we were paying for employees who were no longer at Highland?

6  A    We were overpaying based on the contract, based on largely

7  people weren't there.  Now whether or not we were also paying

8  for people who the percentage was wrong, I don't know.  But he

9  -- he expressed it with Umbridge (phonetic), and with Awe

10 (phonetic).  Umbridge and Awe and that's where --

11 Q    Umbridge --

12 A    -- that's where we stopped paying.

13 Q    Okay.  And -- but is it fair to say at least your

14 understanding is that the bulk of the claim is that you were

15 paying for employees who were no longer employed at Highland?

16 Is that basically it?

17 A    My understanding is largely that.

18          MR. MORRIS:  Okay.  No further questions, Your Honor.

19          THE COURT:  Recross?

20          MR. RUKAVINA:  I have no follow up, Your Honor.

21          THE COURT:  All right.  You're excused from the

22 witness stand, Mr. Dondero.

23          THE WITNESS:  Thank you.

24      (Witness excused)

25          THE COURT:  All right.  Shall we take a break and

Norris - Direct                                              83

 1   then --

 2              MR. MORRIS:  Yes, Your Honor.  Yes.

 3              THE COURT:  Let's take a ten-minute break, please.

 4        (Recess at 2:58 p.m./Reconvened at 3:09 p.m.)

 5              THE CLERK:  All rise.

 6              THE COURT:  Please be seated.  We're back on the

 7   record in Highland.

 8              Mr. Morris, what do you have?

 9              MR. MORRIS:  Last witness.

10              THE COURT:  Okay.

11              MR. MORRIS:  Mr. Norris.  I just need a second to

12   find my questions.

13              THE COURT:  Okay, we'll go ahead and get Mr. Norris

14   up here and sworn in.

15              Please raise your right hand.

16              DUSTIN NORRIS, PLAINTIFF'S WITNESS, SWORN

17              THE COURT:  All right.  Please be seated.

18                        DIRECT EXAMINATION

19   BY MR. MORRIS:

20   Q    Good afternoon, Mr. Norris.

21   A    Good afternoon.

22   Q    You've been here for the last couple of days.  Right?

23   A    I have.

24   Q    I hope this is a little bit more low-key than the last

25   witness.

Norris - Direct                          84

1   A    I hope so, too.

2   Q    Okay.  I don't expect this examination to be particularly

3   lengthy.  So I would just ask you to listen carefully to my

4   questions.  Do the best you can to -- to answer them.

5        From 2000 and -- are you -- are you currently employed by

6   either of the Advisors?

7   A    I'm employed by NexPoint Advisors.

8   Q    And what's your title today?

9   A    The title of the -- my operating title is Head of

10  Distribution and Chief Product Strategist.

11  Q    Okay.  And do you have a roll with HCMFA?

12  A    I am an officer of HCMFA.

13  Q    And do you have a title?

14  A    Yes.  Executive Vice-President.

15  Q    Okay.  And were you affiliated with those two entities as

16  of January 1st, 2018?

17  A    I was.

18  Q    And in what capacity did you serve for NexPoint as of

19  January 1st, 2018?

20  A    The same capacity as I serve today.

21  Q    And did you serve in the same capacity for HCMFA as of

22  that time?

23  A    I believe so, yes.

24  Q    Okay.  So your role hasn't changed; your titles haven't

25  changed in the three or four years since 2018.  Is that fair?

Norris - Direct                          85

1   A     I don't believe so.

2   Q     Okay.  You didn't -- you've listened to the testimony in

3   this trial so far?

4   A     I have.

5   Q     Okay.  I'm just asking that question to try to speed this

6   up a little bit.

7         You're aware that in late 2017 through May of 2018, there

8   were a number of new contracts and changes made in the way that

9   the Advisors compensated Highland for services.  Is that right?

10  A     Yes.  I'm aware.

11  Q     Okay.  But you didn't personally participate in any of the

12  discussions during that time period about the changes that were

13  made and the methods and amounts that were going to be paid for

14  services.  Fair?

15  A     No.  I did not participate.

16  Q     Okay.  And you played no role in formulating, drafting, or

17  administering the sub-advisory agreements that were prepared

18  for NexPoint and HCMFA in March of 2018.  Correct?

19  A     Correct.

20  Q     In fact, were you even aware that sub-advisory agreements

21  were prepared for those two entities at that time?

22  A     I don't remember being involved or having any -- any

23  awareness.

24  Q     Okay.

25  A     At that time.


**WWW.LIBERTYTRANSCRIPTS.COM**

002727

Norris - Direct                                          86

1  Q    Okay. And you played no role in the replacement of those

2  sub-advisory agreements with the payroll reimbursement

3  agreements as of May 1st, 2018.  Right?

4  A    I -- I played no role.

5  Q    So you didn't -- you didn't participate in discussions

6  about what that document was intended to do.  Correct?

7  A    That's correct.

8  Q    And you didn't participate in any review of the language

9  that was going to be used in the document.  Correct?

10 A    Correct.

11 Q    And you didn't review Exhibit -- the Exhibits A that I

12 think you're familiar with, that were attached to those

13 agreements.  Correct?

14 A    Not at that time.

15 Q    And you had no basis of knowing whether the allocations

16 that were used as of May 28th -- as of January 1st 2018 were

17 accurate in any way.  Right?

18 A    Well, based on my working knowledge and my interaction

19 with employees at HCMLP and the Advisors, I can see the

20 allocations and have assumption on the reasonableness.  But I

21 was not involved at that time in assessing the reasonableness.

22 Q    When did you learn that Exhibit -- Exhibits A existed?

23 A    Over -- I don't remember exactly.

24 Q    Do you remember what year it was?

25 A    Probably '19 or '20.

Norris - Direct                              87

1  Q    Okay.  And do you know -- kind of --

2  A    Maybe '18.  It was sometime after it was drafted.

3  Q    Okay.

4  A    And signed.

5  Q    All right.  So we've used the definition called "relevant

6  time period" to mean from January 1st, 2018 until the end of

7  2020.  Okay.  Is that fair?

8  A    Yes.

9  Q    Okay.  Do you remember at all where within the relevant

10 time period you first learned that these Exhibit As existed?

11 A    I don't remember the exact time, no.

12 Q    Do you remember if it was before or after the bankruptcy?

13 A    I don't remember.

14 Q    Do you remember if it was before or after the Independent

15 Board was appointed?

16 A    I don't remember.

17 Q    Okay.  Did you form an understanding at some point -- no,

18 withdrawn.  We'll get there.

19      So you didn't participate in any discussions at any time

20 in the spring of 2018 about what the Payroll Reimbursement

21 Agreements were intended to accomplish.  Correct?

22 A    I did not.

23 Q    And you didn't play -- are you aware that NexPoint entered

24 into a new Shared Services Agreement as of January 1st, 2018?

25 A    At that time was I aware --

Norris - Direct                                88

1   Q    Yes.

2   A    -- or am I aware now?

3   Q    Were you aware at the time?

4   A    I was not.

5   Q    And you didn't play any role in the drafting, in the

6   formulation, or the administration of the NexPoint Shared

7   Services Agreement.  Correct?

8   A    No, I did not.

9   Q    And even though it wasn't signed at that time, you played

10  no role in the drafting or the formulation or the

11  administration of the HCMFA Shared Services Agreement.

12  Correct?

13  A    That's correct.

14  Q    Okay.  Do you know now that there were amendments to the

15  Payroll Reimbursement Agreements at the end of 2018?

16  A    I do.

17  Q    You didn't play any role in drafting, or administering, or

18  making any decisions in connection with those amendments.

19  Correct?

20  A    No.  I have no personal knowledge.

21  Q    And so you have no personal knowledge as to how those

22  amounts were calculated.  Correct?

23  A    Correct.

24  Q    You have no personal knowledge that any true-up was done

25  that formed the basis of the numbers in those amendments.

Norris - Direct                          89

1  Correct?

2  A    At that time, no.  But I was told there was a true-up that

3  was done.

4  Q    Okay.  But you have no personal knowledge that a true-up

5  was done.  Right?  Somebody told you that?

6  A    Somebody told me there was a true-up, yes.

7  Q    And who told you that?

8  A    Mr. Klos.

9  Q    And when did Mr. Klos tell you that?

10  A    December -- December 2020.

11  Q    So you were speaking with Mr. Klos --

12  A    Uh-huh.

13  Q    -- in December 2020.  And it's your testimony that he said

14  that the amendments that were done in 2018 were the result of a

15  true-up?

16  A    He didn't tell me about the amendments.  He told me that a

17  true-up had been done in 2018, but we didn't discuss the

18  specific amendments.

19  Q    Okay.  Do you have an understanding of what a true-up is

20  in that context?

21  A    I do.

22  Q    And what's your understanding of what a true-up is?

23  A    Well, based on the conversation we were having, which was

24  around the actual payments and the employees that were on

25  Schedule A, all right, we saw the emails earlier that Mr. --

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 1   Filed 09/28/22   Page 795 of 888   PageID 4029

Norris - Direct                                                    90

 1  Mr. Klos discussed.

 2      We were talking about those overpayments.  And as we were

 3  -- you know, Mr. Sauter and I were trying to discover what had

 4  actually happened.  He told us there was a true-up done in

 5  2018.  There was no similar true-up done in 2019 or 2020

 6  because of the bankruptcy filing in October 2019.

 7  Q    Okay.  Are you aware that as of the date of the

 8  amendments, I think the number is nine of the employees, the

 9  dual employees on the Exhibit A were terminated?

10  A    I'm aware that there are employees that as of that date

11  that have been terminated.

12  Q    Can you tell Judge Jernigan why you believe that with the

13  loss of approximately a third of the dual employees why you

14  think a true-up would result not in the diminution in the

15  amounts owed, but an increase by $2.5 million in amounts owed;

16  how does that make sense?

17  A    Yeah, I don't have any personal knowledge, as I mentioned

18  on what the calculations, how they were done, what went into

19  it.  I would just be speculating if I said here is how or why.

20  I know Mr. Klos testified that percentages aren't of time spent

21  aren't perfect.

22      There could be compensation.  Right.  That one person

23  received due to Fund performance.  Again, I'm -- I would be

24  speculating. I don't know.

25  Q    So it's possible that even though employees left, that

Norris - Direct                                                91

1    Highland would be entitled to even more money if the people who
2    remained pick up the slack.  Is that fair?  And got paid more.
3    That's possible.  Right?   That's what he told you.
4    A    Do you want to repeat the question?
5    Q    You want to repeat the question?
6    A    He told you, if I understand you correctly, that even
7    though almost a third of the employees left, Highland was still
8    entitled to get millions of dollars more money because the
9    services that had been provided by those dual employees, were
10   just picked up by other people?
11   A    No.
12        He didn't tell me that. He said a true-up was done. He did
13   say it resulted in a slight payment to Highland.  But he didn't
14   go into any of the calculations or the why.
15   Q    Okay.  But you do understand that more than -- that
16   approximately a third of the employees had been terminated
17   before this -- these amendments were entered into.  Correct?
18   A    I'd have to see the specific names, but there were a
19   number of them had been terminated, yes.
20   Q    Okay.  And even though the number of employees went down,
21   the payments when up by $2.5 million.  Correct?
22   A    I have no reason to question the amendments or the wording
23   in the amendments.
24   Q    Okay.  You had access to headcount information at all
25   times.  Correct?

                            Norris - Direct                        92

1   A    Not at all times, but I would receive a monthly report

2   that's been shown in the emails.

3   Q    And we looked at that, and you got that headcount report

4   every single month for the three year period that we're talking

5   about.  Right?

6   A    I believe so.  And I don't know for sure that I -- when I

7   was added, I was added at some point over the last few years,

8   but I did receive it.

9   Q    We're certainly not going to look at every one of them.

10  Let's see if --

11  A    If you go to January 2018, that's probably the quickest

12  way to rule it out.  Because I never got removed once I was

13  added.

14         MR. MORRIS:  Just one moment, Your Honor.  I

15  apologize.

16         THE WITNESS:  Is there an exhibit I should be looking

17  at?

18         MR. MORRIS:  Not yet.

19         THE WITNESS:  Okay.

20  BY MR. MORRIS:

21  Q    So if you can go to Exhibit 88.  Do you see that this is

22  the headcount report that was delivered on February 1st for the

23  month of January 2018?

24  A    It is.

25  Q    And your name is on it.  Right?

1  A    It is.

2  Q    And so your understanding is that for every month covering

3  the headcount report, from January 2018 until the end of 2020,

4  those are headcount reports that would have been delivered to

5  you.  Right?

6  A    That's correct.

7  Q    So you're not sure when you learned of the existence of

8  Exhibit As, but whenever that was, you could have figured out

9  yourself, who on Exhibit A was no longer employed at Highland.

10 Right?

11 A    Absolutely.

12      And -- but the key assumption was that we were reimbursing

13 for only employees that were still employed.  And that was

14 always my expectation, once I learned about Exhibit A.

15 Q    Did you talk about that with Frank?

16 A    What part?

17 Q    Did you tell Frank -- when did you develop that

18 expectation?  In December 2020?

19 A    No.

20      At some point between the actual creation of the

21 agreement, when I first saw it, and understood it was a payroll

22 reimbursement agreement.  And there was an exhibit that had

23 percentage allocation of employees that were one, serving as

24 dual employees, and two, providing investment advisory

25 services.  That was the actual purpose of the agreement, right,

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 31   Filed 01/23/23   Page 719 of 888   PageID 4029

Norris - Direct                                                      94

1  was for reimbursement.

2  Q    Did you ask Frank, Frank, how come you kept paying the

3  money when all these people left.

4  A    I did.

5  Q    What did he say?

6  A    He told me there was nothing he could do because of the

7  automatic stay.  He and Dave Klos were in a meeting.  That was

8  the first time I had heard the word automatic stay.

9  Q    Uh-huh.

10  A    And that he had brought it.  They -- they had

11  calculations.  And that he had brought it to the attention of

12  DSI.  And the told him -- and he said inside and outside

13  counsel.  And there was nothing he could do because of the

14  automatic stay.

15  Q    He did not say outside counsel.

16  A    He did.  Well, I should say in his December -- in our

17  December meeting he said counsel.  We talked again over

18  multiple times.  And at the end of January on a call, he said

19  inside and outside counsel.

20  Q    January of 2021?

21  A    Yes, I --

22  Q    Did you hear him testify yesterday that he never told me

23  or anybody in my firm?

24  A    I did, yes.

25  Q    So -- so maybe you misheard him?

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 4   Filed 09/28/18   Page 790 of 888   PageID 2020

Norris - Direct                                                              95

1  A    I may have misheard him, but I --

2  Q    Okay.

3  A    -- I -- I did take -- after that call I did take notes.

4  And I wrote down inside and outside counsel.  I could have mis-

5  remembered.  But I had written that down.

6  Q    Did you ask him why he didn't make any change from January

7  18 until the petition date?

8  A    January 18th of which --

9  Q    Let me restate the question.  Did you say hey, Frank,

10 okay, you've given me your answer after DSI comes along.  But

11 what about the two years before that?  Why didn't you make any

12 adjustments for the two years before that, when nobody ever

13 heard of Fred Caruso or Jim Seery.

14 A    Yeah.

15     They told me there was a true-up done in December of 2018.

16 And then I actually was trying to figure out, make any sense of

17 the fact that there were employees had been -- many of them,

18 like 20 employees that were no longer there.  And so discussing

19 this with Dave and Frank, I -- I realized and learned from them

20 they were in a tough situation.  Why didn't they do anything.

21 Well, when they told me, it made sense.  They said December

22 2018 there was an annual true-up.

23     Fast forward to the bankruptcy filing in October 2019 and

24 to this point I wasn't really involved in all of the bankruptcy

25 time lines or process.  I'm separately running my business.  So

Norris - Direct                                          96

1  they tell me that okay, October it was filed.  There was put in

2  place something they couldn't change in the agreements.

3  Because of the automatic stay.

4       Again, I'm not an attorney.  It's the first time I'm

5  learning of the bankruptcy law.  But in 2019 there was no true-

6  up done.  Nor in 2020.  Right.  So there was something done,

7  and it would have been done at the end of '19 and '20, had

8  there not been a bankruptcy in place.

9       So -- and to me -- and the reason I remember that

10  specifically is a light bulb went off to me and said that makes

11  sense.  Okay.  They were trying to do what was right.  They

12  understood it.  They would have made a true-up or an

13  adjustment.  Whatever you want to call it for the proper people

14  that were serving under these agreement.

15       But they were told that they couldn't.  And at that point

16  we had to, you know, go our way of actually filing an admin

17  claim for that.

18  Q    Did you hear Frank Waterhouse testify yesterday that he's

19  not aware of any true-up?

20  A    I don't remember specifically.  But it was David Klos that

21  told me about the true-up.  Told me and Mr. Sauter.

22  Q    Did you hear him testify yesterday that there was no

23  analysis of any kind done to support the $2.5 million?

24  A    I don't know  if he said he didn't -- there wasn't an

25  analysis, or if he said he didn't recall.  Because I know a lot

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 64   Filed 04/27/23   Page 722 of 885   PageID 40832

Norris - Direct                                                    97

1  during that he didn't recall.

2  Q    He actually said that Jim Dondero said the number.  Does

3  that refresh your recollection?

4            MR. RUKAVINA:  Your Honor.

5            THE WITNESS:  I think that was Mr. Klos.

6            MR. RUKAVINA:  Your Honor, I'm --

7  BY MR. MORRIS:

8  Q    That -- that is who I'm talking about.

9  A    You said Mr. Waterhouse.

10 Q    Oh, I apologize.

11 A    Did he not?

12           MR. RUKAVINA:  Yes, he did.

13           THE WITNESS:  Okay, sorry.

14           MR. MORRIS:  Okay.  Thank you.

15           THE COURT:  Let's ask again and make sure we're

16 clear.

17           MR. MORRIS:  Sure.

18 BY MR. MORRIS:

19 Q    Okay, so it's your testimony that -- was it just Mr. Klos

20 or was it Mr. Klos and Mr. Waterhouse who told you that there

21 was a true-up at the end of 2018?

22 A    Mr. -- it came from Mr. Klos.  I believe Mr. Waterhouse

23 was there.  Mr. Sauter, as well was told, along with me.  By

24 Mr. Klos.

25 Q    Okay.  You did a damage calculation for purposes of this

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-01170-S   Document 14   Filed 09/19/22   Page 722 of 885   PageID 4073

Norris - Direct                                                    98

1   case.  Right?

2   A    I did.

3   Q    And what you did is you took the amounts paid and reduced

4   it by --

5            MR. RUKAVINA:  Your Honor, let me just object now.

6   Are you going to agree to the admission of the damage

7   calculation?

8            MR. MORRIS:  Sure, I'll agree.

9            MR. RUKAVINA:  Okay.  Your Honor, that's going to be

10  -- Thomas is that H and I? It  is what it is.  Your Honor, it's

11  Exhibit G is the PDF printout.  That's the one we had the

12  stipulation on yesterday about the math.  Is that right?

13           MR. MORRIS:  Yes.

14           MR. RUKAVINA:  And then the electronic version is H.

15  Is H.  So I'll move to admit G and H.

16           THE COURT:  And you agree to it?

17           MR. MORRIS:  Yeah.

18           THE COURT:  Okay, they're admitted.

19      (Defendants' Exhibits G and H admitted into evidence.)

20  BY MR. MORRIS:

21  Q    There's no expertise.  There's no special skill that you

22  brought to that analysis.  Right?

23  A    It's simple math.

24  Q    It's simple math.  Right?  And I think that's what you

25  told me in the deposition.  All you did was you took the money

Norris - Direct                                                99

1  that was paid, and you reduced it by the compensation for the

2  dual employees who were terminated.  Fair?

3  A    I -- I took month by month the employees that were

4  employed.

5  Q    Uh-huh.

6  A    And their total compensation multiplied by the allocation

7  percentages.  And as employees dropped off, so did the

8  compensation.

9  Q    Okay.  And once --

10 A    Or the reimbursement, I would say.

11 Q    And once you had the data, how long does it take you to

12 run them all?

13 A    If I -- say if I wanted to change assumptions?

14 Q    Sure.

15 A    You could do it fairly easily if you know Excel.

16 Q    Five minutes?

17 A    To make sure that it's accurate, maybe longer.  I mean it

18 --

19 Q    Maybe ten.

20 A    Not -- again, the math part is easy.

21 Q    Okay.

22 A    It's --

23 Q    And so is there any reason that anybody on behalf of the

24 advisors, couldn't have done that analysis on February 1st,

25 2018 to take into account the employee who left in January of

002741

Norris - Direct                         100

1  2018?  Any reason at all that they couldn't have done it then?

2  A    We had relied and outsourced that to Highland.

3  Q    Okay.

4       Okay.  And the person who would have overseen what you

5  assumed would have happened -- right?  Because you assumed that

6  Highland was making these changes.  Right?

7       That's your testimony.  Your testimony is that you sat

8  back for three years and you assumed Highland was only charging

9  what you thought they should charge.  Right?

10 A    Yeah.

11      And a key component of that -- if there's payroll data

12 involved, we didn't have access to that.  There was a very

13 limited number of people.  Highland employees only.  That's an

14 important component of this.  So yeah, we had relied on

15 Highland.  We didn't have an accounting function.

16      Why was I -- I say it's simple math.  I had to create the

17 spreadsheet.  I'm a CPA.  I worked at a big four accounting

18 firm.  I worked in Highland's back office when I started as a

19 fund accountant.  I managed.  I was a senior accounting

20 manager.

21 Q    You have-huh.

22 A    So -- so but that was -- ended in 2013.  So there's a

23 number of Excel skills.  We didn't maintain that.  I shifted

24 roles. Focused more on the growth and marketing.  But we -- we

25 outsourced those functions to Highland.

002742

Norris - Direct                                    101

1  Q    How long did it take you to create the model?  A day or

2  two?  Less?  Once you had the data.

3  A    Yeah, it was just a couple few days.

4  Q    So why didn't the advisors just create a contact that said

5  every time a dual employee left, let's just reduce the amount

6  that's paid by their compensation, in real time?  You could

7  have created the model, and in five minutes, instead of doing

8  this true-up at the end of the year, why didn't they do that?

9  A    The people that helped create the contract were Highland

10 employees.  The ones that knew about the calculations.  The

11 ones that had access to the data.  We didn't have a separate

12 team saying well, let's shadow everything that Highland is

13 doing, for contracts.  That is what they were doing.  That was

14 their function.

15 Q    And they all reported to Frank Waterhouse.  Correct?

16 A    Yes.

17 Q    Can you identify one person who you assumed would be

18 administering the contract, who didn't report to Frank

19 Waterhouse?

20 A    No.

21 Q    Thank you.

22        MR. MORRIS:  I have no further questions, Your Honor.

23        THE COURT:  All right.  Pass the witness.

24                    CROSS EXAMINATION

25 BY MR. RUKAVINA:

002743

1  Q    This might be a bit, so if you need some water, let me

2  know.

3  A    I got -- I still have some.  Thank you.

4  Q    So I think Mr. Morris has gone through some of these

5  issues.  But do tell the Judge, please about your educational

6  background.  On a high level.

7  A    Yeah, I have a master's degree in accounting from Brigham

8  Young University and a bachelor's degree in accounting and I

9  have a CPA license.

10 Q    Okay.  Any other professional licenses?

11 A    Yeah, I have a FINRA Series 7, 63 and 24 licenses.

12 Q    How old are you?

13 A    38 years old.

14 Q    Have you ever been disciplined professionally with respect

15 to any of these licenses?

16 A    Never.

17 Q    Okay.  Are you a family man?

18 A    I am.

19 Q    Are you a religious man?

20 A    I am.

21 Q    Do you swear?

22 A    I don't.

23 Q    Do you drink?

24 A    I never have.

25 Q    Any trouble with the law?

Norris - Cross                          103

1  A    No.

2  Q    When did you first join Highland?

3  A    2010, June of 2010.

4  Q    Before that you mentioned you were with some other

5  accounting --

6  A    I was at Deloitte and Touche.

7  Q    What did you do there?

8  A    I was an auditor, an outside auditor, auditing large

9  corporations.

10 Q    And when you joined Highland, what was your role?

11 A    I was a fund accountant in the Hedge Fund and Private

12 Equity Fund Accounting Group.

13 Q    And tell me about your progression at Highland and how you

14 ended up coming to the Advisors and when?  Again, at a high

15 level.

16 A    Yeah.  So when I joined Highland, I started out overseeing

17 accounting and operations, cash management for several of the

18 large hedge funds, private equity funds, and separate accounts.

19 Worked there for two years, got great training, and was given

20 the opportunity to then manage for our retail complex, the

21 accounting and operations team.

22      So I moved employers to Highland Capital Management Fund

23 Advisors around July of 2012.  At that time Highland HCMLP, the

24 hedge fund side of the business or institutional had a separate

25 accounting and operations team than the retail side.  And so I

002745

1  moved over and I was managing accounting, operations, trade

2  settlement, cash management, as well as the broader accounting

3  functions for about 22 mutual fund and closed-end funds.

4       I did that for a little while and then transitioned into

5  what we call product strategy or product development.  So

6  developing new funds, merging funds, acquiring funds, launching

7  training sales people and, at that time, somewhat transitioned

8  the services from our retail funds to the Highland's back

9  office, merging those in.  And my employees moved over, and

10 became employed by HCMLP, as well.

11      So, yeah, I have had experience in several different parts

12 of the business.  Then from there I -- I worked on our

13 closed-end funds and continued to manage, became director of

14 product strategy, and then chief product strategist, and then

15 took over our sales team and became the president or

16 broker/dealer managing all of the marketing and relationship

17 management --

18 Q    This is still while at Highland?

19 A    -- inside sales.  This is all at Highland Capital

20 Management Fund Advisors/NexPoint.

21 Q    Okay.

22 A    From 2012 until the present day.

23 Q    Okay.  And in those ten years, I take it, you've

24 interacted with Highland Capital Management LLP, repeatedly?

25 A    Yes, extensive.

Norris - Cross                                        105

1  Q    At a high level in '18, '19, '20, what did the debtor do?

2  What was the debtor's business?

3  A    '18, '19 and '20?  The debtor's business?

4  Q    Yes.

5  A    Largely -- obviously, they had a services business where

6  they provided shared services.  But that was a function of,

7  they were providing it for various advisory entities.  They

8  managed assets, largely credit, private equity, some at-public

9  equities and included providing services to our advisors.

10 Q    And in that same time frame, '18, '19 and '20, what did

11 the advisors do?  I mean what was their core business and did

12 it change at all over that time?

13 A    Yeah.

14      So when I moved over to the advisors in 2012, we were

15 largely focused on public equities and credit, which was a

16 specialty of Highland.  And so we relied heavily on those

17 services from a back-office and front-office perspective over

18 the coming years.

19      But we started -- in -- in 2012 our advisors had almost no

20 real estate assets. And as we shifted from 2012 into '15 to

21 '18, the real estate business grew significantly.  And so we

22 just started developing a real estate business in-house. Our

23 investment professionals.

24      And if you look at the assets today, approximately maybe

25 three-quarters are real estate assets.  Where less than a

002747

1  quarter are credit and equity and private equity.

2  Q    And on that point, you heard Mr. Powell, and we talked

3  about the retail board some this morning, the $3 billion.  Did

4  you hear all that?

5  A    I did.

6  Q    Generally, what percentage of either the advisor's

7  business or assets under management, whatever the appropriate

8  metric is --

9  A    Uh-huh.

10 Q    -- you tell us.  How much of that whole pie do those

11 retail funds represent?

12 A    Yeah.

13       So we today, NexPoint Advisors and HCMFA manage

14 approximately $11 billion in assets.  And the retail funds as

15 Ethan testified are approximately 3 billion.  So less than 30

16 percent.

17 Q    Would that also be fair to say that that's about how much

18 of your internal time -- the Advisors time an employee is?

19 Servicing the funds is 25 or 30 percent?  Or would the fraction

20 be different?

21 A    Meaning the Advisor employees?

22 Q    Yes.

23 A    It depends.

24       There's some of them that spend 100 percent in non-retail

25 products.  But a number of people do spend -- maybe it's an

1  approximate amount of time, yeah.  So we have you know publicly

2  listed reads; we have private reads; we have 1031 exchange

3  vehicles.  So there's -- there's a lot of other businesses

4  outside of that.

5  Q    You know, we've heard talk about so-called front office.

6  How do you, in your mind define or how do you understand front-

7  office personnel to mean or to be?

8  A    Yeah.  So it is someone providing investment advisory

9  services.

10 Q    Are the front-office employees different back ten years

11 ago when the Advisors were doing more debt and equity than they

12 would be today, when they're doing more real estate?

13 A    Actual employees at the Advisors?

14 Q    Or -- of the actual professionals that would be providing

15 those front-office services.

16 A    Yes.

17      Historically we did rely a lot more on Highland.  Right.

18 Given their credit expertise.  Given the assets that we

19 managed.  And that's part of the, you know, payroll

20 reimbursement agreements.

21      Today, you know, from call it maybe 2018 to today, we've

22 gone from maybe 5 NexPoint, for example, investment

23 professionals to around 25.  And that has been -- and those are

24 almost all real estate focused individuals.

25 Q    So let's zero in on that.  Turn to Exhibit A.  That's one

Norris - Cross                                              108

 1  of the Payroll Reimbursement Agreements.

 2          MR. RUKAVINA:  And, Your Honor, they have the same

 3  Exhibit A.  It's just different percentages.

 4  BY MR. MORRIS:

 5  Q    So are you familiar with these 25 people here?

 6  A    I am.

 7  Q    Okay.  I'm going to avoid that first name.  I tried and I

 8  did not do a good job.

 9          MR. MORRIS:  Mr. Rukavina, I apologize.  Which

10  exhibit are you?

11          MR. RUKAVINA:  I'm sorry.  My Exhibit A and Exhibit A

12  to my Exhibit A. Which is the list of employees.

13          MR. MORRIS:  And is it NexPoint or is it -- because I

14  don't think I have it.  You may have the --

15          MR. RUKAVINA:  I'm sorry.  It's HCMFA.

16          MR. MORRIS:  Okay, thank you.

17  BY MR. RUKAVINA:

18  Q    Did you at one point in time know all of those 25 people?

19  A    Yes.

20  Q    Did you know what they did?

21  A    Yes.

22  Q    And tell us either on a high level or zero in how many --

23  or group in how many of them did the debt and equity front-

24  office services vis-a-vis real estate services.

25  A    Sohan was the credit guy.  Cameron being the private

1  equity --

2  Q    And private equity is that -- did you include that when

3  you're talking about debt and equity.  Is that the same thing

4  as equity?

5  A    Equity and private equity. Yes.

6  Q    Keep going.  Keep going.

7  A    Mete (phonetic) Burns, credit.  He's a credit expert.

8  Hunter Covitz, CLOs, which is collateralized loan obligations,

9  made up of credit.  Neil, another CLO guy. Jim, as you know.

10 Eric Fedorshin (phonetic), worked on the credit team; Matthew

11 Gray was a credit analyst; Sanjay Gulati 100 percent of his

12 time was allocated to HCMFA.  He was 100 percent associated

13 with our main clone, ETF, which was a credit fund that was

14 around 5 or $5 million at one point, and is $30 million today.

15       Chris Hayes (phonetic) was a loan or credit trader;

16 Bobby Hill (phonetic) bounced between teams.  Brendan McFarland

17 (phonetic) was on the credit research team.  Carl Moore

18 (phonetic) with Private Equity; Igor (phonetic) was credit.

19 David Owens (phonetic) I believe was a credit trader.

20       Trey Parker (phonetic) was head of credit research

21 and then became co-CIO and ran the credit and equity investment

22 process.

23 Q    CIO, chief investment officer?

24 A    Chief investment officer.  Andrew Parmenter (phonetic) was

25 brought in.  He started in around 2017.  Was a partner of the

Norris - Cross                                        110

1  firm.  Michael Phillips (phonetic) was a credit guy.  John

2  Pavlish (phonetic) was head of credit research after -- after

3  Trey Parker was promoted to co-CIO.

4        Philip Ryder (phonetic) I believe he was -- yeah, I don't

5  know  the specific, either credit trader or credit.  Kunal was

6  a credit.  Allen Smallwood ( phonetic) was a credit guy.  Mara

7  (phonetic) was public equities, maybe private equity.

8        Jake Tomlin (phonetic) was managing director on the credit

9  team.  Ann Seager (phonetic), I believe, was a par credit

10 analyst who ran credit.

11 Q    And you mentioned that in that same period of time -- '18,

12 '19, '20 -- the advisors went from having 5 in-house investment

13 employees to, what did you say, 25 or 27?

14 A    Approximately, yes.

15 Q    Okay.  And were -- so the delta is whatever, 20, let's

16 just say.  That increase?

17 A    Yes.

18 Q    Okay.  Were those new employees -- were any of those new

19 employees any of these employees?

20 A    As speaking today number of employees?

21 Q    Yeah.

22 A    So one of them did come over when -- actually two.  But

23 he's no longer there.  Hunter Covitz after February 2021 and

24 Sohan.

25        I don't believe any of the others.  Most of them were gone

Norris - Cross                                          111

1   by then.  I think there may have only been five come February.

2   Q     Well, that's my question.

3   A     Yeah.

4   Q     That's my next question.  Did it matter to the Advisors

5   for purposes of their business that 20 of these employees over

6   a period of time were no longer there?

7   A     It didn't.

8         As our business had morphed into much more real estate

9   focused.  We did rely some on them.  Right.  We still had the

10  five or six that were still there.  But it -- it wasn't a -- a

11  big part of our business at that point.

12  Q     Because there's been some implication made by Mr. Klos

13  that as these employees fell off, Highland made up for them

14  with other employees.  Do you agree with any such assertion?

15  A     I don't.  I -- I -- I believe they hired one front-office

16  investment professional.  The existing professionals may have

17  pitched in some.  But a lot of those functions were at our

18  advisors.  And I -- I mentioned the real estate professionals.

19  But there were -- there were a couple other in professional

20  HCMFA, Joe Sowin who became co-CIO when -- when Trey Parker was

21  promoted to co -- head of private equity.

22        He was an HCMFA employee.  When Mark O'Connell (phonetic)

23  left and then Trey Parker left, Joe Sowin and Jim Dondero were

24  co-CIO's.  Both employees of our Advisors.

25  Q     So I think it's important for Your Honor to understand the

Norris - Cross                               112

 1  relationship between the PRAs and the shared services

 2  agreements.

 3       So still looking at this Exhibit A, were these the only

 4  Highland employees that provided services to the Advisors?

 5  A    Any services or front-office services?

 6  Q    Any services.

 7  A    No.

 8  Q    There were a number of Highland employees providing

 9  back-office and middle-office services.  Is that correct?

10  A    That's correct.

11  Q    And do you have an understanding pursuant to what

12  agreement those employees were being used?

13  A    That was according to shared services agreements.

14  Q    So is it important to clearly delineate between the two

15  types of agreements?

16  A    It is.

17  Q    If we want to find out what services were being provided?

18  A    Yes.

19  Q    Okay.  And just while we're on here, so that Her Honor

20  understands the rest of our discussion, go to Page 1 of this

21  exhibit, Exhibit A.  And Section 2.01.

22  A    Yes.

23  Q    I think you mentioned earlier, Mr. Morris was asking you

24  that it shouldn't just be a dual employee, but needs to be

25  providing investment services.  Do you remember mentioning

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 26-14   Filed 01/12/25   Page 737 of 885   PageID 42843

Norris - Cross                          113

1  something like that?

2  A    Yes.  They -- they need to be a dual employee --

3  Q    So that's --

4  A    -- and then they must be able to provide advice to any

5  investment company, investment related service, I think how I

6  explained it in -- provide advice to any investment company.

7  Q    So if some Highland back-office employee or middle-office

8  employee is providing services to the Advisors, would you

9  consider them to fall within this contract?

10 A    If they're providing any services, or if they're providing

11 --

12 Q    No, if they're --

13 A    -- advice?

14       MR. MORRIS:  Your Honor, I object to this whole line

15 of questioning.  He's asking a witness to interpret contracts

16 that he has no personal knowledge of.  And this is what I

17 warned the Court about in my opening statement yesterday.  The

18 witness must testify about personal knowledge and should not be

19 here to interpret contracts that he didn't negotiate, he didn't

20 participate in drafting, and that he never read until recently.

21       THE COURT:  Response?

22       MR. RUKAVINA:  Your Honor, he's not interpreting a

23 contract.  We're trying to explain -- first of all, we're going

24 to work to his damages model.  So his understanding of what an

25 employee falls in here.  He's not -- he's reading the language

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 26-14   Filed 01/12/25   Page 739 of 885   PageID 40849

Norris - Cross                                   114

1  and he's going to tell you which employee provided that

2  investment advice.  He's not going to tell you what this

3  contract means.  So --

4         MR. MORRIS:  He -- with all due respect, Your Honor.

5  That's exactly what he's doing.  Because now he's saying that

6  even though people who were dual employees were providing these

7  services, Highland's entitled to no compensation because they

8  just were providing the services under the shared services

9  agreement.  He can't do that.

10        MR. RUKAVINA:  That's not what I'm asking.  That's

11 not what -- and Your Honor will decide these contracts as a

12 matter of law.  I'm asking for him -- for his understanding of

13 what human being that provided services, for that human being,

14 whether that human being would fall under the payroll

15 reimbursement agreement or the shared services agreement.

16        And all he has to do is to read simple English and

17 then he'll tell you as a question of fact what he thinks.  And

18 you'll decide as a question of law if that's correct.

19        MR. MORRIS:  I'm just going to try one more time.

20        MR. RUKAVINA:  It's a --

21        MR. MORRIS:  It's not fair because the example that

22 I'm going to give and we saw six different exhibits yesterday,

23 where people's titles changed in order to give them the

24 responsibility for doing exactly this service.  And they're now

25 going to take the position that because they were in the legal

Norris - Cross                                                    115

1  department and they paid for legal services that's it.  We get

2  nothing more.  We're providing the exact same service.  This is

3  an argument he can make in closing, but he can't use a witness

4  to do this.

5          THE COURT:  All right.  I sustain.  He can't testify

6  about what terms of the agreement mean.

7  BY MR. MORRIS:

8  Q    Okay, so let's talk about shared services a little bit.

9       You heard Mr. Powell testify and you've heard a lot of

10  people testify.  Are the Advisors complaining to this Court

11  that they did not get the services contracted for under the

12  shared services agreements?

13  A    Generally, no, with the exception of legal compliant

14  services.

15  Q    Are the Advisors complaining that they did not get the

16  employees that they were paying for under the payroll

17  reimbursement agreements?

18  A    Yes.  We're -- we're -- we're saying we're reimbursing for

19  employees that were no longer there and we were not receiving

20  the services that were being paid for.

21  Q    So we looked at a lot of those board minutes, meetings,

22  and you've heard Mr. Powell, he said, "Can one conclude that if

23  we say we are getting the services we contracted for, can one

24  conclude from that, that we're somehow waiving rights under the

25  payroll reimbursement agreements?"

002757

Norris - Cross                                    116

1               MR. MORRIS:  Objection, legal conclusion.

2               MR. RUKAVINA:  It's not a legal conclusion.

3               THE COURT:  Sustained.

4   BY MR. RUKAVINA:

5   Q    Okay.  So let's talk about those back- and middle-office

6   services.

7         Prior to the bankruptcy, did the Advisors have their own

8   employees who provided back and middle office services?

9   A    Not the services that we contracted for with Highland.

10  Q    Okay.  And do your understanding, what were the services

11  that Highland should have been providing pursuant to the shared

12  services agreement?

13  A    Yeah, in the shared services agreement --

14              MR. MORRIS:  Objection. The witness has no knowledge

15  of the contracts.  I don't understand how he gets to testify as

16  to what services we were supposed to be providing when he has

17  no knowledge of the contract.

18              MR. RUKAVINA:  Your Honor, the fact that he didn't

19  negotiate the contract doesn't mean that he can't read it and

20  apply its statements.  It's the same as if the contract says

21  I'm buying a Mercedes and he's telling you whether that car is

22  a Mercedes or a Nissan.

23              He's not interpreting the contract, he's giving the

24  Court facts in which the Court will ultimately determine

25  whether the contract fits or not.

Norris - Cross                              117

```
 1              THE COURT:  Okay.  I don't -- I can read the
 2   contracts.
 3              MR. RUKAVINA:  Okay.
 4              THE COURT:  I can read the contracts.  So how is this
 5   necessary?
 6              MR. RUKAVINA:  Very well.
 7              THE COURT:  Okay.
 8              MR. RUKAVINA:  One moment, Your Honor.
 9              THE COURT:  Okay.
10   BY MR. RUKAVINA:
11   Q    Go to Exhibit 36, please.  It's in the big binders.
12   A    36?
13   Q    Yes, sir.
14   A    Uh-huh.
15   Q    So this is to Mary Irving.  Are you familiar with a Mary
16   Irving?
17   A    I know who she is, yes.
18   Q    Okay.  Does she provide any services in any capacity to
19   the Advisors?
20              MR. MORRIS:  Objection.  Just time frame.
21              THE COURT:  Object -- I'm sorry. Objection, time
22   frame?
23              MR. MORRIS:  Yeah, the question was just vague
24   because as -- as of time frame.
25              THE COURT:  Okay.
```

 1          MR. MORRIS:  He just said does she provide.

 2          THE COURT:  If you could be more specific, Mr.

 3  Rukavina?

 4          MR. RUKAVINA:  I will.

 5  BY MR. RUKAVINA:

 6  Q    Did Mary Irving ever provide any services to the Advisors?

 7  A    I had very little interaction with her.

 8  Q    Okay.

 9  A    Over the last decade.

10  Q    Okay.  Mary Irving, we can look at it, but she's not on

11  the payroll reimbursement agreements.

12  A    She's not.

13  Q    Okay.

14  A    She's part of the legal team.

15  Q    Did Mary Irving ever provide front-office or investment

16  advice services to the Advisors?

17  A    Not that I'm aware of.

18  Q    Okay.  Let's go look at 37.  Are you familiar with

19  Stephanie Vitialo (phonetic)?

20  A    I am.

21  Q    Did Ms. Vitialo ever provide any services to the Advisors?

22  A    She provided some legal services.

23  Q    Okay.  Is she on the payroll reimbursement agreements?

24  A    She's not.

25  Q    Does she provide any so-called front-office or investment

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-01170-S   Document 26-14   Filed 01/12/23   Page 743 of 885   PageID 42454

Norris - Cross                                          119

 1  advice -- advisory services?

 2  A    Over what time frame?

 3  Q    At any point -- well, post-petition.

 4  A    None that I'm aware of.

 5  Q    Okay.  Exhibit 38.  Are you familiar with Matthew Diorio

 6  (phonetic)?

 7  A    I am.

 8  Q    Is he on Exhibit A to the payroll reimbursement

 9  agreements?

10  A    He is not.

11  Q    Okay.  Did he ever provide any services at any point in

12  time to the Advisors?

13  A    Not that I'm aware of.

14  Q    Okay.  Do you know what Mr. Diorio did at Highland?

15  A    He worked on the Legal and Compliance Team. I don't think

16  he's an attorney.  Something with business development, which I

17  never interacted with Matthew.

18  Q    Did he ever provide any investment advisory or front-

19  office services to the Advisors?

20  A    Not that I'm aware of.

21  Q    Post petition?

22  A    Not that I'm aware of.

23  Q    Would you be aware of that post petition, since you're the

24  head of Business Development?

25  A    Well, I frequently interact with the investment

Norris - Cross                                            120

1  professionals.  I sit in on investment committee meetings.  And

2  then the weekly global investment committee meeting.  As part

3  of my role as Chief Product Strategist, I'm a liaison between

4  investors and the investment team.  And so I interacted daily

5  with investment professionals to determine what they're doing,

6  why they're doing it.  So --

7  Q    So you wouldn't --

8  A    -- I'm not going to say I would have knowledge of every

9  single person providing investment services.  But I generally

10 had an idea particularly related to our advisors.

11 Q    Okay.  Well, that's all I'm asking about our advisors.

12 A    Yeah, I --

13 Q    The next one, Exhibit 39, Mr. Leventon.  I think we all

14 know Mr. Leventon.  But just for the record, Mr. Leventon, is

15 he on the payroll reimbursement agreements?

16 A    He's not.

17 Q    And what kind of services, or what did he do at Highland?

18 A    He was an attorney.

19 Q    Okay.

20 A    Worked on litigation and other legal things.

21 Q    Did he ever, to your understanding provide any front-

22 office or advisory services to the Advisors?

23 A    Not that I'm aware of.

24 Q    Okay.  So we've just gone -- well, let's do Exhibit 42.

25 With Timothy -- how do you pronounce that?  Canorlier

Norris - Cross                                    121

1  (phonetic)?

2  A    I wish I knew.  Canorlier -- I've never been able to

3  pronounce it.

4           MR. MORRIS:  Canorlier.

5           THE WITNESS:  Canorlier, yes.  I know I've heard it

6  many times.

7  MR. RUKAVINA:

8  Q    Was Mr. Canorlier on the payroll reimbursement agreements?

9  A    He's not.

10 Q    Okay.  Do you know what he did at Highland?

11 A    He -- he was an attorney on the legal team.

12 Q    Did he ever provide any investment advisory or front-

13 office services to the Advisors post petition?

14 A    Not that I'm aware of.

15 Q    Okay.  So if there's an argument made -- I think we've

16 gone through five or six employees, if there's an argument made

17 that these five or six employees replaced dual employees that

18 were dropped over time, would you agree with that argument?

19 A    I wouldn't have any basis to agree with that.  I -- I

20 don't have -- I didn't have interaction with them providing

21 those services.

22 Q    Because, again, we looked at the contract, and the

23 contract has two elements.  Correct?

24 A    That's right.  They need to be dual employees and they

25 need to be providing advice to registered investment companies.

002763

Norris - Cross                                    122

1  Q    Okay.  Now some of these employees, if they provided
2  services to the Advisors, would that have been pursuant to the
3  shared services agreements?  Like legal?
4          MR. MORRIS:  Objection.  Same -- exact same.  He
5  shouldn't be telling the Court what contract people were
6  providing services pursuant to.
7          THE COURT:  Response?
8          MR. RUKAVINA:  I'll move on.
9          THE COURT:  Okay.
10 BY MR. RUKAVINA:
11 Q    The list of employees on Exhibit A on the payroll
12 agreements, do you have any understanding as to whether any of
13 those employees, once they were terminated by Highland, were
14 replaced by Highland, with respect to their roles for the
15 Advisors?
16 A    I --
17 Q    I think you might have mentioned one earlier.  I don't
18 know if you put it in the record, the name.  It's in the small
19 binder, Dustin.  The smaller binder to your right.
20 A    Oh, yes.
21 Q    Just Exhibit A.
22 A    So I know there was one individual who was hired to help
23 with healthcare, but he helped with the private equity fund,
24 that wasn't related to our Advisors in HCMLP owned fund.  And
25 he did a little bit for our Advisors.  His name was Michael

002764

Norris - Cross                                      123

1    Jueng (phonetic).  And I think he was hired in 2019.  So he was
2    the only front-office person that I'm aware of that -- that was
3    hired.
4         Now, yet, there -- when some left there was, you know,
5    some reallocation of duties.  However, at that point, as I
6    mentioned our assets in credit and private equity had been
7    diminishing significantly over the last several years.  So many
8    of these people left, but they had seen the writing on the
9    wall.  Right.
10        They knew we weren't focused on credit.  They knew we had
11   growth in real estate and that wasn't their expertise.  And you
12   know, they're a lot of good people and they went and started
13   other businesses.  They went to other companies.
14   Q    Would you have offered them employment for the Advisors
15   upon them leaving Highland, had the Advisors a need for them?
16   A    If we had a need, I -- we made an offer to those that --
17   and there were some even that were left to us, we didn't extend
18   an offer to, for various reasons.
19   Q    Okay.
20   A    We didn't need them.  You know, and -- and at this point
21   our assets are very different.  We don't need the large credit
22   team.
23        MR. RUKAVINA:  Your Honor, I think the clock is one
24   hour off, but that's no big deal.
25        THE COURT:  It's two minutes to 4:00.  I don't know

002765

Norris - Cross                                124

1   what that says.

2          MR. RUKAVINA:  It says two minutes to 3:00.  Mr.

3   Berdman (phonetic) if you'll please put Exhibit CC up?  Your

4   Honor, CC is an Excel spreadsheet.  This is the underlying data

5   that rolls up into the David Klos December chart, if you

6   recall.

7          THE COURT:  Okay.

8          MR. RUKAVINA:  So Your Honor will recall that Exhibit

9   Q.  Exhibit Q is the PDF of the summary.

10         THE COURT:  Okay.

11         MR. RUKAVINA:  And Exhibit CC, the way we look at

12  Exhibit CC is unfortunately on the -- on the screen.

13         THE COURT:  Okay.

14         MR. RUKAVINA:  So that's what Mr. Berdman is trying

15  to pull up.  He says it's loading.  And Mr. Berdman, if you'll

16  go to the employee listing.

17         Your Honor, one moment.  So Your Honor, we're just

18  trying to figure out why the screen is so blurry here.  So can

19  you see Mr. Norris, or is it --

20         THE WITNESS:  I can see it.

21         MR. RUKAVINA:  -- again my eyes.

22  BY MR. RUKAVINA:

23  Q   Okay, so this is Mr. Klos's analysis.  And I'd just like

24  to talk about some of these employees here.  So let's look at

25  Chris Rice (phonetic).

002766

1    A    Yes.

2    Q    See 2019 hired.  Do you see that?

3    A    I do.

4    Q    Did Chris Rice provide so-called front-office investment

5    office services to the Advisors?

6    A    No.  He's in the accounting department.

7    Q    Okay.

8    A    As it says there accounting, finance and back office.

9    Q    So rather than me go through each one of these, you just

10   go through them and tell the Court -- so start at line, what is

11   that, 60?

12   A    Uh-huh.

13   Q    And go down.  Those are the new hires that Mr. Klos

14   included.  Tell the Court, for each one of those, whether they

15   would or would not be providing investment services front-

16   office services to the Advisors.

17   A    Yeah, Chris Rice, no.  It's accounting and back-office

18   services.

19   Q    Joey?

20   A    No, it was accounting and finance --

21   Q    Just say yes or no.  Just say yes or no.

22   A    Yeah.  No, no on Kelly.  Michael Young, yes.  Brad McKay,

23   no.  Andrew, no.  Brendan, no.  Tina, no.  Bridget, no.  Sarah,

24   no.  Michael, no.  Austin, no.  Erberto (phonetic), no.

25            MR. RUKAVINA:  Okay.  You can close that, Mr. Berman

1  (phonetic).

2  BY MR. RUKAVINA:

3  Q    So if Mr. Klos used those employees as far as the

4  profitability of the payroll reimbursement agreements in his

5  analysis, would you disagree that those employees should have

6  been included?

7         MR. MORRIS:  Objection to the extent it calls for

8  legal conclusion.

9         THE COURT:  Overruled.

10        THE WITNESS:  So if he -- say it one more time.  If

11 he included in the payroll reimbursement --

12 BY MR. RUKAVINA:

13 Q    Yeah.

14 A    With Michael, or a percentage allocation, I wouldn't

15 necessarily disagree.  The others I would disagree because they

16 would be captured as a back-office employee that was not duly

17 employed in providing investment advice to our registered

18 investment --

19 Q    Okay.

20 A    -- companies.

21 Q    And I think we've discussed this before, and Mr. Morris

22 asked you.  But you were generally aware, more or less

23 contemporaneously with when certain employees left Highland.

24 Is that accurate?

25 A    I was.

1  Q    Okay.  So why didn't you or someone else immediately pound
2  the table and say we've got to stop paying for that employee?
3  A    Well, I had no knowledge that we were continuing to pay or
4  reimburse for their bonuses, comp, and benefits when they were
5  no longer employed.   Had I know that, I would have reacted the
6  same way when I found that out.
7  Q    What did you think -- pardon me, I'm having a hard time
8  phrasing this.
9       Who did you think should have been doing that job?  Or as
10  an officer of the Advisors, who did you expect would be doing
11  that job?
12  A    Yeah, so we -- we outsourced agreement review, payments,
13  payment processing to Highland and they -- they actually had a
14  very robust process.  And it was actually challenging to get
15  agreements through them, and invoices.  If there wasn't an
16  agreement tied to an invoice, they would ask for the agreement.
17  If the agreement didn't match the invoice, they would let us
18  know.
19      And they would go back and either tell the vendor or
20  renegotiate.  So there was a very thorough process that I had
21  dealt with for a decade with them.  And -- and that's who we
22  relied on to administer our agreements and payments across the
23  board.
24  Q    Okay.  Now before we flip to your damages --
25  A    And I don't know  if it's helpful.  There was an accounts

Norris - Cross                                    128

1  payable person.  There was a corporate accounting team --

2  Q    Whose --

3  A    -- who handled this.

4  Q    -- whose employee was accounts payable?

5  A    Who was the employee?

6  Q    No, whose --

7  A    It was Highland Capital Management, L.P.

8  Q    And everyone else that you mentioned?

9  A    And all the other corporate accounts, or HCMLP.

10 Q    So let's look at Exhibit G.

11         MR. RUKAVINA:  Your Honor, Exhibit G, I don't think

12 we've looked at yet, at least not in detail.  Exhibit G is a

13 PDF printout of Mr. Norris's damages calculation.  And Exhibit

14 H is, again, the native form Excel spreadsheet.

15 BY MR. RUKAVINA:

16 Q    Mr. Norris, will you please tell us if you need the native

17 file pulled up for any reason, okay?

18 A    Okay.

19 Q    What -- tell the Court what you're trying to do here in

20 Exhibit G?

21 A    Yeah.

22         So what I do is very simple.  I know there's a lot of

23 numbers on the page, but just to simplify it is I took what are

24 the actual payments made, which we have heard --

25 Q    Payments made from whom to whom?

Norris - Cross                    129

1  A    Payments made by Highland on our behalf to HCMLP from our

2  Advisor accounts for --

3  Q    So, so, so just hold on.

4  A    Yeah.

5  Q    So payments from the Advisors to Highland.

6  A    My Advisors to Highland.

7  Q    Only that Highland was processing the advisor.

8  A    That's correct.

9  Q    Okay.

10  A    Regarding the payroll reimbursement agreements.  So there

11  was each month $252,000 for NexPoint Advisors and $416,000 for

12  Highland Capital Management Advisors, Fund Advisors, that was

13  paid each month.  And we've heard all about how those amounts,

14  the actual payments didn't change.  And so, that $9 million

15  represents the period from the court filing to the end of

16  November.  Nine million dollars is what was actually paid.

17  Q    Why did you stop at the end of November?

18  A    Because that's when payments stopped as we heard from

19  Frank and Mr. Dondero.

20  Q    Okay.  So the $9 million, 9 million 18, that's just the

21  cumulative of HCMFA and NPA.  Right?

22  A    That's correct.

23  Q    Okay.  The next line is cost of dual employees --

24  A    That's right.

25  Q    -- as stated in the original agreement from 2018.

Norris - Cross                    130

1   A      That's right.  So here's the simple math.  I took the

2   total compensation numbers which came from Highland and

3   combined and multiplied them going month by month.  I took each

4   employee that was still employed.  I utilized their termination

5   dates from the filings as well as the monthly -- compared to

6   the monthly termination sheet.  So I went month by month and

7   said who was still employed, multiplied their total

8   compensation times the percentage allocation, and that's where

9   it's broken out between NexPoint Advisors and HCMFA.

10         So, assuming these employees were still employed and

11  providing investment advisory services and a new employee, the

12  $2.8 million during that period is what we would have

13  reimbursed, actual costs of those employees, actual

14  reimbursement costs.

15  Q      Okay.  So just so we're clear, we saw from Mr. Klos

16  yesterday that his analysis was a snapshot point and time

17  December 2020.  Correct?

18  A      Correct.

19  Q      Is yours also a snapshot of a given point and time?

20  A      It's not.  The allocation percentages are because in the

21  beginning --

22  Q      So I was going to -- I was going to ask you that.  Which

23  allocation percentages did you use?

24  A      I used the ones from scheduling.

25  Q      Why?

002772

Case 21-03010-sgj    Doc 116    Filed 04/18/22    Entered 04/18/22 09:05:40    Desc Main
Case 3:22-cv-01170-S    Document 16-14    Filed 04/18/25    Page 756 of 865    PageID 23866

Norris - Cross                                                131

1  A    There was obviously a lot of thought.  It was at that

2  point -- I didn't want to make assumptions here.  Right?  I'm

3  taking the math that was provided on Schedule A.  And then

4  looking at them, you know, they appeared reasonable or should

5  have been lower.  To be conservative, I took the exact same

6  percentages and ran them through the calculation.

7  Q    Okay.  Now just so that the Court is understanding this,

8  if an employee is no longer there, does his or her allocated

9  percentage matter?

10 A    It doesn't.

11 Q    It only matters --

12 A    If there is -- if it's 100 percent of 0, it's 0.  So

13 that's why, yeah, it doesn't matter.

14 Q    So for 20 of the 25 employees, would it matter what

15 allocated percentage they had?

16 A    Allocated percentages doesn't matter.  Compensation

17 doesn't matter.  And you'll see in my second tab that that is

18 NA.  I didn't even need to put their compensation numbers

19 because if they weren't employed as of the bankruptcy filing,

20 they didn't matter.

21 Q    Because we're paying for someone that doesn't exist.

22 A    Or reimbursing for some compensation that was never paid.

23 Q    Just so again the Court is clear, we're talking about the

24 snapshot.  You did a walk forward on a post petition month by

25 month basis?

Norris - Cross                                   132

1  A    Correct.  And I divided that into three segments.

2  Q    Well, let me pause you there.

3  A    Yeah.

4  Q    So if there was an employee that was employed some point

5  and time post petition, but then fell off, how did you treat

6  that employee?

7  A    Yeah.  So the month -- I had them the month that they

8  stayed.  The month later, I dropped them off.  And you can see

9  that on the third and fourth pages.  I can draw your attention

10 to, for example, John Poglich (phonetic), simple on the third

11 page.  John Poglich, you see a monthly allocation and --

12 Q    On 53,066?

13 A    On 53,000.  And the first month is half of that because

14 the petition date or the bankruptcy filing date was the 15th of

15 October, I believe.  And then he was here through September and

16 he drops off.  Right?  You wouldn't expect to be paying for

17 someone that's no longer there.  And you can see that through

18 various other employees.  Mr. Dondero, I kept him on there.  He

19 was a -- he was there until he became a non-paid employee of

20 Highland.  You see Morrow (phonetic), Stall Tarry (phonetic).

21 Same thing.  He was employed until December 2020, and then he

22 drops off.  Same thing, Mr. Parker, until February 2020, and he

23 drops off.  And in all these with zeroes, they just were not

24 employed on the bankruptcy filing date and so they're zeroes.

25 Q    So what is your conclusion from the petition date through

002774

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 26-14   Filed 04/12/22   Page 757 of 885   PageID 40663

Norris - Cross                                    133

1  the date that we stopped paying as to how much we paid, or

2  rather, reimbursed Highland for employees who were no longer

3  there?

4  A    The difference is the $6.2 million right here.

5  Q    So that's even a little less than Mr. Klos' 6.6, isn't it?

6  A    It is.

7  Q    Okay.  Now, what about the next block there?  You say

8  additional two months billed by HCMLP, et cetera, for December

9  '20 through January '21.  Why did you include those additional

10 two months?

11 A    I included those because the services should -- the

12 agreements had not been terminated, right.  So we were paying.

13 And I broke them out separately because the Advisors were no

14 longer paying.  And so this can't be -- this first line isn't

15 total amount reimbursed or paid.  It's what the billings were.

16 And they're -- I think in their damages claim is that the

17 amount is equal to the amount listed in the agreement for those

18 two months, which I put in that top line.  That's simply the

19 amount the --

20 Q    So the top line, the 1336, where are we paying according

21 to their damages, that's how much we would have paid?

22 A    I believe so.  It's $252,000 a month for NexPoint Advisors

23 and $416,000 a month for NPA.

24 Q    And according to your calculation for those months at that

25 point and time, how much should we have paid if the Court

1  accepts our view of this case?

2  A    $264,000 should have been what we paid with a million

3  dollar difference for that two months.

4  Q    So if the Court agrees with us, then the damages just on

5  these two contracts, not shared services, for those two months

6  should be how much?  How much should we have to pay for those

7  two months if the Court agrees with our theory of the case?

8  A    Two hundred and sixty-four thousand dollars, nine eighty-

9  eight based on this calculation.

10 Q    And you mentioned that the payroll termination agreements

11 weren't terminated.  Did you ever discuss that with Mr. Klos or

12 Waterhouse or Seery?

13 A    I did.

14 Q    What did they tell you?

15 A    We had an email exchange with Mr. Klos and Mr. Waterhouse

16 and  they didn't know.  This is like when we found out and Mr.

17 --

18 Q    So let's go back.

19 A    Uh-huh.

20 Q    November 30th we get termination notices, 60-day clock

21 ticking on the search services.  Right?

22 A    Correct.

23 Q    Did we get termination notices for payroll reimbursement?

24 A    We did not.

25 Q    Did that surprise you or?

Norris - Cross                                    135

1    A    It did.

2    Q    What did it cause you to do?

3    A    It caused us to ask why because we knew we were --

4    Q    Well, what was the ultimate answer that you got from

5    either Mr. Klos, Waterhouse, or Seery?

6    A    Mr. Waterhouse said maybe it was overlooked.  That's all

7    we got.

8    Q    Okay.  No discussion about that why would we terminate if

9    it's still profitable?

10   A    Well, I was --

11            MR. MORRIS:  Your Honor, that's the kind of leading

12   question that he used to -- he asked him the question, he got

13   an answer, and now he's fishing for the answer he wants by

14   suggesting the answer in his question.  Exactly what he took me

15   to task for.

16            THE COURT:  Sustained.

17   BY MR. RUKAVINA:

18   Q    Did you ever discuss the profitability or lack thereof of

19   the payroll reimbursement agreements with Mr. Klos?

20   A    The profitability of them, yes.

21   Q    Yes.  What did you discuss with Mr. Klos?

22   A    Yeah.  So, and maybe I should back up to that November

23   30th date we received the notices.  December 1st, I had been,

24   along with Mr. Sauter, tasked with transitioning the services,

25   even prior to that, making sure there was a smooth transition.

Norris - Cross                                    136

1   But at that point there was still the understanding or hope

2   that things would come to a peaceful resolution.

3       At that point we knew, all right, we need to make sure the

4   businesses can continue, that we can continue the shared

5   services through another entity or hiring those employees.

6   What agreements were there that we needed?  And so the shared

7   services and payroll reimbursement agreements were two of

8   those.  D.C. Sauter and I had been discussing them over the

9   previous month or two, but then when this happened, we went to

10  Dave Klos and Frank and said -- I sent Dave Klos an email and

11  said, hey, I need to understand these amounts.  What are we

12  paying?  What are we paying for?

13      And there was a response from Mr. Klos and that email was

14  -- went through with Mr. Klos where I said, you know, hey, what

15  are these the proper amounts?  He came back.  Maybe we can go

16  through the email, but his response was that they had continued

17  to pay the same amounts.  And I had pointed out several

18  employees that were large dollar amounts that were no longer

19  employed and was asking, are we still paying for these or

20  reimbursing these employees that are no longer employed?  And

21  his answer is the amounts had not changed.

22      And so after that conversation, we had a call with Mr.

23  Klos and Mr. Waterhouse and we dug into the why, the how much,

24  the profitability.  Mr. Waterhouse was very aware that we were

25  overpaying, used the word overpayment.  That's when I learned

Case 21-03010-sgj    Doc 116    Filed 04/18/22    Entered 04/18/22 09:05:40    Desc Main
Case 3:22-cv-01170-S    Document 26-14    Filed 04/27/23    Page 762 of 885    PageID 2862

Norris - Cross                                                   137

 1  about the automatic stay.  I think I discussed that.  Mr. Klos

 2  had -- was involved in that discussion as well.  So we had a

 3  couple of discussions.  Mr. Klos called me separately.  We had

 4  another conversation with Mr. Waterhouse.  That was in early

 5  December.  I don't know if you want me to keep going on that,

 6  but.

 7  Q    Sure.  Yes.  What other discussions did you have with Mr.

 8  Klos about the problem?

 9  A    Yeah.  So at that time too, I asked Mr. Klos and Mr.

10  Waterhouse.  They told me there was a schedule that laid out

11  the payments and the overpayments.  And me and Mr. Sauter asked

12  for it.  We said, give it to us.  And I learned a little bit

13  more about the hesitancy that they had in doing anything that

14  would harm or cause damage to the Debtor.

15  Q    Did Mr. Klos tell you anything about that in particular?

16  A    Mr. Klos and Mr. Waterhouse both did.

17  Q    What did they say?

18  A    They had said, and this is the first I had learned about

19  it, that they had been warned that if they did anything that

20  was -- that would harm or be adverse to the Debtor that they

21  would be fired on the spot, and that they would be held

22  personally liable.  And they were -- I mean, they were trying

23  to do what was right in both regards, right.  We know Mr.

24  Waterhouse was wearing two hats, but -- and they expressed

25  their concern.  And so --

002779

Norris - Cross                              138

1   Q    So their concerned about being fired?

2   A    Fired on the spot and held personally liable.

3   Q    Did they share -- did they share that analysis you

4   mentioned with you?

5   A    So Mr. Klos said, I'll check, but I don't think Seery will

6   allow it.

7   Q    Okay.

8   A    So fast forward, we ask multiple times to Frank and Dave.

9   We never got it.  In mid December, it's an important time

10  period, Jim got hit with a temporary restraining order.  And so

11  as we were starting to have these conversations with Dave and

12  Frank, now all the sudden, you know, I for the first time was

13  involved in the court.  That was the first time I ever appeared

14  in court.  We had this restraining order for Jim.  And so we

15  were all very cautious about what we could and couldn't say to

16  any employees.  And so this negotiating or discussion we had

17  had with Dave and Frank kind of paused for several weeks and

18  the discussions then just went with counsel.  Fast forward to

19  around January 13th or so, maybe 12th.

20  Q    Of 2021?

21  A    Of 2021.  Dave Klos, Frank Waterhouse, JP Sivvy

22  (phonetic), and Brian Collins called me and said, Mr. Seery has

23  allowed us to talk to you about the transition of services

24  because both sides --

25  Q    Who was JP Sivvy?

1  A     JP Sivvy was part of the legal team at HCMLP.

2  Q     And who was Mr. Collins?

3  A     Mr. Collins is HR, was a HR director at -- so he chose --

4  and up to that point, we had -- I, in particular, I didn't want

5  to get involved in a restraining order.  So very little

6  discussion, especially around this.  So only around funds,

7  operations.

8  Q     And just again so the Court understands, what were you

9  trying to discuss or negotiate at that point and time?

10 A     Yeah.  Starting January 13th was let's divide the

11 agreements.  Let's divide the services.  Let's have a peaceful

12 transition.  We were receiving a number of back-office

13 functions that were critical to our business.  And so, you

14 know, we also had dated information stored on their systems, on

15 their servers.  We were in their office still.

16 Q     So as part of these -- and the Court may remember.  We had

17 an emergency trial on a mandatory injunction February 16th or

18 something like that.  Ultimately, was there a transition of

19 services done?

20 A     We had the permanent injunction.  Ultimately, the shared

21 services agreements ended.  They were extended.  Highland

22 worked with us for an extension of around three weeks.

23 Q     But that's my question.

24 A     Yeah.

25 Q     As of what -- as of actually what period of time, what

1  day?  How do I put this?  As of what day were the shared

2  services agreements actually terminated to your understanding

3  after these extensions?

4  A    Yeah.  I believe it was February 20th.

5  Q    Okay.

6  A    Maybe 19th.

7  Q    February 28th or 20th?

8  A    Twentieth.

9  Q    Twentieth.

10 A    And the employees were terminated on the 28th of February.

11 And there was a difference and they moved the date of

12 termination of employees back a week --

13 Q    And then --

14 A    -- beyond each of our termination dates, so we had this

15 issue.

16 Q    What happened?  What happened to the employee?  I mean,

17 did the Advisors do anything with the employees that were

18 terminated?

19 A    So we hired a few of the actual terminated employees and

20 then most of them went to Skyview Group, which had a different

21 name at the time, which we entered into shared services

22 agreements for those, with those entities.

23 Q    So during those extensions that we discussed did the

24 Advisors pay the debtor for those extensions in January and

25 February 2021?

1  A    We did.  And that's that third box here, the third section

2  of the damages.  It's $453,286 is what was paid for the payroll

3  reimbursement.  And that's just the -- it was based on the

4  exact dollar amounts and --

5  Q    Why did we pay the exact dollar amounts if we knew that we

6  were overpaying?

7  A    Yeah.

8       So we had discussions on this.  And backing up to the

9  first extension, my conversations with this group of four

10 Highland employees starting January 13th was let's work

11 together.  Let's get a real -- let's get a great solution.  We

12 don't want any disruption in the business.

13      To that point, no one had talked to me about you need to

14 pay these past due amounts or the amounts that they were

15 claiming we owed until January 28th.  I got an email that said,

16 these amounts are -- all these, Highland or NexPoint and HCMFA

17 related entities or Jim-related entities, some were -- I had no

18 relationship to -- will need to be paid.

19      And at this point we had already negotiated and agreed on

20 most of the material terms related to the transition of

21 services.  And so we were waiting on a term sheet at that

22 point.  And they said, these have to be paid or we're pulling

23 the plug on everything you have.  And so then I had a call with

24 JP Sivvy, Frank Waterhouse, and Dave Klos.

25      Again, I reiterated this, you know, asking for the

Norris - Cross                                                            142

1   schedules related to the payroll reimbursement agreements.  But
2   at that point in time, they gave us an ultimatum of you're
3   going to pay the extension fee or you're going to have the plug
4   pulled on you.  And at that point, we weren't ready for that.
5   And so we said we're going to -- we will pay it, but we'll
6   reserve all our rights.
7   Q    And did Highland agree to that?
8   A    They did.
9   Q    Okay.
10  A    And we put the -- that in our actual signed agreement.
11  And when we did -- made our second extension, had multiple
12  conversations, same thing.  We would reserve our rights.
13  Q    And just an order of magnitude, how much did we pay
14  Highland for those two extensions, just ballpark?
15  A    The payroll reimbursement agreement amount was $453,000.
16  The shared services was maybe $2-, or $300,000, so $7-, or
17  $800,000 for 20 days.
18  Q    Okay.  So --
19  A    I may not be perfect on my math, but that's --
20  Q    So if the Court agrees with our theory of the case, how
21  much are we saying we should get back from those extension fees
22  we paid Highland there in February 2021?
23  A    Yeah.  So related to the payroll reimbursement agreements,
24  it's $453,286, is what was paid.  If you take the same
25  calculation I had been doing on all the other months, $81,000

002784

Norris - Cross                                    143

1   is the appropriate, the actual employees that were employed

2   providing advisory services, so that the difference is

3   $372,000.  That's the overpayment amount.

4   Q    So you mentioned that Mr. Klos used a word overpayment

5   when having the discussions with you.  Is that correct?

6   A    Well, I know that was a word that Frank Waterhouse used.

7   Q    Okay.

8   A    Dave may have, but he frequently used it as you were

9   paying for employees that were no longer employed or

10  reimbursing for employees that were no longer employed.

11  Q    So Mr. Klos said you were reimbursing for employees you no

12  longer had?

13  A    Again, I don't remember the specific wording, but it was

14  very clear that the payments were more than what we were

15  contractually obligated.

16  Q    Did he say it to you more than once?

17  A    He did.

18  Q    Did Mr. Waterhouse say it to you more than once?

19  A    He did.

20  Q    Did any other employee or agent of Highland ever say that

21  to you?

22  A    Yes.

23  Q    Who?

24  A    On a call with JP Sivvy and Frank Waterhouse and Dave

25  Klos.  JP Sivvy also acknowledged it.

1   Q    Okay.  Anyone else?

2   A    I had conversations with Fred Caruso where we -- I brought

3   this up in January and asked for the schedule, what we were

4   paying.  He said, I know what you're talking about, but let me

5   check on it.  He did acknowledge.  Same thing in early February

6   with Mr. Sharp, Bradley Sharp.  We brought up the discussion.

7   There were attorneys on the line as well.  We had a phone call.

8   I asked for the schedule.  He said -- I told him we knew that

9   we were paying for employees that were no longer there.

10       There had been an analysis provided.  We've asked for it

11  on multiple occasions.  And he said, I'll check.  I don't know

12  that we can provide that.  And I said, I'm not asking.  I'm not

13  asking for something unreasonable.  We're asking to pay for the

14  employees that are currently here.  And he said, well, I'm --

15  you know, I'm a representative of the Debtor and we have an

16  obligation to the Debtor.

17  Q    And when you said schedule, were you referring to the

18  David Klos analysis?

19  A    Well, I don't know if it was that.  I didn't see this

20  analysis from Dave Klos, the ones that have been in the Court,

21  until discovery.  We had been asking for it.  I didn't see it

22  until February.  Actually, I think after my deposition.  We saw

23  the main schedule.  We hadn't received the Excel files.  And so

24  I'm assuming because Dave and Frank had told me there had been

25  calculations, I'm connecting an assumption here that that is

Norris - Cross                                                145

 1  the schedule, but I don't know.  I don't know if they had

 2  another one.  They didn't provide it.

 3  Q    Is that something we requested in discovery?

 4  A    It is.

 5  Q    So if they didn't provide it, can we conclude that there

 6  is no other one?

 7           MR. MORRIS:  Objection to the form of the question.

 8  I mean, this is just -- this is -- you can't -- I object.  It

 9  is not -- it's complete speculation.  How about that?

10           MR. RUKAVINA:  Well, let me rephrase the question.

11           THE COURT:  Sustained.  Uh-huh.

12  BY MR. RUKAVINA:

13  Q    We requested all internal calculations of profitability.

14  Correct?

15  A    We did.

16  Q    And did we receive from the Debtor anything other than Mr.

17  Klos' December 2020 and December 2019 analysis?

18  A    We did not.

19  Q    Okay.  Well, and I'm sorry.  There were two in late 2019,

20  so let me just clarify.  I think there --

21  A    There were two iterations.

22  Q    Two iterations.  So --

23  A    I think I only saw one of them, but yeah.

24  Q    So technically we might have gotten three, but they would

25  have been the ones from December 2019 and December 2020?

1  A    Correct.

2  Q    Okay.  Now let's -- let me just ask you something while we

3  are still on your Exhibit G.  So, at the end of the day there

4  were only a handful of the original employees left from Exhibit

5  A.  Correct?

6  A    Correct.

7  Q    Now what would happen to your damages model if instead of

8  using the original percentage allocations you bumped it to 100

9  percent such that 100 percent of those five employees would be

10 reimbursed by their Advisors?  What's the resulting number?

11 A    Yeah.  So using these existing plays, I actually plugged

12 this in at 100 percent and it's, I believe, approximately $4.4

13 million would still be the damages.

14 Q    So --

15 A    Applying 100 percent of their time.

16 Q    So if the Court agrees with our theory of the case but

17 says that we should have done a separate analysis of the

18 allocated percentages, even if we bumped that up to 100 instead

19 of 18 percent of 42 percent or whatever, it still results in

20 how much in damages?  Overpayments.

21 A    $4.4 million.

22 Q    Okay.

23 A    Approximately.

24 Q    If you'll flip to Exhibit P, please, as in Paul.  Is this

25 the email exchange that you just referenced with Mr. Klos where

Norris - Cross                                    147

1  you were asking for data and et cetera, et cetera?

2  A    Yes.

3  Q    Okay.  And in the bottom email there where he's writing to

4  you on December 1st at 9:12 a.m. he says that given the changes

5  in head count and along with not paying insider bonus

6  compensation, that has increased the profitability of the

7  contracts.  Do you see that?

8  A    I do.

9  Q    Did you ever separately from this discuss the

10 profitability of the contracts with Mr. Klos other than your

11 communications that there were -- we were paying for employees

12 we didn't have?

13 A    We had a phone call with just he and I.  We had a phone

14 call with he and Frank, multiple discussions, again in January

15 as we were talking about transition of services, discussed it

16 again on a call with the group at the end of January, so there

17 were multiple conversations.

18 Q    Okay.  Did the Debtor ever terminate, to your

19 understanding, the payroll reimbursement agreements?

20 A    Yes, I believe so.

21 Q    And was -- why do you -- did you do anything, to your

22 memory, to prod the Debtor to do so?

23 A    Yes.

24 Q    What did you do?

25 A    So we asked DC Sauter and our team work with their legal

002789

Norris - Cross                                148

1  team, hey, is this going to be -- we wanted to ensure that we

2  weren't continuing to overpay for employees that were no longer

3  there.  And so DC, as a condition of signing, I believe signing

4  the transition services agreement, they made us terminate the -

5  - we asked them to terminate the payroll reimbursement

6  agreement.

7  Q    So we didn't terminate the payroll reimbursement

8  agreements.  The Debtor did.

9  A    I believe so, yeah.

10 Q    Okay.

11 A    Yeah.

12 Q    Because we require that as a condition.

13 A    Yes.

14 Q    Okay.  Other than that, were you aware of any attempts by

15 the Debtor to terminate the payroll reimbursement agreements?

16 A    I'm not.

17 Q    Okay.  Can you think of any reason why the Debtor wouldn't

18 have done that?

19 A    Yes.

20 Q    What?

21      MR. MORRIS:  Objection, Your Honor.  He can't

22 speculate as to the Debtor's motivations here.

23      THE COURT:  Speculation.  Response?

24      MR. RUKAVINA:  I'll withdraw the question.

25      THE COURT:  Okay.

 1 BY MR. RUKAVINA:

 2 Q    And just to clarify what Mr. Morris was asking you, did

 3 Mr. Klos use the word true up when he described what happened

 4 at the end of 2018?

 5 A    He did.

 6 Q    Did he tell you whether money changed hands as a result of

 7 that "true up"?

 8 A    He did.

 9 Q    What do you remember about that?

10 A    He said there had been a -- I don't remember if it was

11 small or immaterial -- it wasn't immaterial, but a small -- a

12 payment actually resulted in paying to Highland from both

13 Advisors.

14 Q    Okay.  Did -- and you mentioned that he didn't --

15 A    And actually, I don't think he said he both Advisors.  He

16 said the Advisors, but didn't specify how much of each.

17 Q    But did he actually tell you about the fact of the

18 amendments?

19 A    No.

20 Q    So just the result.

21 A    Yes.

22 Q    Okay.  Did Mr. Klos ever -- first of all, do you have an

23 opinion on Mr. Klos' -- prior to this litigation, Mr. Klos'

24 ethics and professionalism?

25 A    I do.  Yeah.

1  Q    And what was your opinion?

2  A    I thought highly of him.  I worked with him for over a

3  decade.  His work product was always fantastic.  He was

4  thorough.  I went to him for a lot.  I trusted he would put out

5  an accurate and honest analysis.  He worked closely on board

6  matters, fund matters, advisor matters, and yeah, I thought

7  highly of him.

8  Q    And he was trusted enough to be presented to the retail

9  board?

10 A    Absolutely.

11 Q    Did Mr. Klos, in all of your discussions, ever tell you

12 anything like, geez, Dustin, there's something fishy about

13 these payroll reimbursement agreements or amendments or shared

14 services agreements?

15 A    The way he went about it, he was concerned, right.  And

16 the way he prefaced our conversations was with concern.

17 Q    How so?

18 A    He said we're being -- he didn't say threatened, warned,

19 almost daily that we can't do anything to damage or provide

20 something that would hurt the Debtor.  And so, yeah.  He

21 basically was like kind of you're on your own in figuring out,

22 but I -- he knew the numbers.

23 Q    I don't think you understood my question.  Did Mr. Klos

24 ever tell you that there was -- did he ever flag for you any of

25 the issues?  Well, strike that.  Were you here when Mr. Klos

1  testified yesterday?

2  A    I was.

3  Q    And he testified as to what he thought the $2.5 million

4  number came from and other things.  Remember that?

5  A    Uh-huh.

6  Q    Did he ever tell you anything like that before?

7  A    No.

8  Q    Did he ever tell you anything -- that there was anything

9  potentially deceptive or suspicious about the payroll

10 reimbursement agreements?

11 A    Got it.  No.

12 Q    Did he ever tell you anything, that there was anything

13 suspicious or deceptive about the amendments to the payroll

14 agreements?

15 A    No.

16 Q    What about the shared services agreements?

17 A    No.

18 Q    What about potential tax -- I don't want to use the word

19 fraud because I'm not a tax lawyer -- potential tax

20 shenanigans?

21 A    No.

22 Q    Potential Mr. Dondero trying to get tax questions for

23 himself?

24 A    No, he didn't.

25 Q    Potential that these were used as a method of financing

Norris - Cross                                    152

 1   how --
 2   A     No.
 3   Q     That the payroll reimbursement agreements were intended to
 4   be monthly fees regardless of actual cost?
 5   A     No.
 6   Q     Let's go to Exhibit OO real quick.  We're almost done.
 7   And I really -- I really need to go to the optometrist.
 8        Do you know what Exhibit AA is?  There's a bunch of
 9   individual ones.
10   A     Yes.
11   Q     Okay.  What are these?
12   A     These are the shared services invoices that, as required
13   by the shared services agreement for Highland Capital
14   Management Fund Advisors are to be provided, as this is a cost
15   plus 5 percent agreement.  So they're laying out, if you look
16   in column, the number column 1, it has --
17   Q     Well, let me pause you.
18   A     Yeah.
19   Q     Just so that the Court follows.  We've heard before that -
20   -
21   A     Yeah.
22   Q     -- under certain services NexPoint paid a different
23   methodology than HCMFA.  Right?
24   A     They did.
25   Q     NexPoint was just a flat monthly fee.  Right?

Norris - Cross                                        153

1   A     Correct.

2   Q     And HCMFA was a bit of a work up.

3   A     Cost plus 5 percent.

4   Q     So who prepared these invoices on Exhibit AA?

5   A     Highland, Highland's accounting back-office group.

6   Q     And would they then send us these invoices?

7   A     I didn't see these invoices until discovery.

8   Q     Okay.  You heard Mr. Morris talk about how -- how it was

9   only $10,000 a month for legal.  Did you hear that?

10  A     I did.

11  Q     You see there it says legal, $10,000.  Right?

12          MR. MORRIS:  Excuse me, Your Honor.  I didn't testify

13  to that.  Mr. Klos did.

14          MR. RUKAVINA:  Well, I apologize.  I just remember

15  someone talk -- I apologize, Mr. Morris.

16  BY MR. RUKAVINA:

17  Q     You heard something about that yesterday.  Right?

18  A     I did.

19  Q     Okay.  Is that the whole picture?

20  A     It's not.

21  Q     Why not?

22  A     When you peel back to what is underlying these numbers,

23  $10,000 was a standard legal services.  However, in the

24  compliance bucket, it says general compliance.  If you look to

25  the schedules, that includes Thomas Surgent, an attorney,

1  including his base and bonus and benefits and Lauren Thedford,

2  who is an attorney, providing officer and other functions for

3  us.  So that $92,000 a month -- this is a monthly invoice --

4  includes those two adjacent posts, which is two out of the

5  three attorneys.

6  Q    What about retail operations and finance and accounting?

7  A    Retail operations and finance and accounting includes --

8  it doesn't include attorneys.  It includes back-office

9  accountants.  Frank Waterhouse, I assume did Klos.  We have --

10 we have the Excel spreadsheets that break it out --

11 Q    We do.

12 A    -- by individual, but --

13 Q    But can you tell me how it is that Highland could

14 calculate and bill us for the services of these employees if

15 Mr. Klos testified correctly yesterday that there is no way in

16 the world to do so?

17 A    Yeah.  On a monthly basis, they would calculate the

18 employees and the percent of time that they spent related to

19 Highland Capital Management Fund Advisors.  They had a schedule

20 attached to that spreadsheet.

21 Q    Yep.

22 A    Which then detailed their total comp, salary, bonus,

23 taxes.  There's several columns.  And their percentage

24 allocation.  That was updated monthly.  I looked at the

25 schedules they provided in discovery and they -- when there was

Norris - Redirect                    155

1  a new employee added, they would add that employee.  When an

2  employee left, they would take the employee away.

3  Q    And the --

4  A    There was approximately 20 people underlying --

5  Q    And we paid --

6  A    -- this schedule.

7  Q    And we paid these invoices, well, other than late in the

8  game.  Right?

9  A    Yes.

10  Q    The Advisors or HCMFA paid those invoices.

11  A    Yes.  Highland submitted the payments on behalf of our

12  Advisors.

13  Q    Okay.  So can you conclude from that that there must have

14  been some methodology to allocate employee time per advisor?

15  A    They managed to do it.

16  Q    Or is it -- or is it a fraud?

17        MR. MORRIS:  Your Honor, this is really --

18        MR. RUKAVINA:  Is there any alternative?

19        MR. MORRIS:  He's leading.

20        MR. RUKAVINA:  Is there any alternative, sir?

21        THE COURT:  Sustained.

22  BY MR. RUKAVINA:

23  Q    Is there any alternative?  I'll strike that, Your Honor.

24  I'll just deal with it in closing.  Thank you, Mr. Norris.

25        THE COURT:  All right.  Pass the witness.  Mr.

002797

1  Morris.

2           MR. MORRIS:  I just have a few follow-up.

3           THE WITNESS:  A few is three.  Right?

4           MR. MORRIS:  No.

5           THE WITNESS:  Oh, okay.

6           MR. MORRIS:  No.

7                      REDIRECT EXAMINATION

8  BY MR. MORRIS:

9  Q    You understand that we completely disagree that you -- the

10 Advisors are entitled to any damages.  Right?

11       You understand that that's the position that we've taken

12 in this case.  Right?

13 A    I believe so, yes.

14 Q    Okay.  Can you turn to Exhibit G, please?

15 A    Yes.

16 Q    Okay.  Do you see -- so you understand that we don't agree

17 you're entitled to anything.  Right?

18       You understand that's our position.  Correct?

19 A    If you represent that, I'll take your word for it.

20 Q    I do.  And you've got the million -- so with that

21 understanding though, you've got the $1,336,000 for the

22 December 20th -- December '20 and January 2021 on your chart.

23 Do you see that?

24 A    Yes.

25 Q    And it's your testimony that your recollection is that the

1  Advisors actually paid the amounts that were due under the

2  payroll reimbursement agreement subject to a reservation of

3  rights in connection with the extensions?

4  A    No.  Not the January and December payments.  We paid in

5  February.  Yeah.

6  Q    Did the Advisors ever make the December and January

7  payments?

8  A    I don't believe so.

9  Q    So why is that number here?  Why are you suffering damages

10 that you didn't even pay?

11 A    Yeah.

12      So I think the reason for including it is it says

13 additional two months billed.  We know that we've been billed

14 those.  We're not arguing that there shouldn't be anything

15 paid.  You're saying we actually owe the full amount.  Here is

16 the amount we owe.  So the difference is the million dollars,

17 right.  So you're claiming we owe you the full 1.3.  We're

18 saying it's 264.

19 Q    But you're seeking damages for the difference.  Aren't

20 you?

21      MR. RUKAVINA:  Your Honor, that's not -- that wasn't

22 the testimony, you know.

23      MR. MORRIS:  Just look at -- I'm just asking.  This

24 is math, right.  It's your analysis.

25      MR. RUKAVINA:  It says total over billing.  Our

Norris - Redirect                          158

1  damages, Your Honor, are the $6.2 million, as he testified, and

2  then the $372,000.

3           MR. MORRIS:  Then how could --

4           THE COURT:  Overruled.  He can ask question about it.

5  BY MR. MORRIS:

6  Q    Those two numbers don't add up to $7.6 million, do they?

7  A    Yeah.  And I don't know the legal ramifications here, but

8  the math is you're asking for -- I can't remember the number --

9  three million.  We're saying here is this.  The three million

10 should be offset by million dollars.

11 Q    Sir?  Sir, let's just take this one piece at a time

12 because I --

13 A    Uh-huh.

14 Q    -- I just want to make sure this isn't inflated.  You

15 agree that the Advisors paid zero for December and January

16 under the payroll reimbursement agreement.  Correct?

17 A    Well --

18 Q    Just simple question.

19 A    The argument I think Jim made was we've overpaid.  There

20 should be a true up to those amounts.

21           MR. MORRIS:  I move to strike.  Can you please -- I

22 want to get this done.

23 BY MR. MORRIS:

24 Q    You admit that the Advisors paid zero in December 2020 and

25 January 2021 under the payroll reimbursement agreement.

**WWW.LIBERTYTRANSCRIPTS.COM**

002800

Norris - Redirect                                  159

1  Correct?

2  A    We made no payments in January --

3  Q    Okay.

4  A    -- or December.

5  Q    But your analysis that you did says that if you were to

6  pay something it would be $264,998.  Right?

7  A    Correct.

8  Q    But instead of adding that number to the $6.2 million, you

9  added the difference between that number and what we've

10 invoiced as the damage calculation.  Is that -- that's a

11 mistake.  Right?

12 A    We wouldn't add the 264 as additional damages.

13 Q    So what's the damage --

14 A    That's the amount we would have paid.

15 Q    That's the amount.  So --

16 A    Versus what was billed.  You billed us $1.336 million and

17 --

18 Q    Okay.  So would the proper damages here be 6.206, 891.

19 I'm just trying to do it from your perspective.

20 A    Uh-huh.

21 Q    Plus the $372,040 in the bottom.  Right?  372?  Do you

22 agree with that?  Those two were parts of your damage

23 calculation.

24 A    Those are part damages, correct.

25 Q    And you would add those two together and then you would

002801

                              Norris - Redirect                    160

 1  deduct $264,000.  Right?

 2  A    No.

 3  Q    Because that's the value that you should have paid that

 4  you didn't.

 5  A    I wouldn't necessarily say you'd deduct it from that.  It

 6  would be offset from whatever you're seeking from us, right.

 7  That's separate.

 8  Q    No.

 9      If you win this case, and again, right, it's an assumption

10  that I positively don't agree with.  But I you were to win this

11  case, right, your theory is that you would be entitled to 6.2

12  plus $372,000, right, because that's the overpayment.  And then

13  the 264 is what you should have paid under your theory, so that

14  should be deducted because you didn't pay it.

15  A    Yeah.  Assuming that your three million goes to zero as

16  well or it was reduced.  It's the same way at getting at the

17  same answer.

18  Q    Okay.  Right?  Because -- are we in agreement?  It's if

19  you want to know under your theory if you win under the

20  methodology you've adopted, it would be 6.2 plus 372 minus 264.

21  Right?  Because the 264 is your valuation that you didn't pay.

22  A    Yeah.  And assuming that your numbers are also go away,

23  that there's no -- there's no damages there.

24  Q    I'm going to lose under this hypothetical.

25  A    Yeah.  Yeah.

002802

1  Q    Right?  So it's not $7.6 million.  Right?  It's something

2  closer to 6.  Again, just using your numbers.  I'm just trying

3  to correct the mistake that I think you made.

4  A    I don't think it's necessary a mistake.  I think it's just

5  thinking at it holistically.

6  Q    Okay.  Can you go to Exhibit 27 in Binder Number 1?  And

7  this is that email that you just looked at with Mr. Rukavina.

8  Right?

9  A    Correct.

10 Q    And if we start on the right page, the one with Bates

11 number 730, do you see that you wrote to Mr. Sauter at 7:08

12 p.m. on November 30th and said, time for a call?

13 A    No.  That --

14 Q    At the bottom of the page.

15 A    Oh, at the bottom.  On October 6th, time -- it was time

16 for a call.

17 Q    Right.  But at the bottom of Page 730, there's an email

18 from you to Mr. Norris on November 30th at 7:08 p.m. where

19 you're forwarding the same email.

20 A    Yes.

21 Q    And that's the title of the email.  Right?

22 A    Yes.

23 Q    And you sent that because you just learned that Highland

24 had terminated -- given notice of termination of the shared

25 services agreements.  Right?

Norris - Redirect                                      162

1  A    I believe so, but I'm not certain.

2  Q    And then you walked into the office early the next morning

3  and started to think about what all of this meant.  Right?

4  A    Yes.

5  Q    And so, at 8:53 a.m., you sent an email to DC, to Frank,

6  and to Klos about the topic of the intercompany agreements.

7  Right?

8  A    Yes.

9  Q    And you gave them the amount of money that was paid under

10  all of the agreements between the companies.  Correct?

11  A    I took from the income statement, which isn't necessarily

12  a cash flow statement, but it's the actual amount bill or

13  recorded as expenses.

14  Q    So the Advisors own books and records reflected all of the

15  payments that were made by the Advisors to Highland under the

16  various intercompany agreements.  Right?

17  A    The HCMLP employees were the ones that prepared these very

18  numbers.

19          MR. MORRIS:  I move to strike, Your Honor.

20          THE COURT:  Sustained.

21  BY MR. MORRIS:

22  Q    Okay.  I'll ask my question again.  The Advisors books and

23  records reflected all payments that they made to Highland on

24  account of the intercompany agreements.  Correct?

25  A    Sorry.  One more time.

Norris - Redirect                    163

1  Q    The Advisors books and records reflect every payment they

2  ever made to Highland under the intercompany agreements during

3  the relevant period.  Correct?

4  A    I believe so, yes.

5  Q    And you were able to go in there and to get the

6  information about the amounts that were paid.  Right?  You got

7  it.  You got it.  It's in your email.  Right?

8  A    I got it from the board materials, yes.

9  Q    From the board materials.  So even the board was given the

10 details about the amounts that were being paid.  Who gave it to

11 the board?

12 A    And I'd say not details, but one line, right.  There's no

13 underlying details.

14 Q    But the board was told how much the Advisors paid under

15 the intercompany agreements on an annualized basis.  Is that

16 fair?

17 A    Yes.

18 Q    And that information came form the Advisors own books and

19 records.  Correct?

20 A    From the Highland employees, yes.

21        MR. MORRIS:  I move to strike.

22        THE COURT:  Sustained.

23 BY MR. MORRIS:

24 Q    That information came from the Advisors books and records.

25 Correct?

002805

Norris - Redirect                    164

1  A    Yes.

2  Q    Thank you.

3       And you told -- you told Mr. Sauter and

4  Mr. Waterhouse and Mr. Klos, among other things, that you need

5  to make sure these agreements are fully understood in the

6  context of the notices, in the context of the termination

7  notices.  Do you see that?

8  A    I do.

9  Q    So after you receive notice of termination, that's when

10 you decided that you thought it was the appropriate time to

11 make sure the agreements were fully understood in the context

12 of HCMLP's termination notices.  Right?

13 A    That was a continuation.

14      If you go back in the email of October 6th, there's an

15 email asking for a conversation on shared services and other

16 agreements.  I had an attachment with those agreements, then

17 sent them on October 6th to DC Sauter.  This is when I started

18 to be involved more in the transition of services and was

19 already trying to kind of understand what was going on.  And

20 there wasn't a need at that point to do anything specific.

21 Q    Okay.  So it was after?  Can you just agree with me that

22 what you wrote on the day after you found out that there was a

23 termination notices, that you need -- that you "need to make

24 sure these agreements are fully understood in the context of

25 HCMLP's termination notices for the shared services agreement".

002806

Norris - Redirect                              165

1  Did you see that?

2  A    I did.

3  Q    When you use the phrase, shared services right there, you

4  also meant the payroll reimbursement agreement.  Right?

5  A    I may have, but I don't -- I don't know.

6  Q    Well, that's what sub advisory fees are.  Right?  The

7  column that you have there under sub advisory fees, it doesn't

8  say payroll reimbursement agreement.  It says sub advisory

9  fees.  Correct?

10 A    It says sub advisory fees, yes.

11 Q    And those are the amounts that were paid not under the sub

12 advisory agreements, but the contract that is now called the

13 payroll reimbursement agreement.  Correct?

14 A    Yes.

15 Q    And what you wanted to do is not make sure you fully

16 understood the shared services agreements.  What you wanted to

17 do on December 1st is make sure you fully understood the shared

18 services agreements and the payroll reimbursement agreements.

19 Correct?

20 A    Worth noting the sub advisory fees were higher than the

21 shared services fees, so need to make sure these agreements are

22 fully understood in the -- well, here -- they only terminated

23 the shared services agreement, so and going back my previous, I

24 wasn't sure.

25       They only sent shared services agreement terminations.

                              Norris - Redirect                    166

 1  And so you needed to understand the shared services agreements,

 2  the sub advisory agreements.  Yeah.  We wanted to understand

 3  them, but they hadn't terminated them.  So this specifically

 4  was related to the shared services agreement.

 5  Q    Sir, the rest of the email train that you're relying on is

 6  about the sub advisory fees.  Do you see Mr. Klos' response to

 7  you?

 8  A    Yeah.

 9  Q    It's only about sub advisory fees.  Correct?

10  A    What's only about sub advisory fees?

11  Q    The first paragraph is about sub advisory fees.

12  A    Yeah.  Because he -- he clarified.  I was learning at this

13  point.

14  Q    Uh-huh.

15  A    And he clarified and then it went into a deeper discussion

16  about the sub advisory fees.

17  Q    And is it fair to say that you also needed to fully

18  understand the payroll reimbursement agreements at that time?

19  A    Absolutely.  We should.  Yeah.

20  Q    At that time.  Right?

21  A    Because they didn't terminate them.

22  Q    That's right.  And you hadn't undertaken that exercise at

23  any time before this time.  Is that fair?

24  A    Other than my discussions with outside counsel and DC

25  Sauter that are laid out in the email below about which we had

                                                              002808

Norris - Redirect                                            167

1  had discussions, but we didn't dive into all the details.

2  Q    You're telling me that back in October this email that

3  says nothing doesn't mention payroll reimbursement agreement.

4  Right?

5  A    It says shared services and other agreements with HCMLP.

6  Q    And what was the issue at that time?  Did you know back in

7  October?

8  A    Did I know what back in October?

9  Q    About the alleged overpayments.

10 A    I didn't.

11 Q    Were you looking at the agreements in October?

12 A    We were.

13 Q    So you had the agreement in your hand in October and you

14 didn't make any conclusions about overpayment at that time.

15 Right?

16 A    I looked at the schedule and saw that there's a percentage

17 allocation of employees and assumed that Highland is -- let me

18 step back.  We relied on Highland and were assuming that they

19 were making payments in accordance with the agreement.

20 Q    In the two months before you sent this email to Mr. Sauter

21 and Mr. Waterhouse, did you make any effort to try to figure

22 out if your assumption was accurate?

23 A    No.

24 Q    And you looked at Exhibit A and you said, well, there's a

25 lot of employees who have been terminated, but I just assumed

 1  Highland is doing the right thing.

 2  A    Yeah.

 3  Q    Okay.  You said that you were not aware of the

 4  overpayments, but I believe you said Mr. Waterhouse was very

 5  aware of the overpayments.  Do I have that right?

 6  A    He was.

 7  Q    And did he tell you when he first learned of the

 8  overpayments?

 9  A    Well, in our discussion in December, he said -- he didn't

10  say when he had learned, but in our call at the end of January,

11  which I had taken notes on, he had said -- and I was surprised

12  by this because I thought it was newer knowledge to him in

13  December, but he had said over a year ago he had discussions

14  with Counsel and DSI.  So he had told me it had been over a

15  year.

16  Q    And did -- and that's when he told you?  So other than

17  what Mr. Waterhouse told you about his conversation with Isaac

18  Leventon, Scott Wellington, and Fred Caruso, are you aware of

19  any other conversation that ever took place before November 30,

20  2020, concerning whether or not there should be any

21  modification to the amounts being paid under the payroll

22  reimbursement agreements?

23  A    So I'll correct the -- you said other than him telling his

24  conversation with Fred Caruso and Isaac.  Other than their

25  testimony, he didn't tell me that at the time.  He said he had

 1  spoke to DSI and to -- to counsel.  So just --

 2  Q    Meaning that he didn't identify who the counsel was.

 3  A    He didn't identify who counsel was.

 4  Q    Fair enough.

 5  A    I didn't know who Fred Caruso was at the time.

 6  Q    Okay.

 7  A    Again, I wasn't involved.  So he told me general.  So

 8  that's the first part of the question, so didn't want to agree

 9  to that part by answering.  So then you said was there any

10  other discussion that they should be amended prior to November

11  30th.  Not with me.

12  Q    Okay.  And you're not aware of any.  Correct?

13  A    Other than -- I'm not aware of any, no.

14  Q    Thank you.

15       Nobody's ever told you -- other than this one conversation

16  that Frank had with Fred Caruso and counsel, nobody has ever

17  informed you of any discussion of any kind where the Advisors

18  asked to modify the amounts that were being paid under the

19  payroll reimbursement agreements.  Correct?

20  A    I mean, other than my conversations where I asked for the

21  scheduled, demanded that they be done the right way, but you're

22  saying that --

23  Q    Let me rephrase the question.

24  A    Yeah.

25  Q    Because I want to use that November 30th timeline.

Norris - Redirect                              170

1  A    Yeah.

2  Q    Other than the conversation that Mr. Waterhouse told you

3  he had with Fred Caruso and counsel, you have no knowledge of

4  any request to modify the amounts that were charged under the

5  payroll reimbursement agreement at any time prior to November

6  30, 2020.  Correct?

7  A    I don't.

8  Q    Thank you.

9      You went through a whole lot of testimony with Mr.

10 Rukavina about the change in the advisor's business model.  Do

11 I have that right?

12 A    Correct.

13 Q    And none of those changes ever caused the Advisors to make

14 a request to modify the amounts that were being paid under the

15 payroll reimbursement agreement.  Correct?

16 A    They should have.  And again, Highland -- we thought

17 Highland was doing that, but there's -- yeah.  The people

18 changed.  It should have resulted in a modification.

19 Q    Okay.  And every -- it was the last question I asked and I

20 just want to emphasize the point.

21 A    Uh-huh.

22 Q    Every single person that you believe should have

23 unilaterally made this change reports to Frank Waterhouse.

24 Right?

25 A    Those that had knowledge of this, yes.


**WWW.LIBERTYTRANSCRIPTS.COM**

Norris - Recross                                    171

1  Q    Okay.

2  A    And you said unilaterally, I think the contract is clear

3  and says that if either party, right, will negotiate in good

4  faith.

5          MR. MORRIS:  I'm going to move to strike that part

6  because the contract speaks for itself and --

7          THE COURT:  Sustained.

8          MR. MORRIS:  -- you have no knowledge of what that

9  means.

10         May I just have one moment, Your Honor?

11         THE COURT:  You may.

12         MR. MORRIS:  I have nothing further here.

13         THE COURT:  All right.  Any recross?

14         MR. RUKAVINA:  Briefly, Your Honor.

15         THE COURT:  Okay.

16                  RECROSS-EXAMINATION

17  BY MR. RUKAVINA:

18  Q    Briefly because I think Mr. Morris might make his flight.

19  Exhibit W.  Is that the notes that you referenced to yourself,

20  just so that I can use it in closing?

21  A    Yes.  Those are them.

22  Q    Okay.  And were those kept contemporaneously or right

23  after by you?

24  A    I started typing them up shortly after the call ended.

25  Q    It's Exhibit W.  I think it's been admitted.

002813

1  A    And it was sent -- the call happened that evening and I

2  sent it later that night after I had wrapped up work.  I sent

3  it to myself.

4  Q    Going back to your damages analysis, where did you get the

5  dates of termination of the employees from?

6  A    So I received them from the interrogatories.

7  Q    So let me point you.  Exhibit I.  Exhibit I, Page 9.

8  Yeah.  You might not know what an interrogatory is.  Exhibit I,

9  Page 9.  Your Honor, these are the Debtors' responses to my

10 interrogatories.  Do you see that, sir?

11 A    I do.

12 Q    Okay.  Is that the source information for dates of

13 termination?

14 A    It is.  And I also compared that to the schedule from HR

15 at Highland Kelly Stevens.

16 Q    And just to round off this discussion of damages, back to

17 your Exhibit G.

18 A    Yes.

19 Q    We're claiming the 6.2 million.  Correct?  Go back to

20 Exhibit G.

21 A    Yes.

22 Q    We're claiming the 372,000.  Correct?

23 A    Yes.

24 Q    Then we're claiming -- I'll discuss it in closing -- some

25 $1.3 million from the David Klos analysis for the shared

Case 21-03010-sgj    Doc 116    Filed 04/18/22    Entered 04/18/22 09:05:40    Desc Main
Case 3:22-cv-01170-S    Document 25-11    Filed 12/22/22    Page 797 of 885    PageID 2903

Norris - Recross                                    173

1  services agreements.  Right?

2  A    Yeah.  And that's different than this 1.3.  It's 1.3 in

3  shared services.

4  Q    That's what I wanted to clarify.

5  A    Yes.  Yes.

6  Q    You did not --

7  A    Additional damages.

8  Q    You did not calculate the underlying overcharges under the

9  shared services.  We're just going with Mr. Klos' analysis --

10  A    Going off --

11  Q    -- if the Court agrees with us.

12  A    That's correct.

13  Q    And then 425,000 in cover damages.

14  A    That's correct.

15  Q    And that's for Robert Harris and Jason Post?

16  A    Correct.

17          MR. RUKAVINA:  Your Honor, thank you.

18          THE COURT:  All right.  Mr. Norris, before I excuse

19  you, I have two or three questions.

20          THE WITNESS:  Yes.  Yes.

21          THE COURT:  Okay.  That was it.  That was recross.

22          MR. MORRIS:  Oh, I had a couple -- I have a couple of

23  questions on that.

24          THE COURT:  But that was it.  We went you, you, you,

25  you.

Norris - Examination/Court                    174

1          MR. MORRIS:  Right.  But can I cross now on the very

2   limited testimony?  It's limited to the questions that he just

3   asked.

4          THE COURT:  Okay.  Well, don't --

5          MR. MORRIS:  If you don't want me to, it's fine.

6          THE COURT:  Yeah.  I don't want you to.

7          MR. MORRIS:  Okay.

8                        EXAMINATION

9   BY THE COURT:

10  Q    All right.  My brain thinks in timelines.  And so I just

11  -- I want to be reminded of a couple of things.  NexPoint, NPA,

12  was formed when?

13  A    Yeah.  NexPoint Advisors was formed in 2011 or 2012.  I

14  believe it was 2011.

15  Q    Okay.  So after you started at the Highland complex.  And

16  the other one, HCMFA.  It was --

17  A    Yes.

18         It was formed somewhere between 2007 and 2009 as Highland

19  Funds Asset Management.  That's where Jim got the H fam from

20  and has carried it.  It then became Axis Capital.  And then it

21  changed its name again to Highland Capital Management Fund

22  Advisors in, I believe, February 2013.

23  Q    Okay.  So when did each of these entities begin hiring

24  their own employees?  I'm not 100 percent clear.  I think I

25  heard the answer, but you tell me.

1  A      Yeah.  So they have -- they had their own employees

2  throughout the whole time period, but --

3  Q      Since 2011, since 2007?

4  A      That's right.  And the -- they have -- and I mentioned the

5  shared services agreements.  When I started working for

6  Highland Capital Management Fund Advisors, there were a lot of

7  those in house services that were actually at the Advisors.

8  Q      Right.  Yeah.

9  A      So part of the transitioning those services was with my

10 moving to a different role in around 2013 or so where we merged

11 those services.  We were receiving some services from Highland,

12 back-office services, maybe some --

13 Q      Okay.  I'm more interested in front office.

14 A      Yeah.  Front-office services.

15 Q      Uh-huh.

16 A      So the Retail Advisors have always had front-office

17 personnel.  And we did rely and we had the payroll

18 reimbursement agreements for certain investment professionals.

19 Prior to the 2018 agreement, I believe the shared services

20 agreement had investment advisory services in it.

21      So -- but there was -- you know, we have had investment

22 professionals the whole time.  However, as I mentioned, the

23 shift from being real -- from credit focused to real estate

24 focused really started in 2015, '16, '17, '18, and really into

25 '19 and '20.  So our real estate assets in 2012 or '13 were

002817

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 26-14   Filed 01/12/25   Page 801 of 885   PageID 29051

176

1  close to zero and today it's around nine or ten billion.

2  Q    Okay.

3  A    And I think if you go back to 2008, it was almost

4  primarily credit and a long-short equity fund from our advisors

5  and a mostly credit focused funds.

6            THE COURT:  Okay.  Thank you.

7            THE WITNESS:  Yes.

8            THE COURT:  You're excused.

9            THE WITNESS:  Thank you.

10      (Witness excused)

11            THE COURT:  All right.  That concludes our witnesses.

12  Right?

13            MR. RUKAVINA:  It does, Your Honor.  And Mr. Morris

14  and I discussed a proposal.

15            MR. MORRIS:  Yeah.  Let me just confer with my client

16  --

17            MR. RUKAVINA:  Sure.  Sure.

18            THE COURT:  Okay.

19            MR. MORRIS:  -- to make sure my client is okay with

20  this.

21            All right.  You can --

22            MR. RUKAVINA:  You're okay?

23            Your Honor, we were -- if agreeable to the Court

24  since they could then make their flights and we're all tired,

25  we can do closing by Webex at the Court's convenience rather

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-01170-S   Document 26-14   Filed 04/22/25   Page 802 of 885   PageID 29162

177

1  than go now until probably quite -- we're not going to have, I

2  don't think, huge, long closings, but we're going to have quite

3  some time.

4          THE COURT:  You had an hour opening.

5          MR. MORRIS:  Yeah.  I mean, I actually --

6          MR. RUKAVINA:  I was a lot less than an hour.

7          THE COURT:  Okay.

8          MR. MORRIS:  I don't want to impose my will at all.

9  I'd like to do it consensually, but I think it might be

10 appropriate to just set some time limits and find a day.  We do

11 have a pretty big day next week for the summary judgment motion

12 on the Notes (phonetic) litigation.

13         But at the Court's convenience, I think it would be

14 helpful to review the record because it's been a busy couple of

15 days and I know personally I'd like to read actually the

16 testimony instead of just telling the Court what I think

17 witnesses testified to because people get a little loose with

18 that sometimes.

19         THE COURT:  Okay.  So we'll let you do closing by

20 WebEx.  We'll limit you to an hour each.  We'll do it some day

21 next week, but I need to check with Traci.  I don't have my

22 final calendar for next week --

23         MR. RUKAVINA:  MSJ is the 20th?

24         THE COURT:  -- to know when the best day is.

25         MR. MORRIS:  It is the 20th, yeah.

1          THE COURT:  What day is your Note?

2          MR. MORRIS:  I think it's the 20th.  Yeah.

3          MR. RUKAVINA:  That would be a week from today.

4   Right?

5          MR. MORRIS:  Yeah.  You know, and it may not be

6   feasible to do it next week.  It may wait until the week after.

7          THE COURT:  Okay.

8          MR. MORRIS:  I'll do it whenever the Court wants, but

9   --

10          THE COURT:  Okay.  We'll do it either next week or

11  the following week, okay?

12          MR. MORRIS:  Yeah.  Fair enough.  Fair enough.

13          THE COURT:  Yeah.  I just need to get with Traci --

14          MR. MORRIS:  Yeah.

15          THE COURT:  -- and see what is the best day.  So

16  she'll reach out to you tomorrow.

17          MR. MORRIS:  Perfect.

18          THE COURT:  And let you know.

19          MR. MORRIS:  Perfect.

20          THE COURT:  Okay.

21          MR. MORRIS:  Thanks so much, Your Honor.

22          THE COURT:  All right.

23          MR. RUKAVINA:  So just, I guess, to be clear.

24  Plaintiff has closed.  I have closed because we did it

25  simultaneously, and the evidence is concluded.

179

1          THE COURT:  The evidence is closed.

2          MR. RUKAVINA:  Thank you.

3          MR. MORRIS:  Thank you.

4          THE COURT:  I'm not listening to anything else.  And

5    the briefing is closed, as well.  So we'll just have closing

6    oral arguments again next week or the following week.  Traci

7    will reach out tomorrow.

8          MR. MORRIS: Okie doke.

9       (Proceedings concluded at 5:04 p.m.)

10                      *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

002821

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-01170-S   Document 26-14   Filed 04/18/22   Page 805 of 888   PageID 42905

180

1                    **C E R T I F I C A T I O N**

2          We, DIPTI PATEL, KAREN WATSON, MICHELLE ROGAN, PATTIE

3    MITCHELL, and, CRYSTAL THOMAS, court approved transcribers,

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter, and to the best of our ability.

7

8    /s/ Dipti Patel                    /s/ Crystal Thomas

9    DIPTI PATEL, CET-997               CRYSTAL THOMAS, CET-654

10

11   /s/ Karen K. Watson                /s/ Pattie Mitchell

12   KAREN K. WATSON, CET-1039          PATTIE MITCHELL

13

14   /s/ MICHELLE ROGAN

15   MICHELLE ROGAN

16   LIBERTY TRANSCRIPTS               DATE: April 14, 2022

17

18

19

20

21

22

23

24

25

Case 21-03010-sgj   Doc 116   Filed 04/18/22   Entered 04/18/22 09:05:40   Desc Main
Case 3:22-cv-02170-S   Document 26-14   Filed 04/18/22   Page 806 of 888   PageID 2916

181

WWW.LIBERTYTRANSCRIPTS.COM

# Tab 13

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS (DALLAS)

| | | |
|---|---|---|
| IN RE: | . | Case No. 19-34054-11(SGJ) |
| | . | |
| HIGHLAND CAPITAL | . | Earle Cabell Federal Building |
| MANAGEMENT, L.P., | . | 1100 Commerce Street |
| | . | Dallas, TX  75242-1496 |
| | . | |
| Debtor. | . | |
| . . . . . . . . . . . . . | . | |
| | . | Adv. No. 21-AP-03010(SGJ) |
| HIGHLAND CAPITAL | . | |
| MANAGEMENT, L.P., | . | |
| | . | |
| Plaintiff, | . | |
| | . | |
| v. | . | |
| | . | |
| HIGHLAND CAPITAL, | . | |
| MANAGEMENT FUND ADVISORS | . | |
| L.P., *et al.*, | . | |
| | . | |
| Defendants. | . | Wednesday, April 27, 2022 |
| . . . . . . . . . . . . . | . | 1:34 p.m. |

TRANSCRIPT OF HEARING ON CLOSING ARGUMENTS
BEFORE HONORABLE STACEY G. JERNIGAN
UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For Plaintiff Highland Capital Management, L.P.: | Pachulski Stang Ziehl & Jones LLP BY:  JOHN MORRIS, ESQ. 780 3rd Avenue, 34th Floor New York, New York 10017 |
| For Defendant Highland Capital Management Fund Advisors, L.P.: | Munsch, Hardt, Kopf & Harr BY:  DAVOR RUKAVINA, ESQ. THOMAS DANIEL BERGHMAN, ESQ. 500 North Akard Street, Suite 3800 Dallas, Texas 75201 |
| Audio Operator: | Michael F. Edmond |

Proceedings recorded by electronic sound recording, transcript
produced by a transcript service.

---

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail:  DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

1          THE CLERK:  All rise.  The United States Bankruptcy

2   Court for the Northern District of Texas Dallas Division is now

3   in session.  The Honorable Stacey Jernigan presiding.

4          THE COURT:  Good afternoon.  Please be seated.

5          All right.  We are here for closing arguments in the

6   Highland Capital versus Advisors matter, Adversary 21-3010.

7   Let's get appearances first on the record for Highland first.

8          MR. MORRIS:  Good afternoon, Your Honor.  This is

9   John Morris, Pachulski Stang Ziehl & Jones, for Highland

10  Capital Management, L.P., and I'll be handling today's closing

11  argument on behalf of my client.

12         THE COURT:  All right.  Thank you.

13         Now for the Advisors, who do we have appearing?

14         MR. RUKAVINA:  Your Honor, good afternoon, Davor

15  Rukavina and Thomas Berghman here for the Advisors, NexPoint

16  Advisors, L.P., and Highland Capital Management Fund Advisors,

17  L.P.

18         THE COURT:  All right.  Thank you.

19         All right.  That should be all the appearances.  We

20  have lots of observers, I'm sure.  I believe we allocated one

21  hour each to Highland and then the Advisors collectively.

22  Correct?

23         MR. MORRIS:  That's right, Your Honor.  And as the

24  plaintiff, I'm hoping that I don't use my full hour.  And

25  whatever time remains from my allotted time, I'll reserve for

3

 1   rebuttal.

 2           THE COURT:  All right.  We will allow rebuttal if you

 3   have time.

 4           All right.  Well, with that, let's begin.  It's 1:35

 5   per the Court's clock.  So, Mr. Morris, I'll hear your closing.

 6           MR. MORRIS:  All right.  And I would ask Ms. Canti

 7   (phonetic) to put up our deck, our PowerPoint presentation that

 8   we sent to the Court and to Mr. Rukavina in advance of today's

 9   --

10           THE COURT:  Okay.

11           MR. MORRIS:  -- argument.  So, okay, I'll begin the

12   clock, Your Honor.

13           And thank you for hearing us this afternoon.  Thank

14   you for your patience the week before last in accommodating our

15   travel schedules and allowing us to complete a pretty grueling

16   two days of testimony.  I think it was helpful.

17           And I'd like to begin if we could just turn the deck

18   to the next slide and just remind the Court that at Docket

19   Number 91, Highland filed its proposed findings of fact and

20   conclusions of law.  We stand by every work in that 68-page

21   filing.  I'm hoping to use my time here this afternoon to

22   simply highlight certain facts that came out of the trial, as

23   well as to kind of summarize where I believe the evidence

24   landed and where I believe the Court ought to rule.

25           Just to quickly go through the claims, Highland's

4

 1   claims are awfully straightforward.  There's no dispute that

 2   the Advisors stopped paying for their services under the

 3   various agreements at very specific points in time.  There's no

 4   dispute as to the amounts that are owed under those agreements.

 5   And so unless the Advisors can prove that Highland was in

 6   breach of one or more of the agreements, I think that there's

 7   an undisputed issue as to Highland's claim and as to the

 8   Advisors' liability under that claim.

 9           We believe that the Advisors' claims are meritless,

10   Your Honor.  We believe that -- and I think there was kind of a

11   sea change during the hearing.  I think the Advisors kind of --

12   and we'll talk about this more in a moment -- shifted their

13   theory of the case.  And I believe that we now have an

14   agreement that the contracts are indeed unambiguous.

15           As I'll talk about a little bit more, there really is

16   no such thing, at least in the context of this case, of an

17   overpayment.  Even if the Court were to find there was an

18   ambiguity, and I'll go through the evidence again as quickly as

19   I can, the parole evidence --

20           THE COURT:  Okay.  Just a moment.  My court

21   reporter's saying we need to stop.

22       (Court and Clerk confer briefly)

23           THE COURT:  I apologize.  We are having a technical

24   sound issue.  I didn't observe it, but the court reporter

25   equipment -- just bear with us a moment.

002827

5

1      (Pause)

2              THE COURT:  Okay.  Just so we can let the lawyers

3  know, how long do you predict this is going to take?

4              UNIDENTIFIED SPEAKER:  Testing, testing.

5              THE CLERK:  It's not coming through.

6              UNIDENTIFIED SPEAKER:  Still not coming through.

7              THE CLERK:  How long do you think it's going to take?

8              UNIDENTIFIED SPEAKER:  I have no earthly idea.  I'm

9  not sure what's going on.  Give me five minutes.

10             THE COURT:  Okay.  Lawyers, I apologize.  They say

11 give them five minutes.  They hope they can get this sound

12 issue.  I greatly apologize, but give it five minutes.

13     (Off the record to handle technical issues with audio

14 equipment)

15     (Back on the record)

16             THE CLERK:  All rise.

17             THE COURT:  All right.  Please be seated.  We're back

18 on the record in the Highland closing arguments in Adversary

19 21-3010.  All right.

20             Mr. Morris, we're just going to start the clock over

21 in light of a disruption less than five minutes into your

22 closing.  So you may begin.

23             MR. MORRIS:  Okay.  Thank you, Your Honor.  And

24 again, John Morris, Pachulski Stang Ziehl & Jones for Highland.

25             As I had mentioned earlier, for the record, Highland

6

1    had filed at Docket Number 91 its proposed findings of fact and
2    conclusions of law.  We continue to believe that that document
3    fairly sets forth and describes a mountain of documentary
4    evidence that supports its claims and that defeats the
5    Advisors' claims.

6             Just to summarize kind of where we are, we believe
7    that there's no dispute as to Highland's claim.  We don't
8    believe there's any dispute as to the time in which the
9    Advisors failed to pay for services or the amounts that were
10   due under those contracts, so that unless the Advisors can
11   prove that Highland is in breach, I believe that there's no
12   dispute that Highland would be entitled to a judgment.

13            Highland believes that the Advisors' claims are
14   frivolous.  After some back and forth, I believe that the
15   parties are in agreement now that the contract is unambiguous
16   and that, as I'll discuss further, there really is no such
17   thing as an overpayment under the circumstances that we find
18   ourselves here.

19            Even if the contracts were ambiguous in any way, we
20   believe the evidence firmly establishes that Highland's
21   interpretation is the only fair and reasonable interpretation.
22   That evidence includes parole evidence that led up to the
23   execution of the relevant agreements, and it also includes the
24   parties' course of dealing and the surrounding circumstances.
25            We believe the evidence will establish and has

002829

7

1    established that Highland has fully performed, that the

2    substance of the advisor's claims has changed so radically over

3    time that the credibility of the claim itself is called into

4    question, and their last-minute hail Mary to Frank Waterhouse

5    is nothing but a fumble or an incomplete pass at best.

6    Mr. Waterhouse's story will not withstand scrutiny.

7            If we can go to the next slide just to summarize and

8    to highlight a couple of additional provisions of the relevant,

9    and I'm focused here on the Payroll Reimbursement Agreement

10   because that is the bulk of the Advisors' claims.  Again,

11   Section 2.01 of the agreement provided that not just NexPoint

12   but HCMFA because the documents are identical, and they can be

13   found at Exhibits 6 and 8, provided that the Advisors would

14   reimburse Highland for the actual cost of certain employees,

15   again with a capital A and a capital C.

16           Capital A and capital C actual cost is defined in the

17   agreement to be a flat fee absent a change pursuant to Section

18   2.02.  There's really no dispute about that.  It's plain

19   language (indiscernible) applied as such.  Section 2.02 states

20   that the parties may agree to modify the terms and conditions

21   of the reimbursement.  They may agree, they may not agree.

22   Nobody can act unilaterally.

23           I believe earlier in this case there was a suggestion

24   that Highland had some obligation to do something on its own.

25   You can't find Highland's name in Section 2.02 because nobody

8

1   has the right or the obligation or the ability to act

2   unilaterally.

3          Section 4.02 emphasizes that if somebody does want to

4   make a modification, they have to notify the other party before

5   the last business day of the calendar month.  And that's

6   critical, Your Honor, because it shows that the parties agreed

7   that any change would be prospective.  There wouldn't be a

8   retroactive change because if there could be a retroactive

9   change then you've just rendered the definition of actual cost

10  absolutely meaningless.  Right?

11         If at any time somebody can say, oh, I didn't like

12  what I paid for the last three years, or in this case the last

13  12 months, then why even have a definition of actual cost.

14  Right?  So you've got to read the agreement together.  Section

15  4.02 clearly establishes that any request for change under

16  Section 2.02 is going to be prospective only.

17         Section 6.02 says that the agreement can only be

18  amended by a writing of the parties.  The parties knew that.

19  We know that the evidence in dispute indisputably establishes

20  that they exercised their right.  They did agree to modify

21  under Section 2.02 in December 2018, and we'll talk about that

22  more.  So the parties know exactly what they're doing.

23         And if you remember in my opining, Your Honor, I

24  suggested that the definition of actual cost, we could have

25  called it hamburger, we could have called it tofu if that's

Case 21-03010-sgj   Doc 122   Filed 05/09/22   Entered 05/09/22 09:07:39   Desc Main
Case 3:22-cv-02170-S   Document 16-5   Filed 01/02/81   Page 16 of 885   PageID 29120

9

1  your preference.  And the reason that I said that, Your Honor,

2  is because Section 6.07 exists.  And Section 6.07 says the

3  descriptive headings are for convenience, and they don't

4  constitute a part of the agreement.

5        So again, you know, everything that I think the

6  Advisors are relying upon are all of these headings.  The only

7  thing that matters is the definition of actual cost,

8  Section 2.02, and that any agreement has to be prospective, not

9  retroactive.  We believe that that's what the Payroll

10  Reimbursement Agreement shows.

11        If you go to the next chart, Your Honor, it's really

12  just a summary of Mr. Klos' damage analysis.  It is really

13  incredibly straightforward.  Under the next point, agreements,

14  no payment was made in December or January.  All three

15  agreements were flat-fee agreements.  We've simply multiplied

16  the flat fee by the period of time that remained unpaid to get

17  to the total.

18        The only wrinkle here is the HCMFA Shared Services

19  Agreement.  If Your Honor recalls, there's one -- that's the

20  only contract of the five that isn't a fixed fee.  But it

21  stayed within a very narrow band of 300,000 to 310.  So we just

22  took an average because they didn't pay.  And that's how we got

23  to the 915 because they didn't pay.  If you recall the

24  testimony from Mr. Klos, they didn't pay November either for

25  that particular contract because Highland had not yet prepared

Case 21-03010-sgj   Doc 122   Filed 05/09/22   Entered 05/09/22 09:07:39   Desc Main
Case 3:22-cv-02170-S   Document 64-1   Filed 11/20/23   Page 814 of 885   PageID 2430

10

1 the invoice.  Okay?

2          So that's the damage calculation.  We're entitled to

3 costs, fees, and expenses.  You know, in the joint pretrial

4 order, the parties agreed that that issue would be resolved

5 subsequent to the entry of a judgment, if one is entered on

6 Highland's behalf.  We'll just follow Rule 54 and come back in

7 a couple of weeks for a calculation of our costs, fees, and

8 interest.

9          If we can go to the next slide, I mentioned, Your

10 Honor, from, you know, I think any fair reading of the

11 Advisors' pleadings, you know, always changing, always trying

12 to adapt to the evidence instead of coming in with a consistent

13 story.  You know?  But we adapt and we respond.  And this is

14 where we are.

15          Their original claim which was filed over a year ago

16 said, alleged that Highland stopped providing services in

17 July 2020.  Obviously, that makes no sense.  It's contradicted

18 by every single report to the Retail Board.  They in fact

19 relied on the wrong contract in their original administrative

20 claim.  They said that the NexPoint Shared Services Agreement

21 was an actual cost sharing agreement.  And they cited not to

22 the applicable agreement, the one from January 2018, but they

23 cited to the wrong agreement, the one from 2013.

24          And their entire argument on overpayment was simply

25 that it was an overpayment because there were employees on that

11

1  Exhibit A were no longer employed by Highland, and it was

2  incredibly outdated.  This is just, if you just look at

3  Paragraphs 16, 17, and 18 of their administrative claim, that's

4  all they said.

5       We responded in the fall of 2021.  The Advisors filed

6  a response.  They didn't really change their tune much on the

7  overpayments.  But they insisted that they could not possibly

8  have waived any rights under any of the agreements because the

9  issue didn't crystalize for them until November 2020.  Okay?

10  So they've shifted from July 2020 when we stopped providing

11  services.  One would hope that they would have known if we'd

12  actually done that, to the issue not really crystalizing until

13  November 2020.

14       And then on the eve of trial, we got a completely new

15  and different story, a very contradictory theory.  Instead of

16  saying that the issue didn't crystalize until November 2020,

17  all of a sudden we came up with Frank Waterhouse, not

18  Dave Klos, but Frank Waterhouse noted the overpayments.

19  There's no evidence that Frank Waterhouse did this.

20       But in any event, Frank Waterhouse noted the

21  overpayments in late 2019 and asked Fred Caruso, then allegedly

22  the CRO of Highland, to, quote, change the reimbursement

23  amounts, but was told nothing could be done because of the

24  automatic stay.  Dustin Norris, right, he's quoted as having

25  repeatedly discussed the matter with Highland's controller

1   starting in late summer or early fall of 2020.

2          I don't know how you can make that statement when

3   just a couple of minutes before in your response you told the

4   Court that the issue didn't crystalize until November 2020.

5   Based on the pleadings, I don't think there's any way to

6   actually figure out when they learned what because it just

7   conflicts, all of the statements just conflict with each other.

8          But be that as it may, the important point is that on

9   the eve of trial, they were forced into the 2.02 corner.

10  Right?  They had started out by saying Highland had the

11  obligation to change the amounts that were due because they

12  were in control under the Shared Services Agreement.  When, you

13  know, that become untenable because of the language of

14  Section 2.02, they tried to go with the overpayment and just

15  say the interpretation of the contract was that they shouldn't

16  pay for employees who weren't there.

17         Now they're kind of, you know, last stop, last call.

18  The agreement, Highland breached the agreement because it

19  didn't negotiate in good faith under 2.02.  Last call.  Third

20  try, last call.

21         Your Honor, we believe everything I'm about to say is

22  irrelevant, if I can humbly say that, because the contract is

23  clear and unambiguous.  But to the extent that the Court has a

24  different view, or to the extent the Court wants to get

25  comfortable that the plain and unambiguous terms of the

13

 1    contract mean exactly what they say, we're going to just

 2    summarize what the evidence was that led up to the execution of

 3    the Payroll Reimbursement Agreements.

 4         I don't think there's any dispute that 2017 was a

 5    difficult year for Highland.  In December of that year, if you

 6    look at Exhibit 30, Sean Fox and Tim Cournoyer discussed

 7    shifting NexPoint Shared Services Agreement to a flat monthly

 8    fee.  It's a very significant development, has nothing to do

 9    with Dave Klos.  I'm sure we're going to hear a lot of

10    criticism of Dave Klos.  But understand that Dave Klos was not

11    involved at this point.

12         The following month, in January, Klos does get

13    involved.  And he testifies that he gets instructions from

14    Mr. Dondero to increase from $1.2 million to $6 million the

15    total paid by the Advisors to Highland.  And they come up with

16    an allocation for the services among NexPoint and its

17    affiliates.  And that is also in the Exhibit 130.  And that

18    happens on January 4th.

19         Within seven days, Frank Waterhouse executes on

20    behalf of Highland and NexPoint three agreements, a subadvisory

21    agreement, the new Shared Services Agreement, and the NexPoint

22    Real Estate Advisors Shared Services Agreement.  And when you

23    add up the flat fees, there's no dispute, there can't be any

24    dispute that these are three flat-fee agreements that when you

25    add them up, it's $500,000.  When you multiply it by 12 --

Case 21-03010-sgj   Doc 122   Filed 05/09/22   Entered 05/09/22 09:07:39   Desc Main
Case 3:22-cv-02170-S   Document 84-1   Filed 01/14/23   Page 218 of 355   PageID 29135

14

1         THE COURT:  Mr. Morris, could you maybe close your

2  email box?  Every time you get an email, we get that tone, and

3  it's kind of distracting.

4         MR. MORRIS:  Sure.  Okay.  I'm just going to stop my

5  watch for a second and I'll do just that.  Give me just a

6  moment, Your Honor.

7     (Pause)

8         MR. MORRIS:  Okay.  Can you hear me now?

9         THE COURT:  Yeah.  It's a little faint, but --

10        MR. MORRIS:  Okay.  But I think I solved the problem.

11 Okay.  So --

12        THE COURT:  Okay.  Good.

13        MR. MORRIS:  So they've got this $6 million.  It's

14 three contracts, and they're all signed.  If you look at

15 Exhibit 30, you have three signed agreements, right?  And we're

16 going to hear criticism about Dave Klos and he's lying.  But it

17 doesn't matter because there's no dispute that three agreements

18 are created.  They equal the $6 million.

19        And Jim Dondero is told that because on January 26th

20 at Exhibit 86, you have the deck from the annual review

21 meeting.  And Mr. Dondero and Mr. Okada are given a ton of

22 information, including the fact that the Acis CLOs will be

23 reset so that their useful life is extended for two more years,

24 they're projected to generate more than approximately $10

25 million of revenue which is the second largest source of

15

1   revenue.

2           They're told explicitly that the assumption in the

3   projections is that NexPoint and its subsidiaries will play a

4   flat $6 million per year for subadvisory and shared services.

5   And but that notwithstanding these changes, notwithstanding all

6   of this, Highland is still going to lose $12 million in 2018.

7   But that is the deal.

8           January 26th ends.  They've got three signed

9   agreements.  It's $6 million flat.  They're looking forward to

10  getting this income from Acis.  And if we turn the page, that's

11  when the wheels start to come off.  And this is all very

12  important, right?  This is both parole evidence as well as the

13  surrounding circumstances because within days, Josh Terry

14  commences the involuntary against Acis.  That puts into -- that

15  puts at risk the $10 million that was projected for the

16  Highland complex in 2018.

17          So Mr. Fox and Mr. Cournoyer, not Mr. Klos, respond

18  by creating a flat-fee agreement for HCMFA, a subadvisory

19  agreement.  Not a payroll reimbursement agreement.  Nobody has

20  ever uttered those words at this point.  It is a flat fee

21  subadvisory agreement based on the NexPoint template.  And that

22  can be found at Exhibit 87.  This is the best parole evidence

23  you can possibly have.

24          The wheels come off again.  They think they solved

25  the Acis problem.  But on March 15th, Lauren Thedford informs

1  Fox, Surgent, Cournoyer, and Post, right?  Mr. Post is a chief
2  compliance officer for the Advisors.  Ms. Thedford is not only
3  a lawyer, she's an officer of the Advisors.  She's the
4  secretary of the Advisors.  Dave Klos isn't even on this email
5  chain yet.  He's aware of this, but he's not participating in
6  these conversations directly.

7          And Ms. Thedford informs the team, because this is a
8  team approach, that these subadvisory agreements are not viable
9  because they can't be retroactive, and they need Retail Board
10  approval and an in-person meeting.  There was some testimony
11  from Mr. Norris I think about how -- I think he testified or
12  maybe the Retail Board representative did that the Retail Board
13  wasn't interested in front office services, or that they didn't
14  need investment advisory services, or that, you know, Highland
15  didn't supply.

16          Please.  Look at Ms. Thedford's email.  Why would
17  they need to obtain the Retail Board's approval at an in-person
18  meeting to enter into a subadvisory agreement if there was no
19  expectation and intention that Highland would be providing
20  subadvisory services to the advisors?  It makes no sense.  But
21  that's going to be the theme of this presentation.

22          So after coming to that conclusion that you can't go
23  retroactive and that you need the Retail Board's consent at an
24  in-person meeting, they come up with the concept for the
25  Payroll Reimbursement Agreement because it needs neither of

17

 1 | those things.  Right?  And otherwise, Highland is going to get
 2 | no revenue through June.  I think Mr. Klos testified that that
 3 | number was about $4 million.

 4 |          So she sends the draft of the PRA to Mr. Fox.  And
 5 | this is the coincidence, Your Honor.  The only reason that
 6 | Dave Klos gets involved is because Mr. Fox is on vacation.  And
 7 | you can just look at Exhibit 87.  And he adds Mr. Klos to the
 8 | email chain because Mr. Fox is out of the office.  That's how
 9 | Mr. Klos gets involved.  He's not there thinking that in two
10 | years, Highland's going to be in bankruptcy and Jim Seery is
11 | going to come along.

12 |          He's doing his job as a loyal employee to this
13 | enterprise.  And he tells Ms. Thedford that this isn't going to
14 | work, and this is in writing, Your Honor.  It's just crystal
15 | clear.  All of this analysis of actual costs involves
16 | subjective assumptions.  It creates a ton of internal work that
17 | isn't adding any value to the overall complex.  And that's how
18 | they viewed this.

19 |          It's part of the overall complex.  And that's a word
20 | that we're going to hear a few times this afternoon.  Mr. Klos
21 | suggests having a schedule as of January 1st, 2018 and say that
22 | Actual Cost with an uppercase A and C, shall be set out in the
23 | schedule, paid monthly in installments so that the exercise is
24 | only performed once.  And then if nobody likes it, they can
25 | terminate or they can renegotiate.

002840

18

1        That's exactly what happened.  That's what the

2   agreement now says.  And Mr. Klos does create this $252,000

3   schedule, right?  But again, that $252,000, that's just taken

4   from the subadvisory agreement that has already been signed on

5   behalf of NexPoint.  Right?  He says I backed into the number

6   and I did the best I could using that number.  No debate about

7   that.  You can't come up with those numbers, and we'll talk

8   about that in a minute.  It can't be an accident.

9        I'll say, Your Honor, that's kind of -- that's how we

10  get to the agreement.  And so on May 5th, I think, they signed

11  these Payroll Reimbursement Agreements.  I don't think there's

12  any dispute that they do not exist.  If Ms. Thedford doesn't

13  give the legal advice that the subadvisory agreements, the

14  flat-fee subadvisory agreements that have nothing to do with

15  costs, that don't identify anybody, right, would never exist if

16  those things were viable.

17        If we can go to the next slide, I've created some

18  issues, Your Honor, that I think are just we ask the Court to

19  consider because I think these issues and the testimony and the

20  evidence establish that Highland's testimony and the case that

21  we're presenting here is consistent, it is logical, and it is

22  completely corroborated in contrast to the Advisors.

23        And just to go through some of the issues, why did

24  NexPoint, why did their Shared Services Agreement change from a

25  variable contract to a fixed contract as of the beginning of

002841

Case 21-03010-sgj   Doc 122   Filed 05/09/22   Entered 05/09/22 09:07:39   Desc Main
Case 3:22-cv-02170-S   Document 18-1   Filed 11/22/23   Page 823 of 885   PageID 29130

19

1   2018?  Mr. Klos testified that it was to fit within the realm

2   of the $6 million.  And remember, this is a 500 percent

3   increase in the amount that NexPoint is paying.  They're going

4   from $1.2 million to $6 million.  Okay?

5           The Advisors, I don't think, have much of an

6   explanation as to why they went from variable to fixed.

7   Mr. Dondero testified something about wanting to be compliant.

8   I don't know if that's an acknowledgment that for the six years

9   before that they weren't in compliance.  But I don't understand

10  how the basis on which it's paid, whether it's actual cost or

11  assets under management or flat-fee, I don't see how one of

12  those is compliant and one isn't.  In any event, they don't

13  really have any explanation as to why all of a sudden they went

14  to a flat fee.

15          They have no explanation as to where the $6 million

16  came from.  Right?  Mr. Dondero -- Mr. Klos stated that it came

17  from Mr. Dondero.  And you know, this is, you know, part of the

18  burn the house down and not think about the consequences of

19  what you're saying.  There was a suggestion during the trial

20  that somehow this was a fraudulent document.

21          We're not taking that position, Your Honor.  We're

22  not saying that Mr. Dondero did anything fraudulent.  We're

23  saying that there's business substance to this contract.

24  Highland needed cash.  They were providing services.

25  Mr. Dondero had the opportunity to get a tax break.  And so

Case 21-03010-sgj   Doc 122   Filed 05/09/22   Entered 05/09/22 09:07:39   Desc Main
Case 3:22-cv-02170-S   Document 64-51   Filed 11/22/23   Page 224 of 385   PageID 29431

20

1   they established a price.

2          Nobody's suggesting this is an arm's length

3   negotiation.  Nobody's suggesting that the Advisors went out

4   and shopped this.  There's no evidence to that.  But there is

5   economic substance of it.  And I really -- I really caution the

6   Advisors in throwing out things like tax fraud because you may

7   try to undermine Mr. Klos, but he reported to Mr. Waterhouse.

8   And Mr. Dondero is the ownership of the enterprise.

9          Mr. Waterhouse's signatures are on these documents.

10  And there's so many other people involved when you take that

11  kind of reckless approach.  Right?  Ms. Thedford, she's the

12  drafter of the documents.  She's a lawyer.  Mr. Cournoyer,

13  another lawyer, Mr. Fox.  There are so many people involved in

14  this that it is just reckless to suggest that this is tax

15  fraud.  We don't believe it.  We want to enforce the contract,

16  Your Honor.

17         The Acis bankruptcy, we say that that had a huge

18  impact.  And the undisputed evidence shows that because if you

19  look at the annual review, there is absolutely no expectation

20  on January 26th that HCFMA is going to pay any money for a

21  subadvisory agreement.  It's just not there.  It's not in the

22  projections, it's not in the assumptions.  And the only reason

23  that HCMFA winds up first with the subadvisory agreement and

24  then with the Payroll Reimbursement Agreement is because of the

25  Acis bankruptcy.

21

1    They don't have an explanation as to why HCFMA didn't
2  sign one in January.  They don't have an explanation as to why
3  they suddenly signed one in May, right?  We do.  It's because
4  of Acis.  The surrounding circumstances we think are critical
5  here, Your Honor.

6    The flat-fee subadvisory agreement, right, it was the
7  subadvisory agreement signed by NexPoint, prepared by HCMFA.
8  There's no question that that was flat-fee.  There's no
9  question it had nothing to do with actual cost.  Why was it
10 abandoned in favor of these Payroll Reimbursement Agreement?
11 Not because somebody woke up one day and said oh, I only want
12 to pay for actual costs, but for the reasons that Ms. Thedford
13 said.  Not Mr. Klos, Ms. Thedford, right, her email, can't be
14 retroactive, need Retail Board approval at an in-person
15 meeting.

16   They have no explanation as to why they -- they'll
17 just ignore.  I don't think you'll hear anything in the
18 Advisors' presentation about the subadvisory agreement and why
19 it was abandoned, and what's the genesis of the Payroll
20 Reimbursement Agreements.

21   Dual employees, why weren't dual employees -- if
22 costs were so paramount to the Advisors, why isn't there a
23 provision that says dual employees should keep track of their
24 time because we only want to pay for the time that they expend
25 on the Advisors' matters.  Nobody thought about it, nobody

1    cared about it.  There's no evidence that it was ever done.

2            There is no infrastructure in place to calculate,

3    other than subjective, and I think you heard this not from

4    Mr. Klos, not just from Mr. Klos but from Mr. Waterhouse too,

5    there is no way to do this except subjectively because nobody

6    created the infrastructure that would actually allow somebody

7    to figure out the actual costs.  Very important point when

8    you're here saying I should only pay for actual costs.

9            If we can go to the next slide, was it a coincidence

10   that the actual costs under the Payroll Reimbursement

11   Agreements matched the flat monthly fees under the subadvisory

12   agreements?  We say no.  Right?  Mr. Klos testified that the

13   parties kept the flat fee the exact same, and backed into the

14   number while, quote, trying to find a reasonable estimate that

15   would also validate the outcome that was already known.

16           So you're trying to put a shoe, so you need a

17   shoehorn.  Okay.  People use shoehorns, right, just like

18   there's nothing wrong with taking tax issues into account.

19   This is an agreement.  Nobody's pretending it's an arm's length

20   agreement, but it is an agreement of economic substance.  There

21   is no question that Highland is providing services.  There's no

22   question they're entitled to get paid for those services.

23   Okay?  And that's all that's happening here.

24           The Advisors have absolutely no explanation as to how

25   the numbers in the Payroll Reimbursement Agreements, why they

23

1  match to the penny, the numbers that are in the subadvisory

2  agreements.  The December 2018, you know, was that a result of

3  a true up?  Again, the undisputed evidence is that it's not.

4  Mr. Klos said there was no true up.  Mr. Waterhouse says there

5  was no true up.  And it makes no sense if you just look at the

6  economics.  We'll look at this more in a few minutes.  But I

7  think nine of the dual employees ad already been terminated as

8  of this time, and yet the advisors are paying substantially

9  more money.  Okay?

10       Mr. Norris said that Frank and Dave Klos told him

11  that it was the result of a true up.  I think Mr. Klos was

12  probably hitting the nail on the head when he just said I think

13  Mr. Norris is mistaken, okay, because the people who were

14  actually involved, and Mr. Norris candidly admitted he has no

15  personal knowledge about anything that happened in

16  December 2018.

17       Why did the Advisors pay the flat fee in each of the

18  Payroll Reimbursement Agreements for 35 consecutive months from

19  January 2018 until November 2020, knowing that the dual

20  employees were being terminated?  We say it's because they

21  understood that's what the agreement provided.  They say I

22  don't know.  I don't know.  I don't know.  It's a mistake.  I

23  don't know.  They have no explanation.

24       They didn't even file a proof of claim for the two

25  years before the bankruptcy.  Right?  If their theory of the

24

1  case were right, where was their pre-petition claim?  Right?
2  Why didn't they move to amend for leave to file a pre-petition
3  claim for the two years under Mr. Dondero's watch when Highland
4  did exactly what they did in 2020.

5          Did the Advisors know the amounts that were being
6  paid?  The evidence is overwhelming.  It includes the annual
7  review.  It includes the advisor's books and records.  It
8  includes the fact that the advisors gave the amounts paid to
9  the Retail Board.  It includes, remember all the testimony from
10 Mr. Waterhouse about the 13-week forecast that included all of
11 the payments that were anticipated to be paid.

12         And my favorite may be Exhibit 150, Your Honor.
13 That's the April 14th, 2020, one-page cash-flow statement that
14 was given to Mr. Dondero that showed in April, May, June, July,
15 August, September, October, November, and December of 2020,
16 NexPoint would pay, you got it, $500,000 or $6 million a year,
17 the same number that was in Dave Klos' January 4th email, the
18 same number that was in the contracts themselves, the same
19 number that was in the annual review.  No mystery here, Your
20 Honor.

21         Did the advisors know when each dual employee left?
22 Of course they did.  Exhibits 88 to 127, every single month,
23 all of the Advisors' officers, m. Waterhouse, Ms. Thedford,
24 Mr. Norris, they're all getting these monthly reports that
25 highlight all of the terminations.

25

1          So what do they do?  They manufacture a dispute.  If

2     we can go to the next slide.  Highland gives notice of

3     termination of the Shared Services Agreements on November 30th.

4     And this is where the rubber meets the road.  Everybody knows

5     what's happening now.  Highland has just had its plan and its

6     disclosure statement approved by the Court.

7          Everybody knows that Highland is going to be winding

8     down.  Everybody knows that if confirmed, right, all of these

9     employees are going to be terminated.  And they're supposed to

10    be working toward shifting them to a new platform so that they

11    can service the Advisors and the other non-debtor entities that

12    Mr. Dondero owned and controlled.

13         And the very next morning at 8:53, Mr. Norris walks

14    into the office and he starts sending the emails.  And he

15    states it's worth noting that the subadvisory fees were higher

16    than the Shared Services fees.  So need to make sure these

17    agreements are fully understood.  So on December 1st, this is

18    Mr. Norris' task after notice of termination is given.  Let's

19    make sure we understand the agreements.

20         A couple of days later, Your Honor will recall,

21    Highland filed a motion for a temporary restraining order and

22    injunctive relief against Mr. Dondero to enjoin the threats

23    that he was making, to enjoin the interference with Highland's

24    business.  And the next day, according to the document anyway,

25    Mr. Klos sent Mr. Waterhouse what became the basis for this

26

1  claim here today.

2          Mr. Klos asked Mr. Waterhouse point blank, are you
3  going to use this for an adverse purpose, and he was sure that
4  he wouldn't.  Mr. Waterhouse, to his credit, wouldn't take
5  Mr. Klos on that.  He simply said I don't have a basis to say
6  one way or the other.  I don't remember.  Right?  He didn't
7  deny that.

8          Remember my questioning of Mr. Waterhouse?  Why did
9  you prepare this document?  And he said that Mr. Dondero and
10 Mr. Norris told him there were negotiations going on.  And I
11 pressed him harder.  But you weren't involved in the
12 negotiations.  So why were you asking for this document.  And
13 he wound up saying because I like numbers.  That was the story
14 that Mr. Waterhouse told as to why he asked Mr. Klos to do this
15 on December 8th.

16         Two days later, we obtained our TRO.  And the next
17 day, K&L Gates sent their letter.  And they didn't send this
18 letter under 2.02.  Sure, they wanted to talk.  The notes are
19 discussed in there.  The Shared Services Agreements are
20 discussed in here.  And what they're demanding in that letter,
21 if you read it, Your Honor, isn't, you know, how can we, you
22 know, change this going forward.  They're trying to renegotiate
23 the deal.

24         They're demanding exactly what the Advisors are
25 demanding now, and that is we want to just pay for the services

1 of the employees who are on Exhibit A.  That's not a 2.02 good

2 faith negotiation.  That's a demand that ultimately led to

3 litigation very shortly thereafter.

4        By January 6th, in fact, we had commenced the lawsuit

5 against the Advisors and against the funds for declaratory and

6 injunctive relief.  That was filed -- that's the adversary

7 proceeding 21-03000.

8        So this is where we are.  It's pretty tense.  If Your

9 Honor recalls, the notice of termination was the end of

10 January.  And Highland hadn't gotten paid in a couple months.

11 And they told the Advisors that if you don't pay up, we're

12 cutting you off.  You haven't paid in months.  And so

13 Mr. Norris participated in a conversation with Mr. Waterhouse,

14 Mr. Klos, and some others.

15        And he wrote a note to himself.  And I think it's

16 such a critical piece of evidence, Your Honor.  I would have

17 objected to it, but I think it's so good for Highland that I

18 would rather actually have it into the record.  At 2:22 a.m. in

19 the wee hours of the morning, Mr. Norris sent a note to himself

20 at a Gmail account in which he purports to record, as he said,

21 true and accurately everything he remembered about this

22 conversation.

23        Remember the moment in time.  It's January 28th.

24 We've already sued them for injunctive relief.  They've already

25 filed their administrative claim.  We are two days away from

28

 1  the confirmation hearing.  Highland is telling the advisors if

 2  you don't pay, we're shutting you off.  And let's look what

 3  Mr. Norris' notes say because they are priceless.

 4        The overall tone was not friendly.  It was

 5  adversarial from the beginning as J.P., that's J.P. Sevilla

 6  (phonetic), dove in with a very adversarial tone and a take it

 7  or leave it or lose your business approach.  And there was a

 8  contentious back and forth throughout.  Think about the tone of

 9  this meeting.  Think about the tension.

10        I hope the Court, you know, has read the whole

11  document because before you get to the next piece that I've

12  highlighted, Mr. Norris makes a point of writing that he

13  reminded Mr. Waterhouse that he was the signer of the Payroll

14  Reimbursement Agreements on behalf of the Advisors.  And then

15  it continues in the highlighted, I reminded Frank that the only

16  people paying the amounts each month had been Frank and Dave,

17  and that no one else that I know of has the ability to process

18  the payments.

19        And here is where Frank reached for the lifeline.

20  Frank said they have known that these amounts were overpayments

21  for over a year and tried to update them, but they couldn't due

22  to the automatic stay.  I pressed him.  Imagine being pressed

23  by Mr. Norris in this conversation under these circumstances,

24  adversarial, not friendly, contentious.  You're being told you

25  signed the contracts.  You're being told you messed up.  I

1  pressed him on this.  I was not aware at all of this fact.

2         So this is the first time Frank -- this is the

3  circumstance under which Frank makes the disclosure.  He said

4  they had discussed it with inside and outside counsel, and

5  there was nothing they could do now due to the automatic stay.

6  Think about that, Your Honor.  Where are the words Fred Caruso?

7         Frank Waterhouse was not afraid of Jim Seery.  He was

8  afraid of Jim Dondero.  Frank Waterhouse had taken at least

9  $500,000, but probably more of that $10 million undisclosed

10  payment.  The finger is being pointed at him.  He signed these

11  agreements.  He approved the payments.  And he says I told

12  them.  I told them.  They said there was nothing they could do

13  because of the automatic stay.

14         He doesn't mention Fred Caruso.  Right?  And remember

15  when I cross-examined Mr. Waterhouse and I said Mr. Waterhouse,

16  I was here with you in December of 2019.  I was defending you

17  in a deposition.  You didn't tell me anything about this, isn't

18  that right?  And he said that's right.  Did you tell anybody at

19  my firm about this?  No.

20         Mr. Norris pressed him.  Right?  He reminded him,

21  reminded him of his obligations, reminded him of signatures on

22  here, reminded him that he was in charge of the payments,

23  pressed him on this new story that he'd never heard before.

24  And this is what Frank came up with.

25         If we can go to the next slide, Mr. Waterhouse's

Case 21-03010-sgj    Doc 122    Filed 05/09/22    Entered 05/09/22 09:07:39    Desc Main
Case 3:22-cv-01770-S    Document 84-1    Filed 12/27/23    Page 334 of 885    PageID 29541

30

 1  story, and you know, I feel badly for Mr. Waterhouse.  He was

 2  put in a terrible position.  And I'm not running over him,

 3  right?  I think Mr. Waterhouse did his job.  I think he did --

 4  he signed the contract.  The lawyers for the advisors,

 5  Ms. Thedford, drafted the contract.

 6        The contract reflected the back and forth and the

 7  intent of the parties.  Mr. Waterhouse was the fiduciary.  He

 8  did his job.  But they didn't like the result.  They didn't

 9  like the result when they saw everything moving away from

10  Mr. Dondero, when they saw the disclosure statement get

11  approved, when they saw the entry of the TRO, when they saw the

12  termination of the Shared Services Agreements.

13        And so now they're coming after Mr. Waterhouse.  And

14  Mr. Waterhouse says what he says, and it just makes no sense.

15  It just makes no sense.  His story is that in December 2019, he

16  claims that he heard from Mr. Klos that the Advisors were

17  overpaying under the Payroll Reimbursement Agreements, that he

18  raised the issue with Mr. Leventon, Mr. Ellington, and

19  Mr. Caruso and was told nothing could be done because of the

20  automatic stay.

21        That is the story.  That's their 2.02 you failed to

22  negotiate in good faith because they raised the issue with

23  Mr. Caruso.  Let's look, let's test that theory just a little

24  bit.  If Your Honor remembers, Frank Waterhouse had nothing to

25  do with the creation of the analysis in December of 2019.  That

002853

31

1  was Mr. Leventon and Mr. Klos.

2          Mr. Klos testified that he was trying to create an

3  analysis that painted the agreements in their most positive

4  light because the UCC was pressing on the inter-company

5  relationships.  If Mr. Klos had an analysis that showed that

6  these contracts were wildly profitable, wouldn't he have given

7  that to the UCC?  Wouldn't he have shown it to Mr. Seery the

8  next month?

9          Mr. Seery testified about the pressure he was under

10  from the UCC for months.  He testified about a conversation he

11  had with the Committee in March where Josh Terry pressed him on

12  these agreements.  He didn't know anything about this amazing

13  profitability of the PRAs.

14          Mr. Waterhouse never told anybody?  Is that credible

15  that Mr. Waterhouse never told a soul other than Mr. Ellington,

16  Mr. Leventon, and Mr. Caruso?  Never told the independent

17  board, never told Mr. Dondero, never told an officer of the

18  Advisors?  Is that really possible?  And when you hear his

19  explanation when I cross-examined him, he said I had 20,000

20  other things to do.  Really?

21          Mr. Ellington and Mr. Leventon never told

22  Mr. Dondero?  You have to believe that.  If you buy their

23  story, you must believe that Mr. Ellington and Mr. Leventon

24  never told Mr. Dondero that they had been informed that the

25  Advisors were overpaying the debtor because otherwise, it would

002854

32

1  have appeared in the administrative claim.  It would have

2  appeared in the response.  Maybe Mr. Dondero would have

3  testified to it.

4          There's no evidence of that at all.  And I'll remind

5  the Court that in December 2020, even after the TRO was

6  entered, Mr. Ellington and Mr. Dondero had free-flowing

7  communications.  But a year earlier, Mr. Ellington didn't raise

8  this with Mr. Dondero?  Makes no sense.

9          Mr. Waterhouse knew that Fred Caruso was not the CRO.

10  It's crazy that they even suggest that.  All they have to do is

11  look at the documents.  Mr. Waterhouse's name appears on 24

12  different monthly operating reports as the preparer of those

13  documents.  And right above every report, I did make a mistake

14  in my deck here because I wrote until January 2021.  It's

15  actually until July 2020.  But from October 2019 until

16  July 2020, whose name appears above Frank's?  Brad Sharp

17  (phonetic) because Brad Sharp is the CRO.

18          Fred Caruso was an employee of DSI.  So the whole

19  notion that Fred Caruso was the CRO is just wrong.

20  Mr. Waterhouse's testimony is obviously contradicted by

21  Mr. Norris' notes because Mr. Norris' notes don't mention

22  Frank Waterhouse.  It -- Fred Caruso.  It mentions inside and

23  outside counsel.

24          Do you really believe that if Mr. Waterhouse knew

25  that there were overpayments being made, he wouldn't write it

002855

33

1  down, he wouldn't make a memo to himself, he wouldn't look to
2  confirm what he was told, he wouldn't do -- there's no
3  evidence.  How is that possible?

4          But here's the best part, Your Honor.  Fred --
5  according -- right?  Jim Dondero testified Frank was the
6  fiduciary.  He's the person in charge for administering the
7  contracts.  And this Court has to believe, if you're going to
8  buy the Advisors' position that Frank Waterhouse learned in
9  December 2019 of the overpayments.  And you know what he did?
10 Not only didn't he tell anybody, but he just kept authorizing
11 those payments month after month after month after month.

12         I don't know why they're putting Frank into this
13 vice.  This is the burn the house down strategy.  They don't
14 care.  They'll take no prisoners here, Your Honor.  This is
15 just, it's wrong.  It's just wrong.

16         I just want to finish by pointing to the evidence
17 that shows that Highland fully performed here.  If we can go to
18 the next page, what I've done here, Your Honor, is the Payroll
19 Reimbursement Agreements were in effect for three years, 2018,
20 '19, and '20.  Right?  Each year has 12 months.  2018, 2019,
21 undisputed evidence Mr. Dondero was in control of the whole
22 enterprise.  He was actually in control until
23 January 9th, 2020.

24         And what I've done here is I've taken Exhibit 14
25 which is the Advisors' responses to the interrogatory and I've

002856

34

overlaid the month in which each of the employees on -- the

dual employees on Exhibit A was terminated.  And the red

signifies an important event so that you can see May 2018,

that's when the Payroll Reimbursement Agreement is entered

into.

     From the minute that Frank Waterhouse puts his ink on

the signature, right, with the advice of Ms. Thedford, the

Advisors' secretary, officer, and a lawyer, and fiduciary, the

minute he puts his name on the document they're already

overpaying according to them.  Right, because four people have

been terminated and yet they're paying a flat fee based on

January 1st, 2018.

     By the end of the year, four more people have left.

They enter into the amendments, right?  No adjustment at all to

the flat monthly fee.  Instead, they pay more money even though

there's nine people gone.  By the time you get to the petition

date, five more people are gone.  They're still paying the flat

monthly fee.  For two consecutive years, the Advisors paid

millions and millions and millions of dollars to Highland for

services rendered because they were getting front office

advisory services.

     Let's go to the next slide.  And here's the proof.

You only need three documents, Your Honor.  Right?  You're

going to hear probably, you know, a reliance on Mr. Norris'

uncorroborated testimony about how they didn't, you know, they

002857

35

1   had a change in business model and they didn't need the

2   advisory services, and the retail funds didn't need the

3   advisory, and nobody needed anything.

4         They kept paying, right?  Just I don't know who's

5   more negligent here.  But somebody was.  Somebody on behalf of

6   the Advisors if they continued to pay all of this money for

7   services they don't need.  The truth of the matter is, Your

8   Honor, that's all a fiction.  There's not a single document

9   that's going to support any of that testimony, any of that

10  argument.

11        The documents that actually completely contradict it

12  are three.  You start with Exhibit 14.  In the right-hand

13  column, those are the dates of departure that the Advisors have

14  admitted to.  You next go to Exhibit 85.  Exhibit 85 is -- it

15  was a request from the Retail Board in January of 2020.  So

16  Mr. Dondero has just stepped aside.  The independent board is

17  put in place.  And the Retail Board sends a request to

18  Highland, please provide an updated organizational chart

19  relating to the Highland complex.  Right?

20        They want to know the whole complex because the whole

21  complex, there's that word again, the whole complex is serving

22  the Advisors.  The whole complex is serving the retail funds.

23  The retail funds wouldn't be asking for organizational charges

24  and information relating to the Highland complex if they didn't

25  rely on the Highland complex.  And there would be no reason to.

Case 21-03010-sgj    Doc 122    Filed 05/09/22    Entered 05/09/22 09:07:39    Desc Main
Case 3:22-cv-02170-S    Document 04-51    Filed 12/26/23    Page 843 of 888    PageID 29567

36

1   There would be no reason for the Advisors to provide

2   information about the Highland complex if the Highland wasn't

3   serving the retail funds.

4          And what information did they provide?  They

5   provided, you'll see at Exhibit 85, Your Honor, a list of every

6   single employee in the Highland complex.  And they specifically

7   delineate whether the employee was back office, or investment

8   professionals.  And you won't be surprised to learn, Your

9   Honor, that every person on this list in front of you was

10  identified as an investment professional, not providing back

11  office services.

12         So the Advisors told the Retail Board in January of

13  2020 these are the people in the Highland who are providing --

14  these are the investment professionals.  That's one moment in

15  time.  And the best is that eight months later in August, the

16  Retail Board follows up and they ask again who was doing what

17  work, what's happening.

18         And if you look at Exhibit 17, one of the questions

19  the Retail Board asks is what's happening with the bankruptcy.

20  And you'll see at Page 2 of this memo the Advisors describe the

21  bankruptcy, and then they say -- and this is dated August 13.

22  It's in response to a 15(c) request.  And the Advisors say,

23  quote, we continue to treat HCMLP and its affiliates as the

24  Advisors' affiliates for purposes of discussions with the

25  board.

Case 21-03010-sgj   Doc 122   Filed 05/09/22   Entered 05/09/22 09:07:39   Desc Main
Case 3:22-cv-02170-S   Document 64-1   Filed 12/26/23   Page 441 of 885   PageID 29543

37

1          Okay?  So the Advisors are telling the Retail Board

2    that Highland and its affiliates are still affiliates of the

3    Advisors for purposes of discussions with the Retail Board.

4    But wait, there's more.  They identify every one of the

5    investment professionals again.  And it's all footnoted here.

6    And not only every single one of these investment professionals

7    who the Retail Board was told in January was an investment

8    professional, every one of them in January was still there in

9    August with the exception of Trey Parker.

10          And what's also interesting, Your Honor, and

11   consistent with both Mr. Waterhouse's emails and Mr. Klos'

12   testimony, you'll see that there are several people there that

13   weren't identified as dual employees.  They weren't identified

14   on Exhibit A.  But they're still providing investment

15   professionals.  And do you know why they aren't on Exhibit A?

16   Because they were hired after the Payroll Reimbursement

17   Agreements were signed.  It's that simple.

18          And so people's responsibilities changed.  And if you

19   note, even Trey Parker, a dual employee, it shows that he left

20   on February 28th, 2020.  There's a whole -- I don't have the

21   Exhibit numbers handy, Your Honor.  But there's a whole slew of

22   title changes where a whole bunch of people got elevated to

23   investment advisory-type positions.

24          And that's what's happening here.  He leaves and his

25   responsibilities are divvied up among other Highland employees.

38

1  This is what they're telling the Retail Board.  These are not

2  our documents.  These documents were produced by the Advisors

3  and by the retail funds.  So don't take my word for it, take

4  their word for it.

5        There is a reason that the Advisors are telling the

6  Retail Board that these are our investment professionals in

7  January, these are our investment professionals in August,

8  because these are the people in the Highland complex who are

9  doing work for you, because otherwise, this makes no sense and

10  I'll be waiting patiently to hear an explanation as to why all

11  of this information is being provided to the Retail Board if

12  the Advisors don't need these people, the Retail Board doesn't

13  need these people, and that everything's changed.

14        At the end of the day, Your Honor, again, whacking

15  moles.  I'm just whacking moles.  Highland performed, the

16  contracts are unambiguous, the Frank Waterhouse story is beyond

17  belief.  It's contradicted by Mr. Norris' own notes.  And we

18  respectfully request that the Court grant Highland a judgment

19  in the amount set forth in the slide up above subject to a

20  collection of attorneys fees, and deny the Advisors' claims in

21  all respects.  Thank you, Your Honor.

22        I believe that's 48 minutes by my count.

23        THE COURT:  Let me check with my law clerk.  He had

24  49.  Okay.  We'll call it 48 and a half.  All right.

25  Mr. Rukavina, I'll hear from you.

002861

1          MR. RUKAVINA:  Thank you, Your Honor.

2          And, Mr. Berghman, if you'll please put up my slides.

3          Your Honor just heard 49 minutes of irrelevancies,

4    misdirection, and smear.  Now let's look at some facts and law.

5    Overall, there are two facts and conclusions that cannot be

6    contradicted.

7          First is that there is no support for the allegation

8    that the Payroll Agreements were, quote, pay for services

9    agreements.  You heard that in opening, that they were pay for

10   services, meaning that we have to pay them because the services

11   are allegedly being provided regardless of the terms of the

12   agreements.

13         The only possible evidence on that was from Mr. Klos

14   when he was testifying about how the numbers were arrived at.

15   And as you can see there, it's on his transcript.  I asked him

16   very clearly about that.  And he said it would be just

17   speculation.  So, Your Honor, there is no support for any pay

18   for service agreements, $5 million and $6 million per year as a

19   funding mechanism.

20         And more importantly, you heard Mr. Morris state that

21   we agree there is no ambiguity in these contracts.  Mr. Morris

22   took you what he admitted was parole evidence after parole

23   evidence.  He called one document the best parole evidence.

24   That is not admissible to contradict the terms of these

25   contracts.  Next slide, please.

40

1              On the issue of the bona fides of the contracts --

2              THE COURT:  All right.  I am not -- I'm not seeing

3    the shared content.  Are other WebEx participants seeing it?

4              MR. MORRIS:  I am, Your Honor.

5              THE COURT:  Mr. Morris?  I'm sorry, you said yes you

6    have it?

7              MR. MORRIS:  Yes.  I can see it on the screen.  I

8    didn't receive a copy, but I can see it on the screen.

9              THE COURT:  Yeah.  We have a frozen picture of

10   Mr. Rukavina's face on what's supposed to be the shared screen.

11   Mike, do you have it?  Yeah.  Okay.  Well --

12             MR. RUKAVINA:  You know what, this happened -- can

13   you hear me, Your Honor?

14             THE COURT:  Yes.  I can hear you and see you fine on

15   my screen.

16             MR. RUKAVINA:  Yeah, this happened before.  This

17   happened before.  Can you see it now?

18             THE COURT:  Oh, wait.  Now something is happening.

19   It's --

20             MR. RUKAVINA:  This happened to Mr. Morris last week.

21   And I think Ms. Alaysia (phonetic) would just close the

22   PowerPoint and reopen it.  Can the Court see?

23             THE COURT:  Okay.  Yeah.  Right now I've just got a

24   blank screen, a black screen.  So is Ms. Canti turning

25   something off?

002863

1          MR. RUKAVINA:  No.  Mr. Berghman just turned it off
2    and -- try again, Thomas.  Just close the screen share and then
3    restart the screen share.

4          Can the Court see it?

5          THE COURT:  I can't see it.  No.  But everyone else
6    can see it apparently, except me, right?

7          Mr. Morris, you see it?

8          MR. MORRIS:  I do, Your Honor.

9          THE COURT:  Okay.  Do we have a hard copy of this?
10   Was it --

11         MR. RUKAVINA:  We do not.  I emailed it to Mr. Morris
12   an hour a go.  Let me email it, Your Honor, if you would
13   like --

14         THE COURT:  Ms. Ellison.

15         MR. RUKAVINA:  Yeah, Ms. Ellison.  Let me just --

16         THE COURT:  Okay.  If you'll email it to her, then
17   she can email it to me and I'll pop it up on my other screen.

18         MR. MORRIS:  And just to be clear, it was emailed to
19   me 14 minutes ago at my request.  Thank you.

20      (Pause)

21         MR. RUKAVINA:  I sent it to you at 1:49, John.  But
22   it doesn't matter.  Ms. Ellison should have it momentarily.

23         THE COURT:  Okay.  Traci, are you out there on the
24   WebEx?

25         UNIDENTIFIED SPEAKER:  Yes, Your Honor.  I'm here.

42

1          THE COURT:  Okay.  While we're waiting, Mr. Rukavina,

2   just to confirm, we don't have a dispute that the agreements

3   are ambiguous.  You don't think they're ambiguous.  You just

4   have a different interpretation of what they mean.  Correct?

5   **Crystal

6          MR. RUKAVINA:  I don't know that I have a different

7   interpretation.  They are unambiguous, and I think Mr. Morris

8   and I agreed on the four provisions or so that govern.  My

9   argument is that we properly and timely trigger those

10  provisions.

11         Mr. Berghman, can you --

12         THE COURT:  Oh, I've got it now.  I've got it now.

13  The shared screen is working now.  Go ahead.

14         MR. RUKAVINA:  Just let me --

15         MR. BERGHMAN:  Your Honor, it's in a PDF as opposed

16  to a PowerPoint.  Maybe that's the technology issue, so I think

17  this may work.

18         THE COURT:  Okay.  Good deal.

19         MR. RUKAVINA:  Okay.  Maximize the deck, Thomas,

20  because we're seeing your other stuff on there.  No.  No.  Your

21  Honor, I'm going to mute this and call my partner.

22      (Pause)

23         THE COURT:  Yeah.  Mr. Rukavina, I don't know if

24  you're on hold or you can hear me.  I've got the PowerPoint

25  version up that you emailed to Traci which she emailed to me,

002865

Case 21-03010-sgj   Doc 122   Filed 05/09/22   Entered 05/09/22 09:07:39   Desc Main
Case 3:22-cv-02170-S   Document 24-1   Filed 11/22/23   Page 857 of 885   PageID 21634

43

 1  so if --

 2          MR. RUKAVINA:  Okay.

 3          THE COURT:  -- that helps what you're doing, I've got

 4  a PowerPoint version up.

 5          MR. RUKAVINA:  Okay.  Thank you then.  Let's resume.

 6  Mr. Berghman, please pull it up like you had it originally.

 7  Everyone else can see it and Judge Jernigan, we'll just follow

 8  Your Honor manually.  I would ask you to advance it.

 9          THE COURT:  Uh-huh.  Okay.

10          MR. RUKAVINA:  So, Your Honor, the first slide, we

11  are now in the second slide called Advisors' administrative

12  claim.

13          THE COURT:  Okay.

14          MR. RUKAVINA:  And you see I have a listing of eight

15  points.  So, you know, what I was discussing is to go back to

16  the bonifieds of these contracts.  Mr. Klos testified very

17  clearly that he prepared the underlying reimbursement

18  allocations in good faith and reasonably.  Yes, there's some

19  subjectivity, but accountants and controllers and financial

20  types know how to take those account.

21          Both Waterhouse and Dondero testified that those

22  amounts were arrived at through a good faith process by

23  Highland's team.  And let me just add something to what Mr.

24  Morris keeps mentioning here, somehow that Highland always

25  wears the white hat and the Advisors always wear the dark hat

44

1   here.  Let's not forget that this is the same Debtor that

2   participated in the drafting of these contracts.  Its employees

3   drafted these contracts.  As we said, these are not arms length

4   negotiations.

5          So for him to say or ask questions like, the Advisors

6   have no explanation for this or the Advisors can't explain that

7   and I can't wait for an explanation.  He should ask that of his

8   own client, of his own self.  It takes two to tango, Your

9   Honor, and they stand in the shoes of the Debtor.

10         You know for a fact that Highland was actually able

11  to track employee time because you saw in my Exhibit 88 that

12  every month they sent invoices under the HCMFA Shared Services

13  Agreement where they tracked Highland time.  Ms. Thedford would

14  not have used outside counsel to advise on these contracts if

15  there was something funny about these contracts.

16         Mr. Waterhouse and Mr. Dondero both testified that

17  outside auditors and legal advise was used.  At no time until

18  he testified did Mr. Klos raise any red flag regarding any of

19  what he did or his analyses or these contracts.  And you heard

20  from him that -- and from everyone else -- that he was the most

21  credible man in that trial.

22         So, again, all that is just to say there is no

23  ambiguity.  There is no red flag.  The contracts are what they

24  are and they should be interpreted according to their terms.

25  If we can advance the slide, Your Honor, please.

45

1          The second main fact that the Court should consider

2   is that the fact of overpayment is incontestable.  There can be

3   -- we can argue under the law whether we're allowed to get the

4   overpayments, but the fact of overpayment is incontestable.  We

5   all know what reimbursement means.  We all know what actual

6   cost is defined at.  You can only be reimbursed for your actual

7   out of pocket costs for the employees.  There is no profit.

8          There's no dispute that many employees were not

9   there.  We were paying for 20 employees out of 25 that were not

10  there.  Please don't fall for the misdirection, Your Honor,

11  that, well, four of the employees weren't there when the

12  contracts were signed.  Recall from Mr. Klos that he was

13  preparing that list as of January 1, 2018, which was the

14  effective date.

15         So, yes, those four employees weren't there in May,

16  but they were there in January.  And again, Mr. Klos prepared

17  the list of 20 employees.  If there was something funny about

18  this, he, the most credible man in the courtroom, would not

19  have done that.

20         You have the December 2019 analysis.  This is post-

21  bankruptcy.  The Debtor is a fiduciary.  The Debtor has an

22  outside financial advisor.  Mr. Klos, that financial advisor,

23  and Mr. Waterhouse, internally calculate that the Debtor is

24  making a $3 million profit that's a snapshot in time under

25  these contracts.  And they shared that information with the

002868

Case 21-03010-sgj    Doc 122    Filed 05/09/22    Entered 05/09/22 09:07:39    Desc Main
Case 3:22-cv-01170-S    Document 21-5    Filed 11/28/23    Page 553 of 888    PageID 24657

46

1  committee.  That's their own work product.  There's no funny

2  business there.  There's no funny math.

3        Mr. Klos' December 2020 analysis shows that the

4  profit as a snapshot in time had ballooned to $6.6 million.  It

5  doesn't matter why Mr. Waterhouse asked him to prepare that

6  analysis.  It doesn't matter.  Mr. Klos can invent whatever

7  reason he thinks Mr. Waterhouse did.  Mr. Waterhouse prepared a

8  professional analysis for his bosses.  And he calculated $6.6

9  million.

10        His current attempt to discredit his own work is

11  unbelievable.  He doesn't like the conclusion that he reached.

12  He doesn't like the fact of overpayment because now he's the

13  Debtor's CFO, so he tries to discredit himself.  That was not

14  credible at all.  And his evasiveness on my cross-examination

15  was disturbing.  The assumptions that Mr. Klos used were

16  utterly reasonable.  He used the actual number of employees at

17  that point and time and he used the fact that there were no

18  bonuses being paid.

19        Now Mr. Norris, in hindsight, calculated the $2.6

20  million delta as opposed to 6.6 million.  Now, let's look at

21  very briefly why Mr. Norris' calculations are accurate and

22  reliable.  Highland stipulated that his underlying source of

23  data and his math were correct.  Your Honor will recall that

24  whereas Mr. Klos assumed no bonuses, it's true that certain

25  bonuses were paid to non-insiders.  Well, Mr. Norris took that

47

1  into account.  He didn't give you an artificially inflated

2  number.  He said, okay.  Some bonuses were paid, so the number

3  is going to go down.

4        Mr. Norris' calculation is cumulative.  What Mr. Klos

5  did was a snapshot in time, but not all the employees were gone

6  at the same time.  So Mr. Norris, as I told you, went month by

7  month and looked at which employees were there and how much

8  were they actually paid.

9        Another very important thing, Your Honor, Mr. Klos'

10  analysis included certain replacement employees, again, under

11  this theory that Payroll Reimbursement Agreements are actually

12  service agreements in addition to the service agreements.  So

13  Mr. Klos, I think there were six or seven employees who he

14  unilaterally replaced.  Well, that can't be.  As Mr. Norris

15  testified, none of those employees were front office investment

16  advisory employees.

17        So you have -- oh, and Mr. Norris used David Klos

18  allocations.  Mr. Klos again testified that those allocations

19  were reasonable.  That was not rebutted.  And Mr. Norris

20  confirmed that those allocations were reasonable.  But even if

21  the Court says for those five employees it should have somehow

22  been 100 percent allocation, we still overpaid $4.4 million,

23  but the Court shouldn't do that.  The fact of the matter is

24  that Mr. Norris' calculations were never rebutted.  He wasn't

25  even cross-examined about them.  If we could go to the next

48

1  slide, please.

2          And Highland knew of the overpayments.  Again, we

3  have the facts of DSI.  We have the fact of the committee.  We

4  have Mr. Klos' email where he writes to my client that the fact

5  that there's fewer employees has increased the profitability of

6  these contracts from Highland's perspective.

7          You have multiple other admissions from Mr. Klos of

8  the overpayments and you have a very strong item of

9  circumstantial evidence that you got no explanation for from

10  anyone, which was why did Highland terminate the Shared

11  Services Agreements right around December 1, but did not

12  terminate the Payroll Agreements until the very end of

13  February, and only after being demanded to do so by my client.

14  Because they were making a profit that they knew that they

15  shouldn't have been making.

16          Your Honor should expect more of a fiduciary, more of

17  a debtor-in-possession, more of people that my client was

18  paying big money to every month to perform services.  They

19  can't just stick their head in the ground, make millions of

20  dollars of profit extra contractually, and not do anything

21  about it.  Next slide.  Your Honor, if we can go to the next

22  slide.

23          So my first argument, Your Honor, is that we don't

24  have to look at the contract.  We look at what is an

25  administrative claim.  Basically, if my clients provided value

49

1 to the estate that they did not receive return consideration

2 for, then that is an administrative claim. That's the Supreme

3 Court. That's Judge -- former Judge Lynn in the Northern

4 District. And you also have the fact that these were unassumed

5 and unrejected contracts. And the breach of contract, separate

6 and apart from an overpayment, a breach of contract is an

7 administrative claim unless and until the contract is rejected.

8          So that is our most simple argument. We provided

9 value in the form of cash money to the Debtor post petition for

10 which we did not receive services. As we've always pled,

11 there's been no changing of our story as has been alleged.

12 That's absurd. There's been a refinement of our numbers

13 through discovery, which is how the process should work.

14          If we can go to the next slide, please, Your Honor.

15          If the Court concludes that you actually have to look

16 at the contracts, you can't just rely on what is an

17 administrative claim, you have to look at the contracts, then

18 the fundamental purpose of these contracts is to reimburse for

19 actual costs. Again, I think we agree on that, Mr. Morris and

20 I. That is the overriding purpose. And the word reimbursement

21 is used many times in here.

22          It is true that those contracts define what actual

23 cost is on a monthly basis unless those number are changed as

24 set forth in Section 2.02. That is true. So, as long as no

25 change is made, then the preset numbers control. And that's

002872

1   okay.

2          Your Honor will recall from Mr. Klos' and Ms.

3   Thedford's email exchange that it was very cumbersome to figure

4   this out.  So Mr. Klos is the one who suggested, well, let's

5   just make it a monthly amount and if we have to change it,

6   we'll change it.  We can go to the next slide, Your Honor,

7   please.

8          The problem now is, as Mr. Morris correctly pointed

9   out, it's Section 2.02.  So Section 2.02 needs to be triggered

10  in order to modify the pre-settlements.  And Section 4.02 also

11  bears a role.  But let's not forget what Section 2.02 says, the

12  last line.  The parties will negotiate in good faith the terms

13  of such modification.  The Debtor very conveniently ignores

14  that.

15         And Section 4.02 says that either party may make a

16  request for a modification.  It doesn't say how that request

17  must be made.  It doesn't say it must be formal, in writing.

18  It says either party may make a request for a change.

19         Therefore, I think the contractual analysis is very,

20  very simple.  Unless and until a request for a change is made

21  by either party such as to trigger the requirement for good

22  faith negotiation under Section 2.02, the preset monthly

23  amounts control.  If we can go to the next slide, Your Honor,

24  please.

25         Now there are three reasons that we maintain why we

1  comply with these contracts, with these requirements.  First
2  you have the course of conduct.  Course of conduct is not
3  parole evidence.  As we briefed, whether a contract is
4  ambiguous or unambiguous, the Court can look at the course of
5  conduct to determine how the parties interpreted their own
6  contract.

7          Second, you have Mr. Waterhouse and later Mr. Norris
8  and others actually saying, hey, we've got to revise these
9  numbers.  And Highland did not negotiate in good faith.  As Mr.
10  Seery testified, there was zero negotiation.  And then our
11  third argument is that under the Shared Services Agreements
12  Highland was the one obligated to monitor and review and advise
13  us with respect to our payables.  And if we can go to the next
14  slide, Your Honor, please.

15          THE COURT:  Okay.

16          MR. RUKAVINA:  So Your Honor has the December 2019
17  amendments, the ones pursuant to which my clients ended up
18  paying Highland $2.5 million.  Those are unambiguous.  There's
19  no reason, fact, or logic as to why the Court can or should
20  look behind them.  And they expressly state that upon reviewing
21  the actual costs, my clients underpaid and they owed more.  It
22  doesn't matter that there might have been fewer employees
23  there.

24          Frankly, no one has told us why my clients ended up
25  paying more even though there were fewer employees, but you

Case 21-03010-sgj   Doc 122   Filed 05/09/22   Entered 05/09/22 09:07:39   Desc Main
Case 3:22-cv-01710-S   Document 24-1   Filed 04/22/23   Page 856 of 885   PageID 24763

52

1   heard that it's possible, that because of everything that was

2   going on, certain employees were devoting far more of their

3   time to my clients than Mr. Klos had estimated they would.

4          It doesn't matter.  The contracts say we underpaid

5   after an annual review and we ended up paying more.  Those

6   contracts cannot be swept under the rug, or those amendments,

7   by the Debtor.  They can't be ignored.  Those contracts or

8   those amendments are evidence of an annual true up.

9          Mr. Waterhouse testified to this.  It's on Page 140

10  of the transcript that there was a general policy at Highland

11  to review long term contracts on an annual basis.  As he said,

12  it was just too onerous to true up agreements on less than a

13  yearly basis.  So yearly is kind of more the practice.  And if

14  we can please go to the next slide, Your Honor.

15         This is also --

16         THE COURT:  Okay.

17         MR. RUKAVINA:  If the Court wants to look at the

18  formation emails, this is what Mr. Klos wrote to Ms. Thedford.

19  This is Exhibit K.  And he writes, this is where he says, look,

20  this is going to be really cumbersome.  Let's have a predefined

21  amount payable every month.  Then he says, beyond a year.

22         So again we're -- he's thinking, just like Mr.

23  Waterhouse said, of an annual review.  After a year either

24  party could terminate and or renegotiate for an amended

25  agreement.  Well, that's exactly what they did at the end of

Case 21-03010-sgj   Doc 122   Filed 05/09/22   Entered 05/09/22 09:07:39   Desc Main
Case 3:22-cv-01170-S   Document 4-51   Filed 11/22/23   Page 661 of 889   PageID 29764

53

1   2018.

2           So regardless of the fact that the contract talks

3   about a monthly analysis, the parties, both of them, changed it

4   or they understood it to actually be a one year analysis, at

5   least with respect to a retrospective analysis as opposed to a

6   prospective change.

7           And that's something that's very important as well,

8   Your Honor.  In Section 2.02, Mr. Morris is correct.  It

9   applies prospectively.  But nothing in these agreements

10  prevents a retrospective analysis or a true up or a refund,

11  nothing.  The only reason why a true up wasn't done in 2019 was

12  because of the bankruptcy.  If we can please go to the next

13  slide.

14          THE COURT:  Okay.

15          MR. RUKAVINA:  Now let's talk about Mr. Waterhouse's

16  testimony.  Mr. Waterhouse testified that he told Mr. Caruso,

17  clearly an agent of the Debtor, and that he told the Debtor's

18  other officer, general counsel, that there were these

19  overpayments.  The overpayments were discovered, as Your Honor

20  will recall, because the committee requested an analysis of

21  intercompany contracts.  All of these men, Mr. Caruso and Mr.

22  Klos, in good faith performed that analysis.

23          So there is circumstantial evidence, Your Honor, to

24  confirm that what Mr. Waterhouse said is true.  His testimony

25  was never rebutted, for one thing.  You know, Mr. Morris was

002876

54

1  always fond of saying, well, why isn't someone else here?  Why

2  isn't someone else here?  Mr. Caruso could have rebutted this

3  testimony.  He made millions of dollars in this case.  He never

4  testified here and said, whoa, whoa, whoa, Frank never told me

5  that.

6          And why wouldn't Mr. Waterhouse say to Mr. Caruso

7  what he did?  The gentleman had just performed the analysis.

8  It's not, Your Honor, like I'm trying to suggest that

9  Waterhouse just called up Caruso one night over a glass of wine

10 and said, oh, I just got this idea in my head.  They just

11 performed this analysis.  And the fact at that time of $3

12 million in annual overpayments was learned.

13         Isn't it logical that the CFO and the treasurer would

14 go to the general counsel and a financial advisor and say,

15 guys, we've got to do something about this?

16         So this is credible testimony.  And what Mr.

17 Waterhouse did triggered Section 2.02, the duty to negotiate in

18 good faith.  The Debtor said, we can't because of the automatic

19 stay.  Whether that's right or wrong as a matter of law is

20 irrelevant.

21         Mr. Waterhouse was entitled to rely on what the

22 financial advisor, a bankruptcy expert of 30 years, and of what

23 the internal lawyers told him.  He reasonably relied on that

24 and what more was he to do?  He talked to the lawyers.  He

25 talked to the bankruptcy experts.

002877

1          We also have to point out that the Payroll
2  Agreements, Your Honor, contain anti-waiver provisions.  So not
3  only is there no set method by which a request to modify must
4  be made, there's anti-waiver provisions.  Even if Your Honor
5  does not find Mr. Waterhouse's testimony and what he did to
6  rise to the level of flagging the issue and requesting a
7  change, you have beginning in October of 2020 -- I'm sorry.
8  Yes, October of 2020.

9          Mr. Norris and Mr. Klos having numerous discussions
10 regarding these matters as Mr. Norris became involved with the
11 process.  Mr. Norris was very credible, very credible.  And of
12 course he and Mr. Klos discussed this.  And you see even in
13 that email where Mr. Klos is admitting that these contracts
14 have become even more profitable for Highland.

15         So, yes, Mr. Klos admitted to Mr. Norris that
16 Highland was making profits, that there were overpayments.  Mr.
17 Norris was upset.  He said, we've got to change it.  Again, the
18 message came back automatic stay.  It'll be dealt with in due
19 course.

20         If the Court doesn't find that credible or rising to
21 the level of anything, you have the absolute fact of the
22 December 11, 2020 letter from K&L Gates, who at that point and
23 time represented the Advisors saying it looks like there's
24 about $5 million in overpayments.  We've got to do something
25 about that.  If we can go to the next slide please, Your Honor.

1          THE COURT:  Okay.

2          MR. RUKAVINA:  So what we have, Your Honor, right or

3    wrong, legally appropriate or not, Highland not negotiating a

4    change in the reimbursement rates, whether from late 2019 or

5    October 2020 or December 2020.

6          What is my client supposed to do?  Again, it takes

7    two to tango.  If they're required to negotiate in good faith

8    and they know and they don't, Mr. Morris is right.  My client

9    can't unilaterally change the reimbursement rates, but the

10   requirement to negotiate in good faith is in these contracts.

11   The Court cannot read that out of the contracts.  And the

12   Debtor, for whatever reason, did not negotiate in good faith.

13   The Debtor breached Section 2.02 and it's a frustrational

14   purpose.

15         How are we supposed to change the reimbursement rates

16   when the counter-party breaches an obligation to negotiate in

17   good faith?  Well, it becomes a little bit circular here, Your

18   Honor, because the damages from that breach or the fact that

19   you didn't change the reimbursement rates, but it doesn't even

20   matter because once a party breaches, as the Debtor did here,

21   it cannot insist on the strict application prospectively of

22   that contract.

23         What happened, Your Honor, is that once my clients

24   raised the issue, when they triggered the process, the preset

25   reimbursement rates no longer controlled.  The parties were

1  required to figure out what the actual costs were in good

2  faith.  If you can go to the next slide please, Your Honor.

3          THE COURT:  Okay.

4          MR. RUKAVINA:  And then our third theory, Your Honor,

5  is under the shared services.  You heard -- well, you saw --

6  that in these Shared Service Agreements the Advisors were

7  paying Highland to monitor contracts, monitor payables, ensure

8  that appropriate payable amounts were being paid.

9          Mr. Waterhouse confirmed that these services -- I

10 mean, you can look at the contract.  You don't need his

11 testimony.  But that these services included scrubbing the

12 Advisors bills to make sure that the bills were proper, that

13 there weren't refunds due, that there weren't overpayments.

14 And Highland certainly knew of the overpayments.  Again, we

15 have the December 2019.  You have the report from DCI going to

16 the committee.  Highland knew.

17         We go back to the Payroll Agreements which provided

18 should either party -- that's key -- should either party

19 determine that a chance is appropriate, then either party may

20 request a modification.  Consistent with its duties to assist

21 and advise the Advisors, Highland should have done so.  As

22 we'll talk in a moment, no employee of the Advisors or agent of

23 the Advisors knew of the overpayments who was not at the same

24 time also an employee or an agent of Highland.

25         Does the Court really believe or can anyone really

58

1  believe that these people, Klos, Waterhouse, Caruso, that they

2  all just really did nothing about this, ignored it, that

3  Highland sat back there and knowingly was taking $6.2, $6.6

4  million from my clients?

5       Or is it far more likely that, in fact, they all

6  believed in good faith that the automatic stay prevented any

7  kind of negotiation or modification?  It goes back again to the

8  truth.  The most credible explanation is that Klos and

9  Waterhouse knew what was going on, but were told by the

10  bankruptcy experts, we can't do anything about it, because of

11  the bankruptcy stay.

12       The alternative is, again, that they sat there,

13  violated their duties under the Shared Services Agreements,

14  acted ridiculously as a debtor-in-possession by knowingly

15  taking millions of dollars in profits not entitled to under the

16  contract.

17       Either way, Highland knew about it, had an obligation

18  to do something about it, and did nothing about it.  It cannot

19  now exploit any delay or any advantage as a result of its own

20  fault.  Your Honor, if we can advance to the next slide,

21  please.

22       THE COURT:  Okay.

23       MR. RUKAVINA:  What does Highland say back?  Well,

24  you waived your rights.  Okay.  We might have over billed you

25  by $6.6 million.  We might have known about it.  We might have

002881

Case 21-03010-sgj   Doc 122   Filed 05/09/22   Entered 05/09/22 09:07:39   Desc Main
Case 3:22-cv-01170-S   Document 64-51   Filed 12/23/21   Page 663 of 855   PageID 24170

59

1  had an obligation to tell you about it, but you waived your

2  rights.  Well, the contracts contained anti-waiver provisions.

3  Waiver has to be knowing and intentional.

4        Mr. Waterhouse is the only person who is an agent of

5  the Advisors that knew of the overpayments, but as we briefed,

6  under Texas law when you're an agent to two principals, his

7  knowledge cannot be imputed to one to be used against the

8  other.  The other people involved, Mr. Klos, DSI, Mr. Caruso,

9  they were never agents of the Advisors.

10        So the Advisors -- there's no evidence that the

11  Advisors knew of the overpayments in order to be able to make a

12  knowing and intentional waiver.  Of course the Advisors knew

13  that certain employees weren't there.  That's a given.  Mr.

14  Norris was very clear about that.  But that is a separate issue

15  from knowing that every month, every month, Highland was

16  billing us for those employees that were no longer there.  Only

17  Highland employees knew that.

18        Also, Your Honor, these statements to the board, the

19  funds boards, again, misdirection.  All those communications,

20  all those board minutes, we went through a dozen of them one by

21  one with Mr. Powell.  All of those are referring to the Shared

22  Services Agreements in which case, yes, Highland was providing

23  services to us under the Shared Services Agreements.  None of

24  those talked about the Payroll Reimbursement Agreements.

25        And the fact, Your Honor, that we stopped paying

Case 21-03010-sgj   Doc 122   Filed 05/09/22   Entered 05/09/22 09:07:39   Desc Main
Case 3:22-cv-01170-S   Document 64-1   Filed 10/26/23   Page 864 of 885   PageID 2930

60

1  right after Mr. Norris learned about it was further evidence

2  that there was no waiver.  And when I talk about waiver, Your

3  Honor, I mean, common law waiver.  I mean, contractual

4  interpretation waiver.  That's separate from whether we sat by

5  and did nothing under Section 2.02 and 4.02 of the contract.

6  We're going to go to the next slide please, Your Honor.

7          THE COURT:  Okay.

8          MR. RUKAVINA:  Likewise, the voluntary doctrine

9  payment does not apply.  As we briefed, it doesn't apply in

10 Texas to the contract claims.  It only applies where there's

11 full knowledge of material facts.  And again, we did not know

12 of the overpayments.  The only one who did was Waterhouse and

13 he did what he could.

14         And it's also a critical factor here, Your Honor, as

15 you've heard, that we did not actually write a check or

16 initiate a wire transfer for these payments.  Highland

17 employees did so.  Highland employees, pursuant to the services

18 they were providing, had access and control to our bank account

19 and Highland employees paid themselves.

20         Mr. Waterhouse approved those payments.  That is

21 true.  But he approved them as the CFO of Highland.  It's very

22 clear.  You have Ms. Hendrix's emails to him.  She's writing to

23 his -- to her boss, pardon me -- saying, hey, boss, under all

24 these obligations, under all these contracts, the following

25 Advisor fees and bills are due.  And he says approved.

1         Even if he was wearing his Advisor hat, again,

2    there's no voluntary payment because he was told that the

3    automatic stay prevents anything from being done about this.

4    And we all know that a legal disability, like the automatic

5    stay, for example, tolls limitations.  A legal disability is

6    not voluntary.  It is not a waiver.

7         So, Your Honor, that rounds off the discussion on why

8    the Advisors have legitimate administrative claims.  They have

9    been quantified by Mr. Norris in a calculation where the Debtor

10   has conceded that his numbers and his math are correct.  His

11   number is not dissimilar from Mr. Klos' number, which should

12   add further support and credibility.

13        And really, it just comes down to the contract and

14   how the Court interprets the contract in light of the parties'

15   prior annual true up and in light of Mr. Waterhouse's

16   discussions with Highland personnel saying, there's

17   overpayments.  We've got to do something about those

18   overpayments, which triggered the requirement to negotiate in

19   good faith, which never happened.  If you can go to the next

20   slide, please.

21        Now I'd like to discuss Highland's claims back

22   against us.  So first, let's discuss the claim for attorney's

23   fees because I don't think I am being absurd when I smell that

24   it's going to be a huge number, given that they had five

25   lawyers during this trial in Court and on the video.

62

1          These contracts surprisingly -- and this has not been

2     addressed by Highland -- have no fee shifting provision.  They

3     don't.  Now, we know in Texas that's not fatal because even if

4     your contract doesn't have a fee shifting provision, Section

5     38.001 still allows you to recover attorney's fees under a

6     written contract.

7          But you have to comply as a condition precedent with

8     Section 38.002 which requires that you give presentment of the

9     claim and that the Advisors do not pay a just amount owing

10    prior to 30 days after that.  And we know as a matter of law

11    that the filing of a suit is not a presentment of the claim.

12         Also, the PRAs and SSAs, all four contracts, contain

13    mandatory notice provisions.  And these -- this is a very

14    similar case, Your Honor.  That's not true.  It's not a similar

15    case.  It's a similar principle.  This City of Alamo vs. Garcia

16    case -- in that case, Your Honor, there was -- well, it was an

17    arbitration provision and the arbitration provision required

18    that notice to arbitrate be sent in a particular form to a

19    particular person.  And that provision was not complied with.

20         In this court, the Texas Appellate Court said, okay,

21    well, is that requirement of notice following the notice

22    provision?  Is that a condition precedent or is that just a

23    covenant where you get a breach of contract?  And that Court

24    said that, no, when the notice provision itself, meaning notice

25    shall be sent to this person by such means by such date, when

002885

63

1  it's a condition precedent then it defeats the condition for

2  failure to follow.

3        So because Section 38.002 is a condition precedent to

4  recovering the 38.001 and because Highland did not follow the

5  notice provisions in the contracts, they have no claim under

6  38.001.  If we can please advance to the next slide, Your

7  Honor.

8        THE COURT:  Okay.

9        MR. RUKAVINA:  There is -- first of all, it's

10 amazing.  There is no evidence in front of you of any

11 presentment of the claim at all.  I understand maybe because

12 New York lawyers aren't familiar with Section 38.002, but I

13 would have thought there'd be a letter from Mr. Seery just like

14 we've seen in all the note cases saying, hey, you bad guys,

15 you're not paying.  You owe me money.  Pay now or we'll sue.

16       I've actually had to scrub Highland's exhibits for an

17 scintilla of any evidence of a presentment.  And all that you

18 have is the Highland Exhibit 28.  This is an email.  It's a

19 part of negotiations.  It's an email to Mr. Norris.  It's not

20 even from the Debtor.  It's from DSI or I'm not even sure who.

21       The Court has it.  It's Exhibit 28.  And here he says

22 -- I'm not even sure I know who this man is -- you guys owe the

23 following amounts.  It's an email.  It is done prior to filing

24 suit, but again it does not follow the notice requirements in

25 the contracts, meaning it's not sent to the proper party.  It's

002886

Case 21-03010-sgj   Doc 122   Filed 05/09/22   Entered 05/09/22 09:07:39   Desc Main
Case 3:22-cv-02170-S   Document 64-1   Filed 04/26/23   Page 873 of 885   PageID 29875

64

1    emailed to Mr. Norris.  It's not sent as the contracts require.

2            And interestingly, when you read the email in

3    chambers, Your Honor, this gentleman is saying, you Advisors

4    have to pay all of these funds, $5.4 million, in order --

5    that's how much you owe us.  Notice there's no demand that

6    there will be suit filed.  There's no demand for attorney's

7    fees.

8            Now, it is true that when the Court studies Section

9    38.002 the Court will find that there's no prescribed method

10   for the notice that has to be provided unless the contract

11   provides the method, right?

12           So, all things being equal, this email might suffice

13   as a presentment of the claim.  I've already argued why it

14   doesn't because it didn't follow the notice provisions of the

15   contract, but there's another reason, as Judge Rhoades

16   explained in this case I cite down here before.  And you have

17   to go back to Section 38.002.

18           It can't just be a presentment of a claim.  It has to

19   be a presentment of the just amount owed.  Why in the world is

20   this person who sent this email requiring Mr. Norris to pay

21   alleged amounts owing by all these other people?  You'll see

22   when -- you'll see, Your Honor, when you read this email.  Mr.

23   Norris writes back and he says, what is this?  I don't even

24   represent or know about most of these entities.

25           So there's no presentment because this isn't

65

 1   sufficient.  If it is sufficient, it didn't follow the

 2   condition precedent notice requirement of the contracts.

 3   Therefore, Section 38.002 is not complied with.  And even if it

 4   did, this is not a claim for a just amount.  Why in the world

 5   would the Advisors pay amounts from Dugaboy and NexBank, Ohio

 6   State Life Insurance.

 7           The Debtor, Your Honor, just messed up.  And as a

 8   result, we revert to the American rule and it does not get its

 9   attorney's fees.  If we can advance to Slide 6, Your Honor.

10           THE COURT:  Okay.

11           MR. RUKAVINA:  This is now, unlike Mr. Klos' broad,

12   sweeping statements, oh, you owe all this money.  And unlike

13   Mr. Norris -- I'm sorry, Mr. Morris -- just going over this.

14   Let's look at the facts of the matter when we're talking about

15   millions of dollars in alleged damages.

16           So first, HCMFA they say didn't pay for the November,

17   December, and January amounts.  Your Honor will recall that

18   that agreement is different than the rest.  It requires -- it's

19   not a set amount.  It requires that an analysis be done, a

20   calculation.  It requires a statement.  And I've only taken

21   part of Section 5.01 there, Your Honor, because honestly I'm

22   not good with PowerPoint.  I don't know how the take the rest

23   of it.  Certainly the Court can and will read the whole Section

24   5.01.

25           But notice the language.  Each service provider --

1  Highland shall furnish the other parties hereto with a written

2  statement in which they detail the actual costs.  Highland

3  never did that for January.  And Highland, by the way, never

4  gave you the evidence for November and December.  I did in my

5  Exhibit AA.  Highland did give us an invoice for November and

6  December, but never for January.

7        So, Your Honor, they lose the January argument for

8  two reasons: one, the form of this contract because they never

9  provided the invoice; two, more importantly, because there's no

10 evidence of what the actual cost is.  We're now talking about

11 their claims against us.

12       It's their burden of proof.  They never came.  Mr.

13 Klos never said, you know what?  I did the analysis and it's

14 $300,000.  There is no evidence as to what the actual cost for

15 January is.  If we can go to the next slide, please.

16       THE COURT:  Okay.

17       MR. RUKAVINA:  Now I want to discuss the Payroll

18 Agreements again.  We can discuss them at the same time.  It

19 ties into my argument on the administrative claim.

20       Whether it's early -- I'm sorry.  Whether it's late

21 2019 or October 2020 or December 2020, Highland never

22 negotiated in good faith.  As I've argued, that means that the

23 preset amounts no longer control.  We revert to what is the

24 actual cost.  We are only required to reimburse for actual

25 cost.  It's Highland's burden of proof.  They never even

Case 21-03010-sgj   Doc 122   Filed 05/09/22   Entered 05/09/22 09:07:39   Desc Main
Case 3:22-cv-02170-S   Document 84-1   Filed 10/26/23   Page 874 of 888   PageID 29878

67

1  attempted for the months of December and January to quantify

2  their actual costs.  They never even attempted to do so, Your

3  Honor, on their burden of proof.

4         Even if the Court considers the December 11th letter

5  as the last or as the only trigger, that would still negate

6  then the January numbers.  So it is our argument that Highland,

7  for lack of evidence at this trial, for lack of even trying to

8  quantify actual costs in December and January, fails, lack of

9  evidence.  Those discussions from Mr. Waterhouse, Your Honor,

10  and that letter from K&L Gates must have had some impact on

11  Highland's duty under these contracts.

12         Again, all that we have to do is request a change and

13  then the parties shall -- not may -- shall negotiate in good

14  faith.  And Mr. Seery told you there was no negotiation.  So,

15  again, the argument is the monthly amounts do not control and

16  there's an utter lack of evidence on what the actual costs are.

17         Now it is true that we did not pay under the NexPoint

18  Shared Services.  That's $168,000 per month.  We owe them

19  $336,000.  We do.  Now, Klos testified that it's $500,000.

20  Please don't fall into that trap, Your Honor.  Mr. Klos was

21  very intentionally, and I believe manipulatively, including a

22  subsidiary of Highland, a subsidiary of NexPoint called -- I

23  think I have it in here -- called NexPoint Real Estate

24  Advisors.

25         That's not in the contract, Your Honor.  The NexPoint

002890

68

1 Shared Services Agreement spells out it's $168,000 per month,

2 so we owe them $336,000, not 500. And then if we can go to the

3 final slide, Your Honor.

4         This is what the Court should conclude -- pardon me.

5 You should award us the $6.2 million in overpayments. You

6 should award us the million dollars in Shared Services

7 overpayments. This, Your Honor will recall, is Mr. Klos'

8 analysis. Mr. Klos, from December 2019 -- I'm sorry --

9 December 2020, at that point and time recall, Your Honor, that

10 the Debtor was not providing legal services anymore to the

11 Advisors. The Advisors had hired their own, at least one of

12 their own, regulatory and compliance people.

13        Mr. Klos calculated $1 million in profit under the

14 Shared Services Agreements, which again do not permit of a

15 profit. HCMFA does have a provision for a 5 percent markup.

16 NexPoint does not, but that's different from profit. Your

17 Honor should award us $425,000 in cover damages, as Mr. Norris

18 testified to. We had to go out and hire two employees. That's

19 three months worth of their -- or maybe four months. I don't

20 remember right now. Mr. Norris testified about that. Of their

21 compensation.

22        The Court should deny all parties' attorney's fees.

23 Again, these contracts do not provide for attorney's fees

24 provisions and Section 38.002 was not complied with. The Court

25 should deny the claim for the January HCMFA Shared Service

Case 21-03010-sgj    Doc 122    Filed 05/09/22    Entered 05/09/22 09:07:39    Desc Main
Case 3:22-cv-01170-S    Document 24-1    Filed 10/26/23    Page 876 of 888    PageID 29890

69

1  Agreement because, again, the Debtor did not calculate actual

2  cost or present an invoice.  There's no evidence of what the

3  proper amount payable for January of 2021 should have been.

4          The Court should deny the Debtor amounts unpaid under

5  the Payroll Reimbursement Agreements because the Debtor refused

6  to negotiate in good faith and the Debtor, again, presented no

7  evidence on what actual cost for those months should be on what

8  is the Debtor's burden of proof.

9          We admit that we owe -- that HCMFA did not pay Shared

10  Services in November and December.  There are those invoices.

11  Again, I was so kind as to provide evidence of that.  The

12  Debtor didn't even provide evidence of that.  We admitted we

13  owe that.  That's -- and I'm ignoring dollars, Your Honor.  I'm

14  rounding to the thousand.  We admit that we owe $596,000.  And

15  we admit that NexPoint owes for December and January, $336,000,

16  for a net resulting administrative claim after nettings and set

17  offs of $6,693,000.

18          Your Honor, I will leave you with this final thought

19  that I also mentioned.

20          You can close that now, Mr. Berghman.

21          I'll leave you with this final thought that I

22  mentioned during opening.  This has been a contentious case.

23  We all know that.  Your Honor has mentioned that numerous

24  times.  We know that the Court might not think highly of Mr.

25  Dondero.  The Court has sanctioned Mr. Dondero.  We know that

70

1  the Court may think very highly of Mr. Seery and the Debtor.

2  Certainly the Court has found Mr. Seery very credible in the

3  past.

4      But this is a court of equity.  It ought to bother

5  this Court some, if not a lot, that an entity under your

6  Court's, under Your Honor's protection, with duties of candor

7  and fiduciary duties was billing my client monthly for 20

8  employees that were not there and they knew about it and they

9  did nothing about it.  There has to be a remedy for that harm.

10 Thank you, Your Honor.

11     THE COURT:  All right.  Thank you.

12     Mr. Morris, you have, what did we say, 11-1/2 minutes

13 of rebuttal.

14     MR. MORRIS:  Okay.  So as quickly as I can, Your

15 Honor, Number 1, I'm not prepared to address attorney's fees.

16 We'll do that if and when the Court enters a judgment.  I

17 promise we'll file our motion and we'll address these matters.

18     With respect to damages, we did offer all the proof

19 we needed to, Your Honor, and they're the contracts because

20 they're all fixed rate contracts with the exception of the

21 HCMFA contract.

22     And I appreciate Mr. Rukavina putting in the exhibits

23 because if you take a look at them, if you take a look at

24 Exhibit AA, you'll see that Highland actually reduced the

25 amount it was charging for compliance services in November and

002893

71

1 December precisely because Mr. Post transferred from Highland

2 to the Advisors.

3       You'll see that in October -- in September, the

4 compliance fee was $92,819.  That's in Exhibit AA at Bates

5 Number 590.  And that the same is true in October.  But yet in

6 November, that amount is reduced to $66,900, right?  The legal

7 fees are still the same $10,000 they had been for years.

8 They're paying $10,000 a month.  Yes, it's an actual cost on

9 track.  And the same $66,000 is charged in December.  Highland

10 has already taken into account the transfer of Mr. Post from

11 one side to the other.

12       Quickly, Mr. Klos didn't raise any red flags in his

13 testimony.  In fact, he did just the opposite.  What he

14 testified to was that here was a rational basis for the numbers

15 in the documents.  What he testified to was that Highland

16 provided services and that they were entitled to get paid for

17 it.  So I don't know what red flags Mr. Rukavina was referring

18 to.  They continually refer to profits and the profits that

19 Highland was making.  Completely irrelevant under the contract.

20       If they wanted a contract that limited Highland's

21 profits or that protected Highland from the down side, right?

22 We're only concerned about profits here.  They're only

23 concerned -- they aren't concerned about all the money we were

24 losing, I guess, under the same analysis that we're relying on,

25 that they're relying on frankly, right?

002894

1       If they wanted, they know how to do that because the

2   HCMFA Shared Services Agreement is cost plus 5 percent.  Their

3   whole theory is kind of suspect for the simple reason that

4   they're trying to say that Highland somehow agreed to give the

5   employees to the Advisors for cost.  What business would do

6   that?  Why would anybody be in business to simply have somebody

7   pay for their employees?  It makes no sense to me.  The whole

8   theory makes no sense to me.

9       And that brings me to a very big point, Your Honor.

10  I absolutely do not agree that the contract is to be a

11  reimbursement for cost.  I absolutely will never agree to that.

12  That's not what the contract says.  That's what they're trying

13  to get you to do.  They're trying to rewrite the very plain

14  terms of the agreement.

15      The very plain terms of the definition of actual cost

16  is that it's a fixed amount unless the parties agree otherwise,

17  period, full stop.  Hamburger, tofu, call it whatever you want.

18  It's a fixed amount until the parties agree otherwise.  I have

19  absolutely no agreement with Mr. Rukavina that the purpose of

20  the contract is to pay actual costs.

21      Annual true up, Your Honor, he pointed to some

22  generalized statement from Mr. Waterhouse.  The fact of the

23  matter is there's absolutely no evidence that the December 2018

24  amendments were the result of any true up.  In fact, I asked

25  Mr. Waterhouse the question.  This is at Page 140 of the

Case 21-03010-sgj    Doc 122    Filed 05/09/22    Entered 05/09/22 09:07:39    Desc Main
Case 3:22-cv-02170-S    Document 6451    Filed 12/23 P Page 87 of 885    Page ID 29034

73

1  afternoon, I guess, of the first day hearing.

2  "Q   Do you have any specific recollection that it was an

3  annual true up like the -- just like for the two Payroll

4  Reimbursement Agreements?

5  "A   I don't.  From what I recall, I don't think there was a

6  true up in the agreements."

7          This is his testimony about the agreements at issue.

8  Mr. Rukavina may point to some generalized statement about true

9  ups.  This is his testimony at the bottom of Page 140, the top

10 of Page 141, that he has no knowledge of any true up ever being

11 done with respect to the Payroll Reimbursement Agreements.

12         The notion that they didn't get services.  I think

13 there was a suggestion that somehow they didn't get services.

14 Again, Your Honor, we'd refer to the retail board minutes.  The

15 attempt to somehow slice this so fine to say the retail board

16 minutes was only referring to Shared Services and it didn't

17 have anything to do with front office.

18         There's numerous places in those minutes that refer

19 not to Shared Service Agreements, but shares services

20 arrangements.  And you heard no explanation as to why the

21 Advisors are repeatedly telling the retail board throughout

22 2020, here are our investment professionals.

23         They did it in January.  They did it in August.  And

24 they don't do it for no reason.  They do it in response to the

25 retail board's specific request for information as to who was

74

1  providing services to them, okay.  The evidence is just -- it's
2  beyond dispute.  Mr. Rukavina threw out somehow that Highland
3  was a fiduciary.  A fiduciary to whom?

4         The only fiduciaries that matter in this case are Mr.
5  Dondero, Mr. Waterhouse, Ms. Thedford, and Mr. Norris.  They're
6  the fiduciaries of the Advisors.  Highland had a contract.  It
7  did not owe a fiduciary duty to the Advisors.  And it's just --
8  I don't know where this stuff comes from, but there's no basis
9  to find that Highland owed anybody on the Advisors side a
10  fiduciary duty.

11        Anti-waiver.  He points to the waiver provision.  We
12 have ample case law in our briefing, Your Honor, that you can
13 waive even a waiver provision.  And why does it apply here?
14 Because they waived it 35 times.  Every single month from the
15 beginning of 2018 until the end of November 2020, 35
16 consecutive times, Frank Waterhouse authorized the payment of
17 the fixed fee under the Payroll Reimbursement Agreement with
18 knowledge that many of the dual employees had been terminated.

19        That is a waiver.  That is a waiver 35 times.  That
20 is a waiver so strong that it overcomes anything the Advisors
21 might come up with here.

22        Mr. Rukavina suggests, oh, what can we do?  Poor us.
23 They wouldn't negotiate.  No.  As Mr. Klos said, as the
24 contract provides, if you don't like what's happening, you can
25 terminate without cause on 60 days notice, period, full stop.

75

1   That's why that provision is in there.  There's no requirement

2   that somebody agree.  There's certainly no requirement that

3   somebody agree to a retroactive change.  In fact, that would

4   read out of the whole contract the definition of actual cost.

5           Again, you're trying to rewrite an agreement that

6   they lived with for two years under the Dondero regime.  We

7   just want to be treated the way Highland was treated for the

8   two years that Jim Dondero was in control.  Why do the rules

9   change?  Because Dustin Norris wakes up on December 1st after

10  we give notice of termination and they freak out and they say,

11  oh, my gosh.  We've got to do something here.  That's not a

12  basis to change the terms of the parties' agreement.

13          No mention of Lauren Thedford, right?  Where is Ms.

14  Thedford?  Mr. Rukavina keeps saying, it's the Highland

15  employees.  It's the Highland employees.  Mr. Dondero gave all

16  of these people multiple hats.  I've heard Mr. Rukavina refer

17  twice now to some case law that says if you wear multiple hats

18  you can't impute knowledge from one to the other.  Is that

19  really true when the same person is giving them multiple roles?

20  How does Mr. Dondero get to hide behind the fact that he put

21  Mr. Waterhouse and Ms. Thedford into these conflicting

22  positions?

23          And then he gets to say, oh, he was acting on behalf

24  of Highland, not the Advisors.  That cannot possibly be the

25  law, Your Honor.  That would be the biggest injustice of all,

002898

Case 21-03010-sgj   Doc 122   Filed 05/09/22   Entered 05/09/22 09:07:39   Desc Main
Case 3:22-cv-01170-S   Document 64-51   Filed 11/26/23   Page 830 of 835   PageID 29957

76

1 that they get now to decide which hat Mr. Waterhouse and Ms.

2 Thedford was wearing.  And please don't forget Ms. Thedford.

3 An officer, a fiduciary, a secretary, a lawyer, the person who

4 drafted the contracts.

5          Bankruptcy experts.  Again, now we've moved away from

6 Mr. -- we keep pushing them into the corner even further.  Now

7 Mr. Caruso is no longer referred to as the CRO.  Now he's just

8 an agent.  He's a so-called agent, right?  He's not a

9 bankruptcy expert, as humbly as I can say it, my colleagues and

10 me.  This is what we do for a living, right.  If Mr. Waterhouse

11 was with us all the time.  The testimony is clear.  Looked him

12 right in the eye.  Frank, you didn't tell me, did you?  No, I

13 didn't tell you, John.  I didn't tell you.

14          Yeah.  I'll just end where Mr. Rukavina ended and

15 that is the notion that this is a court of equity.  It may be a

16 court of equity, but it's also a court of law.  And we want the

17 Court to simply enforce the contract as it's drafted.  And on

18 an equitable basis, there's absolutely positively nothing wrong

19 with that.  Why is there nothing wrong with that?  Because we

20 provided the services.  We're entitled to get paid.  The

21 contracts are unambiguous.

22          And I just showed you in Exhibit AA, in the Advisors

23 AA, we even went so far as to reduce the cost of the compliance

24 services when Jason Post was moved from one side to the other.

25 We even went so far as to do that.

Case 21-03010-sgj    Doc 122    Filed 05/09/22    Entered 05/09/22 09:07:39    Desc Main
Case 3:22-cv-02170-S    Document 64-1    Filed 12/26/23    Page 884 of 888    PageID 24938

77

1          That's equity.  Equity says you reward people who are

2   abiding by the rules.  We abided by the rules.  We shifted Mr.

3   Post from one side to the other and we eliminated the cost for

4   him.  They don't get to double dip.  They have no claim here,

5   Your Honor.

6          Their whole case is based on Frank Waterhouse's story

7   that he made up at the very last second that isn't -- that, as

8   recorded by Mr. Norris, doesn't even mention Fred Caruso.  And

9   then, of course, we have the K&L Gates letter sent the day

10  after the TRO was entered, right, that's based on the analysis

11  that Frank Waterhouse gave to Mr. Dondero the day before.  This

12  is all manufactured.

13         And let me just finish on this point.  Highland did

14  not breach its obligation to negotiate in good faith because

15  there was no reason or opportunity to do that.  We don't

16  believe what Frank Waterhouse testified to has any truth to it,

17  but even if it did, an offhand statement to Fred Caruso isn't

18  all of a sudden going to get them some kind of windfall.

19  That's Number 1.  Number 2, this K&L Gates letter, think about

20  the circumstances that existed at the time.

21         And, finally, Your Honor, even if the Court were to

22  find that Highland failed to negotiate in good faith, which I

23  don't think it can under the circumstances, even if you found

24  that, how are there damages a complete rewriting of the

25  contract?  Because we had no obligation to agree to their

1  theory.

2          Why do they get their theory now?  We could have

3  negotiated in good faith and said, Frank, we're not doing -- I

4  mean, we're not doing anything retroactive.  The contract

5  doesn't require us to do anything retroactive.

6          At best, maybe they can make a claim for January.  I

7  don't know.  I don't think it makes any sense.  I don't want it

8  to be seen as a concession, but they had no obligation.

9  Highland had no obligation to agree to their theory.  And now

10 they're going to get their theory that completely rewrites the

11 contract.  It makes no sense.  Thank you, Your Honor.

12         THE COURT:  Okay.  Thank you.

13         All right.  Well, this one is going to be second in

14 the queue.  We were working on the note adversary proceedings

15 report and recommendation.  So we will try not to keep you

16 waiting too long on a ruling on this.

17         You could make my life easier in one regard.  If you

18 all will send to me, send to Traci Ellison a Word version of

19 your proposed findings of fact and conclusions of law, each of

20 you, that way I can copy and paste where I want to copy and

21 paste in my ruling.  So if you could do that.

22         MR. RUKAVINA:  Your Honor, may I interject?  The

23 scheduling order didn't require a proposed findings.  It

24 contemplated trial briefs.  I filed a trial brief.  The Debtor

25 filed proposed findings.

1          THE COURT:  Right.

2          MR. RUKAVINA:  I'm happy to draft proposed findings

3   if you want me to.  I just want you to be aware of that.

4          THE COURT:  Okay.  Well, so I get Mr. Morris referred

5   to his at Docket Entry 91.

6          So send me, Mr. Rukavina, your trial brief, the

7   Advisors' trial brief.  I say send me -- send it to Traci.

8          And then, Mr. Morris, you can send me your findings

9   and conclusions which have obviously both facts and law.  And

10  so, again, that will speed up our process here in chambers, I

11  hope, tremendously if I can copy and paste where I think it

12  makes sense to copy and past in my ruling, all right.

13         All right.  Well, I wish I could give you a date by

14  which this will be done, but all I can say is we're working as

15  fast as we can back here on our different projects, and so

16  we'll try not to keep you waiting too late.  All right.

17         MR. MORRIS:  Thank you, Your Honor.

18         THE COURT:  Thank you.  We're adjourned.

19         MR. RUKAVINA:  Thank you.

20         THE CLERK:  All rise.

21      (Proceedings concluded)

22                    *  *  *  *  *

23

24

25

002902

80

1          **C E R T I F I C A T I O N**

2                We, DIPTI PATEL, CRYSTAL THOMAS, and MICHELLE ROGAN,

3    court approved transcribers, certify that the foregoing is a

4    correct transcript from the official electronic sound recording

5    of the proceedings in the above-entitled matter, and to the

6    best of our ability.

7

8    /s/ Dipti Patel

9    DIPTI PATEL, CET-997

10

11   /s/ Crystal Thomas

12   CRYSTAL THOMAS, CET-654

13

14   /s/ Michelle Rogan

15   MICHELLE ROGAN

16   LIBERTY TRANSCRIPTS              DATE:  May 5, 2022

17

18

19

20

21

22

23

24

25

002903

Case 21-03010-sgj    Doc 122    Filed 05/09/22    Entered 05/09/22 09:07:39    Desc Main
Case 3:22-cv-01170-S    Document 24-51    Filed 11/22/23    Page 895 of 856    PageID 30102

81