No. 3:22-cv-02170-S

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

In the Matter of Highland Capital Management, L.P.,

      Debtor.

NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P.,

    Appellants,

v.

Highland Capital Management, L.P.,

    Appellee.

## ANSWERING BRIEF OF APPELLEE

On Appeal from the United States Bankruptcy Court for the
Northern District of Texas, Adv. Proc. No. 21-03010-sgj,
Hon. Stacey G.C. Jernigan

<table>
<tr>
<td>

PACHULSKI STANG ZIEHL &<br>
  JONES LLP<br>
Jeffrey N. Pomerantz<br>
John A. Morris<br>
Gregory V. Demo<br>
Hayley R. Winograd<br>
10100 Santa Monica Blvd., 13th Floor<br>
Los Angeles, CA 90067<br>
(310) 277-6910

</td>
<td>

HAYWARD PLLC<br>
Melissa S. Hayward<br>
Zachery Z. Annable<br>
10501 N. Central Expy, Ste. 106<br>
Dallas, Texas 75231<br>
Tel: (972) 755-7100

</td>
</tr>
</table>

*Counsel for Appellee*

## CERTIFICATE OF INTERESTED PERSONS
## AND DISCLOSURE STATEMENT

The undersigned counsel of record certifies that:

(a)   There are no other debtors associated with this bankruptcy case other than Highland Capital Management L.P., and there are no publicly-held corporations that own 10% or more of Appellee Highland Capital Management L.P., which is not a corporation and which is not a parent corporation.

(b)   That the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1.   **Appellants:**

NexPoint Advisors, L.P and Highland Capital Management Fund Advisors, L.P.

Counsel for Appellants:

Davor Rukavina, Esq.
Julian P. Vasek, Esq.
MUNSCH HARDT KOPF & HARR P.C. 500 N. Akard St., Ste. 3800
Dallas, Texas 75201-6659

2.   **Appellee (Debtor):**
**Highland Capital Management, L.P.**

Counsel for Appellee:

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910

DOCS_NY:47167.23 36027/003

PACHULSKI STANG ZIEHL & JONES LLP
John A. Morris
Gregory V. Demo
Hayley R. Winograd
780 Third Avenue
34th Floor
New York NY 10017-2024
Tel: (212) 561-7700

HAYWARD PLLC
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

**HAYWARD PLLC**

*/s/ Zachery Z Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110
E-mail:    MHayward@HaywardFirm.com
           ZAnnable@HaywardFirm.com

*Counsel for the Appellee*

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellee respectfully submits that oral argument is unlikely to be helpful to the Court in resolving the questions presented because (a) this appeal lacks merit and (b) the parties' briefs adequately set forth their arguments.

DOCS_NY:47167.23 36027/003

## **TABLE OF CONTENTS**

**Page**

I.   ISSUES PRESENTED ..................................................................1

II.  SUMMARY OF ARGUMENT ....................................................2

III. STATEMENT OF THE CASE ...................................................4

    A.   Introduction ......................................................................4

    B.   Procedural History............................................................5

    C.   Case Background...............................................................7

        1.   The Bankruptcy Case ................................................7

        2.   The Advisors .............................................................8

        3.   The Shared Services Agreements ..............................8

            i.    The HCMFA SSA ..........................................9

            ii.   The NexPoint SSA........................................10

        4.   The Payroll Reimbursement Agreements ................10

            i.    Events Leading up to the PRAs: The Sub-Advisory
                  Agreements ....................................................11

            ii.   Highland's Revenue Stream Faces Unexpected
                  Pressure and Highland Learns That the Sub-
                  Advisory Agreement Is Not a Viable Structure for
                  Providing Highland with Needed Cash ........................13

            iii.  The Payroll Reimbursement Agreements Replace
                  the Sub-Advisory Agreements .....................................16

            iv.   The PRAs Are Amended in December 2018 ...............20

            v.    In January 2020, Klos Confirmed That the PRAs
                  Were "Flat Fees for Services" Arrangements ..............22

            vi.   The Advisors Knowingly Made All Payments
                  Under the Agreements Until Highland Gave
                  Notice of Termination on or Around November 30,
                  2020 ............................................................................24

            vii.  Highland Performed Its Obligations Under the
                  Agreements..................................................................26

            viii. The Advisors Knew When All Dual Employees
                  Left Highland...............................................................30

ix.   The Advisors Paid the Same Flat Fees Under the
      PRAs for 35 Months Until Dondero Instructed
      Them to Stop Immediately After Highland Gave
      Notice of Termination .................................................31

x.    The Advisors Never Sought to Modify the PRAs
      Despite Their Contemporaneous Knowledge of
      Dual Employees' Departures.........................................33

IV.   ARGUMENT..................................................................................35

      A.   Standard of Review ...........................................................35

      B.   The Bankruptcy Court Properly Denied the Advisors' Claim for
           Overpayments Under the PRAs ........................................36

           1.   The Bankruptcy Court Properly Determined That the
                PRAs Mandated Fixed Monthly Fees as a Matter of Law ......36

           2.   The Advisors' Argument That the Bankruptcy Court
                Improperly Relied on Parol Evidence Is Waived and
                Otherwise Without Merit ..........................................39

           3.   The Bankruptcy Court Properly Found That Highland
                Had No Obligation to Unilaterally Modify the PRAs on
                the Advisors' Behalf .................................................42

           4.   The Bankruptcy Court's Finding That the Advisors
                Never Sought to Modify the PRAs Is Not Clearly
                Erroneous ..............................................................44

      C.   The Bankruptcy Court's Finding That Highland Did Not
           Breach the SSAs Is Not Clearly Erroneous.........................46

      D.   The Bankruptcy Court Properly Found That the Advisors
           Waived Their Claims Under the Agreements .....................49

      E.   The Bankruptcy Court Properly Found That the Advisors
           Breached the SSAs by Failing to Pay Highland Amounts Due
           And Owing .......................................................................53

V.    CONCLUSION...............................................................................54

DOCS_NY:47167.23 36027/003

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*,
 590 S.W.3d 471 (Tex. 2019) ................................................................46

*BCC Merch. Sols., Inc. v. Jet Pay, LLC*,
 129 F. Supp.3d 440 (N.D. Tex. 2015)......................................... 36, 37

*Bott v. J.F. Shea Co.*,
 388 F.3d 530 (5th Cir. 2004)...............................................................52

*Butler Aviation Int'l v. Whyte (In re Fairchild Aircraft Corp.)*,
 6 F.3d 1119 (5th Cir. 1993)................................................................35

*Coker v. Coker*,
 650 S.W.2d 391 (Tex. 1983) ..............................................................39

*Coury v. Moss*,
 529 F.3d 579 (5th Cir. 2008)..............................................................44

*EWB-I, LLC v. PlazAmericas Mall Tex., LLC*,
 527 S.W.3d 447 (Tex. App. 2017) ......................................................52

*FDIC v. Mijalis*,
 15 F.3d 1314 (5th Cir. 1994)..............................................................42

*Foulston Siefkin LLP v. Wells Fargo Bank of Tex. N.A.*,
 465 F.3d 211 (5th Cir. 2006)..............................................................38

*Guzman v. Hacienda Records & Recording Studio, Inc.*,
 808 F.3d 1031 (5th Cir. 2015)............................................................36

*Hess Corp. v. Schlumberger Tech. Corp.*,
 26 F.4th 229 (5th Cir. 2022)...............................................................36

*Krueger v. Torres (In re Krueger)*,
 812 F.3d 365 (5th Cir. 2016)..............................................................35

*McLane Foodservice, Inc. v. Table Rock Rests., L.L.C.*,
 736 F.3d 375 (5th Cir. 2013)..............................................................38

*Millgard Corp. v. McKee/Mays*,
 49 F.3d 1070 (5th Cir. 1995)..............................................................39

*Musgrove v. Westridge St. Partners I, LLC*,
   No. 2-07-281-CV, 2009 WL 976010
   (Tex. App. April 9, 2009)...................................................................52

*Nichols v. Enterasys Networks, Inc.*,
   495 F.3d 185 (5th Cir. 2007)............................................................43

*Opelousas Gen. Hosp. Auth. v. FairPay Sols., Inc.*,
   655 F.3d 358 (5th Cir. 2011)............................................................43

*Sandifer v. Gusman*,
   637 F. App'x 117 (5th Cir. 2015).....................................................43

*Sedona Contr., Inc. v. Ford, Powell & Carson, Inc.*,
   995 S.W.2d 192 (Tex. App. 1999) ..................................................51

*Shields Ltd. P'ship v. Bradberry*,
   526 S.W.3d 471 (Tex. 2017) ............................................... 52, 53, 54

*Sojitz Energy Venture, Inc. v. Union Oil Co.*,
   394 F. Supp. 3d 687 (S.D. Tex. 2019)..............................................48

*Tolar v. Allstate Tex. Lloyd's Co.*,
   772 F. Supp. 2d 825 (N.D. Tex. 2011)..............................................39

*Trendsetter HR L.L.C. v. Zurich Am. Ins. Co.*
   *(In re Trendsetter HR L.L.C.)*,
   949 F.3d 905 (5th Cir. 2020)............................................................35

*United Services Automobile Association*,
   No. 03-19-00292-CV, 2020 WL 7640145
   (Tex. App. Dec. 23, 2020)...............................................................54

*United States v. Bates*,
   240 F.3d 1073 (5th Cir. 2000)..........................................................42

*United States v. Lindell*,
   881 F.2d 1313 (5th Cir. 1989)..........................................................43

*United States v. Scroggins*,
   599 F.3d 433 (5th Cir. 2010)............................................................43

*United States v. Upton*,
   91 F.3d 677 (5th Cir. 1996)..............................................................39

*URI, Inc. v. Kleberg Cnty.*,
   543 S.W.3d 755 (Tex. 2018) ..................................................... 41, 46

*Washington v. Thaler*,
   CIV. A. H-09-3937, 2011 WL 1157451 (S.D. Tex. Mar. 28, 2011) ..................42

DOCS_NY:47167.23 36027/003

*Watkins v. Petro-Search, Inc.*,
689 F.2d 537 (5th Cir. 1982) ................................................................. 36, 37, 41

## **RULES**

FED. R. APP. P. 28(a)(8) .......................................................................................... 41

DOCS_NY:47167.23 36027/003

# I.   <u>ISSUES PRESENTED</u>

1.      Whether the Bankruptcy Court properly determined that the PRAs unambiguously required the Advisors to pay Highland a fixed monthly fee?

2.      Whether the Bankruptcy Court properly determined that Highland had no obligation to unilaterally modify the fixed monthly amount (*i.e.*, "Actual Costs") on the Advisors' behalf as Dual Employees were terminated?

3.      Whether the Bankruptcy Court's factual finding that the Advisors never requested to modify the PRAs should be affirmed as not clearly erroneous?

4.      Whether the Bankruptcy Court's factual finding that the Advisors failed to prove their breach of contract claim against Highland should be affirmed as not clearly erroneous?

5.      Whether the Bankruptcy Court properly found that, even if the Advisors had valid claims under the Agreements, the claims were waived?

6.      Whether the Bankruptcy Court's finding that the Advisors breached the Agreements by failing to pay Highland amounts due and owing under the Agreements should be affirmed as not clearly erroneous?

DOCS_NY:47167.23 36027/003

## II.   <u>SUMMARY OF ARGUMENT</u>

The Bankruptcy Court properly denied the Advisors' administrative expense claim for (a) overpayments under the SSAs and PRAs, and (b) breach of contract under the SSAs.

The Bankruptcy Court properly found that there were no overpayments under the PRAs.  The PRAs unambiguously required the Advisors to pay flat monthly fees in exchange for front-office services where the PRAs defined "Actual Cost" as a fixed monthly dollar amount unless the parties agreed to modify this amount in writing pursuant to Section 2.02.  Highland also had no obligation to unilaterally modify the fixed monthly amount (*i.e.*, "Actual Costs") on the Advisors' behalf as Dual Employees were terminated, where (a) no provision imposed such an obligation, and (b) Sections 2.02 and 4.02 provided the exclusive mechanisms for modifying the amounts due and expressly required the parties' agreement.  The Bankruptcy Court's factual finding that the Advisors never requested to modify the PRAs should be affirmed as not clearly erroneous where (a) the Advisors' CFO testified that he did not recall discussing the need to amend the PRAs, and (b) there is no evidence that the Advisors ever made a written request for modification.

The Bankruptcy Court's factual finding that the Advisors failed to prove their breach of contract claim against Highland should also be affirmed as not clearly erroneous where the Advisors failed to prove the elements of breach and damages.

2

The only compliance service Highland refused to perform related to a single transaction (OmniMax) that presented conflict issues.  As disclosed in the Retail Board Minutes and Highland's invoices, the parties then consensually addressed potential conflict issues by (i) transferring a compliance officer from Highland to NexPoint and (ii) reducing the fees owed under the SSAs.  The Advisors failed to prove that their alleged "damages" were caused by Highland's alleged non-performance under the SSAs or were otherwise material.

The Bankruptcy Court properly found that, even if the Advisors had valid claims under the Agreements, the claims were waived, where (a) the Advisors' CFO approved the payment of fixed, flat monthly fees for 35 consecutive months while knowing of the departure of each Dual Employee, intentional conduct inconsistent with the assertion of (allegedly) known rights, and (b) the general non-waiver provisions therein did not specify that such affirmative conduct would be covered.

The Bankruptcy Court's finding that the Advisors breached the Agreements by failing to pay Highland amounts due and owing under the Agreements should be affirmed as not clearly erroneous.  The evidence proved that: (a) valid agreements existed; (b) Highland performed its obligations thereunder; (c) the Advisors failed to pay amounts due and owing; and (d) damages were calculable.

DOCS_NY:47167.23 36027/003

## III.   **STATEMENT OF THE CASE**[1]

### A.   **Introduction**

This appeal concerns the parties' competing claims arising under four separate service agreements entered into between Highland Capital Management, L.P. ("Highland") and appellants NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA," and with NexPoint, the "Advisors"): (a) two Shared Services Agreements (one between Highland and each of the Advisors (the "SSAs")); and (b) two Payroll Reimbursement Agreements (one between Highland and each of the Advisors (the "PRAs," and with the SSAs, the "Agreements").

The Advisors asserted claims against Highland for (a) "overpayment" under the PRAs, (b) "overpayment" under the SSAs, and (c) breach of contract under the SSAs. With respect to their claims for "overpayment" under the PRAs, the Advisors contended that they were wrongfully charged their contractually allocable share of the "Actual Cost" of certain "Dual Employees" for "front-office" services who were no longer employed at Highland at certain times between October 16, 2019 (the date Highland filed for bankruptcy) and the end of 2020 (the "Relevant Period"). In their claims for overpayment and breach of the SSAs, the Advisors contended that during the last three months of the Relevant Period, Highland did not provide certain

---

[1] Citations to "R." are to the Record on Appeal.

DOCS_NY:47167.23 36027/003

undescribed legal and compliance services under the SSAs and therefore overcharged for such services.

In defense, Highland showed that the PRAs unambiguously required the Advisors to pay a flat monthly fee for investment advisory services—regardless of which "Dual Employees" actually performed those services—unless the parties agreed otherwise in writing. Highland also showed that if the PRAs were deemed ambiguous, parol evidence, the surrounding circumstances, and the parties' uninterrupted course of dealing proved that the parties intended the Advisors would pay a flat monthly fee for investment advisory services, unless modified in writing. Highland also proved that, even if the Advisors could somehow be found to have "overpaid" under the PRAs, such claims were waived, because the Advisors' Treasurer personally authorized all payments under the PRAs during the Relevant Period with knowledge that certain "Dual Employees" were no longer employed by Highland (in some cases, since before he signed the PSAs).

Highland also asserted affirmative claims against the Advisors for breach of contract arising from the Advisors' failure to pay required amounts due under the SSAs and PRAs from November 2020 through January 2021.

**B.    Procedural History**

On January 24, 2021, the Advisors filed their *Application for Allowance of Administrative Claim* in Highland's underlying bankruptcy case (the "Admin Claim"), asserting claims against Highland for alleged post-petition overpayments

5

under the PRAs and SSAs and breaches of the SSAs. The Advisors originally sought up to $14 million on account of their administrative claims. R.448-460. In May 2021, Highland objected to the Advisors' Admin Claim. R.461-480.

On February 17, 2021, Highland filed its *Verified Original Complaint for Damages and for Declaratory and Injunctive Relief* (the "Complaint") in Adv. Proc. No. 21-03010-sgj (the "Adversary Proceeding"), asserting breach of contract claims against the Advisors arising from their failure to pay for services rendered under the Agreements. R.28-115. In August 2021, the Admin Claim and Highland's breach of contract claims (together, the "Claims") were consolidated in the Adversary Proceeding. R.123-133.

The Bankruptcy Court held a trial on the Claims on April 12 and April 13, 2022, with closing arguments heard shortly thereafter (the "Trial"). *See* R.2482-2823, 2905-3143. All of Highland's exhibits, and Advisors' Exhibits A-Y and BB, CC, and DD, were admitted into evidence without objection. R.2910 at 6:14-20; R.355.

Six witnesses testified at trial: (1) James Dondero ("Dondero"), Highland's founder and former Chief Executive Officer ("CEO") who controls the Advisors; (2) Frank Waterhouse ("Waterhouse"), who simultaneously served as Highland's Chief Financial Officer ("CFO") and the Treasurer of each Advisor (R.2547-2549 at 66:10-68:3); (3) David Klos ("Klos"), Highland's Controller and Chief Accounting

6

Officer during the Relevant Period, who participated in the creation and administration of the Agreements and who reported directly to Waterhouse, (R.2968-2969 at 64:2-65:12); (4) James P. Seery, Jr. ("Seery"), a member of the Independent Board (defined below) and Highland's CEO since July 2020 (R.3095 at 36:5-13); (5) Dustin Norris ("Norris"), an officer of HCMFA, an employee of NexPoint, and a member of the Retail Board (defined below) (R.2726-2727 at 84:5-85:1); and (6) Ethan Powell ("Powell"), a member of the Retail Board (defined below) (R.3063 at 4:22-24).

On August 30, 2022, the Bankruptcy Court issued its order (the "Order") granting Highland's breach of contract claims against the Advisors and denying the Advisors' Admin Claim. R.264-323.

### C.   Case Background

#### 1.   The Bankruptcy Case

On October 16, 2019 (the "Petition Date"), Dondero caused Highland to file a voluntary petition for bankruptcy under chapter 11 of the Bankruptcy Code (the "Bankruptcy Case").  To avoid the appointment of a chapter 11 trustee, the Official Committee of Unsecured Creditors (the "Committee"), Highland, and Dondero agreed to a corporate governance settlement on January 9, 2020 (the "Governance Settlement"), pursuant to which Dondero relinquished control of Highland and resigned as Highland's CEO but remained at Highland as an unpaid employee and portfolio manager.  Three independent directors were appointed to govern Highland

7

(the "<u>Independent Board</u>"), including Seery.  In July 2020, Seery was appointed Highland's CEO and Chief Restructuring Officer. R.253-254.  In October 2020, after certain disputes arose, Dondero resigned from Highland as required under the Governance Settlement.  Highland's plan of reorganization was confirmed in February 2021 and went effective on August 11, 2021.  On August 19, 2022, the Fifth Circuit affirmed Highland's confirmation order in substantial part.

### 2.    The Advisors

Dondero owns and/or controls numerous non-Debtor entities that were formerly part of the Highland complex, including the Advisors. R.254 ¶ 35; R.2656 at 14:19-20. HCMFA's predecessor, Pyxis Capital, L.P. ("<u>Pyxis</u>"), was formed in or around February 2009, and NexPoint was formed in or around March 2012.  *See* R.255 ¶¶ 38-39; R.2656 at 14:19-20. The Advisors are registered investment advisors whose clients include, among others, certain retail funds (the "<u>Funds</u>"). R.254 ¶ 36.   The Advisors provide investment advisory services to the Funds pursuant to written investment advisory agreements (the "<u>Investment Advisory Agreements</u>"). R.254 ¶37.  The Investment Advisory Agreements are the Advisors' principal source of revenue.

### 3.    The Shared Services Agreements

Since their formation, the Advisors had few employees of their own (R.266-267, 271), so they obtained back- and middle- office services from Highland pursuant to the SSAs summarized below.

### i.    The HCMFA SSA

On February 9, 2012, Highland and HCMFA (then operating as Pyxis) entered into a *Shared Services Agreement*, effective as of December 15, 2011.  RA.1690-1703. On September 12, 2012, the parties executed an *Amended and Restated Shared Services Agreement*, effective as of December 15, 2011.  R.1704-1717. The parties subsequently entered into the *Second Amended and Restated Shared Services Agreement*, effective as of February 8, 2013 (the "HCMFA SSA"), which is one of the SSAs at issue.  R.362-375.

Under the HCMFA SSA, HCMFA agreed to pay Highland for certain "back- and middle- office" services (R.365 § 2.01) based on its allocable share of the "Actual Cost" of "Shared Services" and "Shared Assets" as those terms are defined in the HCFMA SSA. *See* R.366 § 4.01. To determine the amounts owed, (a) Highland was required to provide "Quarterly Reports" setting forth cost allocations and amounts paid during the applicable quarter; (b) the parties were to agree on the allocations set forth in the Quarterly Reports and prepare invoices; and (c) HCMFA was to pay the invoiced amounts within ten days. R.366-367 §§ 5.01, 5.02, and 5.03. As described below and in contrast to the NexPoint SSA and the PRAs, the HCMFA SSA was nominally structured as a variable rate contract, not a fixed fee contract; invoiced amounts generally landed in a tight range from $300,000 to $310,000 each month. R.000274.

### ii.      The NexPoint SSA

On June 5, 2013, Highland and NexPoint executed that certain *Shared Services Agreement*, effective as of January 1, 2013 (the "Original NexPoint SSA"). R.993-1006. The Original NexPoint SSA was modeled on the HCMFA SSA and covered the services—but the formula for determining NexPoint's allocable cost of "Shared Services" and "Shared Assets" was changed from monthly analyses of costs to a percentage of managed assets. R.997-998 §§ 4.01, 5.01, 5.02, and 5.03.

Highland and NexPoint subsequently executed an *Amended and Restated Shared Services Agreement*, effective as of January 1, 2018 (the "NexPoint SSA"), which is the other SSA at issue. R.376-395. This time, the "asset based" formula used to calculate payments due was replaced with a fixed "flat fee" arrangement whereby NexPoint agreed to pay Highland a flat monthly fee of $168,000. R.385 § 3.01; R.2979-2983 at 75:3-79:7. Waterhouse signed the NexPoint SSA on behalf of ***both*** Highland and NexPoint. R.395.

### 4.      The Payroll Reimbursement Agreements

In addition to the SSAs, Highland and each of the Advisors were parties to the Payroll Reimbursement Agreements. *See* R.419-426; R.430-437.  Pursuant to the PRAs, Highland provided "front office" investment advisory services to the Advisors in exchange for flat fees. A summary of the PRAs and the background leading to their execution is below.

10

i.   **Events Leading up to the PRAs: The Sub-Advisory Agreements**

Klos testified that, for the six years prior to 2018, Highland provided "front-office" services to the Advisors for free. R.2973-2975 at 69:1-71:19.  But, as Klos further testified, by late 2017, Highland was operating at a loss, and those losses were expected to increase in 2018.  R.2969 at 65:13-22.  To address Highland's mounting operating losses, and to reduce NexPoint's taxable income, Dondero instructed Highland's team to create a framework to prospectively increase to $6 million NexPoint's aggregate annual payments to Highland for services to be rendered.  R.2970-2975 at 65:23-71:19.

Three agreements were used to achieve Dondero's objective. *See* R.2970-2971 at 66:1-67:13; R.2114-2118.  ***First***, Waterhouse signed that certain *Sub-Advisory Agreement*, effective as of January 1, 2018 (the "Sub-Advisory Agreement"), on behalf of Highland and NexPoint pursuant to which Highland would provide "front-office" services (R.256 ¶48; R.400-418) in exchange for a flat monthly fee of $252,000. R.403 § 2(a)-(b).

***Second***, Waterhouse signed the NexPoint SSA, effective the same day as the Sub-Advisory Agreement (*i.e.*, January 1, 2018), pursuant to which Highland would provide certain shared services in exchange for a flat monthly fee of $168,000. *See* R.385 § 3.01.

11

*Third*, a NexPoint affiliate, NexPoint Real Estate Advisors ("NREA"), was to pay Highland a flat monthly fee of $80,000 for "back- and middle- office" services pursuant to a separate Shared Services Agreement (the "NREA SSA", and together with the NexPoint SSA and the NexPoint Sub-Advisory Agreement, the "NexPoint Agreements"). *See* R.2203 (email discussing the amounts to be paid by NREA and the Advisors); R.2551 at 70:13-17 (Waterhouse testimony concerning the same): R.2984 at 80:10-20 (Klos testimony concerning the same).

Under the NexPoint Agreements, NexPoint was to pay to Highland aggregate flat fees of $500,000 per month, or exactly $6 million per year, as Dondero instructed.  R.2972 at 68:4-25; R.2114-2118.  This framework was explained to Dondero. R.2971-2973 at 67:20-69:21.

Each year, Waterhouse and Klos prepared a report of Highland's past and projected financial performance (each, an "Annual Review") for Dondero and Mark Okada (Highland's co-founder). R.1891-1941 (2017/2018 Annual Review); R.2168-2184 (2018/2019 Annual Review); R.2185-2197 (2019/2020 Annual Review). Then, Dondero, Okada, Waterhouse, and Klos would meet in person to discuss the Annual Reviews.  R.2984-2986 at 80:21-82:11.

The 2017/2018 Annual Review was discussed on January 26, 2018 and disclosed that: (a) Highland was projected to incur operating losses of $12 million in 2018 (R.1893); (b) the $6 million in aggregate annual payments due to Highland

12

under the NexPoint Agreements was projected to remain fixed and unchanged each year through 2020 (R.1927, 1937); and (c) new hires, internal transfers, and terminations were made across the Highland platform (R.1920-1924, R.1939; R.2986-2996 at 82:12-92:17).[2]

> ### ii.    Highland's Revenue Stream Faces Unexpected Pressure and Highland Learns That the Sub-Advisory Agreement Is Not a Viable Structure for Providing Highland with Needed Cash

Immediately after Waterhouse and Klos presented the 2017/2018 Annual Review to Dondero and Okada, Highland faced new threats to its operating cash flow.  R.2999 at 95:2-14.  As Klos testified, on January 30, 2018, within days of this presentation, a former Highland employee named Joshua Terry commenced an involuntary bankruptcy case against Acis Capital Management, L.P. ("Acis") (Terry had obtained a large arbitration award against Acis but was unable to collect).  *Id.* at 95:2-23.

At that time, Acis was a Highland affiliate that managed certain collateralized loan obligations ("CLOs") and had its own sub-advisory and shared services agreements with Highland (the "Acis Agreements").  R.2990-2991 at 86:17-87:11.  As detailed in the 2017/2018 Annual Review, the Acis Agreements were a vital source of Highland's revenue (R.2991-2993 at 87:18-89:8), with Highland projected

---

[2] The 2017/2018 Annual Review ***did not*** contemplate that HCMFA would pay for sub-advisory services R.2995-2996 at 91:24-92:1.

to receive almost $10 million in revenue in 2018 alone under the Acis Agreements—
Highland's second largest source of revenue representing nearly 12% of its total
projected operating revenue. R.1926 ("Highland 2.0 CLOs" refers to the CLOs
managed by Acis); *see also* R.2992 at 88:2-13. The threat presented from the
potential loss of Acis's revenue extended well beyond 2018 because Highland had
intended to "reset" the Acis CLOs to extend the reinvestment period and maturity
by more than two years, which would have provided several years of reliable
revenue. R.1925 ("Acis CLOs 3-6 reset and extend investment period and maturity
by 2.25 years"); *see also* R.2990-2991 at 86:17-87:11.

Thus, the Acis bankruptcy threatened Highland with the loss of over $20
million in projected revenue over the next 27 months and was an unexpected danger
to Highland's operating performance. Meanwhile, Highland continued to urgently
need cash. *See* R.2106-2107 (Waterhouse explaining Highland's "urgency to create
liquidity").

To address these problems, Klos and his team were directed in early March to
create yet another inter-company agreement, this time adopting a Sub-Advisory
Agreement for HCMFA with a flat monthly fee of $450,000, retroactive to January
1, 2018. *See* R.2999-3000 at 95:2-96:20. According to Klos, this additional fee
would "mitigate[] some of the loss that [Highland] would be experiencing." R.2999-
3000 at 95:24-96:4. A week later, a draft Sub-Advisory Agreement modeled after

14

the NexPoint Sub-Advisory Agreement was prepared for HCMFA. *See* R.1942-1945.  Again, for the approximately half-decade before the Sub-Advisory Agreements were created, Highland provided front-office services to HCMFA for free.[3]

After Klos and Dondero discussed "duplicating that NexPoint subadvisory agreement for HCMFA," Highland learned that the Sub-Advisory Agreement structure was "not a viable option" for paying a flat fee for "front office" services because (a) the Retail Board needed to approve the Sub-Advisory Agreements during an in-person meeting; (b) the Retail Board's next in-person meeting would not be until June 2018; and (c) the Sub-Advisory Agreements could not be made retroactive to January 1, 2018. R.1942-1944 (e-mails from Lauren Thedford, an attorney employed by Highland who simultaneously served as Secretary of the Advisors); *see also* R.3001-3002 at 97:4-98:20 (Klos testifying to what he learned from Thedford).

As Klos credibly testified, this approval delay was untenable because Highland needed cash-flow immediately and could not wait until June 2018. R.3003-3004 at 99:18-100:5.  Klos noted that these issues concerned related affiliates, explaining that "this is all in the spirit of one big happy family, one complex, so the

---

[3] HCMFA attempted to dispute this fact, suggesting (without support) that it had previously paid for "front office" services under the SSA.  But if that was true, why would HCMFA suddenly agree to pay an additional $450,000 per month for the same services, with no changes to the SSA?

15

whole exercise itself seems somewhat silly, for someone who just wants to move money from his right pocket to his left pocket, to have to go through all this brain damage…." *Id.*

Ultimately, as Klos explained, the parties concluded that the contemplated Sub-Advisory Agreement structure could not be adopted because Highland would have to forego six months' of needed revenue. *See id.* Another method was needed to overcome these obstacles—and the PRAs were born. *See* R.3003-3004 at 99:16-100:13.

### iii.   The Payroll Reimbursement Agreements Replace the Sub-Advisory Agreements

In April 2018, Highland drafted a Payroll Reimbursement Agreement that did not require the Retail Board's approval and could be made retroactive to the beginning of the year. *See* R.2108-2113. After reviewing the draft PRA, Klos expressed concerns about tying the Advisors' payments to an assessment of "actual costs" for "Dual Employees," writing to Thedford that:

> Does it have to be framed as reimbursement of actual costs? ***We'd much rather it be characterized as just an agreed upon amount between the two entities***. It's not a small task and involves subjective assumptions to allocate individual employees, so as it's written, ***it would be creating a ton of internal work that isn't creating any value to the overall complex***.

*Id.* (Klos e-mail sent on April 17, 2018, at 10:48 a.m.) (emphasis added); R.3004-3005 at 100:10-101:25.

16

Thedford was "open" to changing the "definition of Actual Costs" but observed that there "need[ed] to be some method of determining the amounts" and that it was "important" to treat the agreement as one for "reimbursement." *Id.* (Thedford email sent on April 17, 2018 at 10:49am). Klos replied:

> Could we say that Actual Cost is being determined ***at the outset of the agreement, have a schedule as of Jan 1, 2018 and say that Actual Cost shall be as set out in that schedule and shall be paid in monthly installments for the term of the agreement . . . that way the exercise is only performed once.***
>
> Beyond that year, termination provisions kick-in, so if there's a belief that Actual Costs have changed materially, either party could terminate and/or renegotiate for an amended agreement.

*Id.* (Klos email sent on April 17, 2018, at 10:56 a.m.). *See also* R.3006-3010 at 102:1-106:16.

Thedford thought Klos' approach was "workable" and asked Klos if he had a "methodology for the outset determination." (April 17 email from Thedford to Klos at 5:23 p.m.). Klos subsequently created a list of employees and allocations with "fully loaded compensation" that was based solely on his own subjective views. R.3009-3010 at 105:6-106:16; R.2108-2113.

With these issues resolved and the parties' intent clear, on or around May 1, 2018, Highland and NexPoint entered into that certain *Payroll Reimbursement Agreement*, effective as of January 1, 2018 (the "NexPoint PRA"), and Highland and HCMFA entered into that certain *Payroll Reimbursement Agreement*, effective as of January 1, 2018 (the "HCMFA PRA"). R.419-426 (NexPoint PRA); R.430-437

(HCMFA PRA). The PRAs were identical except for the (a) names of the parties, (b) the monthly fees due thereunder, and (c) the list of Dual Employees and their respective allocations "as of January 1, 2018" set forth in Exhibit A.[4]

As Klos and Thedford agreed, the PRAs unambiguously required the Advisors to pay a fixed flat monthly fee for investment advisory services unless the parties agreed otherwise in writing. Pursuant to Section 2.01 of the PRAs, the Advisors were required to pay Highland the "Actual Cost" to HCMLP for certain Dual Employees (as defined in the PRAs). R.421 (NexPoint PRA) §§ 2.01, 3.01; R.432 (HCMFA PRA) §§ 2.01, 3.01.  The PRAs defined "Actual Cost" as:

> "***Actual Cost***" means, with respect to any period hereunder, the actual costs and expenses caused by, incurred, or otherwise arising from or relating to each Dual Employee, in each case during such period. ***Absent any changes to employee reimbursement, as set forth in Section 2.02, such costs and expenses are equal to [$252,000 for NexPoint, and $416,000 for HCMFA] per month***.

R.420 (NexPoint monthly fee fixed at $252,000); R.431 (HCMFA monthly fee fixed at $416,000) (emphasis added).

Under Section 2.02, the parties could agree to modify the "Allocation Percentage (defined [in each PRA]) applicable to such Dual Employee to reflect the then current fair market value of such Dual Employee's employment." R.421 (NexPoint PRA) § 2.02; R.432 (HCMFA PRA) § 2.02. *See also* R.421 (NexPoint

---

[4] Even though Exhibit A was prepared "as of January 1, 2018," it was never updated even though the Advisors knew that numerous Dual Employees were terminated. R.3010-3014 at 106:20-110-19; R.3018 at 114:4-25.

18

PRA) § 4.02 ("Should either Party determine that a change to employee reimbursement is appropriate, as set forth in Section 2.02, the Party requesting the modification shall notify the other Party on or before the last business day of the calendar month"); R.432 (HCMFA PRA) § 4.02 (same).[5]

Klos testified that the aggregate allocated costs for the "Dual Employees" listed on Exhibit A were structured to equal the flat monthly fees contemplated under the abandoned Sub-Advisory Agreements (R.3008 at 104:9-24) and were a proxy for the fees previously mandated by Dondero. R.3008-3010 at 104:19-106:16.

Klos' unchallenged testimony that payments under the PRAs were intended to be "flat fees" and not reflective of the "actual cost" (with lower case letters) of the Dual Employees is consistent with the plain terms of Section 2.01 and was corroborated by substantial evidence, including the Advisors' admissions:

- The Advisors acknowledged that Highland terminated four (4) Dual Employees between January 1, 2018 (the effective date of each PRA) and May 1, 2018 (the date each PRA was signed) (R.504-505 (response to interrogatory 3));

- The Advisors knew when each Dual Employee was terminated or departed as it occurred (R.505 (response to interrogatory 4));

- Waterhouse, who signed the PRAs on behalf of the Advisors, "understood that the [PRAs] included the compensation for every one of the employees on

---

[5] All notices under the PRAs had to be in writing. R.421 (NexPoint PRA) § 6.10; R.432 (HCMFA PRA) § 6.10.  Other than the PRA Amendments (as defined below), no evidence exists that any party ever gave written notice under Section 2.02 or 4.02 requesting a change to employee reimbursement.

Exhibit A regardless of whether or not they were terminated." R.2592-2593 at 111:22-112:5; and

- Despite knowing that four Dual Employees included on Exhibit A were not employed by Highland as of May 1, 2018, the Advisors signed the PRAs without seeking any adjustment of the "Actual Costs" under Section 2.02. R.2592-2593 at 111:22-112:13.

Based on this indisputable evidence, the Advisors signed the PRAs knowing that the agreed-upon fixed amount of "Actual Costs" were structured with reference to Dual Employees who were not employed by Highland and therefore could not have been part of a calculation of the "actual cost" (lower case) of Dual Employees employed by Highland on the date the PRAs were executed or any time thereafter.

## iv.   The PRAs Are Amended in December 2018

Klos testified that (a) by December 2018, Highland was operating at a "massive operating loss" and "losing money hand over fist," while the Advisors were generating profits; (b) during a meeting with Dondero and Waterhouse, concerns were expressed regarding the high tax liability being generated from the Advisors' operations; and (c) to address these concerns, a decision was made to amend the PRAs and have the Advisors make additional lump sum payments to Highland in the aggregate amount of $2.5 million. R.3015-17 at 110:20-113:21.

On December 14, 2018, "[i]n accordance with Section 2.02," (a) Highland and NexPoint executed that certain *Amendment Number One to Payroll Reimbursement Agreement* (the "NexPoint PRA Amendment"), pursuant to which NexPoint paid Highland $1.3 million, and (b) Highland and HCMFA executed that

20

certain *Amendment Number One to Payroll Reimbursement Agreement* (the "HCMFA PRA Amendment", and together with the NexPoint PRA Amendment, the "PRA Amendments"), pursuant to which HCMFA paid Highland $1.2 million. R.427-429 (NexPoint PRA Amendment); R.438-440 (HCMFA PRA Amendment). Waterhouse executed the PRA Amendments on behalf of ***both*** the Advisors and Highland. R.429; R.440.

According to Klos, (a) Exhibit A was not amended as part of the PRA Amendments; (b) the payments required by the PRA Amendments were not based on any analysis of Highland's "actual cost" of services; (c) no one "took any steps to try to determine [Highland's] actual costs of providing front office services before signing this;" and (d) the PRA Amendments were not based on any "true ups." (R.3016-3017 at 112:1-113:21; *see also* R.3039-3040 at 135:22-136:2). Rather, the PRA Amendments were a "mechanism to send another $2-1/2 million of cash…from these Advisors" in a manner consistent with the general "view of who's making money and who's not making money." (*Id.* at 112:18-113:14).[6]

Although Norris testified that he was told in December 2020 that the PRA Amendments were the result of a "true up," he admitted that he played no role in the

---

[6] At the time, Highland was generating negative cash flow, while NPA and HCMFA were generating positive cash flow, all while providing substantially the same services with substantially the same people, in the same office space, to substantially similar investment vehicles. In context, the notion of NPA and HCMFA paying additional compensation to Highland was eminently reasonable.

drafting, administration, or decision-making concerning those Amendments and had "no personal knowledge" as to how the amounts set forth in the PRA Amendments were calculated. R.2730-2731 at 88:14-89:3. No evidence exists to corroborate Norris' testimony.[7]

Moreover, the indisputable evidence renders the concept of a "true up" implausible.  By December 1, 2018 (two weeks before Waterhouse executed the PRA Amendments on behalf of the Advisors), the Advisors knew that ***nine of the original twenty-five Dual Employees listed in Exhibit A to the original PRAs (or, more than one-third) were no longer employed by Highland.*** R.504-505 (Advisors' responses to Interrogatories 3 and 4).  Yet, with this knowledge, ***the Advisors agreed to pay Highland an additional 25% and 43%, respectively,*** under the PRA Amendments.[8]  Simple arithmetic shows that the PRA Amendments were not based on "actual costs" and that the concept of a "true up" is folly.

### v.      In January 2020, Klos Confirmed That the PRAs Were "Flat Fees for Services" Arrangements

Other evidence further proves that the Advisors knew they were reimbursing Highland for front-office services by paying flat monthly fees.

---

[7] Klos disputed Norris' testimony (R.3016-3017 at 112:11-113:21) and Waterhouse—the Advisors' Treasurer—could not corroborate it. R.2621-2622 at 140:24-141:3.

[8] HCMFA's $1,200,000 payment under its PRA Amendment was approximately 25% of the $4,992,000 due each year under its PRA (*i.e.*, $416,000 per month for 12 months). NexPoint's $1,300,000 payment under its PRA Amendment was approximately 43% of the $3,024,000 due each year under its PRA (*i.e.*, $252,000 per month for 12 months).

In January 2020 (the month Dondero ceded control to the Independent Board under the Corporate Governance Agreement), in response to inquiries from the Retail Board, Thedford sought information concerning expense reimbursements and allocations under the PRAs. After Klos told Thedford that such information "doesn't exist in terms of current percentages," Thedford asked Klos whether such information was contained in Exhibit A to the PRAs. Klos reminded Thedford that the allocations in Exhibit A were:

> *a point in time estimate as of 2018. Half the people are gone now and if you were to re-allocate them now, all the percentages would be different.* On top of that, we don't have anything comprehensive that is comparable for back office people, so the only thing we can really provide is a stale percentage on a small subset of the overall population.
>
> Would be much more logical to do the yes/no and then as *a blanket statement say that HCMFA/NPA pay $x/$y annually to HCMLP for these employees' services.*

R.2218-2220. Thedford responded, "Got it, thanks." R.2218.

Later in January, in response to Waterhouse's request for information concerning the "monthly amount for each agreement." Klos confirmed the fixed amounts due under the Agreements:

Monthly amounts below

HCMFA

$416k *flat* for investment support

$290k-300k for shared services

NPA

23

$252k *flat* for investment support

$248k *flat* for shared services ($168k from NPA directly; $80k from NREA, but assume you're looking for a consolidated number)

R.2203.

There is no evidence that Waterhouse ever disputed the fixed nature of the monthly amounts being charged and, in fact, he continued approving payments in these exact amounts until December 2020, when Dondero instructed him to stop. This is not surprising since, as both Waterhouse and Klos testified, it would have been nearly impossible to calculate "actual costs" associated with each Dual Employee's individual time working for the Advisors. *See* R.2565-2566 at 84:16-85:25; R.3009-3010 at 105:6-106:19.

> **vi.** **The Advisors Knowingly Made All Payments Under the Agreements Until Highland Gave Notice of Termination on or Around November 30, 2020**

Each of the payments the Advisors made under the Agreements between January and November 2020 (when the newly appointed Independent Board controlled Highland) were exactly the same (or, in the case of the HCMFA SSA, utilized the exact same methodology) as the payments that the Advisors made under the Agreements between January 1, 2018, and December 31, 2019 (when Dondero controlled Highland and the Advisors). R.298; R.2561 at 80:6-10; R.3019-3020 at 115:1-116:8.

24

Extensive evidence further establishes that the Advisors knew of the payments being made under the Agreements. For instance: (a) the Agreements (with the exception of the NexPoint SSA) were signed by Waterhouse (the Advisors' Treasurer) and specified the fixed monthly amounts to be paid (R.385 § 3.01, R.420 (definition of "Actual Costs"); and R.431 (definition of "Actual Costs"); (b) Highland sought Waterhouse's permission before making payments under the Agreements (*see, e.g.*, R.2205, 2222 (emails showing Waterhouse approving payments); R.2967 at 63:2-22); (c) Waterhouse admitted that, as an officer and the Treasurer of the Advisors, he was responsible for ensuring the Advisors paid the proper amounts under the Agreements (R.2550-2552 at 69:13-71:2); (d) Klos reminded Waterhouse in January 2020 of the "flat" monthly fees being charged (R.2203); and (e) the Advisors represented to the Retail Board in late October 2020 that "[a]ll amounts owed by each of NPA and HCMFA pursuant to the shared services arrangement ha[d] been paid." (R.931, response to Question 2).[9]

Moreover, the monthly payments made under the NexPoint Agreements were consistent with (a) Dondero's determination that the total annual payment for Highland's services was to be fixed at $6 million (R.1927) (forecast assumed that "NexPoint and subs [would pay Highland] $6 million/year subadvisory + shared

---

[9] The Advisors disingenuously suggest that their representations to the Retail Board were narrowly limited to the SSAs.  But the PRAs were also "shared services" agreements and the Retail Board Minutes (as defined below) are replete with references to "shared services arrangements" and Dual Employees.

services"); and (b) the projections for 2018, 2019, and 2020 (except December 2020), (*see* R.1937) (projecting annual payments of $3,024,000 for sub-advisory fees (*i.e.*, $252,000 per month) and annual payments of $2,976,000 for shared services (*i.e.*, $168,000 per month for shared services for NexPoint and $80,000 per month for shared services for NREA), which together yield $6 million in annual fees).

Finally, in April 2020, Dondero was provided with written forecasts showing that NexPoint was projected to pay Highland exactly $500,000 per month (or, again, $6 million on an annualized basis) through December 2020. *See* R.2215-2216.

### vii.   <u>Highland Performed Its Obligations Under the Agreements</u>

Extensive evidence established that Highland performed its obligations under the Agreements, including (a) Waterhouse's testimony (R.2635 at 154:10-24), and (b) the Advisors' repeated representations—both before and after the Advisors allegedly learned of "overpayments"—to the Retail Board.[10]

---

[10] The Advisors never claimed that Highland breached the PRAs by failing to provide front-office services. They claim only that they "overpaid" under the PRAs because certain Dual Employees were not employed by Highland for all or a portion of the post-petition period. The evidence established that while certain Dual Employees on Exhibit A left Highland's employ before and after the PRAs were executed, Highland either hired new employees who provided front-office, investment advisory services or existing employees took on expanded responsibilities in that area. R. 3046-3051 at 142:19-147:24; R.3025 at 121:2-6; R.2536 at 55:7-17. Had Highland failed to provide front-office, investment advisory services, the Advisors would have been unable to perform their obligations under the Investment Management Agreements.

26

Each year, the Retail Board conducts what is known as a "15(c) review" to determine whether to extend the Advisors' Investment Advisory Agreements. R.3071 at 12:7-21. As part of the 15(c) review, and at other times during Highland's bankruptcy case, the Advisors provided the Retail Board with extensive information concerning Highland's compliance with, and the Advisors' payments under, the Agreements as well as contingency planning in case the Agreements were terminated. Minutes from the Retail Board meetings (the "Retail Board Meetings") were created and adopted in the ordinary course (the "Retail Board Minutes")[11] but only after the Advisors had an opportunity to review and edit them to assure their accuracy. R.3068-3069 at 9:15-10:24.

The Retail Board Minutes reflect that at least one of the Advisors' officers (*i.e.*, Waterhouse, Norris, Thedford, or Post) or their attorneys (*e.g.*, Dennis C. Sauter, the Advisors' in-house counsel) participated in every Retail Board Meeting from January 2020-February 2021. *See* R.1720-1838 (Retail Board Minutes). The Retail Board relied on the Advisors' statements made during Retail Board Meetings and believed they were made on an informed basis. *See* R.3070-3072 at 11:22-12:6, 13:1-13.

The information tendered by the Advisors to the Retail Board throughout 2020 concerning the Agreements included:

---

[11] *See generally* R.1720-1838 (Retail Board Minutes from January 2020-February 2021).

- Information concerning employees (including "dual employees") associated with Highland and the Advisors, as well as staffing levels generally;[12]

- Assurances that ***the Advisors were monitoring the level and quality of services that Highland was providing***;[13]

- Representations that ***Highland's bankruptcy did not cause any service disruptions***;[14]

- Statements that ***the level of services that Highland was providing were consistent with historical levels***;[15]

- Pledges that contingency plans were being created to ensure that there would be "no disruption in services" if Highland's bankruptcy caused the Advisors to seek services elsewhere;[16]

---

[12] R.1721-1722 ("Thedford noted that the Meeting Materials included a headcount report that lists each employee associated with HCMLP and the Advisers and identifies whether the employee is dually employed by both HCMLP and an Adviser"); R.1841-1845 (the Retail Board was provided with a list of every person employed in the Highland complex, including whether the person was a Dual Employee and whether the person was an "investment professional" or was providing "back office services."); R.1770 (Collins told the Retail Board that "he was confident in the firm's ability to retain talent throughout this process based on discussions with the employees. He noted that every employee team leader had been spoken to and also noted that there have been no significant departures to date").

[13] R.1733 (Post told that Retail Board that "the level and quality of services [provided by Highland] are being monitored and confirmed that he is not aware of any disruptions in the service levels provided to the Funds").

[14] *See, e.g.*, R.1740 (Norris "noted that there had been no issues or disruptions in services as a result of the HCMLP bankruptcy matter"). *See also* R.1754-1755; R.1770 ("The Advisers represented that the quality and level of services provided to the Funds by the Advisers and pursuant to the shared services arrangements had not been negatively impacted to date."); R.1782 ("Mr. Norris then noted that there has not been any disruption to the services provided to the Funds by HCMLP pursuant to the Shared Services Agreement and that he expects that such services will continue to be provided in normal course").

[15] R.908 (memorandum stating that the "Advisors and HCMLP believe the current shared services being provided are generally consistent with the level of service that historically been received").

[16] R.1866 (Retail Board told that NexPoint's "backup/contingency plan is to extend employment offers to the vast majority of HCMLP's employees by 12/31/2020. This will help ensure that there is no disruption in services to the Funds."); R.1764 (contingency plans were "in place to continue to provide the same level and quality of services to the Funds").

- Representations that ***the Advisors had paid Highland all amounts due under the shared services arrangements***;[17]

- Assurances that after Highland exercised its contractual right to terminate the Agreements on 60 days' notice, an orderly transition would be arranged to avoid any disruption in service;[18]

- Assurances in January 2021 that the Advisors continued to have access to all necessary information needed to service the Funds;[19]

- Acknowledgment that ***Highland "may require the Advisors and affiliate advisors to pay previously unpaid fees*** allegedly owed to HCM totaling" more than five million dollars;[20] and

- Representations that counsel was "***reviewing potential legal remedies in the event HCM breaches the shared services*** by denying us access to our data held by HCM or otherwise attempts to cause harm to our shareholders."[21]

Perhaps most tellingly, in early 2022 (about a year after the Admin Claim was filed), the NexPoint Diversified Real Estate Trust (one of the Advisors' Clients) filed its annual report with the SEC stating, among other things, that: "The Board of Trustees noted that ***the level and quality of services to the Fund by [NexPoint] and its affiliates had not been materially impacted by the HCMLP bankruptcy***…." R.1860 (emphasis added).

---

[17] R.931 (the Advisors informed the Retail Board that "[a]ll amounts owed by each of NexPoint and HCMFA pursuant to the shared services arrangement with HCMLP have been paid as of the date of this letter.").

[18] R.442 (a specified group of individuals acting on the Advisors' behalf was "working with HCMLP management to ensure an orderly transition"); R.442-43 (question 2); R.1789-1790.

[19] R.1799 ("the Advisers did not feel limited by the temporary restraining orders relating to the HCMLP bankruptcy with respect to access to Fund information").

[20] R.1877 (emphasis added).

[21] R.1877-1878 (emphasis added).

29

### viii.   The Advisors Knew When All Dual Employees Left Highland

The overwhelming and undisputed evidence at trial—including the Advisors' responses to interrogatories—proved that the Advisors had contemporaneous knowledge of when all employees in the Highland complex, including the Dual Employees, were hired and terminated. R.504-505 (Advisors' responses to Interrogatories 3 and 4).

From at least October 2017 through January 2021, Highland's Human Resources department prepared a "Monthly Headcount Report" (the "Monthly Headcount Reports") that listed every employee in the Highland complex, identified recent hires and terminations, and was distributed to the Advisors' officers (*i.e.*, Waterhouse, Thedford, and Norris). R.1946-2105.[22]

Dondero was given extensive information concerning hires, terminations, and employee compensation during the Annual Reviews. *See* R.1920-1924; R.2174-2178.  Indeed, until he ceded control of Highland, Dondero personally made all employee compensation decisions. R.2582-83 at 101:6-102:23.

For his part, Waterhouse admitted that he (a) knew when employees in the Highland complex were hired and fired, (b) received the Monthly Headcount

---

[22]  The Advisors were thus able to provide information concerning Highland's employees to the Retail Board in January 2020. R.1720-1723; R.1841-1845

Reports, and (c) discussed employee hirings, terminations, and compensation with Dondero. R.2581-83 at 100:17-102:24; R.2584-86 at 103:2-105:12.

With this information in hand, the Advisors continued to approve and make the same monthly payments under the PRAs, regardless of whether Dondero or the Independent Board controlled Highland.  In fact, in December 2018, the Advisors paid Highland an additional aggregate flat fee of $2.5 million under the PRA Amendments despite knowing that nine of the twenty-five Dual Employees on Exhibit A had already been terminated.

The Advisors' claim that they were only supposed to pay the allocated cost of the Dual Employees listed on Exhibit A cannot be reconciled with their continued payment of the flat monthly fees while knowing that many of the Dual Employees were no longer employed by Highland.

### ix. The Advisors Paid the Same Flat Fees Under the PRAs for 35 Months Until Dondero Instructed Them to Stop Immediately After Highland Gave Notice of Termination

The Advisors paid Highland "exactly the same amount per the agreements every single month" from the effective date of the PRAs (*i.e.*, January 1, 2018) through November 2020, a period of 35 months.[23] R.3019 at 115:1-18.

---

[23] According to Klos, the "one caveat" is that "because it was executed a few months in arrears, I think there was some sort of catch-up.  But notwithstanding that initial catch-up, it was exactly the same amount per the agreements every single month."  R. 3019 at 115:6-15.

On November 30, 2020, promptly after the Bankruptcy Court approved Highland's disclosure statement, Highland gave written notice of termination of the Shared Services Agreements,[24] as of January 31, 2021 (the "<u>Termination Date</u>"). R.2223-2226.[25]   In response, Dondero instructed Waterhouse to stop making any payments to Highland. *See* R.2601 at 120:8-20.   As a result, the Advisors failed to make payments under the Agreements in December 2020 and January 2021 (and, in the case of the HCMFA SSA, the month of November 2020, because the HCMFA SSA was typically paid in arrears). R.300.

Specifically: (a) HCMFA failed to pay for services rendered by Highland under (i) the HCMFA SSA during the months of November 2020, December 2020, and January 2021 in the aggregate amount of $924,000;[26] and (ii) the HCMFA PRA during the months of December 2020 and January 2021 in the aggregate amount of $832,000; and (b) NexPoint failed to pay for services rendered by Highland under (i) the NexPoint SSA during the months of December 2020 and January 2021 in the

---

[24] Although the PRAs were not included in the termination notices, Seery viewed the PRAs as "one in the same" with the Shared Services Agreements. In any event, (a) the PRAs were executory contracts that were rejected under Highland's Plan, and (b) Highland could never have continued to perform front office, investment advisory services because the employees providing those services were being terminated. *See* R.3121-3122 at 62:1-64:5.

[25] Because the Advisors needed more time to negotiate the terms of a transition services agreement, the Termination Date was extended twice.  R.255-256 ¶¶ 46-47.

[26] The HCMFA SSA was the only Agreement with a variable fee arrangement. Highland made this calculation by taking the most recent payment due in November of $308,000 and multiplying that number by three for the three months of nonpayment.

aggregate amount of $336,000; and (ii) the NexPoint PRA during the months of December 2020 and January 2021 in the aggregate amount of $504,000. R.319.

> **x.** **The Advisors Never Sought to Modify the PRAs Despite Their Contemporaneous Knowledge of Dual Employees' Departures**

Although Waterhouse vaguely testified that he raised the alleged issue of "overpayments" with Fred Caruso, an employee of Development Specialists, Inc. ("DSI") (Highland's restructuring advisors), in late 2019 (R.2786 at 144:2-16; R.2590-2592 at 109:12-111:3), the Advisors offered no corroborating evidence.[27]

That is not surprising, because Waterhouse's testimony was not credible. Although he supposedly raised the issue of "overpayments" with Caruso, Waterhouse also admitted that ***he did not contemporaneously inform Dondero or any of the Advisors' officers of the issue***.  He also failed to inform the Independent Board—even though they took control of Highland at around the same time and he met with them on a weekly basis to go over the 13-week forecasts that included the very payments at issue. R.2590-2600 at 109:18-119:1; 3095-97 at 36:10-39-11; 3102 at 43:10-13.  According to Waterhouse, he sat in silence because he "thought it was Mr. Caruso's responsibility."  R.2597 at 116:22-25.

---

[27] Waterhouse could not recall ever addressing the alleged "overpayment" issue in writing. R.2600-2601 at 119:2-120:3. Of course, the lack of a writing is fatal to the Advisors' contention that it gave notice of a request to modify under Section 4.02. R.422; R.433 (Section 6.10 of the PRAs requires notices to be in writing).

33

Separately, and incredibly, Waterhouse testified that in December 2020, he directed Klos to update an earlier document solely because he "like[s] to know numbers . . . it's kind of just my nature to be curious and, say, okay, well, we did an analysis last year.  Oh, you know, what is this number now, look like today?" R.2601-05 at 120:21-124:12.[28]  Based on the totality of his testimony, Waterhouse either fabricated the story concerning Caruso and "overpayments" or he completely abdicated his fiduciary duties to the Advisors.

The only aspect of Waterhouse's testimony on this topic that was credible was his admission that:

> nothing came of the meeting [with Caruso].  There were no changes or anything.  And I don't – ***I don't recall specifically talking about hey, you know, Highland needs to amend these agreements.***

R.2590-91 at 109:18-110:4 (emphasis added).

This uncontroverted testimony establishes that—contrary to the Advisors' contention—the Advisors never sought to modify the payments in accordance with the PRAs.[29]

---

[28] Klos prepared the original December 2019 analysis to convince the Committee not to seek immediate termination of the Agreements—not to prove "overpayments," as the Advisors now contend.  R.3020-3026 at 116:16-122:5.  Klos was therefore suspicious of Waterhouse's request a year later at such a contentious time in the case.  So Klos directly confronted Waterhouse and asked if he intended to use the new presentation against Highland; Waterhouse assured Klos that wasn't the case.  R.3044-3045 at 140:9-141:13.  At trial, Waterhouse declined to contradict Klos but was later forced to admit that he received "more than" $500,000 in post-petition, undisclosed payments from entities owned by Dondero or Ellington.  R.2605 at 124:13-24; 2638-9 at 157:12-158:5.

[29] Norris testified that in January 2021, Waterhouse told him of his alleged conversation with Caruso in late 2019.  But (a) Norris has no personal knowledge of the alleged conversation and (b)

34

# IV.   ARGUMENT

## A.   Standard of Review

A bankruptcy court's factual findings are reviewed for "clear error" and its legal conclusions are reviewed *de novo*. *Krueger v. Torres (In re Krueger)*, 812 F.3d 365, 369 (5th Cir. 2016); *Trendsetter HR L.L.C. v. Zurich Am. Ins. Co. (In re Trendsetter HR L.L.C.)*, 949 F.3d 905, 910 (5th Cir. 2020).  The "clearly erroneous" standard warrants reversal only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Butler Aviation Int'l v. Whyte* (*In re Fairchild Aircraft Corp.*), 6 F.3d 1119, 1128 (5th Cir. 1993); *see also Trendsetter*, 949 F.3d at 913.  Factual findings made during a bench trial deserve "great deference," and "even greater deference" when those findings are based on credibility determinations. *Hess Corp. v. Schlumberger Tech. Corp.*, 26 F.4th 229 (5th Cir. 2022); *see also Guzman v. Hacienda Records & Recording Studio, Inc.*, 808 F.3d 1031 (5th Cir. 2015) (same).

---

his contemporaneous notes to himself do not mention Caruso.  R.2471 (Norris' notes describe an "adversarial" conversation where, after Norris "pressed him," Waterhouse claimed that he had told "inside and outside counsel" of the alleged overpayments).

B.    **The Bankruptcy Court Properly Denied the Advisors' Claim for
Overpayments Under the PRAs**

1.    **The Bankruptcy Court Properly Determined That the
PRAs Mandated Fixed Monthly Fees as a Matter of Law**

Relying primarily on the term "reimburse," the Advisors contend that the
Bankruptcy Court improperly found that the PRAs unambiguously require the
Advisors to pay fixed monthly fee payments, as opposed to "costs actually incurred,"
in exchange for Highland's advisory services. Br. at 24-31.    The Advisors'
contention is without merit.

"Whether a contract is ambiguous is a question of law for the court to decide
by looking at the contract as a whole in light of the circumstances present when the
contract was entered into." *BCC Merch. Sols., Inc. v. Jet Pay, LLC*, 129 F. Supp.3d
440, 476 (N.D. Tex. 2015); *see also Watkins v. Petro-Search, Inc.*, 689 F.2d 537,
538 (5th Cir. 1982).  "If, in the light of the surrounding circumstances, the language
of the contract appears to be capable of only a single meaning, the court can then
confine itself to the writing." *Watkins*, 689 F.2d at 538.  A contract is unambiguous
and will be enforced as written where it is "susceptible to only one reasonable
construction." *BCC Merch. Sols.*, 129 F. Supp. 3d at 477.

Here, the Bankruptcy Court thoroughly analyzed each of the relevant terms of
the PRAs and properly concluded that, as a matter of law, the Advisors were required
to pay fixed monthly fees in exchange for front-office services until the parties
agreed otherwise. R.304-307. Although the term "Actual Cost" was used and Exhibit

36

A listed certain Dual Employees, the PRAs (a) defined "Actual Cost" "as equal to $252,000 per month for NexPoint and $416,000 per month for HCMFA," and (b) did not require any adjustment based on employee "comings-and-goings." Rather, "[t]he PRAs simply plugged in a decisive monthly amount." *Id*. at 42.

The Bankruptcy Court's reasoning was sound. In context, the PRAs unambiguously required payment of fixed monthly fees unless the parties agreed otherwise in writing:

- "Actual Cost" was a precise amount "*[a]bsent any changes* to employee reimbursement, as set forth in Section 2.02." R.419-426; R.430-437 (definition of "Actual Cost") (emphasis added);

- Under, Section 2.02, "the Parties *may* agree to" alter the terms of reimbursement, including "modifying the Allocation Percentage" (as defined) to "reflect the then current fair market value of such Dual Employee's employment" (*id*. ¶ 2.02) ;

- Under Section 4.02, each Party had the right to *request a modification of "Actual Cost"* by notifying the other Party "on or before the last business day of the calendar month" (*id*. ¶ 4.02); and

- The PRAs could only be amended "by agreement in writing of all Parties." *Id*. ¶ 6.02.

Taken as a whole, the only reasonable meaning of the defined term "Actual Cost" is a flat monthly fee that would remain fixed unless the Parties agreed otherwise in writing.

The Advisors' attempt to impose a contrary meaning—while ignoring the unambiguous definition of "Actual Cost" and three years of uninterrupted conduct

37

consistent with that definition—by focusing on the term "reimburse" is in vain, and the Advisors' case cites do not support their argument.  *See McLane Foodservice, Inc. v. Table Rock Rests., L.L.C.*, 736 F.3d 375 (5th Cir. 2013) (applying dictionary definition to term not defined in agreement so that none of the provisions will be "rendered meaningless"); *Foulston Siefkin LLP v. Wells Fargo Bank of Tex. N.A.*, 465 F.3d 211 (5th Cir. 2006) (dealing with whether trustee should be reimbursed for expenses that he never paid where trust provision provided that "Trustee shall be entitled to *reimbursement out of the trust* estate for all reasonable costs and expenses, including attorneys' fees, *incurred* in resisting such suit"); *United States v. Upton*, 91 F.3d 677, 682 n.8 (5th Cir. 1996) (dealing with whether  Federal Acquisition Regulation governing reimbursement of bond premiums was "ambiguous" where defendants were convicted of making false statements to Air Force for reimbursement of bond premiums, and applying dictionary definition of "reimbursement," finding "sufficient evidence exists upon which a rational trier of fact could have found that appellants never planned on cashing these checks and that their "good faith" misunderstanding of the Federal Acquisition Regulation was, in reality, a scheme to defraud the government"); *Millgard Corp. v. McKee/Mays*, 49 F.3d 1070, 1073 (5th Cir. 1995) ("It is a maxim of interpretation that when two provisions of a contract conflict, the specific trumps the general"); *Tolar v. Allstate Tex. Lloyd's Co.*, 772 F. Supp. 2d 825, 830 (N.D. Tex. 2011) (noting that "[t]he

38

policy should be considered as a whole so as to give each part effect and avoid rendering any portion superfluous"); *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983) (reversing lower court's grant of summary judgment where conflicts in various provisions of agreement "creates an ambiguity as to the intent of the parties").

If, as the Advisors contend, "Actual Cost" means the "actual costs and expenses" of the Dual Employees, then other relevant provisions of the PRAs—including Sections 2.02 and 4.02—would be meaningless.  And as discussed above, calculating each Dual Employees' "actual costs" was not even feasible. *See* R.2565-2566 at 84:16-85:25; R.3009-3010 at 105:6-106:19.  The Bankruptcy Court's finding that the PRAs unambiguously require fixed-fee monthly payments in exchange for Highland's front-office services gave effect to the PRAs as a whole, harmonized each provision so as not to render others "meaningless," and is the only "reasonable" interpretation of the PRAs.  This finding is consistent with applicable Texas law, including the Advisors' cases, and should be affirmed.

> **2.** **The Advisors' Argument That the Bankruptcy Court Improperly Relied on Parol Evidence Is Waived and Otherwise Without Merit**

The Advisors contend that the Bankruptcy Court improperly considered "extraneous evidence" when determining the meaning of "Actual Cost." *See* Br. at 25.  The Advisors are wrong—and they waived this argument in any event.

*First*, the Bankruptcy Court never looked beyond the four corners of the PRAs when concluding that the unambiguous terms required the Advisors to pay flat monthly fees until the parties agreed otherwise in writing.  R.304-307. Instead, the Bankruptcy Court properly considered extrinsic evidence only as part of its alternative holding that ***assumed an ambiguity existed***. *Id*. at 44-46. *See Watkins*, 689 F.2d at 540 ("[E]ven if we were to construe the agreement to be ambiguous (so as to allow parol evidence to show not only the surrounding circumstances but also the intent of the parties)…").  In any event, the parol evidence rule did not bar the bankruptcy court from considering the "surrounding circumstances" to aid in the construction of an unambiguous contract. *See URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 765 (Tex. 2018) ("The parol evidence rule does not … prohibit courts from considering extrinsic evidence of the facts and circumstances surrounding the contract's execution as "an aid in the construction of the contract's language," as long as that evidence "give[s] the words of a contract a meaning consistent with that to which they are reasonably susceptible"); *Watkins*, 689 F.2d at 540 ("The express language of the agreement-in the light of this circumstance (known to both parties who confected the agreement) … -in our opinion is susceptible … of only one reasonable (and thus unambiguous) meaning").  The Bankruptcy Court did not consider extrinsic evidence to contradict or vary the terms of the PRAs, but instead

40

to give context to the PRAs consistent with that to which they were already reasonably susceptible.

*Second*, assuming, *arguendo*, that the Bankruptcy Court considered extrinsic evidence, the Advisors failed to preserve this issue for appeal because *the "extrinsic evidence" was admitted into the record without objection*. *See* R.275-298; R.307-308 (citing evidence); R.2909-2910 at 5:14-6:20 (admitting all of Highland's exhibits into evidence without objection).[30]  *See FDIC v. Mijalis*, 15 F.3d 1314, 1326-27 (5th Cir. 1994) ("If a litigant desires to preserve an argument for appeal, the litigant must press and not merely intimate the argument during the proceedings before the district court"); *United States v. Bates*, 240 F.3d 1073 (5th Cir. 2000) ("[W]hen a party fails to contemporaneously object to the admissibility of evidence at trial, we apply the plain error standard of review"); *Washington v. Thaler*, CIV. A. H-09-3937, 2011 WL 1157451, at *4 (S.D. Tex. Mar. 28, 2011) (same); *Opelousas Gen. Hosp. Auth. v. FairPay Sols., Inc.*, 655 F.3d 358, 361 (5th Cir. 2011) (same).

*Finally*, the Advisors also waived this issue by failing to adequately brief it. *See* FED. R. APP. P. 28(a)(8) (briefs must include "contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant

---

[30] The Advisors elicited their own extrinsic evidence in an effort to establish their interpretation of the PRAs.  *See, e.g.*, R.2609-2617 at 128:2-136:11 (Advisors' examination of Waterhouse concerning his understanding of how actual costs relates to "headcount" of Dual Employees).

41

relies" and "a concise statement of the applicable standard of review"); *United States v. Lindell,* 881 F.2d 1313, 1325 (5th Cir. 1989) (a party waives an argument that it inadequately briefed). The Advisors raise the "parol evidence" issue in their "Statement of Issues" (Br. at 2), and in one short, conclusory paragraph devoid of any evidentiary, factual, or legal analysis (*see id.* at 25). This constitutes inadequate briefing and waiver of the issue. *See Sandifer v. Gusman*, 637 F. App'x 117, 120 (5th Cir. 2015) (appellate issue deemed waived because not adequately briefed); *United States v. Scroggins*, 599 F.3d 433, 447 (5th Cir. 2010) (appellant failed to preserve issue for appeal where "issue appears as an afterthought); *Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 190 (5th Cir. 2007) (same); *Coury v. Moss*, 529 F.3d 579, 587 (5th Cir. 2008) (same).

The Advisors' argument that the Bankruptcy Court improperly considered "extrinsic evidence" should be rejected.

### 3.   The Bankruptcy Court Properly Found That Highland Had No Obligation to Unilaterally Modify the PRAs on the Advisors' Behalf

The Advisors' contention that Highland was obligated to unilaterally modify the PRAs on the Advisors' behalf as each Dual Employee was terminated and failed to do so (*see* Br. at 31-35) is likewise meritless.

As the Bankruptcy Court correctly found, the unambiguous terms of the PRAs imposed no such obligation on Highland. Rather, Section 2.02 provides that the "Parties may agree to modify the terms" and Section 4.02 grants either "Party" the

42

right to request modification in certain circumstances. Neither Section imposes any obligation solely on Highland; "Party" refers to either party to the contract. R.421; R.432.[31] Nor does this argument make any sense, given that:

- Highland and the Advisors knew how to write a variable rate contract that required Highland to disclose changes in actual costs, because *that is exactly what the HCMFA SSA and the Original NexPoint SSA required*;

- When the Agreements were executed, the parties were not independent actors but instead were under the common control of Dondero, with people like Waterhouse and Thedford serving as agents for all of them;

- The indisputable evidence (*e.g.*, Monthly Headcount Reports distributed to the Advisors' officers) proves that the Advisors had contemporaneous knowledge of the Dual Employees' status, and the PRAs gave all of the parties the right to seek modification; and

- Despite knowing when each Dual Employee left Highland's employ, the Advisors never demanded that Highland adjust the monthly amounts at any time before November 30, 2020, when Highland gave written notice of termination.

Nevertheless, the Advisors rely on Dondero's and Norris' conclusory and unsubstantiated testimony that Highland was responsible for administering the PRAs (Br. at 31 (citing R.2652 at 10:4-11)), and suggest that only Highland "had access to" critical data. *Id.* at 32-33 (citing R.2743 at 101:11-14); *see also id.* at 32 (citing to the services Highland provided under the SSAs).

---

[31] By contrast, other provisions of the PRA specify "HCMLP" when assigning obligations solely to Highland. *See, e.g.,* R.421 (specifying in Section 4.03 that "HCMLP will collect such Tax from NexPoint…").

This argument does not pass the straight-face test for many reasons, including that Waterhouse (a) signed the PRAs on behalf of all parties; and (b) at all times (i) served as an officer of all parties; (ii) had access to all information concerning the Dual Employees (including hiring, termination, and compensation) as Highland's CFO; (iii) approved every payment by the Advisors under the Agreements, and (iv) as Dondero testified, was the Advisors' fiduciary responsible for administering the Agreements in accordance with its terms. R.2647-2650 at 5:10-8:17.   Indeed, Waterhouse candidly admitted that he was "ultimately responsible for making sure the [A]dvisors pay the proper amounts due under the [Agreements]." R.2550 at 69:13-25; R.2549-2551 at 68:21-70:5.

The Advisors ignore these facts and instead improperly attempt to introduce extrinsic evidence to vary or add to the terms of PRAs.  *See Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 483 (Tex. 2019) ("The parol evidence rule bars consideration of evidence that contradicts, varies, or adds to the terms of an unambiguous written agreement"); *URI, Inc.*, 543 S.W.3d at 769 (same). The Advisors' attempt to alter the terms of the unambiguous PRAs should be rejected, and the Bankruptcy Court's finding should be affirmed.

### 4. <u>The Bankruptcy Court's Finding That the Advisors Never Sought to Modify the PRAs Is Not Clearly Erroneous</u>

The Advisors argue that even if Highland was not required to unilaterally modify the PRAs on behalf of the Advisors, the Bankruptcy Court's factual finding

that the Advisors never notified Highland of its request to modify the PRAs is clearly erroneous. Br. at 35-38.  This argument likewise fails.

In support of their argument that they "raised the overpayment issue with the Debtor multiple times," the Advisors rely on Waterhouse's unsupported testimony that he raised the issue of "overpayments" with Caruso at the end of 2019, but that Caruso advised that "nothing could be done due to the automatic stay." Br. at 35 (citing to R.2564-2565 at 83:25-84:5, R.2588 at 107:4-11; R.2591 at 110:9-13).  As the Bankruptcy Court properly determined, no "compelling evidence" corroborated Waterhouse's statements.  This determination was based on the Bankruptcy Court's ample factual findings and credibility determinations, including that, *inter alia*, Waterhouse had a "poor memory" of the details of his alleged conversation with Caruso, there was no documentation of his alleged discussion with Caruso (or any subsequent discussion on this issue), (R.301), and Waterhouse never told Dondero or any of the Advisors' officers of the alleged "overpayments." *Id.* Most importantly—and dispositive of the issue—**Waterhouse admitted that he never discussed amending the Agreements with Caruso**. R. 301; R.2590-2591 at 109:18-110:4. As the Bankruptcy Court found, "based on the testimony of Mr. Waterhouse," the Advisors "never made a request to modify the payments under the PRAs during the relevant period before payments were withheld in November 2020." R.301-302.

45

The Advisors also point to December 2020 emails from (a) Norris to Klos in which he addressed the "change in headcount" of Dual Employees, (Br. at 35-36) (citing to R.2447-2449), and (b) from the Advisors to Seery stating that there were $5 million in overpayments, (*id.* at 36) (citing R.3133-3134 at 74:6-75:18). However, these self-serving communications were sent after Highland's Termination Notices were issued and a few weeks before the Advisors filed their Admin Claim.   The Advisors' contention that they "repeatedly brought the overpayment issue to the Debtor's attention," and that Highland failed to "negotiate in good faith" (Br. at 37), is, as the Bankruptcy Court determined, not supported by the record. By contrast, the overwhelming evidence in the record contradicts any notion that the Advisors ever sought modification of the PRAs during the 36-month relevant period.  The Advisors knew of each employee's departure and continued to knowingly pay fixed monthly amounts under the PRAs in the same fashion for 36 months straight.  The Advisors cannot come close to meeting the high "clear error" threshold, and the Bankruptcy Court's finding that the Advisors never sought modification of the PRAs should be affirmed as not clearly erroneous.

### C.    **The Bankruptcy Court's Finding That Highland Did Not Breach the SSAs Is Not Clearly Erroneous**

The Advisors contend that the Bankruptcy Court's finding that they failed to meet their burden that Highland breached the SSAs is clearly erroneous. *See* Br. at 38-42.  The Advisors are wrong.

46

In general, the Advisors complain that the Bankruptcy Court "ignored" their "conclusive" evidence that Highland was ordered "not to provide services to the Advisors if those service[s] could adversely impact the estate." Br. at 38-39.[32] The Advisors' evidence is not only insufficient to prove that Highland breached the SSAs, but—more fundamentally—it represents a disingenuous attempt to re-write history.

The indisputable facts show there was no breach.  Instead, in the latter half of 2020, Seery, the Advisors, and the Retail Board transparently, cooperatively, and responsibly addressed potential conflicts (only one of which ever actually arose) by *transferring a compliance officer from Highland to the Advisors and reducing the amounts charged for compliance services*:

- In July 2020, the Bankruptcy Court reminded Seery to be aware of conflicts among employees wearing "multiple hats" (R.3113-15 at 54:5-56:25];

- Seery took the Court's comments seriously and instructed Highland's employees to notify him of all potential conflicts, (*id.*);

- On August 13, Seery informed the Retail Board that a "potential conflict of interest" arose with respect to one investment (*i.e.*, OmniMax) as a result of a "divergence of investment objectives" (R.1742);

---

[32] The notion that Highland—a debtor in bankruptcy—had a contractual obligation to provide services "adverse" or "inimical" to its own interests (Br. at 13; 39) is facially absurd and requires an illogical construction of the SSAs. *See Sojitz Energy Venture, Inc. v. Union Oil Co.*, 394 F. Supp. 3d 687, 701 (S.D. Tex. 2019) ("We will not construe contracts to produce an absurd result when a reasonable alternative construction exists.").

47

- In mid-September, Seery discussed with the Retail Board "the process for addressing any conflicts of interest" and a "robust discussion" followed where "OmniMax" was identified as the recent transaction that presented conflict issues(R.1750, 1755); and

- On October 13, Ellington informed the Retail Board of "the Advisers' continued analysis of potential conflicts of interest for employees of HCMLP that provided services to the Advisors and the Funds" (R.1763).

At around the same time, with the chances of a global settlement with Dondero diminishing and in order to address any further conflict issues, the Advisors asked Seery to allow Jason Post to transfer from Highland (where he simultaneously served as the Advisors' Chief Compliance Officer) to NexPoint. Seery agreed. R.3116-2117 at 57:17-58:14. Brian Collins, Highland's Director of Human Resources, informed the Retail Board of this arrangement at the next Retail Board Meeting:

> In order to assist with any potential conflict of interests, Jason Post, the Funds' COO, became an employee of NexPoint on October 14, 2020. He noted that Mr. Post, while formerly an HCMLP employee, had only been performing work for the Funds.

R.1770.

No other conflicts ever arose,[33] and—dispositive of the Advisors' breach of contract claim—Highland promptly reduced its monthly fee for compliance services

---

[33] *See, e.g.*, R.1782 ("Norris noted that there have been no issues with an HCMLP employee being conflicted out since the last update").

from $97,294 to $70,102 (*i.e.*, a reduction of $27,192 per month, or $326,304 annualized) on account of Post's transfer.[34]

The Bankruptcy Court got it exactly right. As the Retail Board Minutes conclusively establish, the Advisors repeatedly confirmed that Highland was complying with the "shared services arrangement," and the only issue that ever arose—potential conflicts—was addressed consensually.[35]

### D. The Bankruptcy Court Properly Found That the Advisors Waived Their Claims Under the Agreements

The Advisors maintain that, the Bankruptcy Court erred in finding that they waived their claims. *See* Br. at 42-44. In support thereof, the Advisors primarily rely on the PRA's "non-waiver" provision. *See* R.422; R.433 (Section 6.02 of the PRAs). The Bankruptcy Court's finding that, even if they had valid claims under the Agreements, the Advisors' conduct constituted waiver, should be affirmed.

"Under Texas case law, waiver is the intentional relinquishment of a known right or the intentional conduct inconsistent with claiming that right." *Sedona Contr.,*

---

[34] *Compare* R.2252, 2254-62 (monthly invoices under HCMFA SSA (the "variable" contract) from December 2019 through October 2020 showing compliance service fee of $97,294) *with* R.2253, 2263-4 (monthly invoices from November 2020 through January 2021 showing reduced compliance service fee of $70,102).

[35] The Advisors also contend that the "conflict issues" caused them to hire an in-house attorney. But in contrast to the compliance matters, there is no evidence that (a) Highland ever refused to provide any specific legal services on conflict grounds, or (b) any "legal conflict" ever arose. There simply is no evidence of breach in this regard. But even if there was, any breach was immaterial. R.2252-2264 (showing *de minimus* monthly charge of $10,500 for legal services, or about 3% of the total monthly charge of approximately $300,000).

49

*Inc. v. Ford, Powell & Carson, Inc.*, 995 S.W.2d 192, 195 (Tex. App. 1999). The elements of waiver include: (1) an existing right, benefit, or advantage held by a party; (2) the party's actual or constructive knowledge of its existence; and (3) the party's actual intent to relinquish the right or intentional conduct inconsistent with the right (which can be inferred from the conduct). *Id.*

Under Texas law, non-waiver provisions can be waived. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 484 (Tex. 2017)); *EWB-I, LLC v. PlazAmericas Mall Tex., LLC*, 527 S.W.3d 447, 467 (Tex. App. 2017); *Bott v. J.F. Shea Co.*, 388 F.3d 530, 534 (5th Cir. 2004); *Musgrove v. Westridge St. Partners I, LLC***,** No. 2-07-281-CV, 2009 WL 976010, at *4 (Tex. App. April 9, 2009).

Here, as the Bankruptcy Court found, the Advisors engaged in "intentional conduct inconsistent" with their rights under Sections 2.02 and 4.02 of the PRA by continuing to make payments without requesting modification of the fixed monthly amounts from the time that the PRAs were signed until November 30, 2020, while simultaneously knowing of Dual Employees' departures. R.310-313.

The Advisors contend that the Bankruptcy Court "ignores" that under *Shields*, "nonwaiver provisions are binding and enforceable." Br. at 43 (citing *Shields*, 526 S.W.3d at 481). Here, however, the issue is not whether the non-waiver provision in the PRAs is "binding," but rather whether that provision is itself waivable and, if so, whether the Advisors' conduct constituted waiver. *Shields* holds that while non-

50

waiver provisions are generally enforceable, "a party's rights under a nonwaiver provision may indeed be waived expressly or impliedly," *id.* at 483-84, by "intentionally engag[ing] in conduct inconsistent with claiming the right to enforce the non-waiver agreement," *id.* at 485.  In *Shields*, the court held that the landlord's acceptance of late payments did not waive a non-waiver provision, since the non-waiver provision's plain terms explicitly permitted the landlord to rely on the contractual non-waiver clause and accept late rental payments without waiving its right to enforce the lease as written.  The court reasoned that "engaging in the very conduct disclaimed as a basis for waiver is insufficient as a matter of law to nullify the non-waiver provision in the parties' lease agreement." *Id.* at 484-85.

The PRAs' non-waiver provision is not nearly as specific as that in *Shields*. It does not "prevent waiver through conduct the parties explicitly agree will never give rise to waiver," but instead provides generally that "[n]o failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof…." R.422; R.433.   In other words, as the Bankruptcy Court explained, "[n]othing in the general non-waiver provisions in the PRAs provided any specificity as to the above actions or nonactions of the Advisors regarding amendment to the PRAs that would prevent waiver." R.313. The Bankruptcy Court's finding that, even if they had valid claims of overpayments, the Advisors' waiver was therefore not foreclosed by *Shields*.

51

*In re United Services Automobile Association*, No. 03-19-00292-CV, 2020 WL 7640145, at *2 (Tex. App. Dec. 23, 2020), is also distinguishable.  There, the court found that an insurance company did not waive its right to invoke an appraisal process where it simply delayed invoking the appraisal provision under the policy, and such delay was not inconsistent with the non-waiver provision.  Here, the Advisors did not simply "delay" in invoking their rights to modify the PRAs.  Rather, ***they made flat fee payments under the PRAs for 35 consecutive months while knowing of the status of every Dual Employee***. The Advisors did not just sit on their hands; rather, they took affirmative, informed steps to pay Highland each month and even executed the PRA Amendments to *increase* their payments to Highland. R.427-429; R.438-440. This affirmative conduct was plainly inconsistent with the general non-waiver provision in the PRAs.

The Bankruptcy Court also correctly found the Advisors' waived any claims resulting from the payments under the SSAs. The Advisors continued authorizing payments to Highland without notifying Highland of any breach.  Further, the Advisors affirmatively validated Highland's performance under the "shared service arrangements" in their repeated and unqualified representations to the Retail Board. The Advisors' intentional conduct was inconsistent with asserting breach of contract claims.  The Advisors offer no basis to challenge the Bankruptcy Court's finding of waiver on the SSAs other than their conclusory assertion that it contained the non-

52

waiver provision, (*see* R.392) (Section 8.07 general non-waiver provision), and "the Bankruptcy Court had admonished the Debtor's in-house counsel not to assist the Advisors in this regard." (Br. at 42).

The Bankruptcy Court's finding that the Advisors waived any claims under the Agreements should be affirmed.

### E.    The Bankruptcy Court Properly Found That the Advisors Breached the SSAs by Failing to Pay Highland Amounts Due And Owing

The Advisors argue that Highland should not be entitled to recover for its breach of contract claim against the Advisors because "Highland breached [the Agreements.]" Br. at 46. The Bankruptcy Court's finding that Highland met its burden of proving its breach of contract claims is not clear error.

***First***, the validity of the Agreements is undisputed.  R.320. ***Second***, for the reasons set forth above and in the Order, the Bankruptcy Court did not clearly and erroneously conclude that Highland performed—and did not breach—its obligations under the Agreements. ***Third***, there is no dispute that, at Dondero's instruction, the Advisors failed to make any payments in December 2020 and January 2021 (and, in the case of the HCMFA SSA, November 2020) in breach of the Agreements. ***Finally***, Highland's damages are "present and easily calculable." *Id.*

The Advisors' contention that Highland is not entitled to recover on its breach of contract claims is without merit.  The Bankruptcy Court's ruling on this issue should be affirmed as not clearly erroneous.

# V.   **CONCLUSION**

For foregoing reasons, Appellee respectfully requests that this Court affirm the Bankruptcy Court's Order.

Date:  March 15, 2023

**HAYWARD PLLC**

*/s/ Zachery Z Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
E-mail:     MHayward@HaywardFirm.com
                 ZAnnable@HaywardFirm.com

-and-

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
John Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:     jpomerantz@pszjlaw.com
                 jmorris@pszjlaw.com
                 gdemo@pszjlaw.com
                 hwinograd@pszjlaw.com

*Counsel for the Appellee*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Federal Rule of Bankruptcy Procedure 8015 because, including footnotes and excluding the parts of the document exempted by Rule 8015(g), this document contains 12,693 words.

*/s/ Zachery Z. Annable*
Attorney for Appellee
Dated: March 15, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2023, the foregoing Brief of Appellee was electronically filed using the appellate CM/ECF system.  I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished via CM/ECF.

*/s/ Zachery Z. Annable*
Attorney for Appellee

DOCS_NY:47167.23 36027/003